# EXHIBIT B

555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Tel: +1.202.637.2200  Fax: +1.202.637.2201
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tel Aviv |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

# LATHAM & WATKINS LLP

September 3, 2025

**VIA COURIER AND ELECTRONIC MAIL**

Douglas J. Burgum
Secretary of the Interior
U.S. Department of Interior
1849 C Street, NW
Washington, DC 20240

Matthew Giacona
Acting Director
Bureau of Ocean Energy Management
1849 C Street, NW
Washington, DC 20240

Kenneth Stevens
Principal Deputy Director
Bureau of Safety and Environmental Enforcement
1849 C Street, NW
Washington, DC 20240

Pamela Bondi, Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Office of Governor Ned Lamont
State Capitol
210 Capitol Avenue
Hartford, CT 06106

Office of Governor Dan McKee
82 Smith Street
Providence, RI 02903

Re:   **Outer Continental Shelf Lands Act ("OCSLA") Notice of Intent to Sue for Violations of OCSLA Relating to Revolution Wind, LLC**

Dear Secretary Burgum, Attorney General Bondi, Acting Director Giacona, Principal Deputy Director Stevens, Governor Lamont, and Governor McKee:

On behalf of Revolution Wind, LLC ("Revolution Wind"), this letter hereby provides notice of Revolution Wind's intent to sue the United States Department of the Interior ("Interior"); Doug Burgum, in the official capacity as Secretary of the Interior; Matthew Giacona, in the official capacity as the Acting Director of the Bureau of Ocean Energy Management ("BOEM"); BOEM; Kenneth Stevens, in the official capacity as the Principal Deputy Director Exercising the Delegated Authorities of the Director of the Bureau of Safety and Environmental Enforcement ("BSEE"); and BSEE (collectively, the "Federal Actors"), challenging the Stop Work Order issued by BOEM to Revolution Wind on August 22, 2025 for violations of the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331-1356c; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706; and the United States Constitution. This letter constitutes a notice of violation and intent to file suit ("Notice Letter") pursuant to Section 23(a) of OCSLA, 43 U.S.C. § 1349(a), to the extent necessary and in order to

**LATHAM&WATKINS**LLP

protect Revolution Wind's significant interests, unless the Stop Work Order is immediately withdrawn.[1]  Section 1349(a)(3) allows an action to be brought in court immediately after notification of the alleged violation in any case in which the alleged violation "would immediately affect a legal interest of the plaintiff."  As explained in Section III below, to the extent this Notice is required prior to filing suit, that exception applies here, as Federal Actors' conduct is in effect and the Stop Work Order has immediately and adversely affected Revolution Wind's legal interests.

### I. FACTUAL BACKGROUND

#### A. The Project and Its Extensive Review and Approval Process

The Revolution Wind Farm and Revolution Wind Export Cable (collectively, the "Project") constitute a 704-megawatt ("MW") commercial-scale wind energy facility under construction in federal waters on the U.S. Outer Continental Shelf ("OCS"), 15 miles off the coast of Rhode Island and 15 miles east of Long Island, New York.  The Project is planned to include 65 wind turbine generators ("WTGs") and to deliver enough electricity to provide energy security to over 350,000 homes in Rhode Island and Connecticut using domestic resources.

Construction of the Project is approximately 80% complete.  Among other things, at the time the Stop Work Order was issued, all of the Project's monopile foundations for the WTGs were installed on the ocean floor, and 70% of the WTGs themselves were fully installed.

Over the course of more than nine years, the Project has undergone an exhaustive federal and state review process to study and approve its potential environmental, public safety, and national security impacts.  This review process has led to the issuance of more than 20 federal and state permits and approvals for the Project.

To date, Revolution Wind has incurred substantial financial obligations developing, permitting, engineering, procuring, fabricating, preparing for, and commencing construction of the Project.  Revolution Wind has spent or committed more than $5 billion to date for the development and construction of the Project, and will further incur more than $1 billion in breakaway costs if the Project is cancelled.

#### B. The Stop Work Order

On August 22, 2025, Acting Director Giacona of BOEM issued a "Director's Order" (the "Stop Work Order") to Revolution Wind, directing it to "halt all ongoing activities related to the Revolution Wind Project on the outer continental shelf (OCS) to allow time for [BOEM] to

---

[1] Some courts have held that OCSLA's citizen-suit provision is inapplicable to lessees, such as Revolution Wind.  *See, e.g.*, *Murphy Exploration & Production Co. v. U.S. Dep't of the Interior*, 167 F. Supp. 2d 1 (D.D.C. 2000), rev'd on other grounds, *Murphy Exploration & Prod. Co. v. U.S. Dep't of the Interior*, 252 F.3d 473 (D.C. Cir. 2001).  Either way, Revolution Wind is entitled to relief under the APA and the Due Process Clause of the Fifth Amendment.

address concerns that have arisen during the review that the Department is undertaking pursuant to the President's Memorandum of January 20, 2025. 90 Fed. Reg. 8363 (January 29, 2025)."

The Stop Work Order cited no violations by Revolution Wind. BSEE did not issue any cessation order prior to BOEM issuing the Stop Work Order. The Stop Work Order does not purport to be a "suspension" or "cancellation" of Revolution Wind's OCS lease, the Project or its permits or approvals pursuant to OCSLA or its implementing regulations, and it invokes no legal source authorizing its directive to stop Project-related activities.

## II.  BOEM AND OTHER FEDERAL ACTORS HAVE VIOLATED OCSLA, THE ADMINISTRATIVE PROCEDURE ACT, AND THE U.S. CONSTIUTION

The Stop Work Order violates OCSLA, the APA, and the U.S. Constitution because it is arbitrary and capricious and contrary to law, as well as being issued without observance of procedure as required by law.

### A.  The Stop Work Order Is Arbitrary and Capricious

Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A). Interior's Stop Work Order, issued without sufficiently explaining or justifying the basis for its issuance and without notice or an opportunity to be heard is arbitrary and capricious and impermissible under the APA, which requires an agency to "articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Not only did Interior not provide a sufficient explanation for issuing the Stop Work Order, Interior provided *no explanation* for its decision beyond a conclusory assertion of unsubstantiated "concerns" about national security and interference with other reasonable uses of the OCS. That alone falls short of the required "satisfactory explanation," because it is no explanation at all.

The Stop Work Order also violated the "change-in-position doctrine." The "change-in-position doctrine provides that agencies may only change their existing policies if they "provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *FDA v. Wages and White Lion Investments, LLC*, 145 S. Ct. 898, 917 (2025). Federal Actors have already spent years reviewing and considering all aspects of the Project, including national security and potential for interference with other uses of the OCS, and documented it in the approvals for the Project.

Indeed, Federal Actors have consistently defended the soundness of the review process and approvals for the Project in ongoing litigation. *See Green Oceans v. U.S. Dep't of the Interior*, No. 1:24-cv-00141-RCL (D.D.C. filed Jan. 16, 2024). Interior's Stop Work Order suggests a complete reversal of the agency's prior conclusion that the Project complied with federal law. Federal Actors have not provided any reasoned explanation for the change in position, shown awareness of their change in position, or taken reliance interests into account.

The Stop Work Order also "entirely failed to consider an important aspect of the problem," because it did not consider Revolution Wind's reliance interests. *State Farm*, 463

**LATHAM&WATKINS**LLP

U.S. at 43. When an agency "changes course," as Interior did here, it must consider whether its prior actions "engendered serious reliance interests" and take those interests into account. *Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020).

Revolution Wind has spent or committed more than $5 billion to date to plan, permit, develop, and construct this project. If the Project is cancelled, Revolution Wind will incur an additional $1 billion in breakaway costs, for a total of over $6 billion. In reliance on Federal Actors' approvals, Revolution Wind entered into contracts for union labor, the manufacture and transport of project components and for the leasing of vessels necessary to construct the Project. The Stop Work Order halting construction under Revolution Wind's Construction and Operations Plan approval could further harm Revolution Wind by resulting in liquidated damages under the Power Purchase Agreements ("PPAs") or, ultimately, in PPA termination, causing Revolution Wind to substantially lose its investments and expected future profits. Interior did not consider, or even acknowledge, the harm to Revolution Wind or Revolution Wind's substantial and legitimate reliance interests in issuing its Stop Work Order. This alone is sufficient to render the Order arbitrary and capricious.

An agency's action is also arbitrary and capricious when it "offer[s] an explanation for its decision that runs counter to the evidence before the agency." *Evergreen Shipping Agency Am. Corp. v. Fed. Maritime Comm'n*, 106 F.4th 1113, 1117 (D.C. Cir. 2024). To the extent that the Stop Work Order provides an explanation at all, it references vague purported "concerns that have arisen" about "protection of national security interests and prevention of interference with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas." But BOEM engaged in an extensive notice-and-comment process, consulted with the Department of the Defense, and ultimately concluded that the Project was consistent with national security interests and other reasonable uses of the OCS, issuing the Record of Decision, Construction and Operations Plan approval and Conditions of Approval. Moreover, the Department of Defense consulted on the Project and entered into an agreement with the Project to address any potential for national security concerns. Indeed, the Department of Defense concluded that the Project "would not have adverse impacts to DoD missions in the area." The Stop Work Order is contrary to the robust record supporting the Project approvals. Having presented no substantive evidence for a change in position since these approvals were issued, the Stop Work Order is unlawful.

Interior's Stop Work Order is also arbitrary and capricious because it appears that political pressure may have influenced the decision in a manner not dictated by the relevant statutes and regulations. *See Connecticut v. U.S. Dep't of the Interior*, 363 F. Supp. 3d 45, 63 (D.D.C. 2019). Interior's years-long environmental and safety review process spanning three presidential administrations concluded that Revolution Wind's Project should be permitted to go forward under all statutory and regulatory review requirements. Statements by certain members of the Administration and Members of Congress indicate a political basis for reversal,

inconsistent with the statutory and regulatory factors that Congress provided for it to consider, rendering it arbitrary and capricious.[2]

### B.    The Stop Work Order Is Contrary to Law

Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Here, BOEM has identified no statutory authority allowing it to issue the Stop Work Order and halt activities on the Project despite the Lease and full approvals already received.

OCSLA provides that the OCS as a "vital national resource reserve" that "should be made available for expeditious and orderly development." 43 U.S.C. § 1332(3). To effectuate this "expeditious and orderly development," Congress amended OCSLA in 2005 to expand its reach to include advances in renewable energy, authorizing the Secretary of the Interior to grant leases to "produce or support production, transportation, or transmission of energy for sources other than oil and gas," including offshore wind. 43 U.S.C. § 1337(p)(1)(C); Pub. L. No. 109-58, 119 Stat. 594, 746. By providing for domestic offshore wind development, Congress sought to "enhance the energy security of the United States," to "reduce dependence on foreign sources of fuel," S. Rept. No. 109-78, at 1 (2005), and to "ensure jobs for our future with secure, affordable, and reliable energy," H.R. Rept. No. 109-90, at 1 (2005).

The Stop Work Order invokes OCSLA and its implementing regulations—specifically, 43 U.S.C. § 1337(p)(4) and 30 C.F.R. § 585.102(a)—to justify its mandate to "halt all ongoing activities." 43 U.S.C. § 1337(p)(4) provides that "[t]he Secretary shall ensure that any activity under this subsection," generally covering the required procedures for granting offshore leases, "is carried out in a manner that provides for"— "safety", "protection of the environment," "public notice and comment" on proposed leases, and "protection of national security interests," among other things. 30 C.F.R. § 585.102(a) similarly states that BOEM "will ensure that any activities authorized in this part are carried out in a manner that provides for and reaches a rational balance among the following goals to the extent they conflict or are otherwise in tension, none of which inherently outweighs or supplants any other."

Neither 43 U.S.C. § 1337(p)(4) nor 30 C.F.R. § 585.102(a) grants authority to order a cessation of activities on an already established leasehold for reasons of national security or otherwise.[3] No other provision in OCSLA or its implementing regulations authorizes BOEM to

---

[2] The Stop Work Order is also arbitrary and capricious because it treats Revolution Wind inconsistent with other energy development on the OCS, like oil and gas or critical minerals projects for which Interior has announced expediting review and approval procedures. The Stop Work Order offers no justification for treating Revolution Wind differently than these projects.

[3] Any claim that 43 U.S.C. § 1337(p)(4) grants such authority must be viewed with "skepticism" under the major questions doctrine. *See West Virginia v. EPA*, 597 U.S. 697, 732 (2022).

**LATHAM&WATKINS**LLP

order an immediate stop work order in the circumstances presented here. *See* 43 U.S.C. § 1341. Interior's action is contrary to law in violation of the APA.

### C. The Stop Work Order Violates the Procedures Set Forth in OCSLA Regulations

Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(D). BOEM was thus bound to follow the procedures set forth in its own regulations in issuing the Stop Work Order. *U.S. Int'l Trade Comm'n v. ASAT, Inc.*, 411 F.3d 245, 254 (D.C. Cir. 2005). It failed to do so.

BOEM's regulation at 30 C.F.R. § 585.105(h) purports to require lessees to "conduct all activities authorized by the lease . . . in a manner consistent with the provisions of [43 U.S.C. § 1337(p)]" of OCSLA. 30 C.F.R. § 585.106, in turn, lays out the procedure that BOEM must follow if there is a suspected violation of 30 C.F.R. § 585.105(h). Specifically, BOEM must issue "a notice of noncompliance" that tells the lessee "how [it] failed to comply with this part, any order of the Director and/or the provisions of [its] lease, grant or other approval, and will specify what [it] must do to correct the noncompliance and the time limits within which [it] must act." 30 C.F.R. § 585.106(b)-(c).

BOEM's regulations provide that "failure of a lessee, operator, or grant holder to take the actions specified in a notice of noncompliance . . . within the time limit specified provides the basis for issuance of a cessation order by BSEE, as provided in 30 CFR 285.401 and/or cancellation of the lease or grant by the Secretary as provided in § 585.422." *Id.* at § 585.106(d). Section 285.401 makes clear that such "[a] cessation order will set forth what measures [the lessee is] required to take, including reports [it is] required to prepare and submit to BSEE, to receive approval to resume activities" on a lease. *Id.* § 285.401(b).

BOEM failed to follow these procedures. The Stop Work Order cites 43 U.S.C. § 1337(p)(4) and 30 C.F.R. § 585.102(a), but those provisions do not give BOEM authority to issue the Stop Work Order. BOEM thus issued the Stop Work Order without the procedure required by law in violation of the APA.[4]

### D. The Stop Work Order Violates the Fifth Amendment

Finally, under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). BOEM's Stop Work Order is

---

[4] BOEM also did not purport to act in the Stop Work Order pursuant to the authority or provisions of the lease that set forth specific obligations on the agency when suspending a lease for national security reasons, further underscoring BOEM's failure to follow any required procedure.

**LATHAM&WATKINS**LLP

contrary to law because it deprives Revolution Wind of its property without due process of law, as required by the Fifth Amendment. U.S. Const., amend. V.

Leases convey property interests at common law, and a "leasehold interest is a property interest for purposes of the Fifth Amendment." *Turntable Fishery & Moorage Corp. v. U.S.*, 52 Fed. Cl. 256, 261 (Fed. Cl. 2002). Lessees pursuing energy development on lands leased by the Department of the Interior have "property rights in the . . . leases." *E.g.*, *Hoyl v. Babbitt*, 129 F.3d 1377 (10th Cir. 1997).

The Due Process Clause requires that "an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest." *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) (citations omitted) (emphasis in original). Even "temporary or partial impairments to property rights . . . merit due process protection." *Amoco Prod. Co. v. Fry*, 118 F.3d 812, 819 (D.C. Cir. 1997) (quoting *Connecticut v. Doehr*, 501 U.S. 1, 12 (1991)).

The Stop Work Order impairs Revolution Wind's ability to take advantage of its property interest in its leasehold by requiring Revolution Wind to "halt all ongoing activities" on the Project. Revolution Wind was not afforded any notice or hearing before impairment of its property interest. Accordingly, Revolution Wind was deprived of property without due process required by law.

### III. THE STOP WORK ORDER IMMEDIATELY AFFECTS A LEGAL INTEREST OF REVOLUTION WIND

OCSLA's citizen-suit provision provides that "[a]n action may be brought . . . immediately after notification of the alleged violation in any case in which the alleged violation constitutes an imminent threat to the public health or safety or would immediately affect a legal interest of the plaintiff." 43 U.S.C. § 1349(a)(3). The Stop Work Order is in effect and immediately and adversely affects the legal interests of Revolution Wind. Revolution Wind intends to bring suit imminently to protect its interests, unless the Stop Work Order is rescinded.

The Stop Work Order immediately impacts Revolution Wind's ability to conduct activities on its leasehold. As a result of the Stop Work Order, Revolution is currently facing a sudden, unplanned work stoppage that will necessarily generate cascading delays, substantially increase costs, and ultimately threaten Project viability. Revolution Wind has carefully sequenced its construction schedule to account for multiple time-of-year restrictions on construction to protect species and has contracted (and reserved for a limited time) specialized vessels necessary for the Project's construction. The Stop Work Order prevents Revolution Wind from meeting this schedule, delaying the overall Project timeline, increasing costs, causing workers not to be able to do their jobs, and undermining grid reliability, which can inhibit economic growth.

Delays are costly, regardless of whether the Project is ultimately cancelled. Revolution Wind will be forced to pay millions of dollars in vessel fees whether the specialized vessels are used or not. If the Project misses critical milestones, there is no guarantee that the necessary vessels will be available in time to maintain the viability of the Project. There will also be

**LATHAM&WATKINS**LLP

cascading effects for installation of Project components that interface with the offshore substation, such as array cables. Revolution Wind will also have to pay to store Project components set to be delivered while the Project is stalled. Such delay only increases costs, while the Project will be unable to generate revenue to offset those costs.

Delay of this nature could ultimately lead to the Project's cancellation. As noted above, each of Revolution Wind's PPAs include buyer termination rights if timelines are sufficiently delayed. If the Project is cancelled, Revolution Wind anticipates that it would cost an over $1 billion in breakaway costs. Additionally, Revolution Wind would forgo substantial revenues under the PPAs.

The longer the Stop Work Order remains in place, the more likely it is that the Stop Work Order will lead to the Project's termination. Overall, the delay caused by BOEM's Stop Work Order is already costing Revolution Wind millions of dollars per week. Defendants' Stop Work Order interferes with Revolution Wind's ability to carry out construction activities in the short term, and all operations in the longer term.

## IV. CONCLUSION

This Notice Letter sufficiently states Revolution Wind's grounds for filing suit, to the extent notice is required under 43 U.S.C. § 1349. Revolution Wind intends to imminently pursue an action in federal court pursuant to 43 U.S.C. § 1349(a)(3) and the APA seeking relief. In addition to the violations set forth above, this Notice Letter covers all violations of OCSLA and the APA by the Federal Actors that is evidenced by information that becomes available to Revolution Wind after the date hereof.

In addition to injunctive relief under OCSLA and the APA, Revolution Wind may seek all such other relief as is permitted by law. Section 23(a)(5) of OCSLA, 43 U.S.C. § 1349(a)(5), also permits prevailing parties to recover costs and fees of litigation.

Revolution Wind has retained me to represent it in this matter. Please direct all communications to:

Janice M. Schneider     janice.schneider@lw.com
Stacey VanBelleghem     stacey.vanbelleghem@lw.com
Latham & Watkins, LLP
555 Eleventh St NW, Suite 1000
Washington, D.C. 20004
(202) 637-2306

Sincerely,

Janice M. Schneider
LATHAM & WATKINS LLP

**LATHAM&WATKINS**LLP

      Pursuant to 28 U.S.C. § 1746 and 43 U.S.C. § 1349, I declare under penalty of perjury that the factual information in the foregoing is true and correct to the best of my knowledge.

Executed on September 3, 2025.

Providence, Rhode Island
United States of America

_____
Paul Murphy, Authorized Person
Revolution Wind, LLC

**LATHAM&WATKINS**LLP

## Service List

| | |
|---|---|
| Doug Burgum<br>Secretary of the Interior<br>1849 C Street, NW<br>Washington, DC 20240 | United States Department of the Interior<br>1849 C Street, NW<br>Washington, DC 20240 |
| Matthew Giacona<br>Acting Director<br>Bureau of Ocean Energy Management<br>1849 C Street NW<br>Washington, DC 20240 | Bureau of Ocean Energy Management<br>1849 C Street NW<br>Washington, DC 20240 |
| Kenneth Stevens<br>Principal Deputy Director<br>Bureau of Safety and Environmental Enforcement<br>1849 C Street, NW<br>Washington, DC 20240 | Bureau of Safety and Environmental Enforcement<br>1849 C Street, NW<br>Washington, DC 20240 |
| Pamela Bondi<br>U.S. Department of Justice<br>950 Pennsylvania Avenue NW<br>Washington DC 20530 | Office of Governor Ned Lamont<br>State Capitol<br>210 Capitol Avenue<br>Hartford, CT 06106 |
| Office of Governor Dan McKee<br>82 Smith Street<br>Providence, RI 02903 | William Tong<br>Attorney General, State of Connecticut<br>165 Capitol Avenue<br>Hartford, CT 06106 |
| Peter Neronha<br>Attorney General, State of Rhode Island<br>150 South Main Street<br>Providence, RI 02903 | |