**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

REVOLUTION WIND, LLC,

      *Plaintiff*,

    v.

DOUGLAS J. BURGUM, in his official capacity
as Secretary of the U.S. Department of the
Interior;

UNITED STATES DEPARTMENT OF THE
INTERIOR;

MATTHEW GIACONA, in his official capacity
as Acting Director of the Bureau of Ocean
Energy Management;

BUREAU OF OCEAN ENERGY
MANAGEMENT;

KENNETH STEVENS, in his official capacity as
Principal Deputy Director Exercising the
Delegated Authorities of the Director of the
Bureau of Safety and Environmental
Enforcement; and

BUREAU OF SAFETY AND
ENVIRONMENTAL ENFORCEMENT,

      *Defendants*.

Case No.: 1:25-cv-02999-RCL

<u>Expedited Hearing Requested</u>

<u>**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
AND STAY PENDING REVIEW**</u>

    Pursuant to Section 705 of the Administrative Procedure Act, Federal Rule of Civil

Procedure 65(a), and Local Civil Rule 65.1(c), Plaintiff Revolution Wind, LLC ("Revolution

Wind") hereby moves this Court for a stay pending review and a preliminary injunction of the

Department of the Interior Bureau of Ocean Energy Management's ("BOEM") August 22, 2025 Order "to halt all ongoing activities related to the Revolution Wind Project on the outer continental shelf (OCS)" (the "Stop Work Order").  *See* Compl., Ex. A, Dkt. 1-1.

The Revolution Wind Project is a 704-megawatt ("MW") commercial-scale offshore wind energy facility that will bring approximately 304 MW of domestic energy to Connecticut and approximately 400 MW to Rhode Island pursuant to five power purchase agreements that were awarded to Revolution Wind in competitive solicitations.  Over the past several years, Revolution Wind has received over 20 approvals from the relevant federal and state agencies—including from the Department of the Interior and BOEM.  In reliance on those approvals, Revolution Wind began construction on the Project in August 2023, and has spent or committed approximately $5 billion to date to plan, permit, develop, design, manufacture, and construct this Project.  At the time Revolution Wind received the Stop Work Order, the Project was 80% complete.  In other litigation pending before this Court, BOEM is currently defending the approvals for the Project, compiling and serving an administrative record with thousands of pages of information and analyses supporting those approvals.

The Stop Work Order violates the Outer Continental Shelf Lands Act, the Administrative Procedure Act, and the U.S. Constitution.  Revolution Wind is therefore likely to prevail on the merits of its challenge to the Stop Work Order.  As a result of Defendants' unlawful action, Revolution Wind now faces enterprise-level threats to the Project.  Defendants' unlawful action will irreparably harm Revolution Wind in the absence of preliminary injunctive relief **by September 22**.  The balance of the equities and the public interest strongly favor a stay of the Stop Work Order, so that construction can progress to completion.  Over 2,000 workers have been involved in the construction of the Project, which is also estimated to create hundreds of operations

and maintenance jobs that would be lost if the Project is cancelled.  And the Stop Work Order increases risks to New England grid reliability, potentially depriving Rhode Island and Connecticut of 704 MW of energy needed to power homes and accommodate expected growth in energy demand.

The Stop Work Order should therefore be stayed by this Court to preserve the *status quo* pending judicial review, *see* 5 U.S.C. § 705, and Defendants should be preliminarily enjoined under Federal Rule of Civil Procedure 65(a) from enforcing the Stop Work Order.

Revolution Wind has actively sought to resolve this matter with the Federal government since soon after the Stop Work Order was issued, including through letters and requests for meetings.  Finally, after none of these efforts bore fruit, on September 3, 2025, counsel for Revolution Wind submitted to Defendants a notice of intent to sue if the Stop Work Order was not immediately withdrawn.  *See* Compl., Ex. B, Dkt. 1-2.  Counsel for Revolution Wind requested a call that day prior to the need to file suit.  Defendants did not respond.  After filing suit on the morning of September 4, 2025, pursuant to Local Civil Rule 7(m), counsel for Revolution Wind again met and conferred with counsel at the Department of Justice regarding this motion for a preliminary injunction and stay of agency action.  Counsel for Defendants stated that they oppose a motion for preliminary injunctive relief regarding the Stop Work Order issued to Revolution Wind.

The grounds for this motion are fully set forth in Revolution Wind's accompanying Statement of Points and Authorities, and Declarations of Melanie Gearon and Paul Murphy and the Exhibits thereto.  A proposed order is attached.  For the reasons set forth in Revolution Wind's supporting documents, the Court should enter an Order granting the preliminary injunction and stay of the Stop Work Order.  Additionally, Revolution Wind respectfully requests an expedited

oral hearing pursuant to LCvR 65.1(d), given that Revolution Wind will face irreparable harm in the absence of immediate relief by September 22.

Dated:  September 5, 2025                      Respectfully submitted,


By */s/  Janice M. Schneider*
    Janice M. Schneider (D.C. Bar No. 472037)
    Stacey L. VanBelleghem (D.C. Bar No. 988144)
    Roman Martinez (D.C. Bar No. 1001100)
    Devin. M. O'Connor (D.C. Bar No. 1015632)
    Rachael L. Westmoreland* (D.C. Bar No. 90034032)
    LATHAM & WATKINS LLP
    555 11th Street NW, Suite 1000
    Washington, D.C. 20004
    Tel:  (202) 637-2200
    Fax:  (202) 637-2201
    Email: janice.schneider@lw.com
          stacey.vanbelleghem@lw.com
          roman.martinez@lw.com
          devin.o'connor@lw.com
          rachael.westmoreland@lw.com


*Counsel for Plaintiff Revolution Wind, LLC*

*\*Application for admission to the U.S. District Court for the District of Columbia pending*

## CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2025, I caused the foregoing Motion for Stay and Preliminary Injunction, including all documents associated therewith, to be filed electronically through the Court's CM/ECF system, which will serve a Notice of Electronic Filing upon all counsel of record.  Additionally, with prior consent, I electronically served a copy of these documents on Amanda Rudat and Kristofor Swanson, counsel for Defendants, via email.


*/s/  Janice M. Schneider*
Janice M. Schneider

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| REVOLUTION WIND, LLC, | |
| *Plaintiff*, | |
| v. | Case No.: 1:25-cv-02999-RCL |
| DOUGLAS J. BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior; | <u>Expedited Hearing Requested</u> |
| UNITED STATES DEPARTMENT OF THE INTERIOR; | |
| MATTHEW GIACONA, in his official capacity as Acting Director of the Bureau of Ocean Energy Management; | |
| BUREAU OF OCEAN ENERGY MANAGEMENT; | |
| KENNETH STEVENS, in his official capacity as Principal Deputy Director Exercising the Delegated Authorities of the Director of the Bureau of Safety and Environmental Enforcement; and | |
| BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT, | |
| *Defendants*. | |

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND STAY PENDING REVIEW**

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................4

    A.    The Project ...........................................................................................4
    B.    Outer Continental Shelf Lands Act .......................................................7
    C.    Multi-Year Environmental, National Security, and Safety Review Process ..........8
        1.    Wind Energy Area and COP Review.........................................8
        2.    Department of Defense, U.S. Coast Guard, and Federal Aviation Administration Review ........................................................10
        3.    Compliance with Other Federal Laws .......................................12
        4.    BOEM's COP Approval and Memorandum Documenting Compliance with OCSLA Section 1337(p)(4)...........................12
    D.    Defendants' Longstanding Defense of the Project's Approvals.............13
    E.    The Administration's Actions and the Stop Work Order .....................14

JUSTICIABILITY ...............................................................................................15

ARGUMENT ......................................................................................................18

I.    Revolution Wind is Likely to Succeed on the Merits .......................................18

    A.    BOEM's Stop Work Order Is Arbitrary and Capricious ......................19
        1.    The Stop Work Order Is Wholly Conclusory ............................19
        2.    BOEM Violated the Change-in-Position Doctrine and Ignored Substantial Reliance Interests ...............................................20
        3.    BOEM's Stop Work Order Contradicts the Evidence .............26
    B.    BOEM's Stop Work Order Is Contrary to Law ..................................28
    C.    BOEM's Stop Work Order Was Issued Without Observance of Procedure as Required by Law In Violation of 5 U.S.C. § 706 ..............................31
    D.    The Stop Work Order Deprives Revolution Wind of a Significant Property Interest Without Due Process.................................................32

II.    Revolution Wind Faces Irreparable Harm Absent Immediate Relief...............33

    A.    Revolution Wind Faces Substantial Irreparable Harm From Construction Delays Due To The Stop Work Order ...................................................34
    B.    Revolution Wind Faces Existential Threats to Its Business If The Stop Work Order Remains In Place .............................................................37
    C.    Revolution Wind Faces Substantial Irreparable Reputational Harm Due To The Stop Work Order...........................................................................39

III.    The Remaining Equitable Factors Strongly Favor Immediate Relief................40

i

      A.     Neither the Public Nor Defendants Will Suffer Harm from Preliminary
              Injunctive Relief...........................................................40

      B.     The Public Interest In Agencies Following Federal Law Weighs Strongly
              In Favor an Injunction.....................................................40

      C.     The Public Interest Strongly Favors Relief...........................................41

CONCLUSION...........................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ala. Ass'n of Realtors v. HHS*,
  594 U.S. 758 (2021)............................................................................................31, 38

*Amoco Prod. Co. v. Fry*,
  118 F.3d 812 (1997)...........................................................................................32, 33

*Atlas Air, Inc. v. Int'l Bhd. of Teamsters*,
  280 F. Supp. 3d 59 (D.D.C. 2017), *aff'd*, 928 F.3d 1102 (D.C. Cir. 2019).............39

*Battle v. FAA*,
  393 F.3d 1330 (D.C. Cir. 2005).................................................................................32

*Bell Helicopter Textron, Inc. v. Airbus Helicopters*,
  78 F. Supp. 3d 253 (D.D.C. 2015)............................................................................39

*Bennett v. Spear*,
  520 U.S. 154 (1997)............................................................................................16, 17

*Boddie v. Connecticut*,
  401 U.S. 371 (1971)...................................................................................................33

*Cent. United Life, Inc. v. Burwell*,
  128 F. Supp. 3d 321 (D.D.C. 2015), *aff'd*, 827 F.3d 70 (D.C. Cir. 2016).............40

*Columbia Gas Transmission Corp. v. An Easement to Construct, Operate, &*
  *Maintain a 24-inch Gas Transmission Pipeline Across Properties in Greene*
  *Cnty.*,
  No. 3:07CV00028, 2007 WL 2220530 (W.D. Va. July 31, 2007) ..........................34

*Columbia Gas Transmission, LLC v. 84.53 Acres of Land, More or Less, In*
  *Calhoun, Marshall, Ritchie, Tyler, & Wetzel Cntys.*,
  310 F. Supp. 3d 685 (N.D. W.Va. 2018) .................................................................42

*Connecticut v. Doehr*,
  501 U.S. 1 (1991)......................................................................................................33

*CSL Plasma Inc. v. CBP*,
  628 F. Supp. 3d 243 (D.D.C. 2022).........................................................................25

*Darby v. Cisneros*,
  509 U.S. 137 (1993)..................................................................................................17

*Dep't of Com. v. New York,
    588 U.S. 752 (2019)...............................................................................19, 20

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,
    591 U.S. 1 (2020)...................................................................................20, 25

Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.,
    269 F.3d 1149 (10th Cir. 2001) .....................................................................39

DSE, Inc. v. United States,
    169 F.3d 21 (D.C. Cir. 1999)...........................................................................45

E. Tenn. Nat. Gas Co. v. Sage,
    361 F.3d 808 (4th Cir. 2004) ..........................................................................34

Env't Democracy Project v. Green Sage Mgmt., LLC,
    No. 22-CV-03970, 2022 WL 4596616 (N.D. Cal. Aug. 23, 2022) .........................45

Env't Health Trust v. FCC,
    9 F.4th 893 (D.C. Cir. 2021)...........................................................................19

Everglades Harvesting & Hauling, Inc. v. Scalia,
    427 F. Supp. 3d 101 (D.D.C. 2019) ..................................................................40

Evergreen Shipping Agency Am. Corp. v. Fed. Mar. Comm'n,
    106 F.4th 1113 (D.C. Cir. 2024)......................................................................26

FCC v. Fox Television Stations, Inc.,
    556 U.S. 502 (2009).......................................................................................21

FCC v. Prometheus Radio Project,
    592 U.S. 414 (2021).......................................................................................19

*FDA v. Wages & White Lion Invs., LLC,
    145 S. Ct. 898 (2025)................................................................................21, 25

Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n,
    636 F.2d 755 (D.C. Cir. 1980) .........................................................................45

Gomez v. Trump,
    485 F. Supp. 3d (D.D.C. 2020) ........................................................................20

Gordon v. Holder,
    721 F.3d 638 (D.C. Cir. 2013) .........................................................................40

Hoyl v. Babbitt,
    129 F.3d 1377 (10th Cir. 1997) ......................................................................32

*Humane Soc'y of the U.S. v. Jewell*,
  76 F. Supp. 3d 69 (D.D.C. 2014)...............................................................28

*In re NTE Conn., LLC*,
  26 F.4th 980 (D.C. Cir. 2022) ...................................................37, 39, 43

*Int'l Org. of Masters, Mates, & Pilots v. NLRB*,
  61 F.4th 169 (D.C. Cir. 2023) ..................................................................26

*Int'l Trade Comm'n v. ASAT, Inc.*,
  411 F.3d 245 (D.C. Cir. 2005) .................................................................31

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024)..................................................................................22

*Louisiana v. Biden*,
  622 F. Supp. 3d 267 (W.D. La. 2022).......................................................20

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)..................................................................................16

*Michigan v. EPA*,
  576 U.S. 743 (2015)..................................................................................19

*\*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*,
  463 U.S. 29 (1983)....................................................................................19

*Nalco Co. v. EPA*,
  786 F. Supp. 2d 177 (D.D.C. 2011)..........................................................39

*Nat. Resources Defense Council v. Wheeler*,
  955 F.3d 68 (D.C. Cir. 2020)....................................................................16

*Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*,
  No. 18-1026, 2018 WL 4154794 (D.C. Cir. Aug. 10, 2018)...................38

*League of Women Voters of the U.S. v. Newby*
  838 F.3d 1 (D.C. Cir. 2016)......................................................................40

*Nken v. Holder*,
  556 U.S. 418 (2009)..................................................................................18

*\*Nat. Res. Def. Council v. Kempthorne*,
  525 F. Supp. 2d 115 (D.D.C. 2007)....................................................42, 44

*PayPal, Inc. v. CFPB*,
  728 F. Supp. 3d 31 (D.D.C. 2024)............................................................20

*Pennsylvania v. DeVos*,
    480 F. Supp. 3d 47 (D.D.C. 2020) ........................................................................18

*RFE/RL, Inc. v. Lake*,
    772 F. Supp. 3d 79 (D.D.C. Mar. 25, 2025) .........................................................20

*Rhea Lana, Inc. v. Dep't of Labor*,
    824 F.3d 1023 (D.C. Cir. 2016) ............................................................................17

*S. Educ. Found. v. United States Dep't of Educ.*,
    No. CV 25-1079 (PLF), 2025 WL 1453047 (D.D.C. May 21, 2025)....................38

*Safari Club Int'l v. Zinke*,
    878 F.3d 316 (D.C. Cir. 2017) ..............................................................................18

*Shell Offshore Inc. v. Greenpeace, Inc.*,
    No. 3:12-cv-00042, 2012 U.S. Dist. LEXIS 74387 (D. Alaska May 29, 2012) .....33

*Sierra Club v. EPA*,
    292 F.3d 895 (D.C. Cir. 2002) ..............................................................................16

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    990 F. Supp. 2d 9 (D.D.C. 2013) .....................................................................41, 42

*Sinclair Wyo. Refining Co. LLC v. EPA*,
    114 F.4th 693 (D.C. Cir. 2024)..............................................................................24

*\*Smoking Everywhere, Inc. v. FDA*,
    680 F. Supp. 2d 62 (D.D.C. 2010), *aff'd sub nom. Sottera, Inc. v. FDA*, 627
    F.3d 891 (D.C. Cir. 2010) ................................................................................38, 39

*Southeast Lighthouse Foundation v. Burgum*,
    No. 1:23-cv-03515-RCL (D.D.C.) ........................................................................22

*Torres v. Del Toro*,
    2022 WL 5167371 (D.D.C. Oct. 5, 2022) .............................................................31

*W. Watersheds Project v. Salazar*,
    692 F.3d 921 (9th Cir. 2012) ................................................................................44

*Wash. Teachers' Union, Loc. No. 6 v. Am. Fed'n of Teachers*,
    751 F. Supp. 2d 38 (D.D.C. 2010) ........................................................................39

*Water Quality Ins. Syndicate v. United States*,
    225 F. Supp. 3d 41 (D.D.C. 2016) ........................................................................28

*West Viginia v. EPA*,
    597 U.S. 697 (2022)........................................................................................30, 31

*Widakuswara v. Lake*,
  779 F. Supp. 3d 10 (D.D.C. 2025) ...................................................................16

*Winter v. NRDC*,
  555 U.S. 7 (2008) .....................................................................................18, 37

## STATUTES

5 U.S.C.
  § 702 ................................................................................................................39
  § 704 ..........................................................................................................16, 17
  § 705 ................................................................................................................18
  § 706 ................................................................................................................31
  § 706(2) ...........................................................................................................18
  § 706(2)(A) ......................................................................................................28
  § 706(2)(C) ......................................................................................................28
  § 706(D) ..........................................................................................................31

16 U.S.C.
  § 1451 ..............................................................................................................12

43 U.S.C.
  § 1332(3) ......................................................................................................7, 41
  § 1334(a) ..........................................................................................................31
  § 1334(a)(1) .................................................................................................8, 29
  § 1337(p) ...........................................................................................................8
  § 1337(p)(1)(C) .................................................................................................7
  § 1337(p)(4) ...........................7, 9, 13, 14, 21, 22, 24, 27, 28, 29, 30, 31, 32
  § 1341(c) .....................................................................................................30, 31
  § 1349 ..............................................................................................................17
  § 1349(a)(3) .....................................................................................................17

Pub. L. No. 109-58, 119 Stat. 594, 746 .................................................................7

## RULES

Federal Rule of Civil Procedure 65(c) ..................................................................45

## REGULATIONS

30 C.F.R. pt. 585 ............................................................................................19, 22

30 C.F.R.

§ 285.401 ................................................................................................................30, 32
§ 285.402(c) ...................................................................................................................30
§ 585 .............................................................................................................................13
§ 585.102(a) .................................................................................................29, 31, 32
§ 585.105(h) ....................................................................................................................8
§ 585.106 ......................................................................................8, 30, 31, 32
§ 585.106(b)-(c) .............................................................................................................32
§ 585.106(d) ...................................................................................................................32
§ 585.118 ........................................................................................................................17
§ 585.415(b) ..........................................................................................................8, 30
§ 585.417 ..........................................................................................................................8
§ 585.418(c) ......................................................................................................................8
§ 585.422 .........................................................................................................................32
§§ 585.620-585.635 .........................................................................................................9

## OTHER AUTHORITIES

90 Fed. Reg. 8363 (January 29, 2025) ...........................................................14, 15

## CONSTITUTIONAL PROVISIONS

Fifth Amendment ....................................................................................................1, 32

## INTRODUCTION

This suit challenges the Department of the Interior's unfounded assertion of sweeping power to suspend the activities of the Revolution Wind Farm and Revolution Wind Export Cable (the "Project"), an offshore wind project that will deliver much needed, reliable power to millions of customers in Rhode Island and Connecticut, and support regional energy needs. The Department has authorized those activities, through approvals that the Department itself is currently defending in this Court. Plaintiff Revolution Wind, LLC ("Revolution Wind") secured the relevant approvals in 2023; since then, it has spent or committed approximately $5 billion to develop the Project, which is now 80% complete. On August 22, 2025, the Department issued the challenged Stop Work Order, which declares an abrupt halt to activities related to the Project on the Outer Continental Shelf ("OCS"). The Order was issued without notice or a hearing; it cites no valid legal authority supporting the mandatory halt of activities; and it offers no reasoning other than a vague and conclusory assertion of "concerns" about "national security" and "interference with reasonable uses" of the ocean—two topics that were comprehensively addressed over a multi-year process involving 12 federal agencies, including the Department of Defense ("DOD").

The Stop Work Order violates the substantive and procedural requirements of the Outer Continental Shelf Lands Act ("OCSLA"), the Administrative Procedure Act ("APA"), and the Fifth Amendment. If allowed to remain in force, the Order will continue to cost Revolution Wind more than $2 million dollars per day (estimated conservatively). And compounding costs of delay risk Project cancellation, which would cause Revolution Wind to suffer losses of more than $6 billion. This Court should ultimately reject the Stop Work Order on the merits. For now, the Court should issue a stay and preliminary injunction that blocks the Order and allows offshore construction to resume. Revolution Wind respectfully asks the Court to grant this relief by **September 22**, to prevent irreparable harm.

For years, Revolution Wind and its affiliates have worked with state and federal regulators, including Defendants, to undertake an extensive environmental, national defense, and safety review covering every conceivable aspect of the Project's development and construction.  In 2023, this review—spanning three Presidential administrations—culminated in a consensus decision of more than 15 federal and state agencies that the Project is safe and consistent with both federal and state law.  Indeed, since November 2023, Defendants have been defending the Revolution Wind federal approvals against legal challenges brought by third parties in this Court.

Despite the comprehensive process and robust scientific and technical record supporting the federal approvals, offshore wind has been subject to numerous negative statements by the current Administration.  Since January 2025, the Department of the Interior has issued multiple orders implementing a Presidential Memorandum halting offshore wind leasing and permitting for proposed projects, and has made numerous public statements against offshore wind projects.  But as the prior approvals recognized, the Project will provide many long-term benefits, including providing economic, energy reliability, and health benefits.

On August 22, 2025, BOEM issued the Stop Work Order, prohibiting activities related to the Project on the OCS pending an indefinite review.  While the Stop Work Order alleges that the review is intended to address purported concerns regarding national security and interference with reasonable uses of the ocean, the Order does not identify specific concerns, or any violation by Revolution Wind.  Making things worse, the Order was issued without notice or any opportunity for a hearing in which Revolution Wind could address the Department's purported concerns.

BOEM's Stop Work Order is unlawful, and Revolution Wind respectfully requests a stay of the Stop Work Order and a preliminary injunction against enforcement of it.  All of the preliminary injunction factors strongly support granting immediate relief.  And maintenance of

the status quo is needed now to avoid further irreparable harm.

*First*, Revolution Wind has a strong likelihood of success on the merits.  The Stop Work Order is arbitrary and capricious:  It provides no explanation or justifications for the purported "concerns;" it fails to mention (let alone contest) the many years of exhaustive environmental, national security, and safety reviews already completed; and it provides no basis whatsoever for the Department's abrupt change in position from the approvals granted to the Project.  The Stop Work Order ignores that the Department has stated plainly—to this Court—that the Project does not interfere with national security, or with military or other reasonable uses of the ocean.  It also ignores Revolution Wind's obvious and substantial actions and billions of dollars of investment made in reliance on Defendants' approvals of the Project.  More fundamentally, BOEM lacks authority under OCSLA to halt activities on a project that has already been fully approved, based simply on a vague assertion of "concerns" about national security or interference with other uses of the OCS.  To top it off, BOEM issued the Stop Work Order—and thus directly and immediately impaired Revolution Wind's property interests—without notice and a hearing.

*Second*, Revolution Wind will suffer imminent and irreparable harm if the Stop Work Order remains in force beyond **September 22** and Revolution Wind is unable to proceed with Project construction on the OCS.  The Department issued the Stop Work Order mid-construction, with the Project 80% complete.  Revolution Wind has carefully sequenced its construction schedule to account for to account for seasonal weather variations, and has contracted specialized vessels necessary for Project construction.  These specialized vessels are in limited supply globally and are tightly scheduled, with limited or no availability to work beyond the contracted reservation dates.  Even a short-term delay risks the ability to ensure Project completion.  If the work that had been scheduled for August and September 2025 cannot be completed soon, lack of specialized

vessel availability and harsh winter weather will materially delay the Project, significantly risking Project cancellation.

Revolution Wind has already spent or committed approximately $5 billion to date in planning for, permitting, engineering, procuring, fabricating, preparing for, and commencing construction of the Project in reliance on Defendants' approvals. If the Project is cancelled, Revolution Wind anticipates that it would also incur more than $1 billion in breakaway costs, for a total of loss of over $6 billion. Additionally, Revolution Wind would forgo billions of dollars in revenues under its power purchase agreements ("PPAs") over the life of the Project.

*Third*, the balance of the equities and the public interest both favor immediate relief. The public has a significant interest in the reliable energy the Project will provide to New England, the Project's significant economic benefits, including jobs and state tax revenue, and the health benefits associated with the Project. By contrast, neither the public nor the Defendants will suffer harm if this Court preserves the status quo by granting a stay and preliminary injunction to allow construction to continue through the end of 2025.

## BACKGROUND

### A.    The Project

The Project involves the construction and operation of an approximately 704-megawatt ("MW") commercial-scale offshore wind energy facility with 65 wind turbines, two offshore substations, associated inter-array cabling between the wind turbines, and an export cable that will bring approximately 304 MW of offshore wind capacity to Connecticut and approximately 400 MW to Rhode Island pursuant to five PPAs that were awarded to Revolution Wind in competitive solicitations. Murphy Decl. ¶ 8. In reliance on the Project's approvals, construction of the Project has been underway for nearly two years and is now 80% complete. At the time the Stop Work Order was issued, all of the Project's monopile foundation had been installed, and approximately

4

70% of the wind turbines had been installed. *Id*. ¶ 10. The Project's cable installation was also substantially complete, as its two export cables have been installed, with only connection to the second offshore substation remaining, and more than half of the Project's inter-array cables installed with the remainder scheduled to be installed by the end of the year. *Id*. ¶ 12. Furthermore, one of the Project's two offshore substations was fully installed and is prepared to be commissioned, and the Project's second substation, a key component of the construction program, was in the middle of installation at the time of the Stop Work Order. *Id*. ¶ 13.

The Project's wind turbines are located in federal waters on the OCS, within the area covered by BOEM Renewable Energy Lease No. OCS-A 0486 (held by Revolution Wind), in the Atlantic Ocean approximately 15 miles east of Block Island, Rhode Island, and approximately 15.7 miles from Newport, Rhode Island. *Id*. ¶ 7. Revolution Wind will construct, operate, and maintain the Revolution Wind Export Cable to deliver the generated electricity from the Revolution Wind Farm to the existing Davisville Substation in North Kingstown, Rhode Island, which connects to the transmission system managed by ISO New England. *Id*.

Revolution Wind and its affiliates obtained the BOEM lease in 2013 and subsequently worked to develop the Project for nearly ten years, culminating in BOEM's November 2023 decision to approve the Revolution Wind Farm Project Construction and Operations Plan ("COP"). Gearon Decl. ¶¶ 7-14. Every step of the way, Revolution Wind participated in exhaustive environmental, national security, and safety reviews by Federal and State government agencies, and agreed to countless mitigation measures to ensure that it would have the smallest effect possible, while delivering significant benefits.

Once operational, the Project will generate enough reliable energy to power nearly 350,000 homes. *Id*. ¶ 44. The Project is expected to result in estimated avoided emissions of between 599

to 749 tons of nitrogen oxides per year and 318 to 398 tons of sulfur oxides per year as a result of displacing fossil fuel generation. *Id*. Therefore, the Rhode Island Department of Environmental Management has concluded "that the [P]roject will reduce air emissions that are harmful to human health and the environment." *Id*.

Revolution Wind has executed five PPAs under three separate procurements corresponding to certain energy and renewable energy certificates generated by the Project: (1) two October 2018 PPAs with utilities in Connecticut for approximately 200 MW; (2) one December 2018 PPA with utilities in Rhode Island for approximately 400 MW; and (3) two November 2019 PPAs with utilities in Connecticut for approximately 104 MW. Murphy Decl. ¶ 8. Each of the PPAs between Revolution Wind and the Connecticut and Rhode Island utilities include deadlines by which the Project's Commercial Operation Date must be complete, with no current mechanism for Revolution Wind to request further extensions. *Id*. ¶ 26. After these deadlines, the utility buyer would have a unilateral right to terminate the PPA. *Id*. Because achievement of the Project's Commercial Operation Date requires the Project to have completed construction and performance testing, and to be capable of regular commercial operations (among other requirements), the relevant deadlines for each stage of the complex, sequential construction processes are imminent. *Id*.

The Project will help meet Connecticut's and Rhode Island's domestic energy and emissions reduction policy goals. Gearon Decl. ¶ 43. Connecticut has established a goal of delivering 100% zero-carbon electricity to customers by 2040. *Id*. Similarly, in 2023, Rhode Island issued a Request for Proposals to call for approximately 1200 MW of new offshore wind to power the state's energy needs. *Id*.

To date, Revolution Wind has already spent or committed approximately $5 billion

developing, permitting, engineering, procuring, fabricating, preparing for, and constructing the Project in reliance on BOEM's COP Approval.  Murphy Decl. ¶ 9.

### B.    Outer Continental Shelf Lands Act

OCSLA provides that "the outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards."  43 U.S.C. § 1332(3).

Congress amended OCSLA in 2005 to expand its reach to include advances in renewable energy, authorizing Interior to grant leases to "produce or support production, transportation, or transmission of energy for sources other than oil and gas," including offshore wind.  43 U.S.C. § 1337(p)(1)(C); Pub. L. No. 109-58, 119 Stat. 594, 746.  By providing for domestic offshore wind development, Congress sought to "enhance the energy security of the United States," to "decrease dependence on foreign sources of fuel," S. Rept. No. 109-78, at 1 (2005), and to "ensure jobs for our future with secure, affordable, and reliable energy," H.R. Rept. No. 109-90, at 1 (2005).

Subsection 8(p)(4) of OCSLA[1]—codified at 43 U.S.C. 1337(p)(4)—requires the Secretary of the Interior to consider twelve enumerated factors before authorizing energy development activity on the OCS.  Neither the text of the subsection, nor BOEM's legal interpretation of the subsection, nor the subsection's implementing regulations provides BOEM authority to issue an order simply directing a lessee to halt activities on its lease.

OCSLA grants the Secretary of the Interior the authority to issue regulations allowing for the "suspension or temporary prohibition of any operation or activity" pursuant to a lease or permit in limited circumstances, including "if there is a threat of serious, irreparable, or immediate harm

---

[1] For consistency, this Statement of Points and Authorities refers to this subsection throughout as Section 1337(p)(4).

or damage to life (including fish and other aquatic life), to property, to any mineral deposits . . . , or to the marine, coastal, or human environment . . . ." 43 U.S.C. § 1334(a)(1). BOEM's implementing regulations allow it to order a "suspension" of a lease in only two circumstances: (1) "[w]hen necessary to comply with judicial decrees prohibiting some or all activities under [the] lease," and (2) "[w]hen the suspension is necessary for reasons of national security or defense." 30 C.F.R. § 585.417.[2] Under OCSLA's regulations, if BOEM orders a suspension of the lease, BOEM's "written order [must] explain the reasons for its issuance and describe the effect of the suspension order on [the] lease . . . and any associated activities." *Id.* § 585.418(c).

Another BOEM regulation, 30 C.F.R. § 585.105(h), purports to require lessees to "conduct all activities authorized by the lease . . . in a manner consistent with the provisions of [43 U.S.C. § 1337(p)]" of OCSLA. 30 C.F.R. § 585.106 outlines the procedures—which include providing the lessee with notice and an opportunity to cure the violation—that BOEM must follow if there is a suspected violation of 30 C.F.R. § 585.105(h). Those procedures do not grant BOEM the authority to order a lessee to cease its activities on the lease.

### C.    Multi-Year Environmental, National Security, and Safety Review Process

Revolution Wind has undergone a multi-year environmental, national security, and safety review to comply with numerous federal laws. These processes have resulted in thousands of pages of information and analysis supporting approval of the Project and the agencies', including Defendants', uniform conclusion is that the Project is environmentally sound, does not interfere with national security, and is safe and consistent with federal law.

### 1.    Wind Energy Area and COP Review

---

[2] "A suspension is an interruption of the period of [a] lease" which extends the expiration date of the relevant period of the lease for the length in time the suspension is in effect. *Id.* § 585.415(b).

BOEM's environmental, national security and safety review of the Project and its lease area dates back to nearly 16 years ago when the Agency conducted a review and environmental assessment of potential wind energy areas offshore Massachusetts and Rhode Island. This review was conducted to, among other things, assess whether the Project's planning, leasing, and COP review complied with 43 U.S.C. § 1337(p)(4). Gearon Decl. ¶ 8. The review included consultation with DOD on potential national security issues. For example, materials from the December 10, 2010, May 2, 2011, and March 1, 2012 task force meetings reflect early and ongoing participation by the U.S. Navy, including the Office of the Chief of Naval Operations, N43-Navy Fleet Readiness Division, and the Naval Undersea Warfare Center - Division Newport. *Id.* After issuing a draft environmental assessment and soliciting public comment, BOEM issued a final environmental assessment in May 2013, concluding leasing and site assessment activities in the proposed lease sale area would result in no significant environmental effects. *Id.*

After issuance of a lease, BOEM requires OCS lessees to submit a COP describing planned facilities and construction and operation activities. 30 C.F.R. §§ 585.620-585.635. After extensive environmental surveys and site assessment, Revolution Wind submitted a detailed COP to BOEM in March 2020, which Revolution Wind updated throughout the development process. Gearon Decl. ¶ 10.

In April 2021, BOEM issued a Notice of Intent to prepare an Environmental Impact Statement ("EIS") under the National Environmental Policy Act. *Id.* ¶ 11. That began a more than two-year period of environmental, national security, and safety review by the federal government involving Revolution Wind, twelve federal agencies (the Bureau of Safety and Environmental Enforcement, DOD, the Department of the Navy, the Environmental Protection Agency, the U.S. Army Corps of Engineers, the Fish and Wildlife Service, the National Oceanic and Atmospheric

Administration, the North American Aerospace Defense Command ("NORAD"), the United States Air Force, U.S. Coast Guard, the Federal Aviation Administration, and the National Park Service), three state cooperating agencies, and consultation with an extensive array of other stakeholders, including American Indian tribes, local community members, historic preservation organizations, and members of the fishing industry. *Id.* After publishing the draft EIS in August 2022, BOEM held five public meetings to solicit input. *Id.* ¶¶ 12-13. Revolution Wind attended all of the meetings and submitted comments on that draft. *Id.* ¶ 13. BOEM published the final EIS on July 21, 2023. *Id.* ¶ 12.

### 2. Department of Defense, U.S. Coast Guard, and Federal Aviation Administration Review

The Project was extensively reviewed by DOD, the U.S. Coast Guard, and the Federal Aviation Administration. At each stage of the regulatory process involving the Project's lease and its development, BOEM consulted with DOD to assess national security considerations. *Id.* ¶ 16. BOEM and DOD developed measures to protect against potential liabilities and impacts on DOD activities as well as to protect the Nation's security interests. *Id.* These measures are included in Appendix A of the Project's Record of Decision and as Conditions of the Project's COP approval. *Id.*

The Project itself also engaged in numerous communications with agencies regarding national security, aviation, and navigation safety, including the U.S. Coast Guard, U.S. Naval Undersea Warfare Center, U.S. Air Force, NORAD, U.S. Army Corps of Engineers, and Federal Aviation Administration. *Id.* ¶ 17. After the conclusion of consultation with the DOD Siting Clearinghouse, the division of DOD responsible for reviewing energy infrastructure for potential impacts to military missions, Revolution Wind entered into a mitigation agreement with DOD, acting through DOD Clearinghouse, and the Department of the Air Force to address national

security risks and to mitigate potential adverse impacts on military operations and readiness, including to protect military radar systems.  *Id.*  For example, the mitigation agreement requires that Revolution Wind "immediately curtail wind turbine operations" upon request from NORAD for national security or defense purposes.  Gearon Decl., Ex. 1 at 6.  This agreement provides that the parties "agree that the terms [set forth] will allow the mutual goals of the Parties to be met, including the protection of the radar, which promotes national security, and protection of the National Airspace System, while supporting military readiness."  Gearon Decl., Ex. 1 at 2.  The agreement states that, except as otherwise provided, "[t]he DoD Parties agree not to object to the construction and operation of the Project before any federal, state, or local regulatory entity with jurisdiction over the Project[.]"  Gearon Decl., Ex. 1 at 6.  The DOD Clearinghouse confirmed that "[a]s a result of discussions between Ørsted and the U.S. Air Force and a resulting mitigation agreement," the DOD Clearinghouse found that construction of the Project "would not have adverse impacts to DoD missions in the area."  Gearon Decl., Ex. 2 at 1.

The Federal Aviation Administration also assessed the Project's potential impacts on radar system and navigation safety within its jurisdiction and concluded that the Project's wind turbines would **not** have a "substantial adverse effect on the safe and efficient utilization of the navigable airspace by aircraft or on the operation of air navigation facilities."  Gearon Decl. ¶ 18.  Revolution Wind prepared a Navigation Safety Risk Assessment in the COP that did not identify any major areas of concern regarding the Project's effect on marine navigation.  *Id.* ¶ 29.  The Navigation Safety Risk Assessment was used by the U.S. Coast Guard to evaluate the Project's potential effects on the marine transportation system, including navigation safety, traditional uses of the waterways, and U.S. Coast Guard missions.  *Id.*  Not only did the Navigation Safety Risk Assessment not identify any major areas of concern regarding the Project's impact on marine

navigation, but the Project voluntarily utilizes a one nautical mile[3] by one nautical mile grid for the wind turbines to facilitate safe passage through the lease area, based on consultation with the local mariner community.  *Id*.

### 3. Compliance with Other Federal Laws

The Project also underwent review and permitting pursuant to other federal laws.  BOEM consulted with the National Marine Fisheries Services ("NMFS") and the U.S. Fish and Wildlife Service under Section 7 of the Endangered Species Act and, as part of these consultation processes, both Agencies issued Biological Opinions for the Project.  *Id*. ¶¶ 19-22.  NMFS also reviewed the Project under the Marine Mammal Protection Act and promulgated five-year Incidental Take Regulations and issued an associated Letter of Authorization authorizing Revolution Wind's incidental non-lethal "take" of small numbers of marine mammals during the construction of the Project.  *Id*. ¶ 24.  BOEM completed Section 106 consultation under the National Historic Preservation Act and Essential Fish Habitat consultation under the Magnuson-Stevens Fishery Conservation and Management Act.  *Id*. ¶¶ 27, 32.  Revolution Wind also obtained permits from the U.S. Army Corps of Engineers under Clean Water Act Section 404 and Rivers and Harbors Act of 1899 Sections 10 and 14; and from the Environmental Protection Agency under the Clean Air Act for an OCS air permit to construct and operate the Project.  *Id*. ¶¶ 25, 31.[4]

### 4. BOEM's COP Approval and Memorandum Documenting Compliance with OCSLA Section 1337(p)(4)

On August 21, 2023, BOEM issued a Record of Decision documenting the Department of the Interior's decision to approve the COP, with some modifications.  Gearon Decl. ¶ 14.  On

---

[3] A nautical mile is the equivalent of 1.15 miles on land.

[4] The Project also received state approvals from Rhode Island and Massachusetts under the Coastal Zone Management Act, 16 U.S.C. § 1451.  Gearon Decl. ¶ 26.

November 17, 2023, BOEM issued the Project's COP approval letter.  *Id.*  The COP's Conditions of Approval mandate multiple measures to address national security considerations and to protect commercial fisheries and for-hire and recreational fishing.  *Id.*  Moreover, the Project's Record of Decision documents BOEM's determination that the COP complies with OCSLA and BOEM's regulations implementing that subsection, and that approval of the COP with modifications and the Conditions of Approval "would be in accordance with the regulations at 30 CFR part 585 and would ensure that all the activities on the OCS are carried out in a manner that provides for the factors in subsection 8(p)(4) [43 U.S.C. 1337(p)(4)] of OCSLA."  *Id.*  In Appendix B to the Record of Decision, BOEM detailed its compliance review for the Project's COP under each of the Section 1337(p)(4) factors, including with respect to protection of national security interests and prevention of interference with reasonable use of the OCS.  Record of Decision at Appendix B.

### D.    Defendants' Longstanding Defense of the Project's Approvals

For over a year and a half, Defendants have been defending the Project's federal approvals in ongoing litigation in this Court.  In that capacity, Defendants have confirmed that the Project's environmental, national security, and safety "review was designed to ensure the soundness of the project and to comply with multiple federal statutes. . . ."  *Green Oceans v. U.S. Dep't of the Interior*, No. 1:24-cv-00141-RCL, Dkt. 38 at 7 (D.D.C. filed May 21, 2024).  Defendants, including BOEM, expressly denied that "[t]he Project interferes with national security and military uses of the Outer Continental Shelf."  *Compare* First Amended Complaint at ¶ 133, first sentence, *Green Oceans*, Dkt. 33 (D.D.C. filed May 13, 2024) *with* Answer at ¶ 133, *Green Oceans*, Dkt. 54 (D.D.C. filed July 19, 2024) ("Federal Defendants deny the allegations in the first sentence Paragraph 133.").  And Defendants expressly denied that "Revolution Wind will interfere with almost all other reasonable uses of the Outer Continental Shelf."  *Compare* First Amended Complaint at ¶ 143, first sentence, *Green Oceans*, Dkt. 33 (D.D.C. filed May 13, 2024) *with*

Answer at ¶ 143, *Green Oceans*, Dkt. 54 (D.D.C. filed July 19, 2024) ("Federal Defendants deny the allegations in Paragraph 143."). Each of these statements was made in response to allegations that Defendants failed to properly consider the factors required by 43 U.S.C. § 1337(p)(4), demonstrating that Defendants continued to stand by the analysis underlying the Project's final approvals until the Department's issuance of the unlawful Stop Work Order.

> ### E.    The Administration's Actions and the Stop Work Order

On January 20, 2025, the President issued a Memorandum entitled "Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects" (the "Presidential Memorandum) [5], which, among other things, withdraws all unleased areas of the OCS from further wind energy leasing under OCSLA until the Presidential Memorandum is revoked. 90 Fed. Reg. 8363 (January 29, 2025). The Presidential Memorandum also directs the Secretary of the Interior to "conduct a comprehensive review of the ecological, economic, and environmental necessity of terminating or amending any existing wind energy leases." *Id*. To that effect, on July 29, 2025, Secretary Burgum issued Secretarial Order 3437, which implements the Presidential Memorandum and instructs, among other things, the Interior Assistant Secretary for Land and Minerals Management, within 45 days (e.g., by September 12, 2025), to provide a report to the Secretary with recommendations regarding environmental impacts on wildlife, economic costs associated with the intermittent generation of electricity, effects of subsidies to the wind industry, and impacts that development of offshore wind projects may have on military readiness.

On August 22, 2025, without any notice or warning, BOEM's Acting Director issued the

---

[5] The Presidential Memorandum is the subject of separate litigation brought by numerous States and the District of Columbia. *See generally*, *State of New York, et al. v. Trump*, et al., 25-cv-11221-WGW (D. Mass.).

Stop Work Order, referencing the Presidential Memorandum.  Compl. Ex. A, Dkt. 1-1 at 1.  The

Stop Work Order directs Revolution Wind "to halt all ongoing activities related to the Revolution

Wind Project on the outer continental shelf (OCS) to allow time for [BOEM] to address concerns

that have arising during the review that the Department is undertaking pursuant to the President's

Memorandum of January 20, 2025. 90 Fed. Reg. 8363 (January 29, 2025)."  *Id*.  The Stop Work

Order's only substantive justification was contained in three sentences:

> BOEM is acting to ensure that all activities authorized under the
> Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331 et seq., and
> the implementing regulations at 30 C.F.R. Part 585 are carried out
> in a manner that provides for protection of the environment, among
> other requirements. 43 U.S.C. § 1337(p)(4); 30 C.F.R. § 585.102(a).
> In particular, BOEM is seeking to address concerns related to the
> protection of national security interests of the United States and
> prevention of interference with reasonable uses of the exclusive
> economic zone, the high seas, and the territorial seas, as described
> in that subsection of OCSLA. *Id*.  The BOEM Director is taking this
> action to ensure compliance with the requirements of the Part 585
> regulations and applicable law.

*Id.*  The Stop Work Order directs Revolution Wind to "not resume activities until BOEM informs

[Revolution Wind] that BOEM has completed its necessary review."  *Id.*

Soon afterwards, a news organization reported that a Department of the Interior

spokesperson stated that the Stop Work Order was "in line with President Donald Trump's energy

goals. . . . ."  Compl. ¶ 133, Dkt. 1.  It made no reference in that statement to the Stop Work Order's

stated national security and interference "concerns," but rather told the press that "experimental

and expensive wind projects . . . are proven failures," and that "Interior is putting an immediate

stop to these costly failures."  *Id.* & n.59.

## JUSTICIABILITY

Revolution Wind has standing to challenge the Stop Work Order.  Article III standing

requires a plaintiff to plead facts sufficient to show: (1) injury-in-fact; (2) a "causal connection

between the injury and the conduct complained of;" and (3) a likelihood that the alleged injury "will be 'redressed by a favorable decision.'" *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  Revolution Wind is injured by the Stop Work Order's mandate that it cease construction on the Project.  Murphy Decl. ¶¶ 5, 17-35.  The Order prevents Revolution Wind from constructing and finalizing the Project.  It inflicts financial and contractual burdens on Revolution Wind, creates delay in Revolution Wind's development of the Project, and, depending on the length of delay, potentially jeopardizes the Project and the Revolution Wind enterprise entirely.  *See Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002) (noting that when the plaintiff is "an object of the action . . . at issue," there "should be little question" that the action "caused him injury") (internal quotations and citation omitted).  Revolution Wind's injury is also redressable:  If this Court provides preliminary injunctive relief against the Stop Work Order and vacates the unlawful agency action, Revolution Wind will be able to progress its previously-approved, lawful construction of the Project towards completion.

BOEM's Stop Work Order against Revolution Wind is a final agency action subject to judicial review under 5 U.S.C. § 704.  The Stop Work Order is in effect, and marks the "consummation" of BOEM's decision-making to halt Project activities on the OCS.  *See Bennett v. Spear*, 520 U.S. 154, 178 (1997).  This is true even if Defendants characterize the Stop Work Order as an "interim" decision and even if there is "the potential for a different permanent decision," because the decision to issue the Stop Work Order itself "is not subject to further consideration" by BOEM.  *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020). The Stop Work Order is "the final word from [BOEM] on what will happen up to the time of any different permanent decision."  *Id.*; *see also Widakuswara v. Lake*, 779 F. Supp. 3d 10, 32-33 (D.D.C. 2025) (Lamberth, J.) ("*[F]inal* does not mean permanent—just because [the agency]

maintains the ability to reverse these actions at some unidentified point in the future . . . does not change the fact that the agency has made decisions. . . .") (emphasis in original).

The Stop Work Order is also an action by which Revolution Wind's "rights or obligations have been determined" and from which "legal consequences" have already flowed. *See Bennett*, 520 U.S. at 178. As detailed herein, the Stop Work Order has already resulted in immediate, irreparable harm to Revolution Wind. *See infra* at 33-45. The Stop Work Order further "halt[s] all ongoing activities related to the Revolution Wind Project" on the OCS (with limited exceptions) and threatens "corrective action" for violation of the Order. *See* Compl., Ex. A, at 1. This exposure to enforcement is unquestionably a "legal consequence" that flows from the Stop Work Order. *See Rhea Lana, Inc. v. Dep't of Labor*, 824 F.3d 1023, 1030, 1032 (D.C. Cir. 2016).

Administrative exhaustion is not a prerequisite to this action. *First*, neither OCSLA nor the APA mandate administrative exhaustion. *See* 43 U.S.C. § 1349; 5 U.S.C. § 704. *Second,* the relevant BOEM regulations do not mandate exhaustion and do not make the decision inoperative, pending appeal to the Interior Board of Land Appeals. 30 C.F.R. § 585.118; *see Darby v. Cisneros*, 509 U.S. 137, 154 (1993) ("[W]here the APA applies, an appeal to 'superior agency authority' is a prerequisite to judicial review only when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review.").

Furthermore, this action is subject to immediate review pursuant to OCSLA's citizen-suit provision, which provides that "[a]n action may be brought . . . immediately after notification of the alleged violation in any case in which the alleged violation constitutes an imminent threat to the public health or safety or would immediately affect a legal interest of the plaintiff." 43 U.S.C. § 1349(a)(3). Revolution Wind notified Defendants of their violations before bringing this action.

Revolution Wind has a "legal interest" in the subject of the Stop Work Order that is immediately and adversely affected.

## ARGUMENT

Revolution Wind is entitled to a stay of the Stop Work Order, and a preliminary injunction against enforcement of the Stop Work Order to preserve the status quo pending this Court's adjudication of this case on the merits.  5 U.S.C. § 705.

Issuance of a stay under the APA is governed by the same four-factor test that generally governs preliminary injunctions:  "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Pennsylvania v. DeVos*, 480 F. Supp. 3d 47, 58 (D.D.C. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009)); *see also Nken*, 556 U.S. at 426; *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).

All of the preliminary injunction factors strongly weigh in favor of immediate relief here. This Court should maintain the status quo by staying the Stop Work Order and enjoining Defendants from enforcing the Order pending full adjudication on the merits.

## I.    REVOLUTION WIND IS LIKELY TO SUCCEED ON THE MERITS

Revolution Wind is likely to succeed on the merits of its claims that the Stop Work Order violates OCSLA, the APA, and the U.S. Constitution.  The APA requires this Court to "hold unlawful and set aside" BOEM's Stop Work Order because it is: (1) "arbitrary" and "capricious;" (2) "in excess of statutory jurisdiction" and "authority;" (3) issued "without observance of procedure required by law;" and (4) "contrary to constitutional right."  5 U.S.C. § 706(2); *see also Safari Club Int'l v. Zinke*, 878 F.3d 316, 325 (D.C. Cir. 2017).  Each of these four reasons independently justifies relief.

### A.    BOEM's Stop Work Order Is Arbitrary and Capricious

An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  The agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).  The Stop Work Order fails these requirements on multiple grounds.

### 1.    The Stop Work Order Is Wholly Conclusory

The Stop Work Order is arbitrary and capricious because it is wholly conclusory.  The APA requires BOEM to engage in "reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015).  At minimum, that means the agency "must 'disclose the basis' of its action." *Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019).  "[C]onclusory statements . . . do not substitute for the reasoned explanation that the APA requires." *Env't Health Trust v. FCC*, 9 F.4th 893, 905 (D.C. Cir. 2021).

Here, BOEM provided *no explanation* for its decision beyond three sentences of conclusory, unreasoned assertion.  The Stop Work Order states that BOEM needed time to address unstated "concerns that have arisen during the review that the Department is undertaking pursuant to the [Presidential Memorandum]." Compl. Ex. A at 1.  It also provides that BOEM is seeking to address purported concerns related to "national security interests" and "prevention of interference with reasonable uses of the [ocean]," and that "[t]he BOEM Director is taking this action to ensure compliance with the requirements of the Part 585 regulations and applicable law." *Id.*

The Stop Work Order's stated justification is plainly insufficient.  It does not explain the factual basis of BOEM's purported "concerns" or its legal grounds for perceiving potential non-compliance with OCSLA or its regulations.  The Order's suspension of the Project is "unsupported

by any facts or reasoning" and thus violates the APA.  *See RFE/RL, Inc. v. Lake*, 772 F. Supp. 3d 79, 84 (D.D.C. Mar. 25, 2025) (finding a "one line" conclusion that an "award no longer effectuates agency priorities" to be an unlawful "conclusory statement" that "offers no rational connection between the facts found and choices made") (internal quotations omitted); *PayPal, Inc. v. CFPB*, 728 F. Supp. 3d 31 (D.D.C. 2024) (holding that failure to explain "*why*" facts support agency's "conclusory explanation" rendered it arbitrary and capricious).

BOEM's Stop Work Order also suggests that BOEM became aware of these "concerns" in response to the President's directive to review existing leases under the Presidential Memorandum. Compl., Ex. A, at 1.  But "[a] command in an executive order," whether directly from the President, the Secretary, or from an agency, "does not exempt an agency from the APA's reasoned decision-making requirement."  *Louisiana v. Biden*, 622 F. Supp. 3d 267, 294-95 (W.D. La. 2022) (finding that agency actions implementing President Biden's "pause" on new oil and gas leases violated the APA); *see also Gomez v. Trump*, 485 F. Supp. 3d, 145, 177 (D.D.C. 2020) ("APA review of an Executive Branch official's actions is . . . not precluded merely because the official is carrying out an executive order.").  BOEM's failure to articulate a satisfactory explanation shows that it lacks a "genuine justification[]" for its decision, one "that can be scrutinized by courts and the interested public."  *Dep't of Com.*, 588 U.S. at 785.[6]

### 2.    BOEM Violated the Change-in-Position Doctrine and Ignored Substantial Reliance Interests

The Stop Work Order is also arbitrary and capricious because it violates the "change-in-position doctrine."  *FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 917 (2025).  That

---

[6] BOEM cannot now rely on any basis for its decision that was not communicated to Revolution Wind at the time the Agency issued the Stop Work Order.  "An agency must defend its actions based on the reasons it gave when it acted."  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24 (2020).

doctrine makes clear that agencies may only change their existing policies if they "provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *Id*. Here, BOEM failed to explain why it changed its position after the culmination of a nearly decade-long environmental, national security and safety review process as well as its repeated defense of the Project's approvals in ongoing litigation before this Court. BOEM also failed to consider that Revolution Wind developed substantial reliance interests based on Defendants' prior approvals and repeated defense of those approvals in this very Court.

BOEM entirely failed to "display awareness that it *is* changing position," much less provide a reasoned explanation for doing so. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original). In 2023, after many years of exhaustive review, BOEM concluded "that all practicable means within its authority have been adopted to avoid or minimize environmental and socioeconomic harm associated with" approval of the Project. Record of Decision at 24. BOEM further concluded that "the Project will comply with [BOEM's] regulations and that the proposed activities will be carried out in a manner that provides for safety, protection of the environment, prevention of waste, and the other factors listed in [43 U.S.C. § 1337(p)(4)] of OCSLA." *Id*. at B-2. For instance, BOEM explained how at each stage of the regulatory process BOEM consulted with DOD to assess national security considerations and included mitigation measures in the Project's Conditions of COP Approval consistent with DOD input and sufficient to protect national security. *Id.* at B-15 - B-16. Likewise, BOEM detailed how it considered numerous other OCS uses and prevented interference with reasonable uses of the exclusive economic zone, the high seas, and territorial seas. *Id*. at B-18 - B-23. Overall, BOEM assessed each of the factors listed in 43 U.S.C. § 1337(p)(4), including the protection of the Nation's national security interests and the prevention of interference with reasonable uses of the ocean.

*See generally id.* at B-2 - B-26 (assessing all § 1337(p)(4) factors); *see id.* at B-15 - B-23 (assessing the protection of national security interests and prevention of interference with reasonable ocean uses).  BOEM concluded that approval of the Project's COP with the modifications and accompanying Conditions of Approval "would be in accordance with the regulations at 30 CFR part 585 and would ensure that all the activities on the OCS are carried out in a manner that provides for the factors in subsection 8(p)(4) [43 U.S.C. § 1337(p)(4)] of OCSLA." *Id.* at B-26.[7]

BOEM's decision to approve the Project's COP was based upon and supported by an extensive record before the Agency, including detailed technical information, public comments, and analyses by a multitude of government agencies.  BOEM has compiled and served its administrative record—spanning over 200,000 pages—regarding BOEM's approval of the Revolution Wind COP in cases currently pending before this Court: *Preservation Society of Newport County v. Burgum*, No. 1:23-cv-03513-RCL (D.D.C.), which has been consolidated with *Southeast Lighthouse Foundation v. Burgum*, No. 1:23-cv-03515-RCL (D.D.C.);[8] and *Green Oceans v. U.S. Department of the Interior*, No. 1:24-cv-00141-RCL (D.D.C.) ("*Green Oceans*").[9] Revolution Wind is a defendant-intervenor in these cases.

---

[7] To the extent Defendants point to a recent change in legal interpretation by the Department of the Interior's lawyers regarding how BOEM should address the Section 1337(p)(4) factors, that new interpretation does not expand BOEM's limited authorities under OCSLA to suspend or cancel leases and stop operations in leased areas, *see infra* at 28-31, or otherwise provide adequate basis for the Stop Work Order.  In any event, the Department's new legal interpretation of the Section 1337(p)(4) factors is entitled to no deference.  *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024).  And under either of the Department's interpretations of the factors, BOEM plainly satisfied OCSLA's requirements for the Project, as BOEM detailed in Appendix B to the Record of Decision.

[8] BOEM filed its certified administrative record index on July 31, 2024.  *Pres. Soc'y of Newport Cnty. v. Burgum*, No. 1:23-cv-03513-RCL (D.D.C.), Dkt. 43-1 (corrected index).

[9] BOEM filed its certified administrative record index on August 24, 2024, and filed its certified supplemental administrative record index on October 25, 2024.  *Green Oceans v. U.S. Dep't of the Interior*, No. 1:24-cv-00141-RCL (D.D.C.), Dkts. 59-2, 65-1.

Defendants Department of the Interior, the Secretary of the Interior, BOEM, and the BOEM director have been defending the Revolution Wind federal approvals in the ongoing federal litigation in this Court.  In *Green Oceans*, for example, Defendants represented that "Defendants based their approval of the Revolution Project on an extensive environmental review and permitting process that spanned three years, involved the expertise of multiple cooperating federal agencies, and invited and considered robust public comments."  *Green Oceans v. U.S. Dep't of the Interior*, No. 1:24-cv-00141-RCL, Dkt. 38 at 1 (D.D.C. May 21, 2024).  Defendants further averred that "[t]his review was designed to ensure the soundness of the project and to comply with multiple federal statutes, including the National Environmental Policy Act ("NEPA"), the CWA, the RHA, the ESA, the Marine Mammal Protection Act ("MMPA"), the Migratory Bird Treaty Act, the Coastal Zone Management Act, the National Historic Preservation Act, and the Outer Continental Shelf Lands Act ("OCSLA")."  *Id.* at 7.

Although BOEM asserts in the Stop Work Order that there are purported "concerns" regarding national security, *see* Compl. Ex. A at 1, that is directly contrary to BOEM's long-held position in the ongoing litigation challenging Revolution Wind's permits and approvals. Defendants in that case, including BOEM, expressly denied plaintiffs' allegation that "[t]he Project interferes with national security and military uses of the Outer Continental Shelf."  *Compare* First Amended Complaint, *Green Oceans v. U.S. Dep't of the Interior*, No. 1:24-cv-00141-RCL, Dkt. 33 ¶ 133, first sentence (D.D.C. filed May 13, 2024) *with* Answer, Dkt. 54 ¶ 133 (D.D.C. filed July 19, 2024) ("Defendants deny the allegations in the first sentence Paragraph 133.").

Similarly, contrary to the Stop Work Order's assertion of purported "concerns" regarding interference with other reasonable uses of the ocean, Defendants have expressly denied the allegation that "Revolution Wind will interfere with almost all other reasonable uses of the Outer

Continental Shelf." *Compare* First Amended Complaint, *Green Oceans v. U.S. Dep't of the Interior*, No. 1:24-cv-00141-RCL, Dkt. 33 ¶ 143, first sentence (D.D.C. filed May 13, 2024) *with* Answer, Dkt. 54 ¶ 143 (D.D.C. filed July 19, 2024) ("Defendants deny the allegations in Paragraph 143."). And Defendants have expressly denied the allegation that "BOEM's approval of a Project that guts fishing in the area degrades a vital habitat for fish, adversely impacts recreation and tourism, interferes with navigation and radar systems, interferes with national security and military uses, and destroys pristine visual and scenic resources is proof that BOEM violated Section 1337(p)(4)(I) of OCSLA." *Compare* First Amended Complaint at ¶ 143, second sentence, *Green Oceans*, Dkt. 33 (D.D.C. filed May 13, 2024) *with* Answer at ¶ 143, *Green Oceans*, Dkt. 54 (D.D.C. filed July 19, 2024) ("Federal Defendants deny the allegations in Paragraph 143.").

BOEM's Stop Work Order represents a complete reversal of the Agency's long-held prior conclusions and statements in this Court. The Stop Work Order states that BOEM now needs to address "concerns related to the protection of national security interests in the United States and prevention of interference with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas, as described in [43 U.S.C. § 1337(p)(4)] of OCSLA," Compl., Ex. A at 1, the very statutory provision BOEM already concluded the Revolution Wind COP complied with during the required review leading up to the COP Approval.

BOEM "made no attempt to explain its about-face," long after construction was well under way, let alone give a reasoned explanation for its decision. "[T]hat failure of explanation alone renders" BOEM's Stop Work Order arbitrary and capricious. *Sinclair Wyo. Refining Co. LLC v. EPA*, 114 F.4th 693, 713 (D.C. Cir. 2024). Citation to the Presidential Memorandum and a single reference to unspecified "national security" and "interference" concerns do not excuse BOEM's failure. The purpose of the "change-in-position" doctrine is to make sure that agencies do not

"mislead regulated entities," telling them "that [they] would do one thing and then turn[ing] around and [doing] something different." *Wages & White Lion Invs., LLC*, 145 S. Ct. at 917. Yet that is precisely what BOEM did here.

Making things worse, the Stop Work Order fails to acknowledge that Defendants' prior approval of the Project "engendered serious reliance interests." *Regents*, 591 U.S. at 30. As the Supreme Court has explained, the APA requires an agency that decides to reverse a prior policy or agency action "to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33. BOEM did not even attempt to meet this standard. Nothing in the Stop Work Order "address[ed] why [BOEM's] policy shift outweighs" Revolution Wind's reliance interests or provided "good reasons for concluding those interests were insufficient to hold off the policy shift." *CSL Plasma Inc. v. CBP*, 628 F. Supp. 3d 243, 261 (D.D.C. 2022).

The reliance interests at stake here are immense. Revolution Wind has already spent or committed approximately $5 billion to date to plan, permit, develop, and construct this Project. If the Project is cancelled, Revolution Wind anticipates that it would also incur more than $1 billion in breakaway costs, for a total of over $6 billion in costs to the Project. Murphy Decl. ¶ 9. In reliance on Defendants' approvals, Revolution Wind entered into contracts for the manufacture and transport of Project components and for the leasing of highly specialized vessels necessary to construct the Project, including those capable of lifting infrastructure weighing over 3,000 tons, like the offshore substation topside. *Id*. ¶¶ 13, 18-19, 22. These vessels are scarce and in high demand. *Id*. ¶ 19. The contracts for them are time-limited, with "last vessel availability dates"— meaning that delays are likely to result in the contracted vessels departing to work on other projects. *Id*. ¶¶ 21, 29. Even if the vessels are never used, Revolution Wind is required to pay the

full contract price, subjecting Revolution Wind to further financial liability. *Id.* ¶ 29.

Notably, BOEM has previously conceded Revolution Wind's reliance interests in ongoing litigation in this Court. In ongoing litigation in this Court, BOEM (together with other Federal Defendants) stated, "[w]here, as here, a developer has complied with agency rules and satisfied federal statutory requirements, it should be able to rely on its permits, as it may need to make business and financial decisions in furtherance of completing the authorized activity." *Green Oceans v. U.S. Dep't of the Interior*, No. 1:24-cv-00141-RCL, Dkt. 38 at 43 (D.D.C. May 21, 2024). These are the words of the United States Government, in an argument made to this Court when defending the very Project BOEM has now immediately halted.

BOEM's unreasoned about-face is itself a sufficient basis for deeming the Stop Work Order arbitrary and capricious. *See Int'l Org. of Masters, Mates, & Pilots v. NLRB*, 61 F.4th 169, 180 (D.C. Cir. 2023) (vacating decision for "no regard for the parties' reliance interests").[10]

### 3.    BOEM's Stop Work Order Contradicts the Evidence

BOEM's Stop Work Order is also arbitrary because its meager three-sentence justification for halting the Project's activities runs "counter to the evidence before the agency." *Evergreen Shipping Agency Am. Corp. v. Fed. Mar. Comm'n*, 106 F.4th 1113, 1117 (D.C. Cir. 2024). BOEM justified the Stop Work Order so that it can purportedly "address concerns related to the protection of national security interests in the United States and prevention of interference with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas, as described in [43 U.S.C. § 1337(p)(4)] of OCSLA." Compl., Ex. A at 1. But BOEM has already spent many years

---

[10] The States of Rhode Island and Connecticut also have major reliance interests at stake, as they have relied on Defendants' approvals for the Project in investing hundreds of millions of dollars of State resources and making many significant and interrelated energy-system planning decisions, among other interests. *See, e.g.*, Complaint at ¶¶ 147-151, *Rhode Island v. Dep't of the Interior*, No. 1:25-cv-00349, Dkt. 1 (D.R.I. filed Sept. 4, 2025).

evaluating environmental analyses for the Project, and "[a]t each stage of the regulatory process . . . [it] consulted with the DOD for the purposes of assessing national security considerations in its decision-making processes."  Record of Decision at B-15.  Additionally, "[t]hroughout the planning and leasing process . . . as well as the NEPA process for the COP review, BOEM considered numerous other OCS uses in order to minimize or eliminate interference" with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas.  Record of Decision at B-18.  BOEM's extensive prior consideration of these issues far outweighs the Stop Work Order's vague and unspecified "concerns."

BOEM's new "concerns" about the Project's impacts on "national security interests" and "prevention of interference with reasonable uses" are especially unpersuasive given BOEM's extensive consultation with DOD throughout the multi-year review process giving rise to the approvals.  Indeed, DOD reviewed the Project and "develop[ed] measures necessary to safeguard against potential liabilities and impacts on DOD activities."  Record of Decision at B-16.  In particular, the DOD Clearinghouse reviewed the Project's COP, identified impacts to the NORAD's operation of the Falmouth, Massachusetts, Air Surveillance Radar-8, and coordinated with BOEM "to address these concerns and to avoid and mitigate them."  *Id.*  As part of this process, Revolution Wind entered into an agreement with the DOD to implement a number of mitigation measures and BOEM "included these measures as Conditions of COP Approval in Appendix A of the [Record of Decision]."  *Id.*; *see also* Gearon Decl., Ex. 1 (Mitigation Agreement).  These documents detail environmental, national security, and safety review and contain mitigation requirements deemed satisfactory to DOD in the protection of national security, with the DOD Clearinghouse confirming that the Project "would not have adverse impacts to DoD missions in the area."  Gearon Decl., Ex. 2 at 1.  BOEM's three-sentence justification reflects that

the basis for the Stop Work Order is a pretextual policy change in position. BOEM has not identified any relevant development since these documents and approvals were issued. The Stop Work Order does not explain what could provide a basis to contradict the robust scientific and technical record supporting DOD's determinations or BOEM's prior approval.

"Unsupported assumption[s]" and "speculative" factual assertions like those provided in the Stop Work Order cannot replace the factual evidence before the agency under the APA. *See Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 70 (D.D.C. 2016). When, as here, the Agency has already acknowledged the existence of factual evidence, the APA prevents it from making a conclusion that "runs contrary to th[at] evidence." *Humane Soc'y of the U.S. v. Jewell*, 76 F. Supp. 3d 69, 132 (D.D.C. 2014). BOEM's Stop Work Order is arbitrary and capricious under the APA.

### B.    BOEM's Stop Work Order Is Contrary to Law

Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Here, BOEM has identified no statutory authority allowing it to issue the Stop Work Order and halt activities on the Project despite the Lease and full approvals already received—and certainly not based on mere "concerns" that the approvals were incompatible with the factors set forth in 43 U.S.C. § 1337(p)(4). The Stop Work Order is contrary to law and must be set aside.

The Stop Work Order invokes Section 1337(p)(4) to justify its mandate to "halt all ongoing activities." Compl., Ex. A at 1. That provision states that "[t]he Secretary shall ensure that any activity under this subsection is carried out in a manner that provides for"— "safety", "protection of the environment," "public notice and comment" on proposed leases, and "protection of national security interests," among other things. By its plain terms, Section 1337(p)(4) does not grant

BOEM authority to order a halt on activities on an already established leasehold based on mere "concerns" about the Project's ongoing compatibility with the specified factors. Indeed, recognizing such authority would give BOEM sweeping power to halt activities on approved leases at its whim, as BOEM would inevitably be able to invoke some "concern" about a project's impact on, for example, "safety" or the "environment."[11]

Interpreting Section 1337(p)(4) to grant BOEM carte blanche to order a halt of activities on a lease based on mere "concerns" over the identified factors is also at odds with the OCSLA's structure. As noted above, a different provision of OCSLA—43 U.S.C. § 1334(a)(1)—grants the Secretary of the Interior the authority to issue regulations allowing for the "suspension or temporary prohibition of any operation or activity" pursuant to a lease or permit. But that authority is limited to situations in which "there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits . . . , or to the marine, coastal, or human environment." 43 U.S.C. § 1334(a)(1). The Stop Work Order makes no finding of any such threat. *See* Compl. Ex. A. Section 1334(a)(1)'s careful constraints on the Department's authority to suspend or prohibit activities authorized by a lease or permit undermines any argument that Section 1337(p)(4) somehow grants that authority *without* such limits.

That interpretation of Section 1337(p)(4) is also at odds with the Department's OCSLA regulations. As explained in greater detail below, the Department has established a careful process by which it can address a lessee's perceived non-compliance with OCSLA and its regulations. *See* 30 C.F.R. § 585.106. That process includes notice to the lessee, an opportunity to cure the problem,

---

[11] The Stop Work Order also invokes 30 C.F.R. § 585.102(a) which, in relevant part, is derivative of Section 1337(p)(4). In any event, 30 C.F.R. § 585.102(a) cannot be read to confer statutory authority that Defendants otherwise lack.

and specific remedies if the violation persists (including the option for the Department's Bureau of Safety and Environmental Enforcement ("BSEE")—not BOEM—to order a halt of activities in appropriate circumstances under 30 C.F.R. 285.401). *See infra* at 31-32.[12] That regime for addressing noncompliance—including its procedural protections—is essentially irrelevant if BOEM can order a halt of activity on its own say-so, without procedural protections, based merely on "concerns" about the Project.

The Stop Work Order's reliance on Section 1337(p)(4) with respect to purported "national security interests" is particularly misplaced. Congress recognized the need to accommodate national security interests on leaseholds, and it provides that all leases must contain a provision "whereby authority is vested in the Secretary, upon a recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or the President of the United States . . . to suspend operations under any lease." 43 U.S.C. § 1341(c). Revolution Wind's lease contains just such a provision. Unsurprisingly, BOEM has not invoked this section of the lease, seeing as there is no relevant war or national emergency, and there has been no such cited recommendation by the Secretary of Defense.

Any claim that Section 1337(p)(4) grants BOEM the authority to order a halt of activities on a previously-approved project based simply on vague "concerns" about any of the Section 1337(p)(4) factors must also be viewed with "skepticism" under the major questions doctrine. *West Viginia v. EPA*, 597 U.S. 697, 732 (2022). Congress included detailed provisions in OCSLA providing BOEM limited authority to suspend or cancel leases and operations in leased areas only when certain conditions are met. *See, e.g.*, 43 U.S.C. §§ 1334(a), 1341(c). Interpreting Section

---

[12] A cessation order "does not extend the term of [a] lease or grant," 30 C.F.R. § 285.402(c), as opposed to a suspension order, which "extends the expiration date for the relevant period of [a] lease or grant for the length of time the suspension is in effect," *id.* § 585.415(b).

1337(p)(4) to also provide that authority, despite its silence on the matter, would grant BOEM an impermissible "transformative expansion in [its] regulatory authority." *West Viginia*, 597 U.S. at 724 (citation omitted). The vast economic impact for not only Revolution Wind, but also Connecticut and Rhode Island, further indicates that this is a "major question" subject to additional scrutiny before determining that Congress could have intended to delegate this vast power to the Secretary. *See Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758 (2021). Because Congress could not have intended to confer such vast discretion in Section 1337(p)(4) without "exceedingly clear language," Defendants' actions are contrary to law and should be set aside. *West Virginia*, 597 U.S. at 764.

### C.    BOEM's Stop Work Order Was Issued Without Observance of Procedure as Required by Law In Violation of 5 U.S.C. § 706

Under the APA, the Court shall also "hold unlawful and set aside" final agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). That requires agencies to comply with both "procedural regulations and statutory requirements." *Torres v. Del Toro*, 2022 WL 5167371 at *5 (D.D.C. Oct. 5, 2022); *see also Int'l Trade Comm'n v. ASAT, Inc.*, 411 F.3d 245, 254 (D.C. Cir. 2005). Here, Defendants violated the procedures that its regulations require it to follow when addressing a Project's potential non-compliance with OCSLA.

As noted, the Stop Work Order invoked BOEM's purported "concerns" about the Project's potential incompatibility with various factors listed in 43 U.S.C. § 1337(p)(4) and 30 C.F.R. § 585.102(a). *See* Compl. Ex. A at 1. To the extent BOEM meant to assert that the Project had failed to comply with those provisions, it had to address the perceived violation under 30 C.F.R. § 585.106, which sets forth the specific procedures that BOEM must follow when taking corrective action for any failure to comply with OCSLA or its regulations. Under Section 585.106, BOEM must first issue "a notice of noncompliance" that tells the lessee "how [it] failed to comply with

this part, any order of the Director and/or the provisions of [its] lease, grant or other approval, and will specify what [the lessee] must do to correct the noncompliance and the time limits within which [it] must act." 30 C.F.R. § 585.106(b)-(c). If the lessee "fail[s]" to "take the actions specified in a notice of noncompliance . . . within the time limit specified," then (1) BSEE has the authority to issue a "cessation order" under 30 C.F.R. § 285.401; (2) the Secretary of the Interior has authority to "cancel" the lease under 30 C.F.R. § 585.422 if certain conditions are met; and (3) BOEM "may assess civil penalties" in certain limited circumstances. *Id.* § 585.106(d).

BOEM failed to follow these procedures. The Stop Work Order implies that the Project has failed to comply with 43 U.S.C. § 1337(p)(4) and 30 C.F.R. § 585.102(a) but does not provide Revolution Wind with notice or an opportunity to comply—or otherwise follow the other procedural requirements of 30 C.F.R. § 585.106. *See* Compl. Ex. A at 1. "[A]gencies may not violate their own rules and regulations to the prejudice of others." *See Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005). BOEM's total failure to comply with the regulations' procedures renders the Stop Work Order invalid.

### D.    The Stop Work Order Deprives Revolution Wind of a Significant Property Interest Without Due Process

The Stop Work Order is also unconstitutional because it violates Revolution Wind's Fifth Amendment Due Process rights. The Fifth Amendment guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const., amend. V. "In assessing constitutional due process claims, [courts] ask two questions: Did the Government deprive the party of a protected property interest? If so, what process was due?" *Amoco Prod. Co. v. Fry*, 118 F.3d 812, 819 (1997).

Revolution Wind has a protected property interest in its lease. *See Hoyl v. Babbitt*, 129 F.3d 1377 (10th Cir. 1997); *Shell Offshore Inc. v. Greenpeace, Inc.*, No. 3:12-cv-00042, 2012 U.S.

Dist. LEXIS 74387, at *44 (D. Alaska May 29, 2012) (finding oil company had a property interest in its OCS lease).  The Stop Work Order suspends Revolution Wind's rights to develop its lease by requiring it to "halt all ongoing activities," thus depriving Revolution Wind of its property interest.  Compl., Ex. A.  Even such "temporary or partial impairments to property rights . . . merit due process protection."  *Amoco Prod. Co.*, 118 F.3d at 819 (quoting *Connecticut v. Doehr*, 501 U.S. 1, 12 (1991)).

Revolution Wind must therefore "be given an opportunity" for a notice and "a hearing *before* [it] is deprived of [that] significant property interest."  *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) (citations omitted) (emphasis in original).  In "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event," pre-deprivation process may not be required.  *Id.*  But the government has made no effort to identify any such "extraordinary circumstances" here.  Instead, the Stop Work Order immediately ordered Revolution Wind to cease its activities, without notice, a hearing, or due process of any kind.  *See* Compl., Ex. A.  That violated Revolution Wind's constitutional due process rights.

## II.  REVOLUTION WIND FACES IRREPARABLE HARM ABSENT IMMEDIATE RELIEF

Revolution Wind is suffering immediate, irreparable harm from the Stop Work Order.  Revolution Wind conservatively estimates that the Stop Work Order is currently causing losses of more than $2 million per day to the Project (which may increase significantly with the passage of time).  Murphy Decl. ¶¶ 18, 21.  If Revolution Wind does not obtain immediate relief from the Stop Work Order by **September 22**, it will suffer additional certain, imminent, and irreparable harms because the Order increases costs and creates construction delays that threaten Project cancellation, posing an existential risk to Revolution Wind.  *Id.* ¶¶ 5, 17-35, 40.

### A.    Revolution Wind Faces Substantial Irreparable Harm From Construction Delays Due To The Stop Work Order

Absent an injunction, Revolution Wind will suffer an unplanned work stoppage that will generate cascading delays, substantially increase costs, and ultimately threaten Project viability in the absence of relief from the Stop Work Order by **September 22.**

Revolution Wind has carefully sequenced its construction schedule to account for seasonal weather variations and has contracted (and reserved for a limited time) specialized vessels necessary for the Project's construction that are in limited supply globally.  An action that threatens the plaintiff's ability to timely complete the project to avoid missing contractual deadlines (particularly where, as here, the contracts could be cancelled) poses irreparable harm.  *Columbia Gas Transmission Corp. v. An Easement to Construct, Operate, & Maintain a 24-inch Gas Transmission Pipeline Across Properties in Greene Cnty*., No. 3:07CV00028, 2007 WL 2220530, at *4 (W.D. Va. July 31, 2007); *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 828-29 (4th Cir. 2004) (granting a preliminary injunction to keep a pipeline project on schedule to avoid incurring substantial costs and missing contractual deadlines).

Here, if the Stop Work Order is not lifted by **September 22**, there is a high risk Revolution Wind may not complete installation of critical infrastructure—the Project's second offshore substation and the Project's remaining inter-array cables this year as scheduled.  There is an extremely narrow period to complete the work needed before the highly specialized vessels required to conduct the work are allowed to depart to begin other work pursuant to last vessel availability dates in the existing contracts (which allow contracted vessels to leave the Project if work is not complete by a contracted date) and the time needed to complete construction tasks

becomes longer and riskier with worsening winter weather conditions.  Murphy Decl. ¶¶ 31-32.[13]
For example, a wind turbine that requires approximately three days to install in the summer could
take five to ten days to install in the winter due to worsening weather.  *Id*. ¶ 31.

Further delay of construction would require the Project to attempt to renegotiate vessel
contracts if the Project misses critical milestones, with no guarantee when (or if) the necessary
vessels would be available.  *Id*. ¶¶ 21, 30.  Even if replacement vessels were available, contracting
for them can lead to significant increases in daily costs.  *Id*. ¶ 21.  Moreover, there will be cascading
effects for installation of Project components that rely on installation of the second offshore
substation, such as array cables and export cables.

In ideal weather conditions, substation installation requires approximately five days,
including one day to moor the vessel, lift the substation from the barge, and set down the substation
on a modular support frame, and four days to weld and finalize the substation.  *Id*. ¶ 32.  In
particular, offshore substation installation requires calm weather (e.g., suitable wave period,
direction, and size, and suitable wind speed) and weather and seas in this part of the Northern
Atlantic Ocean worsen during the winter months.  *Id*.  Historic weather data for November and
December indicates that there are very few windows of time to install the substation topside based
on suitable weather conditions (*i.e.*, wave period, direction, and size).  *Id*.  Even in October,
historical weather data suggests that these suitable windows will start to decrease.  *Id*.
Accordingly, the farther out from the end of September or beginning of October installation of the
substation topside is pushed, the more challenging the weather and seas become, and the less likely
it is that there will be a suitable weather window to complete installation in 2025.

---

[13] Revolution Wind is required to pay for the vessels' time even if the work is not completed.
Murphy Decl. ¶ 29.

The second offshore substation's topside now sits idle atop the specialized heavy transport vessel, White Marlin, in the Atlantic Ocean. *Id.* ¶¶ 22, 29. If installation of the second offshore substation cannot be completed in 2025, the Project will likely have to offload the more than 3,000-ton substation topside from the White Marlin, via the Bokalift 2, which has a last vessel availability date of November 9, 2025. *Id.* ¶ 29. This offloading would raise significant logistical issues, including to ensure the quality and integrity of the topside, and require significant engineering and expense as well as the securing of port infrastructure with sufficient bearing capacity or an alternative heavy transport vessel. *Id.* ¶ 22. The specialized vessels required are in limited supply globally and typically contracted approximately two years before the date they are needed, which also creates significant uncertainty as to whether the second offshore substation could be installed in time to meet the deadlines in the Project's PPAs. *Id.* ¶¶ 29, 33.

Furthermore, the more than 3,000-ton substation topside was designed to be lifted directly from the White Marlin onto the substation's monopile foundation and was never intended or engineered to be lifted onto another heavy transport vessel or back to port. *Id.* ¶ 22. If Revolution Wind was forced to move forward with this option, it would create further delays and impair the Project. *Id.* Furthermore, even if the Stop Work Order was lifted after the Bokalift 2's last vessel availability date (currently November 9, 2025), there is a significant risk that Revolution Wind would not be able to re-secure this necessary vessel to complete the installation in 2026 (*i.e.*, to meet the commercial operations date for three of the PPAs). *Id.* ¶¶ 29, 33. If the Stop Work Order is not lifted by **September 22**, it is likely that the second offshore substation could not be installed in 2025, significantly increasing the risk that the Project cannot be completed on time and posing an existential risk to the Project, and thus to Revolution Wind. *Id.* ¶¶ 32-33.

If the Stop Work Order is not lifted by **September 22**, it also becomes unlikely that

Revolution Wind could complete inter-array cable installation in 2025, as the specialized vessel required to do that work can leave the Project site by contract on December 31, 2025. *Id*. ¶ 34. This would push the Project's commercial operation date past the deadlines in certain of its PPAs, with no current mechanism for Revolution Wind to request a further extension and the utility buyer having a termination right. *Id*. ¶¶ 34-35.[14]  Delay or cancellation would result in existential threats to Revolution Wind's business, reputational harm, and the loss of billions of dollars, which Revolution Wind is not certain it could recover. *Id*. ¶¶ 27, 35.

Each of the foregoing harms are independent grounds for relief:  they are "likely in the absence of an injunction," *Winter*, 555 U.S. at 22 (emphasis removed), and "no adequate compensatory or other corrective relief will be available at a later date," *In re NTE Conn., LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022) (internal quotations and citation omitted).  A stay and injunction is necessary to avert these harms.

### B.    Revolution Wind Faces Existential Threats to Its Business If The Stop Work Order Remains In Place

The longer the Stop Work Order remains in place, the more likely it is that the Stop Work Order would lead to the Project's termination.  If the work cannot be completed as scheduled this season, the Project could be materially delayed, and if vessel availability or other consequences of delay (such as PPA terminations) make the timing or cost to proceed infeasible, the Project would be cancelled.  Overall, the delay caused by BOEM's Stop Work Order is currently causing Revolution Wind losses of more than $2 million per day.  Murphy Decl. ¶ 25. If the Project is cancelled, Revolution Wind anticipates breakaway costs in excess of $1 billion and the potential

---

[14] If Project construction and commercial operations were delayed beyond the PPA deadlines, Revolution Wind would also risk losing the $28 million it has posted under the five PPAs, which Revolution Wind is not sure it could avoid or recover.  *See* Murphy Decl. ¶ 27.

loss of its entire investment multi-billion investment for a total of over $6 billion in losses (not including future anticipated revenues).  *Id.* ¶ 9.  That is exactly the kind of enterprise-level harm courts in this Circuit have recognized as irreparable.

"[F]inancial harm can 'constitute irreparable harm . . . where the loss threatens the very existence of the movant's business.'"  *S. Educ. Found. v. United States Dep't of Educ.*, No. CV-25-1079 (PLF), 2025 WL 1453047, at *14 (D.D.C. May 21, 2025) (citation omitted) (cleaned up); *see also Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, No. 18-1026, 2018 WL 4154794, at *1 (D.C. Cir. Aug. 10, 2018) (finding irreparable harm absent injunctive relief where implementation of [an agency's] Order [would] result in substantial, unrecoverable losses in revenue that [might] indeed threaten the future existence of [petitioners'] businesses.").  This Court held that the government's decision to block importation of products caused irreparable harm to companies that "generate[d] all, or virtually all, of their revenue from" the imported products.  *Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 76-77 (D.D.C. 2010), *aff'd sub nom. Sottera, Inc. v. FDA*, 627 F.3d 891 (D.C. Cir. 2010).  There, as here, "economic loss absent preliminary injunctive relief [wa]s sufficiently grave to threaten plaintiffs' very existence."  *Id.* at 77.

Defendants' action here presents a grave threat to Revolution Wind's business. Defendants' Stop Work Order interferes with Revolution Wind's ability to carry out construction or operation of the Project.  Cancellation of the Project would require Revolution Wind to incur billions of dollars in losses.  *See supra* at 36.  Such enterprise-threatening harm is irreparable, including because there is no guarantee Revolution Wind can recover money damages against Defendants. *See Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 (applicants "at risk of irreparable harm" where government action "depriv[ed] them of rent payments with no guarantee of eventual recovery").  The APA, which waives Defendants' sovereign immunity, does not allow for

monetary relief.  5 U.S.C. § 702 (right of review "other than money damages").  Thus, this Court

has recognized these types of losses as "irreparable per se."  *Smoking Everywhere*, 680 F. Supp.

2d at 77 n.19 (citation omitted); *Nalco Co. v. EPA*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011) (same).

A "temporary stay" and injunction "simply ensure[s] that [the agency] d[oes] not impose

unrecoverable losses of millions of dollars and potentially jeopardize a new facility without

fulfilling the basic requirements of reasoned explanation."  *In re NTE Conn. LLC*, 26 F.4th at 991.

### C.    Revolution Wind Faces Substantial Irreparable Reputational Harm Due To The Stop Work Order

"Injury to reputation can . . . support the issuance of an injunction."  *Atlas Air, Inc. v. Int'l*

*Bhd. of Teamsters*, 280 F. Supp. 3d 59, 103 (D.D.C. 2017), *aff'd*, 928 F.3d 1102 (D.C. Cir. 2019).

The government's action will harm Revolution Wind's reputation, which constitutes irreparable

harm.

Cancellation of the Project would in turn mean that Revolution Wind is in default of its

PPAs with Connecticut and Rhode Island.  Murphy Decl. ¶¶ 26-28.  Where the government's

action "jeopardize[s]" the plaintiff's "binding contracts" with other entities, the plaintiff not only

loses economic value but also "good will."  *Smoking Everywhere*, 680 F. Supp. 2d at 76.

Reputational damage is an irreparable injury. *Wash. Teachers' Union, Loc. No. 6 v. Am. Fed'n of*

*Teachers*, 751 F. Supp. 2d 38, 56 (D.D.C. 2010); *Bell Helicopter Textron, Inc. v. Airbus*

*Helicopters*, 78 F. Supp. 3d 253, 274-75 (D.D.C. 2015) ("risk of future reputational harm, lost

sales, and lost customers" found irreparable where such losses "defy attempts at valuation");

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1157 (10th Cir. 2001)

("[N]o remedy could repair the damage to [plaintiff]'s reputation and credibility.").  "[I]t is

unquestionable that plaintiffs will suffer severe reputational harm if they are forced to renege on

their contracts with growers, and such reputational harm will almost certainly be irreparable."

*Everglades Harvesting & Hauling, Inc. v. Scalia*, 427 F. Supp. 3d 101, 116 (D.D.C. 2019).

III.    **THE REMAINING EQUITABLE FACTORS STRONGLY FAVOR IMMEDIATE RELIEF**

The balance of the equities and the public interest clearly favor immediate relief because, as Defendants have acknowledged, the public has an interest in agencies following the law and the Project provides benefits to the public.  Conversely, neither the public nor Defendants will suffer harm if this Court preserves the status quo by enjoining the unlawful Stop Work Order.

A.    **Neither the Public Nor Defendants Will Suffer Harm from Preliminary Injunctive Relief**

Neither the public nor Defendants will suffer harm if this Court preserves the status quo by granting Revolution Wind immediate relief.  After all, "[t]here is generally no public interest in the perpetuation of unlawful agency action."  *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).   That is particularly true here, where Defendants have not even attempted to adequately demonstrate harm.  Indeed, the Stop Work Order lacks justification, let alone evidentiary basis.  And the Stop Work Order directly conflicts with agency consensus that the Project complies with applicable law.

B.    **The Public Interest In Agencies Following Federal Law Weighs Strongly In Favor An Injunction**

There is, however, "a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'"  *Newby*, 838 F.3d at 12 (citation omitted); *see also Cent. United Life, Inc. v. Burwell*, 128 F. Supp. 3d 321, 330 (D.D.C. 2015) ("Forcing federal agencies to comply with the law is undoubtedly in the public interest."), *aff'd*, 827 F.3d 70 (D.C. Cir. 2016).

This is especially so where the public also has a specific interest in the certainty and reliability of Defendants' permitting and approvals process.  *See, e.g.*, *Sierra Club v. U.S. Army*

*Corps of Eng'rs*, 990 F. Supp. 2d 9, 43 (D.D.C. 2013). Indeed, Defendants admitted the lawfulness

of the procedures and approvals for Revolution Wind, stating "[w]here, as here, a developer has

complied with agency rules and satisfied federal statutory requirements, it should be able to rely

on its permits, as it may need to make business and financial decisions in furtherance of completing

the authorized activity." *Green Oceans v. U.S. Dep't of the Interior*, No. 1:24-cv-00141-RCL,

Dkt. 38 at 43; *see* 43 U.S.C. § 1332(3) ("[T]he [O]uter Continental Shelf is a vital national resource

reserve held by the Federal Government for the public, which should be made available for

expeditious and orderly development, subject to environmental safeguards, in a manner which is

consistent with the maintenance of competition and other national needs . . . ."). Allowing

Defendants to halt this Project based on nothing but unsupported "concerns," in violation of its

own procedures, nearly two years after onshore construction began, undermines the public's strong

interest in the reliability of federal agency processes and approvals.

## C.    The Public Interest Strongly Favors Relief

Denying an injunction here would: (1) deprive the public of significant economic benefits

from the Project; (2) present a risk to New England grid reliability, potentially depriving Rhode

Island and Connecticut of 704 MW of electricity generation; and (3) harm public health.

Defendants' Stop Work Order offers nothing to the contrary: It asserts no imminent or long-term

harms from the Project.

Denying an injunction would have significant negative effects on jobs. Over 2,000 workers

have been involved in the construction of the Project. Gearon Decl. ¶ 46. To date, approximately

two million labor hours have been spent on the construction of this Project, including more than

800 local union labor full-time equivalents, not to mention Revolution Wind's contribution to more

than 200 additional union labor full-time equivalents supporting the redevelopment of the State

Pier in New London, Connecticut. *Id.* It is estimated that the Project will generate 236 full-time

equivalent jobs annually during the Project's operations and maintenance work.  *Id.*; *see also* Decl. of Comm'r Katherine S. Dykes ¶ 19, *State of New York v. Trump*, No. 25-cv-11221-WGY, Dkt. 211 (D. Mass filed Aug. 28, 2025) ("Dykes Decl.") (discussing the jobs the Project supports in Connecticut and Rhode Island alone); *see also* Decl. of Acting Comm'r Christopher Kearns ¶ 12, *State of New York v. Trump*, No. 25-cv-11221-WGY, Dkt. 212 (D. Mass filed Aug. 28, 2025) ("Kearns Decl.") (discussing the Project's economic impact on the state of Rhode Island, including "creating a pipeline of long-term operations and maintenance careers tied to the state's growing ocean economy").  If the Project is delayed or cancelled, many if not all of these jobs will be lost. Gearon Decl. ¶ 46.  The public interest favors maintaining those economic opportunities.  *Sierra Club*, 990 F. Supp. 2d at 42 ("The public has a strong interest in the jobs and economic growth that construction and operation of the [] pipeline will create."); *see also Columbia Gas Transmission, LLC v. 84.53 Acres of Land, More or Less, In Calhoun, Marshall, Ritchie, Tyler, & Wetzel Cntys.*, 310 F. Supp. 3d 685, 696 (N.D. W.Va. 2018) (recognizing benefit to public where "construction will hasten the creation of approximately 8,000 temporary jobs").

The public will also benefit from the rents, operating fees, and state taxes Revolution Wind will pay during construction and operations.  Over the lifetime of the Project, Revolution Wind anticipates it will pay $178 million in rents and operating fees, as well as generate hundreds of millions in state tax revenues.  Murphy Decl. ¶¶ 38-39.  It is in the public's interest to collect these significant revenues.  *See Nat. Res. Def. Council v. Kempthorne*, 525 F. Supp. 2d 115, 127 (D.D.C. 2007) (finding that an energy project that would "generate millions of dollars in revenue" was "clearly in the public interest"); *Columbia Gas Transmission*, 310 F. Supp. 3d at 696 (recognizing that $55 million annual property tax revenue from natural gas project would benefit the public).

Furthermore, delay of the Project will deprive ratepayers in New England of electricity cost

savings.    For example, the Commissioner of Connecticut's Department of Energy and Environmental Protection has estimated that the Project is expected to save Connecticut ratepayers hundreds of millions of dollars in direct savings over 20 years due to the Project's fixed contract prices, which "are lower than the average projected cost of energy and [Renewable Energy Certificates] over this period." Dykes Decl. ¶ 16.  The Project is also expected to save Connecticut and New England ratepayers indirect cost savings "[b]y providing a new source of low-marginal cost power in New England[,]" further "caus[ing] wholesale energy and capacity market costs in ISO New England to be lower." *Id*. ¶ 17.  "Regionally, these wholesale market benefits from Revolution Wind are expected to be in the hundreds of millions of dollars each year, of which approximately 25% of the benefits will accrue to Connecticut ratepayers, based on [the] state's share of total regional load." *Id*.  It is in the public's interest to receive these significant savings. *In re NTE Conn.*, 26 F.4th at 992 (granting a stay and finding that there would be harm in "delaying [a] years-long electricity infrastructure project that could benefit consumers in the region through more efficient (*i.e.*, less expensive) electricity.").

The New England grid operator acknowledged the Stop Work Order and said that "[d]elaying the project will increase risks to reliability," including potential "near-term impacts to reliability in the summer and winter peak period." Gearon Decl. ¶ 42.  Relatedly, Rhode Island's Acting Energy Commissioner at Rhode Island's Office of Energy Resources recently testified that losing the Project's "load would negatively impact reliability in Rhode Island and throughout New England." Kearns Decl. ¶ 12.  Similarly, the Commissioner of Connecticut's Department of Energy and Environmental Protection recently testified that "Connecticut specifically is counting on [its] share of Revolution Wind to meet 5% of [the] state's electric distribution company load once the project comes online." Dykes Decl. ¶ 15.  Furthermore, both Connecticut and Rhode

Island officials have provided that offshore wind projects are particularly important in the winter, when New England's energy grid faces its greatest reliability challenges. *Id.* ¶ 12; Kearns Decl. 13. The public interest favors reducing risk to the region's grid reliability. *Kempthorne*, 525 F. Supp. 2d at 127 ("[D]evelopment of domestic energy resources is of paramount public interest and will be harmed (at least to some extent) if that development is delayed.").

The Project will also address State energy needs, generating approximately 704 MW of reliable and needed energy for Rhode Island and Connecticut once operational. Gearon Decl. ¶ 44. That is enough to power more than 350,000 homes. *Id.* In so doing, the Project will assist Connecticut in reaching its goal of providing 100% zero-carbon electricity to customers by 2040 and Rhode Island in reaching its goal of 100% renewable energy by 2033. *Id.* ¶ 43.

In defending the Project's federal approvals in ongoing litigation in this Court, Defendants have conceded, "[e]njoining the agency authorizations associated with the Revolution Project would also hinder the public interest, which will be served by the Revolution Project's capacity to provide 704 MW of reliable and needed energy to the Connecticut and Rhode Island power grids[.]" *Green Oceans v. U.S. Dep't of the Interior*, No. 1:24-cv-00141-RCL, Dkt. 38 at 2. And Defendants argued that enjoining Project construction "would pose significant harm to the public's interest in the certainty and reliability of Defendants' permitting and approvals process." *Id.* at 43.

Canceling or delaying the Project would harm state energy goals and deprive the public of those benefits. *See, e.g.*, *W. Watersheds Project v. Salazar*, 692 F.3d 921, 923 (9th Cir. 2012) (considering the benefits of "state . . . energy goals").

Finally, the Project will also have significant criteria air-pollutant emission-reduction benefits which will result in significant health benefits. Gearon Decl. ¶ 44. For example, the Project is expected to result in estimated avoided emissions of between 599 to 749 tons of nitrogen

oxides per year and 318 to 398 tons of sulfur oxides per year, as a result of displacing fossil fuel generation. *Id*. Therefore, the Rhode Island Department of Environmental Management has concluded "that the [P]roject will reduce air emissions that are harmful to human health and the environment." *Id*. Similarly, the Rhode Island Office of Energy Resources has determined that the Project will result in public health benefits. *Id*. The public has a clear interest in those health benefits. *See Env't Democracy Project v. Green Sage Mgmt., LLC*, No. 22-CV-03970, 2022 WL 4596616, at *4 (N.D. Cal. Aug. 23, 2022) (granting preliminary injunction that "implicate[d] the public's interest in protecting the environment and public health").[15]

## CONCLUSION

For the foregoing reasons, this Court should grant Revolution Wind's motion for a stay of the Stop Work Order and a preliminary injunction that bars Defendants from enforcing the Stop Work Order.

Dated: September 5, 2025                     Respectfully submitted,

                                        By */s/  Janice M. Schneider*
                                             Janice M. Schneider (D.C. Bar No. 472037)
                                             Stacey L. VanBelleghem (D.C. Bar No. 988144)
                                             Roman Martinez (D.C. Bar No. 1001100)
                                             Devin. M. O'Connor (D.C. Bar No. 1015632)
                                             Rachael L. Westmoreland* (D.C. Bar No. 90034032)
                                             LATHAM & WATKINS LLP
                                             555 11th Street NW, Suite 1000
                                             Washington, D.C. 20004

---

[15] Federal Rule of Civil Procedure 65(c) "vest[s] broad discretion in the district court" as to whether to order a plaintiff seeking a preliminary injunction to provide a security to pay the costs and damages of a party found to have been wrongly enjoined. *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999). A court can "dispense with any security requirement whatsoever where the restraint will do the defendant no material damage." *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980) (internal quotation marks and citation omitted). Defendants will not suffer any material damages from the Court restoring the status quo and allowing Revolution Wind to proceed under its existing federal approvals. The Court should not order a bond.

Tel:  (202) 637-2200
Fax:  (202) 637-2201
Email: janice.schneider@lw.com
          stacey.vanbelleghem@lw.com
          roman.martinez@lw.com
          devin.o'connor@lw.com
          rachael.westmoreland@lw.com

*Counsel for Plaintiff Revolution Wind, LLC*

*\*Application for admission to the U.S. District Court for the District of Columbia pending*

46