## IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF COLUMBIA

REVOLUTION WIND, LLC,

     *Plaintiff*,

   v.

DOUG BURGUM, in his official capacity as
Secretary of the U.S. Department of the Interior;

UNITED STATES DEPARTMENT OF THE
INTERIOR;

MATTHEW GIACONA, in his official capacity
as Acting Director of the Bureau of Ocean Energy
Management;

BUREAU OF OCEAN ENERGY
MANAGEMENT;

KENNETH STEVENS, in his official capacity as
Principal Deputy Director Exercising the
Delegated Authorities of the Director of the
Bureau of Safety and Environmental Enforcement;
and

BUREAU OF SAFETY AND
ENVIRONMENTAL ENFORCEMENT,

     *Defendants*.

Civil Action No. 1:25-cv-2999

### DECLARATION OF MELANIE GEARON IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND STAY PENDING REVIEW

Pursuant to 28 U.S.C. § 1746(2), I, Melanie Gearon, declare as follows:

    1.    I am employed by Orsted North America Inc. ("Ørsted") as the Head of Northeast

Permitting, including for the commercial-scale Revolution Wind Farm and Revolution Wind

Export Cable (together, the "Project"). The Project is owned by Revolution Wind, LLC

("Revolution Wind"), which is a joint venture indirectly owned in equal part by Ørsted and an investment joint venture partner.

2.    I have been employed at Ørsted since November of 2018 as a manager of permitting and environmental affairs and have held the position of the Head of Northeast Permitting since March 2022.  From 2017 to 2018, I was an employee of Deepwater Wind, LLC, an entity subsequently acquired by an Ørsted affiliate.  Collectively, I have worked on the Revolution Wind Project for approximately 7 years, participating in and overseeing all aspects of the permitting and environmental studies and surveys conducted for the Project.  I have over 18 years of professional experience in environmental science, impact assessment, and offshore permitting.  I obtained my Bachelor of Science in Marine Science and Biology from Southampton College of Long Island University and a Master of Science in Fisheries Science from the University of Rhode Island.

3.    As Ørsted's Head of Northeast Permitting, I am and have been involved in and aware of numerous aspects of the Project, including: site investigation activities; project layout and design; local, state, and federal permitting, including the Project's Endangered Species Act ("ESA"), Magnuson-Stevens Fishery Conservation and Management Act, and Marine Mammal Protection Act consultations; and stakeholder and market affairs management.

4.    I have reviewed the August 22, 2025 order issued by the Acting Director of the Bureau of Ocean Energy Management ("BOEM") to Revolution Wind "to halt all ongoing activities related to the Revolution Wind Project on the outer continental shelf" and to "not resume activities until BOEM informs [Revolution Wind] that BOEM has completed its necessary review"

(the "Stop Work Order").  A true and correct copy of BOEM's Stop Work Order has been attached to Revolution Wind's Complaint, Dkt. 1-1.[1]

5.    I am personally familiar with the Project's environmental permitting, its development history, and the ongoing and future impacts of the Stop Work Order if not enjoined.

6.    I execute this Declaration in support of Revolution Wind's Motion for a Preliminary Injunction and Stay Pending Review in this case based on my personal knowledge of the matters referred to herein and, if called upon to do so, could and would testify truthfully thereto. I am over 18 years of age and competent to testify about the matters set forth herein.

**A.    The Revolution Wind Project's Multi-Year Development Process**

7.    Revolution Wind has invested significant resources in the extensive, multi-year planning and development process for the Project, including through years of site characterization surveys and data collection, the development of voluminous technical and scientific submissions to federal, state, and local agencies, participating in public consultation and review processes, and years constructing the Project.

8.    BOEM's environmental, national security and safety review for the Project and its lease area dates back nearly 16 years when the Agency conducted a review and environmental assessment, including through a task force, which included participants from the Department of Defense ("DOD"), on potential wind energy areas offshore Massachusetts and Rhode Island.  For

---

[1] The Stop Work Order is also available on BOEM's website at https://www.boem.gov/sites/default/files/documents/renewable-energy/Director%26%23039%3BsOrder-20250822.pdf?VersionId=Y674sNo8zi7jLu3VWRvq2hFb_8KtMldc.

example, materials from the December 10, 2010,[2] May 2, 2011,[3] and March 1, 2012[4] task force meetings reflect early and ongoing participation by the U.S. Navy, including the Office of the Chief of Naval Operations, N43-Navy Fleet Readiness Division, and the Naval Undersea Warfare Center - Division Newport.   This review was conducted for a variety of purposes, including to assess whether the Project's planning, leasing, and National Environmental Policy Act ("NEPA") processes for the COP review complied with 43 U.S.C. § 1337(p)(4).   After issuing a draft environmental assessment and soliciting public comment, BOEM issued a final environmental assessment in May 2013, concluding leasing and site assessment activities in the proposed lease sale area would result in no significant environmental effects.   As described in that environmental assessment, after considering agency and public comments BOEM defined the wind energy area to exclude high value fishing grounds so those areas would not be considered for leasing.[5]   After this extensive process, on July 31, 2013, BOEM conducted a competitive lease sale for commercial leasing for wind power on the outer continental shelf ("OCS") offshore Rhode Island and Massachusetts.   After the competitive bidding process, Deepwater Wind New England, LLC

---

[2] BOEM, Attendees at Massachusetts/Rhode Island Joint Task Force Meeting (December 10, 2010), available at https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/TaskForceMeetingAttendees.pdf.

[3] BOEM, Attendees at Massachusetts/Rhode Island Joint Task Force Meeting (May 2, 2011), available at https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/BOEMREJointRI-MA_TFMAttendees5-2-11.pdf.

[4] BOEM Rhode Island Renewable Energy Task Force Webinar (March 1, 2012), available at https://www.boem.gov/sites/default/files/uploadedFiles/BOEM/Renewable_Energy_Program/State_Activities/BOEM%20RI%20Task%20Force%20March%201%20Presentation.pdf.

[5] BOEM, Revised Environmental Assessment: Commercial Wind Lease Issuance and Site Assessment Activities on the Atlantic Outer Continental Shelf Offshore Rhode Island and Massachusetts (May 2013) at Section 1.5, available at https://www.boem.gov/sites/default/files/documents/renewable-energy/BOEM%20RI_MA_Revised%20EA_22May2013.pdf.

acquired Lease OCS-A 0486 with an effective date of October 1, 2013.[6]  In 2020, Deepwater Wind New England, LLC segregated a portion of the Lease, resulting in the creation of Lease OCS-A 0517, which was assigned to another entity.[7]  The remaining portion of the Lease was assigned to DWW Rev I, LLC, which later changed its name to Revolution Wind, LLC.[8]

9.      To understand and characterize the environment and the Project site, Revolution Wind and its affiliates conducted extensive surveys of the Project area pursuant to the leases and a Site Assessment Plan that BOEM approved on October 12, 2017.  These surveys included meteorological, bathymetric, geological, geotechnical, geophysical, biological, archeological, hazard, and oceanographic surveys.[9]

10.     Revolution Wind submitted a detailed Construction and Operations Plan ("COP") to BOEM in March 2020, describing the planned facilities and construction and operation activities for the Project.  Revolution Wind also submitted updates and revisions to the COP throughout the multi-year review process in response to comments received and requests for additional information from BOEM, other agencies, and the public, as well as to refine Project design details to support consultations and align with information in other federal and state permitting processes. The final version of the Project's COP is thousands of pages long, including appendices.[10]

---

[6] Commercial Lease for Renewable Energy Development OCS-A 0486 (Sept. 9, 2013), available at https://www.boem.gov/sites/default/files/documents/oil-gas-energy/Lease-Issued.pdf.
[7] Notice of Assignment of Lease (March 23, 2020), available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Notice-Assignment-Approved-Lease-Segregated.pdf.
[8] Notice of Assignment of Lease (March 24, 2020), available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Notice-Assignment-Approved-RI.pdf.
[9] These surveys were included in appendices to the Project's Construction and Operations Plan, available at https://www.boem.gov/renewable-energy/state-activities/revolution-wind-farm-construction-and-operations-plan.
[10] The COP is available at https://www.boem.gov/renewable-energy/state-activities/revolution-wind-farm-construction-and-operations-plan.

11.    On April 30, 2021, BOEM issued a Notice of Intent ("NOI") to prepare an Environmental Impact Statement ("EIS") under NEPA for BOEM's review of the proposed COP.[11] The NOI began a more than two-year period of extensive environmental, national defense, and safety review under NEPA by the federal government involving Revolution Wind, 15 federal and state agencies, and a variety of other stakeholders, including American Indian tribes, the commercial and for-hire fishing industries, historic preservation organizations, private recreational fishers/recreational boaters, commercial shipping, and local community members.[12]  The other federal agencies that reviewed the Project include the Bureau of Safety and Environmental Enforcement ("BSEE"), DOD, the Department of the Navy, the Environmental Protection Agency ("EPA"), the U.S. Army Corps of Engineers ("USACE"), the Fish and Wildlife Service ("FWS"), the National Oceanic and Atmospheric Administration  ("NOAA") (including its National Marine Fisheries Service ("NMFS")), the North American Aerospace Defense Command ("NORAD"), the United States Air Force, the U.S. Coast Guard ("USCG"), the Federal Aviation Administration ("FAA"), and the National Park Service.[13]

---

[11] BOEM, Notice of Intent to Prepare an Environmental Impact Statement for Revolution Wind LLC's Proposed Wind Energy Facility Offshore Rhode Island 86 Fed. Reg. 22,972 (April 30, 2021) available at https://www.govinfo.gov/content/pkg/FR-2021-04-30/pdf/2021-09048.pdf.
[12] BOEM, USACE, NMFS, Record of Decision Revolution Wind Farm and Revolution Wind Export Cable Project Construction and Operations Plan (Aug. 21, 2023) at B-8 – B-10, available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution-Wind-Record-of-Decision-OCS-A-0486_Redacted.pdf.
[13] *Id*. at B-15.

12.    BOEM published notice of the Project's Draft EIS on September 2, 2022.[14]  BOEM published the Project's Final EIS on July 21, 2023,[15] after responding to federal, state, and local agency comments and public comments from over a hundred individual submissions.[16]

13.    Appendix A to the Final EIS describes the extensive consultations and public involvement BOEM undertook in the process of its NEPA review.  BOEM's NEPA process included three public scoping meetings following the NOI where interested parties were invited to offer feedback and identify issues and potential alternatives for BOEM to consider in the EIS. BOEM held five additional public hearings on the Draft EIS.  Revolution Wind attended all of these meetings.  Revolution Wind also submitted comments as part of the NEPA process.[17]

14.    On August 21, 2023, BOEM issued a Record of Decision ("ROD") memorializing the Department of the Interior's decision to approve the COP, with some revisions.[18]  On August 24, 2023, BOEM published a notice of availability of the ROD in the Federal Register.[19]  On

---

[14] BOEM, Notice of Availability of a Draft Environmental Impact Statement for  Revolution Wind, LLC's Proposed  Revolution Wind Farm Offshore Rhode Island, 87 Fed. Reg. 54,248 (Sept. 2, 2022) available at https://www.govinfo.gov/content/pkg/FR-2022-09-02/pdf/2022-18915.pdf.

[15] BOEM, Notice of Availability of the Revolution Wind Farm and Revolution Wind Export Cable Project Final Environmental Impact Statement, 88 Fed. Reg. 47,171 (July 21, 2023) available at https://www.govinfo.gov/content/pkg/FR-2023-07-21/pdf/2023-15387.pdf.

[16] The Draft EIS and Final EIS are available under the "Environmental Review" tab at https://www.boem.gov/renewable-energy/state-activities/revolution-wind.

[17] BOEM-2022-0045-0086 available at https://www.regulations.gov/comment/BOEM-2022-0045-0086; Final EIS, Appendix L, Table L-2.

[18] BOEM, USACE, NMFS, Record of Decision Revolution Wind Farm and Revolution Wind Export Cable Project Construction and Operations Plan (Aug. 21, 2023) available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution-Wind-Record-of-Decision-OCS-A-0486_Redacted.pdf.

[19] Notice of Availability of a Joint Record of Decision for the Revolution Wind Farm and Revolution Wind Export Cable Project, 88 Fed. Reg. 57,967 (Aug. 24, 2023), https://www.govinfo.gov/content/pkg/FR-2023-08-24/pdf/2023-18244.pdf.

November 17, 2023, BOEM issued its letter documenting COP approval for the Project.[20]  The COP's Conditions of Approval mandate multiple measures to address navigational and aviation safety, national security considerations, potential impacts to marine life, and commercial fisheries and for-hire and recreational fishing.[21]  The Project's ROD documents BOEM's determination that the COP complies with the Outer Continental Shelf Lands Act's ("OCSLA") subsection 8(p)(4), 43 U.S.C. § 1337(p)(4), and BOEM's regulations implementing that subsection, and that approval of the COP with modifications and Conditions of Approval "would be in accordance with the regulations at 30 CFR part 585 and would ensure that all the activities on the OCS are carried out in a manner that provides for the factors in subsection 8(p)(4) of OCSLA."[22]  For example, the ROD details how BOEM has assessed the Project in accordance with the 8(p)(4) factors and the 30 C.F.R. part 585 regulations, including how the Project will be carried out in a manner that protects the national security interests of the United States and that prevents interferences with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas; BOEM specifically explains how, throughout the Project's planning, leasing, and NEPA processes, BOEM "considered numerous other OCS uses in order to minimize or eliminate interference."[23]

15.    Extensive additional time, effort, and financial resources were also expended to secure other required permits and approvals for the Project.  Overall, Revolution Wind has

---

[20] BOEM Letter of COP Approval (Nov. 17, 2023) available at https://www.boem.gov/renewable-energy/state-activities/cop-appv-ltrrev-ocs-0486pdf; Conditions of COP Approval (Nov. 17, 2023) available at https://www.boem.gov/renewable-energy/state-activities/cond-cop-apprrev-ocs-0486.  On April 25, 2024, BOEM published an errata to its Conditions of COP Approval for the Project on its website that included corrections to the Conditions of COP Approval, noting that none of the edits or corrections were substantive or affect the analysis or conclusions in the Conditions of COP Approval.
[21] Conditions of COP Approval at 27-31, 86-93.
[22] ROD at Appendix B.
[23] *Id*. at B-10, B-15 – B-17, B-18 – B-23.

obtained over 20 local, state and federal permits and approvals issued for the Project and has spent over $100 million to obtain these permits and approvals. I discuss several of the key permits and approvals below.

16. The Project was also reviewed by DOD, USCG, and FAA. For example, as provided in the ROD, at each stage of the regulatory process involving the Project's lease, BOEM consulted with DOD to assess national security considerations.[24] As part of this consultation, BOEM and DOD developed measures to protect against potential liabilities and impacts on DOD activities as well as to protect the Nation's security interests.[25] These measures are included in Appendix A of the ROD and as Conditions of the Project's COP Approval.[26]

17. Representatives of the Project also engaged in numerous communications with agencies regarding national security, aviation and navigation safety, including USCG, U.S. Naval Undersea Warfare Center, U.S. Air Force, NORAD, USACE, and FAA. As explained by BOEM in its approval of the Project, BOEM coordinated with DOD and requested that the DOD's Military Aviation and Installation Assurance Siting Clearinghouse ("DOD Clearinghouse") coordinate within DOD to review the COP before its approval.[27] After the conclusion of consultation with DOD Clearinghouse, Revolution Wind entered into an agreement with DOD, acting through DOD Clearinghouse, and the Department of the Air Force to minimize national security risks and to mitigate potential impacts on military operations and readiness, including to protect military radar systems. A true and correct copy of the agreement is attached hereto as **Exhibit 1**. Under this agreement, the parties "agree that the terms [set forth] will allow the mutual goals of the Parties to

---

[24] ROD at B-15.
[25] *Id*. at B-16.
[26] *Id*. at A-30 – A-31; Conditions of COP Approval at 29-31.
[27] ROD at B-16; Conditions of COP Approval at 30-31 (Conditions 4.2 and 4.3).

be met, including the protection of the radar, which promotes national security, and protection of the National Airspace System, while supporting military readiness." Exhibit 1 at 2. For example, per the agreement, "[u]pon request by NORAD, Revolution Wind agrees to immediately curtail wind turbine operations for a National Security or Defense Purpose." Exhibit 1 at 6. The agreement expressly states that, except as otherwise provided, "[t]he DoD Parties agree not to object to the construction and operation of the Project before any federal, state, or local regulatory entity with jurisdiction over the Project[.]" Exhibit 1 at 6. On December 13, 2024, DOD Clearinghouse sent a letter to the Project stating that "[a]s a result of discussions between Ørsted and the U.S. Air Force and a resulting mitigation agreement", DOD Clearinghouse found that construction of the Revolution Wind Project "would not have adverse impacts to DoD missions in the area." A true and correct copy of this letter is attached hereto as **Exhibit 2.**

18.     FAA also assessed the Project's potential impacts on radar system and navigation safety within its jurisdiction and concluded that the Project's wind turbine generators ("WTGs") would **not** have a "substantial adverse effect on the safe and efficient utilization of the navigable airspace by aircraft or on the operation of air navigation facilities."[28]

19.     BOEM and other cooperating agencies conducted ESA Section 7 consultations for the threatened and endangered species in NMFS's and FWS's jurisdictions pursuant to 16 U.S.C. § 1536. BOEM submitted a draft Biological Assessment to NMFS in April 2022 and a separate Biological Assessment to FWS in August 2022. BOEM subsequently updated the NMFS

---

[28] The Project received Determinations of No Hazard from the Federal Aviation Administration for each applicable structure. An example of one of these Determination of No Hazard approvals is attached as **Exhibit 3**.

Biological Assessment multiple times during the consultation.[29]  Revolution Wind responded to numerous requests for information from NMFS and BOEM throughout their preparation and review of the Biological Assessment to assist NMFS in completing ESA Section 7 consultation.

20.    In July 2023, NMFS issued a Biological Opinion ("BiOp") ("2023 BiOp"), which assessed the potential effects of construction, operation, maintenance, and decommissioning of the Project on ESA-listed whales, sea turtles, fish, corals, and designated critical habitat in the Project area.[30]  The 2023 BiOp concluded that the Project was not likely to adversely affect, or would have no effect on, several ESA-listed species or critical habitat designated for several ESA-listed species.[31]  The 2023 BiOp also concluded that the Project is not likely to jeopardize the continued existence of any ESA-listed species, including the North Atlantic right whale.[32]

21.    In response to requests from NMFS and BOEM, on March 12, 2024, NMFS and BOEM reinitiated the Project's ESA Section 7 consultation process, which concluded with the issuance of a superseding BiOp on April 30, 2024 ("2024 BiOp").[33]  The 2024 BiOp concluded that the Project is not likely to jeopardize the continued existence of any ESA-listed species and that the Project is not likely to adversely affect, or would have no effect on, several ESA-listed species.[34]  The 2024 BiOp also concluded that the Project will have no effect on the critical habitat designated for several ESA-listed species, including the North Atlantic right whale.[35]  The 2024

---

[29] NMFS, Endangered Species Act Biological Opinion for Construction, Operation, Maintenance, and Decommissioning of the Revolution Wind Offshore Energy Project ("BiOp") at 9-10 (Apr. 30, 2024), https://www.fisheries.noaa.gov/s3/2024-05/2024-Rev-Wind-BiOp-508.pdf. .
[30] The 2023 BiOp is available at https://repository.library.noaa.gov/view/noaa/51759.
[31] *Id*. at 424.
[32] *Id.*
[33] The operative 2024 BiOp is available at https://www.fisheries.noaa.gov/s3/2024-05/2024-Rev-Wind-BiOp-508.pdf.
[34] *Id*. at 469; *see also id.* at 474.
[35] *Id*. at 469.

BiOp included an Incidental Take Statement pursuant to ESA Section 7(b)(4), 16 U.S.C. § 1536(b)(4), identifying the permitted take incidental to the Revolution Wind Project and enforceable mitigation measures and requirements to minimize impacts to listed species.[36]

22.    BOEM also consulted with FWS pursuant to its ESA Section 7 obligations.  FWS issued a separate BiOp on May 30, 2023, concluding that the Project is not likely to jeopardize the continued existence of the two ESA-listed bird species in the Project's action area and included an Incidental Take Statement.[37]

23.    On October 8, 2021, Revolution Wind submitted a request to NMFS to promulgate Incidental Take Regulations ("ITRs") and to issue of a Letter of Authorization ("LOA") for the taking of marine mammals incidental to the Project's construction and operation.  In response to NMFS's comments and following extensive information exchange, Revolution Wind submitted a final application on February 23, 2022, which NMFS determined was adequate and complete on February 28, 2022.[38]  On March 21, 2022, NMFS published a Federal Register notice confirming receipt of Revolution Wind's application, and then held a 30-day public comment period.[39]  On December 23, 2022, NMFS published a proposed rule and then held a 45-day public comment

---

[36] Id. (Sec. 11.0 – Incidental Take Statement).

[37] FWS, Biological opinion for the Revolution Wind offshore wind energy project (May 30, 2023) available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/20230530%20BOEM%20Revolution%20Wind%20BO%202022-0023298_FINAL%20alm.pdf.

[38] Taking and Importing Marine Mammals; Taking Marine Mammals Incidental to Construction and Operation of the Revolution Wind Offshore Wind Farm Offshore of Rhode Island, 87 Fed. Reg. 15942, 15943 (March 21, 2022) available at https://www.govinfo.gov/content/pkg/FR-2022-03-21/pdf/2022-05947.pdf.

[39] Id.

period.[40]  NMFS published its final ITRs on October 20, 2023[41] and issued its LOA for the Project

on November 20, 2023.[42]

24.    Pursuant to the Marine Mammal Protection Act, the Project's ITRs and LOA allow

for the non-lethal incidental take of small numbers of marine mammals during construction-related

activities within the Project area from November 20, 2023, through November 19, 2028.  The LOA

includes more than 30 pages of mitigation, monitoring, and reporting requirements.[43]  The ITRs

and LOA authorize incidental take of small numbers of marine mammals by Level A and Level B

Harassment, but *do not* authorize, nor did Revolution Wind request, take of marine mammals by

mortality or serious injury.[44]

25.    On June 3, 2022, Revolution Wind filed an application for the Project with the

USACE for an individual permit under Section 404 of the Clean Water Act and Sections 10 and

---

[40] NMFS, Taking Marine Mammals Incidental to the Revolution  Wind Offshore Wind Farm
Project Offshore Rhode Island, 87 Fed. Reg. 79072 (Dec. 23, 2022),
https://www.govinfo.gov/content/pkg/FR-2022-12-23/pdf/2022-27491.pdf.
[41] NMFS, Takes of Marine Mammals Incidental to Specified Activities; Taking Marine
Mammals Incidental to the Revolution Wind Offshore Wind Farm Project Offshore Rhode
Island, 88 Fed. Reg. 72,562 (Oct. 20, 2023) available at
https://www.federalregister.gov/documents/2023/10/20/2023-22056/takes-of-marine-
mammalsincidental-
to-specified-activities-taking-marine-mammals-incidental-to-the; NMFS, Takes of Marine
Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to the
Revolution Wind Offshore Wind Farm Project Offshore Rhode Island; Correction, 88 Fed. Reg.
78,674 (Nov. 16, 2023) (providing corrections to the Oct. 20, 2023 ITR's vessel strike avoidance
measures provision) available at https://www.federalregister.gov/documents/2023/11/16/2023-
25366/takesof-
marine-mammals-incidental-to-specified-activities-taking-marine-mammals-incidental-to-the.
[42] The Project's LOA is available at https://www.fisheries.noaa.gov/s3/2023-11/BL52-
Revolution-Wind-LOA-OPR1-Final-signed-OPR1.pdf, https://www.fisheries.noaa.gov/s3/2024-
09/RevWind_LOA-MOD2.1_correctformat_OPR1.pdf.
[43] LOA at 3-34; 34; 88 Fed. Reg. at 72,660-73; 50 C.F.R. §§ 217.274, 217.275.
[44] 88 Fed. Reg. at 72,610 ("Revolution Wind did *not request and we are not authorizing* take by
mortality or non-auditory injury.") (emphasis added); LOA at 2 ("Take by mortality or serious
injury of *any* marine species is *not* authorized.") (emphasis added). *See also* 50 C.F.R. §
217.272(c).

14 of the Rivers and Harbors Act of 1899.  On September 2, 2022, the USACE issued a public notice of Revolution Wind's permit application and requested public comment, establishing a 45-day comment period that was later extended.[45]   The USACE approved the Project's ROD on August 21, 2023, and subsequently issued the permit to Revolution Wind on October 2, 2023.[46] The USACE permit includes extensive environmental protection measures, annual compliance reporting requirements, coastal surveying, and other Project conditions.

26.    Pursuant to the Coastal Zone Management Act ("CZMA"), 16 U.S.C. § 1451, on June 7, 2021, Revolution Wind submitted consistency certifications to the Massachusetts Office of Coastal Zone Management and to the Rhode Island Coastal Resources Management Council.[47] Each State concurred with Revolution Wind's consistency certification, finding that the Project is consistent to the maximum extent practicable with the enforceable policies of each State's coastal management plan.[48]   The Rhode Island federal consistency review notes that Revolution Wind agreed to provide a financial mitigation package to directly compensate Rhode Island commercial and charter fishermen for potential loss of access or reduction of harvest.[49]   In addition, a mutually agreed-upon condition of the Rhode Island consistency determination was a reduction in the number of turbine foundations and modified project layout to "minimize the reasonably foreseeable effects

---

[45]USACE, Announcement of Public Meetings and Request for Public Comment, available at https://www.nae.usace.army.mil/Portals/74/docs/regulatory/PublicNotices/2022/NAE-2020-00707-20220901-Public-Notice.pdf; ROD at 32.
[46] The USACE Permit is available at https://www.nae.usace.army.mil/Missions/Regulatory/Permits-Issued/Orsted-Revolution-Wind-LLC-Oct-2023/.
[47] ROD at 61, B-9 – B-10; Final EIS Appendix A, A-3; COP Appendix B, Coastal Zone Management Consistency Certifications.
[48] ROD at B-9 – B-10.  BOEM received the CZMA concurrence letters from Rhode Island on May 12, 2023, and from Massachusetts on May 10, 2023.  *Id*. at B-9 – B-10.
[49] State of Rhode Island Coastal Resources Management Council, Re: CRMC Federal Consistency Review of the Revolution Wind Project at 6 (May 12, 2023), available at http://www.crmc.ri.gov/windenergy/revolution/RevWind_FedConDecision_20230512.pdf.

to Rhode Island coastal resources and uses including effects to those resources and uses with the same characteristics, values, and resources as found in Rhode Island State Waters."[50]  The Massachusetts Office of Coastal Zone Management also issued a federal consistency determination of concurrence for the Project in May 2023, acknowledging that Revolution Wind would establish a direct compensation program to offset potential economic impacts to Massachusetts commercial and charter/for-hire fishing.[51]

27.     BOEM also completed an Essential Fish Habitat consultation with NMFS in June 2023 under the Magnuson-Stevens Fishery Conservation and Management Act, and coordinated with USACE as well.[52]  BOEM analyzed the Project's potential adverse impacts on Essential Fish Habitat in an Essential Fish Habitat Assessment deemed complete by NMFS on March 23, 2023.[53] Section 5 of the Project's Conditions of COP Approval include measures to protect important benthic and fish habitat.[54]  For example, Condition 5.5.3 requires the Project to microsite WTG locations, inter-array cables, and export cable routes "to avoid or minimize impacts to complex habitat and boulders[.]"[55]

28.     The Project has been and is committed to mitigating impacts to the commercial, for-hire, and recreational fishing communities during the development, construction, and operational phases. In addition to voluntary mitigation and deconfliction efforts during the early phases of offshore project development and site assessment, as well as the Project's agreement to

---

[50] *Id*. at 5.

[51] Office of Coastal Zone Management Massachusetts Federal Consistency Review of the Revolution Wind Farm at 2 (May 10, 2023), available at https://www.mass.gov/doc/offshore-wind-revolution-wind-farm-fcr-signed-decision-5-10-23/download.

[52] ROD at 21, 60.

[53] *Id*. at B-13.

[54] Conditions of COP Approval at 31-86.

[55] *Id*. at 49-50.

space the WTGs 1 nautical mile by 1 nautical mile apart to facilitate safe passage through the area, the Project has several permit requirements related to mitigating fishing impacts during construction and operations. Section 6 of the Project's Conditions of COP Approval include measures to protect commercial fisheries and for-hire and recreational fishing. For example, COP Condition 6.2 requires Revolution Wind to maintain a fisheries gear loss compensation program throughout the Project's lifetime to assist commercial and for-hire fishermen potentially impacted by the Project's actions or infrastructure, regardless of homeport.[56] Revolution Wind has implemented a gear loss claims and compensation program since early in the Project's development. COP Condition 6.1 requires Revolution Wind to establish and implement a direct compensation program to provide monetary compensation to commercial and for-hire fishermen potentially impacted by the Project, including in Rhode Island and Massachusetts: nearly $22 million in direct compensation for losses in federal and state waters; $900,000 in coastal community funds; and $833,333 for Navigational Enhancement and Training Programs.[57]

29.    COP Appendix R includes the Project's Navigation Safety Risk Assessment ("NSRA") for USCG to evaluate the Project's potential effects on the marine transportation system, including navigation safety, traditional uses of the waterways, and USCG missions.[58] The "NSRA did not identify any major areas of concern regarding the Project's effect on marine navigation."[59] Furthermore, as provided in the NSRA, "[n]o specific military activities have been identified within the Lease Area; however, aircraft and submarine use occur nearby" and "[t]he closest identified military use is submarine transit lanes" approximately 9 nautical miles from the

---

[56] Conditions of COP Approval at 91.
[57] *Id*. at 86-87.
[58] NSRA at 1, available at https://www.boem.gov/renewable-energy/state-activities/revolution-wind-farm-construction-and-operations-plan.
[59] *Id*. at xi.

Project.[60] The NSRA includes mitigation measures to address potential navigational impacts, including potential radar effects.[61]  For example, to enhance navigation safety, Revolution Wind used a WTG layout of linear rows and columns oriented both north-south and east-west with 1 nautical mile spacing between WTGs, providing at least three lines of orientation and "alternative routes for vessels or aircraft transiting the wind farm and provide multiple options in case of high winds or seas."[62]  The Project implemented this WTG layout to facilitate safe passage through the lease area, based on consultation with the local mariner community.[63]  As provided in the NSRA, USCG[64] has examined and recommended this type of predictable grid pattern layout, concluding that this layout will maintain USCG's ability to conduct search and rescue operations within an offshore wind project's area.[65]  The NSRA affirms USCG's earlier conclusion in an October 27, 2020 letter to the Responsible Offshore Development Alliance, stating that "this combination of alignment and spacing [north/south/east/west orientation and minimum 1 nautical mile separation between structures] would also enable all routine Coast Guard operations, with a specific focus on

---

[60] *Id*. at 65.

[61] *Id*. at 140-45.

[62] *Id*. at 77, 105, C-1,

[63] *Id*. at C-1.

[64] To further understand the Project's potential impact on navigation safety and familiarity, USCG, BOEM, commercial fishermen, and other stakeholders have also attended simulation demonstrations that allowed them to observe visual models of the Project's turbines from the command centers of simulated vessels while virtually navigating through the simulated wind farm in different sized vessels.  These simulations also included differing sea states, weather conditions, and visibility.  Additional information about these simulations is available at https://www.mitags.org/case-study-offshore-wind-simulations-with-orsted/.

[65] NSRA at 77 (citing "U.S. Coast Guard (2020a), "The Areas Offshore of Massachusetts and Rhode Island Port Access Route Study", Final, USCG-2019-0131, dated 14 May 2020, published 27 May 2020"); *see also id*. at 126 (concluding that "[r]egularly spaced turbines can facilitate use of helicopters for [search and rescue] and radar-assisted search" and that "[i]ncreasing the spacing between WTGs generally decreases its effects on radar."); *see also* 85 Fed. Reg. 31,792, 31,395 (May 27, 2020) ("[T]he majority of commenters agreed with our recommendation for a standard and uniform grid pattern with 1 NM spacing between WTGs.").

Search and Rescue (SAR) by aircraft." The NSRA concluded that "[m]ost instances of [radar] interference can be mitigated through the use of radar gain controls."[66] Additionally, in response to mariner concerns about potential impacts to marine radars, especially older "tube" type radars, the Project implemented a unique Navigation Enhancement and Training Program ("NETP") to subsidize purchases of newer generation, higher-performance "solid-state" radars preferred by mariners. The NETP also subsidized purchases of other, newer, navigation electronics and professional training for crew. Part of the reason Revolution Wind created the NETP was to help fishermen buy newer solid-state radars, which also mitigates interference.

30.     Per COP Condition 2.18, Revolution Wind entered into an agreement with the U.S. Department of Commerce, NOAA, the National Ocean Service, and the U.S. Integrated Ocean Observing System Office to mitigate potential interference to high frequency oceanographic radar, whose purposes include "predicting sea state for safe marine navigation."[67] A true and correct copy of the agreement is attached hereto as **Exhibit 4**.

31.     On September 28, 2023, after a notice and public comment process, EPA issued a Clean Air Act ("CAA") OCS air quality permit to construct and operate the Project pursuant to Section 328 of the CAA, 42 U.S.C. § 4207, and Title 40, part 55 of the Code of Federal Regulations.[68] The CAA OCS air permit includes conditions on Revolution Wind's activities consistent with the CAA, including Nonattainment New Source Review offset requirements; testing, recordkeeping, reporting, and operating requirements; and emission limits.

---

[66] NSRA at xiv.
[67] Conditions of COP Approval at 19.
[68] The Project's CAA OCS air permit is available at
https://www.epa.gov/system/files/documents/2023-09/rw-ocs-air-permit-ocs-r1-05-final-permit.pdf.

32.    BOEM also conducted consultation under Section 106 of the National Historic Preservation Act to review potential impacts to historic properties.  This consultation process concluded with a final Memorandum of Agreement ("MOA") executed in August 2023.  The MOA was signed by BOEM, USACE, the Town of Aquinnah, Revolution Wind, the Advisory Council on Historic Preservation, and the New York, Rhode Island, Connecticut, and Massachusetts State Historic Preservation Officers.[69]  The MOA includes measures to resolve any adverse effects to historic properties in the Project's action area including avoidance, minimization, and mitigation measures.[70]

**B.    Continued Coordination with Federal Agencies Following COP Approval**

33.    After BOEM's approval of the Project's COP, Revolution Wind has continued to work in the ordinary course with multiple federal agencies, including BOEM, BSEE, NMFS, USCG, the USACE, and FAA, to ensure compliance with the Conditions of COP Approval for the Project, federal laws and regulations, and other applicable Project requirements.  Several examples of this continued coordination and cooperation are highlighted below.

34.    Throughout 2025, Revolution Wind continued to participate in routine meetings with BOEM and BSEE, approximately bi-weekly, to discuss construction updates, plans, reports, mitigation agreements and other matters relating to the Project.  The most recent of these bi-weekly meetings were held with BOEM on August 6, 2025 and August 20, 2025.  Despite the fact that this latter meeting was held only two days before BOEM's Director issued the Stop Work Order, at neither of these meetings – nor at any other recent Project meetings or in correspondence – did BOEM raise the possibility of a Stop Work Order or the need for any disruption of or conditions

---

[69] ROD at 24; The Project's MOA available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/RevolutionWindFarm_MOA.pdf.
[70] MOA at 5-24.

on the Project's ongoing construction relating to any concerns regarding national security or interference with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas, or for any other reason.

35.    Throughout 2025, Revolution Wind continued to meet regularly—at least monthly—with NMFS to discuss the Project's ITR compliance and implementation.

36.    Throughout 2025, Ørsted's Marine Affairs team continued to meet approximately weekly with USCG for general check-ins regarding all of Ørsted's U.S. projects, including the Revolution Wind Project.  Representatives from BOEM, BSEE, and NOAA were frequently in attendance at USCG's invitation.  Navigation safety and potential impacts to mariners were routinely discussed and it was found that, as intended, the mitigations discussed above and others, such as lighting, marking, and signaling of structures, minimized potential impacts to and even enhanced navigation safety.

37.    Throughout 2025, Revolution Wind certification team continued to meet regularly, typically weekly, with BSEE to discuss construction updates, design and installation compliance, and aspects of the certification and verification process.

38.    Revolution Wind reports weekly to BOEM, BSEE, and NMFS regarding pile driving activities.  All pile driving for the Project is now complete.

39.    On April 3, 2025, USCG approved Revolution Wind's applications for four lighted research buoys.  Following Revolution Wind's request, on August 19, 2025, USCG confirmed that it would terminate four "private aid to navigation" listings for Revolution Wind's research buoys that had been removed due to no longer being needed for acoustic monitoring of pile driving.

40.     From January to August 2025, BSEE's Technical Information Management System ("TIMS") accepted numerous general compliance reports, Protected Species Observer reports, pile driving reports, marine debris event reports, and other monitoring reports.

41.     Since approval of the COP in 2023, no notice of non-compliance has been issued by BOEM or BSEE to Revolution Wind.

### C.     Revolution Wind Will Provide Significant Benefits

42.     If the Revolution Wind Project continues to be delayed or if the Project is cancelled, Connecticut and Rhode Island will be deprived of the Project's 704 MW of reliable energy and the associated public benefits corresponding to the delay period.  For example, ISO New England, New England's independent regional grid operator, has provided that "delaying the project will increase risks to [New England grid] reliability", including potential "near-term impacts to reliability in the summer and winter peak period."[71]  If the Project is cancelled, Connecticut and Rhode Island will not receive that energy and its corresponding benefits.

43.     Completion of construction and operation of the Project will help Connecticut and Rhode Island to reach their domestic energy and emissions reduction policy goals.  Connecticut's climate goals require the creation of 2 gigawatts of offshore wind by 2030 and the state has established a goal of delivering 100% zero-carbon electricity to customers by 2040.[72]  Similarly, in 2023, Rhode Island issued a Request for Proposals to call for approximately 1200 MW of new offshore wind to power the state's clean energy needs.[73]  Rhode Island's clean energy needs

---

[71] ISO Newswire, ISO-NE statement on Revolution Wind stop work order (Aug. 25, 2025) available at https://isonewswire.com/2025/08/25/iso-ne-statement-on-revolution-wind-stop-work-order/.

[72] Conn. Gen. Stat. § 22a-200a(3); ROD at 9.

[73] "Governor McKee Announces New Opportunity to Bring Approximately 1200 Megawatts of New Offshore Wind to Rhode Island" (Sept. 28, 2023), https://governor.ri.gov/press-releases/governor-mckee-announces-new-opportunity-bring-approximately-1200-megawatts-new.

include a goal of reaching 100% renewable energy by 2033[74] and could require the development

of an estimated 9 to 11 gigawatts of offshore wind by 2033.[75]  A delay or cancellation of the Project

would impede Connecticut and Rhode Island's efforts to meet their GHG emissions reduction

goals.

44.     Once operational, the Project will have a generating capacity of approximately 704

MW of needed and reliable energy, enough to power nearly 350,000 homes.  In addition to its

climate-related greenhouse gas emission-reduction benefits, the Project will have significant

additional health benefits.  For example, the Project is expected to result in estimated avoided

emissions of between 599 to 749 tons of nitrogen oxides per year and 318 to 398 tons of sulfur

oxides per year, stemming from displacement of fossil fuel generation.[76]  Thus, the Rhode Island

Department of Environmental Management has concluded "that the [P]roject will reduce air

emissions that are harmful to human health and the environment."[77]  Similarly, the Rhode Island

---

[74] *See* 39 R.I. Gen. Laws § 39-26-4(a)(14).

[75] Rhode Island, Office of Energy Resources, 100 Percent Renewable Electricity by 2030, available at https://energy.ri.gov/renewable-energy/100-percent-renewable-electricity-2030; Rhode Island Office of Energy Resource, The Road to 100% Renewable Electricity by 2030 in Rhode Island, (Dec. 2020) available at https://energy.ri.gov/sites/g/files/xkgbur741/files/documents/renewable/The-Road-to-100-Percent-Renewable-Electricity---Brattle-04Feb2021.pdf.

[76] EPA, Fact Sheet: Outer Continental Shelf Preconstruction Air Permit Revolution Wind Farm Project Revolution Wind, LLC at 130, available at https://www.epa.gov/system/files/documents/2023-03/fact-sheet-draft-revolution-wind-ocs-air-permit-ocs-r1-05.pdf.

[77] Rhode Island Department of Environmental Management's Advisory Opinion to the Rhode Island Public Utilities Commission at 3, available at https://ripuc.ri.gov/sites/g/files/xkgbur841/files/eventsactions/docket/4929-DEM_Advisory_Opinion_2019-3-22.pdf.

Office of Energy Resources has determined that the Project will result in significant public health benefits.[78]

45.    On April 22, 2022, Ørsted and the North America's Building Trades Unions entered into a "National Offshore Wind Agreement," a first-of-its kind U.S. project labor agreement that creates expansive job opportunities for workers in the building trade unions on offshore construction associated with Ørsted's offshore wind projects, including the Project.[79] Construction on the Project is also being performed pursuant to project labor agreements with the Norwich-New London Building Trades Council (offshore wind turbine pre-assembly at the New London State Pier) and the Rhode Island Building and Construction Trades Council (advance foundation component construction, as well as work on the onshore cable route and onshore substation). Consistent with these agreements, many of the jobs associated with the Project are union jobs. If the Project is delayed or cancelled, many if not all of these jobs will be lost.

46.    Over 2,000 workers have been involved in the construction of the Project. To date, approximately two million labor hours have been spent on construction, including more than 800 local union labor full-time equivalents. In addition, Revolution Wind has contributed to more than 200 union labor full-time equivalents supporting the redevelopment of the State Pier in New London, Connecticut, as part of a shared initiative with other projects. As explained in the FEIS, the Project was also anticipated to create thousands of full-time equivalent jobs through direct, indirect, and induced effects of the Project, during its construction, and an estimated 236 full-time

---

[78] Rhode Island Office of Energy Resources Advisory Opinion to the Rhode Island Public Utilities Commission at 29-31, 39-40, available at https://ripuc.ri.gov/sites/g/files/xkgbur841/files/eventsactions/docket/4929-OER-AdvisoryOpinion_3-22-19.pdf.

[79] Ørsted, "North America's Building Trades Unions and Ørsted Agree to Build an American Offshore Wind Energy Industry with American Labor" (May 5, 2022) https://us.orsted.com/news-archive/2022/05/national-offshore-wind-agreement.

equivalent jobs annually for the Project's operations and maintenance work.[80]  The Stop Work Order has already disrupted the work of many, and if the Project is delayed or cancelled these jobs will be lost.

47.    Revolution Wind and its parent companies are investing significantly in port infrastructure and domestic manufacturing.  In Rhode Island, Revolution Wind's parent companies are investing more than $100 million in an offshore wind construction hub at the Port of Providence, creating local union jobs, partnering with local shipyards, investing $1 million in a local training partnership, and collaborating with local fishermen.[81]  Additionally, Revolution Wind's parent companies have also contributed more than $100 million of funding to support the Connecticut Port Authority and the State of Connecticut's re-development of the State Pier Terminal in the Port of New London.  As another example, Revolution Wind's parent companies invested in the first-ever American-built, owned, and crewed offshore wind service operations vessel, which was built in shipyards in Louisiana, Mississippi and Florida.[82]

48.    Revolution Wind has also made commitments totaling more than $10 million to communities and institutions in Connecticut and Rhode Island, including the above-referenced $1 million towards a local training partnership.  While most of these commitments have already been paid, there remains approximately $1 million left to be paid to support local research initiatives,

---

[80] Final EIS at 3.11-45 – 3.11-46.

[81] Revolution Wind, "Governor McKee, Congressional Delegation, Mayor Smiley Mark New Phase of Offshore Wind Construction Hub at ProvPort" (May 1, 2023), https://revolution-wind.com/news/2023/05/new-phase-of-offshore-wind-construction-hub-at-provport.

[82] Ørsted, "Ørsted and Shipbuilder Edison Chouest Christen First-Ever American-Built, Offshore Wind Service Operations Vessel" (May 11, 2024), https://us.orsted.com/news-archive/2024/05/orsted-and-shipbuilder-edison-chouest-christen-american-built-offshore-wind-service-operations-vessel; Ørsted, "America's new fleet: Ørsted is investing nearly $700 million into U.S. vessels to secure our energy future", https://cdn.orsted.com/-/media/www/docs/corp/us/factsheets/orsted_vesselfactsheet.pdf?rev=b14a7bbdddcd4daf88d7726e957cd73a&hash=536C7E36976CC9869635A2B8EFCB23AB.

business attraction and workforce development, including at the University of Rhode Island and through the Rhode Island Department of Commerce. Additionally, some of Revolution Wind's community commitments do not become due until the Project's commercial operations date. This includes $28 million in personal property taxes and Host Community Agreement payments to the Town of North Kingstown, Rhode Island. If Revolution Wind cannot complete the Project due to the Stop Work Order, these community commitments will never materialize.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746(2) that the foregoing is true and correct.

Executed on September 5, 2025, at Providence, Rhode Island.

Melanie Gearon

25