IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF COLUMBIA

| | |
|---|---|
| REVOLUTION WIND, LLC,<br><br>    *Plaintiff*,<br><br>    v.<br><br>DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior;<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR;<br><br>MATTHEW GIACONA, in his official capacity as Acting Director of the Bureau of Ocean Energy Management;<br><br>BUREAU OF OCEAN ENERGY MANAGEMENT;<br><br>KENNETH STEVENS, in his official capacity as Principal Deputy Director Exercising the Delegated Authorities of the Director of the Bureau of Safety and Environmental Enforcement; and<br><br>BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT,<br><br>    *Defendants*. | Case No.: 1:25-cv-02999-RCL |

**DECLARATION OF PAUL MURPHY IN SUPPORT OF PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION AND STAY PENDING REVIEW**

Pursuant to 28 U.S.C. § 1746(2), I, Paul Murphy, declare as follows:

    1.    I am employed by Orsted North America Inc. ("Ørsted") as the Senior Engineering, Procurement, and Construction ("EPC") Director for the commercial-scale Revolution Wind Farm and Revolution Wind Export Cable (together, the "Project"). Ørsted and its affiliate companies

1

develop, construct, and operate offshore and onshore wind farms, solar farms, energy storage facilities, and bioenergy plants, and provide energy products to their customers. The Project is owned by Revolution Wind, LLC ("Revolution Wind"), which is a joint venture indirectly owned in equal part by Ørsted and an investment joint venture partner.

2. I have been employed at Ørsted as the Senior EPC Director and have held leadership roles in delivering the Project since 2018. In my capacity as the Senior EPC Director, I lead project design, procurement, and construction. Collectively, I have worked on the Project for approximately 7 years, and I have over 15 years of professional experience in development and construction of first-of-their kind U.S. offshore wind projects. I obtained my Bachelor of Science in Bioengineering from Syracuse University in 2002 and completed a Master of Science in Civil Engineering at Carnegie Mellon University in 2004. In 2010, I earned a Master of Science in Technology and Policy with an Energy Concentration from the Massachusetts Institute of Technology.

3. From 2010 to 2018, I served in key roles, including as Vice President for Operations and Engineering at Deepwater Wind, where I was prominently involved in the development, construction, operations, and asset management for the Block Island Wind Farm, the first operating U.S. offshore wind project.

4. As Senior EPC Director, I am and have been involved in and aware of numerous aspects of the Project, including: full project engineering, procurement and construction scopes, master schedule, capital expenditures ("CAPEX"), risks and Quality, Health, Safety and Environment.

5. I have reviewed the August 22, 2025, order that Bureau of Ocean Energy Management's ("BOEM") Acting Director issued to Revolution Wind "to halt all ongoing

activities related to the Revolution Wind Project on the outer continental shelf" ("Stop Work Order"). I am personally familiar with the Project's construction history and status as well as the ongoing impacts of the Stop Work Order and future harm from the Stop Work Order if not enjoined or stayed. Based upon my experience and familiarity with the Project, judicial relief is required by the beginning of the last week of September 2025 to avoid significant Project delays, which could ultimately result in cancellation of the Revolution Wind Project.

6. I execute this Declaration in support of Revolution Wind's Motion for a Preliminary Injunction and Stay Pending Review based on my personal knowledge of the matters referred to herein and, if called upon to do so, could and would testify truthfully thereto. I am over 18 years of age and competent to testify about the matters set forth herein.

### A.  Overview of the Project

7. The Project involves the construction and operation of an approximately 704-megawatt ("MW") commercial-scale offshore wind energy facility with 65 wind turbine generators ("WTGs"), two offshore substations, and associated inter-array cabling between the WTGs, as well as an export cable to bring electricity to the electric grid. The Project's WTGs are located in federal waters on the U.S. Outer Continental Shelf ("OCS"), within the area covered by BOEM Renewable Energy Lease No. OCS-A 0486, held by Revolution Wind, LLC, in the Atlantic Ocean approximately 15 miles east of Block Island, Rhode Island, and approximately 15.7 miles from Newport, Rhode Island. A map showing the Project area is provided below. Revolution Wind had been constructing, and would operate and maintain, the Revolution Wind Export Cable to deliver the generated electricity from the Revolution Wind Farm to the existing Davisville

Substation in North Kingstown, Rhode Island, which connects to the transmission system managed by ISO New England.[1]



8. Revolution Wind has executed five power purchase agreements ("PPAs") under three separate procurements corresponding to certain energy and Renewable Energy Certificates (RECs) generated by the Project: (1) two October 2018 PPAs with utilities in Connecticut for approximately 200 MW of energy and RECs; (2) one December 2018 PPA with utilities in Rhode Island for approximately 400 MW of energy and RECs; and (3) two November 2019 PPAs with utilities in Connecticut for approximately 104 MW of energy and RECs.

---

[1] BOEM, Record of Decision Revolution Wind Project Construction and Operations Plan at 8, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution-Wind-Record-of-Decision-OCS-A-0486_Redacted.pdf.

9.     Revolution Wind has already spent or committed approximately $5 billion to date to plan, permit, develop, design, manufacture, and construct this Project. If the Project is cancelled, Revolution Wind anticipates that it would also incur more than $1 billion in breakaway costs, for a total of over $6 billion in costs to the Project. Additionally, Revolution Wind would forgo billions of dollars of revenue under its PPAs over the lifetime of the Project.

B.     **Current Construction Status**

10.     The Project includes onshore and offshore construction activities, and construction of the Project is approximately 80% complete. More specifically, at the time the Stop Work Order was issued on August 22, 2025: all of the Project's 67 monopile foundations[2] had been installed on the OCS, and pile-driving was complete; the array cables had been installed at 34 of the 65 wind turbine sites; the utility export cables (two cables, each approximately 39 miles for a total of 78 miles) from the shore landing in Quonset, Rhode Island to the northern offshore substation had been fully installed; the interlink export cable (approximately eight miles) that connects the two offshore substations was close to being fully installed, with the only remaining scope being to pull the interlink export cable into the southern offshore substation once that substation's installation has been completed; approximately 70% of the Project's WTGs had been fully constructed; and the onshore substation was more than 85% complete, with equipment installed and commissioning activities underway. The following figure, taken from the Project's Construction and Operations Plan, gives a sense of the Project's monopile foundations, which extend from below the seafloor to above the ocean's surface.[3]

---

[2] There are 65 monopiles for WTGs and one each for each offshore substation, for a total of 67.
[3] Revolution Wind Farm Construction and Operations Plan (March 2023) at 56, available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution%20Wind%20COP%20Volume%201%20March%202023_v2_508c_Section_4.4.3.1_Redacted.pdf.

5



Monopile

11.     Construction of the Project has been underway for more than two years.  Before the Stop Work Order was issued, the Project had made significant progress, and both onshore and offshore construction activities were ongoing.  Onshore activities began in August 2023 and have included work related to the Project's onshore transmission cable and construction of a new interconnection station and substation.[4]  Offshore construction began in January 2024 with seabed preparation work.  Monopile foundation installation for the Project's 65 WTGs and two offshore substations stations began in May 2024, and concluded in August 2025, with all 67 of the Project's monopile foundations now installed.  The first WTG was installed almost a year ago, in September 2024.  As noted above, at the time the Stop Work Order was issued, approximately 70% of the

---

[4] Revolution Wind, Construction Updates: Week of August 28, 2023, https://orstedcdn.azureedge.net/-/media/www/docs/corp/us/revolution-wind/rev-windweekly-status-report8282023.pdf?rev=e9c40846d2814a8bbd1bac5f09c99788&hash=3C6D1E22575E7049A7E57F17CA9554D2.

6

WTGs had been fully constructed. Prior to the issuance of BOEM's Stop Work Order, the remainder of the WTGs were scheduled to be installed before the end of the year.

12.     The Project's cable installation is also substantially complete, as its two export cables have been installed, and the interlink export cable that connects the two offshore substations is close to being fully installed. The Project includes inter-array cables between the wind turbines that will deliver power from the WTGs to the offshore substation. Prior to the issuance of BOEM's Stop Work Order, installation of the inter-array cables was also underway; more than half had been installed with the remainder scheduled to be installed by the end of the year.

13.     One of the Project's two offshore substations has been fully installed, and is prepared to be commissioned, and the Project's second offshore substation was partially installed at the time of the Stop Work Order. Specifically, each fully installed offshore substation consists of a monopile foundation, a modular support frame that provides the structural transition support between the monopile foundation and the topside, and the topside itself. For the second offshore substation, both the monopile foundation and the modular support frame have been installed. The final lift to install the second offshore substation's topside had been scheduled for the week of August 25, 2025, and the substation was to be prepared for commissioning later this fall. The topside for the second offshore substation, which weighs over 3,000 tons, is now waiting idle atop a specialized heavy transport vessel, the White Marlin. A photograph of the substation atop the White Marlin is included below.



14. Prior to the Stop Work Order, Revolution Wind was on schedule to complete offshore physical installation by the end of 2025 using key installation vessels, described below, that are currently under contract. This work includes installation of the topside and preparation for commissioning of the Project's second offshore substation (including completion of installation of the interlink export cable), installation and preparation for commissioning of the Project's remaining as-yet-uninstalled WTGs, and installation of 31 remaining inter-array cable sections.

15. Consistent with the terms of the Stop Work Order, all work on the OCS related to the Project has been halted except for activities that are necessary to prevent impacts to health, safety, and the environment, and to comply with the conditions of approval for the Project.

16. Revolution Wind has kept the public aware of construction activities, including through a website[5] and "Mariners Briefing" listserv, as well as Local Notice to Mariners issued regularly.

---

[5] https://revolution-wind.com/construction-updates.

    **C.**    **Threats to Project Feasibility if the Stop Work Order is Not Stayed or Enjoined**

17. As described below, Revolution Wind is injured by its inability to construct the Project. Revolution Wind's inability to construct the Project is directly caused by the Stop Work Order, which prevents Revolution Wind from constructing and finalizing the Project, causing financial and contractual burdens, creating delay in Revolution Wind's development of the Project, and depending on the length of delay, potentially jeopardizing the Project entirely. Accordingly, absent immediate judicial relief, there are several ways that BOEM's Stop Work Order will result in imminent, irreparable harm that threatens the viability of Revolution Wind's business.

    **1.**    **The Stop Work Order Increases Costs that Could Derail the Project**

18. Revolution Wind has entered into contracts for the manufacture, transport, and installation of Project components during specific times of the year and has taken other steps in reliance on its approvals. Revolution Wind conservatively[6] estimates that it is currently losing more than $2 million per day or more than $16 million per week on installation and manufacturing contracts—for example, day rates for idle vessels—without any certainty that construction work will be permitted to resume.

19. Revolution Wind has sequenced its construction schedules to ensure efficient usage of scarce resources, such as specialized transport and installation vessels, for the Project. Construction of large-scale offshore wind projects requires the use of specialized vessels. These vessels are in limited supply and in high demand, with limited or no availability to work beyond

---

[6] This estimate contains zero contingency for unforeseen and unknown costs (such as additional demobilization, maintenance and remobilization costs for vessels that have been unexpectedly stood down). Furthermore, the estimate assumes that vessels that are under contract for the project but provisionally assigned to other work—and thereby (temporarily) not charged to the Project—will never return to the Project, even after that other work is completed. In fact, if the Project becomes liable for additional vessels' day rates, the Project's daily burn rate could increase substantially.

the contracted reservation dates. Given this extreme scarcity, these vessels are normally scheduled years in advance.

20. There are several primary vessels that are needed to transport and install the Project's offshore components: the Scylla[7], a specialized vessel designed to install offshore wind turbines; the aforementioned White Marlin[8], a specialized heavy transport vessel used to transport the second offshore substation; the Crowley 455-8[9], a barge to carry WTG components from New London, Connecticut, to the Project site; two tug boats to transport that barge; the Seaway Aimery[10], an array cable installation vessel; and the Harvey SUB-SEA[11], a support vessel used to support initial commissioning of WTGs. Installation of the Project's second offshore substation topside also requires a specialized heavy lift crane vessel (Bokalift 2)[12], which was scheduled to perform the final lift to install the second offshore substation's topside during the week of August 25, 2025. In addition to these primary vessels, there are numerous support vessels currently under contract that are used to transport personnel and materials. In all, there were 18 vessels mobilized for Revolution Wind as of the date of the Stop Work Order, many of which are now idle as a result of the Stop Work Order.

21. The more than $2 million dollars that Revolution Wind conservatively estimates it is currently losing on a daily basis due to the Stop Work Order includes the day rates and other capital expenditures required to maintain this fleet of idled vessels. Furthermore, many of the key

---

[7] https://www.cadeler.com/vessels/wind-scylla.
[8] https://boskalis.com/media/vqcf4grq/white-marlin.pdf.
[9] The following page shows the "feeding" transportation solution used by the Crowley 455-8 for South Fork Wind, which is also being used for the Revolution Wind Project: https://www.crowley.com/lp/feedering-solution/.
[10] https://www.seaway7.com/vessels/seaway-aimery/.
[11] https://harveygulf.com/wp-content/uploads/2024/12/Harvey-Sub-Sea-Rev-0.pdf.
[12] https://boskalis.com/media/cafdcmsf/bokalift-2.pdf.

specialized vessels have latest vessel availability date limitations, meaning that the vessels may not be available after certain dates to conduct the construction. Even if Revolution Wind were able to secure replacement vessels in the future, which is uncertain given their scarcity and the high demand for them, the associated costs would be higher, in part because of the costs of potential mobilization from Europe or Asia. This means that Revolution Wind's daily losses would begin to increase significantly. Thus, the lack of contracted vessels, particularly when coupled with worsening weather conditions offshore during the winter, presents a significant risk to the Project, as I describe in more detail below.

22. As a result of the Stop Work Order, Revolution Wind will also have to overcome significant logistical constraints (and incur costs) and pay to store Project components that may not be installed this year because of the Stop Work Order, including the offshore substation topside that now sits idle atop the White Marlin in the Atlantic Ocean. It is currently unclear if the offshore substation topside can be placed in storage. Weighing over 3,000 tons, the offshore substation topside was designed only to be lifted off the White Marlin and onto the already-installed offshore substation foundation and modular support frame. The White Marlin has a latest vessel availability date of December 15, 2025. There is currently no solution to offload the topside from the White Marlin to another port or vessel/barge for storage, which would require securing an alternative port/vessel and designing a lift to ensure the quality and integrity of the offshore substation topside for this alternative lift prior to the December 15 White Marlin latest vessel availability date, all while maintaining compliance with applicable laws and regulations (*e.g.*, the Jones Act). Any delay will only increase costs, while the Project would be unable to generate revenue to offset those additional costs.

23. The Stop Work Order has also led to delays and idling with respect to onshore activities that support offshore construction on the OCS. Construction of the offshore components of the Project requires a significant amount of support from onshore facilities and workers. The Project's WTG marshalling facilities (where Project components are received, prepared for installation, and loaded onto barge and tug vessels to be transported for installation) are located at New London State Pier in Connecticut, a facility in which the Connecticut Port Authority, the State of Connecticut, and Revolution Wind's parent companies have invested hundreds of millions of dollars in order to create the only active offshore wind marshalling terminal in the northeast United States with unobstructed access to the ocean.[13] Here, predominantly union workers were preparing WTGs for offshore installation. Work at the New London State Pier is currently idle due to the Stop Work Order, with no loadout possible and insufficient space for deliveries of further components (also creating additional logistical challenges and disrupting the Project's supply chain).

24. Prior to the Stop Work Order, Revolution Wind was preparing for its final campaign of inter-array cable installation offshore that was set to start in early September from the Port of Providence, Rhode Island. Due to the Stop Work Order, those preparations teams have been idled.

25. In the immediate term, Revolution Wind conservatively estimates that the Stop Work Order is causing losses of more than $2 million per day or more than $16 million per week to the Project. These costs are expected to increase the longer the Stop Work Order remains in

---

[13] Connecticut Port Authority, State Pier Infrastructure Improvements Project, available at https://statepiernewlondon.com/.

12

place, significantly increasing once replacement vessels are required—assuming it were possible to secure them—due to the higher costs associated with them, as explained above.

>  **2.    The Project's Construction Schedule is Constrained By the PPAs, Which Could Be Terminated if the Project is Delayed**

26.    Each of the PPAs between Revolution Wind and the Connecticut and Rhode Island utilities include deadlines by which the Project's Commercial Operation Date must be achieved, with no current mechanism for Revolution Wind to request further extensions. After these deadlines the utility buyer would have a unilateral right to terminate the PPA. Those deadlines are as follows: (1) the two 2018 Connecticut PPAs (for 200MW) require a Project Commercial Operation Date by December 31, 2026; (2) the 2018 Rhode Island PPA (for 400MW) requires a Project Commercial Operation Date by January 15, 2027; and (3) the two 2019 Connecticut PPAs (for 104MW) require a Project Commercial Operation Date by November 27, 2027. Because achievement of the Project Commercial Operation Date under the PPAs requires the Project to have completed construction and performance testing, and to be capable of regular commercial operation (among other requirements), the relevant deadlines for each stage of the complex, sequential construction processes are imminent.

27.    If the Stop Work Order is allowed to remain in place, the Project will experience significant, costly construction delays that may prevent Revolution Wind from achieving commercial operations within the time required under some or all of the PPAs. At a minimum, delays can cause the Project to incur daily liquidated damages of $100 per MW-hour of the contract maximum amount (for example, $40,000 per day in liquidated damages under the Rhode Island PPA) for up to a total of 365 days. More importantly, if the delays caused by the Stop Work Order resulted in Revolution Wind missing the deadlines in the PPAs and the PPAs were to be

terminated, it would create enterprise-level threats, the loss of billions of dollars in foregone revenue, forfeiture of $28 million of posted credit support in the aggregate, and reputational harm.

28. Prior to the Stop Work Order, Revolution Wind's construction schedule accounted for a Commercial Operation Date in November 2026. Therefore, even a relatively brief delay could push the operational date of the Project into 2027, beyond the deadlines in three of the Project's PPAs (the two 2018 Connecticut PPAs and the 2018 Rhode Island PPA) rendering the Project potentially unviable.

### 3. The Stop Work Order Will Result In the Loss of Vessels Needed for Construction and Creates Cost Delays that Threaten Project Cancellation If It Is Not Stayed

29. Critically, Revolution Wind's contracts for Project construction vessels include latest vessel availability date provisions. Under these provisions, if Project work is not complete by the specified latest vessel availability date, the contracted vessels are able to depart to work on other projects. As a result, if there are schedule delays, the vessels may be required to depart the site for other contractually-scheduled commitments without completing work. If Revolution Wind cannot use the vessels because of the Stop Work Order, Revolution Wind will nonetheless be required to pay for the vessels' time spent idling due to the Stop Work Order. In addition, Revolution Wind would need to try and secure additional vessel capacity to complete the unfinished works, which would come with significant cost and schedule uncertainty (because, as described above, specialized vessels are in limited supply and often are contracted years in advance) and it is unknown whether the required vessels could be obtained. And, even if replacement vessels could be obtained, their costs would be higher, as explained above. For example, the White Marlin—the specialized heavy transport vessel on which the second offshore substation topside currently sits—has a last vessel availability date of December 15, 2025. The Seaway Aimery, which is necessary for remaining array cable installation, has a last vessel

availability date of December 31, 2025. The Bokalift 2, a heavy-lift vessel that is necessary for installation of the second offshore substation's topside, has a last vessel availability date of November 9, 2025, with a potential option to extend to December 31, 2025; however, to receive this extension, Revolution Wind must coordinate with and confirm alignment with neighboring offshore wind projects and commit to an extension by September 9, 2025. In addition to the Bokalift 2 (currently available until November 9), installation of the offshore substation topside also requires the White Marlin (available until December 15). But even if Revolution Wind could make vessel arrangements, it would be of marginal utility because weather conditions are likely to limit the window for installation of the substation to September or early October, as described below.

30. Significant schedule delay due to vessel unavailability could result in Project termination because delay will cause the Project to miss critical milestones, with no guarantee when the necessary vessels would be available again. Thus, the Project may be cancelled because there are no vessels to build it.

31. The longer BOEM's Stop Work Order remains in place, the more likely it is that, even if the Order is lifted, there will be compounding delays to the Project that threaten its viability. Weather is a significant factor in determining the Project's construction schedule and, if offshore construction is pushed into the winter months when the weather worsens, there will be additional delays. For example, a WTG that requires approximately three days to install in the summer could take five to ten days to install in the winter due to worsening weather. This is because poor weather can prevent the floating barge from mooring against the WTG installation vessel (Scylla), and because of the need to have multiple moorings if the weather conditions worsen during the transfer of WTG components from the floating barge to the Scylla.

32.     Delays caused by worsening weather are highly likely to have an adverse impact on Project feasibility with respect to the installation and preparation for commissioning of the second offshore substation.  In ideal weather conditions, substation installation requires approximately five days, including one day to moor the vessel, lift the substation from the barge, and set down the substation on a modular support frame, and four days to weld and finalize the substation.  However, offshore substation installation requires calm weather to install (*e.g.*, suitable wave period, direction, and size, and suitable wind speed).  Looking ahead to November and December, historic weather data for those months indicates that there are very few windows of time to install the substation topside based on suitable weather conditions (*i.e.*, wave period, direction, and size).  Even in October, historical weather data suggests that these suitable window will start to decrease.  Accordingly, the farther out from the end of September or beginning of October installation of the substation topside is pushed, the more challenging the weather and seas become, and the less likely it is that there will be a suitable weather window to complete installation in 2025.

33.     If installation of the substation topside cannot be completed in 2025, Revolution Wind would lose access to the specialized vessels needed to complete offshore construction of the Project including the specialized vessels to install the topside (*e.g.*, White Marlin and Bokalift 2) and then the subsequent vessels to install the array cables and pull the inter-link cable (*e.g.*, Seaway Aimery) into the topside.  In this case, in 2026, Revolution Wind would need to secure equivalent specialized vessels to first install the topside in a suitable weather window (*e.g.*, after April/May 2026) and then secure alternative specialized vessels for scopes after the topside install to install array cables and pull in the inter-link cable into this offshore substation.  There is a critical and significant risk that Revolution Wind would not be able to resecure the necessary specialized

vessels to complete the installation in 2026 and commission the Project (*i.e.*, to meet the deadlines for three of the PPAs) threatening viability of project and enterprise. For this reason, it is critical that installation of the topside be allowed to move forward by the beginning of the last week of September to avoid the increasing risk of bad weather preventing installation.

34. Furthermore, unless the Stop Work Order is stayed or lifted soon, it is unlikely that Revolution Wind can complete inter-array cable installation prior to the last available dates of the vessel required for this installation. Revolution Wind currently has scheduled the installation of remaining inter-array cables over a 2.5-month period from September 1 to the middle of November. If the Stop Work Order is stayed or lifted by the beginning of the last week of September, that would give Revolution Wind until approximately early-to-mid-December to complete this work. Even in that circumstance, the extremely narrow window leaves no room for delay, particularly given the worsening winter weather conditions. The last date of availability for the Seaway Aimery, the vessel necessary for this installation, is December 31, 2025. Accordingly, if the Stop Work Order remains in place after the last week of September, it becomes increasingly unlikely that the cable installation would be able to be completed in 2025. In addition, Cable Lay Vessels are highly specialized vessels that are typically booked over a year in advance. It is currently uncertain when Revolution could secure an alternative vessel to complete the array cable scope and thus threatening viability of project and enterprise.

35. Accordingly, if the Stop Work Order is not lifted by the beginning of the last week of September, there is a risk that the Project cannot be completed before the final commercial operation date deadlines in three of the Project's PPAs. Revolution Wind currently has no mechanism for extending those deadlines, and the PPAs would be subject to termination,

significantly threatening the financial viability of the entire Project and posing an existential risk to the Project, and thus to Revolution Wind.

### D. Possible Alternatives Would Not Cure Revolution Wind's Irreparable Harms

36. Revolution Wind has been and is continuing to explore possible alternatives to mitigate the irreparable harm that BOEM's Stop Work Order is causing and will continue to cause imminently.

37. It is doubtful whether any offshore components of the Project, which is now 80% constructed, complete, could be decommissioned and repurposed for other projects. The Project's WTGs have been and are continuing to be built (i) with smaller dimensions and therefore lower capacity than newly designed projects are likely to use, and (ii) specifically for the U.S. market at 60 Hz, so they cannot be used in any other global market in their current form. WTG monopile foundations will not be able to be reused either, as they are not structurally capable of being installed again and are location specific. In addition, future projects built with larger WTGs will require correspondingly larger WTG monopile foundations. Accordingly, if Revolution Wind was forced to decommission the monopile foundations, they would ultimately be scrapped. Converting the WTGs would also be cost-prohibitive because of the costs of converting the frequency, as well as the significant storage costs that Revolution Wind would incur while waiting for the WTGs to be repurposed. The cables are not project-specific, but their re-sale value is minimal and, once installed, they cannot be reused, including for other projects.

### E. Important Project Benefits

38. Over the lifetime of the Project, Revolution Wind anticipates it will pay $178 million in rents and operating fees to the federal government. The vast majority of this sum will be foregone by the federal government if the Project cannot move forward due to the Stop Work Order.

39. The Project is currently estimated to generate hundreds of millions of dollars in state tax revenue over its lifetime, and that public value would likewise be lost if the Project is cancelled.

### F. Relief From BOEM's Stop Work Order Is Needed By the Beginning of the Last Week of September 2025

40. For these foregoing reasons, judicial relief is required by the beginning of the last week of September 2025 to avoid significant Project delays and potential cancellation of the Revolution Wind Project. Providing preliminary injunctive relief against the Stop Work Order and vacating the unlawful agency action will redress the injuries described above because Revolution Wind will be able to complete its previously-approved, lawful construction of the Project.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746(2) that the foregoing is true and correct.

Executed on September 5, 2025, at Providence, Rhode Island.

_____
Paul Murphy