IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Revolution Wind, LLC**, <br><br> Plaintiff, <br><br> v. <br><br> **Douglas Burgum**, in his official capacity as Secretary of the Interior, **et al.**, <br><br> Defendants. | Case No. 1:25-cv-02999 |

**FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Introduction ........................................................................................... 1

Background ........................................................................................... 2

    I.    Wind Energy Development on the Outer Continental Shelf ......... 2

    II.    Factual Background ....................................................................... 3

Standard of Review ............................................................................... 6

Argument ............................................................................................... 8

    I.    The Motion Seeks More Than Maintenance of the Status
        Quo ............................................................................................... 8

    II.    Revolution Wind Is Not Likely to Prevail on the Merits ............. 11

        A.    OCSLA Provided BOEM Authority for the Order ............. 11

        B.    BOEM Considered the Relevant Factors and
              Articulated Its Reasoning ................................................... 16

        C.    There Has Been No Due Process Violation ........................ 25

    III.    Revolution Wind Has Not Met Its Burden to Demonstrate an
        Irreparable Harm Warranting Preliminary Relief ...................... 26

        A.    Revolution Wind Has Not Shown Its Alleged Economic
              Injuries Justify a Preliminary Injunction ......................... 28

            1.    Revolution Wind has not proven irreparable
                harm to the company ................................................ 29

            2.    Revolution Wind has not adequately described
                and substantiated its alleged losses ......................... 31

            3.    Revolution Wind's uncertainty regarding
                construction delays does not justify a
                preliminary injunction ............................................. 33

B.    Revolution Wind Has Not Established That It Will Suffer Reputational Harm Absent a Preliminary Injunction ................................................................ 36

IV.   The Balance of Harms Do Not Call for Preliminary Relief ........ 37

Conclusion ..................................................................... 38

# INTRODUCTION

Revolution Wind's motion for preliminary injunctive relief should be denied. The Department of the Interior's Bureau of Ocean Energy Management (BOEM) is conducting a presidentially directed review of existing offshore wind leases. As part of that ongoing review, BOEM identified concerns with the Revolution Wind Farm and Revolution Wind Export Cable Project (Project). Those concerns relate to national security interests and potential interference with other reasonable uses of federal waters. Under its general authority to ensure that activities under federal leases are carried out in a manner that provides for, among other things, protection of national security and prevention of interference with other uses, BOEM issued a stop work order to Revolution Wind. That order did not revoke or modify any existing project approval; it did not terminate the project; and it did not rescind Revolution Wind's lease. Rather, given the identified concerns, the order halts construction work while BOEM completes its review.

BOEM's ongoing administrative authority over wind energy development on the Outer Continental Shelf (OCS) authorized BOEM to act. Though brief, the order identified the relevant factors for its decision and explained its bases. The order also presented Revolution Wind with an opportunity to administratively appeal the decision. Revolution Wind is therefore unlikely to succeed on the merits of its claims. While Revolution Wind may be frustrated

1

that the Project is allegedly not able to proceed on schedule, it fails to meet its steep burden to prove a certain, imminent, and irreparable injury that justifies the extraordinary remedy of preliminary injunctive relief.  The motion should be denied.

## BACKGROUND

### I.    Wind Energy Development on the Outer Continental Shelf

This case involves a wind energy project on the OCS.  The OCS consists of the submerged lands beneath the ocean, generally from 3 to 200 miles seaward of the coastline.  *Ctr. for Biological Diversity v. Jewell*, 563 F.3d 466, 472 (D.C. Cir. 2009); 43 U.S.C. § 1331(a).  Under the Outer Continental Shelf Lands Act (OCSLA), the United States holds these lands as a "vital national resource reserve" that "should be made available for expeditious and orderly development, subject to environmental safeguards."  *Id.* § 1332(3).

Interior approvals related to wind energy development on the OCS are governed by OCSLA and Interior's implementing regulations.  *See* 43 U.S.C. § 1337(p)(1)(C) (authorizing the Secretary of the Interior to "grant a lease, easement, or right-of-way" for activities that "produce or support production, transportation, storage, or transmission of energy from sources other than oil and gas"); *id.* § 1337(p)(8) (authorizing the Secretary to "issue any necessary regulations to carry out this subsection"); *see also id.* § 1334(a) ("The Secretary shall administer the provisions of this subchapter relating to the leasing of the

2

outer Continental Shelf, and shall prescribe such rules and regulations as may be necessary to carry out such provisions.").

In granting Interior that authority, Congress directed that "[t]he Secretary shall ensure that any activity under this subsection is carried out in a manner that provides for" multiple criteria. *Id.* § 1337(p)(4). Among them are: "protection of national security interests of the United States" and "prevention of interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas." *Id.* § 1337(p)(4)(F), (I). Interior regulations delegate to BOEM the responsibility to implement § 1337(p)(4). *See* 30 C.F.R. § 585.102(a).

Under BOEM's renewable energy regulations and lease terms, a lease issued under OCSLA does not itself authorize development. 30 C.F.R. § 585.200(a). A lessee must first assess the site, obtain BOEM's approval of a site assessment plan, and obtain BOEM's approval of a Construction and Operations Plan (COP). 30 C.F.R. §§ 585.600, 585.605–585.613, 585.620–585.628.

## II.    Factual Background

The Revolution Wind Project is an offshore wind energy project that has been under construction in federal waters off the coast of Rhode Island. Compl. For Del. & Injunctive Relief ¶ 19, Dkt. No. 1 ("Compl."). Revolution Wind submitted an initial COP for the Project to BOEM in 2020 and an updated COP in April 2021. Bureau of Ocean Energy Mgmt., Record of Decision: Revolution

3

Wind Farm & Revolution Wind Export Cable Project Construction & Operations Plan 3 (Aug. 21, 2023) ("ROD") (Ex. B to Decl. of Adam Suess). BOEM reviewed the COP under several statutes, including OCSLA. *Id.* at 1. BOEM issued a Record of Decision to approve the COP with modifications in August 2023, and sent Revolution Wind a letter of approval in November 2023. *See generally id.*; Decl. of Adam Suess ¶¶ 5–6, Sept. 12, 2025 (attached to this brief) ("Suess Decl."). The COP, as approved, contemplates construction of up to 65 wind turbine generators, inter-array cables, two offshore substations, and other off-shore and on-shore components. ROD 22.

In January 2025, the President issued a Presidential Memorandum entitled, "Temporary Withdraw of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects." 90 Fed. Reg. 8363 (Jan. 20, 2025) ("Presidential Wind Memo"). Section 1 of that Memorandum instructs the Secretary of the Interior to "conduct a comprehensive review of the ecological, economic, and environmental necessity of terminating or amending any existing wind energy leases." *Id.* The review directed by Section 1 of the Presidential Wind Memo prompted Interior to review the Revolution Wind Project, as approved. *See* Suess Decl. ¶ 15.

In May 2025, Interior withdrew one M-Opinion and reinstated a prior M-Opinion, which also prompted BOEM to review its approval of the Revolution Wind Project.[1]  Suess Decl. ¶¶ 12, 15.  BOEM's 2023 approval of the Revolution Wind COP relied on M-Opinion 37067, which stated that § 1337(p)(4) of OCSLA "does not require the Secretary to ensure that the goals [enumerated in that section] are achieved to a particular degree, and she retains wide discretion to determine the appropriate balance between two or more goals that conflict or are otherwise in tension."  ROD 5–6 (quoting M- Opinion 37067); *see also* ROD B-2 & n.1 (same).  Using that interpretation, Interior "determined that the Project will comply with [BOEM's] regulations and that the proposed activities will be carried out in a manner that provides for … the [] factors listed is subsection [1337](p)(4) of OCSLA."  ROD B-2.

Interior withdrew M-Opinion 37067 in May 2025 and reinstated a prior M-Opinion putting forward a different interpretation of § 1337(p)(4).  Ex. I to Suess Decl.  The current M-Opinion provides that:

> the proper scope of the phrase "prevention of interference with reasonable uses" is such that, when evaluating whether a proposed activity would conflict with an existing use, the Secretary is required "to act to prevent interference with reasonable uses in a way that errs on the side of less interference rather than more interference."

---

[1] M-Opinions are legal interpretations by Interior that are binding on all Departmental offices and officials.  They can only be overruled or modified by the Interior Solicitor, Deputy Secretary, or Secretary. 209 Interior Departmental Manual 3.2(A)(11).

*Id.* at 2. The May 2025 M-Opinion further provides that "any [ ] Departmental action taken in reliance on the now withdrawn M-Opinion 37067[ ] should be re-evaluated." *Id.* at 3.

In accordance with the Presidential Wind Memo and M-Opinion 37086, Interior has been reviewing its prior approval of the Revolution Wind COP. Suess Decl. ¶ 15. During that review, "concerns [ ] have arisen … related to the protection of national security interests of the United States and prevention of interference with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas, as described in [ ] subsection [1337(p)(4)] of OCSLA." Order, ECF No. 1-1. Thus, on August 22, BOEM's Acting Director issued an order ("BOEM Order") directing Revolution Wind to "halt all ongoing activities related to the Revolution Wind Project on the outer continental shelf [ ] to allow time for [BOEM] to address" those concerns. *Id.* Revolution Wind "may not resume activities until BOEM informs [it] that BOEM has completed its necessary review." *Id.* The BOEM Order informed Resolution Wind of its right to administratively appeal the order pursuant to 30 C.F.R. § 585.118. *Id.*

## STANDARD OF REVIEW

Revolution Wind seeks preliminary injunctive relief under Federal Rule of Civil Procedure 65(a). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24

(2008) (citation omitted).  Instead, preliminary injunctive relief "may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Id.* at 22 (citation omitted); *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (same).  Preliminary relief is "intended to maintain a status quo or to preserve the relative positions of the parties until" the court can resolve the merits. *Sherley v. Sebelius*, 689 F.3d 776, 781–82 (D.C. Cir. 2012) (cleaned up).

A plaintiff seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent injunctive relief; (3) a balance of hardships that tips in their favor; and (4) that the public interest weighs in favor of granting the injunction.  *Winter*, 555 U.S. at 20 (citations omitted).  The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor, which includes a "burden of producing credible evidence sufficient to demonstrate [the party's] entitlement to injunctive relief."  *Workman v. Bissessar*, 275 F. Supp. 3d 263, 267 (D.D.C. 2017) (citations omitted).

"Mandatory injunctions that would change the status quo are disfavored as an even more extraordinary remedy than the typical preliminary injunction, especially when directed at the United States Government."  *Strait Shipbrokers Pte Ltd. v. Blinken*, 560 F. Supp. 3d 81, 92–93 (D.D.C. 2021) (quoting *Abdullah v. Bush*, 945 F. Supp. 2d 64, 67 (D.D.C. 2013), and *Sierra Club v. Johnson*, 374 F. Supp. 2d 30, 33 (D.D.C. 2005)) (cleaned up).

7

Revolution Wind also requests preliminary relief under Section 705 of the Administrative Procedure Act (APA), which authorizes "the reviewing court" to "postpone the effective date of an agency action or to preserve status or rights pending" judicial review "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. The same factors governing preliminary injunctions also govern relief under Section 705. *See Cuomo v. U.S. Nuclear Reg. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985). The relief available, however, is not the same—relief under Section 705 can only "postpone the effective date of an agency action" or "preserve status or rights" through a stay. 5 U.S.C. § 705.

## ARGUMENT

Revolution Wind's motion should be denied. The proposed injunction seeks inappropriate relief, and the company has failed to meet its heavy burden to demonstrate a likelihood of success on the merits. The company also has not proven it will suffer a non-speculative irreparable harm before the Court can rule on the merits, nor has it shown that those speculative harms outweigh BOEM's responsibilities under OCLSA.

## I.   The Motion Seeks More Than Maintenance of the Status Quo.

Revolution Wind is seeking more than preliminary relief. Preliminary injunctive relief is intended to *maintain* the status quo until the court can resolve the merits. *See Lackey v. Stinnie*, 604 U.S. 192, 200 (2025). Here, the

current status quo is that work has stopped on the project, consistent with the BOEM Order.

Revolution Wind's proposed order does not seek to maintain that status quo. *See* Proposed Order, Dkt. No. 9-7. Indeed, the proposed order's terms do not even align with the nature of Revolution Wind's motion. The proposed order seeks declaratory relief on the merits of Revolution Wind's claims. *See id.* (requesting an order stating that "the [BOEM] Order violates the Administrative Procedure Act, the Outer Continental Shelf Lands Act, and Revolution Wind's Fifth Amendment Due Process rights" and "is therefore arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory jurisdiction and authority, and short of statutory right"). That is the same relief Revolution Wind seeks in its Complaint. *See* Compl., Prayer for Relief. The proposed order even goes so far as to request attorneys' fees, a topic that Revolution Wind did not address in its motion. *See* Proposed Order.

Where the proposed order at least contemplates preliminary relief, it seeks to stay the BOEM Order and enjoin Interior from "imposing" or "enforcing" it. *Id.* The BOEM Order, however, is currently in place. Thus, Revolution Wind is seeking to alter, rather than maintain, the status quo. While the D.C. Circuit has held that injunctions under Rule 65 can alter the status quo, "courts are institutionally wary" of granting such relief. *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022). And courts in other circuits hold requests for this sort of

preliminary relief to a heightened standard. *Id.* at 96. For the reasons explained in the sections below, the Court should be "wary" before granting Revolution Wind its requested relief.

Revolution Wind's reliance on 5 U.S.C. § 705 does not call for a different outcome. Section 705 allows courts to grant interim relief, but the scope of that relief is limited to postponement of agency action or preserving status or rights. 5 U.S.C. § 705. Mandatory injunctions that alter the status quo are not permitted. *Salt Pond Assocs. v. U.S. Army Corps of Eng'rs*, 815 F. Supp. 766, 776 (D. Del. 1993). "By its very terms, Section 705 does not authorize a court to issue a preliminary injunction that alters the status quo or dictates specific terms and conditions to an agency." *Crawford-Hall v. United States*, No. 2:17-cv-1616-SVW-AFM, 2018 WL 5816117, at *8 (C.D. Cal. May 31, 2018).

Courts have consistently denied requests for relief under Section 705 that would alter the status quo or force an agency to take a specific action. *See, e.g.*, *Kondapally v. U.S. Citizenship & Immigr. Servs.*, No. 20-cv-00920 (BAH), 2020 WL 5061735, at *5 (D.D.C. Aug. 27, 2020) (finding "Section 705 does not empower the Court" to grant affirmative relief); *Comprehensive Cmty. Dev. Corp. v. Sebelius*, No. 12-cv-0776 (PAE), 2012 WL 738185, at *8 (S.D.N.Y. Mar. 7, 2012) (same); *Salt Pond Assocs.*, 815 F. Supp. at 776–77 (denying request to

order government to issue a permit with conditions); Revolution Wind's requested injunction seeks more than preliminary relief and, on that basis, the motion should be denied.

## II.    Revolution Wind Is Not Likely to Prevail on the Merits.

Revolution Wind's motion should also be denied because the company has not met its burden to demonstrate that it is likely to succeed on the merits of its case.  Revolution Wind's complaint includes four claims.  *See* Compl. ¶¶ 160–208.  The claims allege that BOEM acted arbitrarily and capriciously (Claim I); did not have authority under OCSLA to issue the Order (Claim II); did not follow the necessary regulatory procedures (Claim III); and violated procedural due process rights (Claim IV).  We first address BOEM's authority and the necessary procedures, then turn to the arbitrary and capricious and due process claims.

### A.    OCSLA Provided BOEM Authority for the Order.

BOEM was within its authority to issue the stop work order.  BOEM issued the Order under 43 U.S.C. § 1337(p)(4).  Paragraph (p)(4) is stated in the present tense: "The Secretary shall ensure that any activity under this subsection is carried out in a manner that provides for" the enumerated criteria.  43 U.S.C. § 1337(p)(4).  This includes "protection of national security interests" and "prevention of interference with" other reasonable uses of the area in question.  *Id.* § 1337(p)(4)(F), (I); *see also id.* § 1337(p)(6)(B) ("The Secretary shall

require the holder of a lease, easement, or right-of-way granted under [§ 1337(p)] to … (B) comply with such other requirements as the Secretary considers necessary to protect the interests of the public and the United States[.]"). In accordance with the statute, BOEM regulations require that a lessee "[c]onduct all activities authorized by the lease or grant in a manner consistent with the provisions of [43 U.S.C. § 1337(p)]." 30 C.F.R. § 585.105(h).

In another context, the Supreme Court has recognized that, when Congress grants the Secretary of the Interior general powers over the management of public land, that administrative authority exists unless statutorily narrowed. *See Boesche v. Udall*, 373 U.S. 472, 476–77 (1963). And when, as here, Congress grants an agency the power to approve an action under certain factors, the agency necessarily maintains the inherent authority to temporarily stop implementation of the approved action where the agency has concerns about statutory compliance. *See Gun South, Inc. v. Brady*, 877 F.2d 858, 862 (11th Cir. 1989). For example, in *Gun South*, the Eleventh Circuit concluded that, despite previously issued permits, the Bureau of Alcohol, Tobacco, and Firearms had the inherent authority to suspend the importation of firearms while it reassessed whether importation should be allowed under the relevant statute. *Id.* at 859–60, 862; *see id.* at 862–63 (citing cases). The D.C. Circuit has extended the Eleventh Circuit's logic to conclude that the Office of Surface Mining holds the authority to suspend a permit as part of its express authority

to make a permit decision in the first place. *Nat'l Mining Ass'n v. U.S. Dep't of the Interior*, 177 F.3d 1, 9 (D.C. Cir. 1999). Here, too, Interior holds oversight authority under § 1337(p) for the duration of Revolution Wind's lease.

The fact that BOEM previously approved Revolution Wind's COP does not eliminate the Secretary's authority for continued oversight under § 1337(p)(4). *See* Pl.'s Mot. for Prelim. Inj. & Stay Pending Review 27, Dkt. No. 9 ("Pl.'s Br."). Nothing in the text of § 1337 (p)(4) removes the Secretary's oversight after COP approval. To the contrary, the statute is in the present tense and does not limit the Secretary's consideration of the subsection's factors to only situations in which the Secretary is deciding whether to approve an activity in the first instance. 43 U.S.C. § 1337(p)(4) ("The Secretary shall ensure that any activity under this subsection is carried out in a manner that provides for . . . .").

General administrative law principles also support this conclusion. "[I]t is generally accepted that in the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decisions." *Macktal v. Chao*, 286 F.3d 822, 825–26 (5th Cir. 2002) (citations omitted). The D.C. Circuit has long held the same. *See Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (agencies have "inherent reconsideration authority" unless "Congress has spoken"); *Albertson v. FCC,* 182 F.2d 397, 399 (D.C. Cir. 1950) ("The power to reconsider is inherent in the power to decide.").

With those principles in mind, the Secretary's oversight authority in § 1337(p)(4) clearly applies here. BOEM is undertaking a review of the Revolution Wind Project pursuant to the Presidential Wind Memo. Suess Decl. ¶ 15; Order 1. As part of that review, Interior identified "concerns related to" the ongoing oversight factors in § 1337(p)(4) and issued the Order to "ensure compliance" until "BOEM has completed its necessary review." Order 1; *see also* Seuss Decl. ¶ 14. The BOEM Order is not permanent; it is only intended to allow BOEM time to finish its review.

Revolution Wind nonetheless argues that BOEM's authority is more circumscribed and includes procedural steps that BOEM did not take. *See* Pl.'s Br. 7–8, 28–32. According to Revolution Wind, the only relevant Secretarial authority is under 43 U.S.C. § 1334(a)(1), and that authority is only available where there is a threat of serious harm to life, the environment, or mineral deposits. And in any event, Revolution Wind says, Interior should have followed certain regulatory procedural steps.

But these arguments are misplaced. Section 1334(a)(1) references suspensions and temporary prohibitions as topics on which the Secretary must issue regulations. *See* 43 U.S.C. § 1334(a) ("The regulations prescribed by the Secretary under this subsection shall include, but not be limited to, provisions—(1) for the suspension or temporary prohibition of any operation or activity . . . ."). Indeed, § 1334(a) largely focuses on the Secretary's rulemaking

authority. *See id.* ("The Secretary shall administer the provisions of this sub-chapter relating to the leasing of the outer Continental Shelf, and shall prescribe such rules and regulations as may be necessary to carry out such provisions."). But § 1334(a) does not place limits on the Secretary's authority to act under § 1337(p)(4).

Revolution Wind also argues that BOEM should have followed the procedures outlined in 30 C.F.R. § 585.106(b)–(e). But those provisions relate to notices of noncompliance and enforcement of failures to comply with those notices; they do not apply here: the BOEM Order did not allege any failure to comply with a term of the lease or COP approval conditions. *See* Order 1. In any event, 30 C.F.R. § 585.106(b) says BOEM "*may* issue to you a notice of noncompliance." *Id.* § 585.106(b) (emphasis added). It does not say that a notice of noncompliance is the only avenue available. *See, e.g.*, *id.* § 585.106(a) ("BOEM may take appropriate corrective action under this part if you fail to comply with applicable provisions of Federal law[.]"). None of the statutory or regulatory provisions that Revolution Wind relies on address (substantively or procedurally) the Secretary's ongoing responsibilities under § 1337(p)(4).

Revolution Wind is also incorrect that the major questions doctrine is implicated here. Pl.'s Br. at 30–31 (citing *West Virginia v. EPA*, 597 U.S. 697 (2022)). The doctrine asks whether an agency has the authority to regulate a subject "of vast economic and political significance." *See West Virginia*, 597

15

U.S. at 716, 720–24. But here, OCSLA expressly provides Interior with authority to "ensure that any activity under [§ 1337(p)] is carried out in a manner that provides for" the enumerated factors. *See* 43 U.S.C. § 1337(p)(4). And Revolution Wind's assertion of "vast economic impact," Pl.'s Br. 31, is focused on the Order, not the general authority to regulate in consideration of the factors in § 1337(p)(4). Indeed, Revolution Wind does not argue that BOEM lacked the authority to consider § 1337(p)(4) when approving Revolution Wind's COP.

BOEM had the authority to issue the Order and Revolution Wind is unlikely to succeed on its claims alleging the contrary.

## B. BOEM Considered the Relevant Factors and Articulated Its Reasoning.

Revolution Wind's next argument is that the BOEM Order was arbitrary and capricious. Pl.'s Br. 18–28. Specifically, the company asserts that the Order was unlawfully brief on its face, contrary to the evidence before the agency, and violated the change-in-position doctrine. *See id.*

The APA authorizes a reviewing court to "hold unlawful and set aside" final agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). Judicial review under the APA "is highly deferential to the agency's decision and presumes that the agency action

is valid." *Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 72 F.4th 1324, 1336 (D.C. Cir. 2023) (cleaned up).

"Under that standard, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 145 S. Ct. 1497, 1511 (2025) (citing *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983); *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).

"An agency acts arbitrarily or capriciously if it 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 1160 (D.C. Cir. 2025) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

The court may not substitute its judgment for that of the agency and must uphold a decision of less-than-ideal clarity if the agency's path may reasonably be discerned. *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974); *Van Hollen, Jr. v. FEC*, 811 F.3d 486, 497 (D.C. Cir. 2016) ("[I]deal clarity is not the standard."); *Animal Legal Def. Fund, Inc. v. Vilsack*, 237 F. Supp. 3d 15, 20–21 (D.D.C. 2017).

17

The BOEM Order provided an adequate explanation of its reasoning and was supported by the information before BOEM. Given the nature of the Order—in which BOEM was not changing any prior agency action—the change-in-position doctrine is irrelevant and there was no need to consider reliance interests. Revolution Wind is not likely to succeed on this claim.

*First*, the BOEM Order reasonably explained its bases. The Order disclosed that Interior, consistent with the Presidential Memorandum, is undertaking a review of Revolution Wind's lease activities. Order 1. The Order informed Revolution Wind that BOEM had identified "concerns related to the protection of national security … and prevention of interference with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas." Order 1. And the Order disclosed the authority under which BOEM issued it, 43 U.S.C. § 1337(p)(4). Order 1. There is no APA problem with this "reasonable, albeit brief" explanation. *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007).

Revolution Wind's cited cases are distinguishable. This is not a case where the explanation "amounted to one line in [a] termination letter stating that '[a grant] award no longer effectuates agency priorities.'" *RFE/RL, Inc v. Lake*, 772 F. Supp. 3d 79, 84 (D.D.C. 2025). And unlike the issue in *PayPal, Inc. v. CFPB*, 728 F. Supp. 3d 31, 39–40 (D.D.C. 2024), BOEM explained—albeit briefly—why it was issuing the Order.

18

But even if the Court determines that the Order did not adequately explain BOEM's reasons, the proper remedy is to seek further explanation from BOEM. *See Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 5–6 (D.C. Cir. 2006) (permitting an agency to provide an "amplified articulation" of a prior "conclusory" observation); *Constellation Mystic Power, LLC v. FERC*, 45 F.4th 1028, 1055 (D.C. Cir. 2022) ("when an agency fails to provide an intelligible explanation for its decision," the remedy is "remand for further explanation" (cleaned up)). That could occur before a ruling on the merits: "When the record is inadequate, a court may 'obtain from the agency, either through affidavits or testimony, such additional explanations of the reasons for the agency decision as may prove necessary.'" *Env't Def. Fund, Inc. v. Costle*, 657 F.2d 275, 285 (D.C. Cir. 1981) (quoting *Camp v. Pitts*, 411 U.S. 138, 143 (1973)); *see, e.g.*, *TOMAC v. Norton*, 240 F. Supp. 2d 45, 48–49 (D.D.C. 2003) (permitting declaration sworn after agency action, but presenting information known to agency prior to decision). BOEM has here provided further explanation. *See* Suess Decl. ¶¶ 8, 10, 11, 14. With or without that further explanation, Revolution Wind is unlikely to succeed on the portion of its claim alleging inadequate explanation.

*Second*, BOEM made a rational connection between the facts found and the choice made. This claim will turn on whether BOEM's administrative record supports its decision. *Dep't of Commerce v. New York*, 588 U.S. 752, 780 (2019) ("[I]n reviewing agency action, a court is ordinarily limited to evaluating

19

the agency's contemporaneous explanation in light of the existing administrative record." (citations omitted)).

BOEM concluded that Revolution Wind needed to stop work while BOEM addressed concerns that arose during BOEM's ongoing review of Revolution Wind. Order 1. Specifically, BOEM identified "concerns related to the protection of national security" and "prevention of interference with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas." Order 1. The administrative record will demonstrate the reasonableness of that conclusion. As explained in the Declaration of Adam Suess, BOEM based the Order on its concern that there is a continuing failure by Revolution Wind to fully address national security issues raised during the COP approval process. Suess Decl. ¶¶ 8, 10. For example, certain conditions of the COP approval required Revolution Wind to reach agreement on mitigation measures with the Department of Defense, but not before construction could begin. *Id.* ¶ 8. Revolution Wind later reached an agreement, but BOEM believes some of the mitigation requirements in that agreement remain outstanding. *Id.* ¶¶ 8, 10. And other federal stakeholders have continued to express concerns to Interior about other uses of the area. *Id.* ¶¶ 10, 11.

Revolution Wind's counter is effectively that BOEM has forfeited any right to be concerned given its prior approval of the COP. *See* Pl.'s Br. 26–28. But as explained above (*supra* at 14), BOEM has not altered any of its prior

conclusions. And in any event, agencies have the inherent authority to recon-sider. *See supra* at 13.

*Third*, the change-in-position doctrine is irrelevant here, and there was no requirement that BOEM consider Revolution Wind's reliance interests. The change-in-position doctrine permits agencies to change existing policies so long as they recognize the change, reasonably explain it, and consider serious reli-ance interests. *FDA v. Wages & White Lion Inv., LLC*, 145 S. Ct. 898, 917 (2025). The doctrine "asks two questions." *Id.* at 918. The first is whether the agency has in fact changed its position by, for example, acting inconsistently with a prior position or reversing a former view "as to the proper course." *Id.* (citation omitted). If that first question is answered in the affirmative, the second question asks whether the agency recognized it was changing its posi-tion and explained the new policy. *Id.* (citation omitted).

Revolution Wind's effort to invoke the change-in-position doctrine fails at the first question. BOEM has not changed any position with respect to Rev-olution Wind. Yes, it has stated concerns that have come to light as part of its ongoing review and issued a stop-work order. But BOEM's review of lease ac-tivities is ongoing. BOEM has not rescinded or modified Revolution Wind's lease or the prior approval of the COP. Those agency actions remain in place, so there is no need to explain a non-existent change in position.

Nor was BOEM required to consider reliance interests. That is so for two reasons. The first is that any need to consider reliance interests is a part of the change-in-position doctrine. *Id.* at 917 (citing *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016)). As explained above, the doctrine is not applicable here.

The second reason is that none of *Wages & White Lion*, *Regents*, *Encino Motorcars*, or *Fox Television* stands for the principle that agencies must *always* account for reliance interests, regardless of the nature of the action in question. Instead, each of those cases involved an agency allegedly departing from a general policy or rule affecting the regulated community at large, by either changing that general policy or rule or by applying it in a different manner to a specific entity. *See Wages & White Lion,* 145 S. Ct. at 918–19 (plaintiffs alleged that the agency, in denying authorization to market e-cigarettes, departed from established guidelines on contents of applications); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 8 (2020) (rescission of program allowing certain unauthorized aliens who entered the United States as children to apply for a two-year forbearance of removal); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222–23 (2016) (rulemaking that changed general agency position on whether certain employees were exempt from overtime pay

requirements); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 517–18 (2009) (change in standards for what would constitute actionable indecency).[2]

None of these cases involved circumstances like those here, where an agency, in reviewing activities authorized by an earlier informal adjudication, has raised concerns about those ongoing activities. *But see Solenex, LLC v. Bernhardt*, 962 F.3d 520, 529–30 (D.C. Cir. 2020) (considering reliance interests in reviewing decision to cancel lease); *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 719 (D.C. Cir. 2016) (refusing to consider reliance interests argument in assessing permit reversal because argument was forfeited). Indeed, an expansive reliance rule in those situations would greatly hinder federal agency enforcement authority writ large. BOEM's continuing authority in § 1337(p)(4) does not include reliance interest considerations.

Nor is the BOEM Order inconsistent with Interior's defense against litigation involving its COP approval. *See* Pl.'s Br. 23–24. None of the claims briefed to date in those cases have involved the merits of BOEM's prior analysis under § 1337(p)(4), let alone any potential present-day conflicts with the

---

[2] Revolution Wind's other cited cases are of the same ilk. *See Sinclair Wyo. Refining Co. LLC v. EPA*, 114 F.4th 693, 712–13 (D.C. Cir. 2024) (addressing, in the context of specific requests for regulatory exemptions, EPA's departure from previous general conclusion that path to avoid economic hardship was infeasible); *Int'l Org. of Masters, Mates, & Pilots v. NLRB*, 61 F.4th 169, 179–80 (D.C. Cir. 2023) (creation of new NLRB jurisdictional rule considering subjective beliefs about employees' supervisorial status); *CSL Plasma, Inc. v. U.S. Customs & Border Prot.*, 628 F. Supp. 3d 243, 258–61 (D.D.C. 2022) (change from prior general policy that allowed certain visa holders to cross the U.S.-Mexico border to make blood plasma donations).

factors in that subsection.  Revolution Wind invokes Federal Defendants' re-
sponses to certain paragraphs in the Amended Complaint in *Green Oceans v.
U.S. Department of the Interior*, No. 1:24-cv-141-RCL. But the plaintiffs in
*Green Oceans* filed a Second Amended Complaint on July 15—during BOEM's
ongoing lease review.  *See* 2d Am. Compl., No. 1:24-cv-141-RCL, Dkt. No. 82.
The Court granted Federal Defendants' motion to be relieved of the require-
ment to file an answer to that amended complaint.  *Green Oceans*, No. 1:24-cv-
141-RCL, Dkt. 85.  Thus, there are no operative denials of pleading allegations
in that case that Federal Defendants would need to amend.  And in any event,
allegations in a complaint going to the merits of an APA claim are irrelevant
given that the court is not acting as a fact finder.  *See Am. Wild Horse Cam-
paign v. Bernhardt*, 442 F. Supp. 3d 127, 143 (D.D.C. 2020) (quoting *James
Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996)), *aff'd
sub nom., W. Watersheds Project v. Haaland*, 850 Fed. App'x 14 (D.C. Cir.
2021).

Federal Defendants also do not depart from their statements in *Green
Oceans* that developers should be able to rely on federal permits.  *See* Pl.'s Br.
26.  But BOEM also has a responsibility to "ensure that any activity under [43
U.S.C. § 1337(p)] is carried out in a manner that provides for" "protection of
national security interests of the United States" and "prevention of interfer-
ence with reasonable uses (as determined by the Secretary) of the exclusive

economic zone, the high seas, and the territorial seas." 43 U.S.C. § 1337(p)(4). Revolution Wind is unlikely to succeed on its claim that BOEM's Order was arbitrary and capricious.

## C.    There Has Been No Due Process Violation.

Revolution Wind is also unlikely to succeed on its claim that BOEM deprived the company of a property interest without due process under the Fifth Amendment. *See* Pl.'s Br. 32–33. That is so for three reasons.

*First*, property interests protected by the Fifth Amendment "are created and their dimensions are defined by existing rules or understandings that stem from an independent source." *McKinney v. Dist. of Columbia*, 142 F.4th 784, 793 (D.C. Cir. 2025) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)), *rehearing denied en banc*, No. 24-7027, 2025 WL 2551713 (D.C. Cir. Aug. 29, 2025). Any property interest for Revolution Wind arises under § 1337(p) and the resulting lease. *See* 43 U.S.C. § 1337(p)(1). But § 1337(p) also requires that the "[t]he Secretary shall ensure that any activity under this subsection is carried out in a manner that provides for" several factors. 43 U.S.C. § 1337(p)(4). As relevant here, those include national security interests and preventing interference with other uses. *Id.* Revolution Wind's lease similarly acknowledges that the rights conveyed are subject to § 1337(p). Am. Lease § 1 (Ex. A to Suess Decl.). And BOEM issued the Order under § 1337(p)(4).

*Second*, due process requires that a person be given notice and a meaningful opportunity to be heard before being "*finally* deprived of a property interest." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (emphasis added); *see also Gun South*, 877 F.2d at 867–68. BOEM's Order requires Revolution Wind to stop work while BOEM finishes its ongoing review of the lease. Order 1. But the Order does not permanently prohibit development, does not rescind the lease, and does not alter BOEM's prior COP approval.

*Third*, BOEM provided Revolution Wind with process. BOEM notified Revolution Wind that, under 30 C.F.R. § 585.118, it could appeal the Order to the Interior Board of Land Appeals. Order 1. That regulation allows Revolution Wind to seek a stay of the Order pending that administrative appeal. *See* 30 C.F.R. § 585.118(b) (referencing 43 C.F.R. part 4). To date, Revolution Wind has not availed itself of that process. For that reason and those explained above, Revolution Wind is unlikely to succeed on the merits of its claims.

## III. Revolution Wind Has Not Met Its Burden to Demonstrate an Irreparable Harm Warranting Preliminary Relief.

Revolution Wind has also not met its "considerable burden" to prove that it faces a "certain, great and actual[,] … and imminent" irreparable injury "creating a clear and present need for extraordinary equitable relief[.]" *Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017) (quoting *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005)). The party

seeking a preliminary injunction "must provide proof … that the harm is certain to occur in the near future." *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985). Specifically, the moving party must demonstrate that it faces irreparable injury "before the merits are resolved" in the normal course of litigation. *Hanson v. Dist. of Columbia*, 120 F.4th 223, 244 (D.C. Cir. 2024). And to justify issuance of a preliminary injunction, a plaintiff's "harm must be concrete and corroborated, not merely speculative." *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 213 (D.D.C. 2012) (quoting *Trudeau v. Fed. Trade Comm'n*, 384 F. Supp. 2d 281, 297 (D.D.C. 2005), *aff'd*, 456 F.3d 178 (D.C. Cir. 2006)).

Revolution Wind alleges three types of injury: (1) costs stemming from construction delays; (2) a long-term threat to Revolution Wind's viability as a business; and (3) reputational harms in connection with Revolution Wind's power purchase agreements ("PPAs"). Pl.'s Br. 33-40. These arguments are largely unsupported by specific information on Revolution Wind's financial situation and are speculative to the extent they are based on long-term financial or project viability. They therefore do not meet the "high standard for irreparable injury." *Cardinal Health*, 846 F. Supp. 2d at 210 (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).

A.    **Revolution Wind Has Not Shown Its Alleged Economic In-juries Justify a Preliminary Injunction.**

With respect to Plaintiffs' first two types of alleged injuries, "[i]t is well settled in this Circuit that 'economic loss does not, in and of itself, constitute irreparable harm.'" *Air Transp. Ass'n of Am. v. Export-Import Bank of the U.S.*, 840 F. Supp. 2d 327, 336 (D.D.C. 2012) (quoting *Wis. Gas.*, 758 F.2d at 674). Thus, the D.C. Circuit has held that "[r]ecoverable monetary loss may consti-tute irreparable harm only where the loss threatens the very existence of the movant's business." *Wis. Gas.*, 758 F.2d at 674. But even when considering non-recoverable losses, "courts in this district have required the economic harm faced to be serious in terms of its effect on the plaintiff." *Scotts Valley Band of Pomo Indians v. Burgum*, 1:25-cv-00958 (TNM), 2025 WL 1639901, at *5 (D.D.C. June 10, 2025) (quoting *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 179 (D.D.C. May 2, 2025)). This Court recently stated that in cases concerning alleged non-recoverable economic harms, "[r]ather than adopt a per se rule, courts have simply followed the same *Wisconsin Gas* standard recited above. The loss must 'threaten[ ] the very existence of the movant's business.'" *Scotts Valley*, 2025 WL 1639901, at *5 (second alteration in origi-nal; emphasis added) (quoting *Air Transp. Ass'n*, 840 F. Supp. 2d at 336). An-other decision likewise stated that the plaintiff's argument regarding non-re-coverable economic injuries "merge[d]" with the plaintiff's argument that

agency action threatened its existence given the high bar for establishing irreparable injury. *Afghan Yar Int'l Construction Co. Ltd. v. U.S. Dep't of State*, No. 21-1740 (CKK), 2021 WL 3472275, at *16 (D.D.C. Aug. 6, 2021).

In any scenario, "[t]o successfully shoehorn potential economic loss into the irreparable harm requirement, a plaintiff must establish that the economic harm is so severe as to 'cause extreme hardship to the business' or threaten its very existence.'" *Sandoz, Inc. v. Food & Drug Admin.*, 439 F. Supp. 2d 26, 32 (D.D.C. 2006) (quoting *Apotex, Inc. v. Food & Drug Admin.*, No. 06-cv-0627 (JDB), 2006 WL 1030151, at *16 (D.D.C. Apr. 19, 2006)). Revolution Wind has failed to meet that burden in three respects. First, Revolution Wind has not provided context for its alleged losses that would allow the Court to find an existential threat to Revolution Wind as *a company*. Instead, the facts here focus on impacts to *the Project*. Second, Revolution Wind has not adequately explained and corroborated its alleged losses. And, third, Revolution Wind has not clearly shown that alleged delays create a certain risk of incurring breakaway costs due to project cancellation.

> 1.    *Revolution Wind has not proven irreparable harm to the company.*

Revolution Wind has provided no context in which to determine whether its alleged losses are "serious in terms of its effect *on the [company]*." *Scotts Valley*, 2025 WL 1639901, at *5 (emphasis added) (quoting *Perkins Coie*, 2025

WL 1276857, at *48). Revolution Wind focuses on *project* viability (which is discussed further below). But the focus for irreparable harm in these circumstances must be on the *company*. "A claim of substantial financial losses must be evaluated from the perspective of the organization's total revenues in order to determine if the harm is of a magnitude that warrants injunctive relief." *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 48 (D.D.C. 2014). This court has, for example, found an alleged billion-dollar loss would not warrant injunctive relief because it did not represent a sufficiently large portion of the plaintiff's revenues. *Cardinal Health*, 846 F. Supp. 2d at 212. And a picture of the company's overall finances is especially important when, as here, a plaintiff has "parent companies" that could be relevant to the funding issue. *See* Decl. of Melanie Gearon ¶ 47, September 5, 2025 (Dkt. No. 9-1); Decl. of Paul Murphy ¶ 23, September 5, 2025 (Dkt. No. 9-6) ("Murphy Decl."); *see also* Najiyya Budaly, *Ørsted Stands Firm on Plan to Raise $9.4B Despite US Order*, Law360 (Aug. 26, 2025), https://www.law360.com/articles/2380890 (also attached for convenience); *Sandoz*, 439 F. Supp. 2d at 32 (pointing to plaintiff company's status as "one of the largest pharmaceutical companies in the world" in discussing significance of economic harm).

Revolution Wind has not provided facts that would allow the Court to judge the "*overall effect* that [Revolution Wind's] projected [ ] losses would have on the company and its prospective viability" in the time before the Court can

hear this case on the merits. *Afghan Yar Int'l Construction*, 2021 WL 3472275, at *18 (emphasis in original). Revolution Wind's "bald assertions that '[t]he economic loss associated with the irreparable injury [it alleges] threatens the very existence of [its] business … simply do not suffice to prove irreparable injury." *Int'l Internships Programs v. Napolitano*, 798 F. Supp. 2d 92, 100 (D.D.C. 2011) (internal quotations omitted), *order vacated on other grounds*, 463 F. Appx. 2 (D.C. Cir. 2012). Revolution Wind has therefore not provided sufficient information on which to grant a preliminary injunction based solely on its alleged economic harms.

> 2.  *Revolution Wind has not adequately described and substantiated its alleged losses.*

Revolution Wind has also not "adequately describe[d] and quantif[ied] the level of harm it [allegedly] faces.'" *AmSurg EC Wash., Inc. v. MGG Grp. Co., Inc.*, No. 23-2416 (RBW), 2024 WL 2405822, at *2 (D.D.C. Apr. 26, 2024) (cleaned up) (quoting *Air Transp. Ass'n*, 840 F. Supp. 2d at 336). Revolution Wind states it "conservatively estimates that the Stop Work Order is causing losses of more than $2 million per day or more than $16 million per week to the Project." Murphy Decl. ¶ 25. But Revolution Wind offers little in the way of specific factual information underlying its estimate beyond stating that it "includes the day rates and other capital expenditures required to maintain [a] fleet of idled vessels." *Id.* at ¶ 21. The lack of specific information on what is

contributing to Revolution Wind's alleged losses (and to what extent) under-cuts both the Court's and Federal Defendants' ability to evaluate Revolution Wind's estimate. Having specific factual information to review is particularly important here given that Revolution Wind's declarant's estimate of weekly losses does not align with his estimate of daily losses. *See* Murphy Decl. ¶ 25 (stating $2 million per day, but $16 million per week).

Nor does Revolution Wind's alleged estimated $1 billion in breakaway costs or $5 billion allegedly already spent (which Revolution Wind frequently lumps together) justify a preliminary injunction. Pl.'s Br. 4, 37-38. As with Revolution Wind's $16 million per week figure, the company has not provided support for its "anticipat[ion] that it would [ ] incur more than $1 billion in breakaway costs." Murphy Decl. ¶ 9. With respect to the $5 billion figure, Revolution Wind has not explained how lack of money already spent would threaten the *future* viability of its business. Pl.'s Br. 38. It is also unclear whether and to what extent the $5 billion figure includes funds spent during the planning or permitting processes before the COP was approved, and thus not spent in reliance on BOEM's approval of the COP or other federal approv-als. *See* Pl.'s Br. 25 ("Revolution Wind has already spent or committed approx-imately $5 billion to date to *plan, permit*, develop, and construct this Project." (emphasis added)); *Scotts Valley*, 2025 WL 1639901, at *4 (if contracts were

32

entered before an agency's decision, the contracts "did not rely on the [agency's] decision" and thus were "not harmed by the [agency] suspending part of it").

In sum, Revolution Wind has "not provide[d] evidence that details the loss of [funds], and it further fails to place any such vaguely asserted loss [ ] in the context of how the loss" of funds tied to the Project "would affect its overall business." *E&T Elec. LLC v. Su*, No. 24-3377 (RC), 2024 WL 5202090, at *4 (D.D.C. Dec. 23, 2024). Revolution Wind thus has not met its burden to show that its alleged economic losses constitute irreparable harm.

> ### 3. Revolution Wind's uncertainty regarding construction delays does not justify a preliminary injunction.

Consideration of breakaway costs leads to the third issue with Revolution Wind's economic harm arguments. Even assuming Revolution Wind's estimate of breakaway costs is correct, and even assuming the amount presents a threat to the company's overall viability, it is speculative that such costs would be incurred at all absent emergency relief. Revolution Wind's argument relies on uncertainty about how alleged cascading construction delays could affect its ability to complete the project in time to meet PPA deadlines and about how that would affect project viability. *See, e.g.*, Pl.'s Br. 36 (citing "significant uncertainty" and "significant risk"); Murphy Decl. ¶¶ 21, 29, 34. This does not meet Revolution Wind's burden to show it faces a "certain" and "imminent" irreparable injury. *Dallas Safari Club v. Berhnardt*, 453 F. Supp. 3d

33

391, 398 (D.D.C. 2020). Rather, its "uncertainty cuts against a finding of 'irreparable harm.'" *Church v. Biden*, 573 F. Supp. 3d 118, 141 (D.D.C. 2021) (internal quotations omitted).

For one, Revolution Wind has not met its burden to prove it would be unable to meet PPA deadlines if not granted relief before the Court can hear this case on the merits. The earliest deadline set by a PPA is December 31, 2026, and the latest is November 27, 2027. Murphy Decl. ¶ 26. Revolution Wind does not argue with certainty that it could not secure replacement vessels to install project components in the time period after the Court has an opportunity to hear this case on the merits. Rather, Revolution Wind's declarant states it is "uncertain" that Revolution Wind could do so and that "the associated costs would be higher." Murphy Decl. ¶ 21. Revolution Wind also does not provide specific information on what "construction and performance testing" and "other requirements" need to be completed prior to commercial operation, much less why they could not be adjusted to accommodate schedule delays. *Id.* ¶ 26. Revolution Wind also does not address the differences in the various PPAs' deadlines. It does not, for example, address whether missing the December 2026 deadlines in two PPAs would affect its ability to meet the November 2027 PPA deadlines or connect such a possibility to its overall financial situation.

34

Even if Revolution Wind had proven that delays during the pendency of this suit would cause it to miss PPA deadlines, it has not proven that missing those deadlines would threaten the Project or company's long-term viability. It is speculative that the utility purchasers would exercise the option to terminate the PPAs. And Revolution Wind provides no evidence, such as declarations from the utility purchasers, that the purchasers would terminate the PPAs. Given the alleged importance of the Project to meeting Connecticut and Rhode Island's energy needs, it seems especially speculative to assume that they would do so. *See* Pl.'s Br. 42-44; Complaint ¶ 1, *Rhode Island v. U.S. Dep't of the Interior*, No. 25-cv-439-MSM-PAS (D.R.I. Sept. 5, 2025) (alleging that "Connecticut and Rhode Island are relying on Revolution Wind to meet their electricity needs and renewable energy goals."). Further, Revolution Wind fails to show that it could not find other purchasers for electricity potentially produced by the Project if its current PPAs were terminated.

Ultimately, the *possibility* that the Project could become "potentially unviable," Murphy Decl. ¶ 28, does not meet Revolution Wind's burden of showing its alleged harm is "certain" and "imminent." *Dallas Safari Club*, 453 F. Supp. 3d at 398. "A 'possibility of irreparable harm' is not enough." *Church*, 573 F. Supp. 3d at 138 (quoting *Winter*, 555 U.S. at 22). "*[P]roving* irreparable injury is a considerable burden," and Revolution Wind has not met that burden.

*Power Mobility Coal.*, 404 F. Supp. 2d at 204 (internal quotation omitted) (emphasis added).

### B.    Revolution Wind Has Not Established That It Will Suffer Reputational Harm Absent a Preliminary Injunction.

Revolution Wind also argues that it will suffer irreparable injury in the form of reputational harm if it is unable to meet the deadlines in its PPAs. "[I]nsofar as [Revolution Wind] asserts that the … alleged harm to its reputation will cause current customers to leave … and potential customers to avoid doing business with [it], this position is simply a rephrasing of its economic loss argument," which is faulty for the reasons discussed above.  *Cardinal Health*, 846 F. Supp. 2d at 213.  To the extent Revolution Wind is alleging an injury to its reputation separate from its economic position—which it is doubtful a business entity could do—"this alleged injury is entirely speculative." *Verma v. U.S. Citizenship & Immigr. Serv.*, No. 20-3419 (RDM), 2020 WL 7495286, at *12 (D.D.C. Dec. 18, 2020).  "[A]s with all other forms of irreparable harm, the showing of reputational harm must be concrete and corroborated, not merely speculative."  *Cardinal Health*, 846 F. Supp. 2d at 213 (quoting *Trudeau*, 384 F. Supp. 2d at 297).  Revolution Wind has "adduced no evidence that" either its utility purchasers or other parties "will fault [it] for … delay[s]" caused by the Order.  *Verma*, 2020 WL 7495286, at *12.  Indeed, legal action by the states of Rhode Island and Connecticut against Interior would suggest

the opposite. *See generally* Compl., *Rhode Island v. U.S. Dep't of the Interior*, No. 1:25-cv-439-MSM-PAS, Dkt. No. 1 (D.R.I.). Here too, Revolution Wind fails to meet its burden on irreparable harm. Its motion should therefore be denied.

## IV.    The Balance of Harms Do Not Call for Preliminary Relief.

Nor does the balance of the harms weigh in favor of a preliminary injunction here. Revolution Wind's alleged financial losses, which are largely speculative and unsupported, do not outweigh Interior's obligation to ensure responsible and safe use of the OCS. And Revolution Wind does not meaningfully argue that they do; rather, Revolution Wind focuses on what it characterizes as alleged injuries that the public will suffer without the benefits of the Revolution Wind Project. Pl.'s Br. 40–45. But when assessing the balancing of equities and public interest factors, "the government's interest is the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). The government and the public have a strong interest in allowing Interior to ensure that it is "protect[ing] the national security interests of the United States" and "prevent[ing] [ ] interference with reasonable uses … of the exclusive economic zone, the high seas, and the territorial seas" as required by statute. 43 U.S.C. § 1337(p)(4)(F), (I). That interest outweighs financial losses that Revolution Wind allegedly might suffer by virtue of not building out a construction schedule capable of tolerating even a day over a month of delay over a year out from when it allegedly needs to be online. Dkt.

No. 1-1 (stop work order issued August 22); Pl.'s Br. 1–3 (alleging Revolution Wind would suffer irreparable harm if not granted a preliminary injunction by September 22); Murphy Decl. ¶ 26 (PPA deadlines). That is especially so where the BOEM Order is not the only event that has slowed the project down, as Revolution Wind has extended its construction schedule in the past. *See* Suess Decl. ¶ 7. Because the balance of equities and public interest weigh in Federal Defendants' favor, the Court should deny Revolution Wind's motion for a preliminary injunction.

## CONCLUSION

BOEM's Order was a reasonable exercise of its authority under OCSLA, it identified the bases for the Order, and, in deciding to issue the Order, BOEM made a rational conclusion based upon the information before it. BOEM also provided Revolution Wind with an opportunity to administratively appeal the Order. Revolution Wind has not shown it is likely to succeed on its claims challenging the Order, and has not provided facts sufficient for the Court to find a non-speculative irreparable harm. The motion for preliminary injunctive relief should therefore be denied.

September 12, 2025

Respectfully Submitted,

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General

PETER M. TORSTENSEN, JR.
Deputy Assistant Attorney General

 *Kristofor R. Swanson*
KRISTOFOR R. SWANSON
(Colo. Bar. No. 39378)
AMANDA K. RUDAT
Natural Resources Section
Environment & Natural Resources Div.
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 598-1937 (Swanson)
Telephone: (202) 532-3201 (Rudat)
kristofor.swanson@usdoj.gov
amanda.rudat@usdoj.gov

*Attorneys for Federal Defendants*