## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Revolution Wind, LLC,**

      *Plaintiff,*

  v.

**Douglas J. Burgum, et al.,**

      *Defendants.*

No. 1:25-cv-02999-RCL

## BRIEF OF AMICUS CURIAE
## NORTH AMERICA'S BUILDING TRADES UNIONS
## IN SUPPORT OF PLAINTIFF'S MOTION
## FOR A PRELIMINARY INJUNCTION

Jonathan D. Newman (D.C. Bar No. 449141)
Jacob J. Demree (D.C. Bar No. 90012042)
Blake Phillips (D.C. Bar No. 90027926)*
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
(202) 785-9300
newman@shermandunn.com
demree@shermandunn.com
phillips@shermandunn.com

* Pro hac vice admission pending


September 11, 2025

# TABLE OF CONTENTS

Table of Authorities ................................................................................ iii

Statement of Interest ............................................................................... 1

Argument ................................................................................................ 2

    A Preliminary Injunction Will Promote the Public Interest by Saving
    Hundreds of Thousands of Work Hours and Millions in Wages and
    Benefits for Well-Trained, Hard-Working Union Construction Workers......... 2

        A.    Offshore Wind Promotes Efficient Green Infrastructure
               Construction and Guarantees Solid, Middle-Class Union
               Construction Careers.................................................... 2

        B.    NABTU's Members Are Building Cutting-Edge Offshore
               Energy Facilities.......................................................... 8

        C.    A Preliminary Injunction Will Protect NABTU's Members'
               Livelihoods. ................................................................ 15

Conclusion ............................................................................................. 17

Certificate of Compliance ......................................................................

Certificate of Service..............................................................................

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Bldg. & Constr. Trades Council of the Metro. Dist. v. Associated Builders &*
 *Contractors of Mass. / R.I., Inc.*, 507 U.S. 218 (1993) .......................................... 4

*Gov't of Manitoba v. Zinke,*
 849 F.3d 1111 (D.C. Cir. 2017) ..................................................................... 15-16

*Nat'l Ass'n of Farmworkers Orgs. v. Marshall,*
 628 F.2d 604 (D.C. Cir. 1980) ............................................................................ 15

*Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.,*
 50 F.4th 164 (D.C. Cir. 2022) .............................................................................. 3

*Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.,*
 518 F. Supp. 3d 448 (D.D.C. 2021) ..................................................................... 3

*Winter v. Nat. Res. Def. Council, Inc.,*
 555 U.S. 7 (2008) ................................................................................................ 15

**Statutes**

29 U.S.C. § 158(e) .......................................................................................................... 4

29 U.S.C. § 158(f) ........................................................................................................... 4

**Other Authorities**

Boskalis, *Equipment Sheet: Bokalift 2* (2022),
 https://boskalis.com/media/cafdcmsf/bokalift-2.pdf .......................................... 13

Boskalis, *Equipment Sheet: White Marlin* (2023),
 https://boskalis.com/media/vqcf4grq/white-marlin.pdf .................................... 14

Bureau of Ocean Energy Mgmt., *Assignment of Lease Approved* (Mar. 24,
 2020), https://www.boem.gov/sites/default/files/documents/renewable-
 energy/state-activities/Notice-Assignment-Approved-RI.pdf ....................... 8-9

Cadeler, *Wind Scylla*, https://www.cadeler.com/vessels/wind-scylla (last
 visited Sept. 11, 2025) ....................................................................................... 11

iii

Crowley, *Feedering Solution for the Transport of Wind Turbine Components for South Fork Wind*, https://www.crowley.com/lp/feedering-solution/ (last visited Sept. 11, 2025) ............................................................................ 10

NABTU, *North America's Building Trades Unions and Ørsted Agree to Build an American Offshore Wind Energy Industry with American Labor* (May 5, 2022), https://nabtu.org/press_releases/nowa-agreement-orsted/ ............................................................................................................. 3

Ørsted, *North America's Building Trades Unions (NABTU) and Ørsted Sign Landmark MOU for U.S. Offshore Wind Workforce Transition* (Nov. 18, 2020), https://us.orsted.com/news-archive/2020/11/nabtu-and-orsted-sign-landmark-mou-for-us-offshore-wind-workforce-transition ...................... 3

1 Revolution Wind, *Construction & Operations Plan: Revolution Wind Farm* (Mar. 1, 2023), https://www.boem.gov/revolution-wind-cop-volume-i ....................................................................... 9, 11-12, 14-15

Seaway, *Seaway Aimery*, https://www.seaway7.com/vessels/seaway-aimery/ (last visited Sept. 11, 2025) ............................................................................ 12

## STATEMENT OF INTEREST

The August 22, 2025, Order issued by the Department of Interior's Bureau of Ocean Energy Management "to halt all ongoing activities related to the Revolution Wind Project on the outer continental shelf" has thrown union construction workers out of work. Compl. Ex. A, at 1, Dkt. No. 1-1 [hereinafter "Stop Work Order"]. Those workers are represented by affiliates of North America's Building Trades Unions ("NABTU") and are working under collective bargaining agreements to which NABTU, its affiliated national and international unions, and NABTU-affiliated local building and construction trades councils are signatory.

The union employees working offshore are doing so under terms and conditions of employment established through a NABTU collective bargaining agreement. They have undergone extensive training and have been performing the offshore work for years. But now as a result of the unlawful Stop Work Order, they are idled. The same is true for union construction workers performing construction work onshore for the Revolution Wind project. Those employees are working under agreements with NABTU's affiliates to assemble and construct the components that are transported by vessel for installation offshore. They have also lost their jobs because of the Stop Work Order. A preliminary injunction is necessary, and for the reasons stated herein, is wholly consistent with the public interest.

NABTU is a labor organization composed of fourteen national and international unions and 327 provincial, state, and local building and construction trades councils representing more than three million workers. Members of NABTU's affiliated unions have worked over 1.7 million hours on Plaintiff Revolution Wind,

LLC's ("Revolution Wind") offshore wind construction project. When completed, the project is slated to generate approximately 704 megawatts of electricity. Not only is that enough electricity to power nearly 350,000 homes with clean energy, but the construction of the project has provided, and but for the Stop Work Order would continue to provide, solid middle-class wages and benefits to thousands of skilled union construction craftworkers. NABTU has a strong interest in this case because the Stop Work Order has imperiled the job security of its affiliates' members, who would work nearly 300,000 more hours on the Revolution Wind project if not for the Stop Work Order.

Revolution Wind consents to the filing of the brief, and the Defendants take no position on NABTU's motion for leave to file the brief. NABTU and its counsel declare that: (1) no party's counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money to fund the preparation or submission of the brief; and (3) no person other than NABTU, its members, and its counsel has contributed money to fund the preparation or submission of the brief.

## ARGUMENT

**A Preliminary Injunction Will Promote the Public Interest by Saving Hundreds of Thousands of Work Hours and Millions in Wages and Benefits for Well-Trained, Hard-Working Union Construction Workers.**

### A. *Offshore Wind Promotes Efficient Green Infrastructure Construction and Guarantees Solid, Middle-Class Union Construction Careers.*

In November 2020, NABTU and Ørsted announced a memorandum of understanding ("MOU") in anticipation of future offshore wind projects across the

Eastern United States.[1]  Ørsted, together with a joint venture partner, owns Revolution Wind.  Decl. of Melanie Gearon ¶ 1, Dkt. No. 9-1 [hereinafter Gearon Decl.].  Under the MOU, Ørsted agreed to negotiate a labor agreement with NABTU covering offshore construction work carried out by Ørsted and its subcontractors. Ørsted also agreed to negotiate agreements with NABTU-affiliated local building and construction trades councils and appropriate NABTU-affiliated craft unions to cover related onshore construction work.

On April 22, 2022, NABTU and Ørsted signed a landmark agreement, known as the National Offshore Wind Agreement ("NOWA"), to govern labor relations for the offshore portion of the construction of six Ørsted projects that were slated to be built in the United States.  Gearon Decl. ¶ 45; *see* NABTU, *North America's Building Trades Unions and Ørsted Agree to Build an American Offshore Wind Energy Industry with American Labor* (May 5, 2022).[2]  The NOWA is a multi-union and

---

[1]    Ørsted, *North America's Building Trades Unions (NABTU) and Ørsted Sign Landmark MOU for U.S. Offshore Wind Workforce Transition* (Nov. 18, 2020), https://us.orsted.com/news-archive/2020/11/nabtu-and-orsted-sign-landmark-mou-for-us-offshore-wind-workforce-transition.

[2]    https://nabtu.org/press_releases/nowa-agreement-orsted/.    This Court has "broad discretion to allow amicus briefs when they provide 'unique information or perspective.'"  *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 50 F.4th 164, 193 (D.C. Cir. 2022) (quoting *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 518 F. Supp. 3d 448, 453 n.2 (D.D.C. 2021)).  To the extent this brief refers to facts outside the record, those facts are merely intended to provide perspective on labor relations governing the Revolution Wind project, including the collective bargaining agreements covering the project, the amount of union construction work already performed on the project, and the amount of union construction work that would still be performed but for the Stop Work Order.

multi-employer prehire collective bargaining agreement, often referred to as a project labor agreement ("PLA"). It sets terms and conditions of work performed in the ocean (offshore) for Ørsted's offshore wind projects, including the Revolution Wind project.

Congress authorized the use of PLAs like the NOWA under Sections 8(e) and (f) of the National Labor Relations Act, 29 U.S.C. § 158(e), (f). A typical construction project involves work performed by multiple contractors, with multiple unions representing the employees working for those contractors. A project labor agreement brings labor-relations uniformity to a construction project by setting forth terms and conditions of employment and work rules applicable across the project, irrespective of the contractor or union involved. PLAs like the NOWA create forums for communication and coordination, include no-strike, no-lockout provisions, and contain speedy dispute-resolution mechanisms. They also set standard pay and benefit rates and provide for hiring through union job referral systems. *See, e.g., Bldg. & Constr. Trades Council of the Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 221-22, 230-32 (1993).

By signing the NOWA, NABTU and Ørsted sought to promote efficient completion of high-quality offshore wind projects, and just as importantly, sought to establish the development of a skilled U.S. construction workforce for offshore wind projects. The NOWA streamlines hiring procedures to ensure a reliable supply of skilled U.S. labor on offshore wind projects. NABTU's affiliated national and international unions designate locals with expertise in relevant trades. When contractors need employees, they contact the designated union for a referral, and the

union provides requested applicants for employment. The unions guarantee that the referred applicants have received the training necessary to work offshore and will be available to perform the work as scheduled. The unions also commit to recruiting sufficient employees to meet future project demands quickly.

The workers who perform the offshore construction work must obtain training that is unique in the construction industry. That training requires not only an investment of resources, but a significant investment of time by those who undertake it. That training includes, for example, Helicopter Underwater Escape Training and Global Wind Organization Sea Survival Training.

The NOWA sets standard workweek and workday lengths for all covered employees, allowing contractors to plan work on the project well in advance. The NOWA also sets forth the wages and benefits for covered employees, allowing contractors to predict their labor costs in advance. Employees covered by the NOWA earn family-sustaining compensation, ranging from $55.00 to $140.88 per hour in total wages and benefits.

The NOWA also ensures that once work is underway, projects are completed smoothly and on time. It establishes a five-step grievance process that includes input from union and employer representatives from local, national, and international organizations. The grievance process involves fast turnarounds between steps, ensuring that any dispute is settled quickly without disrupting construction. The NOWA also prohibits all work stoppages, including strikes and lockouts, meaning work continues while disputes are resolved. In the event such a stoppage ever

occurred, the NOWA provides for an expedited arbitration procedure to clear the stoppage within twenty-four hours. The NOWA also provides for speedy resolution of jurisdictional disputes between unions.

The NOWA contains a "Standards of Excellence" provision to "reinforce the pride of every construction worker and the commitment to be the most skilled, most productive, and safest workforce available to construction employers and users in the United States." Under that provision, both labor and management make commitments to each other. For example, the members represented by NABTU's affiliates agree to:

1. Provide a full day's work for a full day's pay;

2. Safely work towards the timely completion of the job;

3. Arrive to the work location on time and work until the established quitting time;

4. Adhere to established meal periods;

5. Promote a drug and alcohol-free work site;

6. Work in accordance with all applicable safety rules and procedures;

7. Allow union representatives to handle jobsite disputes and grievances without resort to slowdowns or unlawful job disruptions;

8. Respect management directives that are safe, reasonable, and legitimate;

9. Respect the rights of co-workers; and

10. Respect the property rights of the owner, management, and contractors.

Management, in turn, commits to corresponding obligations, agreeing that the

unions shall expect the following from the contractors working on the project:

1. Management adherence to the NOWA;

2. Communication and cooperation with trade foremen and stewards;

3. Efficient, safe, and sanitary management of the jobsite;

4. Efficient job scheduling to mitigate and minimize unproductive time;

5. Efficient and adequate staffing by properly trained employees by trade;

6. Availability of equipment and tools to ensure efficient job progress;

7. The provision of proper blueprints, specification, direction, and materials in a timely manner;

8. The promotion of jobsite dispute resolution and leadership skills to mitigate disputes; and

9. The treatment of all employees in a respectful and dignified manner, acknowledging their contributions to a successful project.

Revolution Wind contractors have further agreed to provide comprehensive safety, equipment, and other training to building trades workers, fueling the growth of a U.S. base of qualified offshore wind workers. The NOWA prioritizes worker safety and reduces the risk of lost time due to injuries by requiring contractors to follow strict safety standards. All applicants for employment offshore must be certified as fit for duty and must have passed a recent medical examination. Unions must also verify that the applicants they refer to the project have received the necessary training for offshore work.

In addition to the offshore work in the ocean, workers represented by NABTU's

affiliates are working onshore.  In accordance with the MOU between NABTU and Ørsted, the onshore portion of the work is performed under separate PLAs.  For example, NABTU's affiliated Norwich-New London Building Trades Council is party to a PLA covering the wind turbine pre-assembly and construction at the New London, Connecticut State Pier, and NABTU's affiliated Rhode Island Building and Construction Trades Council is party to a PLA covering advance foundation component construction, as well as work on the onshore cable route and onshore substation.  *See* Gearon Decl. ¶ 47.

To date, skilled building trades workers have worked over 1.7 million hours on the Revolution Wind project.  Because many construction trades workers often work intermittently, moving from job to job and employer to employer, and because wages and benefits are paid and reported on an hourly basis, employment in the industry is commonly tracked through hours of work rather than numbers of individual workers.  Assuming the reported hours reflect full-time employment (forty hours a week for fifty weeks in a year), the hours represent continuous full-time employment for over 800 workers.  Gearon Decl. ¶ 46.  Those hours have enabled workers represented by NABTU's affiliates employed on the Revolution Wind project to earn over $107.3 million in wages and over $53.7 million in health and pension contributions, for total compensation so far in excess of $161 million.

### B.    *NABTU's Members Are Building Cutting-Edge Offshore Energy Facilities.*

The entity that would become Revolution Wind acquired its offshore lease in March 2020.  Bureau of Ocean Energy Mgmt., *Assignment of Lease Approved* (Mar.

24, 2020).[3]  After several years of surveys and permitting processes, onshore work began in August 2023, and offshore work began in January 2024.  Decl. of Paul Murphy ¶ 11, Dkt. No. 9-6 [hereinafter Murphy Decl.].  The construction of Revolution Wind is an extremely complex project, involving multiple phases and components of construction.

**Monopile Foundations.**  The turbines and substations are all installed on steel tubes (monopiles) driven into the seabed.  1 Revolution Wind, *Construction & Operations Plan: Revolution Wind Farm* 55 (Mar. 1, 2023) [hereinafter Revolution Wind, *COP*].[4]  Each monopile has a diameter of between twenty and forty-nine feet, and is embedded 98 to 164 feet below the seabed using specialized installation vessels.  *Id.* at 97.  Employees working under the NOWA began installing monopiles in May 2024.  Murphy Decl. ¶ 11.  By the time the Stop Work Order issued, all of the project's sixty-seven monopile foundations had been installed.  *Id.* ¶ 10.

**Wind Turbine Generators.**  When installed, the wind turbine generators can stand as tall as 873 feet.  1 Revolution Wind, *COP*, *supra*, at 109.  The three blades — each of which could be longer than a football field — are attached to a nacelle that is up to seventy-two feet long, thirty-three feet wide, and thirty-nine feet high.  *Id.* at 110.  The Crowley 455-8 vessel (pictured below) transports turbine components from New London, Connecticut, to the offshore project site.  Murphy Decl.

---

[3]      https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Notice-Assignment-Approved-RI.pdf

[4]      https://www.boem.gov/revolution-wind-cop-volume-i

¶ 20.



Photograph of the Crowley 455-8, *in* Crowley, *Feedering Solution for the Transport of Wind Turbine Components for South Fork Wind.*[5]

Workers use the Scylla vessel (pictured below) to install the turbines. Murphy Decl. ¶ 20.

---

[5]     https://www.crowley.com/lp/feedering-solution/ (last visited Sept. 11, 2025).



Photograph of the Scylla, *in* Cadeler, *Wind Scylla*.[6]

First, workers position the turbine's tower on top of the monopile and bolt it in place.  1 Revolution Wind, *COP*, *supra*, at 112.  Workers then bolt the nacelle on top of the tower, followed by the blades.  *Id.*  Workers installed the first turbine in September 2024.  Murphy Decl. ¶ 11.  Since then, workers have installed approximately seventy percent of the turbines.  *Id.* ¶ 10.  Before the Stop Work Order issued, the remaining turbines were expected to be installed by the end of the year. *Id.* ¶ 11.

**Inter-Array Cables.**  Power generated from the turbines is transported using inter-array cables.  Murphy Decl. ¶ 12.  These cables consist of bundled copper or aluminum cores and a fiber optic cable surrounded by insulation and protective shielding.  1 Revolution Wind, *COP*, *supra*, at 106.  Each cable is eight inches in diameter and must be buried four to six feet below the seabed.  *Id.*  Workers use the

---

6        https://www.cadeler.com/vessels/wind-scylla (last visited Sept. 11, 2025).

Seaway Aimery vessel (pictured below) to bury the cables.  Murphy Decl. ¶ 20.



Photograph of the Seaway Aimery, *in* Seaway, *Seaway Aimery*.[7]

All told, workers covered under the NOWA were to bury up to 155 miles of inter-array cables.  1 Revolution Wind, *COP*, *supra*, at 106.  At the time of the Stop Work Order, workers had laid inter-array cables for thirty-four of the sixty-five turbines.  Murphy Decl. ¶ 10.

**Offshore Substations.**  The project includes the construction of two offshore substations.  Those substations "contain[] the electrical components necessary to collect the power generated by the [turbines] (via the [inter-array cables]), [and] transform it to a higher voltage for transmission and transport of that power to the Project's onshore electricity infrastructure (via the export cables)."  1 Revolution Wind, *COP*, *supra*, at 100-01.

---

[7]    https://www.seaway7.com/vessels/seaway-aimery/ (last visited Sept. 11, 2025).

Construction of the substations involves three parts: the monopile foundation, a modular support frame, and the topside.  Installing the topside platform requires a specialized heavy lift crane vessel called the Bokalift 2 (pictured below).  Murphy Decl. ¶ 20.



Photograph of the Bokalift 2, *in* Boskalis, *Equipment Sheet: Bokalift 2* (2022).[8]

One of the topsides weighs over 3,000 tons and is being transported using the White Marlin heavy transport vessel (pictured below).  Murphy Decl. ¶ 13.

---

[8]     https://boskalis.com/media/cafdcmsf/bokalift-2.pdf



Photograph of the White Marlin, *in* Boskalis, *Equipment Sheet: White Marlin* (2023).[9]

Workers use the Bokalift 2 to move the topside platform from the White Marlin to the monopiles, to which they are secured. Then, workers connect the substation to the inter-array cables and to the export cables. 1 Revolution Wind, *COP*, *supra*, at 104.

One of the substations is fully installed and is prepared to be commissioned. Murphy Decl. ¶ 13. The other substation has been partially installed and is waiting for attachment of the topside, which is currently sitting on the White Marlin. *Id.*

**Export Cables.** The export cables "transfer the electricity from the [offshore substations] and will be jointed with the Onshore Transmission Cable" to deliver energy to the grid. 1 Revolution Wind, *COP*, *supra*, at 74. Like the inter-array cables, the export cables are bundles of conductors, fiber optic cables, and shielding. *Id.* at

---

[9]     https://boskalis.com/media/vqcf4grq/white-marlin.pdf

75. The export cable has a diameter of 11.8 inches and is buried four to six feet below the seabed. *Id.* at 76. Workers bury the export cables using one of three techniques: by jet-plow (using water jets to fluidize the soil), mechanical plowing (using equipment to displace the soil), or mechanical cutters (equipment that temporarily removes the soil). *Id.* at 89-90.

Workers have laid two thirty-nine-mile-long export cables between one of the offshore substations and landfall in Quonset, Rhode Island. Murphy Decl. ¶ 10. The eight-mile-long interlink export cable between the two offshore substations is almost complete. *Id.*

### C.    A Preliminary Injunction Will Protect NABTU's Members' Livelihoods.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When evaluating whether a preliminary injunction is in the public interest, courts weigh the social and economic costs of maintaining the status quo. *See Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 616 (D.C. Cir. 1980); *see also Gov't of Manitoba v. Zinke*, 849 F.3d 1111, 1121-22 (D.C. Cir. 2017) (weighing the costs of delaying construction of a water treatment plant in determining the public interest

of modifying an injunction).[10]

The Stop Work Order jeopardizes not only the just transition to clean energy, but also the livelihoods of hundreds of construction workers represented by NABTU's affiliates. The project — both offshore and onshore — has provided steady employment and solid, middle-class wages and benefits to thousands of building trades workers. The average hourly wage on the project is $55.21, and the average fringe benefit contribution is $29.69 per hour (found by averaging the second-highest and second-lowest rates). Revolution Wind contractors provide training opportunities for the next generation of building trades workers, securing a pipeline of expert offshore wind employees for the future and providing those workers with the credentials and experience they need to support their families.

At the time of the Stop Work Order, workers represented by NABTU's affiliates were expected collectively to work another 286,749 hours and receive an additional $19 million in wages and over $9 million in additional fringe benefit fund contributions. The offshore workers who have invested the time to obtain the specialized skills necessary to work offshore have been forced to seek work elsewhere. Even if the Stop Work Order is eventually declared unlawful, without an injunction, those workers trained to work on Revolution Wind will need to find work elsewhere to support their families. As a result, without a preliminary injunction, other workers

---

[10] For the reasons explained in Revolution Wind's motion and brief, NABTU agrees that a preliminary injunction is appropriate here due to the likelihood of success on the merits, the irreparable harm that will be suffered, and the balance of equities. This brief addresses only the public interest prong.

will have to be trained, which will delay the project even further. This Court should promptly protect the wages, benefits, training, and livelihoods of the U.S. unionized offshore construction workforce by enjoining the Stop Work Order.

## CONCLUSION

This Court should grant Revolution Wind's motion for a preliminary injunction.

Respectfully submitted,

/s/ Jonathan D. Newman
Jonathan D. Newman (D.C. Bar No. 449141)
Jacob J. Demree (D.C. Bar No. 90012042)
Blake Phillips (D.C. Bar No. 90027926)*
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
(202) 785-9300
newman@shermandunn.com
demree@shermandunn.com
phillips@shermandunn.com

* Pro hac vice admission pending

September 11, 2025

## CERTIFICATE OF COMPLIANCE

In accordance with Local Rule 7(o), I certify that this brief conforms to the requirements of Local Rule 5.4, complies with the requirements set forth in Federal Rule of Appellate Procedure 29(a)(4), and does not exceed twenty-five pages.

/s/ Jonathan D. Newman
Jonathan D. Newman (D.C. Bar No. 449141)
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
(202) 785-9300
newman@shermandunn.com

September 11, 2025

## CERTIFICATE OF SERVICE

I certify that on September 11, 2025, this brief was filed using the Court's CM/ECF system. All attorney participants in the case are registered CM/ECF users and will be served electronically via that system.

/s/ Jonathan D. Newman
Jonathan D. Newman (D.C. Bar No. 449141)
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
(202) 785-9300
newman@shermandunn.com

September 11, 2025