**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

REVOLUTION WIND, LLC,

        *Plaintiff,*

    v.

DOUGLAS J. BURGUM, in his official capacity as
Secretary of the U.S. Department of the Interior;

UNITED STATES DEPARTMENT OF THE
INTERIOR;

MATTHEW GIACONA, in his official capacity as
Acting Director of the Bureau of Ocean Energy
Management;

BUREAU OF OCEAN ENERGY MANAGEMENT;

KENNETH STEVENS, in his official capacity as
Principal Deputy Director Exercising the Delegated
Authorities of the Director of the Bureau of Safety
and Environmental Enforcement; and

BUREAU OF SAFETY AND ENVIRONMENTAL
ENFORCEMENT,

        *Defendants*,

and

GREEN OCEANS,

        *Defendant-Intervenor.*

Case No.: 1:25-cv-02999-RCL

Hearing: September 22, 2025,
11:00 AM, Courtroom 15

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
AND STAY PENDING REVIEW**

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................1

ARGUMENT .....................................................................................................................2

I.     REVOLUTION WIND SEEKS TO PRESERVE THE STATUS QUO ...........................2

II.    REVOLUTION WIND IS LIKELY TO SUCCEED ON THE MERITS ..........................4

      A.     Interior Has No "Inherent Authority" To Issue the Stop Work Order....................4

      B.     The Government Admits It Did Not Follow Its Own Regulatory
           Procedures ................................................................................................................8

      C.     The Stop Work Order Is Arbitrary And Capricious.................................................9

           1.     The Suess Declaration Does Not Cure The Stop Work Order's
                Defects ........................................................................................................10

           2.     Defendants Mischaracterize Their Change In Position And Admit
                They Failed To Consider Reliance Interests ...............................................13

      D.     The Stop Work Order Violates Revolution Wind's Due Process Rights .............15

III.   REVOLUTION WIND HAS SHOWN IT FACES CONCRETE IRREPARABLE
      HARM ABSENT IMMEDIATE RELIEF ......................................................................17

      A.     Revolution Wind Owns No Other Enterprises and Thus Faces An
           Existential Threat To Its Business If The Stop Work Order Remains In
           Place......................................................................................................................18

           1.     The Stop Work Order Threatens Revolution Wind's Existence...............18

           2.     Revolution Wind Has Adequately Substantiated Its Losses.....................19

           3.     Revolution Wind's Irreparable Harm Is Not Speculative.........................21

      B.     Construction Delays Themselves Will Cause Irreparable Harm ...........................22

      C.     Revolution Wind Has Adequately Established Reputational Harm .....................24

IV.    EQUITABLE FACTORS STRONGLY FAVOR IMMEDIATE RELIEF ......................24

CONCLUSION..................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abdullah v. Bush,*
    945 F. Supp. 2d 64 (D.D.C. 2013) ......................................................................................3

*Afghan Yar Int'l Construction Co. Ltd. v. U.S. Dep't of State,*
    No. 21-1740 (CKK), 2021 WL 3472275 (D.D.C. Aug. 6, 2021) ..........................................19

*Air Transp. Ass'n of Am. v. Export-Import Bank of the U.S.,*
    840 F. Supp. 2d 327 (D.D.C. 2012) ....................................................................................17

*Ala. Envt'l Council v. EPA,*
    711 F.3d 1277 (11th Cir. 2013) ...........................................................................................7

*Am. Wild Horse Campaign v. Bernhardt,*
    442 F. Supp. 3d 127 (D.D.C. 2020) ....................................................................................15

*Amoco Prod. Co. v. Fry,*
    118 F.3d 812 (D.C. Cir. 1997) ...........................................................................................16

*Battle v. FAA,*
    393 F.3d 1330 (D.C. Cir. 2005) ...........................................................................................6

*Boddie v. Connecticut,*
    401 U.S. 371 (1971) ...........................................................................................................17

*Boesche v. Udall,*
    373 U.S. 472 (1963) .............................................................................................................7

*Bracco Diagnostics, Inc. v. Shalala,*
    963 F. Supp. 20 (D.D.C. 1997) ......................................................................................20, 21

*Cardinal Health, Inc. v. Holder,*
    846 F. Supp. 2d 203 (D.D.C. 2012) ................................................................................18, 19

*Charles H. v. D.C.,*
    No. 1:21-CV-00997 (CJN), 2021 WL 2946127 (D.D.C. June 16, 2021) ..............................22

*Church v. Biden,*
    573 F. Supp. 3d 118 (D.D.C. 2021) ....................................................................................17

*Connecticut v. Doehr,*
    501 U.S. 1 (1991) ...............................................................................................................16

*ConverDyn v. Moniz*,
    68 F. Supp. 3d 34 (D.D.C. 2014) ............................................................19

*Crawford-Hall v. United States*,
    2:17-cv-1616-SVW-AFM, 2018 WL 5816117 (C.D. Cal. May 31, 2018) ............................4

*Darby v. Cisneros*,
    509 U.S. 137 (1993) ............................................................16

*\*DHS v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ............................................................10, 14

*E. Tenn. Nat. Gas Co. v. Sage*,
    361 F.3d 808 (4th Cir. 2004) ............................................................24

*Env't Health Trust v. FCC*,
    9 F.4th 893 (D.C. Cir. 2021) ............................................................10

*\*Express One Intern., Inc. v. U.S. Postal Serv.*,
    814 F. Supp. 87 (D.D.C. 1992) ............................................................19, 20

*\*Fox Television Stations, Inc. v. FilmOn X LLC*,
    966 F. Supp. 2d 30 (D.D.C. 2013) ............................................................17, 20

*Gun South, Inc. v. Brady*,
    877 F.2d 858 (11th Cir. 1989) ............................................................7

*\*Huisha-Huisha v. Mayorkas*,
    27 F.4th 718 (D.C. Cir. 2022) ............................................................2

*In re NTE Conn., LLC*,
    26 F.4th 980 (D.C. Cir. 2022) ............................................................19

*Int'l Internships Programs v. Napolitano*,
    798 F. Supp. 2d 92 (D.D.C. 2011) ............................................................19

*\*Ivy Sports Medicine, LLC v. Burwell*,
    767 F.3d 81 (D.C. Cir. 2014) ............................................................6, 7

*Kingdom v. Trump*,
    1:25-cv-691-RCL, 2025 WL 1568238 (D.D.C. June 3, 2025) ............................................................4

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ............................................................24

*Long Island Care at Home, Ltd. v. Coke*,
    551 U.S. 158 (2007) ............................................................10

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. 369 (2024)........................................................................................5, 15

*Mazaleski v. Truesdell*,
    562 F.2d 701 (D.C. Cir. 1977) ....................................................................7

*McGregor Printing Corp. v. Kemp*,
    No. 91-3255, 1992 WL 118794 (D.D.C. May 14, 1992)........................21

*Milligan v. Pompeo*,
    502 F. Supp. 3d 302 (D.D.C. 2020) ........................................................22

*Mingo Logan Coal Co. v. EPA*,
    829 F.3d 710 (D.C. Cir. 2016) ................................................................14

*Moncrief v. DOI*,
    339 F. Supp. 3d 1 (D.D.C. 2018) ............................................................14

*\*Nat. Resources Defense Council v. Regan*,
    67 F.4th 397 (D.C. Cir. 2023).............................................................4, 5

*Patriot, Inc. v. U.S. Dept. of Hous. & Urb. Dev't*,
    963 F. Supp. 1 (D.D.C. 1997) ................................................................24

*Petties v. D.C.*,
    No. 1:95CV00148, 1995 WL 153027 (D.D.C. Mar. 17, 1995)*, modified,* 894
    F. Supp. 465 (D.D.C. 1995), *vacated on other grounds,* No. 1:95CV0148
    PLF, 2012 WL 6696928 (D.D.C. Dec. 19, 2012) ..................................22

*Sandoz, Inc. v. Food & Drug Admin.*,
    439 F. Supp. 2d 26 (D.D.C. 2006) ..........................................................19

*Scotts Valley Band of Pomo Indians v. Burgum*,
    1:25-cv-00958, 2025 WL 1639901 (D.D.C. June 10, 2025) ...................17

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) ................................................................21

*Sierra Club v. Johnson*,
    374 F. Supp. 3d 30 (D.D.C. 2005) ............................................................3

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    990 F. Supp. 2d 9 (D.D.C. 2013) ............................................................25

*\*Singh v. Berger*,
    56 F.4th 88 (D.C. Cir. 2022) ....................................................................3

*Smoking Everywhere, Inc. v. FDA*,
  680 F. Supp. 2d 62 (D.D.C. 2010) ...................................................................19, 24

*Solenex, LLC v. Bernhardt*,
  962 F.3d 520 (D.C. Cir. 2020) ................................................................................14

*Strait Shipbrokers Pte. Ltd. v. Blinken*,
  560 F. Supp. 3d 81 (D.D.C. 2021) ............................................................................3

*Torres v. Del Toro*,
  2022 WL 5167371 (D.D.C. Oct. 5, 2022) ..............................................................6, 8

*Winter v. NRDC*,
  555 U.S. 7 (2008) ......................................................................................................18

*Xiaomi Corp. v. Dep't of Def.*,
  No. CV 21-280 (RC), 2021 WL 950144 (D.D.C. Mar. 12, 2021)....................21, 24

*Zevallos v. Obama*,
  793 F.3d 106 (D.C. Cir. 2015) .................................................................................17

## STATUTES

5 U.S.C. § 705 ...........................................................................................................3, 4

43 U.S.C.
  § 1337(p) ........................................................................................5, 6, 8, 9, 16
  § 1337(p)(4) ..................................................................................5, 7, 15, 16
  § 1337(p)(5) ....................................................................................................5
  § 1337(p)(8) ....................................................................................................5

## REGULATIONS

30 C.F.R.
  § 585.105(h) ..................................................................................................8, 9
  § 585.106 ....................................................................................................6, 8, 9
  § 585.417 ........................................................................................................6
  § 585.418 ........................................................................................................6
  § 590.4 ..........................................................................................................16

43 C.F.R. § 4.405(b) .....................................................................................................16

## INTRODUCTION

Over more than nine years of exhaustive agency review, Revolution Wind diligently pursued—and obtained—approvals to launch the Revolution Wind Farm and Revolution Wind Export Cable Project. Relying on those approvals, Revolution Wind started construction; it has spent or committed more than $5 billion, and the Project is now 80% complete. The Stop Work Order has brought that activity to a halt. The Order throws the construction schedule into chaos, imperils existing contracts, imposes costs of over $2 million per day, and threatens Revolution Wind's ultimate viability as a business. That Order is illegal under OCSLA, the APA, and the Fifth Amendment. Indeed, it reflects a shockingly expansive theory of agency power to undo prior regulatory approvals, flout due process, and impose massive unjustified costs on industry—all freed from any meaningful legal constraint whatsoever.

The Government's defense of its Stop Work Order is not supported by law. The Government asserts sweeping "inherent authority" to suspend or cancel previously-approved projects, paying no heed to the careful constraints and procedures embedded in OCSLA and the Department of the Interior's own regulations. The Government makes the novel claim that these duly enacted statutory and regulatory procedures are entirely optional, and that due process is irrelevant because the Stop Work Order only "temporarily" (albeit indefinitely) suspends the activities on the Project. Those arguments are baseless. And although the Stop Work Order itself rested on three conclusory sentences asserting vague "concerns" about national security and interference with other reasonable uses of the seas, the Government's opposition brief now belatedly offers a handful of *post-hoc* rationalizations for the Order untethered to any legal requirement. Those rationalizations come too late for purposes of APA review, and they fail on the merits in any event. Revolution Wind is acting lawfully, and the Stop Work Order is arbitrary and capricious.

The equities strongly favor a stay and injunction.  Revolution Wind is suffering enterprise-level financial harms, in addition to reputational harm and irreparable disruptions to its construction schedule.  The Government ignores that the Project is expected to provide critically needed low-cost energy to New England as soon as next year.  As the States of Rhode Island and Connecticut, the New England Independent System Operator, and the amicus labor union have stated, the Stop Work Order threatens energy reliability and affordability, and decimates good-paying jobs and vast regional economic benefits.  The public interest overwhelmingly favors a stay, especially given that the livelihoods of many workers—and the energy needs of hundreds of thousands of citizens—are impacted.

This case defends against egregious agency overreach.  This Court should not uphold the Government's boundless claims of authority.  It should protect Revolution Wind from irreparable harm and issue preliminary relief blocking the Stop Work Order pending full review on the merits.

## ARGUMENT

## I.    REVOLUTION WIND SEEKS TO PRESERVE THE STATUS QUO

The Government starts its brief with the claim that Revolution Wind's request for a stay and injunction of the August 22, 2025, Stop Work Order seeks to change—not maintain—the status quo.  Dkt. 17, at 8-9 ("Opp.").  According to the Government, Revolution Wind seeks to "alter . . . the status quo" because the "current status quo is that work has stopped on the project, consistent with the BOEM Order."  *Id.* at 9.  But as the D.C. Circuit put it in rejecting a nearly identical argument from the Executive Branch, "that's backwards."  *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022).  "The status quo is the last *uncontested* status which preceded the pending controversy."  *Id.* (quotation omitted, emphasis in original).

Here, that "last uncontested status" is the status as it stood on August 22, 2025, before Defendants issued the Stop Work Order.  At that time, Revolution Wind was in active construction,

relying on approvals that BOEM finalized nearly two years ago.  Dkt. 9, at 4 ("Mot.").  Revolution Wind wants this Court to preserve that status quo by "issu[ing] a stay and preliminary injunction that blocks the Order and allows offshore construction to resume."  *Id.* at 1; *see also id.* at 45.[1]

Revolution Wind's request differs from the mandatory injunctions sought in the Government's cited cases.  *See* Opp. 7, 9.  In those cases, plaintiffs asked courts to order the Government to *take* specific action, not to block the effect of action *already taken*.  *See Singh v. Berger*, 56 F.4th 88, 96 (D.C. Cir. 2022) (seeking "preliminary injunction requiring the Marine Corps to allow [plaintiffs] to enlist without shaving their heads or beards"); *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 92 (D.D.C. 2021) (seeking "preliminary injunction requiring [agency] to issue a general license"); *Abdullah v. Bush*, 945 F. Supp. 2d 64, 66 (D.D.C. 2013) ("seeking an order releasing [plaintiff]" from detention; *Sierra Club v. Johnson*, 374 F. Supp. 3d 30, 33 (D.D.C. 2005) (entering injunctive relief requiring EPA to act on plaintiffs' submissions to the agency).  Here, Revolution Wind seeks only to block the effect of the Stop Work Order.[2]

All this is doubly true for Revolution Wind's request for a stay under 5 U.S.C. § 705, which expressly permits the Court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  Section 705 thus contemplates that a court will freeze the status quo *by preventing the agency action from going into effect*.  The Government's argument that the challenged agency

---

[1] To the extent the text of the proposed order is unclear, Revolution Wind clarifies that it seeks only a preliminary injunction and stay of the Stop Work Order pending conclusion of these proceedings, barring Defendants from enforcing the Order, thereby permitting lawfully authorized work to resume immediately.  *See, e.g.* Mot. 1, 45.  An amended proposed order is attached hereto.

[2] Even if Revolution Wind were seeking to alter the status quo (which it is not), the Government's own primary case *rejects* a higher standard for issuance of a mandatory injunction.  *See Singh*, 56 F.4th at 96 (while "many of our sister circuits have adopted more stringent criteria for injunctions that alter the status quo," "we decline to reformulate the traditional test").

action itself reflects the status quo baseline cannot be squared with Section 705.

Here, Revolution Wind is asking the Court to maintain the status quo pending appeal by staying the Stop Work Order and thereby "preserv[ing]" its "status" and "rights" to construct the Project consistent with the terms of its existing approvals. That is exactly what Section 705 authorizes. *See Kingdom v. Trump*, 1:25-cv-691-RCL, 2025 WL 1568238, at *5 (D.D.C. June 3, 2025) (Lamberth, J.) (characterizing Section 705 as permitting "a 'stay'—which may be more aptly described as a temporary rollback—even of already-consummated agency action.").[3] The Government's baseless status-quo arguments should be rejected.

## II.    REVOLUTION WIND IS LIKELY TO SUCCEED ON THE MERITS

### A.    Interior Has No "Inherent Authority" To Issue the Stop Work Order

The Government does not—and cannot—argue that OCSLA specifically gives Defendants the authority to order an immediate halt to Revolution Wind's activities on the Project, without advance notice, and based on unsubstantiated "concerns." Instead, it claims unlimited "inherent authority" for BOEM to halt operations on federally-approved leases. Opp. 12. That assertion cuts against every relevant principle of administrative law.

To start, the D.C. Circuit has recognized that the concept of "inherent authority" "rests on a faulty premise." *Nat. Res. Def. Council v. Regan*, 67 F.4th 397, 401 (D.C. Cir. 2023). "It is axiomatic that administrative agencies may act only pursuant to authority delegated to them by Congress." *Id.* (internal quotations omitted). Interior, then, "has no inherent authority. It has only the authority given to it by" Congress in OCSLA. *Id.*

---

[3] Revolution Wind's request for a stay of the unlawful Stop Work Order is nothing like the affirmative relief requested in the cases relied upon by the Government. *See* Opp. 10; *see also, e.g., Crawford-Hall v. United States*, 2:17-cv-1616-SVW-AFM, 2018 WL 5816117, at *2, *8 (C.D. Cal. May 31, 2018) (rejecting attempt to rely on Section 705 to compel conveying land).

The Government invokes Section 1337(p)(4) of OCSLA. Opp. 11. But, on its face, that provision confers no blanket authority to order a halt or cessation of previously authorized activities. Its text requires the Secretary "to ensure" that "any activity *under this subsection*" is carried out in accordance with various considerations. The "subsection" is Section 1337(p), which confers authority to *grant* leases—and establishes the criteria the Secretary must consider when *approving* such projects—*in the first place*. *See id.* §§ 1337(p)(4)(J), (K) (enumerating requirements before entitlement is granted). BOEM has interpreted Section 1337(p)(4) as such, including when approving Revolution Wind's Construction and Operations Plan ("COP"). *See* Suess Decl., Ex. B, Record of Decision at B-2 ("43 U.S.C. § 1337(p)(4), requires the Secretary of the Interior (Secretary) to consider 12 enumerated factors *before authorizing an activity* under subsection 8(p) of OCSLA") (emphasis added). Interior has only recently argued that Section 1337(p)(4) confers inherent authority to halt previously-permitted activities at any time without any notice or process. Indeed, Interior's suggestion that Revolution Wind would get more process if it were actually violating its permit than if it were not (Opp. at 15) cannot be squared with administrative law and due process principles. Interior's novel theory is not entitled to deference. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 399-401 (2024).

Congress recognized that in certain circumstances, Interior might have valid reason to halt previously-approved activities. OCSLA therefore directs issuance of regulations "provid[ing] for the duration, issuance, transfer, renewal, suspension, and cancellation of a lease." 43 U.S.C. §§ 1337(p)(5), (8). It also requires the Secretary to issue regulations allowing for "for temporary prohibition of any operation or activity," "if there is a threat of serious, irreparable, or immediate harm or damage . . . ." *Id.* § 1334(a)(1).

These express grants of regulatory authority confirm that Congress did not view Section

1337 *itself* as a self-executing grant of power to suspend activities on an approved project.  Indeed, the D.C. Circuit has made clear that when Congress "provid[es] statutory authority" to undo an agency determination, it "displace[s]" any "inherent authority" that the agency might otherwise have had to reconsider.  *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014). Defendants' claim of inherent temporary-halt authority under Section 1337 would obviate the important limits on that authority in Section 1334(a)(1).

Interior has issued regulations allowing BOEM to suspend leases or address lessee conduct that may be inconsistent with Section 1337(p).  Mot. 7-8, 29-30; *see* 30 C.F.R. §§ 585.106, 585.417, 585.418.  As Revolution Wind has explained, those regulations provide a careful step-by-step process under which a lessee suspected of engaging in prohibited activities is given notice and an opportunity to cure any alleged violation, before a different entity—the Bureau of Safety and Environmental Enforcement ("BSEE")—decides whether to order a cessation of activities. Mot. 29-30.  Those protections are toothless if the Government retains a textually unmoored "inherent" authority to order a halt of activities, with no due process, based on mere "concerns" about lessee conduct that do not even violate OCSLA, Interior's regulations, or the lease.

Here, Defendants ignored Interior's regulations—as they freely admit.  Opp. 15-16. Defendants cannot now say they are free to invent their own procedures, without notice and comment and to be deployed on a whim, contrary to those promulgated at Congress's direction. "[A]gencies may not violate their own rules and regulations to the prejudice of others." *Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005); *see also Torres v. Del Toro*, 2022 WL 5167371, at *5 (D.D.C. Oct. 5, 2022) (noting that agencies must follow their own "procedural regulations"). So doing would run contrary to OCSLA's purpose of encouraging development of the OCS and developing a regulatory structure that provides the predictability to foster commercial investment.

The Government's reliance on *Boesche v. Udall* and *Gun South, Inc. v. Brady* is misplaced. *See* Opp. 12. In *Boesche*, the Supreme Court determined that Interior retained some administrative authority under the Mineral Leasing Act when the Secretary would otherwise have been "powerless to cancel [a] lease" that was improperly issued. 373 U.S. 472, 479 (1963). Here, OCSLA and the regulations provide the framework to address purported statutory violations—that Interior simply chose not to follow. And, as the Eleventh Circuit has explained, its decision in *Gun South* "recognized the [agency's] implied authority to impose a temporary suspension where the [statute] lacked an express provision authorizing such action." *Ala. Env't Council v. EPA*, 711 F.3d 1277, 1290 (11th Cir. 2013) (citing *Gun South, Inc. v. Brady*, 877 F.2d 858 (11th Cir. 1989)). But where, as here, "statutory tools" are "available" to guide the agency, *Gun South* (a non-binding out-of-circuit case) has no relevance. *Ala. Env't Council*, 711 F.3d at 1291.

Even when agencies possess some degree of inherent authority to reconsider prior decisions, they may only exercise that authority "in a timely fashion." *Ivy Sports Med.*, 767 F.3d at 86. The D.C. Circuit has described a "reasonable" period for reconsideration as something "measured in weeks, not years." *Mazaleski v. Truesdell*, 562 F.2d 701, 720 (D.C. Cir. 1977). Here, Interior issued the relevant approval in November 2023—and the Stop Work Order was issued in August 2025. Mot. 12-13. The Order comes years too late, after Revolution Wind has spent billions of dollars in reliance on the approvals—with the project now 80% complete. There is nothing "reasonable" or "timely" about the Government's approach, or "ongoing review".

If there were any doubt about whether § 1337(p)(4) confers unbridled power to halt a multi-billion-dollar energy project that is 80% complete, the major questions doctrine resolves that question in Revolution Wind's favor. The Government says that OCSLA gives Interior "the authority to regulate a subject 'of vast economic and political significance,'" because it empowers

the agency to regulate offshore wind leases.  Opp. 15-16 (quoting 597 U.S. 697, 716 (2022)).  But that frames the inquiry at far too high a level of generality:  The real question here is whether Interior has authority to summarily suspend all activities on a previously-approved project, mid-construction, with no advance notice, no meaningful explanation, no consideration of the lessee's reliance interests, and no due process, thereby increasing risks to the reliability of the regional energy grid in New England, and imposing enterprise-level risks to the company and causing the loss of numerous jobs.  The answer is no:  There is no reason to think Congress wanted to give Defendants that authority—and certainly not the "'clear congressional authorization'" required by the major questions doctrine.  *West Virginia*, 597 U.S. at 723 (citation omitted).

## B.    The Government Admits It Did Not Follow Its Own Regulatory Procedures

BOEM was required to comply with both "procedural regulations and statutory requirements."  *Torres v. Del Toro*, 2022 WL 5167371 at *5 (D.D.C. Oct. 5, 2022).  But the Stop Work Order failed to do so in all respects, violating the APA.  *See* Mot. 31-32.

The Government argues that BOEM's regulations "require that a lessee '[c]onduct all activities authorized by the lease or grant in a manner consistent with the provisions of [43 U.S.C. § 1337(p)].'"  Opp. 12 (quoting 30 C.F.R. § 585.105(h)).  But as Revolution Wind explained, Interior's recourse when it identifies a violation of Section 585.105(h) is to follow the procedures set forth in 30 C.F.R. § 585.106, which addresses the "corrective action" that BOEM is authorized to take if a lessee "fail[s] to comply with applicable provisions of Federal law, the regulations in this part, other applicable regulations, any order of the Director, the provisions of a lease or grant issued under this part, or the requirements of an approved plan or other approval under this part."

The Government says Section 585.106 is irrelevant because, as it admits, BOEM has not issued a notice of noncompliance with "any term of the lease" or "COP approval conditions."  Opp. 15.  But by its plain terms, Section 585.106 governs any perceived failure to comply with

"applicable provisions of Federal law" (including Section 1337(p)) and the Interior's OCSLA "regulations" (including Section 585.105(h)). The Government ignores this language while arguing (inconsistently) both that there is no noncompliance and that the Stop Work Order was lawful because of Revolution Wind's alleged failure to comply with the conditions contained at Sections 4.3, 4.4, and 6.3 of the COP. Opp. at 20 (citing Suess Decl. ¶¶ 8-11).[4]

The Government also argues that Section 585.106 is not "the only avenue available" for addressing compliance concerns, because that provision states that BOEM "*may* take appropriate action under this part if you fail to comply with applicable provisions of Federal law." Opp. 15 (emphasis in original). This does not stand up to scrutiny. The regulation's use of "may" informs lessees that BOEM has the discretion to seek appropriate corrective action for violations under specific regulations. It does not somehow reserve BOEM's right to impose unilateral corrective action outside of Section 585.106, with no basis in the statutory or regulatory text, no substantive standards, and no procedures. Recognizing such unbounded authority to halt activities on a lease would render Section 585.106's careful process a nullity. *Supra* at 6. The Government's interpretation is baseless.

## C.    The Stop Work Order Is Arbitrary and Capricious

The Government responds to Revolution Wind's arbitrary-and-capricious claim by offering improper *post hoc* rationalizations and arguing that foundational administrative law principles have no bearing here. That argument fails.

---

[4] To the extent the Government means to suggest that it has greater freedom to halt Revolution Wind's activities—subject to fewer procedural protections—because it has not accused Revolution Wind of noncompliance, that is absurd. If anything, Revolution Wind's compliance with applicable law is reason to provide it with more procedural protection, not less.

**1.    The Suess Declaration Does Not Cure The Stop Work Order's Defects**

On its face, the Stop Work Order did not provide the "reasoned explanation that the APA requires." *Env't Health Trust v. FCC*, 9 F.4th 893, 905 (D.C. Cir. 2021); *see* Mot. 19-20.  The Government does not seriously contest this point, citing only a Supreme Court case on whether an agency sufficiently explained its withdrawal of a proposed rulemaking.  *See* Opp. 18 (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007)).  That case says nothing about what constitutes a sufficient explanation in the context of arbitrary and capricious agency action.

Unsurprisingly, the Government pivots to relying on a made-for-litigation declaration from Interior's Acting Assistant Secretary Adam Suess, appointed in 2025, who oversees BOEM.  It contains no more than a *post hoc* rationalization and should not be considered.  "Judicial review of agency action is limited to the grounds that the agency invoked *when it took the action*."  *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (emphasis added).  Even when a court remands for the agency to offer a "fuller explanation" of the reasons for its action, the explanation is temporally limited to explaining the "reasoning at the time of the agency action."  *Id.*  An agency may not "provide new [reasons]" by further explanation.  *Id.*[5]

The Suess Declaration does just that.  The Stop Work Order mentions only vague "concerns related to the national security interests of the United States and prevention of interferences with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas."  Compl., Ex. A, at 1.  Now, the Suess Declaration belatedly asserts—for the first time—purported failures that were not mentioned in the Stop Work Order or identified to Revolution Wind until they were

---

[5] The Government is also wrong to suggest that the Court seek further explanation for BOEM's Stop Work Order by remanding the action in the midst of preliminary injunction proceedings. Opp. 19.  None of the Government's cases stand for that proposition.

newly advanced in this litigation, and each of which is factually incorrect.  *See* Suess Decl. ¶ 14.[6]

*First*, Suess says that "Revolution Wind had not satisfied . . . National Security Condition[]
. . . 4.3 required by the Department of the Navy."  Suess Decl. ¶ 10.  COP Condition 4.3 requires
"coordinat[ion]" with the Navy on proposals to use certain fiber-optic sensing technology.
LeBlanc Decl. ¶ 9.  The purpose of the consultation is "to ensure that distributed fiber-optic sensing
technology is not used to detect sensitive data from DOD activities, to conduct any other type of
surveillance of U.S. government operations, or to otherwise pose a threat to national security."  *Id.*
¶ 10.  Revolution Wind has complied with that condition.  In May 2024, Revolution Wind sent the
appropriate Navy contact over 300 pages of specifications for its fiber-optic sensing technology,
demonstrating that the Revolution Wind export cable uses Distributed Temperature Sensing
systems, which only monitor the internal temperature of the cable itself, but cannot be used to
detect nearby vessel activities.  *Id.* ¶¶ 10-12.  At the same time, Revolution Wind specifically asked
the Navy whether any additional information was required to satisfy Condition 4.3.  *Id.* ¶ 13.
Neither the Navy nor Interior requested additional information from Revolution Wind or provided
any indication that the information provided was problematic.  *Id.* ¶¶ 13-16.  In October 2024,
BSEE (which had also been informed of the cables' Distributed Temperature Sensing system)
authorized Revolution Wind to proceed with export cable installation.  *Id.* ¶ 13.

*Second*, Suess says "Revolution Wind had not satisfied . . . National Security Condition[]
. . . 4.4 required by the Department of Navy."  Suess Decl. ¶ 10.  COP Condition 4.4 contemplates
that Revolution Wind will enter into an agreement with DOD to coordinate electromagnetic

---

[6] Secretary Burgum's defense of the Stop Work Order in the media is notably inconsistent with
the Suess Declaration.  When pressed in an interview about the purported national security
justification for the Stop Work Order, Secretary Burgum made only loose references to "radar"
and "undersea drones," and tried to justify the Stop Work Order based mostly on other issues, such
as whales and electricity prices.  Compl. ¶ 134.

emissions associated with underwater survey activities in certain areas.  LeBlanc Decl. ¶ 17. Revolution Wind has complied with that condition.  After discussions with the Navy, a draft agreement was provided to Navy officials in February 2023, with repeated follow-up.  *Id.* ¶¶ 19-20.  The Navy has not signaled any concerns with the draft agreement, or Project activities, or Revolution Wind's regular updates, and the Project is complying with the terms of the draft agreement by providing information to the Navy on a routine basis.  *Id.* ¶¶ 21-23.[7]

*Third*, Suess states that "Revolution Wind still has not mitigated [National Oceanic and Atmospheric Administration ("NOAA")]'s concerns as to the impacts to NOAA's National Marine Fisheries Service (NMFS) surveys as required in Section 6.3 of the COP," and that Interior "has concerns as to whether this requirement will ever be satisfied."  Suess Decl. ¶ 10.  But Revolution Wind is in compliance with COP Condition 6.3.  *See* Gearon Rebuttal Decl. ¶¶ 11-13.  On July 9, 2024, BOEM and BSEE agreed that Revolution Wind's submission of a Survey Mitigation Plan satisfied the deadline in Condition 6.3, as amended by a previous variance approved by BOEM, and that discussions with NMFS to progress a mitigation agreement could continue after that submission.  *Id.* ¶¶ 11-12.  In any event, it is NMFS's desire to reach a regional approach to survey mitigation that has delayed resolution of a mitigation agreement with Revolution Wind.  *Id.* ¶¶ 8-11, 14.  Revolution Wind has met with agency representatives consistently over the past two years, entered into a "Tier 1" agreement with NMFS, and has been in ongoing communication with BOEM, including as recently as September 2025 regarding Condition 6.3.  *Id.* ¶¶ 6-13.

*Fourth*, Suess states that "NOAA officials have expressed to me that BOEM has not yet sufficiently addressed the project's impacts on Atlantic cod spawning areas and other sensitive

---

[7] Suess also implies that Revolution Wind has not addressed *potential* additional mitigation referenced in its agreement with DOD.  Suess Decl. ¶ 8.  But Revolution Wind is complying with each item referenced by Suess.  *See* LeBlanc Decl. ¶¶ 24-32.

habitats . . . ," citing two- and three-year-old letters, respectively, that NOAA sent to BOEM before the Project was approved in 2023. Suess Decl. ¶ 10.[8] Suess ignores, however, the numerous separate measures required by the Project's COP conditions to minimize any impacts on cod-spawning, which post-dated the letters cited in the Suess Declaration, as well as BOEM's response to NOAA's concerns in the Project's Final Environmental Impact Statement and Record of Decision. Gearon Rebuttal Decl. ¶¶ 15-17. Also, at the time of the Stop Work Order, 100% of the Project's monopile foundations had been installed and pile driving completed, the array cables had been installed at 34 of the 65 wind turbine sites, the export cables had been fully installed, the interlink export cable between the two offshore substations was close to being fully installed, and approximately 70% of the Project's wind turbine generators had been fully installed. *Id.* ¶ 18. Thus, the majority of activities that could potentially result in impacts to Atlantic cod spawning habitat were complete by the time the Stop Work Order issued. *Id.*

In sum, Suess's declaration presents an incomplete picture of key compliance facts at best, and is misleading at worst. As illustrated above, Revolution Wind has complied in every respect.

### 2.    Defendants Mischaracterize Their Change In Position And Admit They Failed To Consider Reliance Interests

The Government argues that it has not changed its position because it did not rescind or modify Revolution Wind's lease or COP approval. Opp. 21. But before the Stop Work Order, BOEM's position was that Revolution Wind was *permitted* to construct the Project. *See* Suess Decl. Ex. C, Dkt. 17-4 at Condition 1.3 (effectiveness of approval). Now, relying on the Stop Work Order, BOEM *prohibits* construction on the Project for reasons already fully addressed in

---

[8] Intervenor also erroneously claims (Dkt. 29 at 11) degradation of essential fish habitat at Cox Ledge, ignoring numerous COP conditions to avoid and minimize impacts to complex fish habitat, proven successful for another project. Gearon Rebuttal Decl. ¶¶ 17, 19.

favor of allowing the Project to proceed.   This is a change in position.

The Government goes on to argue (at 22) that it has no obligation to consider reliance interests here because the position does not reflect a broad programmatic shift, but rather a shift as to a single project.   Under that premise, the Government can change its mind regarding a validly issued permit at any time, without any regard to billions of dollars of investment in reliance on the permit or the near-complete status of construction.   Which is exactly what Intervenor advocates. Dkt. 29 at 8.   Neither the Government nor Intervenor identifies any case supporting that view.   The Government relies only on the fact that leading Supreme Court change-in-position cases arise in different circumstances.   Opp. 22-23.   Indeed, the Government appears to eventually acknowledge that the D.C. Circuit does not excuse an agency from considering reliance interests in these circumstances.   *Id.* at 23 (citing *Solenex, LLC v. Bernhardt*, 962 F.3d 520, 529–30 (D.C. Cir. 2020) and *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 719 (D.C. Cir. 2016)).   And it is clear that courts require agencies to consider reliance interests in reversing position on individual project adjudications.   *See, e.g.*, *Moncrief v. DOI*, 339 F. Supp. 3d 1, 10 (D.D.C. 2018) (invalidating lease cancellation for not considering reliance interests).

The Government claims that it "do[es] not depart" from prior statements "that developers should be able to rely on federal permits," Opp. 24, but it concedes not considering Revolution Wind's reliance interests here.   Opp. 22-23.   That failing is itself sufficient to establish arbitrary and capricious agency action.   *See Regents of the Univ. of Cal.*, 591 U.S. at 30.   The Government also does not contest that Revolution Wind's reliance interests are substantial.   Revolution Wind has already spent or committed over $5 billion in connection with the Project and, if the Project is cancelled, Revolution Wind would also incur more than $1 billion in breakaway costs.   Murphy Decl. ¶ 9.   Revolution Wind relied on Defendants' approvals before entering into contracts for the

manufacture and transport of Project components and for the hiring of highly specialized vessels necessary to construct the Project costing billions of dollars. *Id.* ¶¶ 13, 18-19, 22. Reliance interests are especially important in cases such as this, where the agency has not even alleged wrongdoing or any immediate harm–despite the extensive monitoring under the terms of the Project's approvals. *See* Suess Decl., Ex. F (under seal).

The Government cannot belatedly distance itself from clear positions it has taken in litigation defending the Project's permit approvals. Revolution Wind is not asking this Court to accept the Government's litigation statements as "fact" or to act as "fact finder." *Cf.* Opp. 24 (citing *Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127, 143 (D.D.C. 2020)). Rather, the Government's litigation statements are proof of its previous position that changed after issuance of the Stop Work Order. *See* Mot. 22-24. Here, that prior position could not be clearer: The Record of Decision recognizes the Project "will comply with the Bureau's regulations," and that activities "will be carried out in a manner that provides for safety, protection of the environment, prevention of waste, and the other factors listed in [43 U.S.C. § 1337(p)(4)]." Suess Decl., Ex. B, Record of Decision[9] at B-2; *see also* Compl. ¶ 72. And that is what occurred.

### D.    The Stop Work Order Violates Revolution Wind's Due Process Rights

The Government does not contest that Revolution Wind's lease conveys a property interest entitled to due process protection; nor does the Government deny that it gave Revolution Wind no process whatsoever before issuing the Stop Work Order. Opp. 25-26. That establishes the Fifth Amendment violation. The Government argues instead that 43 U.S.C. § 1337(p)(4) places limits

---

[9] That Interior has now changed its legal position with respect to interpretation of 43 U.S.C. § 1337(p)(4) in the form of an M-Opinion is of no moment. Interior's approval of the Project was and is consistent with applicable law. In any event, this Court should give no deference to Interior's new legal interpretation. *Loper Bright Enterprises*, 603 U.S. 369 at 399-401.

on Revolution Wind's due process rights, and that Revolution Wind knowingly received the lease subject to Section 1337(p).  *Id.* at 25.  That's true, but nothing in Section 1337(p) gives Defendants the right to order a halt to the Project's operations without following the procedures set forth in OCSLA and its regulations.  *Supra* at 8-9.  And even if that were a close question (it is not), Revolution Wind lacked any fair notice that it was acquiring the lease subject to Interior's ongoing right to halt lease activities outside of the legal process.  The Government's brand-new Section 1337(p) theory does not solve the due process problem.

The Government also makes the argument that the Due Process Clause extends only to "final[]" deprivations of property interests, not "temporary" bans on property use like the Stop Work Order.  Opp. 26.  But as the D.C. Circuit recognized, "'even temporary or partial impairments to property rights . . . merit due process protection.'"  *Amoco Prod. Co. v. Fry,* 118 F.3d 812, 819 (D.C. Cir. 1997) (quoting *Connecticut v. Doehr*, 501 U.S. 1, 12 (1991)).  In any event, the Stop Work Order halts the Project indefinitely—and Secretary Burgum publicly shared the article, "Trump Admin Kills Massive Offshore Wind Project".  Compl. ¶ 133.  Indeed, just days ago at a conference in Europe, on September 10, 2025, the Secretary stated "[t]here is not a future for offshore wind"[10] in the United States.

Finally, the Government says it actually "provided Revolution Wind with process," by flagging the option to appeal to the Interior Board of Land Appeals. [11]  Opp. 26.  The Stop Work Order was immediately effective, so the only "process" available was *post-deprivation* process,

---

[10] *See*  https://perma.cc/2DG4-Z9F7.  Indeed, the "ongoing review" has no deadline.

[11] The post-deprivation process offered up by Interior is neither timely nor effective.  30 C.F.R. § 590.4, 43 C.F.R. § 4.405(b) (collectively allowing 105 days to rule on motion for stay, which is automatically denied if there is no ruling within that timeframe).  It is also not mandatory, so contrary to Intervenor's argument (Dkt. 29 at 6), administrative exhaustion is not required.  *See Darby v. Cisneros*, 509 U.S. 137, 154 (1993); Mot. 17.

which is constitutionally sufficient only in "extraordinary situations" not present here. *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971); *Zevallos v. Obama*, 793 F.3d 106, 117 (D.C. Cir. 2015).

## III.    REVOLUTION WIND HAS SHOWN IT FACES CONCRETE IRREPARABLE HARM ABSENT IMMEDIATE RELIEF

The Government argues (at 27) that Revolution Wind has not supported its three categories of irreparable harm with "specific information" and that Revolution Wind's claims are speculative. Not so. Revolution Wind has "supported each category with evidence that [the Government] has not controverted, including [] sworn declaration[s][.]". *Fox Television Stations, Inc. v. FilmOn X LLC*, 966 F. Supp. 2d 30, 50 (D.D.C. 2013) (rejecting arguments that claims of irreparable harm were "insufficiently speculative" and "unsupported by any evidence" where plaintiffs provided uncontroverted declarations describing the harm).

Defendants' reliance on cases where the Court found alleged irreparable harm to be speculative or very small is misplaced here, where the Stop Work Order threatens the Project— Revolution Wind's entire enterprise. *See Air Transp. Ass'n of Am. v. Export-Import Bank of the U.S.*, 840 F. Supp. 2d 327, 336 (D.D.C. 2012) (potential injury caused by delivery of one or two planes to competitor was "wholly speculative"); *Scotts Valley Band of Pomo Indians v. Burgum*, 1:25-cv-00958 (TNM), 2025 WL 1639901, at *4 (D.D.C. June 10, 2025) (incurring "around $450,000 in contract payments . . . with no showing of how this [expenditure] impact[ed] [its] programs, or whether such a continued expenditure for the next few months w[ould] have an 'immediate,' threatening effect on the [plaintiff's] function" did not demonstrate irreparable harm); *Church v. Biden*, 573 F. Supp. 3d 118, 140 (D.D.C. 2021) (finding speculative whether alleged First Amendment violations would occur).

Here, by contrast, Revolution Wind has shown that its sole commercial enterprise is to construct and operate the Project. Murphy Decl. ¶¶ 1, 7-9; Murphy Rebuttal Decl. ¶ 4. It has

entered into over 80 contracts to construct the Project as well as power purchase agreements ("PPAs") from which it will receive revenue.  Mot. 6; Murphy Rebuttal Decl. ¶¶ 4, 7.  Absent preliminary relief, the Stop Work Order will prevent the Revolution Wind from meeting required Commercial Operations Dates under those PPAs, exposing Revolution Wind to project cancellation and termination of the enterprise.  Murphy Decl. ¶¶ 27-28.  Preliminary relief is necessary to avert these harms.  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008).

### A.    Revolution Wind Owns No Other Enterprises And Thus Faces An Existential Threat To Its Business If The Stop Work Order Remains In Place

As the Government concedes (Opp. at 28-29), financial harm is irreparable if it threatens the very existence of the movant's business.  The Government alleges (Opp. at 29) Revolution Wind failed to: (1) "provide[] context for its alleged losses that would allow the Court to find an existential threat to Revolution Wind as *a company*"; (2) "adequately explain[] and corroborate[] its alleged losses"; and (3) "clearly show that alleged delays create a certain risk of incurring break-away costs due to project cancellation."  Revolution Wind's uncontroverted declaration from Paul Murphy adequately demonstrates each of these items.  Murphy Decl. ¶¶ 17-37; *see also* Murphy Rebuttal Decl. ¶¶ 6-13.

### 1.    The Stop Work Order Threatens Revolution Wind's Existence

The Government wrongly asserts (at 29-31) that Revolution Wind has not provided sufficient information to establish an existential threat to the company itself.  Revolution Wind's sole enterprise is the construction and operation of the Project.  Murphy Rebuttal Decl. ¶ 4.  The Government's reliance on *Cardinal Health, Inc. v. Holder* is thus misplaced, as that case only involved a single facility and plaintiff was "free to ship from its other distribution facilities[.]"  846 F. Supp. 2d 203, 211-12 (D.D.C. 2012).  Revolution Wind does not have that option.

The Government also wrongly suggests (at 30) that Revolution Wind's claims of financial

losses must be evaluated based on the company's total revenues, ignoring that the Project is not yet operational and generating revenues to offset its losses stemming from the Stop Work Order. Mot. at 4, 38; Murphy Decl. ¶ 22. Thus, four of the Government's five cases are inapplicable, because plaintiffs were already operational companies receiving substantial revenues that could offset their losses absent preliminary injunctive relief.[12]  In these circumstances, the fact that the Government's action could deprive Revolution Wind of future revenue itself shows irreparable harm.  *See In re NTE Conn., LLC*, 26 F.4th 980, 990-92 (D.C. Cir. 2022); *see also Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 76-77 (D.D.C. 2010).

Furthermore, the Government's argument (at 30) that Revolution Wind's parent companies could be relevant to its "funding issue" contradicts the Government's insistence (Opp. 29) that Revolution Wind must establish harm to the company itself.  The Government's reliance on *Sandoz, Inc. v. Food & Drug Administration* is thus misplaced.  *See* 439 F. Supp. 2d at 32 (plaintiff was operational and revenue producing and projected losses of less than 1% of total sales).  Absent preliminary relief, Revolution Wind is at substantial risk of losing its entire enterprise.

## 2.    Revolution Wind Has Adequately Substantiated Its Losses

The Government wrongly asserts (at 31) that Revolution Wind has not adequately quantified the harm it faces.  *See* Mot. 4, 37; Murphy Decl. ¶¶ 9, 18, 21, 25, 27; *see Express One Intern., Inc. v. U.S. Postal Serv.*, 814 F. Supp. 87, 92 (D.D.C. 1992).  Revolution Wind provided

---

[12] *See Cardinal Health*, 846 F. Supp. 2d at 212 (profitable company with multiple operating facilities); *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 47-48 (D.D.C. 2014) (profitable company did not claim the government's action "w[ould] force it out of business" or state with certainty that the business would operate at a loss); *Sandoz, Inc. v. Food & Drug Admin.*, 439 F. Supp. 2d 26 (D.D.C. 2006); *Afghan Yar Int'l Construction Co. Ltd. v. U.S. Dep't of State*, No. 21-1740 (CKK), 2021 WL 3472275, at *18 (D.D.C. Aug. 6, 2021).  The Government's reliance on *Int'l Internships Programs v. Napolitano*, 798 F. Supp. 2d 92 (D.D.C. 2011) is also misplaced as—unlike here—the plaintiff did "not offer a single piece of evidence . . . to support the harm it alleges."  *See* Mot. at 33-39; Murphy Decl. ¶¶ 17-35.

an uncontroverted declaration estimating the company is "currently losing more than $2 million per day or more than $16 million per week on installation and manufacturing contracts—for example, day rates for idle vessels" and "other capital expenditures required to maintain th[e] fleet of idled vessels." Murphy Decl. ¶¶ 18, 21; *see Fox Television Stations, Inc*, 966 F. Supp. 2d at 50.

The Government ignores the "specific factual information" they allege is lacking, and do not point to a single case supporting its argument that the level of detail offered in the Murphy Declaration is inadequate. Indeed, this Court has granted preliminary relief in cases where plaintiffs have provided this same level of detail—and in some circumstances even less detail.[13] Nonetheless, Revolution Wind is submitting the documentation and calculations relied upon in the uncontroverted declaration. *See* Murphy Rebuttal Decl. ¶¶ 6-8.

Revolution Wind has detailed ongoing losses of more than $2 million per day—and more than $16 million per week—on construction contracts, including day rates for idle vessels and other expenses. Murphy Decl. ¶¶ 18, 21; Murphy Rebuttal Decl. ¶ 6.[14] Revolution Wind has provided an estimate of anticipated breakaway costs in excess of $1 billion[15] and the potential loss of its entire multi-billion investment for a total of over $6 billion in losses (not including future anticipated revenues), which Revolution Wind is unsure it could recover. Murphy Decl. ¶ 9;

---

[13] *See, e.g.*, *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 29, 31 (D.D.C. 1997) (irreparable harm where plaintiff's declaration alleged the challenged action resulted in "at least $1.5 million in additional expenses" and plaintiff faced "greater financial costs, which . . . can never be recouped""); *see also Express One Intern., Inc.*, 814 F. Supp at 91 (irreparable harm from "significant lay-off, capital, and facility costs inherent in closing down and restarting a major [project]", that would have impact on the plaintiff's relationship with subcontractors).

[14] Contrary to the Government's allegation (at 32), Revolution Wind's declarant's estimate of more than $16 million of weekly losses aligns with his estimate of *more than* $2 million in daily losses. Murphy Decl. ¶¶ 18, 25; Murphy Rebuttal Decl. ¶ 6 (providing detailed back up).

[15] This $1 billion consists of $325.4 million of costs estimated by BOEM for decommissioning the Project, as well as $677 million in remaining capital expenditures that would need to be incurred, even if the Project is cancelled. Murphy Rebuttal Decl. ¶ 8.

Murphy Rebuttal Decl. ¶¶ 7-8; *Xiaomi Corp. v. Dep't of Def.*, No. CV 21-280 (RC), 2021 WL 950144, at *10 (D.D.C. Mar. 12, 2021) (unrecoverable economic harm can be irreparable harm).

Contrary to the Government (at 32-33), Revolution Wind's investments prior to BOEM's approval of the COP support, irreparable harm because this Circuit has recognized that potential losses of a plaintiff's "*investments in project planning*" is relevant to that factor. *Sherley v. Sebelius*, 644 F.3d 388, 398-99 (D.C. Cir. 2011); *see also Bracco Diagnostics Inc.*, 963 F.Supp. at 29 (irreparable harm where substantial investment of time and money "can never be recouped"). Revolution Wind has also detailed the Stop Work Order's irreparable harm through loss of construction, operations, and maintenance jobs associated with the Project, Mot. at 41-42, as has been found relevant by this court in determining that a movant faces irreparable harm. *See McGregor Printing Corp. v. Kemp*, No. 91-3255, 1992 WL 118794 at *5 (D.D.C. May 14, 1992) (irreparable harm due to substantial increased likelihood that a facility will be closed with an attendant loss of jobs).

### 3.    Revolution Wind's Irreparable Harm Is Not Speculative

Defendants wrongly assert (at 33-36) that Revolution Wind's harm is speculative or uncertain.  Revolution Wind has demonstrated "additional certain, imminent, and irreparable harms" absent relief by **September 22** a result of the Stop Work Order's ongoing construction delay.  That is because: (a) the time needed to complete construction tasks becomes longer and riskier with worsening winter weather conditions and (b) there is an extremely narrow period of time to complete the work required before the highly specialized (and limited supply) vessels needed are scheduled to leave the Project even if work is unfinished.  Mot. at 33-35; Murphy Decl. ¶¶ 21, 29-32; Murphy Rebuttal Decl. ¶ 9.  These very real and ongoing existential construction delays cannot wait until the merits are resolved.

This Court has routinely found that "imminent and ongoing" risks like those present here

are sufficient to demonstrate that "[p]laintiffs are likely to show that they have and will continue to suffer irreparable harm absent injunctive relief." *See, e.g.*, *Charles H. v. D.C.*, No. 1:21-CV-00997 (CJN), 2021 WL 2946127, at *11 (D.D.C. June 16, 2021). The Government fails to acknowledge those factors. It instead only alludes to "long-term" effects, ignoring that if certain construction is not started in the very short term, the Project's long term is seriously threatened.

Defendants mischaracterize (at 33) Revolution Wind's "significant uncertainty." Revolution Wind explained that the Stop Work Order "creates significant uncertainty as to whether the second offshore substation could be installed in time to meet the deadlines in the Project's PPAs." Mot. at 36. This is a direct reference to the problem the Project faces with worsening weather and limited vessel availability. Such uncertainty is enough for irreparable harm. *See Petties v. D.C.*, No. 1:95CV00148, 1995 WL 153027, at *1 (D.D.C. Mar. 17, 1995)*, modified,* 894 F. Supp. 465 (D.D.C. 1995), *vacated on other grounds,* No. 1:95CV0148 PLF, 2012 WL 6696928 (D.D.C. Dec. 19, 2012) ("[p]laintiffs . . . are suffering and will continue to suffer irreparable harm as a result of the uncertainty brought on by defendants' [actions]" placing them "in constant jeopardy."); *Milligan v. Pompeo*, 502 F. Supp. 3d 302, 320 (D.D.C. 2020).

Defendants also wrongly imply (Opp. at 34-35) that even if Revolution Wind's PPAs with earlier deadlines are ultimately terminated, Revolution Wind can move forward either by relying on its 2019 Connecticut PPAs, which have a later deadline of November 2027, or by signing new PPAs. Not so. The Connecticut PPAs account for only 104 megawatts of the Project's overall 704-megawatt output (totaling less than 15% of the Project's overall output), so Defendants' asserted solution is not even close to being financially viable. Murphy Rebuttal Decl. ¶ 13. And the Project's PPAs took years to secure. *Id.* ¶ 12.

## B.    Construction Delays Themselves Will Cause Irreparable Harm

The Government wrongly characterize (at 27) Revolution Wind's claim of injury as merely

"costs." The Government ignores that the Project's construction schedule has been carefully sequenced to account for seasonal weather variations and the availability of specialized vessels that are necessary for Project construction, but in limited supply globally and tightly scheduled. Mot. 34-37; Murphy Decl. ¶¶ 17-35, 40. If Revolution Wind cannot resume construction by the end of September, it is substantially less likely that there will be a suitable weather window to complete critical infrastructure installation in 2025. Murphy Decl. ¶¶ 29, 32. Because this window could not reopen until Spring 2026 at the earliest, there is a significant risk that Revolution Wind will not be able to resecure the highly specialized vessels (typically scheduled years in advance) required to complete installation in order to complete the Project. *Id.* ¶¶ 33, 35. The vessel Revolution Wind will lose on December 31 is then booked through mid-2028. *See* Murphy Rebuttal Decl. ¶ 9. This would lead to a real risk of Project cancellation, as vessel scarcity was a key cause of the recent cancellation of another project. *Id.* ¶ 5; Murphy Decl. ¶ 33.

Furthermore, there are additional steps that require months of activity, including performance testing, that must be completed to achieve the Commercial Operation Dates in the Project's PPAs. Murphy Decl. ¶ 26. Before the Stop Work Order, Revolution Wind's construction schedule targeted a Commercial Operation Date in November 2026—just a little over one month before the deadlines for three of Revolution Wind's five PPAs with utilities in Connecticut and Rhode Island. *Id.* ¶¶ 26-28. Even a relatively brief delay over the next month could push the Commercial Operation Date into 2027 beyond the deadlines for three of the PPAs, assuming vessels could even be secured, which is highly unlikely. *Id.* ¶ 28.

The Stop Work Order has and continues to substantially threaten Revolution Wind's ability to timely complete the Project to avoid missing contractual deadlines, incurring substantial costs and losing the Project (and billions of dollars in sunk costs) altogether. That is quintessential

irreparable harm.[16]  Mot. 34-37; *see also E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 828-29 (4th Cir. 2004) (granting preliminary injunction to keep pipeline project on schedule).

### C.    Revolution Wind Has Adequately Established Reputational Harm

Contrary to the Government's arguments (at 36-37), Revolution Wind has shown that it will suffer irreparable reputational harm absent preliminary injunctive relief.  Where government action "jeopardize[s]" the plaintiff's "binding contracts" with other entities, the plaintiff not only loses economic value but also "good will." *Smoking Everywhere*, 680 F. Supp. 2d at 76.  The Government's speculation that third parties will not fault Revolution Wind for contract damages because of ongoing legal action by the states of Rhode Island and Connecticut against Interior is unfounded.  Revolution Wind's PPAs are with utility companies; the States are not parties to these agreements.  Murphy Rebuttal Decl. ¶ 10.  Neither State has control under the PPAs over any decision by the utility companies to exercise a termination right. *Id*. ¶ 11.

Indeed, even the Government's recent characterization of Revolution Wind as not complying with its national security-related COP conditions is sufficient to establish irreparable harm to Revolution Wind's reputation. *See* Dkt. 17-1 ¶ 10; *see Xiaomi Corp.*, 2021 WL 950144, at *9-*10 (irreparable harm where government labelled plaintiff as a threat to U.S interests); *see also Patriot, Inc. v. U.S. Dept. of Hous. & Urb. Dev't*, 963 F. Supp. 1, 5 (D.D.C. 1997).

## IV.    EQUITABLE FACTORS STRONGLY FAVOR IMMEDIATE RELIEF

The Government asserts (at 37) that its interest is the public interest.  But the D.C. Circuit clearly holds that the public's interest is in agencies following the law, *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016), which Defendants have not done here.

---

[16] Intervenor's argument that these harms are "self-inflicted" is specious and if accepted would upend the ability of any company to rely on lawfully issued permits.

In reality, "[t]he public has a strong interest in the [benefits] that construction and operation of the [Project] will create." *See Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9 (D.D.C. 2013); *see also* Mot. at 41-45.  For example, North America's Building Trades Unions, whose affiliates represent workers who are constructing the Project, has explained that the Stop Work Order threatens the livelihoods of "thousands of skilled union construction craftworkers" who expected to receive $19 million in wages and over $9 million in benefits for completing the Project.  Dkt. 21. at 2, 16.  "Even if the Stop Work Order is eventually declared unlawful, without an injunction, those workers . . . will need to find work elsewhere[.]"  *Id.* at 16.

The States of Connecticut and Rhode Island have also stated that "the Stop Work Order jeopardizes a project that is critical to the States' economic vitality, energy mix, and climate goals." Complaint ¶ 12, *Rhode Island v. Dep't of the Interior*, No. 1:25-cv-00349, Dkt. 1 (D.R.I. filed Sept. 4, 2025); *see also id*. ¶¶ 1, 12-13, 39, 42, 50 94-107, 107, 110-30 (describing the Project's impacts on the States' energy needs, economies, policy goals, and ratepayers); *see also* Motion for Preliminary Injunction (same), *Rhode Island v. Dep't of the Interior*, No. 1:25-cv-00349, Dkt. 21 at 31-41 (D.R.I. filed Sept. 17, 2025) (same).  These States have provided that the Stop Work Order has already caused them to suffer harm and, if not enjoined, will cause the States to lose "millions of dollars and countless hours" invested in the Project.  *Rhode Island v. Dep't of the Interior*, Dkt. 21 at 37-40.  The Government and Intervenors ignore those critical public interests, which heavily favor granting preliminary relief.

**CONCLUSION**

This Court should grant Revolution Wind's request for a stay and injunctive relief.

Dated:  September 18, 2025                    Respectfully submitted,


                                              By /s/  Janice M. Schneider
                                                 Janice M. Schneider (D.C. Bar No. 472037)
                                                 Stacey L. VanBelleghem (D.C. Bar No. 988144)
                                                 Roman Martinez (D.C. Bar No. 1001100)
                                                 Devin. M. O'Connor (D.C. Bar No. 1015632)
                                                 Rachael L. Westmoreland (D.C. Bar No. 90034032)
                                                 LATHAM & WATKINS LLP
                                                 555 11th Street NW, Suite 1000
                                                 Washington, D.C. 20004
                                                 Tel:  (202) 637-2200
                                                 Fax:  (202) 637-2201
                                                 Email: janice.schneider@lw.com
                                                        stacey.vanbelleghem@lw.com
                                                        roman.martinez@lw.com
                                                        devin.o'connor@lw.com
                                                        rachael.westmoreland@lw.com

                                                 *Counsel for Plaintiff Revolution Wind, LLC*