IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF COLUMBIA

REVOLUTION WIND, LLC,

    *Plaintiff*,

  v.

DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior;

UNITED STATES DEPARTMENT OF THE INTERIOR;

MATTHEW GIACONA, in his official capacity as Acting Director of the Bureau of Ocean Energy Management;

BUREAU OF OCEAN ENERGY MANAGEMENT;

KENNETH STEVENS, in his official capacity as Principal Deputy Director Exercising the Delegated Authorities of the Director of the Bureau of Safety and Environmental Enforcement; and

BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT,

    *Defendants*,
and

GREEN OCEANS,

    *Defendant-Intervenor*.

Case No.: 1:25-cv-02999-RCL

Hearing: September 22, 2025, 11:00 AM, Courtroom 15

**REBUTTAL DECLARATION OF MELANIE GEARON IN SUPPORT OF
PLAINTIFF'S REPLY IN SUPPORT OF
MOTION FOR A PRELIMINARY INJUNCTION AND STAY PENDING REVIEW**

1

Pursuant to 28 U.S.C. § 1746(2), I, Melanie Gearon, declare as follows:

1. My role at Orsted North America Inc. ("Ørsted") as the Head of Northeast Permitting, including for the commercial-scale Revolution Wind Farm and Revolution Wind Export Cable (together, the "Project"), my familiarity with the Project's permitting and environmental review, and my relevant background experience are described in my first Declaration in Support of Revolution Wind, LLC's ("Revolution Wind") Motion for a Preliminary Injunction and Stay Pending Review. *See* Dkt. 9-1 at ¶¶ 1-6.

2. I have reviewed the Federal Defendants' Opposition to Revolution Wind's Motion for Preliminary Injunction, as well as the declaration of the U.S. Department of the Interior's Acting Assistant Secretary and Principal Deputy Assistant Secretary for Land and Minerals Management Adam G. Suess ("Suess Declaration") and the exhibits attached thereto. For the avoidance of doubt, neither Revolution Wind nor Ørsted has ever met with Mr. Suess, despite inquiries to his office by an Ørsted consultant as to whether a meeting with Ørsted could be arranged. Nor have Ørsted's requests for meetings with Secretary Burgum and Deputy Secretary MacGregor resulted in any meetings.

3. I execute this Declaration in support of Revolution Wind's Reply in Support of its Motion for a Preliminary Injunction and Stay Pending Review in this case based on my personal knowledge of the matters referred to herein and, if called upon to do so, could and would testify truthfully thereto. I am over 18 years of age and competent to testify about the matters set forth herein.

COP Condition 6.3 Regarding Mitigation for NOAA NMFS Scientific Surveys

4. Citing Revolution Wind's 2024 Annual Certification of Compliance submitted to the Department of the Interior ("DOI") on January 31, 2025, Mr. Suess states that "Revolution Wind still has not mitigated NOAA's concerns as to the impacts to NOAA's National Marine

Fisheries Service (NMFS) surveys as required in Section 6.3 of the COP."[1]  Suess Decl. at ¶ 10. He states that DOI "has concerns as to whether this requirement will ever be satisfied." *Id.*  As explained in Revolution Wind's 2024 Annual Certification of Compliance:

> "[Revolution Wind] began discussions with NMFS pertaining to the nine overlapping scientific surveys on December 7, 2023.  A Variance Request to extend the deadline to execute a mitigation agreement with NMFS was approved by BOEM on May 3, 2024.  The approved Variance Request extended the deadline to execute a mitigation agreement to May 15, 2025."[2]

The Suess Declaration does not include relevant information—including more recent information than January 2025—regarding Revolution Wind's extensive activities to comply with Condition 6.3 of the Project's Conditions of Construction and Operations Plan Approval ("COP Conditions") in coordination with BOEM and NMFS.[3]

5.      NMFS conducts scientific surveys to collect data relating to the status and management of certain species in the ocean, including species numbers and distribution.  As described in COP Condition 6.3, nine NMFS scientific surveys overlap with the Project's footprint. Dkt. 17-4 at 91.  COP Condition 6.3 required Revolution Wind, within 120 days of the COP approval, to "submit to BOEM a survey mitigation agreement between NMFS and Lessee [Revolution Wind]. The survey mitigation agreement must describe how [Revolution Wind] will mitigate the Project impacts on the 9 NMFS surveys."  Dkt. 17-4 at 91-92.  But COP Condition

---

[1] NMFS is an office of the National Oceanic and Atmospheric Administration ("NOAA") within the U.S. Department of Commerce.
[2] Revolution Wind's 2024 Annual Certification of Compliance (dated January 31, 2025) is Exhibit F to the Suess Declaration.  Dkt. 17-7 (filed under seal).  The text referenced here, which was submitted by Revolution Wind to the agencies, is not confidential.  *Id.* at 65.
[3] The COP Conditions are Exhibit C to the Suess Declaration.  Dkt. 17-4.

6.3 also provided an alternative path to compliance: "If the Lessee [Revolution Wind] and NMFS fail to reach a survey mitigation agreement, then [Revolution Wind] must submit a Survey Mitigation Plan to BOEM and NMFS that is consistent with the mitigation activities, actions, and procedures described in Sections 6.3.1 and 6.3.2 below, within 180 days of COP approval. BOEM will review the Survey Mitigation Plan in consultation with NMFS Northeast Fisheries Science Center (NEFSC), and [Revolution Wind] must resolve comments to BOEM's satisfaction and must conduct activities in accordance with the plan." Dkt. 17-4 at 92.[4]

6. For nearly two years, I, along with other members of the Revolution Wind team, have worked with NMFS and BOEM to comply with COP Condition 6.3.[5] I provide the following summary of the relevant history. Less than 30 days after receiving BOEM's COP approval letter, I and others from the Revolution Wind team met with NMFS on December 7, 2023, to initiate coordination with NMFS to develop a scientific survey mitigation agreement, within the timeframe established in COP Condition 6.3.1. After further coordination with NMFS regarding the approach to the agreement, on February 27, 2024, I submitted a draft mitigation framework document on behalf of Revolution Wind to NMFS, confirming the parties' intent to enter a mitigation agreement or other binding agreement concerning federal scientific survey mitigation measures pertaining to the Project. BOEM was copied on that correspondence.[6] In response, NMFS provided comments to me and the Revolution Wind team on March 11, 2024, and included BOEM in that correspondence.

---

[4] BOEM has since approved a variance to COP Condition 6.3, as discussed below.
[5] References to meetings throughout my Declaration include meetings that were held virtually or in person.
[6] Exhibit 1 is a true and correct copy of my February 27, 2024 email to NMFS regarding the Revolution Wind Draft Mitigation Framework.

4

7.  On March 12, 2024, representatives from Ørsted and other offshore wind developers met with NMFS staff to discuss scientific survey mitigation. During the meeting there was discussion that a regional approach to scientific survey mitigation would be the preferred solution, along with the acknowledgement that more time was needed to formulate a regional approach to scientific survey mitigation. The next day, I, along with other representatives from Ørsted, NMFS, and BOEM met and continued discussing a regionalized approach to the scientific survey mitigation agreement. I recall that NMFS and Ørsted representatives agreed that a regional solution should be pursued but acknowledged that more time was needed to develop the specific details of the approach. The meeting ended with an agreement to work collaboratively to further this initiative.

8.  On March 25, 2024, I attended another meeting with representatives from Ørsted, NMFS, and BOEM to discuss further a regionalized approach to the scientific survey mitigation agreement. At that meeting, all parties agreed that a one-year extension from the 180-day deadline in COP Condition 6.3 was appropriate and necessary and that quarterly meetings would be held to work towards an agreement. Consistent with its discussions with BOEM and NMFS, on April 5, 2024, Revolution Wind submitted a request to BOEM for a variance from COP Condition 6.3 (as authorized by COP Condition 1.5) to extend the deadline for submitting a scientific survey agreement (between NMFS and Revolution Wind) to BOEM to May 15, 2025. BOEM approved this variance on May 3, 2024.[7] In approving the request, BOEM considered that "Revolution Wind states during coordination with the National Marine Fisheries Service (NMFS) Northeast Fisheries Science Center (NEFSC), it was mutually agreed upon that the allowance for additional time to

---

[7] BOEM's May 3, 2024 variance approval letter to Revolution Wind is Exhibit D to the Suess Declaration, Dkt. 17-5.

5

provide a regionalized approach to Condition 6.3 would be beneficial to both NMFS – NEFSC and Revolution Wind."[8]  BOEM also approved a corresponding change in the date for the alternative path to compliance in COP Condition 6.3, explaining that "if no agreement is reached between Revolution Wind and NMFS by May 15, 2025, Revolution Wind would submit a Survey Mitigation Plan to BOEM and NMFS 60 days from the requested variance date, or July 14, 2025."[9] As stated in BOEM's approval letter, among other findings, BOEM determined that the variance "would not result in a change in the Project impact levels" and "would not alter BOEM's determination that the activities associated with the Project would be conducted in accordance with Section 8(p)(4) of OCSLA."[10]

9.   In August 2024, November 2024, and March 2025, representatives from Revolution Wind and NMFS met to continue discussing a regional approach to the scientific survey mitigation agreement, a potential cost model for a regional framework, and an interagency process to implement such an arrangement.[11]  Representatives from BOEM also attended the August 2024 and March 2025 meetings.

10.  After additional coordination, NMFS and Revolution Wind developed a "Tier 1" agreement in principle regarding scientific survey mitigation.  On May 14, 2025, BOEM emailed me (and others from Revolution Wind) and NMFS to "recommend that the following occur for [BOEM's] determination of compliance for COP Approval T&C 6.3 if an agreement in principle is signed: BOEM would consider that compliance is met when formal email exchanges occur between the Lessee and NMFS, with BOEM copied on the correspondence. These emails should

---

[8] *Id.* at 1.
[9] *Id.*
[10] *Id.*
[11] I was also present at the November 2024 and March 2025 meetings.  Other members of the team I supervise for Revolution Wind attended the August 2024 meeting.

6

clearly indicate that both parties agree to the terms outlined in the attached 'Agreement in Principle" document.'"[12] Consistent with this instruction, NMFS sent a NMFS-executed Tier 1 agreement to me on May 15, 2025, copying BOEM.[13]

11.   Revolution Wind, BOEM, and NMFS continued to coordinate regarding this draft agreement in June and July 2025. Under the terms of the Tier 1 agreement, on June 30, 2025, a member of my Revolution Wind team sent NMFS a draft "Tier 2" implementation agreement, describing Revolution Wind's proposed scientific survey mitigation.[14] Revolution Wind received comments from NMFS on this draft Tier 2 agreement on July 8, 2025.[15] On July 9, 2025, BOEM sent an email to NMFS and Revolution Wind (including me) stating that "BOEM staff discussed the situation regarding the July 14th due date internally (including with our solicitors) and have determined that an option that could be taken is for Orsted/Rev Wind to submit a draft Survey Mitigation Plan to BOEM by July 14th (as per T&C 6.3 and the variance that was issued last year). In that Plan, Orsted could state that they are continuing to work with NMFS on a Survey Mitigation Agreement, which could still be submitted at a later date. If the Agreement does not get signed, Orsted could then proceed to the 'offramp" with the Plan.'"[16] That same day, I, and other representatives from Revolution Wind met with representatives from BOEM and DOI's Bureau of Safety and Environmental Enforcement ("BSEE"), during which meeting it was agreed that

---

[12] Exhibit 2 includes true and correct copies of the emails between BOEM, NMFS, and Revolution Wind regarding the agreement in principle on May 14 and May 15, 2025. The Tier 1 Agreement was fully executed and submitted to BOEM on May 21, 2025, within the window of time allowed by BOEM to submit documentation of compliance.
[13] *Id.*
[14] Exhibit 3 includes true and correct copies of the emails between NMFS, BOEM, and Revolution Wind regarding the draft Tier 2 implementation agreement between June 30 and July 11, 2025.
[15] *Id.* at 4-5.
[16] *Id.* at 2.

7

Revolution Wind's submission of a Survey Mitigation Plan would comply with the July 14, 2025 date in COP Condition 6.3, as amended by the variance, and that discussions with NMFS to progress a mitigation agreement could continue after that milestone and submission.

12. On July 14, 2025, on behalf of Revolution Wind, a member of my team submitted to BOEM the Revolution Wind Federal Survey Mitigation Plan in compliance with COP Condition 6.3.[17] The transmittal email explained that "[i]t is our understanding that this submission does not prevent Revolution Wind and NMFS from engaging in further negotiations to work towards a bilateral agreement."[18]

13. Since July 2025, Revolution Wind has continued to meet (as recently as August 28, 2025) and discuss with NMFS the "Tier 2" agreement and economic cost modeling.[19] On September 10, 2025, Revolution Wind requested a meeting with NMFS to discuss the Tier 2 agreement based on an updated cost model after it was received from NMFS on September 9, 2025. Regardless, because the Survey Mitigation Plan was submitted by the deadline in COP Condition 6.3 (under the approved variance) and to date Revolution Wind has received no comments from BOEM that must be "resolve[d]", Revolution Wind understands that it is in compliance with this condition. *See* Dkt. 17-5 at 3. In any case, Revolution Wind intends to continue discussions with NMFS regarding scientific survey mitigation.

---

[17] Exhibit 4 is a true and correct copy of the Revolution Wind Survey Mitigation Plan and July 14, 2025 transmittal email to BOEM.
[18] *Id*. at 1.
[19] As part of the Tier 1 agreement, Revolution Wind and NMFS agreed to work together to develop a Tier 2 implementation agreement that would include procedures and commitments to meet the elements of the approach for scientific survey mitigation that was set forth in the Tier 1 agreement. These details include Revolution Wind's commitment to regional scientific survey mitigation in order to generate data equivalent to data generated by the affected scientific surveys for the Project, including by establishing the total cost Revolution Wind is responsible for over an agreed upon term.

14.     Mr. Suess states: "In 2024, Revolution Wind communicated to BOEM staff about a series of delays associated with aspects of construction and other issues that prompted BOEM to approve several requests for 'variances' that would allow Revolution Wind to take actions that did not conform to conditions of COP approval." Suess Decl. at ¶ 7. The first variance referenced in the Suess Declaration is the COP Condition 6.3 variance described above. But this variance was necessary in order to allow NMFS to develop a regionalized approach to scientific survey mitigation, which BOEM supported, and further develop a cost model. The variance request from COP Condition 6.3 was not prompted by any delays in the Project's construction. Neither of the other two variances to which Mr. Suess refers involved a situation where Revolution Wind sought to extend a deadline in the COP Conditions because of Project construction delays.[20] In July 2024, BOEM approved a variance from Condition 5.10.5.e relating to particular technical conditions for restarting pile driving under certain circumstances. In December 2024, BOEM approved a variance from Conditions 5.10 and 5.10.5.f regarding certain technical conditions on Revolution Wind's installation of one monopile foundation. All pile driving for the Project is now complete.

<u>Mitigation Measures Regarding Atlantic Cod Spawning and Seafloor Habitat</u>

15.     Mr. Suess states: "NOAA officials have expressed to me that BOEM has not yet sufficiently addressed the project's impacts on Atlantic cod spawning areas and other sensitive habitats . . . ." Suess Decl. at ¶ 11. He states that "[t]hose concerns were set forth in NOAA's October 17, 2022, and March 15, 2023, letters to BOEM", *id.*, and attaches those letters as Exhibits G and H to the Suess Declaration. In BOEM's Final Environmental Impact Statement ("FEIS")

---

[20] *See* Suess Decl. at ¶ 7 n.2. As referenced in the Suess Declaration, both of these variance approvals are available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/REV_0486_Variance%205.10.5.f_July%202024_signed.pdf and https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/REV_0486_Variance%205.10_5.10.5.f_signed.pdf.

for the Project, BOEM specifically responded to NMFS' comments to BOEM in its October 17, 2022 letter (Suess Declaration Exhibit G).[21]  BOEM provided detailed responses to these comments, and, in many instances, BOEM made revisions in the FEIS accordingly.[22] With respect to NMFS comments in the March 15, 2023 letter to BOEM (Suess Declaration Exhibit H), BOEM subsequently completed Essential Fish Habitat consultation with NMFS under the Magnuson-Stevens Fishery Conservation and Management Act.[23]  The Suess Declaration does not acknowledge the extensive measures required by BOEM's Record of Decision and approved COP Conditions to protect cod spawning and benthic (seafloor) habitat—measures that were based on consultations with NMFS, as summarized below.  Revolution Wind has already implemented applicable mitigation measures since offshore construction began in early 2024, and offshore construction is now nearly complete.

16.   BOEM's FEIS for the Project explains that, early in the Project's development history, BOEM conducted a lengthy stakeholder and scientific review process that identified "high-value" fishing grounds and excluded those areas from the Rhode Island/Massachusetts Wind Energy Area in which the Revolution Wind Project lease was later approved.[24]  The Project was optimized during development to avoid and minimize impacts on complex fish habitats in several ways, including through the selection and approval by DOI of project "Alternative G," which was identified as the preferred alternative in part because it reduces the impact of the Project's wind

---

[21] BOEM, Revolution Wind Farm and Revolution Wind Export Cable Project Final Environmental Impact Statement, Appendix L at L-6 (July 2023), available at https://www.boem.gov/renewable-energy/state-activities/revolution-wind-final-eis.  NMFS's letter is identified by submission number, "BOEM-2022-0045-0100".
[22] For example, see FEIS at L-98 to L-104, L-171 to L-177.
[23] BOEM's Record of Decision (Aug. 21, 2023) at B-9, which is Exhibit B to the Suess Declaration, Dkt. 17-3.
[24] FEIS at 3.9-15.

10

turbine generators and inter-array cables on complex habitat areas and areas of known Atlantic cod spawning by reducing the number wind turbine generators (from 100 to 65) and removing from the Project's proposed layout wind turbine generators that would have been located in portions of the lease area identified as high-priority fish habitat.[25] In fact, the Project layout ultimately followed a variant of Alternative G (G1) that explicitly "maximizes the avoidance of complex benthic habitat and cod spawning areas within NMFS priority areas."[26]

17. The Suess Declaration also does not account for multiple COP Conditions designed to avoid and minimize impacts to Atlantic cod spawning and complex fish habitat, which have been implemented throughout the Project's construction, which is nearly complete. As examples, these measures include requirements for Revolution Wind to: (1) implement Anchoring Plans that include avoidances of complex habitats,[27] (2) prepare a Cod Spawning Monitoring Plan and submit annual reports to document "any cod detections" and describe "survey activities . . . regardless of whether cod were detected,"[28] (3) conduct micrositing "to avoid or minimize impacts to complex habitat,"[29] (4) submit a micrositing report describing "how impacts to complex habitats and benthic features were avoided and/or minimized within the lease area and export cable corridors,"[30] (5) prepare and implement a Sequencing Plan that "describes how construction activities will be sequenced to avoid or minimize impacts to Atlantic cod spawning," including how construction activities (e.g., inter-array cable installation and burial, scour protection installation, boulder relocation, foundation site preparation, and pile driving) "will occur such that construction

---

[25] FEIS at 3.6-78 to 3.6-83; Dkt. 17-3 at 20-22, 25.
[26] Dkt. 17-3 at 21.
[27] Dkt. 17-4 at Condition 5.5.2.
[28] *Id*. at Condition 5.5.4.
[29] *Id*. at Condition 5.5.3.
[30] *Id*. at Condition 5.6.1.

activities in the center portion of the lease area are avoided between November 1 to March 31,"[31] (6) "prioritize the use of spare locations that would have the least impacts on complex habitats and areas of cod spawning" to the extent practical or feasible,[32] (7) avoid jack-up barge locations in complex habitats, and where full avoidance is not feasible, must avoid locations for the jack-up barge in a specified order of priority,[33] (8) submit a "Pre-lay Grapnel Run Plan" that includes measures taken to avoid further adverse impacts "complex habitat, and fishing operations,"[34] (9) submit a "Fisheries Research and Monitoring Plan" and conduct fisheries monitoring "to assess fisheries status in the Project area pre-, during, and post-construction,"[35] (10) submit a "Boulder Identification and Relocation Plan" to locate boulders as close as practicable to areas immediately adjacent to existing and similar habitat,[36] (11) prepare and implement a "Scour and Cable Protection Plan" to "avoid the use of engineered stone or concrete mattresses in complex habitat" and "ensure that all materials used for scour and cable protection measures consist of natural or engineered stone that does not inhibit epibenthic growth and provides three-dimensional complexity in height and in interstitial spaces,"[37] and (12) conduct long-term Passive Acoustic Monitoring of "commercially-important fish vocalizations in the Lease area before, during, and following construction", including with "manual or automatic detection software to detect vocalizations of spawning cod."[38] Revolution Wind has coordinated extensively with the relevant

---

[31] *Id*. at Condition 5.5.5.  The center portion of the lease area was identified as a priority area for Atlantic cod spawning as part of BOEM's Essential Fish Habitat assessment with NMFS, and this time of year restriction corresponds to cod spawning.  *See* FEIS at 3.13-9 to 3.13-11, 3.13-64.
[32] Dkt. 17-4 at Condition 5.5.9.
[33] *Id*. at Condition 5.5.11.
[34] *Id*. at Condition 2.23.
[35] *Id*. at Condition 5.3.
[36] *Id*. at Condition 5.5.6.
[37] *Id*. at Condition 5.5.7.
[38] *Id*. at Condition 5.4.6.

federal agencies when implementing these measures, including submitting numerous plans that were reviewed and approved by BOEM and other agencies as provided in the COP Conditions.

18.     These measures have been in place throughout the construction of the Project. At the time of the Stop Work Order, all of the Project's 67 monopile foundations had been installed and pile driving was complete, the array cables had been installed at 34 of the 65 wind turbine sites, the export cables had been fully installed, the interlink export cable was close to being fully installed, and approximately 70% of the Project's wind turbine generators had been fully constructed. *See* Dkt. 9-6 at ¶ 10. This means that the majority of ocean bottom-disturbing activities (*i.e.*, construction activities that could potentially result in impacts to Atlantic cod spawning) were complete by the time the Stop Work Order was issued.

19.     Further, the benthic (seafloor) monitoring program at a nearby offshore wind farm, which was constructed between 2022 and 2024, has shown how wind farms add new structures to the marine environment that marine invertebrates attach to and grow on, providing a source of food that attracts fish and crustaceans to the area.[39] The results of the monitoring program concluded: "benthic visual surveys documented this effect, revealing numerous commercially, recreationally, and ecologically important species such as black sea bass, lobster, and flounder near the new structures. Some other species observed include Atlantic cod, scup, cunner, barrelfish, flounder, butterfish, jack, mahi mahi, triggerfish, Bermuda chub, winter and summer flounder, sculpin, spotted and red hake, ocean pout, and Atlantic rock/Jonah crabs."[40] That nearby offshore wind farm is in an area with similar complex benthic habitats as the Revolution Wind

---

[39] Benthic Monitoring Program Sediment Profile and Plan View Imaging (SPI/PV), ROV-based Sampling, and Sediment Grab Sampling, https://storymaps.arcgis.com/stories/43138bdb3826449bbc4ce2b3eba49bb0 (last visited Sept. 18, 2025).
[40] *Id.*

13

Project, and the post-construction benthic surveys for that nearby project "have not detected demonstrable changes in the biological communities or benthic functions associated with a) soft sediments surrounding offshore wind structures, b) soft sediments along the export cable, or c) boulders relocated during seafloor preparation."[41]

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746(2) that the foregoing is true and correct.

Executed on September 18, 2025 at Charlestown, Rhode Island.

_____
Melanie Gearon

---

[41] *Id.*