IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF COLUMBIA

REVOLUTION WIND, LLC,

    *Plaintiff*,

  v.

DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior;

UNITED STATES DEPARTMENT OF THE INTERIOR;

MATTHEW GIACONA, in his official capacity as Acting Director of the Bureau of Ocean Energy Management;

BUREAU OF OCEAN ENERGY MANAGEMENT;

KENNETH STEVENS, in his official capacity as Principal Deputy Director Exercising the Delegated Authorities of the Director of the Bureau of Safety and Environmental Enforcement; and

BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT,

    *Defendants*,
and

GREEN OCEANS,

    *Defendant-Intervenor*.

Case No.: 1:25-cv-02999-RCL

Hearing: September 22, 2025, 11:00 AM, Courtroom 15

**REBUTTAL DECLARATION OF EDWARD LEBLANC IN SUPPORT OF PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION AND STAY PENDING REVIEW**

1

Pursuant to 28 U.S.C. § 1746(2), I, Edward LeBlanc, declare as follows:

1. I am employed by Orsted North America Inc. ("Ørsted") as the Head of Marine Affairs, in which role I direct and oversee a range of activities, such as deconfliction of offshore wind construction and operations with other uses of the seas, compliance with navigational safety requirements, interactions with the U.S. Coast Guard, U.S. Navy, U.S. Air Force, the Department of Defense ("DOD"), and the Federal Aviation Administration, and mitigation of impacts on commercial and recreational fishing, including for the commercial-scale Revolution Wind Farm and Revolution Wind Export Cable (together, the "Project").

2. I have been employed at Ørsted since August of 2019 as a manager of marine affairs, and have held the position of Head of Marine Affairs since November of 2021. Prior to joining Ørsted, I served for more than 40 years in military and civilian positions with the U.S. Coast Guard. I served on multiple sea tours patrolling the Northeastern U.S. fishing grounds. I also served in a special assignment with the U.S. Navy as the Anti-Submarine Warfare Officer aboard the USS Connole (home-quartered in Newport, Rhode Island), where I actively hunted Russian submarines in the North Atlantic and Mediterranean Sea. In this role, I was also responsible for the ship's nuclear weapons administration program. I also served as head of the U.S. Coast Guard search and rescue mission for New England. I retired from the U.S. Coast Guard with the rank of Commander after 28 years of active military service. I then served in a civilian position as Chief of the Waterways Management Division, Coast Guard Sector Southeastern New England, from 2003 until my retirement in 2019. In that role, among other responsibilities, I led the U.S. Coast Guard's review of offshore wind farm proposals off the coast of southeastern New England, including the proposed Cape Wind offshore wind farm and the now-operational Block Island Wind Farm. Beginning in 2010, I participated in the Department of the Interior's Bureau

of Ocean Energy Management's ("BOEM") Joint Rhode Island/Massachusetts Renewable Energy Task Force. Collectively, I have more than 20 years' experience working on offshore wind deconfliction and navigational safety matters, including more than six years working on the Revolution Wind Project.

3. I obtained my Bachelor of Science in General Studies from George Washington University's Columbian College of Arts & Sciences and a Master's Degree in Quality Management from the National Graduate School of Quality Management.

4. As Ørsted's Head of Marine Affairs, I am and have been directly involved in, have directed and overseen, and am and have been otherwise aware of numerous aspects of the Project, including: Project layout; coordination with the U.S. Navy, U.S. Air Force, and DOD regarding Project design, construction, and operations; permitting and regulatory requirements from the U.S. Coast Guard and the Federal Aviation Administration; compliance with navigational safety requirements; communication with the maritime community including through weekly notices of Project construction activities; and mitigation of Project impacts on commercial and recreational fishing.

5. I have reviewed the August 22, 2025 Order issued by the Acting Director of BOEM to Revolution Wind, LLC ("Revolution Wind") "to halt all ongoing activities related to the Revolution Wind Project on the outer continental shelf" and to "not resume activities until BOEM informs [Revolution Wind] that BOEM has completed its necessary review" (the "Stop Work Order"). I have also reviewed the Federal Defendants' Opposition to Revolution Wind's Motion for Preliminary Injunction, as well as the declaration of the Department of the Interior's Acting Assistant Secretary and Principal Deputy Assistant Secretary for Land and Minerals Management Adam G. Suess ("Suess Declaration") and the exhibits attached to that declaration.

6. I am personally familiar with the Project's development history, its permitting, including compliance with BOEM's Conditions of Construction and Operations Plan Approval ("COP Conditions") referenced in the Suess Declaration, its interactions with the DOD and its agencies, and the ongoing and future impacts of the Stop Work Order on the Project if not enjoined.

7. I execute this Declaration in support of Revolution Wind's Reply in Support of its Motion for a Preliminary Injunction and Stay Pending Review in this case based on my personal knowledge of the matters referred to herein and, if called upon to do so, could and would testify truthfully thereto. I am over 18 years of age and competent to testify about the matters set forth herein.

8. According to Mr. Suess, as of January 31, 2025, "Revolution Wind had not satisfied two National Security Conditions in Sections 4.3 and 4.4. [of the COP Conditions] required by the Department of Navy." Suess Decl. ¶ 10. In response, I provide the following summary and information regarding Revolution Wind's compliance with these COP Conditions, and ongoing coordination with DOD and the Department of the Navy.[1]

COP Condition 4.3 Regarding Distributed Fiber-Optic Sensing Technology

9. With respect to Mr. Suess's statements regarding COP Condition 4.3 in paragraphs 8 and 10 of his Declaration, COP Condition 4.3 requires: "To mitigate potential impacts on the Department of the Navy's (DON's) operations, the Lessee [Revolution Wind] must coordinate with the DOD/DON on any proposal to use distributed fiber-optic sensing technology as part of the Project or associated transmission cables. The DON point-of-contact for coordination is Matthew Senska; matthew.senska@navy.mil; 571-970-8400." Suess Decl., Ex. C at 31, Dkt. 17-4 (COP Condition 4.3). Revolution Wind complied with this condition by coordinating with the

---

[1] The Department of the Navy is referred to as the U.S. Navy or the "DON".

DOD and U.S. Navy on this topic. I provide the following summary of this coordination based on my direct involvement and my supervision of employees and consultants acting on behalf of Revolution Wind at my direction.

10. In describing the mitigation measures resulting from national security consultations, BOEM's Final Environmental Impact Statement ("FEIS") for the Project noted that "[d]istributed fiber-optic sensing technology proposed for the Project or associated transmission cables would be reviewed by the DOD to ensure that distributed fiber-optic sensing technology is not used to detect sensitive data from DOD activities, to conduct any other type of surveillance of U.S. government operations, or to otherwise pose a threat to national security."[2] I understand that there has been concern on the U.S. Navy's part that certain distributed fiber-optic sensing technology, referred to as "Distributed Acoustic Sensing," may be used to detect nearby vessel activities or other operations. Mindful of this concern, and after consultation with DOD and the U.S. Navy, including the Director of the Navy's Seafloor Cable Protection Office, Distributed Acoustic Sensing capability, which could be a component of distributed fiber-optic technology, is *not* incorporated into the Revolution Wind export and array cables. Rather, the Revolution Wind export and array cables only use "Distributed Temperature Sensing" systems, which monitor the internal temperature of the cable itself, and can be used to identify, for example, locations where the cable has become unburied (which could be evidenced by a cold spot), but cannot be used to detect nearby vessel activities.

---

[2] BOEM, Revolution Wind Farm and Revolution Wind Export Cable Project Final Environmental Impact Statement at 3.17-44 (July 2023), available at
https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution_Wind_FEIS_Vol1-and-2_Redacted.pdf.

11. The distributed fiber-optic sensing systems for the Project's export cable and array cables are capable of Distributed Temperature Sensing only, and are not capable of Distributed Acoustic Sensing.

12. On May 8, 2024, Revolution Wind sent a letter via email to the U.S. Navy point of contact identified in COP Condition 4.3, Matthew Senska, noting that the Project "utilizes distributed fiber-optic sensing equipment," and attaching five specifications documents for the hardware and software used in the distributed fiber-optic sensing system in the Project's cables, totaling over 300 pages. Attached to this Declaration as Exhibit 1 is a true and correct copy of Revolution Wind's May 8, 2024 letter and transmittal email. This letter was sent to the U.S. Navy several months before inter-array cable installation began (in August 2024) and export cable installation began (in October 2024) for the Project. The cable specifications included as attachments to the letter show that the distributed fiber-optic sensing system in the Project's export cable and array cables is capable of Distributed Temperature Sensing technology only, not the Distributed Acoustic Sensing technology as to which I understand the U.S. Navy has previously expressed concerns.

13. In the communications that Revolution Wind employees and consultants have had with the U.S. Navy on this topic, the U.S. Navy has not expressed any concerns over the use of Distributed Temperature Sensing technology for the Revolution Wind export cable. In the cover email for the May 8, 2024 letter, the Compliance Manager on my staff requested that Mr. Senska "[p]lease advise if any additional information is requested to satisfy this condition [4.3]". Ex. 1 at 1. And in the letter itself, my colleague asked for Mr. Senska to contact Revolution Wind "if any additional coordination with the DOD/DON is required with regards to the use of this equipment." Ex. 1 at 3. No response was received by Revolution Wind. In October 2024, the Department of

6

the Interior's Bureau of Safety and Environmental Enforcement ("BSEE") (which had also been informed of the cables' Distributed Temperature Sensing system) authorized Revolution Wind to proceed with export cable installation. A true and correct copy of BSEE's authorization is attached as Exhibit 2.

14. In the Revolution Wind 2024 Annual Certification of Compliance, dated January 31, 2025, which is Exhibit F to the Suess Declaration, Dkt. 17-7, Revolution Wind provided information to BOEM regarding this coordination with the U.S. Navy under COP Condition 4.3 (on PDF page 22):

> "[Revolution Wind] submitted information regarding DFOS equipment used for Revolution Wind to Matthew Senska via email on May 8, 2024. [Revolution Wind] requested that Mr. Senska advise the Project if additional information is requested and no request for additional information was received."[3]

15. In the time period since submittal of the Annual Certification of Compliance on January 31, 2025 and up until the Suess Declaration was filed in this case on September 12, 2025, the Department of the Interior had not asked for additional information from Revolution Wind regarding satisfaction of COP Condition 4.3. COP Condition 4.3 does not require Revolution Wind to "to reach further mitigation agreements" with DOD, contrary to the statement in Suess Declaration paragraph 8.

16. In March 2025, during discussions related to another COP Condition, a different contact at the U.S. Navy asked the Compliance Manager on my staff, "[i]s there fiber-optic monitoring cable also being installed with the transmission cables?" A true and correct copy of

---

[3] Exhibit F to the Suess Declaration was filed under seal. The text referenced here, which was submitted by Revolution Wind to the Department of the Interior, is not confidential.

7

March 2025 email communications between representatives of Ørsted and the U.S. Navy is attached as Exhibit 3. The Compliance Manager responded by confirming "[t]here are some fiber-optic monitoring components to the cables" and noting that this information had previously been provided to the U.S. Navy in May 2024; in response, the U.S. Navy representative stated, "appreciate the feedback." Ex. 3 at 1. To date, the U.S. Navy has not requested any additional information from Revolution Wind regarding the Project's use of fiber-optic monitoring components or expressed any concerns to Revolution Wind with the Project's use of this equipment as specified in Revolution Wind's May 8, 2024 letter and technical specifications sent to the U.S. Navy.

COP Condition 4.4 Regarding Electromagnetic Emissions for Survey Activities

17. With respect to Mr. Suess's statements regarding COP Condition 4.4 in paragraphs 8 and 10 of his Declaration, Condition 4.4 requires: "Before entering any designated defense operating area, warning area, or water test area for the purpose of carrying out any survey activities under the approved COP, the Lessee [Revolution Wind] must enter into an agreement with the commander of the appropriate command headquarters to coordinate the electromagnetic emissions associated with such survey activities. The Lessee must ensure that all electromagnetic emissions associated with such survey activities are controlled as directed by the commander of the appropriate command headquarters. The Lessee must provide BOEM with a copy of the agreement within 15 days of entering into the agreement." Dkt. 17-4 at 31 (COP Condition 4.4).

18. In 2022, Ørsted's consultant began coordination with the U.S. Navy regarding a potential agreement relating to electromagnetic emissions from survey activities in connection with another offshore wind project (approved before and located in the vicinity of the Revolution Wind Project). In an email on January 25, 2023 to Ørsted's consultants, Mr. Senska of the U.S.

Navy noted that "I looked into this with the Navy team and we're not anticipating much potential for negative effects from survey activities. The likely outcome is requesting a notification when conducting surveys or maybe a schedule for survey activities planned." A true and correct copy of an email exchange between Ørsted's consultants and a U.S. Navy representative between January 2023 and October 2024 is attached as Exhibit 4. During a phone conference on January 25, 2023 that I participated in, Mr. Senska stated that survey activity for a different Ørsted offshore wind project using the same survey technology as the Revolution Wind Project was unlikely to be a concern, and that notifications regarding survey activities will likely be sufficient for the U.S. Navy's awareness of Ørsted's activities.

19. Following this discussion, on February 6, 2023, Ørsted's consultant sent the U.S. Navy (Mr. Senska) a draft agreement between DOD and Ørsted (with me as the planned signatory) to satisfy the obligation to coordinate electromagnetic emissions associated with survey activities with the appropriate command headquarters. Ex. 4 at 7-8.[4] For efficiency, the agreement was proposed to cover all of Ørsted's U.S. offshore wind projects, specifically including the Revolution Wind Project. Under the terms of the draft agreement, Ørsted notifies the public of its activities, including DOD and other federal, state, and local authorities, through its Mariners' Briefings and agrees to share forecasts of survey activity with DOD and the appropriate command headquarters. Ex. 5 at 3.

20. Ørsted's consultant followed up with the U.S. Navy regarding the draft agreement on February 21, March 27, and May 1, 2023. Ex. 4 at 5-7. On May 2, 2023, Mr. Senska of the U.S. Navy responded that "[t]his looks pretty straight forward on a quick read" and stated, "I'll

---

[4] A true and correct copy of the draft agreement regarding notification of survey activities shared with the U.S. Navy on February 6, 2023 is included as Exhibit 5.

share with a couple of the folks who will be on the receiving end of the notifications for any thoughts." Ex. 4 at 5. Ørsted's consultant continued to follow-up with the U.S. Navy regarding the draft agreement. On February 27, 2024, Ørsted's consultant asked Mr. Senska, "would you like to finalize the draft agreement between Navy and Orsted? Alternatively, would Orsted survey notifications and coordination be sufficient?" Ex. 4 at 3. On March 15, 2024, Mr. Senska responded that "I don't think there would be an objection to completing the agreement" but also that "I am not against considering an alternative." Ex. 4 at 2. Mr. Senska indicated that he would follow up with the DOD Clearinghouse. Ex. 4 at 2. On October 25, 2024, Ørsted's consultant re-sent the draft agreement to the U.S. Navy explaining again that "the agreement would apply to all Orsted offshore wind lease agreements" and seeking "clarity on whether the Navy would like to finalize such an agreement, or alternatively if Orsted monthly survey notifications and coordination are sufficient for the Navy." Ex. 4 at 1. Ørsted's consultant has not received any comments on the draft agreement in response from the U.S. Navy.

21. Revolution Wind has been following the terms of the draft agreement. Specifically, from March 2024 onwards, Ørsted has been providing the U.S. Navy on a periodic (usually monthly, but occasionally bi-monthly) basis with a proposed schedule of upcoming surveys for the Project. A true and correct copy of an example of the monthly offshore windfarm survey schedule from March 14, 2024 is attached in Exhibit 6. The transmittal email from Ørsted notes—as every such email from Ørsted has noted—that "[t]he attached survey schedule is provided to the U.S. Navy in an effort to comply with the intent of the COP Condition while an agreement is finalized." Ex. 6 at 1. On those occasions when the U.S. Navy has responded to Ørsted's periodic survey schedule emails, U.S. Navy representatives have never raised any concerns. For example, in December 2024, the U.S. Navy acknowledged receipt and indicated "[n]o questions or concerns

with the activities scheduled." True and correct copies of emails between Ørsted and U.S. Navy representatives in December 2024, January 2025, March 2025, and July 2025 are attached as Exhibit 7. In January 2025, the U.S. Navy responded that they "[w]ill review and get back to you if there are any concerns." Ex. 7 at 3. In March 2025, the U.S. Navy representative responded that there are "no significant concerns for this activity." Ex. 7 at 5. In July 2025, the U.S. Navy representative responded noting that "I have reviewed the schedule and charts, at this time no additional information required." Ex. 7 at 8. To date, Revolution Wind has not received any communication from the U.S. Navy that it has concerns regarding the electromagnetic emissions from the Project's survey activities.

22.  In the Revolution Wind 2024 Annual Certification of Compliance, dated January 31, 2025 (Dkt. 17-7 at PDF page 23), Revolution Wind provided information to BOEM regarding its efforts under COP Condition 4.4:

> "A draft agreement was provided to the Navy in May of 2023. [Revolution Wind] has since continued to request review or finalization of the agreement; however, the Navy has not provided feedback regarding their desired path forward. [Revolution Wind] has been submitting a monthly report to the Navy with survey activity that could potentially cause EMF [electromagnetic emissions]."[5]

23.  In the time period since submittal of the Annual Certification of Compliance and up until the Suess Declaration was filed in this case on September 12, 2025, the Department of the Interior had not asked for additional information from Revolution Wind regarding satisfaction of

---

[5] Exhibit F to the Suess Declaration was filed under seal. The text referenced here, which was submitted by Revolution Wind to the Department of the Interior, is not confidential.

11

COP Condition 4.4. Revolution Wind will continue to coordinate with the U.S. Navy regarding survey activities going forward.

2024 Mitigation Agreement with DOD and Department of the Air Force

24. Paragraph 8 of the Suess Declaration also references the mitigation agreement that Revolution Wind entered into with DOD, acting through DOD's Military Aviation and Installation Assurance Siting Clearinghouse ("DOD Clearinghouse"), and the Department of the Air Force to minimize national security risks and to mitigate potential impacts on military operations and readiness, including to protect military radar systems ("2024 DOD Agreement"). The background and purpose for this agreement were discussed in the Declaration of Melanie Gearon in Support of Revolution Wind's Motion for Preliminary Injunction, *see* Dkt. 9-1 at ¶ 17, and the 2024 DOD Agreement was included as an exhibit, *see* Dkt. 9-2.[6]

25. Mr. Suess quotes a portion of the "Purpose" section of the 2024 DOD Agreement, which notes that, in addition to the mitigation included in the 2024 DOD Agreement:

> "Additional mitigation, implemented as part of BOEM's approval of the Construction and Operations Plan, will also be sought by the DoD to de-conflict the Project with national defense interests. Those measures address the following concerns: 1. Coordination between the Project Owner and DoD at-sea operators during construction and operation of the Project; 2. DoD efforts to evaluate and mitigate risk from distributed optical fiber sensing and acoustic monitoring equipment deployed as part of the project; and 3. Evaluation and mitigation of risk related to foreign investment." Dkt. 9-2 at 3.

---

[6] The 2024 DOD Agreement is also Exhibit E to the Suess Declaration, Dkt. 17-6.

26. From November 2024 when the 2024 DOD Agreement was executed and up until the Suess Declaration was filed on September 12, 2025, the Department of the Interior had not communicated to Revolution Wind that it required any further information about the 2024 DOD Agreement—to which the Department of the Interior is not a party.

27. With respect to "1. Coordination between the Project Owner and DoD at-sea operators," weekly Mariners Briefings are sent to DOD and other federal, state, and local authorities detailing the Project's offshore activities.[7] There are four representatives from the U.S. Navy that receive these Mariners Briefings, and each has been a subscriber since the Spring of 2023. As described above, we also notify the U.S. Navy of proposed survey activities for the Project on a monthly (or occasionally bi-monthly) basis. In addition, Ørsted participates in various Port Safety Committees, which frequently have DOD representation. Ørsted also has established a productive working relationship with leadership at the Naval Submarine Base New London, and Ørsted coordinates with and defers to the U.S. Navy regarding vessel movement, including to remain clear of the Thames River channel regarding submarine vessel movements. To date, Revolution Wind has never received a notice or any indication that it has failed to coordinate with DOD regarding its offshore activities, or that the U.S. Navy or DOD has any concerns with the ongoing coordination.

28. Revolution Wind's Maritime Stakeholder Communication and Outreach Plan, which was approved by BOEM on June 25, 2024, includes the following overview of the Project's coordination with DOD:

"5.4 Coordination with Department of Defense (DOD)

---

[7] For reference, Revolution Wind's latest Mariners' Briefing is available at https://a2f3e3.emailsp.com/frontend/nl_preview_window.aspx?idNL=1032 (last accessed Sept. 17, 2025).

In addition to general distribution communications such as the U.S. Coast Guard's weekly [Local Notice to Mariners], Orsted participates in various Port Safety Committees, which frequently have DOD representation. Orsted also develops relationships with those DOD entities without dedicated participation in such committees. Orsted makes full use of the DOD military Aviation and Installation Assurance Siting Clearinghouse ('The Clearinghouse') to ensure relevant project information is communicated to appropriate DOD elements and offices. Where impacts to DOD activities are identified, Orsted establishes and maintains relationships with the cognizant commands (local military bases, Fleet Forces, etc.) to deconflict activities."[8]

29.     With respect to "2. DoD efforts to evaluate and mitigate risk from distributed optical fiber sending and acoustic monitoring equipment," this corresponds to COP Condition 4.3 (requiring Revolution Wind to "coordinate with the DOD/DON on any proposal to use distributed fiber-optic sensing technology as part of the Project or associated transmission cables"). As described above in Paragraphs 9–16 of my Declaration, Revolution Wind has coordinated with DOD on this topic and satisfied COP Condition 4.3.

30.     With respect to "3. Evaluation and risk related to foreign investment," Revolution Wind has and will continue to comply with federal investment laws and regulations, and has received no notice or indication from any federal agency that Revolution Wind is in violation of any federal investment laws or regulations, including any applicable rules from the U.S.

---

[8] Revolution Wind's approved Maritime Stakeholder Communication and Outreach Plan at 11 (June 2024) is available at https://cdn.orsted.com/-/media/www/docs/corp/us/mariners/maritime-stakeholder-communication-and-outrea.pdf?rev=a5f18a6a05684f0bbf5f146f770ffd3c&hash=06746A96CB29E183BB7F48EC591C958B (last accessed Sept. 17, 2025).

Committee on Foreign Investment in the United States ("CFIUS"). In addition, the 2024 DOD Agreement requires Revolution Wind to notify CFIUS of proposed assignment of the agreement when doing so is "required by applicable regulations (31 CFR Parts 800 and 802) and provide a copy of the notice to the DoD Parties" who are not limited by the 2024 DOD Agreement from "objecting to the transaction before CFIUS". Dkt. 9-2 at 7.

31. The 2024 DOD Agreement notes these three areas (referenced in the paragraph 8 of the Suess Declaration) as relating to additional mitigation measures to be sought by DOD. However, to date, DOD has not sought additional mitigation in any of these three areas.

32. Revolution Wind submits a monthly Navigation Safety Complaint and Correspondence report to BOEM, BSEE, and the U.S. Coast Guard. In those reports, there have been no credible complaints to report regarding Project vessels causing collisions, fully obstructing a navigable waterway, or forcing unreasonable detours as Green Oceans suggests. Nor has the Coast Guard instructed Revolution Wind to take corrective actions or make improvements with respect to navigational safety in response to those reports.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746(2) that the foregoing is true and correct.

Executed on September 18, 2025, at Northborough, Massachusetts.

_____
Edward LeBlanc