**IN THE UNITED STATES DISTRICT COURT**
**FOR DISTRICT OF COLUMBIA**

REVOLUTION WIND, LLC,

       *Plaintiff*,

    v.

DOUG BURGUM, in his official capacity as
Secretary of the U.S. Department of the Interior;

UNITED STATES DEPARTMENT OF THE
INTERIOR;

MATTHEW GIACONA, in his official capacity
as Acting Director of the Bureau of Ocean Energy
Management;

BUREAU OF OCEAN ENERGY
MANAGEMENT;

KENNETH STEVENS, in his official capacity as
Principal Deputy Director Exercising the
Delegated Authorities of the Director of the
Bureau of Safety and Environmental Enforcement;
and

BUREAU OF SAFETY AND
ENVIRONMENTAL ENFORCEMENT,

       *Defendants*,
and

GREEN OCEANS,

       *Defendant-Intervenor*.

Case No.: 1:25-cv-02999-RCL

<u>Hearing: September 22, 2025, 11:00
AM, Courtroom 15</u>

## <u>REBUTTAL DECLARATION OF PAUL MURPHY IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND STAY PENDING REVIEW</u>

Pursuant to 28 U.S.C. § 1746(2), I, Paul Murphy, declare as follows:

1

1.      This is my second declaration submitted in this matter.  My role at Orsted North America Inc. ("Ørsted") as the Senior Engineering, Procurement, and Construction ("EPC") Director for the commercial-scale Revolution Wind Farm and Revolution Wind Export Cable (together, the "Project"), my relevant background and experience, and my familiarity with the Project's construction status and history are described in my first Declaration in Support of Plaintiff's Motion for a Preliminary Injunction and Stay Pending Review.  Dkt. 9-6 ¶¶ 1-4, 7-16 (Sept. 5, 2025).  My first Declaration also describes my familiarity with the August 22, 2025, order that Bureau of Ocean Energy Management's ("BOEM") Acting Director issued to Revolution Wind (the "Stop Work Order"), the ongoing impacts of the Stop Work Order and future harm from the Stop Work Order if not enjoined or stayed.  *Id.* ¶¶ 5-6, 17-40.  As I provided in my first Declaration, based on my experience and familiarity with the Project, judicial relief is required by the beginning of the last week of September 2025 to avoid significant Project delays, which could ultimately result in the Project's cancellation.  *Id.* ¶ 5.

2.      I have reviewed the Federal Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction ("Opposition"), Dkt. 17 (Sept. 12, 2025), as well as the declaration of the Department of the Interior's Acting Assistant Secretary and Principal Deputy Assistant Secretary for Land and Minerals Management Adam G. Seuss ("Suess Declaration"), Dkt. 17-1 (Sept. 12, 2025), and the exhibits attached to that declaration, Dkts. 17-2 – 17-6, 17-8 – 17-11.

3.      I execute this Declaration in support of Plaintiff's Reply in Support of its Motion for a Preliminary Injunction and Stay Pending Review in this case based on my personal knowledge of the matters referred to herein and, if called upon to do so, could and would testify truthfully thereto.  I am over 18 years of age and competent to testify about the matters set forth herein.  My Declaration responds to numerous points raised in the Federal Defendants' Opposition.

This Declaration relies on the same data and information that I reviewed and relied on at the time I signed my first Declaration in this matter.

4.      Federal Defendants' Opposition (at page 29) states: "Revolution Wind has not provided context for its alleged losses that would allow the Court to find an existential threat to Revolution Wind as *a company*.  Instead, the facts here focus on impacts to *the Project*." (Emphasis in original).  This statement ignores the fact that the Project is owned by Revolution Wind, LLC ("Revolution Wind") whose sole and exclusive corporate function is to develop, construct and operate the Project.  Revolution Wind holds the BOEM offshore lease for the Project, as well as the Federal and State permits for the Project.  Revolution Wind has incurred the costs of developing and constructing the Project, and is the "Seller" in the Project's five power purchase agreements ("PPAs"), from which Revolution Wind would receive revenue.  Revolution Wind has no business other than the Project.  If Revolution Wind is prevented from constructing the Project, Revolution Wind will be unable to fulfill its sole and exclusive corporate function of developing, constructing, and operating the Project.  If the Stop Work Order remains in place, it will likely prevent Revolution Wind from constructing the Project altogether.  This is an existential threat to both the Project and Revolution Wind as a company.

5.      I am aware that the Ocean Wind offshore wind project was terminated due to macroeconomic factors and supply chain issues.  As to supply chain issues, the November 2023 Interim Financial Report for Ørsted A/S explained that the project was canceled in October 2023 "as a consequence of additional supplier delays further impacting the project schedule and leading to an additional significant delay of the project....  We have concluded that outstanding risks remain in these suppliers' ability to deliver on their commitments and contracted schedules,

including worldwide vessel scarcity." Attached as Exhibit 1, is a true and correct copy of a page from the November 1, 2023 Interim Financial Report [page 30 of 42].

6.      Federal Defendants' Opposition (at page 31-32) also states that my estimates of over $2 million per day and $16 million per week in losses due to the Stop Work Order are not substantiated, and do "not align". Attached as Exhibit 2, is a true and correct copy of the summary materials outlining costs associated with an idled workforce and vessels as a result of the August 22, 2025, Stop Work Order that I reviewed prior to executing my first Declaration in this matter. As one can see from Exhibit 2, the estimated daily cost impact prepared as of the week of September 1, 2025, is a little over $2.3 million per day. $2.3 million per day multiplied by 7 days is over $16 million per week. As I discussed in my first Declaration in this matter, these costs are expected to increase substantially the longer the Stop Work Order is in effect. Dkt. 9-6 ¶¶ 18, 21, 25.

7.      Federal Defendants' Opposition (at page 32) states that my estimates of over $5 billion in costs spent or committed are not substantiated. Revolution Wind currently has 84 contracts with 76 counterparties, relating to construction. Revolution Wind maintains a specific accounting of costs spent and committed, updated on a monthly basis in accordance with financial reporting accepted practices. Attached as Exhibit 3, is a true and correct copy of the summary back-up information of Revolution Wind cost management, prepared in the ordinary course of business, showing Project capital expenditures ("CAPEX") through the end of July 2025 to support my estimate of over $5 billion in costs already spent or committed based upon Revolution Wind's accounting. The two orange figures on Exhibit 3 in the right-hand column (Actuals of $4.387 billion spent and contractual Commitments of $668 million) add up to over $5 billion.

8.    Federal Defendants' Opposition (at page 32) states that my estimates of over $1 billion in breakaway costs are not corroborated. Of that amount, $325.4 million is BOEM's December 2023 estimate of the cost of decommissioning and removing Project facilities from the Outer Continental Shelf. Attached as Exhibit 4, is a true and correct copy of BOEM's December 22, 2023, letter to Revolution Wind outlining these estimated costs. Note that on August 19, 2025, the Bureau of Safety and Environmental Enforcement instructed Revolution Wind to provide a decommissioning cost estimate within 60 days, so this $325.4 million figure from 2023 is subject to change. Exhibit 3 also shows the remaining summary back-up information to support my estimate of $1 billion in breakaway costs. The red figure on Exhibit 3 in the right-hand column shows $677 million in remaining costs that we expect to have to pay in the normal course if the Project were cancelled. Adding $325.6 million with $677 million totals over $1 billion in breakaway costs.

9.    Attached as Exhibit 5, is a true and correct copy of the pages from the applicable contracts for the White Marlin and the Seaway Aimery showing the Latest Vessel Availability Dates of December 15, 2025 and December 31, 2025, respectively. In the case of the Seaway Aimery, the contract states that the vessel would arrive in Rhode Island between August 15 and September 15 of 2025, and would have a Latest Vessel Availability Date of December 31, 2025— unless Revolution Wind had provided notice by March 15, 2025 that Revolution Wind wanted to delay the vessel's arrival until between September 15 and October 15 of 2025 (in which case the Latest Vessel Availability Date would be January 30, 2026). Revolution Wind provided no such notice, and the Seaway Aimery arrived in Providence on August 26, 2025 (having departed from the Netherlands before the Stop Work Order was issued), meaning that its Latest Vessel Availability Date is December 31, 2025. It is my current understanding that, following this Latest

Vessel Availability Date for the Project, the Seaway Aimery is booked for other projects through mid-2028.

10.    Federal Defendants' Opposition (at page 34-35) argues that it is speculative that Revolution Wind's PPAs would be terminated given the Project's importance to Connecticut and Rhode Island's energy needs.  It is important to remember that the PPAs are executed between Revolution Wind and private, individual utility companies.  The States are not party to any of the PPAs.  Attached as Exhibit 6, are true and correct copies of relevant portions of the two 2018 PPAs in Connecticut with the Connecticut Light and Power Company d/b/a Eversource Energy and the United Illuminating Company, respectively (as buyers of the electricity), and the two 2019 PPAs in Connecticut with Eversource Energy and the United Illuminating Company, respectively.  The Exhibit includes Subsections 3.1 (Critical Milestones), 3.2 (Delay Damages), 9.2 (Events of Default by Seller), and 9.3 (Remedies).[1]  The fifth PPA (the 2018 PPA in Rhode Island) with the Narragansett Electric Company, d/b/a National Grid (as buyer of the electricity) is available in full,

---

[1] If the Court wishes to view the public redacted versions of these PPAs, they are available here:
- 2018 Connecticut Light & Power PPA:
  https://www.dpuc.state.ct.us/DOCKCURR.NSF/5f3a36a996853741852588c600420c
  24/6159c983671d32f8852583320051344f/$FILE/PUBLIC%20Exhibit%20C-
  1%20REDACTED-%20DWW%20Rev%20I%20LLC.pdf
- 2018 United Illuminating PPA:
  https://www.dpuc.state.ct.us/DOCKCURR.NSF/5f3a36a996853741852588c600420c
  24/c4e1af03d35af05785258332005139e7/$FILE/UI%20Exhibit%20C-
  1%20(redacted).pdf
- 2019 Connecticut Light & Power PPA:
  https://www.dpuc.state.ct.us/DOCKCURR.NSF/5f3a36a996853741852588c600420c
  24/d7f16ef07874cf67852584bd0053bec2/$FILE/98574910.pdf/PUBLIC%20Exhibit
  %20C-4%20Amended%20Revolution%20Wind%20Expansion%20(redacted).pdf
- 2019 United Illuminating PPA:
  https://www.dpuc.state.ct.us/DOCKCURR.NSF/5f3a36a996853741852588c600420c
  24/255f8514de2c65b4852584ba00670578/$FILE/2019-11-
  22%20UI%20Exhibit%20C-04%20REDACTED%20%2318-05-04.pdf

unredacted form on the Rhode Island Public Utilities Commission website, available at: https://ripuc.ri.gov/sites/g/files/xkgbur841/files/eventsactions/docket/4929-NGrid-PPA-NG-1.pdf.

11.    Furthermore, each of the executed PPAs was subsequently approved in its entirety by the respective State's public utilities commission.[2] Thus, neither State has control under the PPAs over any decision by the utility companies to exercise a termination right.

12.    As stated in the regulatory approvals, all five of the PPAs were negotiated, executed, and approved pursuant to competitive solicitations. For the 2018 Connecticut PPAs, the competitive solicitation was issued in final form on January 31, 2018, and the regulatory approval was granted on December 19, 2018. For the 2018 Rhode Island PPA, the competitive solicitation was issued in final form on June 19, 2017, and the regulatory approval was granted effective May 28, 2019. For the 2019 Connecticut PPAs, the competitive solicitation was issued in final form on July 31, 2018, and the regulatory approval was granted on November 17, 2019.

13.    Federal Defendants' Opposition (at page 34-35) also seems to suggest that if Revolution Wind's PPAs with earlier deadlines are terminated, Revolution Wind can proceed and remain viable by relying on its 2019 Connecticut PPAs that had a later deadline of November 2027. This suggestion is incorrect, because reliance on PPAs that total only 104 megawatts of the

_____

[2] If the Court wishes to view the orders approving the executed PPAs, they are available here:
- 2018 Connecticut PPAs:
  https://www.dpuc.state.ct.us/dockcurr.nsf/8e6fc37a54110e3e852576190052b64d/4a9b83f01a20ee7b85258368005860b9/$FILE/180637-121918.docx
- 2018 Rhode Island PPA:
  https://ripuc.ri.gov/sites/g/files/xkgbur841/files/eventsactions/docket/4929-NGrid-Ord23609_6-7-19.pdf
- 2019 Connecticut PPAs:
  https://www.dpuc.state.ct.us/dockcurr.nsf/8e6fc37a54110e3e852576190052b64d/cd36395577cb8718852584c4006b76ca/$FILE/180504-112719.pdf

7

Project's overall 704-megawatt output totals less than 15% of the Project's overall output and thus would be financially unviable for Revolution Wind to only receive revenue associated with a relatively small portion of the Project's total output.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746(2) that the foregoing is true and correct.

Executed on September 18, 2025, at Providence, Rhode Island.

Paul Murphy

# EXHIBIT 1

Ørsted  **Interim financial report** First nine months 2023

**Consolidated financial statements**

# 4. Impairment

| Impairment losses on segment level DKKm | 9M 2023 | 9M 2022 | Q3 2023 | Q3 2022 |
|---|---|---|---|---|
| Offshore | 26,988 | - | 26,988 | - |
| Onshore | 1,434 | - | 1,434 | - |
| Bioenergy & Other | - | - | - | - |
| **Total impairment losses** | **28,422** | **-** | **28,422** | **-** |

On 29 August 2023, we announced anticipated impairments on our US portfolio due to adverse impacts related to the supply chain, progress in investment tax credit (ITC) guidance, and increased interest rates. Following these impairment indicators, our impairment calculations have been updated as of 30 September 2023.

Management has taken these impacts and other related risks and inherent uncertainties into consideration when estimating the future cash flows for the value-in-use calculations of our CGUs. Based on this, our impairment tests prepared in Q3 2023 have resulted in total impairment losses of DKK 28.4 billion. Our announced indicative impairments from 29 August were up to DKK 16 billion.

On 31 October 2023, we decided to cease the development of Ocean Wind 1 as a conse-quence of additional supplier delays further impacting the project schedule and leading to an additional significant delay of the project. In addition, we have updated our view on certain assumptions, including tax credit mon-

etisation and the timing and likelihood of final construction permits. Finally, increases to long-dated US interest rates have further deteriorated the business case, resulting in a substantial negative forward-looking value. We have also ceased development of Ocean Wind 2, which has not led to an impairment as the carrying amount is insignificant.

As the decision was not taken as of 30 September 2023, this note presents the impairment of Ocean Wind 1 as if the project was still to be constructed. However, sensitivity impacts are no longer relevant. Investments incurred on the project up until it was ceased will be offset against the provision.

The circumstances and assumptions with the most significant impairment impact and high involvement of estimates and uncertainties are described here.

**Supply chain**
The Ocean Wind 1, Sunrise Wind, and Revolution Wind projects have been

| WACC levels, % | |
|---|---|
| Base discount rate applied for the US | 6.00 % - 7.50 % |

The base discount rate after tax applied for the value-in-use calculation is determined per CGU.

adversely impacted by supply chain bottle-necks. We have concluded that outstanding risks remain in these suppliers' ability to deliver on their commitments and contracted schedules, including worldwide vessel scarcity. This could create knock-on effects, requiring future remobilisations to finish installation, as well as potentially delayed revenues, extra costs, and other business case implications.

Our impairment tests are based on a probability-weighted assessment of the likelihood of these and other supply chain impacts. While we are taking mitigating actions to the extent possible, we continue to see risks, especially regarding vessel availability.

The effect from changes in supplier-related assumptions has led to an impairment loss of DKK 16.9 billion and relates to our US offshore projects. Our announced indicative estimate was up to DKK 5 billion. The substantial increase mainly relates to Ocean Wind 1 due to continuing supplier delays further

impacting our project schedule and leading to an additional significant delay of the project. Furthermore, we now assume a new installation approach with a longer timeline for Revolution Wind and Sunrise Wind.

**Investment tax credit guidance**
The 2022 Inflation Reduction Act (IRA) reaffirmed the existing 30 % ITC for all US offshore projects. The IRA also made two additional 10 % ITC bonus credits available to projects meeting 'domestic content' and 'energy community' criteria. Projects can qualify for one or both ITC bonus credits.

The US Treasury has provided preliminary guidance on how 'energy community' and 'domestic content' requirements will be defined and implemented by the Internal Revenue Service (IRS), and which exemptions to the requirements may be allowed.

In our impairment testing, we have assumed a 95 % probability of achieving an additional 10 % ITC bonus credit for Revolution Wind and Sunrise Wind due to the brownfield status of both sites under the current energy communities guidance. These assumptions are unchanged compared to our expectations as at 30 June 2023 but an improvement for Sunrise Wind compared to our expectations late August.

In addition, we have changed our tax credit monetisation assumptions as a result of the

# EXHIBIT 2

## FILED UNDER SEAL

# EXHIBIT 3

# FILED UNDER SEAL

# EXHIBIT 4



# United States Department of the Interior

BUREAU OF OCEAN ENERGY MANAGEMENT
WASHINGTON, DC  20240-0001

Mr. Peter Allen
Revolution Wind, LLC
56 Exchange Terrace, Suite 300
Providence, Rhode Island  02903

Dear Mr. Allen:

In accordance with the Bureau of Ocean Energy Management's (BOEM) renewable energy regulations at 30 C.F.R. § 585. 516 and 585.521, Section 13 of Renewable Energy Lease Number OCS-A 0486, and Addendum B Section III (b)(3) of Renewable Energy Lease Number OCS-A 0486, Revolution Wind, LLC (Revolution Wind) is required to provide additional supplemental financial assurance before installation of the Revolution Wind Farm and the Revolution Wind Export Cable (Project) facilities on the Outer Continental Shelf.

Pursuant to 30 C.F.R. § 585.521, BOEM determines the amount of required supplemental financial assurance on a case-by-case basis.  The amount of supplemental financial assurance must "meet all accrued lease or grant obligations, including:

1.  The projected amount of rent and other payments due to the Government over the next 12 months;
2.  Any past due rent and other payments;
3.  Other monetary obligations; and
4.  The estimated cost of facility decommissioning."

The Bureau of Safety and Environmental Enforcement (BSEE) evaluated the decommissioning cost of the Project based upon preliminary engineering design and specifications of the facilities project design envelop as described in the Revolution Wind Construction and Operations Plan (COP) and as modified in the Record of Decision with 65 wind turbine generators. ICF Incorporated, L.L.C. (ICF) completed a study described in their report dated October 20, 2023. The study considered all decommissioning requirements of the lease and applicable BOEM regulations at 30 C.F.R. § 285.902(a)(1-2), including decommissioning of the wind turbine generators, offshore substation foundations and structures, the array cables, the interconnector cable, and the portions of the submarine export cables in federal waters.  The work breakdown structure included preliminary decommissioning activities (i.e., engineering, project management, decommissioning planning, permitting and approvals, bidding, and procurement), an initial seabed survey, mobilization, onshore activities, demobilization, and some additional management and contingency items.

BOEM determined the ICF study accurately estimates the expected cost of decommissioning the Project and is setting the decommissioning liability for the Project at the estimated value of

2

$325,440,000. BOEM may consider adjusting the amount of supplemental financial assurance in the future if liabilities and obligations change, as outlined in Section III(c) of Addendum B of Lease OCS-A 0486. This estimate is reasonably conservative and meets the requirements of 30 C.F.R. § 585.521(a)(4).

Revolution Wind must provide supplemental financial assurance in the amount of $325,440,000 to satisfy the requirements of 30 C.F.R. § 585.521 and section 13 of Renewable Energy Lease Number OCS-A 0486. This supplemental financial assurance must be received prior to the installation of facilities on the Outer Continental Shelf.

BOEM acknowledges receipt of, and is currently evaluating, Revolution Wind's request, submitted pursuant to 30 C.F.R. § 585.103, to depart from 30 C.F.R. § 585.516(a)(4) and defer providing the full amount of its decommissioning requirements until after commercial operations commence.

If you have any questions regarding this matter, please contact Whitney Hauer at (571) 536-8698 or whitney.hauer@boem.gov.

Sincerely,

KAREN BAKER

Digitally signed by
KAREN BAKER
Date: 2023.12.22
14:00:34 -05'00'

Karen J. Baker
Chief
Office of Renewable Energy Programs

cc:
Bryan Stockton, Head of Federal and Regulatory Affairs
Kellen Ingalls, Project Development Director
Whitney Marsh, Revolution Wind Permit Manager

# EXHIBIT 5

## FILED UNDER SEAL

# EXHIBIT 6

## FILED UNDER SEAL