**IN THE UNITED STATES DISTRICT COURT**
**FOR DISTRICT OF COLUMBIA**

REVOLUTION WIND, LLC,

       *Plaintiff*,

  v.

DOUG BURGUM, in his official capacity as
Secretary of the U.S. Department of the Interior;

UNITED STATES DEPARTMENT OF THE
INTERIOR;

MATTHEW GIACONA, in his official capacity
as Acting Director of the Bureau of Ocean Energy
Management;

BUREAU OF OCEAN ENERGY
MANAGEMENT;

KENNETH STEVENS, in his official capacity as
Principal Deputy Director Exercising the
Delegated Authorities of the Director of the
Bureau of Safety and Environmental Enforcement;
and

BUREAU OF SAFETY AND
ENVIRONMENTAL ENFORCEMENT,

       *Defendants*,
and

GREEN OCEANS,

       *Defendant-Intervenor*.

Case No.: 1:25-cv-02999-RCL

Hearing: September 22, 2025,
11:00 AM, Courtroom 15

**REBUTTAL DECLARATION OF MELANIE GEARON IN SUPPORT OF**
**PLAINTIFF'S REPLY IN SUPPORT OF**
**MOTION FOR A PRELIMINARY INJUNCTION AND STAY PENDING REVIEW**

Pursuant to 28 U.S.C. § 1746(2), I, Melanie Gearon, declare as follows:

1.      My role at Orsted North America Inc. ("Ørsted") as the Head of Northeast Permitting, including for the commercial-scale Revolution Wind Farm and Revolution Wind Export Cable (together, the "Project"), my familiarity with the Project's permitting and environmental review, and my relevant background experience are described in my first Declaration in Support of Revolution Wind, LLC's ("Revolution Wind") Motion for a Preliminary Injunction and Stay Pending Review. *See* Dkt. 9-1 at ¶¶ 1-6.

2.      I have reviewed the Federal Defendants' Opposition to Revolution Wind's Motion for Preliminary Injunction, as well as the declaration of the U.S. Department of the Interior's Acting Assistant Secretary and Principal Deputy Assistant Secretary for Land and Minerals Management Adam G. Suess ("Suess Declaration") and the exhibits attached thereto.  For the avoidance of doubt, neither Revolution Wind nor Ørsted has ever met with Mr. Suess, despite inquiries to his office by an Ørsted consultant as to whether a meeting with Ørsted could be arranged.  Nor have Ørsted's requests for meetings with Secretary Burgum and Deputy Secretary MacGregor resulted in any meetings.

3.      I execute this Declaration in support of Revolution Wind's Reply in Support of its Motion for a Preliminary Injunction and Stay Pending Review in this case based on my personal knowledge of the matters referred to herein and, if called upon to do so, could and would testify truthfully thereto.  I am over 18 years of age and competent to testify about the matters set forth herein.

COP Condition 6.3 Regarding Mitigation for NOAA NMFS Scientific Surveys

4.      Citing Revolution Wind's 2024 Annual Certification of Compliance submitted to the Department of the Interior ("DOI") on January 31, 2025, Mr. Suess states that "Revolution Wind still has not mitigated NOAA's concerns as to the impacts to NOAA's National Marine

Fisheries Service (NMFS) surveys as required in Section 6.3 of the COP."[1]  Suess Decl. at ¶ 10.

He states that DOI "has concerns as to whether this requirement will ever be satisfied."  *Id.*  As

explained in Revolution Wind's 2024 Annual Certification of Compliance:

> "[Revolution Wind] began discussions with NMFS pertaining to the nine
>
> overlapping scientific surveys on December 7, 2023.  A Variance Request to extend
>
> the deadline to execute a mitigation agreement with NMFS was approved by
>
> BOEM on May 3, 2024.  The approved Variance Request extended the deadline to
>
> execute a mitigation agreement to May 15, 2025."[2]

The Suess Declaration does not include relevant information—including more recent information

than January 2025—regarding Revolution Wind's extensive activities to comply with Condition

6.3 of the Project's Conditions of Construction and Operations Plan Approval ("COP Conditions")

in coordination with BOEM and NMFS.[3]

5.    NMFS conducts scientific surveys to collect data relating to the status and

management of certain species in the ocean, including species numbers and distribution.  As

described in COP Condition 6.3, nine NMFS scientific surveys overlap with the Project's footprint.

Dkt. 17-4 at 91.  COP Condition 6.3 required Revolution Wind, within 120 days of the COP

approval, to "submit to BOEM a survey mitigation agreement between NMFS and Lessee

[Revolution Wind]. The survey mitigation agreement must describe how [Revolution Wind] will

mitigate the Project impacts on the 9 NMFS surveys."  Dkt. 17-4 at 91-92.  But COP Condition

---

[1] NMFS is an office of the National Oceanic and Atmospheric Administration ("NOAA") within the U.S. Department of Commerce.

[2] Revolution Wind's 2024 Annual Certification of Compliance (dated January 31, 2025) is Exhibit F to the Suess Declaration.  Dkt. 17-7 (filed under seal).  The text referenced here, which was submitted by Revolution Wind to the agencies, is not confidential.  *Id.* at 65.

[3] The COP Conditions are Exhibit C to the Suess Declaration.  Dkt. 17-4.

6.3 also provided an alternative path to compliance: "If the Lessee [Revolution Wind] and NMFS fail to reach a survey mitigation agreement, then [Revolution Wind] must submit a Survey Mitigation Plan to BOEM and NMFS that is consistent with the mitigation activities, actions, and procedures described in Sections 6.3.1 and 6.3.2 below, within 180 days of COP approval. BOEM will review the Survey Mitigation Plan in consultation with NMFS Northeast Fisheries Science Center (NEFSC), and [Revolution Wind] must resolve comments to BOEM's satisfaction and must conduct activities in accordance with the plan." Dkt. 17-4 at 92.[4]

6.      For nearly two years, I, along with other members of the Revolution Wind team, have worked with NMFS and BOEM to comply with COP Condition 6.3.[5] I provide the following summary of the relevant history. Less than 30 days after receiving BOEM's COP approval letter, I and others from the Revolution Wind team met with NMFS on December 7, 2023, to initiate coordination with NMFS to develop a scientific survey mitigation agreement, within the timeframe established in COP Condition 6.3.1. After further coordination with NMFS regarding the approach to the agreement, on February 27, 2024, I submitted a draft mitigation framework document on behalf of Revolution Wind to NMFS, confirming the parties' intent to enter a mitigation agreement or other binding agreement concerning federal scientific survey mitigation measures pertaining to the Project. BOEM was copied on that correspondence.[6] In response, NMFS provided comments to me and the Revolution Wind team on March 11, 2024, and included BOEM in that correspondence.

---

[4] BOEM has since approved a variance to COP Condition 6.3, as discussed below.
[5] References to meetings throughout my Declaration include meetings that were held virtually or in person.
[6] Exhibit 1 is a true and correct copy of my February 27, 2024 email to NMFS regarding the Revolution Wind Draft Mitigation Framework.

7.     On March 12, 2024, representatives from Ørsted and other offshore wind developers met with NMFS staff to discuss scientific survey mitigation.  During the meeting there was discussion that a regional approach to scientific survey mitigation would be the preferred solution, along with the acknowledgement that more time was needed to formulate a regional approach to scientific survey mitigation.  The next day, I, along with other representatives from Ørsted, NMFS, and BOEM met and continued discussing a regionalized approach to the scientific survey mitigation agreement.  I recall that NMFS and Ørsted representatives agreed that a regional solution should be pursued but acknowledged that more time was needed to develop the specific details of the approach.  The meeting ended with an agreement to work collaboratively to further this initiative.

8.     On March 25, 2024, I attended another meeting with representatives from Ørsted, NMFS, and BOEM to discuss further a regionalized approach to the scientific survey mitigation agreement.  At that meeting, all parties agreed that a one-year extension from the 180-day deadline in COP Condition 6.3 was appropriate and necessary and that quarterly meetings would be held to work towards an agreement.  Consistent with its discussions with BOEM and NMFS, on April 5, 2024, Revolution Wind submitted a request to BOEM for a variance from COP Condition 6.3 (as authorized by COP Condition 1.5) to extend the deadline for submitting a scientific survey agreement (between NMFS and Revolution Wind) to BOEM to May 15, 2025.  BOEM approved this variance on May 3, 2024.[7]  In approving the request, BOEM considered that "Revolution Wind states during coordination with the National Marine Fisheries Service (NMFS) Northeast Fisheries Science Center (NEFSC), it was mutually agreed upon that the allowance for additional time to

---

[7] BOEM's May 3, 2024 variance approval letter to Revolution Wind is Exhibit D to the Suess Declaration, Dkt. 17-5.

provide a regionalized approach to Condition 6.3 would be beneficial to both NMFS – NEFSC and Revolution Wind."[8]  BOEM also approved a corresponding change in the date for the alternative path to compliance in COP Condition 6.3, explaining that "if no agreement is reached between Revolution Wind and NMFS by May 15, 2025, Revolution Wind would submit a Survey Mitigation Plan to BOEM and NMFS 60 days from the requested variance date, or July 14, 2025."[9] As stated in BOEM's approval letter, among other findings, BOEM determined that the variance "would not result in a change in the Project impact levels" and "would not alter BOEM's determination that the activities associated with the Project would be conducted in accordance with Section 8(p)(4) of OCSLA."[10]

9.      In August 2024, November 2024, and March 2025, representatives from Revolution Wind and NMFS met to continue discussing a regional approach to the scientific survey mitigation agreement, a potential cost model for a regional framework, and an interagency process to implement such an arrangement.[11]  Representatives from BOEM also attended the August 2024 and March 2025 meetings.

10.      After additional coordination, NMFS and Revolution Wind developed a "Tier 1" agreement in principle regarding scientific survey mitigation.  On May 14, 2025, BOEM emailed me (and others from Revolution Wind) and NMFS to "recommend that the following occur for [BOEM's] determination of compliance for COP Approval T&C 6.3 if an agreement in principle is signed: BOEM would consider that compliance is met when formal email exchanges occur between the Lessee and NMFS, with BOEM copied on the correspondence. These emails should

---

[8] *Id.* at 1.
[9] *Id.*
[10] *Id.*
[11] I was also present at the November 2024 and March 2025 meetings.  Other members of the team I supervise for Revolution Wind attended the August 2024 meeting.

clearly indicate that both parties agree to the terms outlined in the attached 'Agreement in Principle" document.'"[12]  Consistent with this instruction, NMFS sent a NMFS-executed Tier 1 agreement to me on May 15, 2025, copying BOEM.[13]

11.    Revolution Wind, BOEM, and NMFS continued to coordinate regarding this draft agreement in June and July 2025.  Under the terms of the Tier 1 agreement, on June 30, 2025, a member of my Revolution Wind team sent NMFS a draft "Tier 2" implementation agreement, describing Revolution Wind's proposed scientific survey mitigation.[14]  Revolution Wind received comments from NMFS on this draft Tier 2 agreement on July 8, 2025.[15]  On July 9, 2025, BOEM sent an email to NMFS and Revolution Wind (including me) stating that "BOEM staff discussed the situation regarding the July 14th due date internally (including with our solicitors) and have determined that an option that could be taken is for Orsted/Rev Wind to submit a draft Survey Mitigation Plan to BOEM by July 14th (as per T&C 6.3 and the variance that was issued last year). In that Plan, Orsted could state that they are continuing to work with NMFS on a Survey Mitigation Agreement, which could still be submitted at a later date.  If the Agreement does not get signed, Orsted could then proceed to the 'offramp' with the Plan.'"[16]  That same day, I, and other representatives from Revolution Wind met with representatives from BOEM and DOI's Bureau of Safety and Environmental Enforcement ("BSEE"), during which meeting it was agreed that

---

[12] Exhibit 2 includes true and correct copies of the emails between BOEM, NMFS, and Revolution Wind regarding the agreement in principle on May 14 and May 15, 2025.  The Tier 1 Agreement was fully executed and submitted to BOEM on May 21, 2025, within the window of time allowed by BOEM to submit documentation of compliance.

[13] *Id*.

[14] Exhibit 3 includes true and correct copies of the emails between NMFS, BOEM, and Revolution Wind regarding the draft Tier 2 implementation agreement between June 30 and July 11, 2025.

[15] *Id*. at 4-5.

[16] *Id*. at 2.

Revolution Wind's submission of a Survey Mitigation Plan would comply with the July 14, 2025 date in COP Condition 6.3, as amended by the variance, and that discussions with NMFS to progress a mitigation agreement could continue after that milestone and submission.

12.     On July 14, 2025, on behalf of Revolution Wind, a member of my team submitted to BOEM the Revolution Wind Federal Survey Mitigation Plan in compliance with COP Condition 6.3.[17]  The transmittal email explained that "[i]t is our understanding that this submission does not prevent Revolution Wind and NMFS from engaging in further negotiations to work towards a bilateral agreement."[18]

13.     Since July 2025, Revolution Wind has continued to meet (as recently as August 28, 2025) and discuss with NMFS the "Tier 2" agreement and economic cost modeling.[19]  On September 10, 2025, Revolution Wind requested a meeting with NMFS to discuss the Tier 2 agreement based on an updated cost model after it was received from NMFS on September 9, 2025.  Regardless, because the Survey Mitigation Plan was submitted by the deadline in COP Condition 6.3 (under the approved variance) and to date Revolution Wind has received no comments from BOEM that must be "resolve[d]", Revolution Wind understands that it is in compliance with this condition.  *See* Dkt. 17-5 at 3.  In any case, Revolution Wind intends to continue discussions with NMFS regarding scientific survey mitigation.

---

[17] Exhibit 4 is a true and correct copy of the Revolution Wind Survey Mitigation Plan and July 14, 2025 transmittal email to BOEM.
[18] *Id*. at 1.
[19] As part of the Tier 1 agreement, Revolution Wind and NMFS agreed to work together to develop a Tier 2 implementation agreement that would include procedures and commitments to meet the elements of the approach for scientific survey mitigation that was set forth in the Tier 1 agreement.  These details include Revolution Wind's commitment to regional scientific survey mitigation in order to generate data equivalent to data generated by the affected scientific surveys for the Project, including by establishing the total cost Revolution Wind is responsible for over an agreed upon term.

14.    Mr. Suess states: "In 2024, Revolution Wind communicated to BOEM staff about a series of delays associated with aspects of construction and other issues that prompted BOEM to approve several requests for 'variances' that would allow Revolution Wind to take actions that did not conform to conditions of COP approval."  Suess Decl. at ¶ 7.  The first variance referenced in the Suess Declaration is the COP Condition 6.3 variance described above.  But this variance was necessary in order to allow NMFS to develop a regionalized approach to scientific survey mitigation, which BOEM supported, and further develop a cost model.  The variance request from COP Condition 6.3 was not prompted by any delays in the Project's construction.  Neither of the other two variances to which Mr. Suess refers involved a situation where Revolution Wind sought to extend a deadline in the COP Conditions because of Project construction delays.[20]  In July 2024, BOEM approved a variance from Condition 5.10.5.e relating to particular technical conditions for restarting pile driving under certain circumstances.  In December 2024, BOEM approved a variance from Conditions 5.10 and 5.10.5.f regarding certain technical conditions on Revolution Wind's installation of one monopile foundation.  All pile driving for the Project is now complete.

Mitigation Measures Regarding Atlantic Cod Spawning and Seafloor Habitat

15.    Mr. Suess states: "NOAA officials have expressed to me that BOEM has not yet sufficiently addressed the project's impacts on Atlantic cod spawning areas and other sensitive habitats . . . ."  Suess Decl. at ¶ 11.  He states that "[t]hose concerns were set forth in NOAA's October 17, 2022, and March 15, 2023, letters to BOEM", *id.*, and attaches those letters as Exhibits G and H to the Suess Declaration.   In BOEM's Final Environmental Impact Statement ("FEIS")

---

[20] *See* Suess Decl. at ¶ 7 n.2.  As referenced in the Suess Declaration, both of these variance approvals are available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/REV_0486_Variance%205.10.5.f_July%202024_signed.pdf and https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/REV_0486_Variance%205.10_5.10.5.f_signed.pdf.

for the Project, BOEM specifically responded to NMFS' comments to BOEM in its October 17, 2022 letter (Suess Declaration Exhibit G).[21]    BOEM provided detailed responses to these comments, and, in many instances, BOEM made revisions in the FEIS accordingly.[22]  With respect to NMFS comments in the March 15, 2023 letter to BOEM (Suess Declaration Exhibit H), BOEM subsequently completed Essential Fish Habitat consultation with NMFS under the Magnuson-Stevens Fishery Conservation and Management Act.[23]    The Suess Declaration does not acknowledge the extensive measures required by BOEM's Record of Decision and approved COP Conditions to protect cod spawning and benthic (seafloor) habitat—measures that were based on consultations with NMFS, as summarized below.  Revolution Wind has already implemented applicable mitigation measures since offshore construction began in early 2024, and offshore construction is now nearly complete.

16.    BOEM's FEIS for the Project explains that, early in the Project's development history, BOEM conducted a lengthy stakeholder and scientific review process that identified "high-value" fishing grounds and excluded those areas from the Rhode Island/Massachusetts Wind Energy Area in which the Revolution Wind Project lease was later approved.[24]  The Project was optimized during development to avoid and minimize impacts on complex fish habitats in several ways, including through the selection and approval by DOI of project "Alternative G," which was identified as the preferred alternative in part because it reduces the impact of the Project's wind

---

[21] BOEM, Revolution Wind Farm and Revolution Wind Export Cable Project Final Environmental Impact Statement, Appendix L at L-6 (July 2023), available at https://www.boem.gov/renewable-energy/state-activities/revolution-wind-final-eis.  NMFS's letter is identified by submission number, "BOEM-2022-0045-0100".
[22] For example, see FEIS at L-98 to L-104, L-171 to L-177.
[23] BOEM's Record of Decision (Aug. 21, 2023) at B-9, which is Exhibit B to the Suess Declaration, Dkt. 17-3.
[24] FEIS at 3.9-15.

turbine generators and inter-array cables on complex habitat areas and areas of known Atlantic cod spawning by reducing the number wind turbine generators (from 100 to 65) and removing from the Project's proposed layout wind turbine generators that would have been located in portions of the lease area identified as high-priority fish habitat.[25]  In fact, the Project layout ultimately followed a variant of Alternative G (G1) that explicitly "maximizes the avoidance of complex benthic habitat and cod spawning areas within NMFS priority areas."[26]

17.    The Suess Declaration also does not account for multiple COP Conditions designed to avoid and minimize impacts to Atlantic cod spawning and complex fish habitat, which have been implemented throughout the Project's construction, which is nearly complete.  As examples, these measures include requirements for Revolution Wind to: (1) implement Anchoring Plans that include avoidances of complex habitats,[27] (2) prepare a Cod Spawning Monitoring Plan and submit annual reports to document "any cod detections" and describe "survey activities . . . regardless of whether cod were detected,"[28] (3) conduct micrositing "to avoid or minimize impacts to complex habitat,"[29] (4) submit a micrositing report describing "how impacts to complex habitats and benthic features were avoided and/or minimized within the lease area and export cable corridors,"[30] (5) prepare and implement a Sequencing Plan that "describes how construction activities will be sequenced to avoid or minimize impacts to Atlantic cod spawning," including how construction activities (e.g., inter-array cable installation and burial, scour protection installation, boulder relocation, foundation site preparation, and pile driving) "will occur such that construction

---

[25] FEIS at 3.6-78 to 3.6-83; Dkt. 17-3 at 20-22, 25.
[26] Dkt. 17-3 at 21.
[27] Dkt. 17-4 at Condition 5.5.2.
[28] *Id*. at Condition 5.5.4.
[29] *Id*. at Condition 5.5.3.
[30] *Id*. at Condition 5.6.1.

activities in the center portion of the lease area are avoided between November 1 to March 31,"[31] (6) "prioritize the use of spare locations that would have the least impacts on complex habitats and areas of cod spawning" to the extent practical or feasible,[32] (7) avoid jack-up barge locations in complex habitats, and where full avoidance is not feasible, must avoid locations for the jack-up barge in a specified order of priority,[33] (8) submit a "Pre-lay Grapnel Run Plan" that includes measures taken to avoid further adverse impacts "complex habitat, and fishing operations,"[34] (9) submit a "Fisheries Research and Monitoring Plan" and conduct fisheries monitoring "to assess fisheries status in the Project area pre-, during, and post-construction,"[35] (10) submit a "Boulder Identification and Relocation Plan" to locate boulders as close as practicable to areas immediately adjacent to existing and similar habitat,[36] (11) prepare and implement a "Scour and Cable Protection Plan" to "avoid the use of engineered stone or concrete mattresses in complex habitat" and "ensure that all materials used for scour and cable protection measures consist of natural or engineered stone that does not inhibit epibenthic growth and provides three-dimensional complexity in height and in interstitial spaces,"[37] and (12) conduct long-term Passive Acoustic Monitoring of "commercially-important fish vocalizations in the Lease area before, during, and following construction", including with "manual or automatic detection software to detect vocalizations of spawning cod."[38] Revolution Wind has coordinated extensively with the relevant

---

[31] *Id*. at Condition 5.5.5.  The center portion of the lease area was identified as a priority area for Atlantic cod spawning as part of BOEM's Essential Fish Habitat assessment with NMFS, and this time of year restriction corresponds to cod spawning.  *See* FEIS at 3.13-9 to 3.13-11, 3.13-64.
[32] Dkt. 17-4 at Condition 5.5.9.
[33] *Id*. at Condition 5.5.11.
[34] *Id*. at Condition 2.23.
[35] *Id*. at Condition 5.3.
[36] *Id*. at Condition 5.5.6.
[37] *Id*. at Condition 5.5.7.
[38] *Id*. at Condition 5.4.6.

federal agencies when implementing these measures, including submitting numerous plans that were reviewed and approved by BOEM and other agencies as provided in the COP Conditions.

18.     These measures have been in place throughout the construction of the Project.  At the time of the Stop Work Order, all of the Project's 67 monopile foundations had been installed and pile driving was complete, the array cables had been installed at 34 of the 65 wind turbine sites, the export cables had been fully installed, the interlink export cable was close to being fully installed, and approximately 70% of the Project's wind turbine generators had been fully constructed.  *See* Dkt. 9-6 at ¶ 10.  This means that the majority of ocean bottom-disturbing activities (*i.e.*, construction activities that could potentially result in impacts to Atlantic cod spawning) were complete by the time the Stop Work Order was issued.

19.     Further, the benthic (seafloor) monitoring program at a nearby offshore wind farm, which was constructed between 2022 and 2024, has shown how wind farms add new structures to the marine environment that marine invertebrates attach to and grow on, providing a source of food that attracts fish and crustaceans to the area.[39]  The results of the monitoring program concluded: "benthic visual surveys documented this effect, revealing numerous commercially, recreationally, and ecologically important species such as black sea bass, lobster, and flounder near the new structures.  Some other species observed include Atlantic cod, scup, cunner, barrelfish, flounder, butterfish, jack, mahi mahi, triggerfish, Bermuda chub, winter and summer flounder, sculpin, spotted and red hake, ocean pout, and Atlantic rock/Jonah crabs."[40]  That nearby offshore wind farm is in an area with similar complex benthic habitats as the Revolution Wind

---

[39] Benthic Monitoring Program Sediment Profile and Plan View Imaging (SPI/PV), ROV-based Sampling, and Sediment Grab Sampling,
https://storymaps.arcgis.com/stories/43138bdb3826449bbc4ce2b3eba49bb0 (last visited Sept. 18, 2025).
[40] *Id*.

Project, and the post-construction benthic surveys for that nearby project "have not detected demonstrable changes in the biological communities or benthic functions associated with a) soft sediments surrounding offshore wind structures, b) soft sediments along the export cable, or c) boulders relocated during seafloor preparation."[41]

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746(2) that the foregoing is true and correct.

Executed on September 18, 2025 at Charlestown, Rhode Island.

Melanie Gearon

---

[41] *Id.*

# EXHIBIT 1

## Melanie Gearon

| | |
|---|---|
| **Sent:** | Tuesday, February 27, 2024 5:01 PM |
| **To:** | andrew.lipsky@noaa.gov; madison.hall@noaa.gov |
| **Cc:** | christopher.meadows@noaa.gov; chris.orphanides@noaa.gov; elizabeth.methratta@noaa.gov; Whitney Marsh; Christopher Sarro; ursula.howson@boem.gov; brian.hooker@boem.gov; whitney.hauer@boem.gov; Greg DeCelles; jon.hare@noaa.gov; kathryn.ford@noaa.gov; Elliott Reid; Ariana Spawn; Kirsten Holland Nantz; mia.logan@noaa.gov; Scott.Farley@noaa.gov; joshua.hatch@noaa.gov; karen.abrams@noaa.gov; sean.hayes@noaa.gov; douglas.christel@noaa.gov; thomas.heimann@noaa.gov; debra.palka@noaa.gov; danielle.cholewiak@noaa.gov; libby.jewett@noaa.gov; brad.blythe@boem.gov; Michael.Rasser@boem.gov; Bryan Stockton; Kellen Ingalls; Charles R. Scott |
| **Subject:** | Revolution Wind Draft Mitigation Framework |
| **Attachments:** | 2-27-2024-Draft Survey Mitigation FRAMEWORK.pdf |

Good Afternoon Andy and Madison,

On behalf of Revolution Wind, LLC, I would like to submit the attached Draft Mitigation Framework for NEFSC Science Surveys for NMFS review and comment.

The intent of this document is to provide a framework for parties to work under while more specific mitigation measures, terms, and conditions are developed. The document contains Revolution Wind's commitments to this process and suggestions for potential mitigation concepts which could be further considered and discussed with the agency.

Once you and your team have reviewed this framework, we can schedule a follow up meeting (or meetings). Chris Sarro and I can work with you directly on scheduling a time over the next two weeks. We understand that all are very busy, but it would be great if we could receive written comments no later than March 11, 2024 if possible.

Please reach out if you have any questions. Thanks!


Best regards,
**Melanie Gearon**
Head of Northeast Permitting
Northeast Permitting
Region Americas

Ørsted
Tel. +18573483261

# EXHIBIT 2

**Melanie Gearon**

| | |
|---|---|
| **From:** | jon.hare@noaa.gov |
| **Sent:** | Thursday, May 15, 2025 1:22 PM |
| **To:** | Melanie Gearon |
| **Cc:** | ursula.howson@boem.gov; Whitney Marsh; kathryn.ford@noaa.gov; John.Stokely@boem.gov; Brian.Hooker@boem.gov; Brad.Blythe@boem.gov; scott.farley@noaa.gov; andrew.lipsky@noaa.gov |
| **Subject:** | Re: BOEM Information Needs for Determination of Compliance, T&C 6.3 |
| **Attachments:** | Revolution Wind_Tier 1 Agreement in Principle.pdf |

Dear Melanie,

Attached is a finalized and signed Agreement in Principle. Please let me know if you have any questions or concerns.

Cheers

Jon

On Wed, May 14, 2025 at 3:36 PM Howson, Ursula A <ursula.howson@boem.gov> wrote:

All,

We recommend that the following occur for our determination of compliance for COP Approval T&C 6.3 if an agreement in principle is signed:


BOEM would consider that compliance is met when formal email exchanges occur between the Lessee and NMFS, with BOEM copied on the correspondence. These emails should clearly indicate that both parties agree to the terms outlined in the attached "Agreement in Principle" document.


Thanks,

Ursula




*Ursula Howson, PhD*

Management and Program Analyst

Renewable Energy Policy Group

Office of Renewable Energy Programs

Bureau of Ocean Energy Management

(571) 491-7499

--
**Jon Hare**
*Northeast Fisheries Science Center Director*
NOAA Fisheries | U.S. Department of Commerce
Mobile: 774-392-3113
www.fisheries.noaa.gov



# EXHIBIT 3

**Melanie Gearon**

| | |
|---|---|
| **From:** | jon.hare@noaa.gov |
| **Sent:** | Friday, July 11, 2025 11:28 AM |
| **To:** | Whitney Marsh |
| **Cc:** | ursula.howson@boem.gov; kathryn.ford@noaa.gov; andrew.lipsky@noaa.gov; Melanie Gearon; Brad.Blythe@boem.gov; scott.farley@noaa.gov; madison.hall@noaa.gov; whitney.hauer@boem.gov; Brian.Hooker@boem.gov; Ariana Spawn; Greg DeCelles; Christopher Sarro; Charles R. Scott; Elliott Reid; Ross Pearsall; Arianna.Honeycutt@boem.gov; mariana.steen@boem.gov |
| **Subject:** | Re: [EXTERNAL] RE: Revolution Wind Tier 2 Implementation Agreement |

Dear Whitney,

Thank you for the update. We will reply to your questions next week.

Cheers

Jon

On Fri, Jul 11, 2025 at 11:11 AM Whitney Marsh <WHIMA@orsted.com> wrote:

Hi Jon and Ursula,


Thank you for the below guidance.  Revolution Wind is committed to continuing to work with NMFS on a survey mitigation agreement.  But, by way of brief update, Revolution Wind also intends to submit a survey mitigation plan to BOEM by the current deadline of July 14th, on the understanding that such a submission would not prevent Revolution Wind and NMFS from engaging in further negotiations to work towards a bilateral agreement.


Thank you,


Best regards,
**Whitney Marsh**
Permit Manager, Revolution Wind
Northeast Permitting
Commercial

Ørsted
Tel. +18572603248

---

**From:** Jon Hare - NOAA Federal <jon.hare@noaa.gov>
**Sent:** Wednesday, July 9, 2025 3:23 PM
**To:** Howson, Ursula A <ursula.howson@boem.gov>
**Cc:** Whitney Marsh <WHIMA@orsted.com>; Kathryn Ford - NOAA Federal <kathryn.ford@noaa.gov>; Andrew Lipsky -

NOAA Federal <andrew.lipsky@noaa.gov>; Melanie Gearon <MELGE@orsted.com>; Blythe, Brad J
<Brad.Blythe@boem.gov>; Scott Farley - NOAA Federal <scott.farley@noaa.gov>; Madison Hall - NOAA Federal
<madison.hall@noaa.gov>; Hauer, Whitney B <whitney.hauer@boem.gov>; Hooker, Brian <Brian.Hooker@boem.gov>;
Ariana Spawn <ARSPA@orsted.com>; Greg DeCelles <GREDE@orsted.com>; Christopher Sarro <CHSAR@orsted.com>;
Charles R. Scott <CHSCO@orsted.com>; Elliott Reid <EREID@orsted.com>; Ross Pearsall <ROSPE@orsted.com>;
Honeycutt, Arianna C <Arianna.Honeycutt@boem.gov>; Steen, Mariana E <mariana.steen@boem.gov>
**Subject:** Re: [EXTERNAL] RE: Revolution Wind Tier 2 Implementation Agreement

Dear Ursula,

Thank you for the information.

Cheers

Jon

On Wed, Jul 9, 2025 at 3:18 PM Howson, Ursula A <ursula.howson@boem.gov> wrote:

> Hi All,
>
> BOEM staff discussed the situation regarding the July 14th due date internally (including with our solicitors) and
> have determined that an option that could be taken is for Orsted/Rev Wind to submit a draft Survey Mitigation
> Plan to BOEM by July 14th (as per T&C 6.3 and the variance that was issued last year). In that Plan, Orsted could
> state that they are continuing to work with NMFS on a Survey Mitigation Agreement, which could still be
> submitted at a later date.  If the Agreement does not get signed, Orsted could then proceed to the "offramp" with
> the Plan.
>
> We met with Orsted/Rev Wind this afternoon and presented them with this option.
>
> Thanks,
>
> Ursula

**From:** Whitney Marsh <WHIMA@orsted.com>
**Sent:** Wednesday, July 9, 2025 10:55 AM
**To:** Jon Hare - NOAA Federal <jon.hare@noaa.gov>
**Cc:** Kathryn Ford - NOAA Federal <kathryn.ford@noaa.gov>; Andrew Lipsky - NOAA Federal <andrew.lipsky@noaa.gov>; Melanie Gearon <MELGE@orsted.com>; Howson, Ursula A <ursula.howson@boem.gov>; Blythe, Brad J <Brad.Blythe@boem.gov>; Scott Farley - NOAA Federal <scott.farley@noaa.gov>; Madison Hall - NOAA Federal <madison.hall@noaa.gov>; Stokely, John M <John.Stokely@boem.gov>; Hauer, Whitney B <whitney.hauer@boem.gov>; Hooker, Brian <Brian.Hooker@boem.gov>; Ariana Spawn <ARSPA@orsted.com>; Greg DeCelles <GREDE@orsted.com>; Christopher Sarro <CHSAR@orsted.com>; Charles R. Scott <CHSCO@orsted.com>; Elliott Reid <EREID@orsted.com>; Ross Pearsall <ROSPE@orsted.com>
**Subject:** [EXTERNAL] RE: Revolution Wind Tier 2 Implementation Agreement

> **This email has been received from outside of DOI - Use caution before clicking on links, opening attachments, or responding.**

Hi Jon,

We did have two initial questions based on the recent response sent over to our team:

    1. Can you provide a map for the calculated acreage featured in your response document?

    2. Can you provide additional detail on bullet #5?  We are a bit unclear on this item, so any additional information is helpful.

Our team is continuing to review, but we appreciate your help with these two items.

Thanks!

Best regards,
**Whitney Marsh**
Permit Manager, Revolution Wind
Northeast Permitting
Commercial

Ørsted
Tel. +18572603248

**From:** Whitney Marsh
**Sent:** Tuesday, July 8, 2025 3:44 PM
**To:** Jon Hare - NOAA Federal <jon.hare@noaa.gov>
**Cc:** Kathryn Ford - NOAA Federal <kathryn.ford@noaa.gov>; Andrew Lipsky - NOAA Federal <andrew.lipsky@noaa.gov>; Melanie Gearon <MELGE@orsted.com>; Howson, Ursula A <ursula.howson@boem.gov>; Blythe, Brad J <brad.blythe@boem.gov>; Scott Farley - NOAA Federal <scott.farley@noaa.gov>; Madison Hall - NOAA Federal <madison.hall@noaa.gov>; Stokely, John M <john.stokely@boem.gov>; Hauer, Whitney B <whitney.hauer@boem.gov>; Hooker, Brian <brian.hooker@boem.gov>; Ariana Spawn <ARSPA@orsted.com>; Greg DeCelles <GREDE@orsted.com>; Christopher Sarro <CHSAR@orsted.com>; Charles R. Scott <CHSCO@orsted.com>; Elliott Reid <EREID@orsted.com>; Ross Pearsall <ROSPE@orsted.com>
**Subject:** RE: Revolution Wind Tier 2 Implementation Agreement

Hi Jon,

We are in receipt and will revert back shortly.

Thank you!

Best regards,
**Whitney Marsh**
Permit Manager, Revolution Wind
Northeast Permitting
Commercial

Ørsted
Tel. +18572603248

---

**From:** Jon Hare - NOAA Federal <jon.hare@noaa.gov>
**Sent:** Tuesday, July 8, 2025 2:17 PM
**To:** Whitney Marsh <WHIMA@orsted.com>
**Cc:** Kathryn Ford - NOAA Federal <kathryn.ford@noaa.gov>; Andrew Lipsky - NOAA Federal <andrew.lipsky@noaa.gov>; Melanie Gearon <MELGE@orsted.com>; Howson, Ursula A <ursula.howson@boem.gov>; Blythe, Brad J <brad.blythe@boem.gov>; Scott Farley - NOAA Federal <scott.farley@noaa.gov>; Madison Hall - NOAA Federal <madison.hall@noaa.gov>; Stokely, John M <john.stokely@boem.gov>; Hauer, Whitney B <whitney.hauer@boem.gov>; Hooker, Brian <brian.hooker@boem.gov>; Ariana Spawn <ARSPA@orsted.com>; Greg DeCelles <GREDE@orsted.com>; Christopher Sarro <CHSAR@orsted.com>; Charles R. Scott <CHSCO@orsted.com>; Elliott Reid <EREID@orsted.com>; Ross Pearsall <ROSPE@orsted.com>
**Subject:** Re: Revolution Wind Tier 2 Implementation Agreement

Dear Whitney,

Attached please find NEFSC response. Please let us know if you have any questions.


Regards


Jon


On Mon, Jun 30, 2025 at 6:11 PM Whitney Marsh <WHIMA@orsted.com> wrote:

INTERNAL


Hello,


Revolution Wind has prepared the attached Draft Tier 2 Implementation Agreement package for NMFS review.  We appreciate the grace period pertaining to Subsection 4.b of the Agreement in Principle.  Please don't hesitate to reach out to our team should you wish to discuss this Implementation Agreement package.  We appreciate your teams' attention to this review noting execution of the agreement must occur prior to the July 14, 2025 deadline.


Many thanks!


Best regards,
**Whitney Marsh**
Permit Manager, Revolution Wind
Northeast Permitting
Commercial

Tel. +18572603248
whima@orsted.com

Örsted

Learn more at us.orsted.com

399 Boylston St., 12th Floor
Boston, MA 02116



Ørsted handles personal data as stated in our Privacy Policy for business relations

--

**Jon Hare**
*Northeast Fisheries Science Center Director*
NOAA Fisheries | U.S. Department of Commerce
Mobile: 774-392-3113
www.fisheries.noaa.gov



--

**Jon Hare**
*Northeast Fisheries Science Center Director*
NOAA Fisheries | U.S. Department of Commerce
Mobile: 774-392-3113
www.fisheries.noaa.gov



--

**Jon Hare**
*Northeast Fisheries Science Center Director*
NOAA Fisheries | U.S. Department of Commerce
Mobile: 774-392-3113
www.fisheries.noaa.gov

# EXHIBIT 4

**Melanie Gearon**

| | |
|---|---|
| **From:** | Whitney Marsh |
| **Sent:** | Monday, July 14, 2025 4:56 PM |
| **To:** | Hauer, Whitney B; Wolfson, Laura Lee W |
| **Cc:** | Stokely, John M; Howson, Ursula A; Hooker, Brian; Blythe, Brad J; Melanie Gearon; Elliott Reid; Ariana Spawn; Greg DeCelles; Christopher Sarro; Amanda Zuniga; Clayton Starr; Mary Colbert; Kaitlin Eames; Ross Pearsall; Charles R. Scott; Honeycutt, Arianna C; Steen, Mariana E |
| **Subject:** | Revolution Wind Federal Survey Mitigation Plan - COP Condition 6.3 |
| **Attachments:** | REV_Federal Survey Mitigation Plan_2025_07_14.pdf |

Hello,

Pursuant to COP Approval Condition 6.3 and the subsequent granted Variance for COP Approval Condition 6.3, Revolution Wind submits the attached Federal Survey Mitigation Plan. It is our understanding that this submission does not prevent Revolution Wind and NMFS from engaging in further negotiations to work towards a bilateral agreement. Please reach out if you have any questions.

Thank you!

Best regards,
**Whitney Marsh**
Permit Manager, Revolution Wind
Northeast Permitting
Commercial

Tel. +18572603248
whima@orsted.com



Learn more at us.orsted.com

399 Boylston St., 12th Floor
Boston, MA 02116



Ørsted handles personal data as stated in our Privacy Policy for business relations



# Revolution Wind Federal Survey Mitigation Plan

**Submitted pursuant to COP Approval Condition 6.3**

JULY 2025 (v1)

**Revolution Wind**

Federal Survey Mitigation Plan

# Table of Contents

Executive Summary ........................................................................................................................... 3

    Federal Survey Mitigation Approach Background ............................................................................ 3

    Proposed Mitigation .................................................................................................................... 4

1.0    Introduction ....................................................................................................................... 6

    1.1    Relevant Permit Condition ........................................................................................... 7

2.0    Background ........................................................................................................................ 9

    2.1    Lease .......................................................................................................................... 9

    2.2    Construction and Operations Plan Approval .................................................................. 9

    2.3    Impacts of Offshore Wind Energy Development ............................................................ 9

    2.4    COP Approval Condition 6.3 ......................................................................................... 9

    2.5    Project Area ............................................................................................................... 10

    2.6    Federal Survey Mitigation Agreement ........................................................................ 10

3.0    Purpose ........................................................................................................................... 12

4.0    Mitigation Requirements .................................................................................................. 13

    4.1    Monetary Contributions ............................................................................................. 13

    4.2    Data Sharing ............................................................................................................. 14

5.0    General Provisions ........................................................................................................... 16

**Revolution
Wind**

5.1     Points of Contact ................................................................................................................... 16

5.2     Funds and Personpower ......................................................................................................... 16

5.3     Access to the Project Area .................................................................................................... 17

5.4     Data Access and National Security ......................................................................................... 17

5.5     Scientific Integrity ................................................................................................................ 17

5.6     Cooperation with Other Organizations ................................................................................... 17

5.7     Existing Authorities .............................................................................................................. 17

5.8     Non-Precedent ..................................................................................................................... 17

5.9     Responsibility and Liability .................................................................................................... 18

**6.0     Implemenetation Agreement and Federal Survey Mitigation Plan ........................................... 19**

## Appendices

Appendix A – Revolution Wind Project Area

Appendix B – Agreement in Principle

Appendix C – Non-Proprietary Environmental and Biological Data

Appendix D – Draft Implementation Agreement between Revolution Wind, LLC and NMFS NEFSC

**Revolution Wind**

# Executive Summary

## Federal Survey Mitigation Approach Background

For several years, Ørsted representatives have been engaging, in the course of permitting processes, with National Marine Fisheries Service (NMFS) Northeast Fisheries Science Center (NEFSC) regarding the impacts of U.S. offshore wind projects to federal scientific surveys. Revolution Wind began coordination with NMFS NEFSC on December 7, 2023, after the Construction and Operations Plan (COP) Approval (November 17, 2023), in compliance with the requirements of COP Approval Condition 6.3.1. As part of the amended Condition, Revolution Wind has participated in quarterly check-ins with NMFS NEFSC. Revolution Wind has also participated in several industry-wide meetings with NMFS NEFSC and in several ad-hoc consultations through 2025.

In the spirit of collaboration, Revolution Wind and NMFS NEFSC have met to discuss survey mitigation objectives and how those objectives follow the noted Strategy Actions. Revolution Wind has also submitted a Request for Information (RFI) dated December 29, 2023, requesting several clarifications on the status of the Strategy Actions and to clarify the magnitude of impacts to the surveys identified. Based on the responses to the RFI, information from other public sources, and meetings, it has not been feasible for NMFS NEFSC and BOEM to fully advance the Strategy Actions as noted in COP Approval Condition 6.3. As a result, Revolution Wind and NMFS NEFSC acknowledge it is impossible at this early stage of the Strategy's development for any offshore wind developer to submit a proposal that fully addresses the noted Strategy Actions, because those Strategy Actions themselves have not been finalized.

The Variance granted on May 3, 2024, amended COP Approval Condition 6.3 so that it allowed for more time for an agreement between NMFS NEFSC and Revolution Wind to be reached. Specifically, pursuant to the Variance, the timeline was extended from May 15, 2024, to May 15, 2025, in order for NMFS NEFSC to build out its regional mitigation framework, strategies, and cost model that could be applied across approved offshore wind projects planned on the eastern seaboard. In April and May of 2025 NMFS NEFSC provided verbal explanation of their draft mitigation cost estimates for the Revolution Wind Project. It was at this point that the two-tiered agreement process was established between the two parties (as described in the Tier 1 Agreement in Principle, Appendix B).

On June 10, 2025, after the Tier 1 Agreement in Principle was executed, NMFS NEFSC provided documentation of the draft cost model for Lease Area OCS-A-0486 as part of the wider Regional Mitigation Framework under development as per Subsection 4.b of the Agreement in Principle. Revolution Wind

**Revolution Wind**

submitted the Draft Implementation Agreement (Appendix D) for NMFS NEFSC review on June 30, 2025, and is now submitting this Federal Survey Mitigation Plan for BOEM review.

## Proposed Mitigation

The following outlines important assumptions and details of the Draft Implementation Agreement and the Federal Survey Mitigation Plan, and summarizes the mitigation proposed by Revolution Wind that will result in the generation of data equivalent to data generated by NMFS's affected surveys for the duration of the Project.

- In good faith effort to mitigate impacts from the Revolution Wind offshore wind project and to be compliant with the requirements laid out in COP Approval Condition 6.3, Revolution Wind presents the following mitigation package that includes:

  - **Data contributions** from Revolution Wind that will support mitigation for the affected surveys sited in COP Approval Condition 6.3. A summary of these data collection efforts as part of the Revolution Wind Fisheries and Benthic Monitoring Plan and the POWERON Project are summarized in Section 5.2 and Appendix C. These are scientific data already, or planned to be, collected by Revolution Wind that will be shared with NMFS NEFSC. The equivalency and utility of this data is outlined in Appendix C. These data collection efforts have an estimated value at approximately $17,400,000 over the course of the monitoring periods. Revolution Wind is committed to sharing non-proprietary environmental and biological data with NMFS NEFSC and is further described in Section 5.2.3.

  - **Monetary contributions** are proposed as mitigation and based off the cost model provided by NMFS NEFSC. Revolution Wind and NMFS NEFSC agree that monetary contributions during an adjustment period will constitute mitigation and will result in the ability for NMFS NEFSC to generate data equivalent to data generated by NMFS's affected surveys for the duration of the Project. Revolution Wind is proposing an annual monetary contribution of $474,000 that will support the mitigation of the surveys referenced in COP Approval Condition 6.3 for a term of five years and a cap on total cost of $2,370,000. See explanation of contribution amount in Section 5.1. NMFS NEFSC has identified the Atlantic States Marine Fisheries Commission (AFMSC) as the custodian for the monetary contribution, as further outlined in Section 5.1.3. As the lead federal agency responsible for ecosystem, fisheries, marine mammals, and sea turtle monitoring in the Northeast Atlantic region, Revolution Wind believes it is paramount that NMFS NEFSC maintain its role as the data collector in areas of offshore wind projects. There are acknowledged uncertainties regarding the length of the overall alignment period and uncertainties associated with early-stage industry development/buildout and how a Regional Mitigation Framework would be implemented. A five-year post-construction period to allow for survey adjustments is consistent with similar assumptions related to other offshore wind mitigation approaches. During this five-year adjustment period, impacts to NMFS NEFSC science surveys (as listed in Condition 6.3) can be avoided, or otherwise mitigated during the early stages of the project's lifetime, while at the same time adjustments are developed for future years that would effectively mitigate impacts for the duration of the project. After the five-

**Revolution
Wind**

year term and if necessary, Revolution Wind and NMFS NEFSC, with BOEM as a third party, may assess the need for continued monetary contributions, which would require execution of a new agreement. In the event that continued mitigation is proposed by NMFS NEFSC to be necessary, NMFS NEFSC would be required to provide documentation to Revolution Wind and BOEM of how funds were allocated and utilized over the previous five-year term, show what data was generated, and progress made in adjusting the impacted surveys.

**Revolution Wind**

# 1.0    Introduction

Revolution Wind, LLC (Revolution Wind) proposes to construct and operate the Revolution Wind Farm Project (hereinafter referred to as the Project). The purpose of the Project is to provide clean, reliable offshore wind energy that will increase the amount and availability of renewable energy to New England consumers while creating the opportunity to displace electricity generated by fossil fuel-powered plants and offering substantial economic and environmental benefits to the New England region. Massachusetts, Rhode Island, Connecticut, and New York have adopted substantial renewable portfolio standards and clean energy targets to address issues associated with climate change, highlighting the current and future demand for this Project. In response to this expressed need and demand, Rhode Island and Connecticut have awarded Revolution Wind five Power Purchase Agreements (PPAs) to-date, totaling 704 MW of generation capacity. The Project will fulfill Revolution Wind's obligations to both Connecticut and Rhode Island in accordance with the PPAs and provide substantial environmental and economic benefits.

Revolution Wind will include the installation of up to 65 wind turbine generators (WTGs or turbines), with an 11 MW capacity turbine, as well as submarine cables between the WTGs (Inter-array Cables), and two offshore substations (OSS). The Project will be located within federal waters on the outer continental shelf (OCS), specifically in the Bureau of Ocean Energy Management (BOEM) Renewable Energy Lease Area OCS-A 0486 (Lease Area) of the Rhode Island/Massachusetts Wind Energy Area (WEA), approximately 18 miles (mi; 29 kilometers [km], 15 nautical miles [nm]) southeast of Point Judith, Rhode Island, and approximately 15 mi (24 km, 13 nm) east of Block Island, Rhode Island. This area is within the Mid-Atlantic Bight, an oceanic region that spans Cape Cod, Massachusetts, to Cape Hatteras, North Carolina, and is characterized by a broad expanse of gently sloping, sandy-bottomed continental shelf. This shelf extends up to 93 mi (150 km) offshore, where the waters reach about 650 feet (ft;200 m) deep. The Revolution Wind Project is next to the South Fork Wind Project (Lease Area OCS-A 0517), surrounding it on three sides, and is adjacent to the Sunrise Wind Project (Lease Area OCS-A 0487). Power from the Project will be delivered to the existing mainland electric grid via the submarine export cable referred to as the Revolution Wind Export Cable (RWEC) in federal waters on the outer continental shelf (RWEC-OCS) and in Rhode Island State waters (RWEC-RI), the Onshore Transmission Cable, the Onshore Substation (OnSS), and the underground right-of-way connecting the OnSS to the Interconnection Facility (ICF).

**Revolution Wind**

## 1.1    Relevant Permit Condition

| Permit Condition | Detail |
|---|---|
| COP Condition 6.3 | There are 14 NMFS scientific surveys that overlap with wind energy development in the northeast region. Nine of these surveys overlap with the Project. Consistent with NMFS and BOEM survey mitigation strategy actions 1.3.1, 1.3.2, 2.1.1, and 2.1.2 in the *NOAA Fisheries and BOEM Federal Survey Mitigation Implementation Strategy - Northeast US Region,* within 120 days of COP approval, the Lessee must submit to BOEM a survey mitigation agreement between NMFS and the Lessee. The survey mitigation agreement must describe how the Lessee will mitigate the Project impacts on the 9 NMFS surveys. The Lessee must conduct activities in accordance with such agreement. |
| | If the Lessee and NMFS fail to reach a survey mitigation agreement, then the Lessee must submit a Survey Mitigation Plan to BOEM and NMFS that is consistent with the mitigation activities, actions, and procedures described in Sections 6.3.1 and 6.3.2 below, within 180 days of COP approval. BOEM will review the Survey Mitigation Plan in consultation with NMFS Northeast Fisheries Science Center (NEFSC), and the Lessee must resolve comments to BOEM's satisfaction and must conduct activities in accordance with the plan. |
| | 6.3.1. As soon as reasonably practicable, but no later than 30 days after the issuance of the Project's COP approval, the Lessee must initiate coordination with NMFS NEFSC to develop the survey mitigation agreement described above. Mitigation activities specified under the agreement must be designed to mitigate the Project impacts on the following NMFS NEFSC surveys: (a) Spring Bottom Trawl survey; (b) Autumn Multi-species Bottom Trawl survey; (c) Ecosystem Monitoring survey; (d) NARW aerial survey; (e) Aerial marine mammal and sea turtle survey; (f) Shipboard marine mammal and sea turtle survey; (g) Atlantic surfclam and ocean quahog survey; (h) Atlantic sea scallop survey; and (i) Seal survey. At a minimum, the survey mitigation agreement must describe actions to address impacts on the affected surveys due to the preclusion of sampling platforms and impacts on statistical designs. NMFS has determined that the Project area is a discrete stratum for surveys that use a random stratified design. This agreement may also consider other anticipated Project impacts on NMFS surveys, such as changes in habitat and increased operational costs due to loss of sampling efficiencies. |
| | 6.3.2. The survey mitigation agreement must identify activities that will result in the generation of data equivalent to data generated by NMFS's affected surveys for the duration of the Project. The survey mitigation agreement must describe the implementation procedures by which the Lessee will work with NEFSC to generate, share, and manage the data required by NEFSC for each of the surveys impacted by the Project, as mutually agreed upon between the Lessee and NMFS NEFSC. The survey mitigation agreement must also describe the Lessee's participation in the NMFS NEFSC Northeast Survey Mitigation Program to support activities that address regional-level impacts for the surveys listed above. |
| COP Condition 6.3 Variance | There are 14 NMFS scientific surveys that overlap with wind energy development in the northeast region. Nine of these surveys overlap with the Project. Consistent with NMFS and BOEM survey mitigation strategy actions 1.3.1, 1.3.2, 2.1.1, and 2.1.2 in the NOAA Fisheries and BOEM Federal Survey Mitigation Implementation Strategy - Northeast US Region, by May 15, 2025, the Lessee must submit to BOEM a survey mitigation agreement between NMFS and the Lessee. The survey mitigation agreement must describe how the Lessee will mitigate the Project impacts on the 9 NMFS surveys. The Lessee must conduct activities in accordance with such agreement. |

**Revolution Wind**

Federal Survey Mitigation Plan

| Permit Condition | Detail |
|---|---|
| | If the Lessee and NMFS fail to reach a survey mitigation agreement, then the Lessee must submit a Survey Mitigation Plan to BOEM and NMFS that is consistent with the mitigation activities, actions, and procedures described in Sections 6.3.1 and 6.3.2 below, by July 14, 2025. BOEM will review the Survey Mitigation Plan in consultation with NMFS Northeast Fisheries Science Center (NEFSC), and the Lessee must resolve comments to BOEM's satisfaction and must conduct activities in accordance with the plan. |
| | 6.3.1. As soon as reasonably practicable, but no later than 30 days after the issuance of the Project's COP approval, the Lessee must initiate coordination with NMFS NEFSC to develop the survey mitigation agreement described above. Mitigation activities specified under the agreement must be designed to mitigate the Project impacts on the following NMFS NEFSC surveys: (a) Spring Bottom Trawl survey; (b) Autumn Multi-species Bottom Trawl survey; (c) Ecosystem Monitoring survey; (d) NARW aerial survey; (e) Aerial marine mammal and sea turtle survey; (f) Shipboard marine mammal and sea turtle survey; (g) Atlantic surfclam and ocean quahog survey; (h) Atlantic sea scallop survey; and (i) Seal survey. At a minimum, the survey mitigation agreement must describe actions to address impacts on the affected surveys due to the preclusion of sampling platforms and impacts on statistical designs. NMFS has determined that the Project area is a discrete stratum for surveys that use a random stratified design. This agreement may also consider other anticipated Project impacts on NMFS surveys, such as changes in habitat and increased operational costs due to loss of sampling efficiencies. |
| | 6.3.2. The survey mitigation agreement must identify activities that will result in the generation of data equivalent to data generated by NMFS's affected surveys for the duration of the Project. The survey mitigation agreement must describe the implementation procedures by which the Lessee will work with NEFSC to generate, share, and manage the data required by NEFSC for each of the surveys impacted by the Project, as mutually agreed upon between the Lessee and NMFS NEFSC. The survey mitigation agreement must also describe the Lessee's participation in the NMFS NEFSC Northeast Survey Mitigation Program to support activities that address regional-level impacts for the surveys listed above. |

Following the requirements set forth in Condition 6.3 of the Construction and Operations Plan (COP) Approval, and the subsequent granting of a variance from Condition 6.3 on May 3, 2024, this Plan that is to be consistent with the mitigation activities, actions, and procedures as described in Sections 6.3.1 and 6.3.2 is being submitted to the Bureau of Ocean Energy Management (BOEM) and the National Marine Fisheries Service (NMFS).

**Revolution Wind**

# 2.0    Background

## 2.1    Lease

Revolution Wind holds U.S. Bureau of Ocean Energy Management (BOEM) Renewable Energy Lease No. OCS-A 0486 (the "Lease"), which covers an area of the Atlantic U.S. Outer Continental Shelf ("OCS") offshore Rhode Island and Massachusetts.

## 2.2    Construction and Operations Plan Approval

On November 17, 2023, BOEM approved the Construction and Operations Plan ("COP") for the Revolution Wind Farm and the Revolution Wind Export Cable Project (collectively, the Project) subject to certain conditions (the "Conditions of COP Approval").

## 2.3    Impacts of Offshore Wind Energy Development

BOEM assesses impacts of offshore wind energy development under multiple statutes and has an obligation to ensure that energy development is carried out in a manner that provides for protection of the environment and ensures a fair return to the United States, among other considerations.

## 2.4    COP Approval Condition 6.3

Revolution Wind is required by Condition 6.3 of the Conditions of COP Approval ("COP Approval Condition 6.3") to enter into a survey mitigation agreement with the National Marine Fisheries Service ("NMFS") that describes how Revolution Wind Lessee will mitigate Project impacts on the nine (9) NMFS surveys that overlap with the Project (the "Impacted NMFS Surveys"), or alternatively, if no such agreement is reached, to submit a survey mitigation plan for BOEM's review (in consultation with NMFS).

### 2.4.1    Variance from Condition 6.3

On May 3, 2024, BOEM granted Revolution Wind a variance from Condition 6.3 of the Conditions of COP Approval, extending the deadline for executing a mitigation agreement with NMFS and submitting the

**Revolution Wind**

Federal Survey Mitigation Plan

agreement to BOEM from 120 days after COP approval to one year plus 180 days after COP approval, as well as extending the deadline for submitting a survey mitigation plan to BOEM in the alternative.

## 2.5    Project Area

The Project area, for purposes of the Draft Implementation Agreement and this Federal Survey Mitigation Plan (the "Project Area"), is the area of the OCS covered by the Lease in which Revolution Wind has constructed wind turbine generators ("WTGs") and offshore substations ("OSSs"), including a one- (1) mile buffer around such WTGs and OSSs.  For the avoidance of doubt, the areas covered by cables for the Project are excluded from the Project Area, except to the extent they fall within the aforementioned one- (1) mile buffer, due to the absence of impacts to the Impacted NMFS Surveys.

### 2.5.1    Developed Project Area

It is acknowledged that Revolution Wind has not developed the entire area of the OCS covered by the Lease for purposes of the Project, and that such remaining area has therefore been removed from consideration of survey impacts.  For additional information pertaining to the Project Area, refer to Appendix A.

## 2.6    Federal Survey Mitigation Agreement

On May 21, 2025, Revolution Wind and NMFS NEFSC agreed to a two-tiered approach to address survey mitigation through a mitigation agreement, consisting of an Agreement in Principle and an Implementation Agreement (to be subsequently negotiated).

### 2.6.1    Agreement in Principle

Revolution Wind entered into an Agreement in Principle (Appendix B) with NMFS NEFSC on May 21, 2025. The Agreement in Principle was executed within a grace period honored by BOEM, the U.S. Bureau of Safety and Environmental Enforcement ("BSEE"), and NMFS for adherence to the extended timeline in BOEM's May 4, 2024, variance approval.

In Revolution Wind's view, the Agreement in Principle satisfied COP Approval Condition 6.3; reflected the mutual agreement between NMFS NEFSC and Revolution Wind for Tier 1 of the approach; established a framework for Revolution Wind to meet its obligations under COP Approval Condition 6.3 through execution of an agreement with NMFS; and provided for negotiation of a detailed Implementation Agreement.

The Agreement in Principle requires Revolution Wind and NMFS NEFSC to negotiate in good faith toward a mutually agreeable Implementation Agreement, including a requirement for NMFS NEFSC to provide data and methodologies for calculating impacts to surveys, the adjustment plan for impacted surveys, and allocating responsibility for survey impacts among various offshore wind projects.

**Revolution Wind**

### 2.6.2    Cost Model

NMFS NEFSC provided a cost model to Revolution Wind on June 10, 2025, per Section 4b of the Agreement in Principle, which provides the basis for the monetary contribution as outlined in Subsection 4.a of the Draft Implementation Agreement (Appendix D) and as outlined in Section 5.1 of Federal Survey Mitigation Plan.

### 2.6.3    Adjustment Period

Based on the information provided in the cost model, and applying a five-year post-construction adjustment period to determine adjustments to surveys—which timeframe is consistent with similar adjustment assumptions related to offshore wind, the Parties have determined that the mitigation measures included herein will constitute compliance with COP Approval Condition 6.3.

### 2.6.4    Data Contributions

Revolution Wind is committed to providing data contributions to NMFS NEFSC (as outlined in Section 5.2 and Appendix C) to aid in the adjustment of the Impacted NMFS Surveys for continuation of data collection within the developed Revolution Wind lease area that will result in the generation of data equivalent to data generated by NMFS's affected surveys for the duration of the Project.

### 2.6.5    Project Siting

Revolution Wind has sited the Project to avoid and minimize impacts to multiple resource groups.  Because these mitigations may not avoid all impacts, NMFS NEFSC acknowledges that data and monetary contributions from Revolution Wind will mitigate scientific survey impacts.

### 2.6.6    Agreement in Principle combined with the Implementation Agreement or Federal Survey Mitigation Plan

This Federal Survey Mitigation Plan will result in the generation of data equivalent to data generated by NMFS's affected surveys for the duration of the Project, thus satisfying COP Approval Condition 6.3.

**Revolution Wind**

# 3.0    Purpose

This Federal Survey Mitigation Plan establish a process that will mitigate the Project's impacts on the Impacted NMFS Surveys, including by aiding in the adjustment of the Impacted NMFS Surveys to enable continuation of data collection within the Project Area, for the purpose of accomplishing Revolution Wind's compliance with Condition 6.3 of the Conditions of COP Approval. This data collection will result in the generation of data equivalent to data generated by NMFS's affected surveys for the duration of the Project. This Federal Survey Mitigation Plan establishes amounts, payment schedules, and other requirements for which Revolution Wind to support NMFS NEFSC survey mitigation.

This Federal Survey Mitigation Plan sets forth the requirements for Revolution Wind to provide mitigation to NMFS NEFSC for the adjustment of the Impacted NMFS Surveys in order to generate data equivalent to data generated by the Impacted NMFS Surveys for the duration of Project within the Project Area, as contemplated by set forth in COP Approval Condition 6.3.

**Revolution Wind**

# 4.0   Mitigation Requirements

## 4.1   Monetary Contributions

### 4.1.1    Annual Funding Amount

Revolution Wind will provide annual monetary contribution of Four Hundred and Seventy-Four Thousand and 00/100 Dollars ($474,000) per year to NMFS NEFSC for the duration of the funding period, as outlined in Section 5.1.2.  This amount was determined pursuant to the NMFS NEFSC-provisioned cost model, which states that an offshore wind project's contribution to NOAA Fisheries and BOEM's Survey Mitigation Program should be $7.42 per acre per year. Revolution Wind's Project Area is 63,815 acres in size, as further described in Exhibit A. Therefore, the final amount would be $473,507 per year. A chart showing the acreage of the Project Area is attached as Appendix A.

### 4.1.2    Funding Period

Revolution Wind will provide annual funding to NMFS NEFSC pursuant to Section 5.1.1, for a period of five years.  A five-year post-construction adjustment period is in line with similar assumptions related to offshore wind, as it is understood that the adjustments implemented within the five-year period will carry forward for the life of the Project.

### 4.1.3    Custodial Administrator

NMFS NEFSC has a memorandum of understanding ("MOU") with Atlantic States Marine Fisheries Commission ("ASMFC") to oversee regional survey mitigation program implementation. This MOU will allow ASMFC to receive contributions from offshore wind developers. The contributions will be used to fund survey mitigation activities.

### 4.1.4    Financial Agreement

ASMFC shall serve as custodial administrator of monetary contributions from Revolution Wind to NMFS NEFSC that serve as mitigation. Revolution Wind will begin working with AMFSC to establish a separate agreement between Revolution Wind and the ASMFC within ninety (90) days of resolving all comments to BOEM's satisfaction for the Federal Survey Mitigation Plan.

**Revolution Wind**

### 4.1.5    First Payment

Revolution Wind will provide the first annual funding payment within ninety (90) days after execution of the Financial Agreement.

### 4.1.6    Subsequent Payments

Subsequent payments shall be made by the anniversary of the first payment in each of the successive four years.

### 4.1.7    Maximum Funding

The total of Revolution Wind's annual payments will be Two Million Three Hundred and Seventy Thousand and 00/100 Dollars ($2,370,000) (the "Total Amount"), which is equivalent to Four Hundred and Seventy-Four Thousand 00/100 Dollars [$474,000] per year for a total of five (5) years.

### 4.1.8    Utilization of Funding

NMFS NEFSC will only use Revolution Wind's monetary contributions in a manner that is appropriate and relevant to aiding NMFS NEFSC in adjusting the Impacted NMFS Surveys for continuation of data collection within the Project Area.

## 4.2    Data Sharing

### 4.2.1    Revolution Wind Data

Revolution Wind has collected and will be collecting non-proprietary environmental and biological data that may be useful to NMFS NEFSC in furtherance of the Survey Mitigation Program.  Revolution Wind will share available data as reasonably requested by NMFS NEFSC, within the following categories, as further described in Appendix C:

1. Oceanographic Data
2. Bathymetric and Habitat Data
3. Acoustic Telemetry Receiver Network
4. Trawl Survey
5. Ventless Trap Survey
6. Cod Monitoring
7. POWERON
8. Benthic Monitoring

### 4.2.2    Ownership

Notwithstanding any sharing with NMFS NEFSC, Revolution Wind will retain all right, title, and interest to the data.  Revolution Wind will execute a document granting NMFS NEFSC a fully paid-up, non-exclusive license to use any shared data in connection with the Survey Mitigation Program.

**Revolution Wind**

### 4.2.3    Sharing

Revolution Wind will make commercially reasonable efforts to share available, relevant, and non-confidential data within the categories listed in Section 5.2.1, promptly upon reasonable request by NMFS NEFSC.

.

**Revolution Wind**

Federal Survey Mitigation Plan

# 5.0    General Provisions

## 5.1    Points of Contact

The point of contact for NMFS NEFSC is:
Director - Jonathan Hare, PhD
Email: jon.hare@noaa.gov
Phone: (774) 392-3113

The point of contact for Revolution Wind, LLC is:
Head of Northeast Permitting - Melanie Gearon
Email: MELGE@orsted.com
Phone: (857) 348-3261

The point of contact for BOEM is:
Revolution Wind Project Coordinator - Whitney Hauer, PhD
Email: whitney.hauer@boem.gov
Phone: (571) 536-8698

## 5.2    Funds and Personpower

Funds for work conducted by the NMFS NEFSC team will be provided as outlined under Section 5.1 through the annual contribution from Revolution Wind to AMFSC, who will serve as custodial administrator of monetary contributions. Revolution Wind will have no financial obligation or liability to NMFS NEFSC beyond the Total Amount, including—but not limited to—for loss of or damage to survey equipment within the Project Area.

Work may be performed by partners to NMFS NEFSC, which may include other federal agencies, state governments, academics, environmental non-governmental organizations, or tribes. Notwithstanding the foregoing, Revolution Wind will have no obligation or liability to any such partners under this Federal Survey Mitigation Plan.

**Revolution Wind**

## 5.3    Access to the Project Area

Revolution Wind will have no responsibility for the conduct of the Impacted NMFS Surveys other than with respect to the mitigation requirements set forth in Section 5.  Notwithstanding the foregoing, Revolution Wind will communicate and coordinate with the NMFS NEFSC team for deconfliction of all Impacted NMFS Survey activities with Project construction and operations within the Project Area.  Revolution Wind will establish, and share with NMFS NEFSC, protocols for communication and timelines for providing any applicable notices. Any vessels entering the Project Area will be required to adhere to all applicable safety zones. Further, Revolution Wind intends to work collaboratively with NMFS NEFSC to ensure that there are no conflicts with assets and ongoing wind farm construction and operations.

## 5.4    Data Access and National Security

NMFS NEFSC will be responsible for ensuring adequate coordination with the Navy or other military branches to ensure that national security interests are protected in the course of activities associated with the Impacted NMFS Surveys.

## 5.5    Scientific Integrity

All work performed by the NMFS NEFSC team pursuant to the Implementation Agreement or Federal Survey Mitigation Plan will comply with the DOI Scientific Integrity Policy posted to http://www.doi.gov, or its equivalent as provided by the organization performing the work or by state law.

## 5.6    Cooperation with Other Organizations

The Federal Survey Mitigation Plan in no way restricts Revolution Wind or NMFS NEFSC from participating with other public or private agencies, organizations, or individuals.  Revolution Wind recognizes the importance of continuing cooperation and participation with environmental non-governmental organizations, tribal organizations, and institutions in programs of mutual interest.

## 5.7    Existing Authorities

The activities contemplated in this Federal Survey Mitigation Plan will be conducted in accordance with existing authorities.  If any provisions of the Federal Survey Mitigation Plan are determined to be inconsistent with existing laws, regulations, or directives governing the signatories, then the provisions of the Federal Survey Mitigation Plan not affected by a finding of inconsistency will remain in effect.

## 5.8    Non-Precedent

Each offshore wind project stands alone and must be evaluated on its own merits. This Federal Survey Mitigation Plan does not provide a binding precedent for future offshore wind projects.

**Revolution Wind**

## 5.9    Responsibility and Liability

NMFS NEFSC will be responsible for all equipment, personnel, and other necessities for conducting surveys within the Project Area, including harm to survey personnel or loss of, or damage to, survey equipment.

**Revolution Wind**

# 6.0    Implemenetation Agreement and Federal Survey Mitigation Plan

Revolution Wind submitted the Draft Implementation Agreement (Appendix D) for NMFS NEFSC review on June 30, 2025, and is now submitting this Federal Survey Mitigation Plan for BOEM review. Revolution Wind continues to engage in further negotiations to work towards a bilateral agreement with NMFS NEFSC, which may be finalized at a later date. Should the Implementation Agreement not be finalized, Revolution Wind will continue with the Federal Survey Mitigation Agreement Plan.

**Revolution
Wind**

## Appendix A

## Revolution Wind Project Area



Revolution
Wind

# Appendix B

# Agreement in Principle

# Agreement in Principle

**Revolution Wind, LLC ("Revolution Wind" or "the Lessee") and the NMFS Northeast Fisheries Science Center (NEFSC)") for Survey Mitigation**

**Tiered Approach for Compliance with Revolution Wind COP Approval Condition 6.3**

Revolution Wind COP Approval Condition 6.3 (Federal Survey Mitigation Program), as amended by the May 3, 2024, Variance Request approved by BOEM, requires the Lessee to submit to BOEM a survey mitigation agreement between NMFS and the Lessee within 1 year plus 180 days of the COP Approval (i.e. by May 15, 2025). NMFS Northeast Fisheries Science Center (NEFSC) and Revolution Wind have put forth the following plan to achieve a complete survey mitigation agreement in a two-tiered approach:

Tier 1:" Agreement in Principle" by May 15, 2025

Tier 2: Completion of an "Implementation Agreement" prior to July 14, 2025 (see outline under Section 4 for key elements of an agreement)

1. **Background:** Condition 6.3 of the COP Approval states that "*There are 14 NMFS scientific surveys that overlap with wind energy development in the northeast region. Nine of these surveys overlap with the Project. Consistent with NMFS and BOEM survey mitigation strategy actions 1.3.1, 1.3.2, 2.1.1, and 2.1.2 in the NOAA Fisheries and BOEM Federal Survey Mitigation Implementation Strategy - Northeast US Region, 1 within 120 days 1 year plus 180 days of COP approval, the Lessee must submit to BOEM a survey mitigation agreement between NMFS and the Lessee. The survey mitigation agreement must describe how the Lessee will mitigate the Project impacts on the 9 NMFS surveys consistent with a regionalized approach agreed upon by the Lessee and NMFS Northeast Fisheries Science Center (NEFSC). The mitigation agreement must outline how the Lessee will implement a regionalized solution as appropriate for the scale of the Project. The Lessee must conduct activities in accordance with such agreement.*"

   a. Section 6.3.1 states that "*Mitigation activities specified under the agreement must be designed to mitigate the Project impacts on the following NMFS NEFSC surveys: (a) Spring Bottom Trawl survey; (b) Autumn Multi-species Bottom Trawl survey; (c) Ecosystem Monitoring survey; (d) NARW aerial survey; (e) Aerial marine mammal and sea turtle survey; (f) Shipboard marine mammal and sea turtle survey; (g) Atlantic surfclam and ocean quahog survey; (h) Atlantic sea scallop survey; and (i) Seal survey.*"

   b. Condition 6.3 states "*If the Lessee and NMFS fail to reach a survey mitigation agreement within 1 year plus 180 days of COP approval, then the Lessee must submit a Survey Summary Mitigation Plan to BOEM and NMFS that is consistent with the mitigation activities, actions, and procedures described in Sections 6.3.1 and 6.3.2 below, within 1 year plus 240 days 180 days of COP approval. BOEM will review the Survey Mitigation Plan in consultation with NMFS Northeast Fisheries Science Center (NEFSC), and the Lessee must resolve comments to BOEM's satisfaction and must conduct activities in accordance with the plan.*" (i.e. Revolution Wind must submit a Mitigation Plan to BOEM by July 14, 2025 if an agreement is not reached with NMFS).

   c. Recent leasing and construction of offshore wind energy areas in the northeast region and consequent disruptions in NMFS NEFSC's long-term survey enterprise led BOEM and NMFS NEFSC to develop the NOAA Fisheries and BOEM Federal Survey Mitigation Strategy - Northeast U.S. Region2 (Strategy). The Strategy defines the development and implementation of a Survey Mitigation Program (Program) to mitigate impacts on NMFS scientific surveys from offshore wind energy projects in the Northeast U.S. over the duration of those wind energy projects. The Program is specific to the Northeast U.S. Region (Maine to North Carolina) and contains 18 survey mitigation plans that describe and address impacts on existing NMFS NEFSC scientific surveys. The Program also includes sampling plans for several new surveys that could minimize the loss of data in the event of unavoidable survey impacts whereby existing survey methodologies are not possible within offshore

wind energy areas. It is expected to be implemented in partnership with the Atlantic States Marine Fisheries Commission (ASMFC); NMFS NEFSC has a memorandum of understanding with ASMFC to oversee Program implementation to meet survey mitigation needs.

2. **Purpose and Need**: This Agreement in Principle is designed to meet the requirements of COP Approval Condition 6.3 and reflect mutual agreement between NMFS NEFSC and Revolution Wind.
   a. This Agreement in Principle satisfies COP Approval Condition 6.3 as amended which requires submission of a survey mitigation agreement by May 15, 2025.
   b. This Agreement in Principle reflects mutual agreement between NMFS NEFSC and Revolution Wind for Tier 1 of the approach.
   c. This Agreement in Principle establishes a framework for ensuring that Revolution Wind meets its obligations under COP Approval Condition 6.3.
   d. This Agreement in Principle establishes a tiered framework to develop a detailed Implementation Agreement that established and fulfills commitments.

3. **Lessee Approach to Survey Mitigation** (Tier 1 elements and commitments of the Agreement in Principle):
   a. Revolution Wind acknowledges impacts to the NMFS NEFSC scientific surveys identified in COP Approval Condition 6.3.
   b. Revolution Wind proposes to mitigate impacts to NMFS NEFSC scientific surveys.
   c. Revolution Wind is committed to participation in the Regional Survey Mitigation Program being developed by NMFS NEFSC and alongside impacted project developers in the region, or similar mitigation approach that NMFS NEFSC is agreeable to.
   d. Revolution Wind will continue to work with NMFS NEFSC to develop an Implementation Agreement (Tier 2) prior to July 14, 2025. The Implementation Agreement will include detailed procedures and commitments to meet the elements of the approach for survey mitigation set forth in Section 3 and 4 of this Agreement in Principle.
   e. Revolution Wind will provide a description of any other required or committed to survey mitigation actions planned or currently implemented by the project, outside of the Regional Survey Mitigation Program, which generate data equivalent to NMFS NEFSC data collections or are acceptable alternative data in areas of offshore wind projects (e.g. POWERON).
   f. Revolution Wind is committed to sharing non-proprietary environmental and biological data with NMFS NEFSC collected as part of their required environmental monitoring surveys that will be described in a data sharing agreement as part of the Implementing Agreement.

4. **Development of the Implementation Agreement** (Tier 2 elements and commitments):
   a. Revolution Wind and NMFS NEFSC will negotiate in good faith to reach a mutually agreeable Implementation Agreement.
   b. NMFS NEFSC will provide further detail on the Northeast Regional Survey Mitigation Program, including the data and methodologies for calculating impacts to surveys, the transition plan for mitigating impacted surveys, and allocating responsibility for them among various offshore wind projects, by June 2, 2025.
   c. Revolution Wind will prepare a draft Implementation Agreement and share with NMFS NEFSC for review within 10 business days after NMFS NEFSC has provided Revolution Wind with information required by Subsection 4.b.
   d. The Implementation Agreement will include commitments and further details related to elements in Section 3 of the Agreement in Principle.
   e. The Implementation Agreement will contain Revolution Wind's commitment to Regional Survey Mitigation (or similar mitigation approach that NMFS NEFSC is agreeable to, such as transitioning to alternate survey methodologies) in order to generate data equivalent to data generated by the affected surveys for Revolution Wind's project, including by establishing the total cost Revolution Wind is responsible for over an agreed upon term.

     f.   The Implementation Agreement will include a payment schedule outlining:
- a. Initial down payment
- b. Periodic payments
- c. Cap on total costs (i.e. maximum liability)

     g.   The Implementation Plan will describe and include an adaptive process for reviewing and adjusting costs over time (an upward adjustment on costs would not exceed the cap agreed upon).

     h.   The Implementation Agreement will include standard terms and conditions, including limitations on liability and delineation of intellectual property rights, suitable to a commercial contract of its scale and scope.

5. **Effect of this Agreement in Principle**:

     a.  This Agreement in Principle reflects Revolution Wind and NMFS NEFSC's mutual agreement that Revolution Wind has committed to undertake actions, to be mutually agreed upon through good-faith negotiations in the Implementation Agreement, that are sufficient to meet its survey mitigation requirements set forth in condition 6.3 of the Revolution Wind COP Approval as amended.

     b.  This Agreement in Principle must be effectuated by development and execution of a detailed implementing agreement prior to July 14, 2025.

     c.  If the Revolution Wind and NMFS NEFSC fail to reach a Tier 2 Implementation Agreement prior to July 14, 2025 then Revolution Wind "*must submit a Survey Mitigation Plan to BOEM and NMFS that is consistent with the mitigation activities, actions, and procedures described in Sections 6.3.1 and 6.3.2*" within 1 year plus 240 days of COP approval (i.e. on or by July 14, 2025) BOEM will review the Survey Mitigation Plan in consultation with NMFS NEFSC, and the Lessee must resolve comments to BOEM's satisfaction and must conduct activities in accordance with the plan.

6. **NMFS Verification:** NMFS NEFSC verifies that the proposed survey mitigation approach (Tier 1) when carried out with the Implementation Agreement (Tier 2) will mitigate adverse impacts to surveys for the project thus satisfying the Lessees obligations under Condition 6.3 of the Revolution Wind COP Approval.


**NMFS Northeast Fisheries Science Center**

By: _____ Date: __5/21/2025
**Name: Jon Hare**
**Title: Director**


**Revolution Wind, LLC,**
**by its agent, Orsted Wind Power North America LLC**


By: _____ Date: _5/21/2025_
**Name: Ryan Chaytors**
**Title: Authorized Person**

**Revolution Wind**

# Appendix C

# Non-Proprietary Environmental and Biological Data

**EXHIBIT C**
REVOLUTION WIND
NON-PROPRIETARY ENVIRONMENTAL AND BIOLOGICAL DATA

## DATA CONTRIBUTION PURPOSE

Per condition 6.3.2, the purpose of this document is to identify Revolution Wind's activities which may result in the generation of data equivalent to data generated by NMFS NEFSC's surveys impacted by Revolution Wind. In addition to specifically satisfying condition 6.3.2, this document simultaneously advances NOAA Fisheries and BOEM Federal Survey Mitigation Implementation Strategy – Northeast U.S. Region Strategy Goal 2 and inclusive Strategy Objective 2 and Strategy Actions 2.1.1 and 2.1.2[1].

The following sections outline planned and ongoing data collections and opportunities for data sharing to support NMFS NEFSC survey mitigation. Revolution Wind has committed substantial resources to fulfill environmental monitoring obligations and has partnered with leading regional scientists to carry out this work. Revolution Wind is collecting acoustic, benthic, biological and oceanographic data through fisheries and benthic monitoring studies and other required monitoring activities (e.g. POWERON). This work provides NMFS NEFSC data from the Project area. Revolution Wind conservatively estimates that it will spend upwards of $17,400,000 on monitoring, depending on the duration of these activities. This includes all fisheries and benthic activities as described in the Revolution Wind Fisheries and Benthic Monitoring Plan, as well as other permit required monitoring including POWERON and cod spawning monitoring.

## DATA COLLECTED BY REVOLUTION WIND

**Bathymetric and Habitat Data to Help Operation of NOAA surveys:**
Revolution Wind has collected detailed information regarding the bathymetry and characteristics of the benthic habitats present within the Project area. This information has been collected through a variety of approaches, such as multi-beam echosounder, side-scan sonar, and ROV imagery. Revolution Wind can provide NMFS NEFSC with locations of assets (wind turbines, inter-array cables, etc.) and information regarding the spatial extent of the scour protection material at the base of the turbine foundations. Collectively, this detailed information could have utility for NMFS NEFSC and their scientific research partners to help in the planning and design of their survey activities in the Project area.

**Acoustic Telemetry Receiver Network**:
Revolution Wind has partnered with scientists from the New England Aquarium Anderson Cabot Center for Ocean Life and Inspire Environmental to deploy and maintain an array of 32 acoustic receivers across the Revolution Wind, Sunrise Wind, South Fork Wind lease areas and lease area 500. These receivers are scheduled to remain within the wind farm project areas through at least 2026. Beyond maintaining the receiver network, staff at the New England Aquarium are also tagging Highly Migratory Species to track their movements and behavior. Revolution Wind has contributed $680,000 to this effort. For this telemetry project, bottom temperature data is recorded continuously by the receivers, which can be

---
[1] NOAA Tech Memo NMFS-NE-292 NOAA Fisheries and BOEM Federal Survey Mitigation Strategy - Northeast U.S. Region

valuable for evaluating the regional oceanography and the thermal habitats of species in southern New England. Orsted has committed to working with scientific collaborators to ensure that acoustic telemetry detection data for animals tagged by other researchers is made publicly available (e.g., through MATOS). Revolution Wind notes that these receiver networks are valuable for understanding how animals like sea turtles and seals use this habitat.

**Revolution Wind Trawl Survey:**
As outlined in the Revolution Wind Fisheries and Benthic Monitoring Plan, Revolution Wind is performing a fishery-independent trawl survey at Revolution Wind and two nearby control areas. The survey is being executed by scientists from the UMass Dartmouth School for Marine Science and Technology (SMAST) and the Commercial Fisheries Research Foundation (CFRF). The survey is currently underway, will include two years of post-construction monitoring. The cost estimate for the trawl survey is $3,600,000.

The survey is executed using a NEAMAP trawl net and performed with standardized sampling protocols. Revolution Wind notes that the trawl survey is consistent with monitoring efforts being undertaken by other developers with leases area in southern New England. The survey is seasonal (quarterly) with a target sample intensity of 15 tows per season in the Revolution Wind Farm area, and 30 tows per season across the two control areas. Multiple products from the trawl survey will support survey mitigation.

Revolution Wind can provide biological samples (e.g., whole frozen fish) and data from the trawl survey to support ongoing NMFS NEFSC priority research at the Population Biology branch. Biological samples, which are typically collected during fisheries-independent surveys, provide critical information regarding the size-structure, age-structure, maturity, diet, stock structure, and condition of fish and invertebrate populations. Having additional biological samples will support NMFS NEFSC in that these life history parameters are important in estimating Biological Reference Points. The Revolution Wind trawl survey operates in every season, providing an opportunity to collect biological samples year-round. Revolution Wind notes that these data collection efforts could be especially useful during the winter and summer seasons when the NMFS NEFSC trawl survey does not sample in southern New England. Conductivity Temperature Depth (CTD) profiles are being collected at each station sampled during the Revolution Wind trawl survey, and bottom temperature data is recorded continuously while the net is deployed. This oceanographic data can aid in regional analyses of climate change, species distribution modeling, and other efforts.

**Ventless Trap Survey:**
Revolution Wind is collaborating with CFRF and the SMAST to execute a ventless trap survey for lobsters and crabs in the Revolution Wind and two nearby control areas. The survey operates from May through November annually and is scheduled to continue through 2028. The cost estimate for the ventless trap survey is $4,790,000.

Revolution Wind can also provide biological samples (e.g., whole organisms) and data from the ventless survey to support ongoing NMFS NEFSC priority research at the Population Biology branch. Biological samples, which are typically collected during fisheries-independent surveys, provide critical information regarding the size-structure, age-structure, maturity, diet, stock structure, and condition of fish and invertebrate populations. The Revolution Wind ventless trap survey has temperature loggers attached to the traps continuously collecting bottom temperature data when sampling gear is in the water. The

survey operates from May through November annually with sampling in Revolution Wind, and nearby control areas.

**Cod Monitoring:**

To fulfill the Revolution Wind COP Approval Condition 5.5.4, Revolution Wind is working with researchers at Rutgers University and JASCO Applied Sciences to perform glider-based passive acoustic monitoring (PAM) for Atlantic cod in the Revolution Wind Project area. The monitoring is performed using a Slocum glider equipped with a passive acoustic recorder, an acoustic telemetry receiver, and oceanographic sensors. The acoustic recorder also detects whale vocalizations. The research partners are sharing the data from these monitoring efforts, and that data sharing will continue. Glider-based cod monitoring is expected to continue from November 2025 through March 2026. The estimated costs of this monitoring campaign are approximately $1,100,000.

**POWERON:**

To fulfill the Revolution Wind COP Approval Condition 5.4.6, Revolution Wind has signed into an agreement with BOEM to support the collection of marine mammal acoustic data through the POWERON network, which also collects cod data within the lease area. This funding supports an array of PAM receivers in the Revolution Wind lease area, and the Project has committed to providing $244,000 in funding per year for three (3) years, and up to ten (10 years) ($732,000 and up to $2,440,000).

**Hard-Bottom and Soft-Bottom Benthic Monitoring:**

Revolution Wind is working with INSPIRE Environmental to execute a comprehensive, multi-year benthic monitoring campaign. As described in the Project's Fisheries Research and Monitoring Plan[2], this benthic monitoring uses an ROV to investigate the epifaunal community growing on the monopile foundations, scour protection layers, and boulders. This ROV survey also collects opportunistic data on the fish and invertebrate associated with these introduced habitats. Another component of the benthic monitoring plan is to use SPI/PV imagery to assess benthic habitats. The SPI/PV survey is using a Before After Gradient design to sample at varying distances around the foundations, and at multiple distances along the export cable route. The ROV survey of the monopile foundation and scour protection layers is proposed to occur for 5 years after construction (Y0, Y1, Y2, Y3, and Y5), and the boulder survey will occur for at least 4 years (Y0, Y1, Y2, Y3). The SPI/PV survey of the sediments around the wind turbine foundations is proposed to occur for 5 years after construction (Y0, Y1, Y2, Y3, and Y5), while the SPI/PV sampling along the export cable route will occur for at least 3 years (Y0, Y1, Y2). This detailed information on the benthic habitats, and species associated with the project infrastructure can be a valuable supplement to NOAA survey efforts. The costs associated with these benthic monitoring surveys is approximately $6,500,000.

---

[2] Appendix Y - Revolution Wind Fisheries Research and Monitoring Plan

**OVERVIEW OF DATA COLLECTIONS AND DATA SHARING**

**Table 1 – Fisheries, Benthic, and Oceanographic Data Collected by Revolution Wind**

| Survey | Vessels | Duration | Timing | Survey days | Est. Total Cost |
|---|---|---|---|---|---|
| Bottom Trawl | 1 | August 2023 – January 2028 (dependent on construction completion) | Quarterly | 5 days/survey per season | $3,600,000 |
| Ventless Lobster Trap | 2 | May 2023 – November 2028 (dependent on construction completion) | May-November Two 5-day soaks per month | 3 days/vessel per month | $4,790,000 |
| Highly Migratory Species Acoustic Telemetry | 1-3 for receiver maintenance and tagging | 2022 – 2026 | 2-3 receiver downloads/year. Tagging trips occur during the summer | Varies | $680,000 |
| Hard Bottom Benthic | 1 | 2024-2029 Y0, Y1, Y2, Y3, Y5 | Late summer/early fall | 7 est. | $3,250,000 |
| Soft Bottom Benthic | 1 | 2024-2029 Y0, Y1, Y2, Y3, Y5 | Late summer/early fall | 7 est. | $3,250,000 |
| POWERON | - | 2024-2027 | Year-round | - | $732,000 |
| Cod Spawning Monitoring | 1 | 2024-2026 | November 1 - March 31 | 150 days/ per year | $1,100,000 |

As stated in the Revolution Wind Fisheries Monitoring Plan, 'Fisheries monitoring data will be shared with regulatory agencies and interested stakeholders upon request. Data sharing will occur on an annual cycle, which may be unique to each survey, and all data will be subject to rigorous quality assurance and quality control criterion prior to dissemination.' Revolution Wind will share these data upon request and work with NMFS NEFSC on the best method of sharing data (e.g. email, file sharing, physical drop off). These data are not to be shared without the authorization of Revolution Wind.

**Revolution Wind**

## Appendix D

## Draft Implementation Agreement between
## Revolution Wind, LLC and NMFS NEFSC

IMPLEMENTATION AGREEMENT
BETWEEN
REVOLUTION WIND, LLC
AND
THE NMFS NORTHEAST FISHERIES SCIENCE CENTER
FOR SURVEY MITIGATION
WITHIN RENEWABLE ENERGY LEASE NUMBER OCS-A 0486

This Implementation Agreement regarding the Establishment of Survey Mitigation (the **"Implementation Agreement"**) is made between Revolution Wind, LLC (**"Revolution Wind"**) and the National Marine Fisheries Service Northeast Fisheries Science Center (**"NMFS NEFSC"**) (each a **"Party"** and, together, the **"Parties"**).

1.  BACKGROUND:

    a.  Revolution Wind holds U.S. Bureau of Ocean Energy Management Renewable Energy Lease No. OCS-A 0486 (the "Lease"), which covers an area of the Atlantic U.S. Outer Continental Shelf ("OCS") offshore Rhode Island and Massachusetts.

    b.  On November 17, 2023, BOEM approved the Construction and Operations Plan ("COP") for the Revolution Wind Farm and the Revolution Wind Export Cable Project (collectively, the Project) subject to certain conditions (the "Conditions of COP Approval").

    c.  BOEM assesses impacts of offshore wind energy development under multiple statutes and has an obligation to ensure that energy development is carried out in a manner that provides for protection of the environment and ensures a fair return to the United States, among other considerations.

    d.  Revolution Wind is required by Condition 6.3 of the Conditions of COP Approval ("COP Approval Condition 6.3") to enter into a survey mitigation agreement with the National Marine Fisheries Service ("NMFS") that describes how Revolution Wind Lessee will mitigate Project impacts on the nine (9) NMFS surveys that overlap with the Project (the "Impacted NMFS Surveys"), or to submit a survey mitigation plan for BOEM's review in consultation with NMFS.

    e.  The Project area, for purposes of this Implementation Agreement (the "Project Area"), is the area of the OCS covered by the Lease in which Revolution Wind has constructed wind turbine generators ("WTGs") and offshore substations ("OSSs"), s including a one- (1) mile buffer around such WTGs and OSSs.  For the avoidance of doubt, the areas covered by cables for the Project are excluded from the Project Area, except to the extent they fall within the aforementioned one- (1) mile buffer, due to the absence of impacts to the Impacted NMFS Surveys.

1

f.  Both Parties acknowledge that Revolution Wind has not developed the entire area of the OCS covered by the Lease for purposes of the Project, and that such remaining area has therefore been removed from consideration of survey impacts.  For additional information pertaining to the Project Area, refer to Exhibit A of the Implementation Agreement.

g.  On May 3, 2024, BOEM granted Revolution Wind a variance from Condition 6.3 of the Conditions of COP Approval, extending the deadline for executing a mitigation agreement with NMFS and submitting the agreement to BOEM from 120 days after COP approval to one year plus 180 days after COP approval, as well as extending the deadline for submitting a survey mitigation plan to BOEM in the alternative.

h.  The Parties have agreed to a two-tiered approach to address survey mitigation through a mitigation agreement, consisting of an Agreement in Principle and this Implementation Agreement.

i.  Revolution Wind entered into an Agreement in Principle (Exhibit B) with NMFS NEFSC on May 21, 2025.  The Agreement in Principle was executed within a grace period honored by BOEM, the U.S. Bureau of Safety and Environmental Enforcement ("BSEE"), and NMFS for adherence to the extended timeline in BOEM's May 4, 2024 variance approval.

j.  The Agreement in Principle satisfied COP Approval Condition 6.3; reflected the mutual agreement between NMFS NEFSC and Revolution Wind for Tier 1 of the approach; established a framework for Revolution Wind to meet its obligations under COP Approval Condition 6.3 through execution of an agreement with NMFS; and provided for development of a detailed Implementation Agreement.

k.  The Agreement in Principle required Revolution Wind and NMFS NEFSC to negotiate in good faith to reach a mutually agreeable Implementation Agreement, including a requirement for NMFS NEFSC to provide data and methodologies for calculating impacts to surveys, the adjustment plan for impacted surveys, and allocating responsibility for survey impacts among various offshore wind projects.

l.  NMFS NEFSC provided a cost model to Revolution Wind on June 10, 2025, per Section 4b of the Agreement in Principle, which provides the basis for the monetary contribution as outlined in Subsection 4.a of this Implementation Agreement.

m.  Based on the information provided in the cost model, and applying a five-year post-construction adjustment period to determine adjustments to surveys—which timeframe is consistent with similar adjustment assumptions related to offshore wind, the Parties have determined that the mitigation measures included herein will constitute compliance with COP Approval Condition 6.3.

n.  Revolution Wind is committed to providing data contributions to NMFS NEFSC (as outlined in Section 3 and Exhibit C of this Implementation Agreement) to aid in the

2

adjustment of the Impacted NMFS Surveys for continuation of data collection within the developed Revolution Wind lease area.

    o.  Revolution Wind has sited the Project to avoid and minimize impacts to multiple resource groups.  Because these mitigations may not avoid all impacts, NMFS NEFSC acknowledges that data and monetary contributions from Revolution Wind will mitigate scientific survey impacts to provide compliance with COP Approval Condition 6.3.

    p.  Revolution Wind and NMFS NEFSC verify that the Agreement in Principle when carried out with the Implementation Agreement will mitigate adverse impacts to surveys for the project thus satisfying thus satisfying COP Approval Condition 6.3.

2.  PURPOSE:  This Implementation Agreement establishes a process that will mitigate the Project's impacts on the Impacted NMFS Surveys, including by aiding in the adjustment of the Impacted NMFS Surveys to enable continuation of data collection within the Project Area, for the purpose of accomplishing Revolution Wind's compliance with Condition 6.3 of the Conditions of COP Approval. This Implementation Agreement represents the second tier of the two-tiered approach as outlined in the Agreement in Principle. This Implementation Agreement also establishes amounts, payment schedules, and other requirements for which Revolution Wind to support NMFS NEFSC survey mitigation.

3.  UNDERSTANDINGS OF THE PARTIES:

    a.  The Parties hereby acknowledge and agree that this Implementation Agreement sets forth the requirements for Revolution Wind to provide mitigation to NMFS NEFSC for the adjustment of the Impacted NMFS Surveys in order to generate data equivalent to data generated by the Impacted NMFS Surveys for the duration of Project within the Project Area, as contemplated by set forth in COP Approval Condition 6.3.

    b.  The Parties further hereby acknowledge and agree that, by executing this Implementation Agreement, Revolution Wind should be deemed by BOEM to have complied with COP Approval Condition 6.3.  Specifically, the Parties agree that the mitigation requirements in Section 4, constitute full and complete mitigation of Project impacts on the Impacted NMFS Surveys in the Project Area.

4.  MITIGATION REQUIREMENTS:

    a.  Monetary Contribution:

        i.  Annual Funding Amount: Revolution Wind shall provide annual monetary contribution of Four Hundred and Seventy Four Thousand and 00/100 Dollars ($474,000) per year to NMFS NEFSC for the duration of the funding period, as outlined in Subsection 4.a.ii.  This amount was determined pursuant to the NMFS NEFSC-provisioned cost model, which states that an offshore wind

3

project's contribution to NOAA Fisheries and BOEM's Survey Mitigation Program should be $7.42 per acre per year. Revolution Wind's Project Area is 63,815 acres in size, as further described in Exhibit A. Therefore, the final amount would be $473,507 per year. A chart showing the acreage of the Project Area is attached as Exhibit A.

ii.   Funding Period: Revolution Wind shall provide annual funding to NMFS NEFSC pursuant to Subsection 4.a.i, for a period of five years.  A five-year post-construction adjustment period is in line with similar assumptions related to offshore wind, as it is understood that the adjustments implemented within the five-year period will carry forward for the life of the Project.

iii.  Custodial Administrator: NMFS NEFSC has a memorandum of understanding ("MOU") with Atlantic States Marine Fisheries Commission ("ASMFC") to oversee regional survey mitigation program implementation. This MOU will allow ASMFC to receive contributions from offshore wind developers. The contributions will be used to fund survey mitigation activities. The MOU is attached as Exhibit D.

iv.   Financial Agreement: ASMFC shall serve as custodial administrator of monetary contributions from Revolution Wind to NMFS NEFSC that serve as mitigation. Revolution Wind will begin working with ASMFC to establish a separate agreement between Revolution Wind and the ASMFC within ninety (90) days of the Effective Date (as defined below) of this Implementation Agreement.

v.    First Payment: Revolution Wind shall provide the first annual funding payment within ninety (90) days after execution of the Financial Agreement.

vi.   Subsequent Payments: Subsequent payments shall be made by the anniversary of the first payment in each of the successive four years.

vii.  Maximum Funding:  The total of Revolution Wind's annual payments shall be Two Million Three Hundred and Seventy Thousand and 00/100 Dollars ($2,370,000) (the "Total Amount"), which is equivalent to Four Hundred and Seventy Four Thousand 00/100 Dollars [$474,000] per year for a total of five (5) years. Revolution Wind shall have no financial obligation or liability to NMFS NEFSC under this Implementation Agreement beyond the Total Amount.

viii. Utilization of Funding: NMFS NEFSC shall only use Revolution Wind's monetary contributions in a manner that is appropriate and relevant to aiding NMFS NEFSC in adjusting the Impacted NMFS Surveys for continuation of data collection within the Project Area.

4

b.  Data Sharing:

   i.  Revolution Wind Data: Revolution Wind has collected and will be collecting non-proprietary environmental and biological data that may be useful to NMFS NEFSC in furtherance of the Survey Mitigation Program.  Revolution Wind will share available data as reasonably requested by NMFS NEFSC, within the following categories, as further described in Exhibit C:

      1.  Oceanographic Data
      2.  Bathymetric and Habitat Data
      3.  Acoustic Telemetry Receiver Network
      4.  Trawl Survey
      5.  Ventless Trap Survey
      6.  Cod Monitoring
      7.  POWERON
      8.  Benthic Monitoring

   ii.  Ownership: Notwithstanding any sharing with NMFS NEFSC, Revolution Wind shall retain all right, title, and interest to the data.  Revolution Wind hereby grants NMFS NEFSC a fully paid-up, non-exclusive license to use any shared data in connection with the Survey Mitigation Program.

   iii.  Sharing: Revolution Wind shall make commercially reasonable efforts to share available, relevant, and non-confidential data within the categories listed in Subsection 4.b.i, promptly upon reasonable request by NMFS NEFSC. Revolution Wind makes no express or implied warranty as to the accuracy, completeness, or fitness for any purpose of such shared data, and shall have no liability for NMFS NEFSC's use of such shared data.

5.  GENERAL PROVISIONS:

   a.  Points of contact:
       The point of contact for NMFS NEFSC is the Director (Jonathan Hare, PhD; jon.hare@noaa.gov)
       Phone: (774) 392-3113

       The point of contact for Revolution Wind, LLC is the Head of Northeast Permitting (Melanie Gearon, MELGE@orsted.com)
       Phone: (857) 348-3261

   b.  Funds and Personpower:

      i.  Funds for work conducted by the NMFS NEFSC team will be provided as outlined under Subsection 4.a of the Implementation Agreement through the annual contribution from Revolution Wind to AMFSC, who serve as custodial

administrator of monetary contributions in association with this agreement. Revolution Wind shall have no financial obligation or liability to NMFS NEFSC under this Implementation Agreement beyond the Total Amount, including—but not limited to—for loss of or damage to survey equipment within the Project Area.

ii.   Work may be performed by partners to NMFS NEFSC, which may include other federal agencies, state governments, academics, environmental non-governmental organizations, or tribes. Notwithstanding the foregoing, Revolution Wind shall have no obligation or liability to any such partners under this Implementation Agreement.

c.   Access to the Project Area:  Revolution Wind shall have no responsibility for the conduct of the Impacted NMFS Surveys other than with respect to the mitigation requirements set forth in Section 4.  Notwithstanding the foregoing, Revolution Wind will communicate and coordinate with the NMFS NEFSC team for deconfliction of all Impacted NMFS Survey activities with Project construction and operations within the Project Area.  Revolution Wind will establish, and share with NMFS NEFSC, protocols for communication and timelines for providing any applicable notices. Any vessels entering the Project Area shall adhere to all applicable safety zones. Further, NMFS NEFSC will work with Revolution Wind to ensure that there are no conflicts with assets and ongoing wind farm construction and operations.

d.   Data Access and National Security:  NMFS NEFSC shall be responsible for ensuring adequate coordination with the Navy or other military branches to ensure that national security interests are protected in the course of activities associated with the Impacted NMFS Surveys.

e.   Scientific Integrity:  All work performed by the NMFS NEFSC team pursuant to this Implementation Agreement shall comply with the DOI Scientific Integrity Policy posted to http://www.doi.gov, or its equivalent as provided by the organization performing the work or by state law.

f.   Modification of Implementation Agreement:  This Implementation Agreement may be modified or amended at any time by mutual agreement of both Parties in writing.

g.   Cooperation with other organizations:  This Implementation Agreement in no way restricts the Parties involved from participating with other public or private agencies, organizations, or individuals.  All Parties recognize the importance of continuing cooperation and participation with environmental non-governmental organizations, tribal organizations, and institutions in programs of mutual interest.

h.   Existing authorities:  The Parties intend to conduct the activities contemplated in this Implementation Agreement in accordance with existing authorities.  If any provisions of this Implementation Agreement are determined to be inconsistent with existing laws, regulations, or directives governing the signatories, then the provisions of this

6

Implementation Agreement not affected by a finding of inconsistency will remain in effect.

i. Successors and Assigns: This Implementation Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

j. No Third-Party Beneficiaries: The Parties do not confer any rights or remedies upon any person other than the Parties to this Agreement and their respective successors and assigns.

k. Non-Precedent: The Parties recognize and acknowledge that each offshore wind project stands alone and must be evaluated on its own merits, and that this Implementation Agreement does not provide a binding precedent for future offshore wind projects.

l. Effective date:  This Implementation Agreement becomes effective as of the date when it has been signed by both Parties (the "Effective Date").

m. Disputes:  The Parties agree to make every attempt to settle any disputes regarding this Implementation Agreement at the lowest operational level.  In the case of any substantial disagreement between NMFS NEFSC and Revolution Wind with respect to any matters or activities subject to this Implementation Agreement, the Parties will each designate a senior management official and endeavor to resolve the matter as soon as possible.

n. Severability: If any part of this Agreement is found to be unenforceable, the rest will remain in full force and effect and shall be interpreted so as to give full effect to the intent of the Parties.

o. Responsibility and Liability: NMFS NEFSC shall be solely responsible for all equipment, personnel, and other necessities for conducting surveys within the Project Area, including harm to survey personnel or loss of, or damage to, survey equipment. Revolution Wind shall have no obligation or liability to NMFS NEFSC in connection with this Implementation Agreement other than with respect to the mitigation requirements set forth in Section 4.  Under no circumstances shall Revolution Wind's liability to NMFS NEFSC under this Implementation Agreement exceed the Total Amount.

p. Entire Agreement: This Implementation Agreement, together with the Agreement in Principle executed on May 21, 2025, constitutes the entire agreement of the Parties as to the subject matter hereof, and supersedes any and all prior oral or written agreements of the Parties.

**IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the Effective Date.**

REVOLUTION WIND, LLC,                                FOR NMFS NEFSC:
by its agent,
Orsted Wind Power North America LLC


_____          _____
Ryan Chaytors                                              Jon Hare
Authorized Person                                         Director
Revolution Wind, LLC                                   NMFS Northeast Fisheries Science Center
Orsted Wind Power North America, LLC


_____          _____
(Date)                                                         (Date)

8

**EXHIBIT A**

REVOLUTION WIND PROJECT AREA

**EXHIBIT B**

AGREEMENT IN PRINCIPLE
BETWEEN
REVOLUTION WIND, LLC
AND
THE NMFS NORTHEAST FISHERIES SCIENCE CENTER
FOR SURVEY MITIGATION
WITHIN RENEWABLE ENERGY LEASE NUMBER OCS-A 0486

**EXHIBIT C**

REVOLUTION WIND
NON-PROPRIETARY ENVIRONMENTAL AND BIOLOGICAL DATA

**EXHIBIT D**

MEMORANDUM OF UNDERSTANDING
BETWEEN
ATLANTIC STATES MARINE FISHERIES COMMISSION
AND
THE NMFS NORTHEAST FISHERIES SCIENCE CENTER