```
1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
2       - - - - - - - - - - - - - - - x
        REVOLUTION WIND, LLC,
3                                          CA No: 1:25-cv-02999-RCL
                     Plaintiff,
4                                          Washington, D.C.
                                           Monday, September 22, 2025
5       v.                                 11:08 a.m.

6       DOUGLAS J. BURGUM, et al.,

7                    Defendants.
        - - - - - - - - - - - - - - - x
8       _____

9           TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
          HELD BEFORE THE HONORABLE ROYCE C. LAMBERTH
10                  UNITED STATES DISTRICT JUDGE
        _____
11      APPEARANCES:
        For the Plaintiff:      JANICE M. SCHNEIDER, ESQ.
12                              LATHAM & WATKINS LLP
                                555 11th Street, NW, Suite 1000
13                              Washington, DC 20004-1304
                                (202) 637-2200
14                              janice.schneider@lw.com

15      For the Defendants:     PETER MARTIN TORSTENSEN, JR, ESQ.
                                KRISTOFOR R. SWANSON, ESQ.
16                              DOJ-ENRD
                                950 Pennsylvania Ave NW
17                              Washington, DC 20530
                                (202) 598-9646
18                              peter.torstensen@usdoj.gov
                                kristofor.swanson@usdoj.gov
19
        For Green Oceans:       ROGER JOSEPH MARZULLA, ESQ.
20                              MARZULLA LAW, LLC
                                1150 Connecticut Avenue NW, Suite 1050
21                              Washington, DC 20036
                                (202) 822-6760
22                              roger@marzulla.com

23      Court Reporter:                 Lisa A. Moreira, RDR, CRR
                                        Official Court Reporter
24                                      U.S. Courthouse, Room 6718
                                        333 Constitution Avenue, NW
25                                      Washington, DC  20001
                                        (202) 354-3187
```

```
1                    P R O C E E D I N G S

2            THE COURTROOM DEPUTY:  Good morning, Your Honor.

3    We are on the record in Civil Case 25-2999, *Revolution Wind,*

4    *LLC v. Douglas J. Burgum, et al.*

5            Starting with plaintiff's counsel, please approach

6    the podium and state your appearance for the record.

7            MS. SCHNEIDER:  Good morning, Your Honor; Janice

8    Schneider with Latham & Watkins on behalf of plaintiff,

9    Revolution Wind.

10           THE COURTROOM DEPUTY:  For defendants?

11           MR. TORSTENSEN:  Good morning, Your Honor; Peter

12   Torstensen on behalf of the federal defendants.

13           THE COURT:  Okay.

14           All right.  The plaintiffs may proceed.

15           Oh, go ahead.

16           MR. MARZULLA:  And good morning, Your Honor; for

17   defendant intervenor Green Oceans, I am Roger Marzulla.

18           THE COURT:  Okay.  Plaintiffs may proceed.

19           MS. SCHNEIDER:  Thank you, Your Honor.  With the

20   Court's permission, I'd like to reserve five minutes for

21   rebuttal.

22           THE COURT:  Sure.

23           MS. SCHNEIDER:  Thank you.

24           Following no process under statute or regulation,

25   the government changed its position and suspended work on a
```

1    previously approved project at a critical stage of

2    construction with no notice, no allegation of violation, no

3    meaningful explanation, no consideration of Revolution

4    Wind's reliance interests, and no due process whatsoever

5    imposing enterprise-level existential harm to the company.

6              The project was first approved in 2023 after a

7    decade of environmental, national defense, and safety

8    reviews involving more than 15 state, federal, and local

9    agencies.  The 704-megawatt project is now 80 percent built.

10   All of the turbine foundations are in, and approximately 70

11   percent of the wind turbines are up.  It will provide power

12   to more than 350,000 homes and businesses in a region that

13   desperately needs low-cost and reliable energy.  The New

14   England independent system operator, which runs the grid up

15   there, and the states of Connecticut and Rhode Island have

16   all said that this unprecedented and, I will add, unlawful

17   move threatens grid reliability.  The stop work order has

18   already cost Revolution Wind approximately $70 million.

19             The Bureau of Ocean Energy Management's August

20   22nd stop work order was issued based on unsubstantial

21   concerns in violation of required procedure, due process

22   protections, and is contrary to law and is arbitrary and

23   capricious.  Now the government offers up post hoc

24   allegations in a declaration that are so weak it simply

25   underscores the arbitrary and pretextual nature of the

1    government's stop work order.

2              The stop work order violates both OCSLA, the

3    Administrative Procedure Act, and the U.S. Constitution, and

4    that's the Outer --

5              THE COURT:  At the time the stop work order was

6    issued, there was no reason given other than review.  Right?

7              MS. SCHNEIDER:  Correct, Your Honor.

8              THE COURT:  So they had no basis whatsoever.  They

9    just said, "Stop work.  We're going to review it."

10             MS. SCHNEIDER:  That is correct, Your Honor.

11             THE COURT:  So that's the height of arbitrariness,

12   from your point of view.

13             MS. SCHNEIDER:  That is exactly correct, Your

14   Honor.

15             THE COURT:  All right.  And now they're coming up

16   with an explanation of national security concerns and other

17   concerns in the assistant secretary's letter.

18             MS. SCHNEIDER:  That is correct, Your Honor.

19             THE COURT:  But at the time they ordered the stop

20   work, they had nothing other than we're going to look at it.

21             MS. SCHNEIDER:  I'm sorry.  Say again?

22             THE COURT:  They had nothing other than we're

23   going to look at it.

24             MS. SCHNEIDER:  That's correct, Your Honor.

25             THE COURT:  And that incurred this cost of $70

1  million.

2        Now, tell me how that $70 million was incurred.

3        MS. SCHNEIDER:  So in order to immediately comply

4  with this effective order, we had to demobilize our entire

5  work force.  We had 18 vessels out on the lease, you know,

6  lawfully constructing the project consistent with the 350

7  construct and operation plan conditions that we need to

8  comply with.  So we had a lot of people involved, hundreds

9  of workers, both onshore and offshore, having to move all of

10  the various equipment, you know, to the area, out to sea, et

11  cetera, and we had to immediately demobilize.  So those

12  workers are all idled, Your Honor.  The boats are no longer

13  on the lease site.

14        You know, in a manner that is consistent with the

15  stop work order they have allowed us to make sure that some

16  work has continued to prevent, you know, safety-related

17  issues, you know, to sort of tie things up while we wait.

18  But every day that goes by it costs the project $2.3

19  million.

20        THE COURT:  All right.  Do you use that figure in

21  persuading me to issue this -- I set this hearing for today.

22  Tell me how you're injured going forward then.

23        MS. SCHNEIDER:  Well, there are a number of ways

24  that we are injured going forward.

25        First, just to step back for a moment, the

1    project's sole and exclusive function is to build the

2    project on this lease.  That's its only business.  It is a

3    joint venture between companies.  And under the joint

4    venture agreement, you know, neither company can

5    unilaterally increase the project's budget.  It just can't

6    be done.

7         The harm comes from the need to do the work

8    expeditiously, and I'm going to walk through for Your Honor

9    just what the work is that needs to be done so that you can

10   understand why we need relief now.  Because if we can't do

11   Step 1, we can't get the work done.

12        So it's going to take approximately three months

13   from now for us to finish critical work, including putting

14   -- finishing the offshore substation.  There's a 3,000-ton

15   top side sitting on a boat in a bay waiting to be built.

16        We have to finish the array cable construction

17   between --

18        THE COURT:  And that's the boat you have to have

19   now because you can't get it for another three years.

20        MS. SCHNEIDER:  That's correct.  That's called the

21   WHITE MARLIN, Your Honor.  That's exactly right.

22        But just to go back to the timeline.  So we need

23   three -- we need to finish before mid-December because two

24   key boats can leave even if the work is not complete, WHITE

25   MARLIN and the SEAWAY AIMERY.

1          Then we need one to two months to prep the

2    facilities after we complete construction; prep the

3    facilities to energize them, to make sure that they're ready

4    to take the electricity that's going to be generated.

5          We then need seven months to actually energize the

6    facilities and test the facilities once we get first power.

7    That involves ramping up every single wind turbine

8    generator.  We have to run them for ten days each.  There

9    are 65 of them.  So it takes time.  And then we need to test

10   the whole system to make sure it's working together, that

11   it's all communicating together and can actually, you know,

12   deliver energy to the New England grid.

13          And so, you know, as I said, we need to get the

14   work done while we have the vessels.  It took us years to

15   contract these vessels.  There's no guarantee that these

16   vessels will be available, and we do know that the SEAWAY

17   AIMERY is under contract until 2028, so we definitely --

18          THE COURT:  So it's 2028 before you can get the

19   vessel again.

20          MS. SCHNEIDER:  Before we can get that vessel back

21   if we don't do the work now.

22          The other thing I'll mention that's really

23   important and why we've asked for relief today is the

24   weather is a real issue.  It's not something we can control.

25   The project is in the north Atlantic.  So I don't know if

1    you saw "The Perfect Storm," but it can get pretty rough up

2    there.  And as we get further into winter, the weather just

3    gets worse.  The seas get rougher, and it's harder to do

4    work safely, which we have to do.  And if there isn't a

5    weather window available to do the construction work, we

6    can't do the construction work.

7              So between the vessels and them being able to

8    leave and the worsening weather as we get into the winter --

9    and this is a matter of historical record -- we've got to

10   have relief now in order to have any real opportunity of

11   finishing Step 1, so that we can then get on to Steps 2, 3,

12   4, 5, and 6 and meet our commercial operation dates as

13   required under our contractual power of purchase agreements.

14             THE COURT:  And Step 1 is three months.

15             MS. SCHNEIDER:  Step 1 is three months, Your

16   Honor.

17             THE COURT:  I understand.

18             MS. SCHNEIDER:  Just to go back to the merits,

19   Your Honor, just to sort of underscore in terms of

20   likelihood of success on the merits.  You know, we have a

21   lot of arguments in our briefs, of course.  I want to focus

22   on three, and Your Honor touched on them briefly at the

23   outset.

24             But the three that I want to focus on is the

25   government's complete failure to follow its own statutory

1   and regulatory procedures, its complete failure to consider

2   reliance interests in the face of a clear change of

3   position, and the stop work order's complete failure to

4   articulate a reasoned explanation for its issuance.  Our

5   perspective is that the declaration that was filed does not

6   cure that infirmity.  It's incorrect factually, and it is a

7   post hoc declaration.

8           Your Honor, on the first point, the government

9   simply doesn't grapple with the text of OCSLA or its

10  implementing regulations.  The government, in fact, admits

11  that it didn't invoke any -- any -- of these provisions or

12  follow any of its own rules.  Interior does not have

13  inherent authority to issue the stop work order.  Its

14  authority is limited to what Congress gave to it.

15          And when you look at the statute, Section

16  1337(p)(4) does not confer blanket authority to order a halt

17  or to suspend previously authorized activities.  And, Your

18  Honor, Interior has never taken this position before.

19          I will say it's also at odds with other sections

20  of OCSLA, including 43 USC 1341(c) and 1341(d), which are

21  other provisions in the statute governing suspensions.

22          OCSLA and its regulations set out a clear process.

23  Congress did tell the department and the secretary to go

24  draft regulations, and they did.  And they're extensive

25  regulations.  And if there's a violation of your approval,

1    the process requires that the government issue a notice of

2    noncompliance under 30 CFR 585.106 to take corrective

3    action.  And in that notice, Your Honor, it will tell you

4    how you failed to comply, what you must do to correct the

5    noncompliance, and within what time frame you have to

6    correct the noncompliance.

7         THE COURT:  And they did not do that here.

8         MS. SCHNEIDER:  They did not do that, Your Honor.

9         And if you fail to comply, then a different agency

10    with the Interior department, the Bureau of Safety and

11    Environment Enforcement, which I'll call "bess-ee," can

12    issue a sanction order under 30 CFR 285.401, and in the

13    cessation order, BSEE will set forth what measures you're

14    required to take in order to receive approval to resume

15    activities on your lease.

16         BSEE can also issue a notice of noncompliance

17    under 30 CFR 285.400(c).  And guess what?  BSEE's notice of

18    noncompliance will tell you how you failed to comply, will

19    specify what you must do to correct the noncompliance and

20    the time limits in which you need to act.

21         None of these things occurred.  On its face the

22    stop work order issued by BOEM does none of this.

23         The government also has authority to issue a lease

24    suspension, but that can only be issued under defined

25    circumstances in the regulations.  Those regulations are 30

1    CFR 585.417 and 30 CFR 285.417.  Nor did the Department of

2    Defense invoke its authorities for a lease suspension under

3    OCSLA, which I referred to earlier.

4         The government, Your Honor, has utterly failed to

5    follow its governing statute and its own rules and is now

6    arguing that the statutory and regulatory scheme is somehow

7    optional.  To suggest now that Revolution will get more

8    process if it were actually violating the terms of its

9    approval cannot be squared with applicable law.  And I would

10   add, Your Honor, that this new federal interpretation should

11   be given absolutely no deference.

12        The second point is with respect to change in

13   position.  The government argues it has not changed its

14   position, and that's simply not credible.  The Construction

15   Operation Plan Condition 5.1 provides that the effective

16   date for authorizing construction is the date of when it was

17   issued.  That's effectively the notice to proceed, and that

18   was August 21, 2023, over two years ago.

19        The stop work order halts construction.  That,

20   plain and simple, is a change in position, and Revolution

21   Wind's reliance interests, the billions of dollars invested

22   constructing the project over just the last two years, and

23   the workers and the jobs and the hundreds of thousands of

24   manhours put into this project and the needs of the state

25   that planned for this electricity to come online on time

1    must all be considered.  And, Your Honor, they were not.

2    And that violates the law.

3              And then third, based on the new declaration, they

4    identify -- well, let me step back.

5              When you look at the order -- here's the order.

6    It's one page, right?  It gives no real reason.  It's

7    extremely abbreviated.  What little it does say -- national

8    security and the prevention of interference to other

9    reasonable uses, that's all it says.

10             THE COURT:  It says they're going to review that.

11             MS. SCHNEIDER:  It says they're going to go on to

12    review it, not that they finished it.

13             THE COURT:  Right.

14             MS. SCHNEIDER:  Exactly, Your Honor.

15             So this new declaration that they provided --

16    which they provided for the very first time to us in this

17    litigation -- is the first time we've heard about these

18    concerns and are completely different from what the

19    administration has been saying in the press and on TV.  And

20    I would urge the Court to review the secretary's statements

21    cited in our brief --

22             THE COURT:  I saw what you said in your brief.

23    The secretary is saying something totally different.

24             MS. SCHNEIDER:  Totally different.

25             THE COURT:  Right.

```
 1              MS. SCHNEIDER:  Totally different.

 2         And the new reasons, Your Honor, given by the

 3    declaration, they just don't hold water when you actually

 4    look at the record.  The declaration is incomplete, and,

 5    candidly, it's uninformed.  The declaration is not credible,

 6    and it should be given no weight.

 7         And importantly, nowhere -- nowhere -- in that

 8    declaration does the declarant explain why halting

 9    construction would mitigate any of the concerns that are

10    being raised.  And, in fact, there's just no nexus, and this

11    is the hallmark of arbitrary and capricious behavior.

12         And if the Court wants to probe, I could also

13    point you to a hearing recently where the declarant was

14    being questioned by members of Congress and was unable to

15    answer why the stop work order was issued and, in fact, did

16    not talk about any of the things in his declaration.  So if

17    the Court would like to see that, we're happy to file that

18    clip with the Court.

19         The bottom line is there are four buckets of

20    issues raised in the declaration.

21              THE COURT:  When were those hearings?

22              MS. SCHNEIDER:  They were in early September, Your

23    Honor.

24              THE COURT:  And where were they?

25              MS. SCHNEIDER:  I believe they were here before
```

1        the House of Representatives subcommittee hearing.

2                    THE COURT:  They were public hearings?

3                    MS. SCHNEIDER:  Yes, Your Honor.

4                    So going back to the four issues raised in the

5        declaration, two are related to the Navy, and here's the

6        bottom line of the facts.  Revolution Wind consulted with

7        the Navy on the export cable technology, and the survey

8        activities provided the Navy with hundreds of pages of

9        information, and we continue to routinely consult with them.

10       The Navy has --

11                   THE COURT:  Prior to the stop work order the Navy

12       never told you that there was any problem.

13                   MS. SCHNEIDER:  That is correct, Your Honor.

14                   THE COURT:  Okay.

15                   MS. SCHNEIDER:  That is correct, Your Honor.

16                   THE COURT:  And even now you have not been told

17       there was a problem.  It's just they're going to review

18       that.

19                   MS. SCHNEIDER:  That is correct, Your Honor.

20                   THE COURT:  Even with the Suess declaration.

21                   MS. SCHNEIDER:  That is correct, Your Honor.

22                   We have gone through the clearing process with the

23       Department of Defense.  We have an agreement with the

24       Department of Defense where the Department of Defense says

25       it does not have concerns.

```
 1              The second two issues are related to the National

 2    Oceanic and Atmospheric Administration, which I'll call

 3    NOAA, N-O-A-A.  One is related to survey mitigation where we

 4    document in our rebuttal declarations that we are in a

 5    regional process requested by the government, and the other

 6    is related to cod spawning, which ignores all of the

 7    conditions that the company -- that the project complied

 8    with to protect cod.  And the other point is that most of

 9    that work was already done before the stop work order was

10    issued.

11              So we have two rebuttal declarations from those

12    individuals who were actually involved in furthering and

13    complying with these conditions.  They have decades of

14    experience, including with the Navy and the U.S. Coast

15    Guard, and I would urge the Court to take a close look at

16    those.

17              I can go into more detail on those, but I wanted

18    to stop and see if you had any specific questions related to

19    those.

20              THE COURT:  That's all I have for now.

21              MS. SCHNEIDER:  Thank you, Your Honor.

22              We talked about irreparable harm, Your Honor.

23    Again, you know, I just want to underscore that with each

24    passing day the risk of not meeting the deadlines and having

25    the power purchase agreements terminated goes up.
```

```
 1              THE COURT:  Tell me how it's irreparable.

 2              MS. SCHNEIDER:  Say it again.

 3              THE COURT:  Tell me how it is irreparable.

 4              MS. SCHNEIDER:  Well, I think in terms of

 5     irreparability it goes back to not being able to do the work

 6     on Step 1.  And if we can't do Step 1, we can't finish the

 7     project.  We can't meet our contractual deadlines under the

 8     power purchase agreements on time, and the utilities in

 9     which we have entered into those agreements would have the

10     right to terminate those agreements.  So the entire

11     enterprise falls away.

12              This is not like any of the cases that they cited

13     in their briefs.  This is not CVS and two stores.  This is

14     not Delta Airlines and two planes.  The entire enterprise

15     could fail because of the stop work order, and that, Your

16     Honor, is, you know, the nature of our irreparable harm.

17              So we could lose $5 billion invested --

18              THE COURT:  Already invested.

19              MS. SCHNEIDER:  Already spent or otherwise

20     committed to contractually.

21              THE COURT:  Because you wouldn't be able to

22     complete the project.

23              MS. SCHNEIDER:  That's exactly right, Your Honor.

24     And if the project is terminated, it will cost us another

25     estimated billion dollars -- what we call breakaway costs --
```

1    to wind things down.

2            THE COURT:  Because you spent the $5 billion for

3    nothing then.

4            MS. SCHNEIDER:  That's right, Your Honor.  And so

5    when you think about the public interest here and sort of

6    the balance of harms, I mean, we think that those -- that

7    that balance weighs heavily in favor of an injunction on

8    behalf of Revolution Wind.

9            The government is not harmed if the Court grants a

10   preliminary injunction.  Their ongoing review will not be

11   affected.  Right?  We're just asking for the stop work order

12   to be lifted.

13           The government is all -- Green Oceans, excuse me,

14   is also -- the defendant intervenor is also not harmed.

15   They have litigation pending in front of this Court.  That

16   litigation will continue to go forward.  They can protect

17   their interests in that litigation.

18           But failure to grant the preliminary injunction

19   significantly increases the risk to energy reliability in

20   New England.  The states most affected have said this as has

21   the grid operator.  We're at risk of losing hundreds of

22   well-paying jobs, as the amicus brief articulates very well.

23   And failure to issue a preliminary injunction will result in

24   higher electricity costs for rate payers in New England.

25   This is low-cost, reliable energy, and similarly situated

1    wind farms in the area are operating in a manner comparable

2    to base load plants.

3             This significant harm to the public interest, you

4    know, and the balance of harms therefore weighs heavily in

5    favor of an injunction.

6             Thank you, Your Honor.

7             THE COURT:  Okay.

8             Let me hear from the government.

9             MR. TORSTENSEN:  Good morning, Your Honor.

10            THE COURT:  Good morning.

11            MR. TORSTENSEN:  Peter Torstensen for the federal

12   defendants.

13            Revolution Wind's motion for preliminary

14   injunction should be denied.

15            THE COURT:  Would you pull that mic up so I can

16   hear you.

17            MR. TORSTENSEN:  Yes.  Is that better?

18            THE COURT:  Yes.

19            MR. TORSTENSEN:  In January President Trump

20   directed federal agencies to review existing offshore wind

21   leases, and as part of that ongoing review the Bureau of

22   Ocean Energy Management, or BOEM, identified concerns with

23   Revolution Wind -- with the Revolution Wind project related

24   to national security and the interference with other

25   reasonable uses of federal waters.  Under its general

1    supervisory authority under OCSLA, BOEM issued a stop work

2    order while it investigates those concerns.

3         Revolution Wind is unlikely to prevail on the

4    merits of any of its claims.  I'll start with the statutory

5    argument and then turn to the APA claims.

6         Section 1337(p)(4) grants the secretary

7    supervisory authority for the OCS.  It states the secretary

8    shall ensure that any activity under this subsection is

9    carried out in a manner that provides for 12 enumerated

10   factors.  Among those 12 include the national security

11   concerns and the interference with reasonable uses that were

12   identified in the stop work order.  It's written in the

13   present tense so we understand that to impose an ongoing

14   obligation that extends beyond COP approval.

15        The statutory grant of general powers to manage

16   lands includes the administrative authority necessary to

17   ensure that that statutory obligation is met, and this is

18   from the *Udall* case, 373 U.S. at 479.

19        Now Revolution Wind argues that 1334(a)(1)(B) and

20   1341(c) eliminate any inherent authority, which we would

21   phrase as being statutorily implicit authority, that BOEM

22   had to issue the stop work order, but we believe both of

23   those miss the mark.

24        First of all, 1334(a)(1)(B) refers to the

25   obligations of the secretary to promulgate regulations, to

1  address suspensions of temporary prohibitions, and that's

2  limited to circumstances where there is a threat of serious,

3  irreparable, or immediate harm or damage to life, to

4  property, or to mineral interests.  And we simply are not in

5  that universe here.

6          As it relates to 1341(c), that construes all

7  leases -- that provision construes all leases as containing

8  a provision that vests authority in the secretary upon

9  recommendation from the Secretary of War during a time of

10  war or declared national emergency to suspend all operations

11  on a lease subject to certain conditions.  But this is,

12  again, limited to very particular circumstances involving

13  national emergencies or declarations of war, and it only

14  identifies provisions that need to be included in leases.

15  It does not eliminate the national security issues or the

16  prevention with reasonable -- the prevention of interference

17  with reasonable uses of the Outer Continental Shelf under

18  1337(p)(4), nor does it address any of the remaining (p)(4)

19  factors.

20          We think there is too much emphasis placed on the

21  use of the term "inherent."  We are primarily arguing that

22  BOEM has the general -- because they have the general

23  authority to manage or supervise lands to ensure statutory

24  compliance, even if the statute doesn't expressly say so.

25          So we can move on to whether or not the order

1    itself complied with the requirements of the APA.

2            First of all, we would say that the order does, in

3    fact, meet all the requirements that it would need to to

4    demonstrate the agency's rationale.  Namely, it includes the

5    reason why they were engaged in a review, which is that

6    review was undertaken pursuant to the presidential memo; it

7    identifies specific concerns, national security and the

8    interference with the reasonable uses of the OCS; and it

9    identifies the statutory authority that they relied on in

10   issuing the order, which is 1337(p)(4).

11           THE COURT:  Well, when the original decision was

12   made by the administration prior to this one, and the $5

13   billion was committed, all of those findings were made that

14   national security was protected.  All of those other

15   findings were made.

16           And so to come back and say now we're going to

17   review them -- I understand the need to review them, but to

18   now jeopardize all of that and -- because you're reviewing

19   it.  But to stop the work it, seems to me you would need to

20   do more than just say you're going to review it.

21           How do you justify actually stopping the work?

22   All of those decisions -- all the national security

23   implications and everything else was reviewed in the plan,

24   and all the plans were reviewed and approved by the

25   government.  And so this company undertakes it, and they

1    spend $5 billion approved by the government.

2           Now the government wants to come along and say,

3    Oh, you might have thrown away that $5 billion because now

4    we're going to look into whether we think you're complying

5    with all the national security concerns, and you stop work,

6    and it might cost you a billion, it may cost you $5 billion,

7    but stop work while we decide whether you've really complied

8    or not.

9           How is that something reasonable?  And how does

10   that square with -- under APA with what would be not

11   arbitrary and capricious?

12          MR. TORSTENSEN:  Right.  So I would start by

13   saying that the text requires the secretary to exercise

14   ongoing authority, and so even though there was a process

15   beforehand that led to COP approvals under, you know, the --

16          THE COURT:  Well, what process did you have before

17   you issued the stop work order?  They didn't participate --

18   the plaintiffs had no opportunity when the stop order

19   issued.  They say they were simply told to stop work.  You

20   lose.

21          MR. TORSTENSEN:  Correct.  They were told to stop

22   work.  They were told to stop work because, as they were

23   engaging in the process of the presidentially directed

24   review, they identified specific things.  So this was

25   included in the January 31 annual report on COP compliance,

1    and they did identify that there were -- related to I

2    believe it was COP Condition 4.4, COP Condition 6.3, that

3    there were final agreements that had not yet been reached.

4    And even though there were discussions related to those

5    agreements, those final agreements had not been reached even

6    though construction had already started and was obviously

7    well underway.

8         And so identifying -- you know, as we say, there

9    were concerns that were raised relating to whether or not

10   the failure to complete the agreement would warrant further

11   investigation, and they believed that it was necessary at

12   that point in time to stop while they reviewed that.  And

13   that review is ongoing.  So -- and they provided rationale

14   with -- you know, as to why they were engaging in that

15   review.

16        THE COURT:  None of that was cited in the decision

17   to stop work.

18        MR. TORSTENSEN:  The decision to stop work did

19   identify those national security concerns and --

20        THE COURT:  Concerns.

21        MR. TORSTENSEN:  Correct.

22        -- and the Suess declaration, which we believe is

23   permissible under --

24        THE COURT:  Well, even though the post hoc

25   rationale doesn't say that they were doing anything wrong,

1    the grantee.

2          MR. TORSTENSEN:  And they -- you know, the

3    declaration, for one, doesn't, you know, say that they have

4    violated anything.  It says that there are concerns because

5    -- it identifies what those specific concerns were.  And we

6    don't think it's post hoc because, you know, the rationale

7    was, again, related to national security concerns and

8    interference with the uses of the OCS, and the declaration

9    is merely providing additional explanation as to what

10   motivated that August 22nd decision.

11          And so it's not providing new information or post

12   hoc information.  It is simply explaining in more detail

13   what the agency considered when it made the decision.

14          THE COURT:  Now, if that Suess declaration is the

15   reason, why is the secretary out contradicting that, these

16   statements?

17          MR. TORSTENSEN:  I'm not in a position to say

18   why the secretary would say things that appear to

19   contradict that.  All I can say is that the information

20   before Mr. Suess was the fact that they had not entered into

21   those final agreements, and because they had not entered

22   into those final agreements, it presented a concern as to

23   whether or not they complied with -- whether or not there

24   were kind of genuine national security concerns and

25   otherwise that they needed --

1          THE COURT:  Who made the decision to stop work?

2          MR. TORSTENSEN:  I believe that order was issued

3     by acting director -- is it Mac -- Matt Giacona.

4          THE COURT:  That wasn't what I asked.

5          MR. TORSTENSEN:  Who made the decision?  I mean, I

6     believe -- all I know is the person who signed the order,

7     and I believe that was Matt Giacona.

8          THE COURT:  Go ahead with whatever you want to

9     say.

10          MR. TORSTENSEN:  Okay.  Well, then we would say

11    that the evidence for the stop work order we don't believe

12    was contrary to the evidence that was before the agency.  It

13    notes, again, as we said, that national security and

14    interference with other uses, those concerns arose during

15    their review, and the declaration explains further why those

16    were concerns and why that warranted the stop work order.

17    That review is ongoing.

18          THE COURT:  Why would the plaintiffs not have a

19    due process right to know in advance of that decision, then

20    have an opportunity to contest the facts that were being

21    considered by whoever made the decision?  Why wouldn't

22    simple due process require that they know that stop work was

23    being considered when you look at the impact of that stop

24    work order?

25          MR. TORSTENSEN:  So I would say we don't believe

1    that there's a due process violation here in part because

2    those protected interests are sort of subject to the

3    statutory provisions that provide those rights.  And here we

4    have 1337(p)(4), which is part of, you know, the bundle of

5    rights, and that includes the secretary's ongoing obligation

6    to ensure that activities are carried out consistent with

7    that statute, and so those leases would inherently include,

8    you know, or would allow for the need to exercise that

9    authority, which the secretary did here.

10           We think, for one, they've been -- they have not

11   been finally deprived of a property right.  There's a

12   temporary order or at least a review limited to the period

13   necessary to determine whether and to what extent there are

14   national --

15           THE COURT:  You say it's temporary.  What makes me

16   think it's temporary?

17           MR. TORSTENSEN:  You know, I misspoke.  I wasn't

18   trying to say "temporary."  I think it is obviously limited

19   to the period necessary to review whether or not there are

20   indeed national security issues.

21           THE COURT:  How long do we think that review might

22   last?

23           MR. TORSTENSEN:  We can say that, you know,

24   Interior is working expeditiously with -- you know, to

25   interface with the Navy, with NOAA, to determine if the fact

1    that those contracts have not been -- or agreements have not

2    been finalized, whether it presents any concerns related to

3    national security or to interference reasonable uses.  So I

4    can't give a specific timeline, but I can say that they're

5    working expeditiously to reach resolution on that.

6            And the last point I'll note on the due process is

7    they did provide Revolution Wind with the opportunity to

8    appeal that determination to the Interior Board of Land

9    Appeals.

10           THE COURT:  Well, what kind of an appeal would

11   that be?  That board could overturn the secretary's decision

12   or the director's decision.

13           MR. TORSTENSEN:  Right.  I mean --

14           THE COURT:  Give me a break.

15           MR. TORSTENSEN:  Obviously it could.  But, again,

16   the question is whether or not they provide them with

17   process, not whether that process is likely to result in a

18   decision that they want.

19           I'll just say that, you know, I don't think we

20   have -- well, I will say we don't believe that -- contrary

21   to Revolution Wind's position regarding a change in

22   position, we don't believe that there is a change of

23   position here or that that's implicated in part because we

24   have not taken any -- or Interior has not taken any action

25   to rescind the lease, to modify any conditions of the COP

1    approval, and so in that instance we don't believe that

2    there is currently a need to consider reliance interests.

3    That would only arise if they actually took action.

4         Unless Your Honor has any further questions?

5         THE COURT:  I don't have anything further for you.

6         I'll allow Green Oceans to intervene.  If you want

7    to say something, you may.  I had your motion on my six-

8    month list, and I was hoping to get it done by September

9    30th, but obviously I've now spent a lot of time on this, so

10   I'm obviously not going to reach your motion by September

11   30th having to do this in the meantime.  But I understand

12   your motion is -- I would like to get to your motion, too,

13   but -- and it might have mooted this, but I didn't get it

14   done.

15        In any event, whatever you want to say here, you

16   may.

17        MR. MARZULLA:  Well, thank you, Your Honor, and I

18   certainly won't repeat anything that the Court has discussed

19   with counsel for the government.  What I'd like to do is to

20   suggest that we set aside for a moment the discussion of due

21   process and the other merits claims here in that this

22   hearing is with respect to whether a preliminary injunction

23   should issue.

24        As the Court knows, there's certain requirements

25   for that, and I'd like to just address whether the company,

1     Revolution Wind, has, in fact, demonstrated to the Court the

2     kind of irreparable injury that will support a preliminary

3     injunction -- I don't think they have -- and whether they

4     have demonstrated to the Court the kind of balance of

5     equities and public interest that would merit the

6     extraordinary step of issuing a preliminary injunction.

7           Let's talk about irreparable injury for a moment.

8     As the Court knows, back in January of 2024 Green Oceans

9     filed a lawsuit in which it raised these very issues.  Green

10    Oceans's cause of action dealing with the Outer Continental

11    Shelf Lands Act argued that the secretary had erred in

12    setting up a balance in taking the provision that said the

13    secretary shall ensure certain elements with respect to

14    activities on the Outer Continental Shelf and had, instead,

15    said explicitly that she was balancing those against the

16    importance of offshore wind.  And so she didn't really have

17    to ensure things like --

18           THE COURT:  And she hasn't changed her position

19    now in your case.  They're still defending and saying you're

20    wrong in your case, right?

21           MR. MARZULLA:  That -- well, they haven't filed

22    yet, Your Honor, since the May 1, 2025, memorandum which we

23    read as adopting precisely the position that Green Oceans

24    put forward.  So up to -- without a filing, we don't know

25    their new position, but I think if you look at that

1        memorandum, it is now the position of the Interior

2        department that "in fact shall ensure" means "shall ensure."

3              So the issues of national defense, which is not

4        really a Green Oceans issue, but certainly the use of the

5        high seas and interference with that use is a key issue for

6        Green Oceans.  We went to the fact that this project

7        destroys Coxes Ledge, which is -- has been designated as an

8        essential habitat for a number of fish that are a primary

9        source for the fisheries in the Rhode Island and

10       Massachusetts area.

11             We pointed out that the fishing industry --

12       another major activity in this very area where this is being

13       built -- was being significantly interfered with,

14       significantly disadvantaged by the way in which these

15       turbines were being built, by the way in which they were

16       being located, and by the effects of these mammoth monoliths

17       on the fishermen themselves, including -- this is also a

18       national defense matter, and that is the impact on radar the

19       fishermen need, that airplanes need, that ships, everything

20       from sailboats to huge cargo ships, require.

21             All of those were impacted.  All of those were set

22       aside or balanced away by the prior Secretary of Interior in

23       the analysis of letting this go forward.

24             Well, so Green Oceans filed that suit, placed

25       those issues before this Court.  The company had not yet

1    started construction.  They began construction in April of

2    2024, the offshore construction, well knowing that these

3    issues had been raised and well knowing that they were

4    within the Court's purview to determine and, if the Court

5    determined that those approvals had been improperly issued

6    as Green Oceans argues, that, in fact, their project could

7    be stopped.

8           They went ahead with that full knowledge and

9    committed and made whatever payments they talk about here

10   and in construction activities with that full knowledge.

11   And as the Court knows, there is a doctrine that says if you

12   assume the risk, if you go ahead with your activity in the

13   face of knowing that there is uncertainty, you can't then

14   later say, Oh, I suffered irreparable injury because I went

15   ahead and did that.

16          Turning second to a couple of numbers issues.  I

17   hear the companies talking about how they've spent $5

18   billion.  Well, they've spent it.  That is not an

19   irreparable injury within the confines of preliminary

20   injunction analysis; that is, if the money's already spent,

21   it isn't an injury.

22          THE COURT:  That's already gone, yes.

23          MR. MARZULLA:  I'm sorry, Your Honor?

24          THE COURT:  That's already gone.

25          MR. MARZULLA:  Yes.  It's not an injury to be

1     suffered as a result of this order.  It was spent before.

2          The company made an impassioned argument, at least

3     in their brief -- I didn't hear it today in oral argument --

4     that $12 million a week for whatever this temporary period

5     may be -- and I think it is a temporary period -- that

6     that's going to kill the companies.  As counsel indicated,

7     this is a joint venture between a huge global offshore wind

8     company out of Denmark, Orsted, and a major hedge fund

9     investment company, Global Investment Partners.

10          What the plaintiff has not indicated to the Court

11     is how -- I'm sorry, I said 12, maybe it was $16 million,

12     whatever that number is -- how that was going to drive out

13     of business this multibillion dollar corporation that has

14     spent $5 billion already and is contemplating other billions

15     here and there.  That doesn't sound like it establishes the

16     high bar on irreparable injury; that is, that the plaintiff

17     is going to be destroyed, put out of business, as a result.

18          And finally, to the extent that the government --

19     or that the Revolution Wind claims that they are suffering

20     losses as a result of a breach of their lease, as a result

21     of a destruction of their property rights, if any, whatever

22     they may be, well, that's what the United States Court of

23     Federal Claims is for.  It has jurisdiction over all claims

24     for money damages arising out of breaches of the

25     Constitution, statutes, and contracts.  So they do have a

1    claim.  It's not irreparable.  It's repairable, if, indeed,

2    such a claim exists at all.  So that's the irreparable

3    injury point.

4           As to the balance of equities and public interest,

5    the principle equity that one hears being put forth again by

6    Revolution Wind is that we have a lot of money at stake.

7    We're going to make a lot of money on this project, and we

8    won't make it if we are halted and our project is likely to

9    either be delayed or to fail as a result.

10           Well, once again, to what extent is that, first of

11   all, a public interest?  And we think it is not.  And second

12   of all, to what extent does mere financial loss, however

13   substantial, count as a balance in the equities component

14   insofar as this Court acts as a court of equity?  We think

15   it does not.

16           Now, the company makes the argument that there are

17   public benefits to offshore wind, and there may be.  The

18   company makes some I think somewhat unsubstantiated

19   arguments that offshore wind power is going to be cheap,

20   cheap, cheap.  There are lots of studies that say that's not

21   -- it's just the opposite.  And although they speculate that

22   maybe they could have problems with their contracts, the CEO

23   of Rhode Island Energy over the weekend said he is not going

24   to hold them to those deadlines if they get delayed as a

25   result of this stop work order.  We'd be happy to provide

1    the Court with some press articles reporting those

2    statements.

3         So what we have, then, on the one hand is the

4    financial losses of this company.  On the other hand, what

5    we have is the continuation of the damages to the other uses

6    of the oceans.  And keep in mind that the Outer Continental

7    Shelf is a federal enclave.  It belongs to the public.  It

8    does not belong to any private company.  And it serves many

9    purposes and contains many resources, everything from

10   fisheries to marine mammals, including the highly endangered

11   species whales.  It includes the kinds of activities that

12   occur and can only occur on the ocean, fishing, cargo,

13   sailing, and in some instances indeed the religious

14   practices of tribes like the Wampanoag.

15        So to the extent that we look at the balance of

16   the equities and at the public interest here, does the

17   substantial -- it looks like a substantial -- millions of

18   dollars is still significant -- a substantial interest of

19   the company, does that outweigh the public's interest in an

20   ocean bed that will be forever changed, forever altered, and

21   ocean resources that will be forever destroyed, or is it

22   worth taking a close look at the other uses of the ocean for

23   a limited period of time?  And I think this sort of would

24   have to be limited, Your Honor, and doing so before we have

25   finally and irretrievably, irrevocably, irreparably

 1    destroyed the ocean bed.

 2           THE COURT:  Well, having done that in the prior

 3    administration and having the final decision, until that's

 4    overturned -- while this administration wants to review it,

 5    I understand, but until they review and decide something, I

 6    don't understand making the final stop work order without

 7    really any findings, which is what they've done.  And if I

 8    had ruled in your favor in your case, it would be different,

 9    but I didn't get there yet.

10           MR. MARZULLA:  Understood, Your Honor.

11           THE COURT:  And trying to do it now is difficult,

12    which, if you had won your case, you'd be in good shape, but

13    I'm not there yet.

14           MR. MARZULLA:  Correct.  That's why I say I am

15    troubled by the fact that the company is really asking the

16    Court to rule on the merits without --

17           THE COURT:  Right.

18           MR. MARZULLA:  -- a record.

19           THE COURT:  The government is asking me to rule

20    the opposite way --

21           MR. MARZULLA:  Well, yes.

22           THE COURT:  -- without a record, too.

23           MR. MARZULLA:  And I guess we're in the middle,

24    Your Honor, asking you to take a close look at the process

25    under the Administrative Procedure Act and make a

1    determination not today on a preliminary injunction because

2    Revolution Wind says they're going to lose money, but rather

3    to make your decision based on the documents, whatever they

4    were, before the decision-maker, whoever that was, and to do

5    so even in an expedited manner, if necessary, but not to do

6    so today on a preliminary injunction.

7         THE COURT:  Thank you very much.

8         MR. MARZULLA:  Thank you, Your Honor.

9         THE COURT:  I appreciate it.

10        I'll let the government speak to the two cases

11   since I did not have you address that, if you want to speak

12   to how your position squares in the two cases.

13        MR. TORSTENSEN:  In which cases?  Sorry.  I'm not

14   sure I...

15        THE COURT:  You've got Green Oceans.

16        MR. SWANSON:  I do not, but I can answer your

17   question.

18        So currently, as referenced in the status reports

19   filed with Your Honor in those cases and in the stop work

20   order here, Interior is undertaking a review pursuant to the

21   presidential memorandum.  That review is not complete yet.

22        Of course, if something comes up in that review

23   that causes us to think those cases need to go a different

24   way, we would alert the Court and the other parties.  But

25   we're not there yet.

1          Thank you.

2          THE COURT:  All right.

3          MS. SCHNEIDER:  Thank you, Your Honor.

4          With respect to the government's position

5     regarding its oversight over the Outer Continental Shelf, we

6     don't quibble with that, Your Honor, but what we are saying

7     is that when they have procedures in place they need to

8     follow those procedures, and they did not follow those

9     procedures.

10          The declaration where they point to the January

11    31, 2025, annual compliance report, which is attached as

12    Exhibit F to that declaration, ignores -- the declaration

13    relies on it, but it ignores everything that has happened

14    since January of 2025 through to today.  And it's important

15    because there has been a lot of activity.

16          When you sort of dig down onto their two claims

17    related to or their two arguments related to the conditions

18    and the agreements, COP Condition 4.4, we did provide the

19    Navy with a draft agreement.  We are waiting for the Navy to

20    respond.  We cannot force the Navy to respond to us, but we

21    are, you know, fully coordinating with them to make sure

22    that any concerns that they have -- and they've articulated

23    none -- are addressed.

24          With respect to COP Condition 6.3, we complied

25    with that by submitting a survey mitigation plan as outlined

1    in the Gearon declaration, the rebuttal declaration, at

2    Paragraph 5.

3         The stop work order has no deadlines in it, Your

4    Honor.  We have no idea how long this review, which has been

5    ongoing since the first day of this administration, will

6    take place.  There is no end in sight, and that's why we

7    have come to this Court for relief.

8         Appealing to the Interior Board of Land Appeals

9    is, you know, a futile effort.  First, it's not required

10   under *Darby v. Cisneros*, and, two, the secretary can take

11   jurisdiction over the appeal like that.  And that's, again,

12   why we came here.

13        I appreciate Green Oceans taking their opportunity

14   to argue their other cases before this Court.  I would argue

15   that they should keep those arguments there.  What might

16   happen in the future is just not relevant.

17        With respect to the public interest, they talk

18   about fishing and, you know, concerns relating to search and

19   rescue.  I will state that in this project the wind turbines

20   are built on a one nautical mile by one nautical mile grid

21   which is more than a statute mile, so there's plenty of room

22   to move through the wind farm should anyone choose to do

23   that, and quite a few folks have actually been coming to see

24   it, including to fish within the lease area because, like

25   many things in the ocean, it becomes encrusted with marine

1      life.  It's teeming, actually, with marine life, and we

2      provided a clip in our briefing for the Court to review.

3              With respect to the joint venture question that

4      Mr. Marzulla raised, the parents are not relevant here.

5      This is a very unique situation.  Neither parent can provide

6      additional funding to Revolution Wind under the terms of the

7      joint venture agreement.

8              And with respect to costs -- and this is a matter

9      of public record -- all I will say on that, Your Honor, is

10     that New England independent system operator wholesale

11     electricity prices, for example, in January of 2025, were

12     $135 per megawatt hour, and Revolution Wind's fixed contract

13     price is $98 per megawatt hour.  So, in fact, it is cheaper.

14              I hadn't heard about the statement from the CEO,

15     but my understanding is that it's only one of the PPA's

16     involved.

17              So with that, unless the Court has any additional

18     questions, we ask again that the Court grant our motion for

19     a preliminary injunction and a stay as expeditiously as

20     possible in this matter.

21              THE COURT:  I'll take a short recess, and I'll be

22     back in a few minutes.

23              MS. SCHNEIDER:  Thank you, Your Honor.

24              (Recess taken)

25              THE COURT:  The Bureau of Ocean and Energy

1    Management issued a stop work order to Revolution Wind on

2    August 22nd ordering plaintiffs to halt all ongoing

3    activities related to the Revolution Wind project on the

4    Outer Continental Shelf.  I'm now considering the

5    plaintiff's motion for preliminary injunction.

6         Under the *Winter* factors, a plaintiff seeking a

7    preliminary injunction must establish that he's likely to

8    succeed on the merits, that he's likely to suffer

9    irreparable harm in the absence of preliminary relief, that

10   the balance of equities tips in his favor, and that an

11   injunction is in the public interest.  555 U.S. 7 at 20

12   (2008).

13        As the basis for the stop work order, the bureau

14   cited a need for, quote, time to address concerns that have

15   arisen, unquote, as part of the review that the Department

16   of the Interior is undertaking pursuant to the President's

17   January 20th memo.  However, the only, quote, concerns,

18   unquote, the bureau cites are the mere potential for

19   national security concerns or, quote, interference with

20   reasonable uses of the exclusive economic zone, the high

21   seas, and the territorial seas, unquote.  The bureau does

22   not actually point to any factual findings that lead them to

23   believe that Revolution Wind has implicated either of these

24   concerns or that those concerns rise to such a level that

25   work must cease immediately.

1          The stop work order represents a clear change in

2     position on the part of the bureau, which previously

3     certified that the project did not implicate national

4     security or interference concerns as part of its multiyear,

5     multiagency approval process for the project as mandated by

6     the Outer Continental Shelf Lands Act.  The statutory

7     factors that the bureau claims to be reviewing now are the

8     exact same ones that it previously considered and found

9     compliance with as part of the multiyear approval process

10    for the Revolution Wind project.  And to make clear, that is

11    the very same approval the bureau is currently defending in

12    two other cases pending before this Court.

13         The bureau did not make any factual findings or

14    cite any reasons to believe that the Revolution Wind was no

15    longer in compliance with the Outer Continental Shelf Act at

16    the time it issued the stop work order.  Mandating an

17    immediate pause to construction of a project whose approval

18    the bureau continues to defend in those other cases is the

19    height of arbitrary and capricious action.

20         The arbitrary and capricious nature of that action

21    is not cured by the additional reasons now provided in the

22    Suess declaration because they were not offered at the time

23    that BOEM issued the order.  Under *DHS v. Regents of the*

24    *University of California*, I'm limited to consider the

25    grounds the bureau invoked when it acted.  591 U.S. 1 at 20

1    (2022).  Quote, it is a foundational principle of

2    administrative law that judicial review of agency action is

3    limited to the grounds that the agency invoked when it took

4    the action, unquote.  That is at Page 20 of that U.S.

5    Reports decision.

6            Obviously the -- well, I'll leave it at that.

7            Green Oceans and the federal defendants note that

8    the stop work order contained a permissive administrative

9    appeal, which Revolution Wind did not make use of.  They

10   claim that a failure to exhaust that administrative appeal

11   prohibits judicial review.  However, the Supreme Court in

12   the case of *Darby v. Cisneros* held that under the APA

13   exhaustion is a prerequisite to judicial review only when

14   expressly required by statute or agency rule and when the

15   agency administrative action is made inoperative during that

16   -- pending that review.  *Darby* is at 509 U.S. 137.  I'm

17   citing Pages 153 to 154.  That's a 1993 Supreme Court case.

18           I see no portion of the Outer Continental Shelf

19   Lands Act or the bureau's regulations that make the

20   administrative appeal cited in the stop work order

21   mandatory, nor has either defendant pointed me to a specific

22   provision mandating such an appeal.

23           If it proceeds as planned, the project will

24   provide the energy to Rhode Island and Connecticut.

25   Revolution Wind has sunk $5 billion so far into planning,

1    developing, designing, manufacturing, and constructing this

2    project.  The project is now 80 percent complete and many

3    hundreds of workers have stopped work.  At every step

4    Revolution Wind has relied on approval from the Interior and

5    BOEM decisions that are currently being defended in related

6    cases before this Court, meaning that there are strong

7    reliance interests at stake.  Revolution Wind represents the

8    delays cost it $2.3 million a day, but more importantly, if

9    Revolution Wind cannot meet benchmarked deadlines, the

10   entire enterprise could collapse.  Specifically, a

11   specialized ship necessary to complete the project will no

12   longer be available after December of this year until at

13   least the year 2028.  If Revolution Wind cannot meet its

14   contractual agreements, then Rhode Island and Connecticut

15   will have the right to terminate the planned power

16   agreements with the company.

17         So there is no question in my mind of irreparable

18   harm to the plaintiff.  Particularly in light of Revolution

19   Wind's reliance interests and the government's change in

20   position, the balance of the equities clearly cut in favor

21   of Revolution Wind continuing work while the government

22   conducts whatever review of potential national security or

23   reasonableness concerns they have.

24         For these reasons, the plaintiff's motion for a

25   preliminary injunction is granted.  The injunction runs only

1    to the August 22nd stop work order.  I'll issue the proposed

2    amended order that the plaintiffs attached to their final

3    reply brief and say "For the reasons stated on the record in

4    open court."

5              Anything else any counsel wants to state for the

6    record now?

7              The Court will be in recess.  Thank you very much,

8    Counsel.

9              (Whereupon the hearing was

10             adjourned at 12:40 p.m.)

11

12             **CERTIFICATE OF OFFICIAL COURT REPORTER**

13

14             I, LISA A. MOREIRA, RDR, CRR, do hereby

15    certify that the above and foregoing constitutes a true and

16    accurate transcript of my stenographic notes and is a full,

17    true and complete transcript of the proceedings to the best

18    of my ability.

19      Dated this 22nd day of September, 2025.

20

21                              /s/Lisa A. Moreira, RDR, CRR

22                              Official Court Reporter
                               United States Courthouse
23                              Room 6718
                               333 Constitution Avenue, NW
24                              Washington, DC 20001

25

45

## $

**$12** [1] - 32:4
**$135** [1] - 39:12
**$16** [1] - 32:11
**$70** [3] - 3:18, 4:25, 5:2
**$98** [1] - 39:13

## /

**/s/Lisa** [1] - 44:21

## 1

**1** [8] - 6:11, 8:11, 8:14, 8:15, 16:6, 29:22, 41:25
**1000** [1] - 1:12
**1050** [1] - 1:20
**1150** [1] - 1:20
**11:08** [1] - 1:5
**11th** [1] - 1:12
**12** [3] - 19:9, 19:10, 32:11
**12:40** [1] - 44:10
**1334(a)(1)(B** [2] - 19:19, 19:24
**1337(p)(4** [4] - 9:16, 19:6, 20:18, 26:4
**1337(p)(4)** [1] - 21:10
**1341(c** [3] - 9:20, 19:20, 20:6
**1341(d** [1] - 9:20
**137** [1] - 42:16
**15** [1] - 3:8
**153** [1] - 42:17
**154** [1] - 42:17
**18** [1] - 5:5
**1993** [1] - 42:17
**1:25-cv-02999-RCL** [1] - 1:3

## 2

**2** [1] - 8:11
**2.3** [2] - 5:18, 43:8
**20** [3] - 40:11, 41:25, 42:4
**20001** [2] - 1:25, 44:24
**20004-1304** [1] - 1:13
**20036** [1] - 1:21
**2008)** [1] - 40:12
**202** [4] - 1:13, 1:17, 1:21, 1:25
**2022)** [1] - 42:1
**2023** [2] - 3:6, 11:18
**2024** [2] - 29:8, 31:2
**2025** [6] - 1:4, 29:22, 37:11, 37:14, 39:11, 44:19

**2028** [3] - 7:17, 7:18, 43:13
**20530** [1] - 1:17
**20th** [1] - 40:17
**21** [1] - 11:18
**22** [1] - 1:4
**22nd** [5] - 3:20, 24:10, 40:2, 44:1, 44:19
**25-2999** [1] - 2:3
**285.400(c)** [1] - 10:17
**285.401** [1] - 10:12
**285.417** [1] - 11:1

## 3

**3** [1] - 8:11
**3,000-ton** [1] - 6:14
**30** [5] - 10:2, 10:12, 10:17, 10:25, 11:1
**30th** [2] - 28:9, 28:11
**31** [2] - 22:25, 37:11
**333** [2] - 1:24, 44:23
**350** [1] - 5:6
**350,000** [1] - 3:12
**354-3187** [1] - 1:25
**373** [1] - 19:18

## 4

**4** [1] - 8:12
**4.4** [2] - 23:2, 37:18
**43** [1] - 9:20
**479** [1] - 19:18

## 5

**5** [11] - 8:12, 16:17, 17:2, 21:12, 22:1, 22:3, 22:6, 31:17, 32:14, 38:2, 42:25
**5.1** [1] - 11:15
**509** [1] - 42:16
**555** [2] - 1:12, 40:11
**585.106** [1] - 10:2
**585.417** [1] - 11:1
**591** [1] - 41:25
**598-9646** [1] - 1:17

## 6

**6** [1] - 8:12
**6.3** [2] - 23:2, 37:24
**637-2200** [1] - 1:13
**65** [1] - 7:9
**6718** [2] - 1:24, 44:23

## 7

**7** [1] - 40:11
**70** [1] - 3:10
**704-megawatt** [1] - 3:9

## 8

**80** [2] - 3:9, 43:2
**822-6760** [1] - 1:21

## 9

**950** [1] - 1:16

## A

**a.m** [1] - 1:5
**abbreviated** [1] - 12:7
**ability** [1] - 44:18
**able** [3] - 8:7, 16:5, 16:21
**absence** [1] - 40:9
**absolutely** [1] - 11:11
**accurate** [1] - 44:16
**act** [1] - 10:20
**Act** [4] - 4:3, 29:11, 35:25, 41:6, 41:15, 42:19
**acted** [1] - 41:25
**acting** [1] - 25:3
**action** [9] - 10:3, 27:24, 28:3, 29:10, 41:19, 41:20, 42:2, 42:4, 42:15
**activities** [8] - 9:17, 10:15, 14:8, 26:6, 29:14, 31:10, 34:11, 40:3
**activity** [4] - 19:8, 30:12, 31:12, 37:15
**acts** [1] - 33:14
**add** [2] - 3:16, 11:10
**additional** [4] - 24:9, 39:6, 39:17, 41:21
**address** [5] - 20:1, 20:18, 28:25, 36:11, 40:14
**addressed** [1] - 37:23
**adjourned** [1] - 44:10
**administration** [5] - 12:19, 21:12, 35:3, 35:4, 38:5
**Administration** [1] - 15:2
**administrative** [6] - 19:16, 42:2, 42:8, 42:10, 42:15, 42:20
**Administrative** [2] - 4:3, 35:25
**admits** [1] - 9:10
**adopting** [1] - 29:23
**advance** [1] - 25:19
**affected** [2] - 17:11, 17:20
**agencies** [2] - 3:9, 18:20

**agency** [7] - 10:9, 24:13, 25:12, 42:2, 42:3, 42:14, 42:15
**agency's** [1] - 21:4
**ago** [1] - 11:18
**agreement** [5] - 6:4, 14:23, 23:10, 37:19, 39:7
**agreements** [14] - 8:13, 15:25, 16:8, 16:9, 16:10, 23:3, 23:5, 24:21, 24:22, 27:1, 37:18, 43:14, 43:16
**ahead** [5] - 2:15, 25:8, 31:8, 31:12, 31:15
**AIMERY** [2] - 6:25, 7:17
**Airlines** [1] - 16:14
**airplanes** [1] - 30:19
**al** [2] - 1:6, 2:4
**alert** [1] - 36:24
**allegation** [1] - 3:2
**allegations** [1] - 3:24
**allow** [2] - 26:8, 28:6
**allowed** [1] - 5:15
**altered** [1] - 34:20
**amended** [1] - 44:2
**amicus** [1] - 17:22
**analysis** [2] - 30:23, 31:20
**annual** [2] - 22:25, 37:11
**answer** [2] - 13:15, 36:16
**APA** [4] - 19:5, 21:1, 22:10, 42:12
**appeal** [7] - 27:8, 27:10, 38:11, 42:9, 42:10, 42:20, 42:22
**appealing** [1] - 38:8
**Appeals** [2] - 27:9, 38:8
**appear** [1] - 24:18
**appearance** [1] - 2:6
**APPEARANCES** [1] - 1:11
**applicable** [1] - 11:9
**appreciate** [2] - 36:9, 38:13
**approach** [1] - 2:5
**approval** [10] - 9:25, 10:14, 11:9, 19:14, 28:1, 41:5, 41:9, 41:11, 41:17, 43:4
**approvals** [2] - 22:15, 31:5
**approved** [4] - 3:1, 3:6, 21:24, 22:1
**April** [1] - 31:1

**arbitrariness** [1] - 4:11
**arbitrary** [6] - 3:22, 3:25, 13:11, 22:11, 41:19, 41:20
**area** [5] - 5:10, 18:1, 30:10, 30:12, 38:24
**argue** [2] - 38:14
**argued** [1] - 29:11
**argues** [3] - 11:13, 19:19, 31:6
**arguing** [2] - 11:6, 20:21
**argument** [4] - 19:5, 32:2, 32:3, 33:16
**arguments** [4] - 8:21, 33:19, 37:17, 38:15
**arise** [1] - 28:3
**arisen** [1] - 40:15
**arising** [1] - 32:24
**arose** [1] - 25:14
**array** [1] - 6:16
**articles** [1] - 34:1
**articulate** [1] - 9:4
**articulated** [1] - 37:22
**articulates** [1] - 17:22
**aside** [2] - 28:20, 30:22
**assistant** [1] - 4:17
**assume** [1] - 31:12
**Atlantic** [1] - 7:25
**Atmospheric** [1] - 15:2
**attached** [2] - 37:11, 44:2
**August** [5] - 3:19, 11:18, 24:10, 40:2, 44:1
**authorities** [1] - 11:2
**authority** [14] - 9:13, 9:14, 9:16, 10:23, 19:1, 19:7, 19:16, 19:20, 19:21, 20:8, 20:23, 21:9, 22:14, 26:9
**authorized** [1] - 9:17
**authorizing** [1] - 11:16
**available** [3] - 7:16, 8:5, 43:12
**Ave** [1] - 1:16
**Avenue** [3] - 1:20, 1:24, 44:23

## B

**balance** [10] - 17:6, 17:7, 18:4, 29:4, 29:12, 33:4, 33:13, 34:15, 40:10, 43:20
**balanced** [1] - 30:22
**balancing** [1] - 29:15

**bar** [1] - 32:16
**base** [1] - 18:2
**based** [3] - 3:20, 12:3, 36:3
**basis** [2] - 4:8, 40:13
**bay** [1] - 6:15
**becomes** [1] - 38:25
**bed** [2] - 34:20, 35:1
**BEFORE** [1] - 1:9
**beforehand** [1] - 22:15
**began** [1] - 31:1
**behalf** [3] - 2:8, 2:12, 17:8
**behavior** [1] - 13:11
**belong** [1] - 34:8
**belongs** [1] - 34:7
**benchmarked** [1] - 43:9
**benefits** [1] - 33:17
**bess** [1] - 10:11
**bess-ee** [1] - 10:11
**best** [1] - 44:17
**better** [1] - 18:17
**between** [4] - 6:3, 6:17, 8:7, 32:7
**beyond** [1] - 19:14
**billion** [11] - 16:17, 16:25, 17:2, 21:13, 22:1, 22:3, 22:6, 31:18, 32:14, 42:25
**billions** [2] - 11:21, 32:14
**blanket** [1] - 9:16
**Board** [2] - 27:8, 38:8
**board** [1] - 27:11
**boat** [2] - 6:15, 6:18
**boats** [2] - 5:12, 6:24
**BOEM** [7] - 10:22, 18:22, 19:1, 19:21, 20:22, 41:23, 43:5
**bottom** [2] - 13:19, 14:6
**breach** [1] - 32:20
**breaches** [1] - 32:24
**break** [1] - 27:14
**breakaway** [1] - 16:25
**brief** [5] - 12:21, 12:22, 17:22, 32:3, 44:3
**briefing** [1] - 39:2
**briefly** [1] - 8:22
**briefs** [2] - 8:21, 16:13
**BSEE** [2] - 10:13, 10:16
**BSEE's** [1] - 10:17
**buckets** [1] - 13:19
**budget** [1] - 6:5
**build** [1] - 6:1
**built** [5] - 3:9, 6:15, 30:13, 30:15, 38:20

**bundle** [1] - 26:4
**bureau** [9] - 40:13, 40:18, 40:21, 41:2, 41:7, 41:11, 41:13, 41:18, 41:25
**Bureau** [4] - 3:19, 10:10, 18:21, 39:25
**bureau's** [1] - 42:19
**BURGUM** [1] - 1:6
**Burgum** [1] - 2:4
**business** [3] - 6:2, 32:13, 32:17
**businesses** [1] - 3:12

## C

**CA** [1] - 1:3
**cable** [2] - 6:16, 14:7
**California** [1] - 41:24
**candidly** [1] - 13:5
**cannot** [4] - 11:9, 37:20, 43:9, 43:13
**capricious** [5] - 3:23, 13:11, 22:11, 41:19, 41:20
**cargo** [2] - 30:20, 34:12
**carried** [2] - 19:9, 26:6
**case** [7] - 19:18, 29:19, 29:20, 35:8, 35:12, 42:12, 42:17
**Case** [1] - 2:3
**cases** [10] - 16:12, 36:10, 36:12, 36:13, 36:19, 36:23, 38:14, 41:12, 41:18, 43:6
**causes** [1] - 36:23
**cease** [1] - 40:25
**CEO** [2] - 33:22, 39:14
**certain** [3] - 20:11, 28:24, 29:13
**certainly** [2] - 28:18, 30:4
**CERTIFICATE** [1] - 44:12
**certified** [1] - 41:3
**certify** [1] - 44:15
**cessation** [1] - 10:13
**cetera** [1] - 5:11
**CFR** [5] - 10:2, 10:12, 10:17, 11:1
**change** [7] - 9:2, 11:12, 11:20, 27:21, 27:22, 41:1, 43:19
**changed** [4] - 2:25, 11:13, 29:18, 34:20
**cheap** [3] - 33:19, 33:20
**cheaper** [1] - 39:13
**choose** [1] - 38:22

**circumstances** [3] - 10:25, 20:2, 20:12
**Cisneros** [2] - 38:10, 42:12
**cite** [1] - 41:14
**cited** [5] - 12:21, 16:12, 23:16, 40:14, 42:20
**cites** [1] - 40:18
**citing** [1] - 42:17
**Civil** [1] - 2:3
**claim** [3] - 33:1, 33:2, 42:10
**claims** [7] - 19:4, 19:5, 28:21, 32:19, 32:23, 37:16, 41:7
**Claims** [1] - 32:23
**clear** [4] - 9:2, 9:22, 41:1, 41:10
**clearing** [1] - 14:22
**clearly** [1] - 43:20
**clip** [2] - 13:18, 39:2
**close** [3] - 15:15, 34:22, 35:24
**Coast** [1] - 15:14
**cod** [2] - 15:6, 15:8
**collapse** [1] - 43:10
**COLUMBIA** [1] - 1:1
**coming** [2] - 4:15, 38:23
**commercial** [1] - 8:12
**committed** [3] - 16:20, 21:13, 31:9
**communicating** [1] - 7:11
**companies** [3] - 6:3, 31:17, 32:6
**company** [16] - 3:5, 6:4, 15:7, 21:25, 28:25, 30:25, 32:2, 32:8, 32:9, 33:16, 33:18, 34:4, 34:8, 34:19, 35:15, 43:16
**comparable** [1] - 18:1
**complete** [11] - 6:24, 7:2, 8:25, 9:1, 9:3, 16:22, 23:10, 36:21, 43:2, 43:11, 44:17
**completely** [1] - 12:18
**compliance** [5] - 20:24, 22:25, 37:11, 41:9, 41:15
**complied** [5] - 15:7, 21:1, 22:7, 24:23, 37:24
**comply** [5] - 5:3, 5:8, 10:4, 10:9, 10:18
**complying** [2] - 15:13, 22:4
**component** [1] - 33:13

**concern** [1] - 24:22
**concerns** [30] - 3:21, 4:16, 4:17, 12:18, 13:9, 14:25, 18:22, 19:2, 19:11, 21:7, 22:5, 23:9, 23:19, 23:20, 24:4, 24:5, 24:7, 24:24, 25:14, 25:16, 27:2, 37:22, 38:18, 40:14, 40:17, 40:19, 40:24, 41:4, 43:23
**Condition** [5] - 11:15, 23:2, 37:18, 37:24
**conditions** [6] - 5:7, 15:7, 15:13, 20:11, 27:25, 37:17
**conducts** [1] - 43:22
**confer** [1] - 9:16
**confines** [1] - 31:19
**Congress** [5] - 9:14, 9:23, 13:14
**Connecticut** [2] - 1:20, 3:15, 42:24, 43:14
**consider** [3] - 9:1, 28:2, 41:24
**consideration** [1] - 3:3
**considered** [5] - 12:1, 24:13, 25:21, 25:23, 41:8
**considering** [1] - 40:4
**consistent** [3] - 5:6, 5:14, 26:6
**constitutes** [1] - 44:15
**Constitution** [4] - 1:24, 4:3, 32:25, 44:23
**construct** [1] - 5:7
**constructing** [3] - 5:6, 11:22, 43:1
**Construction** [1] - 11:14
**construction** [14] - 3:2, 6:16, 7:2, 8:5, 8:6, 11:16, 11:19, 13:9, 23:6, 31:1, 31:2, 31:10, 41:17
**construes** [2] - 20:6, 20:7
**consult** [1] - 14:9
**consulted** [1] - 14:6
**contained** [1] - 42:8
**containing** [1] - 20:7
**contains** [1] - 34:9
**contemplating** [1] - 32:14
**contest** [1] - 25:20
**Continental** [9] - 20:17, 29:10, 29:14, 34:6, 37:5, 40:4,

41:6, 41:15, 42:18
**continuation** [1] - 34:5
**continue** [2] - 14:9, 17:16
**continued** [1] - 5:16
**continues** [1] - 41:18
**continuing** [1] - 43:21
**contract** [3] - 7:15, 7:17, 39:12
**contracts** [3] - 27:1, 32:25, 33:22
**contractual** [3] - 8:13, 16:7, 43:14
**contractually** [1] - 16:20
**contradict** [1] - 24:19
**contradicting** [1] - 24:15
**contrary** [3] - 3:22, 25:12, 27:20
**control** [1] - 7:24
**coordinating** [1] - 37:21
**COP** [8] - 19:14, 22:15, 22:25, 23:2, 27:25, 37:18, 37:24
**corporation** [1] - 32:13
**correct** [16] - 4:7, 4:10, 4:13, 4:18, 4:24, 6:20, 10:4, 10:6, 10:19, 14:13, 14:15, 14:19, 14:21, 22:21, 23:21, 35:14
**corrective** [1] - 10:2
**cost** [8] - 3:13, 3:18, 4:25, 16:24, 17:25, 22:6, 43:8
**costs** [5] - 5:18, 16:25, 17:24, 39:8
**counsel** [4] - 2:5, 28:19, 32:6, 44:5
**Counsel** [1] - 44:8
**count** [1] - 33:13
**couple** [1] - 31:16
**course** [2] - 8:21, 36:22
**court** [2] - 33:14, 44:4
**COURT** [68] - 1:1, 2:13, 2:18, 2:22, 4:5, 4:8, 4:11, 4:15, 4:19, 4:22, 4:25, 5:20, 6:18, 7:18, 8:14, 8:17, 10:7, 12:10, 12:13, 12:22, 12:25, 13:21, 13:24, 14:2, 14:11, 14:14, 14:16, 14:20, 15:20, 16:1, 16:3, 16:18, 16:21, 17:2, 18:7, 18:10,

18:15, 18:18, 21:11, 22:16, 23:16, 23:20, 23:24, 24:14, 25:1, 25:4, 25:8, 25:18, 26:15, 26:21, 27:10, 27:14, 28:5, 29:18, 31:22, 31:24, 35:2, 35:11, 35:17, 35:19, 35:22, 36:7, 36:9, 36:15, 37:2, 39:21, 39:25, 44:12
**Court** [34] - 1:23, 1:23, 12:20, 13:12, 13:17, 13:18, 15:15, 17:9, 17:15, 28:24, 29:1, 29:4, 29:8, 30:25, 31:4, 31:11, 32:10, 32:22, 33:14, 34:1, 35:16, 36:24, 38:7, 38:14, 39:2, 39:17, 39:18, 41:12, 42:11, 42:17, 43:6, 44:7, 44:22
**Court's** [2] - 2:20, 31:4
**Courthouse** [2] - 1:24, 44:22
**COURTROOM** [2] - 2:2, 2:10
**Coxes** [1] - 30:7
**credible** [2] - 11:14, 13:5
**critical** [2] - 3:1, 6:13
**CRR** [3] - 1:23, 44:14, 44:21
**cure** [1] - 9:6
**cured** [1] - 41:21
**cut** [1] - 43:20
**CVS** [1] - 16:13

**D**

**D.C** [1] - 1:4
**damage** [1] - 20:3
**damages** [2] - 32:24, 34:5
**Darby** [3] - 38:10, 42:12, 42:16
**date** [2] - 11:16
**Dated** [1] - 44:19
**dates** [1] - 8:12
**days** [1] - 7:8
**DC** [5] - 1:13, 1:17, 1:21, 1:25, 44:24
**deadlines** [5] - 15:24, 16:7, 33:24, 38:3, 43:9
**dealing** [1] - 29:10
**decade** [1] - 3:7
**decades** [1] - 15:13
**December** [2] - 6:23,

43:12
**decide** [2] - 22:7, 35:5
**decision** [16] - 21:11, 23:16, 23:18, 24:10, 24:13, 25:1, 25:5, 25:19, 25:21, 27:11, 27:12, 27:18, 35:3, 36:3, 36:4, 42:5
**decision-maker** [1] - 36:4
**decisions** [2] - 21:22, 43:5
**declarant** [2] - 13:8, 13:13
**declaration** [24] - 3:24, 9:5, 9:7, 12:3, 12:15, 13:3, 13:4, 13:5, 13:8, 13:16, 13:20, 14:5, 14:20, 23:22, 24:3, 24:8, 24:14, 25:15, 37:10, 37:12, 38:1, 41:22
**declarations** [3] - 15:4, 15:11, 20:13
**declared** [1] - 20:10
**defend** [1] - 41:18
**defendant** [2] - 2:17, 17:14, 42:21
**defendants** [4] - 2:10, 2:12, 18:12, 42:7
**Defendants** [2] - 1:7, 1:15
**defended** [1] - 43:5
**defending** [2] - 29:19, 41:11
**Defense** [4] - 11:2, 14:23, 14:24
**defense** [3] - 3:7, 30:3, 30:18
**deference** [1] - 11:11
**defined** [1] - 10:24
**definitely** [1] - 7:17
**delayed** [2] - 33:9, 33:24
**delays** [1] - 43:8
**deliver** [1] - 7:17
**Delta** [1] - 16:14
**demobilize** [2] - 5:4, 5:11
**demonstrate** [1] - 21:4
**demonstrated** [2] - 29:1, 29:4
**denied** [1] - 18:14
**Denmark** [1] - 32:8
**department** [3] - 9:23, 10:10, 30:2
**Department** [5] - 11:1, 14:23, 14:24, 40:15
**deprived** [1] - 26:11
**DEPUTY** [2] - 2:2, 2:10

**designated** [1] - 30:7
**designing** [1] - 43:1
**desperately** [1] - 3:13
**destroyed** [2] - 32:17, 34:21, 35:1
**destroys** [1] - 30:7
**destruction** [1] - 32:21
**detail** [2] - 15:17, 24:12
**determination** [2] - 27:8, 36:1
**determine** [3] - 26:13, 26:25, 31:4
**determined** [1] - 31:5
**developing** [1] - 43:1
**DHS** [1] - 41:23
**different** [7] - 10:9, 12:18, 12:23, 12:24, 13:1, 35:8, 36:23
**difficult** [1] - 35:11
**dig** [1] - 37:16
**directed** [2] - 18:20, 22:23
**director** [1] - 25:3
**director's** [1] - 27:12
**disadvantaged** [1] - 30:14
**discussed** [1] - 28:18
**discussion** [1] - 28:20
**discussions** [1] - 23:4
**DISTRICT** [3] - 1:1, 1:1, 1:10
**doctrine** [1] - 31:11
**document** [1] - 15:4
**documents** [1] - 36:3
**DOJ** [1] - 1:16
**DOJ-ENRD** [1] - 1:16
**dollar** [1] - 32:13
**dollars** [3] - 11:21, 16:25, 34:18
**done** [9] - 6:6, 6:9, 6:11, 7:14, 15:9, 28:8, 28:14, 35:2, 35:7
**DOUGLAS** [1] - 1:6
**Douglas** [1] - 2:4
**down** [2] - 17:1, 37:16
**draft** [2] - 9:24, 37:19
**drive** [1] - 32:12
**due** [7] - 3:4, 3:21, 25:19, 25:22, 26:1, 27:6, 28:20
**during** [3] - 20:9, 25:14, 42:15

**E**

**early** [1] - 13:22
**economic** [1] - 40:20
**ee** [1] - 10:11

**effective** [2] - 5:4, 11:15
**effectively** [1] - 11:17
**effects** [1] - 30:16
**effort** [1] - 38:9
**either** [3] - 33:9, 40:23, 42:21
**electricity** [4] - 7:4, 11:25, 17:24, 39:11
**elements** [1] - 29:13
**eliminate** [2] - 19:20, 20:15
**emergencies** [1] - 20:13
**emergency** [1] - 20:10
**emphasis** [1] - 20:20
**enclave** [1] - 34:7
**encrusted** [1] - 38:25
**end** [1] - 38:6
**endangered** [1] - 34:10
**energize** [2] - 7:3, 7:5
**energy** [5] - 3:13, 7:12, 17:19, 17:25, 42:24
**Energy** [4] - 3:19, 18:22, 33:23, 39:25
**Enforcement** [1] - 10:11
**engaged** [1] - 21:5
**engaging** [2] - 22:23, 23:14
**England** [5] - 3:14, 7:12, 17:20, 17:24, 39:10
**ENRD** [1] - 1:16
**ensure** [5] - 19:8, 19:17, 20:23, 26:6, 29:13, 29:17, 30:2
**entered** [3] - 16:9, 24:20, 24:21
**enterprise** [4] - 3:5, 16:11, 16:14, 43:10
**enterprise-level** [1] - 3:5
**entire** [4] - 5:4, 16:10, 16:14, 43:10
**enumerated** [1] - 19:9
**Environment** [1] - 10:11
**environmental** [1] - 3:7
**equipment** [1] - 5:10
**equities** [6] - 29:5, 33:4, 33:13, 34:16, 40:10, 43:20
**equity** [2] - 33:5, 33:14
**erred** [1] - 29:11
**ESQ** [4] - 1:11, 1:15, 1:15, 1:19
**essential** [1] - 30:8

**establish** [1] - 40:7
**establishes** [1] - 32:15
**estimated** [1] - 16:25
**et** [3] - 1:6, 2:4, 5:10
**event** [1] - 28:15
**evidence** [2] - 25:11, 25:12
**exact** [1] - 41:8
**exactly** [4] - 4:13, 6:21, 12:14, 16:23
**example** [1] - 15:14
**exclusive** [2] - 6:1, 40:20
**excuse** [1] - 17:13
**exercise** [2] - 22:13, 26:8
**exhaust** [1] - 42:10
**exhaustion** [1] - 42:13
**Exhibit** [1] - 37:12
**existential** [1] - 3:5
**existing** [1] - 18:20
**exists** [1] - 33:2
**expedited** [1] - 36:5
**expeditiously** [4] - 6:8, 26:24, 27:5, 39:19
**experience** [1] - 15:14
**explain** [1] - 13:8
**explaining** [1] - 24:12
**explains** [1] - 25:15
**explanation** [4] - 3:3, 4:16, 9:4, 24:9
**explicitly** [1] - 29:15
**export** [1] - 14:7
**expressly** [2] - 20:24, 42:14
**extends** [1] - 19:14
**extensive** [1] - 9:24
**extent** [5] - 26:13, 32:18, 33:10, 33:12, 34:15
**extraordinary** [1] - 29:6
**extremely** [1] - 12:7

**F**

**face** [3] - 9:2, 10:21, 31:13
**facilities** [4] - 7:2, 7:3, 7:6
**fact** [12] - 9:10, 13:10, 13:15, 21:3, 24:20, 26:25, 29:1, 30:2, 30:6, 31:6, 35:15, 39:13
**factors** [4] - 19:10, 20:19, 40:6, 41:7
**facts** [2] - 14:6, 25:20
**factual** [2] - 40:22,

41:13
**factually** [1] - 9:6
**fail** [3] - 10:9, 16:15, 33:9
**failed** [3] - 10:4, 10:18, 11:4
**failure** [7] - 8:25, 9:1, 9:3, 17:18, 17:23, 23:10, 42:10
**falls** [1] - 16:11
**far** [1] - 42:25
**farm** [1] - 38:22
**farms** [1] - 18:1
**favor** [5] - 17:7, 18:5, 35:8, 40:10, 43:20
**federal** [8] - 2:12, 3:8, 11:10, 18:11, 18:20, 18:25, 34:7, 42:7
**Federal** [1] - 32:23
**few** [2] - 38:23, 39:22
**figure** [1] - 5:20
**file** [1] - 13:17
**filed** [5] - 9:5, 29:9, 29:21, 30:24, 36:19
**filing** [1] - 29:24
**final** [7] - 23:3, 23:5, 24:21, 24:22, 35:3, 35:6, 44:2
**finalized** [1] - 27:2
**finally** [3] - 26:11, 32:18, 34:25
**financial** [2] - 33:12, 34:4
**findings** [5] - 21:13, 21:15, 35:7, 40:22, 41:13
**finish** [4] - 6:13, 6:16, 6:23, 16:6
**finished** [1] - 12:12
**finishing** [2] - 6:14, 8:11
**first** [11] - 3:6, 5:25, 7:6, 9:8, 12:16, 12:17, 19:24, 21:2, 33:10, 38:5, 38:9
**fish** [2] - 30:8, 38:24
**fisheries** [2] - 30:9, 34:10
**fishermen** [2] - 30:17, 30:19
**fishing** [3] - 30:11, 34:12, 38:18
**five** [1] - 2:20
**fixed** [1] - 39:12
**focus** [2] - 8:21, 8:24
**folks** [1] - 38:23
**follow** [5] - 8:25, 9:12, 11:5, 37:8
**following** [1] - 2:24
**FOR** [1] - 1:1

**force** [2] - 5:5, 37:20
**foregoing** [1] - 44:15
**forever** [3] - 34:20, 34:21
**forth** [2] - 10:13, 33:5
**forward** [5] - 5:22, 5:24, 17:16, 29:24, 30:23
**foundational** [1] - 42:1
**foundations** [1] - 3:10
**four** [2] - 13:19, 14:4
**frame** [1] - 10:5
**front** [1] - 17:15
**full** [3] - 31:8, 31:10, 44:16
**fully** [1] - 37:21
**function** [1] - 6:1
**fund** [1] - 32:8
**funding** [1] - 39:6
**furthering** [1] - 15:12
**futile** [1] - 38:9
**future** [1] - 38:16

## G

**Gearon** [1] - 38:1
**general** [4] - 18:25, 19:15, 20:22
**generated** [1] - 7:4
**generator** [1] - 7:8
**genuine** [1] - 24:24
**Giacona** [2] - 25:3, 25:7
**given** [4] - 4:6, 11:11, 13:2, 13:6
**global** [1] - 32:7
**Global** [1] - 32:9
**governing** [2] - 9:21, 11:5
**government** [20] - 2:25, 3:23, 9:8, 9:10, 10:1, 10:23, 11:4, 11:13, 15:5, 17:9, 17:13, 18:8, 21:25, 22:1, 22:2, 28:19, 32:18, 35:19, 36:10, 43:21
**government's** [4] - 4:1, 8:25, 37:4, 43:19
**grant** [3] - 17:18, 19:15, 39:18
**granted** [1] - 43:25
**grantee** [1] - 24:1
**grants** [2] - 17:9, 19:6
**grapple** [1] - 9:9
**Green** [14] - 1:19, 2:17, 17:13, 28:6, 29:8, 29:9, 29:23, 30:4, 30:6, 30:24,

31:6, 36:15, 38:13, 42:7
**grid** [5] - 3:14, 3:17, 7:12, 17:21, 38:20
**grounds** [2] - 41:25, 42:3
**guarantee** [1] - 7:15
**Guard** [1] - 15:15
**guess** [2] - 10:17, 35:23

## H

**habitat** [1] - 30:8
**hallmark** [1] - 13:11
**halt** [2] - 9:16, 40:2
**halted** [1] - 33:8
**halting** [1] - 13:8
**halts** [1] - 11:19
**hand** [2] - 34:3, 34:4
**happy** [2] - 13:17, 33:25
**harder** [1] - 8:3
**harm** [8] - 3:5, 6:7, 15:22, 16:16, 18:3, 20:3, 40:9, 43:18
**harmed** [2] - 17:9, 17:14
**harms** [2] - 17:6, 18:4
**hear** [4] - 18:8, 18:16, 31:17, 32:3
**heard** [2] - 12:17, 39:14
**hearing** [5] - 5:21, 13:13, 14:1, 28:22, 44:9
**HEARING** [1] - 1:9
**hearings** [2] - 13:21, 14:2
**hears** [1] - 33:5
**heavily** [2] - 17:7, 18:4
**hedge** [1] - 32:8
**height** [2] - 4:11, 41:19
**HELD** [1] - 1:9
**held** [1] - 42:12
**hereby** [1] - 44:14
**high** [3] - 30:5, 32:16, 40:20
**higher** [1] - 17:24
**highly** [1] - 34:10
**historical** [1] - 8:9
**hoc** [5] - 3:23, 9:7, 23:24, 24:6, 24:12
**hold** [2] - 13:3, 33:24
**homes** [1] - 3:12
**Honor** [52] - 2:2, 2:7, 2:11, 2:16, 2:19, 4:7, 4:10, 4:14, 4:18, 4:24, 5:12, 6:8, 6:21, 8:16, 8:19, 8:22, 9:8,

9:18, 10:3, 10:8, 11:4, 11:10, 12:1, 12:14, 13:2, 13:23, 14:3, 14:13, 14:15, 14:19, 14:21, 15:21, 15:22, 16:16, 16:23, 17:4, 18:6, 18:9, 28:4, 28:17, 29:22, 31:23, 34:24, 35:10, 35:24, 36:8, 36:19, 37:3, 37:6, 38:4, 39:9, 39:23
**HONORABLE** [1] - 1:9
**hoping** [1] - 28:8
**hour** [2] - 39:12, 39:13
**House** [1] - 14:1
**huge** [2] - 30:20, 32:7
**hundreds** [5] - 5:8, 11:23, 14:8, 17:21, 43:3

## I

**I..** [1] - 36:14
**idea** [1] - 38:4
**identified** [3] - 18:22, 19:12, 22:24
**identifies** [4] - 20:14, 21:7, 21:9, 24:5
**identify** [3] - 12:4, 23:1, 23:19
**identifying** [1] - 23:8
**idled** [1] - 5:12
**ignores** [3] - 15:6, 37:12, 37:13
**immediate** [2] - 20:3, 41:17
**immediately** [3] - 5:3, 5:11, 40:25
**impact** [2] - 25:23, 30:18
**impacted** [1] - 30:21
**impassioned** [1] - 32:2
**implementing** [1] - 9:10
**implicate** [1] - 41:3
**implicated** [2] - 27:23, 40:23
**implications** [1] - 21:23
**implicit** [1] - 19:21
**importance** [1] - 29:16
**important** [2] - 7:23, 37:14
**importantly** [2] - 13:7, 43:8
**impose** [1] - 19:13
**imposing** [1] - 3:5
**improperly** [1] - 31:5

**IN** [1] - 1:1
**include** [2] - 19:10, 26:7
**included** [2] - 20:14, 22:25
**includes** [4] - 19:16, 21:4, 26:5, 34:11
**including** [6] - 6:13, 9:20, 15:14, 30:17, 34:10, 38:24
**incomplete** [1] - 13:4
**incorrect** [1] - 9:6
**increase** [1] - 6:5
**increases** [1] - 17:19
**incurred** [2] - 4:25, 5:2
**indeed** [3] - 26:20, 33:1, 34:13
**independent** [2] - 3:14, 39:10
**indicated** [2] - 32:6, 32:10
**individuals** [1] - 15:12
**industry** [1] - 30:11
**infirmity** [1] - 9:6
**information** [4] - 14:9, 24:11, 24:12, 24:19
**inherent** [3] - 9:13, 19:20, 20:21
**inherently** [1] - 26:7
**INJUNCTION** [1] - 1:9
**injunction** [18] - 17:7, 17:10, 17:18, 17:23, 18:5, 18:14, 28:22, 29:3, 29:6, 31:20, 36:1, 36:6, 39:19, 40:5, 40:7, 40:11, 43:25
**injured** [2] - 5:22, 5:24
**injury** [8] - 29:2, 29:7, 31:14, 31:19, 31:21, 31:25, 32:16, 33:3
**inoperative** [1] - 42:15
**insofar** [1] - 33:14
**instance** [1] - 28:1
**instances** [1] - 34:13
**instead** [1] - 29:14
**interest** [10] - 17:5, 18:3, 29:5, 33:4, 33:11, 34:16, 34:18, 34:19, 38:17, 40:11
**interests** [9] - 3:4, 9:2, 11:21, 17:17, 20:4, 26:2, 28:2, 43:7, 43:19
**interface** [1] - 26:25
**interfered** [1] - 30:13
**interference** [11] - 12:8, 18:24, 19:11, 20:16, 21:8, 24:8, 25:14, 27:3, 30:5,

40:19, 41:4
**interior** [1] - 9:12
**Interior** [11] - 9:18,
10:10, 26:24, 27:8,
27:24, 30:1, 30:22,
36:20, 38:8, 40:16,
43:4
**interpretation** [1] -
11:10
**intervene** [1] - 28:6
**intervenor** [2] - 2:17,
17:14
**invested** [3] - 11:21,
16:17, 16:18
**investigates** [1] - 19:2
**investigation** [1] -
23:11
**investment** [1] - 32:9
**Investment** [1] - 32:9
**invoke** [2] - 9:11, 11:2
**invoked** [2] - 41:25,
42:3
**involved** [3] - 5:8,
15:12, 39:16
**involves** [1] - 7:7
**involving** [2] - 3:8,
20:12
**irreparability** [1] - 16:5
**irreparable** [14] -
15:22, 16:1, 16:3,
16:16, 20:3, 29:2,
29:7, 31:14, 31:19,
32:16, 33:1, 33:2,
40:9, 43:17
**irreparably** [1] - 34:25
**irretrievably** [1] -
34:25
**irrevocably** [1] - 34:25
**Island** [5] - 3:15, 30:9,
33:23, 42:24, 43:14
**issuance** [1] - 9:4
**issue** [13] - 5:21, 7:24,
9:13, 10:1, 10:12,
10:16, 10:23, 17:23,
19:22, 28:23, 30:4,
30:5, 44:1
**issued** [15] - 3:20, 4:6,
10:22, 10:24, 11:17,
13:15, 15:10, 19:1,
22:17, 22:19, 25:2,
31:5, 40:1, 41:16,
41:23
**issues** [11] - 5:17,
13:20, 14:4, 15:1,
20:15, 26:20, 29:9,
30:3, 30:25, 31:3,
31:16
**issuing** [2] - 21:10,
29:6
**itself** [1] - 21:1

**J**

**Janice** - 2:7
**JANICE** [1] - 1:11
**janice.schneider@lw**
**.com** [1] - 1:14
**January** [7] - 18:19,
22:25, 29:8, 37:10,
37:14, 39:11, 40:17
**jeopardize** [1] - 21:18
**jobs** [2] - 11:23, 17:22
**joint** [5] - 6:3, 32:7,
39:3, 39:7
**JOSEPH** [1] - 1:19
**JR** [1] - 1:15
**JUDGE** [1] - 1:10
**judicial** [3] - 42:2,
42:11, 42:13
**jurisdiction** [2] -
32:23, 38:11
**justify** [1] - 21:21

**K**

**keep** [2] - 34:6, 38:15
**key** [2] - 6:24, 30:5
**kill** [1] - 32:6
**kind** [4] - 24:24, 27:10,
29:2, 29:4
**kinds** [1] - 34:11
**knowing** [3] - 31:2,
31:3, 31:13
**knowledge** [2] - 31:8,
31:10
**knows** [3] - 28:24,
29:8, 31:11
**KRISTOFOR** [1] - 1:15
**kristofor.swanson@**
**usdoj.gov** [1] - 1:18

**L**

**LAMBERTH** [1] - 1:9
**Land** [2] - 27:8, 38:8
**Lands** [3] - 29:11,
41:6, 42:19
**lands** [2] - 19:16,
20:23
**last** [3] - 11:22, 26:22,
27:6
**LATHAM** [1] - 1:12
**Latham** [1] - 2:8
**law** [4] - 3:22, 11:9,
12:2, 42:2
**LAW** [1] - 1:20
**lawfully** [1] - 5:6
**lawsuit** [1] - 29:9
**lead** [1] - 40:22
**lease** [10] - 5:5, 5:13,
6:2, 10:15, 10:23,

11:2, 20:11, 27:25,
32:20, 38:24
**leases** [5] - 18:21,
20:7, 20:14, 26:7
**least** [3] - 26:12, 32:2,
43:13
**leave** [3] - 6:24, 8:8,
42:6
**led** [1] - 22:15
**Ledge** [1] - 30:7
**letter** [1] - 4:17
**letting** [1] - 30:23
**level** [2] - 3:5, 40:24
**life** [3] - 20:3, 39:1
**lifted** [1] - 17:12
**light** [1] - 43:18
**likelihood** [1] - 8:20
**likely** [4] - 27:17, 33:8,
40:7, 40:8
**limited** [9] - 9:14, 20:2,
20:12, 26:12, 26:18,
34:23, 34:24, 41:24,
42:3
**limits** [1] - 10:20
**line** [2] - 13:19, 14:6
**LISA** [1] - 44:14
**Lisa** [1] - 1:23
**list** [1] - 28:8
**litigation** [4] - 12:17,
17:15, 17:16, 17:17
**LLC** [3] - 1:2, 1:20, 2:4
**LLP** [1] - 1:12
**load** [1] - 18:2
**local** [1] - 3:8
**located** [1] - 30:16
**look** [12] - 4:20, 4:23,
9:15, 12:5, 13:4,
15:15, 22:4, 25:23,
29:25, 34:15, 34:22,
35:24
**looks** [1] - 34:17
**lose** [3] - 16:17, 22:20,
36:2
**losing** [1] - 17:21
**loss** [1] - 33:12
**losses** [2] - 32:20,
34:4
**low** [2] - 3:13, 17:25
**low-cost** [2] - 3:13,
17:25

**M**

**Mac** [1] - 25:3
**major** [2] - 30:12, 32:8
**maker** [1] - 36:4
**mammals** [1] - 34:10
**mammoth** [1] - 30:16
**manage** [2] - 19:15,
20:23

**Management** [2] -
18:22, 40:1
**Management's** [1] -
3:19
**mandated** [1] - 41:5
**mandating** [2] - 41:16,
42:22
**mandatory** [1] - 42:21
**manhours** [1] - 11:24
**manner** [4] - 5:14,
18:1, 19:9, 36:5
**manufacturing** [1] -
43:1
**marine** [3] - 34:10,
38:25, 39:1
**mark** [1] - 19:23
**MARLIN** [2] - 6:21,
6:25
**MARTIN** [1] - 1:15
**Marzulla** [2] - 2:17,
39:4
**MARZULLA** [13] -
1:19, 1:20, 2:16,
2:17, 2:18, 2:20, 2:6,
28:17, 29:21, 31:23,
31:25, 35:10, 35:14,
35:18, 35:21, 35:23,
36:8
**Massachusetts** [1] -
30:10
**Matt** [2] - 25:3, 25:7
**matter** [4] - 8:9, 30:18,
39:8, 39:20
**mean** [3] - 17:6, 25:5,
27:13
**meaning** [1] - 43:6
**meaningful** [1] - 3:3
**means** [1] - 30:2
**meantime** [1] - 28:11
**measures** [1] - 10:13
**meet** [5] - 8:12, 16:7,
21:3, 43:9, 43:13
**meeting** [1] - 15:24
**megawatt** [2] - 39:12,
39:13
**members** [1] - 13:14
**memo** [2] - 21:6, 40:17
**memorandum** [3] -
29:22, 30:1, 36:21
**mention** [1] - 7:22
**mere** [2] - 33:12, 40:18
**merely** [1] - 24:9
**merit** [1] - 29:5
**merits** [6] - 8:18, 8:20,
19:4, 28:21, 35:16,
40:8
**met** [1] - 19:17
**mic** [1] - 18:15
**mid** [1] - 6:23
**mid-December** [1] -
6:23

**middle** [1] - 35:23
**might** [5] - 22:3, 22:6,
26:21, 28:13, 38:15
**mile** [3] - 38:20, 38:21
**million** [7] - 3:18, 5:1,
5:2, 5:19, 32:4,
32:11, 43:8
**millions** [1] - 34:17
**mind** [2] - 34:6, 43:17
**mineral** [1] - 20:4
**minutes** [2] - 2:20,
39:22
**miss** [1] - 19:23
**misspoke** [1] - 26:17
**mitigate** [1] - 13:9
**mitigation** [2] - 15:3,
37:25
**modify** [1] - 27:25
**moment** [3] - 5:25,
28:20, 29:7
**Monday** [1] - 1:4
**money** [4] - 32:24,
33:6, 33:7, 36:2
**money's** [1] - 31:20
**monoliths** [1] - 30:16
**month** [1] - 28:8
**months** [5] - 6:12, 7:1,
7:5, 8:14, 8:15
**mooted** [1] - 28:13
**MOREIRA** [1] - 44:14
**Moreira** [2] - 1:23,
44:21
**morning** [6] - 2:2, 2:7,
2:11, 2:16, 18:9,
18:10
**most** [2] - 15:8, 17:20
**motion** [8] - 18:13,
28:7, 28:10, 28:12,
39:18, 40:5, 43:24
**motivated** [1] - 24:10
**move** [4] - 3:17, 5:9,
20:25, 38:22
**MR** [32] - 2:11, 2:16,
18:9, 18:11, 18:17,
18:19, 22:12, 22:21,
23:18, 23:21, 24:2,
24:17, 25:2, 25:5,
25:10, 25:25, 26:17,
26:23, 27:13, 27:15,
28:17, 29:21, 31:23,
31:25, 35:10, 35:14,
35:18, 35:21, 35:23,
36:8, 36:13, 36:16
**MS** [35] - 2:7, 2:19,
2:23, 4:7, 4:10, 4:13,
4:18, 4:21, 4:24, 5:3,
5:23, 6:20, 7:20,
8:15, 8:18, 10:8,
12:11, 12:14, 12:24,
13:1, 13:22, 13:25,

14:3, 14:13, 14:15, 14:19, 14:21, 15:21, 16:2, 16:4, 16:19, 16:23, 17:4, 37:3, 39:23
**multiagency** [1] - 41:5
**multibillion** [1] - 32:13
**multiyear** [2] - 41:4, 41:9
**must** [5] - 10:4, 10:19, 12:1, 40:7, 40:25

**N**

**N-O-A-A** [1] - 15:3
**namely** [1] - 21:4
**national** [24] - 3:7, 4:16, 12:7, 18:24, 19:10, 20:10, 20:13, 20:15, 21:7, 21:14, 21:22, 22:5, 23:19, 24:7, 24:24, 25:13, 26:14, 26:20, 27:3, 30:3, 30:18, 40:19, 41:3, 43:22
**National** [1] - 15:1
**nature** [3] - 3:25, 16:16, 41:20
**nautical** [1] - 38:20
**Navy** [10] - 14:5, 14:7, 14:8, 14:10, 14:11, 15:14, 26:25, 37:19, 37:20
**necessary** [6] - 19:16, 23:11, 26:13, 26:19, 36:5, 43:11
**need** [21] - 5:7, 6:7, 6:10, 6:22, 6:23, 7:1, 7:5, 7:9, 7:13, 10:20, 20:14, 21:3, 21:17, 21:19, 26:8, 28:2, 30:19, 36:23, 37:7, 40:14
**needed** [1] - 24:25
**needs** [5] - 3:13, 6:9, 11:24
**never** [2] - 9:18, 14:12
**New** [5] - 3:13, 7:12, 17:20, 17:24, 39:10
**new** [6] - 11:10, 12:3, 12:15, 13:2, 24:11, 29:25
**nexus** [1] - 13:10
**NOAA** [2] - 15:3, 26:25
**noncompliance** [6] - 10:2, 10:5, 10:6, 10:16, 10:18, 10:19
**none** [4] - 10:21, 10:22, 23:16, 37:23
**north** [1] - 7:25

**note** [2] - 27:6, 42:7
**notes** [2] - 25:13, 44:16
**nothing** [3] - 4:20, 4:22, 17:3
**notice** [6] - 3:2, 10:1, 10:3, 10:16, 10:17, 11:17
**nowhere** [1] - 13:7
**number** [3] - 5:23, 30:8, 32:12
**numbers** [1] - 31:16
**NW** [5] - 1:12, 1:16, 1:20, 1:24, 44:23

**O**

**obligation** [3] - 19:14, 19:17, 26:5
**obligations** [1] - 19:25
**obviously** [6] - 23:6, 26:18, 27:15, 28:9, 28:10, 42:6
**occur** [2] - 34:12
**occurred** [1] - 10:21
**ocean** [6] - 34:12, 34:20, 34:21, 34:22, 35:1, 38:25
**Ocean** [3] - 3:19, 18:22, 39:25
**Oceanic** [1] - 15:2
**Oceans** [13] - 1:19, 2:17, 17:13, 28:6, 29:8, 29:23, 30:4, 30:6, 30:24, 31:6, 36:15, 38:13, 42:7
**oceans** [1] - 34:6
**Oceans's** [1] - 29:10
**OCS** [3] - 19:7, 21:8, 24:8
**OCSLA** [6] - 4:2, 9:9, 9:20, 9:22, 11:3, 19:1
**odds** [1] - 9:19
**OF** [3] - 1:1, 1:9, 44:12
**offered** [1] - 41:22
**offers** [1] - 3:23
**OFFICIAL** [1] - 44:12
**Official** [1] - 1:23
**official** [1] - 44:22
**offshore** [8] - 5:9, 6:14, 18:20, 29:16, 31:2, 32:7, 33:17, 33:19
**once** [2] - 7:6, 33:10
**one** [11] - 7:1, 12:6, 15:3, 21:12, 24:3, 26:10, 33:5, 34:3, 38:20, 39:15
**ones** [1] - 41:8

**ongoing** [9] - 17:10, 18:21, 19:13, 22:14, 23:13, 25:17, 26:5, 38:5, 40:2
**online** [1] - 11:25
**onshore** [1] - 5:9
**open** [1] - 44:4
**operating** [1] - 18:1
**Operation** [1] - 11:15
**operation** [2] - 5:7, 8:12
**operations** [1] - 20:10
**operator** [3] - 3:14, 17:21, 39:10
**opportunity** [5] - 8:10, 22:18, 25:20, 27:7, 38:13
**opposite** [2] - 33:21, 35:20
**optional** [1] - 11:7
**oral** [1] - 32:3
**order** [51] - 3:17, 3:20, 4:1, 4:2, 4:5, 5:3, 5:4, 5:15, 8:10, 9:13, 9:16, 10:12, 10:13, 10:14, 10:22, 11:19, 12:5, 13:15, 14:11, 15:9, 16:15, 17:11, 19:2, 19:12, 19:22, 20:25, 21:2, 21:10, 22:17, 22:18, 25:2, 25:6, 25:11, 25:16, 25:24, 26:12, 32:1, 33:25, 35:6, 36:20, 38:3, 40:1, 40:13, 41:1, 41:16, 41:23, 42:8, 42:20, 44:1, 44:2
**order's** [1] - 9:3
**ordered** [1] - 4:19
**ordering** [1] - 40:2
**original** [1] - 21:11
**Orsted** [1] - 32:8
**otherwise** [2] - 16:19, 24:25
**Outer** [10] - 4:4, 20:17, 29:10, 29:14, 34:6, 37:5, 40:4, 41:6, 41:15, 42:18
**outlined** [1] - 37:25
**outset** [1] - 8:23
**outweigh** [1] - 34:19
**oversight** [1] - 37:5
**overturn** [1] - 27:11
**overturned** [1] - 35:4
**own** [3] - 8:25, 9:12, 11:5

**P**

**p)(4** [1] - 20:18
**p.m** [1] - 44:10
**Page** [1] - 42:4
**page** [1] - 12:6
**pages** [1] - 14:8
**Pages** [1] - 42:17
**Paragraph** [1] - 38:2
**parent** [1] - 39:5
**parents** [1] - 39:4
**part** [8] - 18:21, 26:1, 26:4, 27:23, 40:15, 41:2, 41:4, 41:9
**participate** [1] - 22:17
**particular** [1] - 20:12
**particularly** [1] - 43:18
**parties** [1] - 36:24
**Partners** [1] - 32:9
**passing** [1] - 15:24
**pause** [1] - 41:17
**payers** [1] - 17:24
**paying** [1] - 17:22
**payments** [1] - 31:9
**pending** [3] - 17:15, 41:12, 42:16
**Pennsylvania** [1] - 1:16
**people** [1] - 5:8
**per** [2] - 39:12, 39:13
**percent** [3] - 3:9, 3:11, 43:2
**Perfect** [1] - 8:1
**period** [5] - 26:12, 26:19, 32:4, 32:5, 34:23
**permissible** [1] - 23:23
**permission** [1] - 2:20
**permissive** [1] - 42:8
**person** [1] - 25:6
**perspective** [1] - 9:5
**persuading** [1] - 5:21
**Peter** [2] - 2:11, 18:11
**PETER** [1] - 1:15
**peter.torstensen@ usdoj.gov** [1] - 1:18
**phrase** [1] - 19:21
**place** [2] - 37:7, 38:6
**placed** [2] - 20:20, 30:24
**plain** [1] - 11:20
**Plaintiff** [2] - 1:3, 1:11
**plaintiff** [5] - 2:8, 32:10, 32:16, 40:6, 43:18
**plaintiff's** [3] - 2:5, 40:5, 43:24
**plaintiffs** [6] - 2:14, 2:18, 22:18, 25:18,

40:2, 44:2
**plan** [3] - 5:7, 21:23, 37:25
**Plan** [1] - 11:15
**planes** [1] - 16:14
**planned** [3] - 11:25, 42:23, 43:15
**planning** [1] - 42:25
**plans** [1] - 21:24
**plants** [1] - 18:2
**plenty** [1] - 38:21
**podium** [1] - 2:6
**point** [10] - 4:12, 9:8, 11:12, 13:13, 15:8, 23:12, 27:6, 33:3, 37:10, 40:22
**pointed** [2] - 30:11, 42:21
**portion** [1] - 42:18
**position** [18] - 2:25, 9:3, 9:18, 11:13, 11:14, 11:20, 24:17, 27:21, 27:22, 27:23, 29:18, 29:23, 29:25, 30:1, 36:12, 37:4, 41:2, 43:20
**possible** [1] - 39:20
**post** [5] - 3:23, 9:7, 23:24, 24:6, 24:11
**potential** [2] - 40:18, 43:22
**power** [7] - 3:11, 7:6, 8:13, 15:25, 16:8, 33:19, 43:15
**powers** [1] - 19:15
**PPA's** [1] - 39:15
**practices** [1] - 34:14
**precisely** [1] - 29:23
**PRELIMINARY** [1] - 1:9
**preliminary** [15] - 17:10, 17:18, 17:23, 18:13, 28:22, 29:2, 29:6, 31:19, 36:1, 36:6, 39:19, 40:5, 40:7, 40:9, 43:25
**prep** [2] - 7:1, 7:2
**prerequisite** [1] - 42:13
**present** [1] - 19:13
**presented** [1] - 44:22
**presents** [1] - 27:2
**President** [1] - 18:19
**President's** [1] - 40:16
**presidential** [2] - 21:6, 36:21
**presidentially** [1] - 22:23
**press** [2] - 12:19, 34:1
**pretextual** [1] - 3:25

**pretty** [1] - 8:1
**prevail** [1] - 19:3
**prevent** [1] - 5:16
**prevention** [3] - 12:8, 20:16
**previously** [4] - 3:1, 9:17, 41:2, 41:8
**price** [1] - 39:13
**prices** [1] - 39:11
**primarily** [1] - 20:21
**primary** [1] - 30:8
**principle** [2] - 33:5, 42:1
**private** [1] - 34:8
**probe** [1] - 13:12
**problem** [2] - 14:12, 14:17
**problems** [1] - 33:22
**procedure** [1] - 3:21
**Procedure** [2] - 4:3, 35:25
**procedures** [4] - 9:1, 37:7, 37:8, 37:9
**proceed** [3] - 2:14, 2:18, 11:17
**proceedings** [1] - 44:17
**proceeds** [1] - 42:23
**process** [21] - 2:24, 3:4, 3:21, 9:22, 10:1, 11:8, 14:22, 15:5, 22:14, 22:16, 22:23, 25:19, 25:22, 26:1, 27:6, 27:17, 28:21, 35:24, 41:5, 41:9
**prohibitions** [1] - 20:1
**prohibits** [1] - 42:11
**project** [28] - 3:1, 3:6, 3:9, 5:6, 5:18, 6:2, 7:25, 11:22, 11:24, 15:7, 16:7, 16:22, 16:24, 18:23, 30:6, 31:6, 33:7, 33:8, 38:19, 40:3, 41:3, 41:5, 41:10, 41:17, 42:23, 43:2, 43:11
**project's** [2] - 6:1, 6:5
**promulgate** [1] - 19:25
**property** [3] - 20:4, 26:11, 32:21
**proposed** [1] - 44:1
**protect** [2] - 15:8, 17:16
**protected** [2] - 21:14, 26:2
**protections** [1] - 3:22
**provide** [8] - 3:11, 26:3, 27:7, 27:16, 33:25, 37:18, 39:5, 42:24

**provided** [6] - 12:15, 12:16, 14:8, 23:13, 39:2, 41:21
**provides** [2] - 11:15, 19:9
**providing** [2] - 24:9, 24:11
**provision** [4] - 20:7, 20:8, 29:12, 42:22
**provisions** [4] - 9:11, 9:21, 20:14, 26:3
**public** [12] - 14:2, 17:5, 18:3, 29:5, 33:4, 33:11, 33:17, 34:7, 34:16, 38:17, 39:9, 40:11
**public's** [1] - 34:19
**pull** [1] - 18:15
**purchase** [3] - 8:13, 15:25, 16:8
**purposes** [1] - 34:9
**pursuant** [3] - 21:6, 36:20, 40:16
**purview** [1] - 31:4
**put** [4] - 11:24, 29:24, 32:17, 33:5
**putting** [1] - 6:13

## Q

**questioned** [1] - 13:14
**questions** [3] - 15:18, 28:4, 39:18
**quibble** [1] - 37:6
**quite** [1] - 38:23
**quote** [4] - 40:14, 40:17, 40:19, 42:1

## R

**radar** [1] - 30:18
**raised** [7] - 13:10, 13:20, 14:4, 23:9, 29:9, 31:3, 39:4
**ramping** [1] - 7:7
**rate** [1] - 17:24
**rather** [1] - 36:2
**rationale** [4] - 21:4, 23:13, 23:25, 24:6
**RDR** [3] - 1:23, 44:14, 44:21
**reach** [2] - 27:5, 28:10
**reached** [2] - 23:3, 23:5
**read** [1] - 29:23
**ready** [1] - 7:3
**real** [3] - 7:24, 8:10, 12:6
**really** [6] - 7:22, 22:7, 29:16, 30:4, 35:7,

35:15
**reason** [4] - 4:6, 12:6, 21:5, 24:15
**reasonable** [9] - 12:9, 18:25, 19:11, 20:16, 20:17, 21:8, 22:9, 27:3, 40:20
**reasonableness** [1] - 43:23
**reasoned** [1] - 9:4
**reasons** [5] - 13:2, 41:14, 41:21, 43:24, 44:3
**rebuttal** [4] - 2:21, 15:4, 15:11, 38:1
**receive** [1] - 10:14
**recently** [1] - 13:13
**recess** [2] - 39:21, 44:7
**Recess** [1] - 39:24
**recommendation** [1] - 20:9
**record** [9] - 2:3, 2:6, 8:9, 13:4, 35:18, 35:22, 39:9, 44:3, 44:6
**referenced** [1] - 36:18
**referred** [1] - 11:3
**refers** [1] - 19:24
**regarding** [2] - 27:21, 37:5
**regents** [1] - 41:23
**region** [1] - 3:12
**regional** [1] - 15:5
**regulation** [1] - 2:24
**regulations** [8] - 9:10, 9:22, 9:24, 9:25, 10:25, 19:25, 42:19
**regulatory** [2] - 9:1, 11:6
**related** [15] - 5:16, 14:5, 15:1, 15:3, 15:6, 15:18, 18:23, 23:1, 23:4, 24:7, 27:2, 37:17, 40:3, 43:5
**relates** [1] - 20:6
**relating** [2] - 23:9, 38:18
**relevant** [2] - 38:16, 39:4
**reliability** [2] - 3:17, 17:19
**reliable** [2] - 3:13, 17:25
**reliance** [6] - 3:4, 9:2, 11:21, 28:2, 43:7, 43:19
**relied** [2] - 21:9, 43:4
**relief** [5] - 6:10, 7:23,

8:10, 38:7, 40:9
**relies** [1] - 37:13
**religious** [1] - 34:13
**remaining** [1] - 20:18
**repairable** [1] - 33:1
**repeat** [1] - 28:18
**reply** [1] - 44:3
**report** [2] - 22:25, 37:11
**Reporter** [3] - 1:23, 1:23, 44:22
**REPORTER** [1] - 44:12
**reporting** [1] - 34:1
**Reports** [1] - 42:5
**reports** [1] - 36:18
**Representatives** [1] - 14:1
**represents** [2] - 41:1, 43:7
**requested** [1] - 15:5
**require** [2] - 25:22, 30:20
**required** [5] - 3:21, 8:13, 10:14, 38:9, 42:14
**requirements** [3] - 21:1, 21:3, 28:24
**requires** [2] - 10:1, 22:13
**rescind** [1] - 27:25
**rescue** [1] - 38:19
**reserve** [1] - 2:20
**resolution** [1] - 27:5
**resources** [2] - 34:9, 34:21
**respect** [8] - 11:12, 28:22, 29:13, 37:4, 37:24, 38:17, 39:3, 39:8
**respond** [2] - 37:20
**result** [8] - 17:23, 27:17, 32:1, 32:17, 32:20, 33:9, 33:25
**resume** [1] - 10:14
**review** [35] - 4:6, 4:9, 12:10, 12:12, 12:20, 14:17, 17:10, 18:20, 18:21, 21:5, 21:6, 21:17, 21:20, 22:24, 23:13, 23:15, 25:15, 25:17, 26:12, 26:19, 26:21, 35:4, 35:5, 36:20, 36:21, 36:22, 38:4, 39:2, 40:15, 42:2, 42:11, 42:13, 42:16, 43:22
**reviewed** [3] - 21:23, 21:24, 23:12
**reviewing** [2] - 21:18,

41:7
**reviews** [1] - 3:8
**Revolution** [34] - 2:3, 2:9, 3:3, 3:18, 11:7, 11:20, 14:6, 17:8, 18:13, 18:23, 19:3, 19:19, 27:7, 27:21, 29:1, 32:19, 33:6, 36:2, 39:6, 39:12, 40:1, 40:3, 40:23, 41:10, 41:14, 42:9, 42:25, 43:4, 43:7, 43:9, 43:13, 43:18, 43:21
**REVOLUTION** [1] - 1:2
**Rhode** [5] - 3:15, 30:9, 33:23, 42:24, 43:14
**rights** [3] - 26:3, 26:5, 32:21
**rise** [1] - 40:24
**risk** [4] - 15:24, 17:19, 17:21, 31:12
**ROGER** [1] - 1:19
**Roger** [1] - 2:17
**roger@marzulla.com** [1] - 1:22
**room** [1] - 38:21
**Room** [2] - 1:24, 44:23
**rough** [1] - 8:1
**rougher** [1] - 8:3
**routinely** [1] - 14:9
**ROYCE** [1] - 1:9
**rule** [3] - 35:16, 35:19, 42:14
**ruled** [1] - 35:8
**rules** [2] - 9:12, 11:5
**run** [1] - 7:8
**runs** [2] - 3:14, 43:25

## S

**safely** [1] - 8:4
**Safety** [1] - 10:10
**safety** [2] - 3:7, 5:16
**safety-related** [1] - 5:16
**sailboats** [1] - 30:20
**sailing** [1] - 34:13
**sanction** [1] - 10:12
**saw** [2] - 8:1, 12:22
**scheme** [1] - 11:6
**Schneider** [1] - 2:8
**SCHNEIDER** [36] - 1:11, 2:7, 2:19, 2:23, 4:7, 4:10, 4:13, 4:18, 4:21, 4:24, 5:3, 5:23, 6:20, 7:20, 8:15, 8:18, 10:8, 12:11, 12:14, 12:24, 13:1, 13:22, 13:25, 14:3,

14:13, 14:15, 14:19, 14:21, 15:21, 16:2, 16:4, 16:19, 16:23, 17:4, 37:3, 39:23
**sea** [1] - 5:10
**search** [1] - 38:18
**seas** [4] - 8:3, 30:5, 40:21
**SEAWAY** [2] - 6:25, 7:16
**second** [4] - 11:12, 15:1, 31:16, 33:11
**Secretary** [2] - 20:9, 30:22
**secretary** [13] - 9:23, 12:23, 19:6, 19:7, 19:25, 20:8, 22:13, 24:15, 24:18, 26:9, 29:11, 29:13, 38:10
**secretary's** [4] - 4:17, 12:20, 26:5, 27:11
**section** [1] - 19:6
**Section** [1] - 9:15
**sections** [1] - 9:19
**security** [18] - 4:16, 12:8, 18:24, 19:10, 20:15, 21:7, 21:14, 21:22, 22:5, 23:19, 24:7, 24:24, 25:13, 26:20, 27:3, 40:19, 41:4, 43:22
**see** [4] - 13:17, 15:18, 38:23, 42:18
**seeking** [1] - 40:6
**September** [5] - 1:4, 13:22, 28:8, 28:10, 44:19
**serious** [1] - 20:2
**serves** [1] - 34:8
**set** [5] - 5:21, 9:22, 10:13, 28:20, 30:21
**setting** [1] - 29:12
**seven** [1] - 7:5
**shall** [4] - 19:8, 29:13, 30:2
**shape** [1] - 35:12
**Shelf** [9] - 20:17, 29:11, 29:14, 34:7, 37:5, 40:4, 41:6, 41:15, 42:18
**ship** [1] - 43:11
**ships** [2] - 30:19, 30:20
**short** [1] - 39:21
**side** [1] - 6:15
**sight** [1] - 38:6
**signed** [1] - 25:6
**significant** [2] - 18:3, 34:18
**significantly** [3] -

17:19, 30:13, 30:14
**similarly** [1] - 17:25
**simple** [2] - 11:20, 25:22
**simply** [6] - 3:24, 9:9, 11:14, 20:4, 22:19, 24:12
**single** [1] - 7:7
**site** [1] - 5:13
**sitting** [1] - 6:15
**situated** [1] - 17:25
**situation** [1] - 39:5
**six** [1] - 28:7
**sole** [1] - 6:1
**somewhat** [1] - 33:18
**sorry** [4] - 4:21, 31:23, 32:11, 36:13
**sort** [6] - 5:17, 8:19, 17:5, 26:2, 34:23, 37:16
**sound** [1] - 32:15
**source** [1] - 30:9
**spawning** [1] - 15:6
**specialized** [1] - 43:11
**species** [1] - 34:11
**specific** [5] - 15:18, 21:7, 22:24, 24:5, 27:4, 42:21
**specifically** [1] - 43:10
**specify** [1] - 10:19
**speculate** [1] - 33:21
**spend** [1] - 22:1
**spent** [8] - 16:19, 17:2, 28:9, 31:17, 31:18, 31:20, 32:1, 32:14
**square** [1] - 22:10
**squared** [1] - 11:9
**squares** [1] - 36:12
**stage** [1] - 3:1
**stake** [2] - 33:6, 43:7
**start** [2] - 19:4, 22:12
**started** [2] - 23:6, 31:1
**starting** [1] - 2:5
**state** [5] - 2:6, 3:8, 11:24, 38:19, 44:5
**statement** [1] - 39:14
**statements** [3] - 12:20, 24:16, 34:2
**STATES** [2] - 1:1, 1:10
**states** [3] - 3:15, 17:20, 19:7
**States** [2] - 32:22, 44:22
**status** [1] - 36:18
**statute** [8] - 2:24, 9:15, 9:21, 11:5, 20:24, 26:7, 38:21, 42:14
**statutes** [1] - 32:25
**statutorily** [1] - 19:21

**statutory** [9] - 8:25, 11:6, 19:4, 19:15, 19:17, 20:23, 21:9, 26:3, 41:6
**stay** [1] - 39:19
**stenographic** [1] - 44:16
**step** [4] - 5:25, 12:4, 29:6, 43:3
**Step** [6] - 6:11, 8:11, 8:14, 8:15, 16:6
**Steps** [1] - 8:11
**still** [2] - 29:19, 34:18
**Stop** [1] - 4:9
**stop** [47] - 3:17, 3:20, 4:1, 4:2, 4:5, 4:19, 5:15, 9:3, 9:13, 10:22, 11:19, 13:15, 14:11, 15:9, 15:18, 16:15, 17:11, 19:1, 19:12, 19:22, 21:19, 22:5, 22:7, 22:17, 22:18, 22:19, 22:21, 22:22, 23:12, 23:17, 23:18, 25:1, 25:11, 25:16, 25:22, 25:23, 33:25, 35:6, 36:19, 38:3, 40:1, 40:13, 41:1, 41:16, 42:8, 42:20, 44:1
**stopped** [2] - 31:7, 43:3
**stopping** [1] - 21:21
**stores** [1] - 16:13
**Storm** [1] - 8:1
**Street** [1] - 1:12
**strong** [1] - 43:6
**studies** [1] - 33:20
**subcommittee** [1] - 14:1
**subject** [2] - 20:11, 26:2
**submitting** [1] - 37:25
**subsection** [1] - 19:8
**substantial** [4] - 33:13, 34:17, 34:18
**substation** [1] - 6:14
**succeed** [1] - 40:8
**success** [1] - 8:20
**Suess** [5] - 14:20, 23:22, 24:14, 24:20, 41:22
**suffer** [1] - 40:8
**suffered** [2] - 31:14, 32:1
**suffering** [1] - 32:19
**suggest** [2] - 11:7, 28:20
**suit** [1] - 30:24
**Suite** [2] - 1:12, 1:20

**sunk** [1] - 42:25
**supervise** [1] - 20:23
**supervisory** [2] - 19:1, 19:7
**support** [1] - 29:2
**Supreme** [2] - 42:11, 42:17
**survey** [3] - 14:7, 15:3, 37:25
**suspend** [2] - 9:17, 20:10
**suspended** [1] - 2:25
**suspension** [2] - 10:24, 11:2
**suspensions** [2] - 9:21, 20:1
**SWANSON** [2] - 1:15, 36:16
**system** [3] - 3:14, 7:10, 39:10

## T

**technology** [1] - 14:7
**teeming** [1] - 39:1
**temporary** [7] - 20:1, 26:12, 26:15, 26:16, 26:18, 32:4, 32:5
**ten** [1] - 7:8
**tense** [1] - 19:13
**term** [1] - 20:21
**terminate** [2] - 16:10, 43:15
**terminated** [1] - 15:25, 16:24
**terms** [4] - 8:19, 11:8, 16:4, 39:6
**territorial** [1] - 40:21
**test** [2] - 7:6, 7:9
**text** [2] - 9:9, 22:13
**THE** [71] - 1:1, 1:1, 1:9, 2:2, 2:10, 2:13, 2:18, 2:22, 4:5, 4:8, 4:11, 4:15, 4:19, 4:22, 4:25, 5:20, 6:18, 7:18, 8:14, 8:17, 10:7, 12:10, 12:13, 12:22, 12:25, 13:21, 13:24, 14:2, 14:11, 14:14, 14:16, 14:20, 15:20, 16:1, 16:3, 16:18, 16:21, 17:2, 18:7, 18:10, 18:15, 18:18, 21:11, 22:16, 23:16, 23:20, 23:24, 24:14, 25:1, 25:4, 25:8, 25:18, 26:15, 26:21, 27:10, 27:14, 28:5, 29:18, 31:22, 31:24, 35:2, 35:11,

35:17, 35:19, 35:22, 36:7, 36:9, 36:15, 37:2, 39:21, 39:25
**themselves** [1] - 30:17
**therefore** [1] - 18:4
**they've** [5] - 26:10, 31:17, 31:18, 35:7, 37:22
**third** [1] - 12:3
**thousands** [1] - 11:23
**threat** [1] - 20:2
**threatens** [1] - 3:17
**three** [7] - 6:12, 6:19, 6:23, 8:14, 8:15, 8:22, 8:24
**thrown** [1] - 22:3
**tie** [1] - 5:17
**timeline** [2] - 6:22, 27:4
**tips** [1] - 40:10
**today** [6] - 5:21, 7:23, 32:3, 36:1, 36:6, 37:14
**together** [2] - 7:10, 7:11
**took** [3] - 7:14, 28:3, 42:3
**top** [1] - 6:15
**Torstensen** [2] - 2:12, 18:11
**TORSTENSEN** [21] - 1:15, 2:11, 18:9, 18:11, 18:17, 18:19, 22:12, 22:21, 23:18, 23:21, 24:2, 24:17, 25:2, 25:5, 25:10, 25:25, 26:17, 26:23, 27:13, 27:15, 36:13
**totally** [3] - 12:23, 12:24, 13:1
**touched** [1] - 8:22
**transcript** [2] - 44:16, 44:17
**TRANSCRIPT** [1] - 1:9
**tribes** [1] - 34:14
**troubled** [1] - 35:15
**true** [2] - 44:15, 44:17
**Trump** [1] - 18:19
**trying** [2] - 26:18, 35:11
**turbine** [2] - 3:10, 7:7
**turbines** [3] - 3:11, 30:15, 38:19
**turn** [1] - 19:5
**turning** [1] - 31:16
**TV** [1] - 12:19
**two** [15] - 6:23, 7:1, 11:18, 11:22, 14:5, 15:1, 15:11, 16:13, 16:14, 36:10, 36:12,

37:16, 37:17, 38:10,
41:12

## U

**U.S** [8] - 1:24, 4:3,
15:14, 19:18, 40:11,
41:25, 42:4, 42:16
**Udall** [1] - 19:18
**unable** [1] - 13:14
**uncertainty** [1] - 31:13
**under** [23] - 2:24, 6:3,
7:17, 8:13, 10:2,
10:12, 10:17, 10:24,
11:2, 16:7, 18:25,
19:1, 19:8, 20:17,
22:10, 22:15, 23:23,
35:25, 38:10, 39:6,
40:6, 41:23, 42:12
**underscore** [2] - 8:19,
15:23
**underscores** [1] - 3:25
**understood** [1] - 35:10
**undertaken** [1] - 21:6
**undertakes** [1] - 21:25
**undertaking** [2] -
36:20, 40:16
**underway** [1] - 23:7
**unilaterally** [1] - 6:5
**uninformed** [1] - 13:5
**unique** [1] - 39:5
**UNITED** [2] - 1:1, 1:10
**United** [2] - 32:22,
44:22
**universe** [1] - 20:5
**University** [1] - 41:24
**unlawful** [1] - 3:16
**unless** [2] - 28:4,
39:17
**unlikely** [1] - 19:3
**unprecedented** [1] -
3:16
**unquote** [4] - 40:15,
40:18, 40:21, 42:4
**unsubstantial** [1] -
3:20
**unsubstantiated** [1] -
33:18
**up** [12] - 3:11, 3:14,
3:23, 4:15, 5:17, 7:7,
8:1, 15:25, 18:15,
29:12, 29:24, 36:22
**urge** [2] - 12:20, 15:15
**USC** [1] - 9:20
**uses** [11] - 12:9, 18:25,
19:11, 20:17, 21:8,
24:8, 25:14, 27:3,
34:5, 34:22, 40:20
**utilities** [1] - 16:8
**utterly** [1] - 11:4

## V

**various** [1] - 5:10
**venture** [5] - 6:3, 6:4,
32:7, 39:3, 39:7
**vessel** [2] - 7:19, 7:20
**vessels** [5] - 5:5, 7:14,
7:15, 7:16, 8:7
**vests** [1] - 20:8
**view** [1] - 4:12
**violated** [1] - 24:4
**violates** [2] - 4:2, 12:2
**violating** [1] - 11:8
**violation** [4] - 3:2,
3:21, 9:25, 26:1

## W

**wait** [1] - 5:17
**waiting** [2] - 6:15,
37:19
**walk** [1] - 6:8
**Wampanoag** [1] -
34:14
**wants** [4] - 13:12,
22:2, 35:4, 44:5
**War** [1] - 20:9
**war** [2] - 20:10, 20:13
**warrant** [1] - 23:10
**warranted** [1] - 25:16
**Washington** [6] - 1:4,
1:13, 1:17, 1:21,
1:25, 44:24
**water** [1] - 13:3
**waters** [1] - 18:25
**WATKINS** [1] - 1:12
**Watkins** [1] - 2:8
**ways** [1] - 5:23
**weak** [1] - 3:24
**weather** [4] - 7:24, 8:2,
8:5, 8:8
**week** [1] - 32:4
**weekend** [1] - 33:23
**weighs** [2] - 17:7, 18:4
**weight** [1] - 13:6
**well-paying** [1] - 17:22
**whales** [1] - 34:11
**whatsoever** [2] - 3:4,
4:8
**WHITE** [2] - 6:21, 6:24
**whole** [1] - 7:10
**wholesale** [1] - 39:10
**Wind** [27] - 2:3, 2:9,
3:18, 14:6, 17:8,
18:23, 19:3, 19:19,
27:7, 29:1, 32:19,
33:6, 36:2, 39:6,
40:1, 40:3, 40:23,
41:10, 41:14, 42:9,
42:25, 43:4, 43:7,

43:9, 43:13, 43:21
**wind** [11] - 3:11, 7:7,
17:1, 18:1, 18:20,
29:16, 32:7, 33:17,
33:19, 38:19, 38:22
**WIND** [1] - 1:2
**Wind's** [6] - 3:4, 11:21,
18:13, 27:21, 39:12,
43:19
**window** [1] - 8:5
**Winter** [1] - 40:6
**winter** [2] - 8:2, 8:8
**won** [1] - 35:12
**workers** [4] - 5:9, 5:12,
11:23, 43:3
**worse** [1] - 8:3
**worsening** [1] - 8:8
**worth** [1] - 34:22
**written** [1] - 19:12

## Y

**year** [2] - 43:12, 43:13
**years** [4] - 6:19, 7:14,
11:18, 11:22

## Z

**zone** [1] - 40:20