**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

REVOLUTION WIND, LLC,
~~500 Exchange Street, 10th Floor~~
~~Providence, RI 02903~~

       *Plaintiff,*

    v.

DOUGLAS J. BURGUM, in his official
capacity as Secretary of the U.S. Department
of the Interior;
~~1849 C Street, NW~~
~~Washington, DC 20240~~

UNITED STATES DEPARTMENT OF THE
INTERIOR;
~~1849 C Street, NW~~
~~Washington, DC 20240~~

MATTHEW GIACONA, in his official
capacity as Acting Director of the Bureau of
Ocean Energy Management;
~~1849 C Street, NW~~
~~Washington, DC 20240~~

BUREAU OF OCEAN ENERGY
MANAGEMENT;
~~1849 C Street, NW~~
~~Washington, DC 20240~~

KENNETH STEVENS, in his official
capacity as Principal Deputy Director
Exercising the Delegated Authorities of the
Director of the Bureau of Safety and
Environmental Enforcement; and
~~1849 C Street, NW~~
~~Washington, DC 20240~~

BUREAU OF SAFETY AND
ENVIRONMENTAL ENFORCEMENT,
~~1849 C Street, NW~~
~~Washington, DC 20240~~

       *Defendants~~.~~,*

**and**

**GREEN OCEANS,**

       ***Defendant-Intervenor.***

Civil Action No.: 1:25-cv-2999**-RCL**

**SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Revolution Wind, LLC ("Revolution Wind") brings this **Supplemental** Complaint for Declaratory and Injunctive Relief against Defendants Douglas J. Burgum, in his official capacity as Secretary of the Interior; the United States Department of the Interior ("Interior"); Matthew Giacona, in his official capacity as the Acting Director of the Bureau of Ocean Energy Management ("BOEM"); BOEM; Kenneth Stevens, in his official capacity as the Principal Deputy Director Exercising the Delegated Authorities of the Director of the Bureau of Safety and Environmental Enforcement ("BSEE"); and BSEE.

## PRELIMINARY STATEMENT

1.      This is an action for emergency injunctive relief and to vacate and set aside the unlawful August 22, 2025 BOEM "Director's Order" (hereinafter the "**First** Stop Work Order"), Ex. A,[1] ~~requiring that~~ **and the unlawful December 22, 2025 BOEM "Director's Order" (hereinafter the "Second Stop Work Order), Ex. B.**

**2.      The First Stop Work Order required** Revolution Wind **to** halt construction on the U.S. Outer Continental Shelf that was approved almost two years ago and is almost complete.  The Project has spent billions of dollars in reliance on these valid approvals.  The **First** Stop Work Order is invalid and must be set aside because it was issued without statutory authority, in violation of agency regulations and procedures and the Fifth Amendment's Due Process Clause, and is arbitrary and capricious.  **This Court preliminarily enjoined the First Stop Work Order on September 22, 2025.  Dkt. 36.  The Federal Defendants did not appeal the Court's September**

---

[1] The **First and Second** Stop Work ~~Order is~~**Orders are** also available on BOEM's website at https://www.boem.gov/~~sites/default/files/documents/~~renewable-energy/~~Director%26%23039%3BsOrder-20250822.pdf?VersionId=Y674sNo8zi7jLu3VWRvq2hFb_8KtMlde~~**state-activities/revolution-wind**.

**22, 2025 preliminary injunction.**

**3.    The Second Stop Work Order suspended all ongoing activities related to the Revolution Wind Project on the Outer Continental Shelf for the next 90 days, while also contemplating extensions of that deadline.  The Second Stop Work Order is invalid and must be set aside for many of the same reasons as this Court preliminarily enjoined the First Stop Work Order.**

~~2~~4.    The Revolution Wind Farm and Revolution Wind Export Cable (the "Project") is an offshore wind project located on the ~~U.S.~~ Outer Continental Shelf that is currently slated to deliver substantial additional energy necessary to support reliability and expected economic growth in New England, particularly in Rhode Island and Connecticut.

~~3~~5.    Over the course of many years, Revolution Wind and federal regulators, including Defendants, have undertaken an extensive environmental, national defense, and safety review covering every conceivable aspect of the Project's development and construction.  This review, spanning three Presidential administrations, culminated nearly two years ago in a consensus decision of 15 federal and state agencies that the Project is both safe and consistent with federal and state law.

~~4~~6.    The federal government conducted a multi-year process to review and delineate the lease area obtained by Revolution Wind, including, but not limited to, consultation with the Department of ~~Defense~~War ("~~DOD~~DOW")[2] and consideration of fisheries issues.   After Revolution Wind obtained its lease through auction by the United States, it worked to conduct and secure more than 20 required federal, state, and local environmental consultations, permits, and

---

[2] **Because the majority of the documents involved in the Project's consultations and approvals predate the renaming of the "Department of Defense" to the "Department of War" this complaint uses "Department of War" or "DOW," except where a quoted document or other material refers to the "Department of Defense" or "DOD."**

approvals as a part of the extensive review required to secure a final decision on the Project.³ The review also included numerous opportunities for stakeholders and members of the public to provide comments, input, and consultations.

**5̶7̲.** Since January 2024, Defendants have been defending Revolution Wind's federal permits and approvals in ongoing federal litigation in this Court. Defendants confirmed in court filings that Revolution Wind's "review was designed to ensure the soundness of the project and to comply with multiple federal statutes. . . ." Defendants admitted the lawfulness of the procedures and approvals for Revolution Wind, stating that "[w]here, as here, a developer has complied with agency rules and satisfied federal statutory requirements, it should be able to rely on its permits, as it may need to make business and financial decisions in furtherance of completing the authorized activity."

**6̶8̲.** In reliance on these permits and approvals (that Defendants have been defending in court) and continued coordination with relevant federal agencies, offshore construction of this multi-billion dollar Project has been underway since January 2024 and is now **very** close to completion.

**9̲.** **As of the First Stop Work Order,** Revolution Wind **has̶had** installed all 67 monopile foundations in the ocean floor for the Project's wind turbine generators ("WTGs") and for its two offshore substations **and, as of the Stop Work Order, it̲;** had **also̶** fully installed approximately 70% of the WTGs themselves**. ̶ ̶O̶v̶e̶r̶a̶l̶l̲; and overall**, construction of the Project **is̶was** approximately 80% complete and **has̶** cost billions of dollars in reliance on the validly issued

---

³ *See, e.g.*, BOEM, Revolution Wind Farm and Revolution Wind Export Cable Project Final Environmental Impact Statement, Appendix A: Required Environmental Permits and Consultations, at Table A-1 (July 2023), https://www.boem.gov/sites/default/files/ documents/renewable-energy/state-activities/Revolution_Wind_FEIS_Vol2_Part1of3_0.pdf (listing required permits and consultations).

permits.

**10.    As of the Second Stop Work Order, construction of the Project was approximately 87% complete.  All of the monopile foundations had been installed, slightly less than 90% of the wind turbines (58 out of 65) were completed; and cable installation was substantially complete.**

~~7~~**11**.  The Project is projected to deliver enough domestic energy to power more than 350,000 homes in Rhode Island and Connecticut.  The New England grid operator has stated that "[d]elaying the [P]roject will increase risks to reliability," including "near-term impacts to reliability in the summer and winter peak periods" and inhibiting expected economic growth.  *See infra ¶ 196.*  The Project has employed more than 2,000 people to date across construction, manufacturing, shipbuilding, and operations, and would create hundreds of additional jobs for the lifetime of the Project, along with other investments in the community.  To date, more than 800 local union labor full-time equivalents have worked on the construction of the Project.

~~8~~**12**.  On January 20, 2025,  the President issued a Presidential Memorandum that withdrew the Outer Continental Shelf from offshore wind leasing, purported to halt all new permits for offshore wind development, and required agencies to review whether existing permits and leases may be terminated, among other things.[~~3~~4]  On July 29, 2025, Secretary Burgum followed by issuing a Secretarial Order implementing the Presidential Memorandum and requiring the Interior Assistant Secretary of Land and Minerals Management within 45 days **(i.e., by September 12, 2025)** to provide a report with recommendations on the effects of taxpayer-funded subsidies on

---

[~~3~~4] Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects, 90 Fed. Reg. 8363 (Jan. 29, 2025) ("Presidential Memorandum").  ~~The Presidential Memorandum is the subject of separate litigation brought by numerous States and the District of Columbia.  *See generally State of New York, et al. v. Trump, et al.*, 25-cv-11221-WGW (D. Mass.).~~

the wind industry, and impacts that the development of offshore wind projects may have on military readiness, among other things.[4][5]  **Federal agency defendants' implementation of the Presidential Memorandum's pause on new wind energy authorizations was recently declared unlawful and set aside by the United States District Court for the District of Massachusetts.** *State of New York v. Trump***, No. 25-cv-11221 (D. Mass.), Dkts. 234, 240.**

~~9~~**13**. While halting new offshore wind energy development in the Presidential Memorandum, the President declared a "national energy emergency" in a separate executive order.[5][6]  That "national energy emergency" order identified the "integrity and expansion of our Nation's energy infrastructure—from coast to coast—[as] an immediate and pressing priority for the protection of the United States' national and economic security," but it excluded any mention of wind energy from its terms, which otherwise encompassed "oil, natural gas, coal, hydropower, biofuels, critical mineral, and nuclear energy resources." *Id.*  In addition, the Executive Order, "Removing Barriers to American Leadership in Artificial Intelligence" directs certain actions to "retain global leadership in artificial intelligence," which requires substantial additional power.[6][7]

~~10~~**14**.   On August 22, 2025, BOEM's Acting Director issued the unlawful **First** Stop Work Order**,** referring to the Presidential Memorandum.   The **First** Stop Work Order halts offshore construction of Revolution Wind on the Outer Continental Shelf pending BOEM's review of purported national security "concerns" and interference with reasonable uses of the Outer Continental Shelf.  But ~~DOD~~**DOW** previously cleared the Project to proceed.  The **First** Stop

---

[4][5] Secretarial Order 3437, "Ending Preferential Treatment for Unreliable, Foreign-Controlled Energy Sources in Department Decision-Making."

[5][6] Exec. Order No. 14156, Declaring a National Energy Emergency, 90 Fed. Reg. 8433 (Jan. 29, 2025).

[6][7] Exec. Order No. 14179, Removing Barriers to American Leadership in Artificial Intelligence, 90 Fed. Reg. 8741 (Jan. 31, 2025).

Work Order does not accuse Revolution Wind of violating any law or condition of the Project's approval.

**11****15**.   The **First** Stop Work Order was issued without statutory authority, lacks any evidentiary basis, and is unlawful.  Although the Order invokes 43 U.S.C § 1337(p)(4) and 30 C.F.R. § 585.102(a), those provisions do not authorize BOEM to halt ongoing activities—rather, those provisions instruct BOEM on the factors to evaluate in the course of making a decision, which the agency evaluated in great detail in approving the Project and issuing a Record of Decision.  The **First** Stop Work Order exceeds BOEM's authority under the Outer Continental Shelf Lands Act ("OCSLA"), and must be set aside under the Administrative Procedure Act ("APA").

**12****16**.   Further, the **First** Stop Work Order was issued without observance of procedure as required by law, in violation of the APA.  OCSLA and Department of the Interior regulations provide specific processes to be followed if the Department believes there is a need to suspend a lease or halt activities for reasons specified in the statute, applicable regulations, and the Revolution Wind lease.  BOEM completely disregarded those processes ~~here~~**with the First Stop Work Order**.  And, because Defendants failed to provide Revolution Wind any process, the **First** Stop Work Order also violates the Due Process requirement of the Fifth Amendment.

**13****17**.   The **First** Stop Work Order is also arbitrary and capricious in violation of the APA, as it is inconsistent with the facts and record before the agency showing that the Project's operations will not harm national security or interfere with other reasonable uses of the Outer Continental Shelf.  The **First** Stop Work Order's concerns are inconsistent with Defendants' statements in filings before this Court in other litigation; those statements expressly deny that the Project interferes with national security and military uses of the ~~Outer Continental Shelf~~**OCS**,

7

and deny that the Project will interfere with other reasonable uses of the Outer Continental Shelf. The **First** Stop Work Order does not include a single reference to the federal review to identify preferred areas for leasing offshore of Rhode Island and Massachusetts dating back to 2009, or to the more than nine years of exhaustive federal and state review already completed for this Project in particular. Nor does it explain the basis for its decision, particularly in light of previous agency findings supporting approval of the Project that specifically addressed national security and other uses of the Outer Continental Shelf.

~~14~~18. The **First** Stop Work Order also arbitrarily ignores Revolution Wind's obvious and substantial actions and billions of dollars of investments made in reliance on Defendants' approvals of the Project. Defendants fail to account for these significant reliance interests, offer no reasoned explanation for the decision, fail to even acknowledge their change in position, and base the decision to issue the **First** Stop Work Order on factors that Congress did not intend them to consider—including political pressure without regard to the administrative record underlying the Project's approval. This failure is particularly inexcusable because Defendants have admitted in ongoing litigation before this Court that Revolution Wind has legitimately relied on the federal approvals to make business and financial decisions.

~~15.    If unabated, the~~**19.    In the absence of the Court's stay and preliminary injunction, the First** Stop Work Order ~~will~~**would** inflict devastating and irreparable harm on Revolution Wind. **As of the First Stop Work Order,** Revolution Wind ~~has~~**had** already spent or committed approximately $5 billion on the Project, and will incur over $1 billion in breakaway costs if the Project is cancelled, all of which Revolution Wind may lose if the unlawful **First** Stop Work Order ~~remains~~**is ultimately allowed to remain** in effect. Revolution Wind spent these sums and incurred these financial obligations in reasonable reliance on Defendants' approval and

authorization of the Project and with the expectation of due process under the law.

~~16.~~    ~~The~~20.    In the absence of the Court's stay and preliminary injunction, the First Stop Work Order also ~~impairs~~threatened Revolution Wind's ability to meet its contractual obligations to deliver power pursuant to twenty-year Power Purchase Agreements ("PPAs") it executed with utilities in Connecticut and Rhode Island, and ~~there is a risk~~risked that some or all of those PPAs could be terminated (in addition to the liquidated damages that are payable by Revolution Wind under them).  It also ~~threatens~~threatened multiple billions of dollars of revenue over the life of the Project.

~~17.~~    ~~The~~21.    In the absence of the Court's stay and preliminary injunction, the First Stop Work Order also ~~increases~~increased risks to the New England regional electric grid's reliability by preventing much-needed new power from coming online.  The independent operator of the New England grid issued a statement acknowledging the First Stop Work Order, stating that delaying the Project will "increase risks to reliability," and explaining that "[u]npredictable risks and threats to resources—regardless of technology—that have made significant capital investments, secured necessary permits, and are close to completion will stifle future investments, increase costs to consumers, and undermine the power grid's reliability."

22.    On December 22, 2025, with no advance notice, BOEM issued the Second Stop Work Order:  a new "Director's Order" to Revolution Wind ordering it to "suspend all ongoing activities related to the Revolution Wind Project on the Outer Continental Shelf for the next 90 days for reasons of national security."  The Second Stop Work Order states that BOEM may further extend the 90-day suspension period.

23.    The Second Stop Work Order, like the First, was issued without notice or a hearing and it offers no reasoning other than a conclusory assertion of "impacts to national

security from offshore wind projects"—a topic that was comprehensively addressed during the Project's approval process and was previously litigated in this Court in conjunction with the First Stop Work Order.

24.    Like the First Stop Work Order, the Second Stop Work Order violates the APA, OCSLA, and the Fifth Amendment.

25.    The Second Stop Work Order is arbitrary and capricious:  It is wholly conclusory, internally inconsistent, and overbroad.  The Second Stop Work Order ignores that Interior has stated plainly that the Project does not interfere with national security.  It also ignores Revolution Wind's obvious and substantial actions and billions of dollars of investment made in reliance on Defendants' approvals of the Project.

26.    BOEM issued the Second Stop Work Order—and thus directly and immediately impaired Revolution Wind's property interests—without notice and a hearing, in violation of the U.S. Constitution and 5 U.S.C. § 558.

27.    BOEM also lacked statutory authority for the Second Stop Work Order.

28.    If allowed to remain in force, the Second Stop Work Order is estimated to continue to cost Revolution Wind at least $1.44 million per day.  And compounding impacts of delay risk Project cancellation, which would cause Revolution Wind to suffer enterprise-level harm including losses of more than $6 billion.

29.    Revolution Wind will suffer imminent and irreparable harm if the Second Stop Work Order remains in force and Revolution Wind is unable to proceed with Project construction on the Outer Continental Shelf.

30.    Revolution Wind has carefully sequenced its construction schedule and has contracted specialized vessels necessary for Project construction.  These specialized vessels

**are in limited supply globally and are tightly scheduled, with little or no availability to work beyond the contracted reservation dates.**

**31.    If the Second Stop Work Order is not enjoined, there is a high-risk Revolution Wind will not complete installation of the Project's remaining WTGs before the latest vessel availability date in the contract for the specialized vessel required to complete this critical work.  Even a short-term delay threatens Project completion and the Project's ability to meet the deadlines in its Rhode Island PPA.**

**32.    As of the Second Stop Work Order, Revolution Wind had already spent or committed more than $5 billion on the Project, and, as with the First Stop Work Order, will incur over $1 billion in breakaway costs if the Project is cancelled.  Revolution Wind may lose all of this investment if the unlawful Second Stop Work Order remains in effect. Revolution Wind spent these sums and incurred these financial obligations in reasonable reliance on Defendants' approval and authorization of the Project and with the expectation of due process under the law.  Revolution Wind would also forgo billions of dollars in revenues under its PPAs over the life of the Project.**

**33.    Revolution Wind requests an order from the Court declaring that the First Stop Work Order violates OCSLA, its implementing regulations, the APA, and the U.S. Constitution, and vacating and setting aside the unlawful First Stop Work Order.  The Court should further maintain its stay of the First Stop Work Order and preliminary injunctive relief and grant permanent injunctive relief preventing Defendants from enforcing the Stop Work Order to interfere with Revolution Wind's ability to conduct lawful activities to construct and operate the Project.**

~~18~~**34**.   Revolution Wind **also** requests an order from the Court declaring that the **Second**

Stop Work Order violates OCSLA, ~~its implementing regulations~~, the APA, and the U.S. Constitution, and vacating and setting aside the unlawful **Second** Stop Work Order. The Court should further grant a stay of the **Second** Stop Work Order and preliminary and permanent injunctive relief preventing Defendants from enforcing the ~~Stop~~**Second** Work Order to interfere with Revolution Wind's ability to conduct lawful activities to construct and operate the Project.

## PARTIES

~~19~~**35**. Plaintiff Revolution Wind is an offshore wind energy company engaged in the construction of ~~a~~**an approximately** 704-megawatt ("MW") offshore wind farm located on the Outer Continental Shelf, in federal waters in the Atlantic Ocean 15 miles east of Block Island, Rhode Island, and approximately 15.7 miles from Newport, Rhode Island. Revolution Wind is a limited liability company organized under the laws of Delaware with its principal place of business at 500 Exchange Street, 10th Floor, Providence, Rhode Island 02903. Defendants' unlawful actions are injuring Revolution Wind by directly preventing Revolution Wind from developing its lease, causing financial and contractual burdens, creating delay in Revolution Wind's development of the Project on its leasehold, and depending on the length of delay, potentially jeopardizing the Project entirely. *See Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002) (noting that when the plaintiff is "an object of the action . . . at issue," there "should be little question" that the action "caused him injury"). Enjoining enforcement of the **First and Second** Stop Work ~~Order~~**Orders** and vacating the unlawful agency ~~action~~**actions** will redress these injuries because Revolution Wind will be able to complete its approved, lawful construction of the Project.

~~20~~**36**. Defendant Department of the Interior is a department of the United States that oversees BOEM and BSEE. Its headquarters and principal place of business are located at 1849 C Street NW, Washington, DC 20240. Its governmental activities occur nationwide.

~~21~~**37**.   Defendant Douglas J. Burgum is the Secretary of the Interior.  He is sued in his official capacity.   In this capacity, Secretary Burgum is responsible for activities at Interior, including the actions and decisions complained of herein.

~~22~~**38**.   Defendant Matthew Giacona is the Acting Director of BOEM and Defendant Kenneth Stevens is the Principal Deputy Director of BSEE.  Both are sued in their official capacities.  Defendant BOEM and Defendant BSEE are agencies within the Department of the Interior, subject to control by Interior leadership.  BOEM's headquarters are located at 1849 C Street NW, Washington, DC 20240.  BSEE's headquarters are also located at 1849 C Street NW, Washington, DC 20240.  BOEM and BSEE are the agencies charged with managing offshore resources in federal waters on the Outer Continental Shelf, including offshore wind.  43 U.S.C. § 1337; 30 C.F.R. part 585 (BOEM); 30 C.F.R. part 285 (BSEE).  BOEM approved the Project's Construction and Operations Plan and issued the **First and Second** Stop Work ~~Order~~**Orders**. BSEE did not issue any cessation order prior to BOEM issuing the **First and Second** Stop Work ~~Order~~**Orders**.  The governmental activities of both BOEM and BSEE occur nationwide.

### JURISDICTION, VENUE, EXHAUSTION, AND FINAL AGENCY ACTION

~~23~~**39**.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under federal law pursuant to the APA, 5 U.S.C. §§ 701-706, OCSLA, 43 U.S.C. §§ 1331-1356c, and the United States Constitution.

~~24~~**40**.   Revolution Wind's prayers for a declaratory judgment and injunctive relief are authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the APA, 5 U.S.C. §§ 701-706, and 28 U.S.C. § 1361.

~~25~~**41**.   Venue is proper in this district under 28 U.S.C. § 1391(e) and 5 U.S.C. § 703 because federal Defendants are sued in their official capacities and reside in the District of

Columbia, and because "a substantial part of the events or omissions giving rise to the claim[s]" brought herein "occurred" in the District of Columbia.  28 U.S.C. § 1391(e).

**26~~42~~**.    The **First and Second** Stop Work ~~Order is~~**Orders are** final agency action subject to judicial review under 5 U.S.C. § 704.  The **First and Second** Stop Work ~~Order was~~**Orders were** immediately effective, ~~marks~~**marked** the consummation of Defendants' decision-making, and ~~results~~**resulted** in immediate, irreparable legal consequences to Revolution Wind.

**27~~43~~**.    There is no mandatory statutory or regulatory requirement for exhaustion of administrative remedies.  Thus, administrative exhaustion is not a prerequisite to suit.[7~~8~~]

<h1 style="text-align:center">BACKGROUND</h1>

**A.    The Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331-1356c**

**28~~44~~**.    OCSLA governs the leasing of the Outer Continental Shelf for energy and mineral development.  OCSLA describes the Outer Continental Shelf as a "vital national resource reserve" that "should be made available for expeditious and orderly development."  43 U.S.C. § 1332(3).

**29~~45~~**.    To effectuate this "expeditious and orderly development," Congress amended OCSLA in 2005 to expand its reach to include advances in renewable energy, authorizing the Secretary of the Interior to grant leases to "produce or support production, transportation, storage,

---

[7~~8~~] To the extent necessary, Revolution Wind submitted a citizen-suit notice **regarding the First Stop Work Order** to Federal Defendants on September 3, 2025**,** that complies with the statutory requirements in 43 U.S.C. § 1349(a).  Ex. ~~B.~~**C.  Revolution Wind also submitted a second citizen-suit notice regarding the Second Stop Work Order to Federal Defendants on December 31, 2025, that complies with the statutory requirements in 43 U.S.C. § 1349(a). Ex. D.**  Some courts have held that OCSLA's citizen-suit provision is inapplicable to lessees, such as Revolution Wind.  *See, e.g.*, *Murphy Exploration & Production Co. v. U.S. Dep't of the Interior*, 167 F. Supp. 2d 1 (D.D.C. 2000), rev'd on other grounds, *Murphy Exploration & Prod. Co. v. U.S. Dep't of the Interior*, 252 F.3d 473 (D.C. Cir. 2001).  To the extent notice is required under Section 1349, Section 1349(a)(3) allows an action to be brought in court immediately after notification of the alleged violation in any case in which the alleged violation "would immediately affect a legal interest of the plaintiff." 43 U.S.C. § 1349(a)(3).  That exception applies here, as Revolution Wind has a "legal interest" in the subject of the **First and Second** Stop Work ~~Order~~**Orders** that has been immediately and adversely affected by Interior's violation.  Either way, Revolution Wind is entitled to relief under the APA and the Due Process Clause of the Fifth Amendment.

or transmission of energy from sources other than oil and gas," including offshore wind.  43 U.S.C. § 1337(p)(1)(C); Pub. L. No. 109-58, 119 Stat. 594, 746.  OCSLA now directs and authorizes the Secretary of the Interior to issue calls for nominations of areas to be leased for offshore wind energy and to conduct wind lease sales on the Outer Continental Shelf.  43 U.S.C. § 1356c.

~~30~~46.  By providing for domestic offshore wind development, Congress sought to "enhance the energy security of the United States," to "decrease dependence on foreign sources of fuel," S. Rept. No. 109-78, at 1 (2005), and to "ensure jobs for our future with secure, affordable, and reliable energy," H.R. Rept. No. 109-90, at 1 (2005).

~~31~~47.  Since OCSLA's amendment in 2005, the United States has issued at least 39 commercial leases for wind development projects on the Outer Continental Shelf and has approved 11 wind projects totaling over 19 gigawatts, enough to provide electricity to millions of homes.

~~32~~48.  Offshore wind leasing and development under OCSLA is subject to numerous, extensive environmental reviews and stringent safety, national security, and environmental standards.  *See* 43 U.S.C. § 1346(a)(1).

~~33~~49.  BOEM is generally responsible for the development of offshore renewable energy in federal waters.  BOEM's renewable energy program occurs in four phases: planning and analysis, lease issuance, site assessment, and construction and operations.  BOEM conducts reviews throughout this process.

~~34~~50.  During phase one, BOEM determines where it will offer leases.  BOEM first enters into task forces with States to take stakeholder input, and to plan and assess areas for potential offshore wind development.  30 C.F.R. § 585.102(e).  It then publishes a Request for Interest in the Federal Register to gauge commercial interest in wind energy development at a generalized offshore location.  30 C.F.R. § 585.116.  Taking feedback from the Request for Interest and the

State task forces, BOEM selects a Wind Energy Area that appears most suitable for commercial wind energy activities, while presenting the fewest apparent environmental and user conflicts. The next step is publication of a "Call" in the Federal Register to identify locations where there is interest in seeking commercial leases for developing wind projects and to identify site conditions and resources and avoid conflicts with other uses of the Outer Continental Shelf. BOEM finally prepares an environmental assessment of the Call Area under the National Environmental Policy Act ("NEPA") to evaluate lease issuance. 30 C.F.R. §§ 585.210-212. This process includes consultation with multiple federal agencies, including consultation with ~~DOD~~**the DOW** on potential national security issues.

~~35~~**51**. During phase two, BOEM makes a Proposed Sale Notice available, 30 C.F.R. §§ 585.210(b)(3), 585.213, and may, as it did here, hold a competitive lease sale. 30 C.F.R. §§ 585.220-226.

~~36~~**52**. During phase three, after lease issuance, a lessee may submit and have BOEM approve a Site Assessment Plan including "detailed information and analysis to assist BOEM in complying with NEPA," 30 C.F.R. § 585.611(a), and a demonstration of how the lessee's activities to assess a lease site will maintain safety and environmental protection, including "proposed measures for avoiding, minimizing, reducing, eliminating, and monitoring environmental impacts," 30 C.F.R. § 585.610(a)(8), as well as the results of numerous geological, biological, archaeological, meteorological, and oceanographic studies and models. 30 C.F.R. § 585.610(b).

~~37~~**53**. During phase four, lessees must submit for BOEM's approval a Construction and Operations Plan describing, among other things: how the construction, operation, and decommissioning of the project will proceed; the results of navigational and safety risk assessments for the project's interactions with military vessels, commercial vessels, and fisheries;

a detailed description of the project's safety management system; what liquid and solid wastes the project will generate; the results of geological, geotechnical, biological, archaeological, socioeconomic and oceanographic studies; detailed information on environmental hazards, water quality, biological resources (including marine mammals), threatened and endangered species, sensitive habitats, other ocean users (including fishing) and how the project will prevent, minimize, and if necessary ameliorate impacts to any of these; and other requirements.  30 C.F.R. §§ 585.620-628.

~~38~~54.    BOEM then conducts a thorough review of a project's Construction and Operations Plan, including developing an environmental impact statement ("EIS"), as well as complying with numerous other federal laws.  30 C.F.R. § 585.628; 43 C.F.R. Part 46 (2023).[8][2]

~~39~~55.    In practice, completing the necessary reviews requires years of careful preparation, investment, field surveys, analyses, documentation, and response to public comments before final approvals may be issued.  The Project expended over a hundred million dollars in this process.

~~40~~56.    BSEE collaborates with BOEM to ensure that offshore wind projects will be constructed and operated safely, consistent with BSEE's role in developing safety and environmental regulations for the offshore wind industry.

~~41~~57.    BSEE thus conducts additional review and compliance monitoring for offshore wind developments.  For example, BSEE requires lessees to submit, among other things: facility design reports and fabrication and installation reports prior to installing any facilities described in the Construction and Operations Plan, 30 C.F.R. § 285.700(a); and an Oil Spill Response Plan for review and approval, *id.* § 585.627.  BSEE also requires lessees to have a Safety Management

---

[8][2] The Department of the Interior has recently revised its NEPA regulations.  *See* Dep't of Interior, National Environmental Policy Act Implementing Regulations, 90 Fed. Reg. 29,498 (July 3, 2025).

System that will guide all activities described in the approved Construction and Operations Plan. *Id.* § 285.810.

~~42~~**58**.   43 U.S.C. § 1337(p)(4) provides that "[t]he Secretary shall ensure that any activity under this subsection," generally covering the required procedures for granting offshore leases, "is carried out in a manner that provides for:" "safety", "protection of the environment," "public notice and comment" on proposed leases, "protection of national security interests," and "prevention of interference with reasonable uses" of the Outer Continental Shelf, among other things.

~~43~~**59**.   OCSLA's provision that authorizes leasing of the Outer Continental Shelf for offshore wind also provides that the "Secretary shall provide for the duration, issuance, transfer, renewal, suspension, and cancellation of a lease, easement, or right-of-way under this subsection", 43 U.S.C. § 1337(p)(5), and requires the Secretary to promulgate regulations implementing that directive in consultation with certain Cabinet secretaries, including the Secretary of Defense.  *Id.* at § 1337(p)(8).  Those regulations are found at 30 C.F.R. parts 285 (BSEE) and 585 (BOEM).

~~44~~**60**.   OCSLA's statutory text and implementing regulations provide very narrow authority and specific procedures for: (1) directing the cessation of activities on leased areas if violations occur; (2) suspending operations under any lease during a state of war or national emergency for national security reasons; and (3) suspending offshore wind leases.  Neither the statute nor the regulations grant Interior, BOEM, or BSEE general authority to order cessation of activities or suspend leases based on pure policy considerations**, including the alleged national security concerns articulated here**.

~~45~~**61**.   One national security provision states that "[a]ll leases issued under this subchapter, and leases, the maintenance and operation of which are authorized under this subchapter, shall contain or be construed to contain a provision whereby authority is vested in the Secretary, upon

a recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or the President of the United States after August 7, 1953, to suspend operations under any lease; and all such leases shall contain or be construed to contain provisions for the payment of just compensation to the lessee whose operations are thus suspended."  43 U.S.C. § 1341(c).

~~46~~62.   Another OCSLA provision states that "[t]he United States reserves and retains the right to designate by and through the Secretary of Defense, with the approval of the President, as areas restricted from exploration and operation that part of the outer Continental Shelf needed for national defense; and so long as such designation remains in effect no exploration or operations may be conducted on any part of the surface of such area except with the concurrence of the Secretary of Defense; and if operations or production under any lease theretofore issued on lands within any such restricted area shall be suspended, any payment of rentals, minimum royalty, and royalty prescribed by such lease likewise shall be suspended during such period of suspension of operation and production, and the term of such lease shall be extended by adding thereto any such suspension period, and the United States shall be liable to the lessee for such compensation as is required to be paid under the Constitution of the United States."  43 U.S.C. § 1341(d).  The Secretary of ~~Defense~~**War** has not designated the Revolution Wind lease area as a restricted National Defense Area under OCSLA.

**63.   Revolution Wind's lease provides that BOEM may "suspend . . . operations in accordance with the national security and defense provisions of [42 U.S.C. § 1341]."  Ex. E at Section 3(c).  The lease further provides that, in the event of a suspension under § 1341, "[e]very effort will be made by the appropriate military agency to provide as much advance notice as possible of the need to suspend operations" and that "[a]dvance notice will normally**

be given before requiring a suspension."  *Id.* at Addendum C, Sec. 3.2.2.  Such "suspensions

. . . for national security reasons" will "not generally exceed seventy-two (72) hours."  *Id.* at

Addendum C, Sec. 3.2.3.

64.     43 U.S.C. § 1334(a)(1)(B) gives BOEM authority to order "suspension or

temporary prohibition of any operation or activity . . . pursuant to any lease or permit" "if

there is a threat of serious, irreparable, or immediate harm or damage to life . . . , to property,

to any mineral deposits . . . , or the marine, coastal, or human environment."  BOEM must

then provide "for the extension of any permit or lease affected by [such] suspension or

prohibition . . . by a period equivalent to the period of such suspension or prohibition."  43

U.S.C. § 1334(a)(1)(B).

65.     Revolution Wind's lease provides that "[a]ny cancellation or suspension ordered

by the Lessor that is predicated on a threat of serious irreparable, or immediate harm or

damage, or on an imminent threat of serious or irreparable harm or damage, requires a

finding by the Lessor of particularized harm that it determines can only be feasibly averted

by suspension of on-lease activities."  Ex. E at Section 8.  No such finding by BOEM has been

presented here and no advance warning was provided.

~~47~~66.   30 C.F.R. § 585.102(a), which is the regulation cited in the **First** Stop Work Order

as the basis for ~~the Stop Work~~that Order, states that BOEM "will ensure that any activities

authorized in this part are carried out in a manner that provides for and reaches a rational balance

among the following goals to the extent they conflict or are otherwise in tension, none of which

inherently outweighs or supplants any other . . . ."  This analysis is required as part of BOEM's

review process before a project is approved.

**48****67**.    Neither 43 U.S.C. § 1337(p)(4) nor 30 C.F.R. § 585.102(a) grants authority to order a cessation of activities on an already established leasehold for reasons of national security or otherwise.

**49****68**.    30 C.F.R. § 585.105(h) purports to require lessees to "[c]onduct all activities authorized by the lease . . . in a manner consistent with the provisions of [43 U.S.C. § 1337(p)]" of OCSLA.

**50****69**.    30 C.F.R. § 585.106, in turn, lays out the procedure that BOEM must follow if there is a suspected violation of 30 C.F.R. § 585.105(h).

**51****70**.    Specifically, BOEM may issue "a notice of noncompliance" that tells the lessee "how [it] failed to comply with this part, any order of the Director and/or the provisions of [its] lease, grant or other approval, and will specify what [it] must do to correct the noncompliance and the time limits within which [it] must act." 30 C.F.R. § 585.106(b)-(c).

**52****71**.    BOEM's regulations provide that "[f]ailure of a lessee, operator, or grant holder to take the actions specified in a notice of noncompliance . . . within the time limit specified provides the basis for issuance of a cessation order by BSEE, as provided in 30 CFR 285.401 and/or cancellation of the lease or grant by the Secretary as provided in § 585.422." 30 C.F.R. § 585.106(d).

**53****72**.    In addition to BOEM's procedures for issuing a notice of noncompliance, under the regulations, BSEE regulations also provide that BSEE may issue a "cessation order" requiring the cessation of activities on a lease when a lessee "fail[s] to comply with an applicable law; regulation; order; or provision of a lease, grant, plan, or BSEE or BOEM approval." 30 C.F.R. § 285.401(a). BSEE must allow lessees "a period of time to correct any noncompliance before issuing an order to cease activities," *id.* § 285.401(a). The only exception to that requirement is

when BSEE "determines that any incident of noncompliance poses an imminent threat of serious or irreparable damage to natural resources; life (including human and wildlife); property; the marine, coastal, or human environment; or sites, structures, or objects of historical or archaeological significance." *Id.* § 285.400(e). In all cases, "[a] cessation order will set forth what measures [the lessee is] required to take, including reports [it is] required to prepare and submit to BSEE, to receive approval to resume activities" on a lease. *Id.* § 285.401(b).

54.    BOEM is permitted to 73.    BOEM's regulations provide it may order "suspension" of a lease only to comply with judicial decrees or "when the suspension is necessary for reasons of national security or defense." 30 C.F.R. § 585.417. "A suspension is an interruption of the period of [a] lease" which extends the expiration date of the relevant period of the lease for the length in time the suspension is in effect. *Id.* § 585.415(b). The Stop Work Order does not use the term "suspension" nor otherwise state that the lease has been extended. During a "suspension," "[a]ctivities may not be conducted on [the] lease . . . except as expressly authorized under the terms of the lease . . . suspension." *Id.* § 585.415(a), (c). In other words, a lease suspension "suspends" the term (i.e., length) of the lease. In contrast, an order that halts activities does not preserve the equivalent lease term.[9] BOEM's regulations require that, in the event BOEM orders a suspension, BOEM's "written order will explain the reasons for its issuance and describe the effect of the suspension order on [the] lease or grant and any associated activities." *Id.* § 585.218 585.418(c).

---

[9]  Revolution Wind's lease provides, at Section 8, that "[a]ny cancellation or suspension ordered by the Lessor that is predicated on a threat of serious irreparable, or immediate harm or damage, or on an imminent threat of serious or irreparable harm or damage, requires a finding by the Lessor of particularized harm that it determines can only be feasibly averted by suspension of on-lease activities."

~~55~~74.  BSEE may also order a suspension of a lease to comply with judicial decrees or "when continued activities pose an imminent threat of serious or irreparable harm or damage to natural resources; life (including human and wildlife); property; the marine, coastal, or human environment; or sites, structures, or objects of historical or archaeological significance."  *Id.* § 285.417(a).  If BSEE orders a suspension, the lessee may be required to "conduct a site-specific study that evaluates the cause of the harm, the potential damage, and the available mitigation measures."  *Id.* § 285.417(b).  OCSLA regulations require that, in the event BSEE orders a suspension, BSEE's "written order will explain the reasons for its issuance and describe the effect of the suspension order on [the] lease or grant and any associated activities."  *Id.* § ~~285.218~~285.418(c).

**75.  The First Stop Work Order does not use the term "suspension" nor otherwise state that the lease has been extended.**

**76.  The Second Stop Work Order cites 30 C.F.R. § 585.417.  It "suspend[s] all ongoing activities related to the Revolution Wind Project on the Outer Continental Shelf for the next 90 days for reasons of national security," does not explain why suspension is "necessary" for reasons of national security, and does not otherwise state that the lease has been extended.**

**B.    Multi-Year Federal Consultation and Approval Process Concluding that Revolution Wind's Project Is Safe, Environmentally Sound, and Consistent with Federal Law**

~~56~~77.  Over the course of nearly a decade, Revolution Wind has undertaken an extensive environmental and safety review, costing the company over a hundred million dollars in planning, studies, surveys, and permitting.  A multitude of federal agencies reviewed and consulted on Revolution Wind's project proposal throughout the many years of its approval process.  These

reviews have resulted in thousands of pages of data and have uniformly concluded that the Project is environmentally sound, safe and consistent with federal law.

### 1.    BOEM's Review

**57**<u>78</u>.  BOEM's reviews for the Project can be traced back to well before 2013, when BOEM conducted a competitive lease auction for offshore wind projects in areas offshore Rhode Island and Massachusetts.  The first BOEM-Massachusetts Intergovernmental Renewable Energy Task Force meeting occurred in November 2009 and the first BOEM-Joint Rhode Island and Massachusetts Renewable Task Force Meeting occurred in December 2010.  *See* https://www.boem.gov/renewable-energy/state-activities/renewable-energy-task-force-meetings. After task force deliberations and public comments received in response to a Request for Interest published in December 2010 and a Call for Information and Nominations published in February 2012, BOEM announced identification of the Rhode Island and Massachusetts Wind Energy Area on May 30, 2012.  *See* https://www.boem.gov/newsroom/press-releases/boem-identifies-wind-energy-area-offshore-rhode-island-and-massachusetts.    This pre-auction process included **DOD**<u>the DOW</u>.[10]

**58**<u>79</u>.  This lease auction was predicated on BOEM's environmental review and environmental assessment, including consultation with **DOD.** <u>DOW.  Relevant meeting materials from December 10, 2010; May 2, 2011; and March 1, 2012, reflect early and ongoing participation by Department of the Navy, including the Office of the Chief of Naval Operations, N43-Navy Fleet Readiness Division, and the Naval Undersea Warfare Center - Division Newport.</u>

---

[10] Meeting notes from the March 1, 2012 meeting note early input from the Naval Undersea Warfare Center - Division Newport.  *See* https://www.boem.gov/sites/default/files/uploadedFiles/BOEM/RenewableEnergy_Program/State_Activities/BOEM%20RI%20Task%20Force%20March%201%20Presentation.pdf.

**80.**    After an initial draft and public comment period in 2012, BOEM issued a 417-page environmental assessment in May 2013, which concluded that leasing and site assessment activities in the proposed lease sale area would result in no significant environmental effects.[11]

~~59~~81.    BOEM conducted another lease sale offshore Massachusetts in 2015 after undertaking a separate environmental review beginning in 2012.  The final review for the second lease sale similarly concluded, after public comment, that lease issuances and site assessment activities would have "no significant impact" on the environment.[12]

~~60~~82.    Revolution Wind holds Lease OCS-A-0486.

~~61~~83.    In 2016, Revolution Wind[13] developed and submitted to BOEM a Site Assessment Plan.[14]   The Site Assessment Plan demonstrated that Revolution Wind would conduct site assessment activities in a manner that was "safe," that would "not unreasonably interfere with other uses of the [Outer Continental Shelf]," and that it would "not cause undue harm or damage to natural resources; life (including human and wildlife); property; the marine, coastal, or human environment; or sites, structures, or objects of historical or archaeological significance."  30 C.F.R. § 585.606.   BOEM reviewed the Site Assessment Plan, completed its own "technical and

---

[11] BOEM, Commercial Wind Lease Issuance and Site Assessment Activities on the Atlantic Outer Continental Shelf Offshore Rhode Island and Massachusetts: Revised Environmental Assessment, at 1 (May 2013), https://www.boem.gov/sites/default/files/documents/renewable-energy/BOEM%20RI_MA_Revised%20EA_22May2013.pdf.

[12] *See* BOEM, Commercial Wind Lease Issuance and Site Assessment Activities on the Atlantic Outer Continental Shelf (OCS) Offshore Massachusetts, 79 Fed. Reg. 34,781, 34,781 (June 18, 2014), https://www.govinfo.gov/content/pkg/FR-2014-06-18/pdf/2014-14004.pdf.

[13] Where an assignor completed an environmental review pertaining to Revolution Wind's current lease, the assignor is referred to as Revolution Wind for avoidance of confusion.

[14] Deepwater Wind, Site Assessment Plan for North Lease OCS-A 0486, https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/RI/2016-11-16_Deepwater_North-Lease-SAP_Final_Clean-%281%29.pdf.

environmental reviews," *id.* § 585.613, and approved Revolution Wind's Site Assessment Plan in October 2017.[15]

~~62~~**84**.    After its Site Assessment Plan was approved, Revolution Wind undertook field surveys over a three-year period to understand and characterize the environment and the Project site and its potential suitability for wind energy development, including meteorological, bathymetric, geological, geotechnical, geophysical, biological, archaeological, hazard, and oceanographic surveys.

~~63~~**85**.    Based on these extensive environmental surveys, Revolution Wind submitted a detailed Construction and Operations Plan to BOEM in March 2020, describing the planned facilities and construction and operation activities for the Project, which it updated throughout the development process.

**86.**    As with the Site Assessment Plan, Revolution Wind demonstrated in the Construction and Operations Plan that it would conduct its activities in an environmentally sound manner.  *See* 30 C.F.R. § 585.621.

**87.**    The Navy confirmed by email to the Project that the export cable would not interfere with the Navy underwater range in Narragansett Bay.   The final version of the Construction and Operations Plan is thousands of pages long, including appendices, and includes the many environmental and ecological studies Revolution Wind conducted in preparation for development.[16]

---

[15]   BOEM Letter to Deepwater Wind (Oct. 12, 2017), https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/RI/SIGNED_BOEM-to-DWW_SAP-Approval-for-OCS-A-0486_101217-%281%29.pdf.

[16]   *See* BOEM, Revolution Wind Construction & Operations Plan (Mar. 2023), https://www.boem.gov/renewable-energy/state-activities/revolution-wind-farm-construction-and-operations-plan.

~~64~~**88**.   Appendix S2 of the Project's Construction and Operations Plan includes a Radar and Navigational Aid Screening Study covering airspace, radar, and other national security-related potential impacts of the project using DOD's Preliminary Screening Tool.  In addition to this study, the Project's Record of Decision[17] found that BOEM "coordinated with DOD to develop measures necessary to safeguard against potential liabilities and impacts on DOD activities," and that "[t]o protect the security interests of the United States," BOEM included various measures as conditions of approval of the Record of Decision for the Project.  Record of Decision at B-16.

~~65~~**89**.   Appendix R of the Project's Construction and Operations Plan includes a Navigation Safety Risk Assessment ("NSRA") for the Project.[18]  This risk assessment is used by the United States Coast Guard to assist with evaluating the potential impacts of the Project on the marine transportation system, including navigation safety, traditional uses of the waterways, and U.S. Coast Guard missions.  NSRA at 1.  The Navigation Safety Risk Assessment did not identify any major areas of concern regarding the Project's impact on marine navigation, *id*., and the Project voluntarily utilizes a one nautical mile[19] by one nautical mile grid for the wind turbines to facilitate safe passage through the lease area, based on consultation with the local mariner community.  *Id.* at C-1.

~~66~~**90**.   BOEM issued a Notice of Intent to prepare an EIS under the NEPA, 42 U.S.C. §§ 4321-4347, in 2021.  That began a more than two-year period of environmental review by the

---

[17] The Project's Record of Decision, jointly issued by BOEM, NOAA Fisheries, and the U.S. Army Corps of Engineers, is available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution-Wind-Record-of-Decision-OCS-A-0486_Redacted.pdf.

[18] Revolution Wind Farm Navigation Safety Risk Assessment (October 1, 2020), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/App_R_NSRA%20Rev%20F.pdf.

[19] A nautical mile is the equivalent of 1.15 miles on land.

federal government involving Revolution Wind, twelve federal agencies, three state cooperating agencies, as well as meetings and consultations with an extensive array of other stakeholders, including American Indian tribes, the fishing industry, local communities, and historic preservation organizations.

67**91**.    After publishing the Draft EIS in 2022, BOEM held five public meetings to solicit additional input.  BOEM published the Final EIS on July 21, 2023.[20]  The Final EIS describes the extensive consultations and public involvement BOEM undertook in the process of its NEPA review, as well as many of the more than 20 federal, state, and local consultations and approvals issued for the Project.

68**92**.    BOEM conducted a National Historic Preservation Act Section 106 consultation process that concluded with a final Memorandum of Agreement on August 18, 2023, which was signed by BOEM, the Advisory Council on Historic Preservation, and the New York, Rhode Island, Connecticut, and Massachusetts State Historic Preservation Officers.  Record of Decision at 24.  The Memorandum of Agreement contains measures that will resolve the Project's adverse effects to historic properties including avoidance, minimization, and mitigation measures.  *Id.*

69**93**.    BOEM completed an essential fish habitat consultation under the Magnuson-Stevens Fishery Conservation and Management Act.  Record of Decision at 60.  BOEM analyzed potential adverse impacts of the Project on essential fish habitat in an assessment that was included as Appendix L to the COP.[21]  It concluded that most of the potential Project-related impacts on

---

[20]  The Draft EIS and Final EIS are available under the "Environmental Review" tab at https://www.boem.gov/renewable-energy/state-activities/revolution-wind.    *See also* BOEM, *Revolution Wind Final EIS*, https://www.boem.gov/renewable-energy/state-activities/revolution-wind-final-eis; BOEM, *Revolution Wind DEIS*, https://www.boem.gov/renewable-energy/state-activities/revolution-wind-deis.

[21]  *See* BOEM, Revolution Wind Farm & Revolution Wind Export Cable – Development and Operation: Essential Fish Habitat Assessment (Feb. 3, 2023), https://www.boem.gov/sites/default/files/documents/renewable-

essential fish habitat would be "short-term" and that these impacts "represent a small percentage of the habitat available" in the region.  BOEM, Essential Fish Habitat Assessment 246-47, 255 (Feb. 3, 2023).  BOEM also prepared an addendum to the Essential Fish Habitat Assessment in response to NOAA Fisheries' feedback, dated March 20, 2023.[22]  NOAA Fisheries deemed the Essential Fish Habitat Assessment complete on March 23, 2023.  Record of Decision at B-13.

~~70~~**94**.    Section 6 of the Project's Conditions of Construction and Operations Plan Approval (the "Conditions of Approval") also include measures to protect commercial fisheries and for-hire and recreational fishing.  For example, Condition 6.2 requires Revolution Wind to maintain a fisheries gear loss compensation program throughout the life of the project to assist all commercial and for-hire fishermen impacted by Project activities or infrastructure, regardless of homeport. The Project has also committed to providing tens of millions in direct compensation to local fishermen.

~~71~~**95**.    On August 24, 2023, BOEM published the notice of a Record of Decision documenting the Department of the Interior's decision to approve the Construction and Operations Plan with some modifications.[23]

~~72~~**96**.    With respect to § 8(p)(4) of OCSLA, 43 U.S.C. § 1337(p)(4), which requires the Secretary of the Interior to consider twelve enumerated factors before authorizing energy development activity on the Outer Continental Shelf, BOEM determined that the Project "will comply with the Bureau's regulations and that the proposed activities will be carried out in a

---

energy/Revolution%20Wind%20NMFS%20Essential%20Fish%20Habitat%20Assessment.pdf.

[22]    BOEM, Essential Fish Habitat Assessment—Addendum (Mar. 20, 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/RevWind_NMFS%20EFH_Addendum.pdf.

[23] Notice of Availability of a Joint Record of Decision for the Revolution Wind Farm and Revolution Wind Export Cable Project, 88 Fed. Reg. 57,967 (Aug. 24, 2023).

manner that provides for safety, protection of the environment, prevention of waste, and the other factors listed in subsection 8(p)(4) of OCSLA." Record of Decision at B-2. In its assessment, BOEM evaluated each of the twelve (p)(4) factors in light of the Project's detailed Construction and Operations Plan, including the protection of the national security interests of the United States and preventing interference with other reasonable uses of the Outer Continental Shelf, and concluded that approval of the Construction and Operations Plan with the modifications and conditions of approval it set forth "would be in accordance with the regulations at 30 CFR part 585 and would ensure that all the activities on the OCS are carried out in a manner that provides for the factors in subsection 8(p)(4) of OCSLA." Record of Decision at B-26.

~~73~~**97**. Subsequently, on November 17, 2023, BOEM sent Revolution Wind a Construction and Operations Plan approval letter.[24] Interior concluded that its decision was "consistent with the duties required under subsection 8(p)(4) of OCSLA, which requires the Secretary to ensure that approved activity is carried out in a manner that provides for Congress's enumerated goals." Record of Decision at 25.

~~74~~**98**. That same day, BOEM sent Revolution Wind the Conditions of Approval, which contain extensive mitigation requirements, including related to navigational and aviation safety, national security, and commercial, for-hire, and recreational fishing.[25]

### 2.    Department of ~~Defense~~**War** Review

~~75~~**99**. As BOEM described in the Record of Decision, "[a]t each stage of the regulatory process involving Lease OCS-A 0486, BOEM . . . consulted with the DOD for the purposes of

---

[24] Letter from Karen Baker, Chief, Office of Renewable Energy Programs, Dep't of Interior, to Peter Allen (Nov. 17, 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/COP%20Appv%20Ltr_REV%20OCS-A%200486.pdf.

[25] BOEM, Conditions of Construction and Operations Plan Approval: Lease Number OCS-A 0486 (Nov. 17, 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Rev%20Wind%20Cond%20of%20COP.pdf.

assessing national security considerations in its decision-making processes."  Record of Decision at B-15.  This consultation began in 2011 when BOEM worked with multiple agencies, including the ~~DOD~~**DOW**, to identify potential areas to develop commercial offshore wind.  Record of Decision at B-15 to 16.  The Naval Undersea Warfare Center, for example, participated in a March 1, 2012 preliminary meeting.[26]  BOEM also consulted with the ~~DOD~~**DOW** on the revised environmental assessment for the Call Area, which "discusses military activities and aviation within the [Wind Energy Area]," and, following BOEM's proposal to issue leases in the entire Wind Energy Area, "the DOD concluded that site-specific stipulations, designed in consultation with the DOD, could mitigate the impact" on the Navy's training areas and other ~~DOD~~**DOW** activities in the Wind Energy Area.  BOEM further determined that, "when addressed through coordination with the DOD, impacts would be negligible and avoidable."  Record of Decision at B-16.

~~76~~**100**. While reviewing the Project's COP, BOEM also coordinated with ~~DOD~~**the DOW** to "develop measures necessary to safeguard against potential liabilities and impacts on DOD activities" and requested that the DOD's Military Aviation and Installation Assurance Siting Clearinghouse ("DOD Clearinghouse") coordinate within the ~~DOD~~**DOW** to review the COP. Record of Decision at B-16.  As part of this process, Revolution Wind consulted with the Navy's Naval Undersea Warfare Center, the North American Aerospace Defense Command ("NORAD"), the Air Force (including the Assistant Secretary of the Air Force for Energy, Installations, and the Environment's Mission Sustainment Program) and the DOD Clearinghouse.  In October 2021, the DOD Clearinghouse sent a letter to BOEM explaining that it "coordinated within the Department

---

[26] *See* BOEM, BOEM Rhode Island Renewable Energy Task Force Webinar, at 12-15 (March 1, 2012), https://www.boem.gov/sites/default/files/uploadedFiles/BOEM/Renewable_Energy_Program/State_Activities/BOEM%20RI%20Task%20Force%20March%201%20Presentation.pdf.

of Defense (DoD) a review of the Revolution Offshore Wind Project Construction and Operations Plan (COP), Commercial Lease OCS-A-0486." Although the letter referenced potential adverse impacts with "the Falmouth, Massachusetts Airport Surveillance Radar model 8 (ASR-8) used for NORAD's air defense mission," the DOD Clearinghouse explained that it "developed two mitigation strategies that would mitigate the radar impacts: overlapping radar coverage and Radar Adverse Impact Management (RAM)," and requested that BOEM "require[] [Revolution Wind] to enter into an agreement to mitigate the identified impact."[27] The letter also identified mitigation proposed by the Department of Navy related to distributed fiber-optic sensing technology to mitigate potential impacts on Navy operations. "To protect the security interests of the United States, BOEM . . . included these measures as conditions of approval in Appendix A of the ROD," including a requirement for Revolution Wind to coordinate with the Navy on the use of certain transmission cable technology "to mitigate potential impacts on the [Navy's] operations." Record of Decision at B-16.

77**101**. As requested, in 2024, Revolution Wind entered into an agreement with **what was then the** DOD, acting through DOD Clearinghouse, and the Department of the Air Force "to mitigate any potential adverse impacts on military operations and readiness and to minimize risks to national security while allowing the Revolution Offshore Wind Project (Project), within the BOEM lease area OCS-A 0486, to proceed with development."[28] As this agreement explained, "[a]s the Project was originally filed, its spinning turbine blades would conflict with North American Aerospace Defense Command's (NORAD) operation of the Falmouth, Massachusetts

---

[27] DOD Clearinghouse Letter to BOEM (Oct. 15, 2021) at 1. The mitigation that Clearinghouse identified is also included in the Project's Conditions of COP Approval. *See* Revolution Wind Conditions of COP Approval (April 24, 2024) at 30.

[28] Agreement Between DOD, Department of the Air Force, and Revolution Wind **("Curtailment Agreement")§ 1.A** (Nov. 4, 2024) **at § 1.A**.

Airport Surveillance Radar 8 (ASR-8)" but the "Parties have focused on de-conflicting these activities and agree that the terms [set forth] will allow the mutual goals of the Parties to be met, including the protection of the radar, which promotes national security, and protection of the National Airspace System, while supporting military readiness."[29]  For example, upon request by NORAD, Revolution Wind has agreed to immediately curtail wind turbine operations for a national security or defense purpose.  On December 13, 2024, the Office of the Assistant Secretary of Defense for Energy, Installations and Environment provided a letter signed by the Executive Director of the DOD Clearinghouse to Revolution Wind stating that the Project "would not have adverse impacts to DoD missions in the area."[30]

~~78~~**102**. The Project's Conditions of Approval includes the provision requested by the Department of Navy as Condition 4.3, as well as other national security mitigation provisions relating to air surveillance radar and electromagnetic submissions as Conditions 4.2 and 4.4. **Condition 4.2, for example, requires Revolution Wind to contribute funding to the DOW "to offset the cost of measures undertaken by DoD to mitigate adverse impacts of this Project" and to notify NORAD prior to the completion of commissioning of the last wind turbine generator.**

~~79~~**103**. Revolution Wind's Lease includes specific national security and suspension provisions.  Section 3(c) provides:  "The Lessor reserves the right to suspend the Lessee's operations in accordance with the national security and defense provisions of section 12 of the Act and applicable regulations, provided that compensation must be paid to the Lessee as provided by ~~43U~~**43 U**.S.C. § 1341(c) and (d)."  **Ex. E at Section 3(c).**

---

[29] *Id*. at § 1.B.

[30]  Letter from Steven J. Sample, Executive Director, Military Aviation and Installation Assurance Siting Clearinghouse, to Whitney Marsh (Dec. 13, 2024).

80104. Appendix C to the Lease also includes a section on "National Security and Military Operations" that details procedures in the event of an "evacuation or suspension of activities" and for "electromagnetic emissions." **Ex. E at** Appendix C ~~§, Sec.~~ 3.2-3.3. In particular, Section 3.2.3 of Appendix C notes that "[s]uspensions or evacuations for national security reasons will not generally exceed seventy-two (72) hours." Section 3.2.2 also states that "[a]dvance notice will normally be given before requiring a suspension or evacuation" and that the "appropriate command headquarters, military agency, or higher authority will provide information to allow the Lessee to assess the degree of risk to, and provide sufficient protection for, the Lessee's personnel and property."

### 3.    Federal Aviation Administration and Other Airspace-Related Review

81105. The Federal Aviation Administration also conducted a review of the Project's potential impacts on radar system and navigation safety within its jurisdiction. In particular, the Federal Aviation Administration conducted "an aeronautical study under the provisions of 49 U.S.C., Section 44718 and if applicable Title 14 of the Code of Federal Regulations, part 77," for each of the reviewed WTGs, "reveal[ing] that the structure would have no substantial adverse effect on the safe and efficient utilization of the navigable airspace by aircraft or on the operation of air navigation facilities."[31]

82106. Revolution Wind also entered into a ~~Mitigation Agreement~~mitigation agreement with the U.S. Integrated Ocean Observing System, an office of NOAA's National Ocean Service, and U.S. Department of Commerce requiring Revolution Wind to "mitigate potential interference . . . by sharing real-time metocean data in the period leading up to and including the installation of all rotor blades" and to "make available . . . near real-time, accurate numerical telemetry of surface

_____

[31] Federal Aviation Administration Determinations of No Hazard; *see also* 14 C.F.R. § 77.31(d) (describing such determinations).

current velocity, wave height, wave period and wave direction data" at certain locations, allowing radar to perform consistent with Project and governmental needs.[32]  Revolution Wind also agreed to "make available" relevant data "throughout the life of the Project" to mitigate any conflict.[33]

### 4.    NOAA Fisheries and U.S. Fish and Wildlife Service Review

~~83~~**107**. After notice and opportunity for public comment, NOAA Fisheries promulgated five-year incidental take regulations and issued an associated Letter of Authorization to Revolution Wind for the incidental "take"[34] of small numbers of marine mammals during the construction of the Project in May 2024 and June 2024, respectively.  *See* 50 C.F.R. §§ 217.270-217.277.[35]  The incidental take regulations and Letter of Authorization for the Project require Revolution Wind to implement mitigation measures as well as to abide by other monitoring and reporting requirements. While the incidental take regulations and Letter of Authorization permit the incidental "take" of marine mammals by Level A and Level B harassment,[36] they do not authorize, and the Project did

---

[32] *See* Programmatic Agreement Between the U.S. Department of Commerce National Oceanic & Atmospheric Administration, National Ocean Service, U.S. Integrated Ocean Observing System Office and Revolution Wind, LLC for the Mitigation of Mission Degrading Offshore Wind Turbine Interference to Oceanographic High-Frequency Radar by the Revolution Wind Offshore Wind Farm, at 9 (July 9, 2024) (NOS Agreement Code MOA-2024-070/12900).

[33] *Id.*

[34] Under the Marine Mammal Protection Act, "[t]he term 'take' means to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." 16 U.S.C. § 1362(13).

[35] Copies of the incidental take regulations and Letter of Authorization are available at https://www.fisheries.noaa.gov/action/incidental-take-authorization-revolution-wind-llc-construction-revolution-wind-energy.

[36] Under the Marine Mammal Protection Act, "[t]he term 'harassment' means any act of pursuit, torment, or annoyance which—(i) has the potential to injure a marine mammal or marine mammal stock in the wild; or (ii) has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering." 16 U.S.C. § 1362(18)(A).  Level A harassment is defined as "any act of pursuit, torment, or annoyance which has the potential to injure a marine mammal or marine mammal stock in the wild." 50 C.F.R. 216.3; 16 U.S.C. § 1362(18)(A)(i),(C).  Level B harassment is defined as "any act of pursuit, torment, or annoyance which has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering but which does not have the potential to injure a marine mammal or marine mammal stock in the wild." 50 C.F.R. § 216.3; 16 U.S.C. §

not request, the "take" of marine mammals either intentionally or incidentally by serious injury or mortality.

~~84~~**108**. NOAA Fisheries included detailed mitigation requirements and monitoring and reporting requirements—spanning 30 pages in the Letter of Authorization—that protect marine mammals, including the North Atlantic right whale.[37]

~~85~~**109**. Additionally, with regard to the North Atlantic right whale and whales more generally, the overwhelming scientific consensus is that offshore wind activity is not a cause of marine mammal mortalities.  Instead, the scientific community has overwhelmingly determined that whale deaths are primarily caused by vessel strikes and fishing gear entanglements.[38]  And NOAA,[39] the U.S. Department of Energy,[40] the Marine Mammal Commission,[41] along with numerous academic and other institutions, have all issued official statements confirming that marine mammal mortality has not been attributed to offshore wind activities.

---

1362(18)(A)(ii),(D).

[37] Letter of Authorization at 2-34; 50 C.F.R. §§ 217.274- 217.275.

[38] *E.g.*, J.V. Redfern,  E.A. Becker, & T.J. Moore, *Effects of Variability in Ship Traffic and Whale Distributions on the Risk of Ships Striking Whales*, 6 FRONTIERS IN MARINE SCI. 793 (2020); R.C. Rockwood, J.D. Adams, S. Hastings, J. Morten, & J. Jahncke, *Modeling Whale Deaths from Vessel Strikes to Reduce the Risk of Fatality to Endangered Whales*, 8 FRONTIERS IN MARINE SCI. 649890 (2021); D.E. Kelley, J.P. Vlasic, & S.W. Brillant, *Assessing the Lethality of Ship Strikes on Whales Using Simple Biophysical Models*, 37(1) MARINE MAMMAL SCI. 251 (2021); NOAA Fisheries, *US Atlantic and Gulf of Mexico Marine Mammal Stock Assessments 2022,* at 26-27 (S.A. Hayes, E. Josephson, K. Maze-Foley, P.E. Rosel, J. McCordic, & J. Wallace eds., 2023) (NOAA Technical Memorandum NOAA FISHERIES-NE-271304).

[39] NOAA Fisheries, *Frequent Questions—Offshore Wind and Whales*, https://www.fisheries. noaa.gov/new-england-mid-atlantic/marine-life-distress/frequent-questions-offshore-wind-and-whales  ("There are no known links between large whale deaths and ongoing offshore wind activities.").

[40] U.S. Department of Energy, *Addressing Misinformation on Offshore Wind Farms & Recent Whale Mortalities* (Apr. 28, 2023), https://www.energy.gov/articles/addressing-misinformation-offshore-wind-farms-and-recent-whale-mortalities.

[41] Marine Mammal Commission, *Update on Strandings of Large Whales along the East Coast* (Feb. 21, 2023), https://www.mmc.gov/wp-content/uploads/Update-on-Strandings-of-Large-Whales-along-the-East-Coast-2.21.2023.pdf.

~~86~~**110**. BOEM, as the lead federal agency, and other agencies also conducted an Endangered Species Act Section 7 consultation with NOAA Fisheries, *see* 16 U.S.C. § 1536, on the Project culminating in NOAA Fisheries' issuance of an Endangered Species Act Biological Opinion on July 21, 2023.[42]  The other agencies that participated in the consultation process included BSEE, the U.S. Army Corps of Engineers, the U.S. Coast Guard, the U.S. Environmental Protection Agency ("EPA"), and NOAA Fisheries' Office of Protected Resources, each of whom took action under their respective statutory and regulatory authorities related to approval of the Construction and Operations Plan or other permits and approvals and therefore had corresponding Endangered Species Act Section 7 consultation responsibilities.

~~87~~**111**. On March 12, 2024, in response to requests from NMFS' Office of Protected Resources ("NMFS-OPR") and BOEM, NMFS-Greater Atlantic Regional Fisheries Office ("NMFS-GARFO") reinitiated ESA Section 7 consultation for the Project.  The reinitiated consultation process concluded with NMFS-GARFO's issuance of a superseding Biological Opinion on April 30, 2024 ("2024 BiOp").[43]  The 2024 BiOp spans over 600 pages including appendices and assessed the potential effects of construction (including pile driving), operation, maintenance, and decommissioning of the Project on ESA-listed whales in the Project area, including the North Atlantic right whale, and designated critical habitat in the Project area.  The 2024 BiOp concluded that the Revolution Wind Project is not likely to jeopardize the continued existence of any ESA-listed species.  *Id.* at 469; *see also id.* at 474.  The 2024 BiOp also concluded the Project was not likely to adversely affect, or would have no effect, on several other ESA-listed

---

[42]  The Biological Opinion is available at https://www.boem.gov/sites/default/files/documents /renewable-energy/state-activities/Rev-Wind-BiOp.pdf.

[43]  The 2024 BiOp is available at https://www.fisheries.noaa.gov/s3/2024-05/2024-Rev-Wind-BiOp-508.pdf.

species and would have no effect on the critical habitat designated for the North Atlantic right whale or several other ESA-listed species. *Id.* at 469.

~~88~~112. The 2024 BiOp assesses the adverse impacts of harassment, including alleged whale deaths, and assesses cumulative impacts to protected species. In assessing the potential for whale deaths, the 2024 BiOp concludes that for endangered whales, "[n]o serious injury or mortality is expected to result from exposure to any project noise sources and none is proposed to be authorized through" the Marine Mammal Protection Act incidental take authorization. *Id.* at 200.

~~89~~113. The 2024 BiOp includes an incidental take statement that describes extensive, enforceable "reasonable and prudent measures" and Terms and Conditions that were incorporated as conditions of the Construction and Operations Plan approval to minimize and mitigate impacts on relevant species. *Id.* at 475; *see also id.* at 471.

~~90~~114. BOEM also consulted with the U.S. Fish and Wildlife Service ("U.S. FWS") pursuant to its ESA Section 7 obligations, and U.S. FWS issued a separate BiOp on May 30, 2023, concluding that the Project is not likely to jeopardize the continued existence of two ESA-listed bird species in the Project's action area and included an Incidental Take Statement.[44]

### 5.    U.S. Army Corps of Engineers Review

~~91~~115. On June 3, 2022, Revolution Wind filed an application with the U.S. Army Corps of Engineers ("USACE") for a Clean Water Act ("CWA") Section 404 and Rivers and Harbors Act of 1899 ("RHA") Section 10 individual permit for the Revolution Wind Project. The Section 404 permit jurisdiction extends only to areas onshore and in state waters. On September 2, 2022,

---

[44] The U.S. FWS BiOp is available at https://www.boem.gov/sites/default/files/documents /renewable-energy/state-activities/20230530%20BOEM%20Revolution%20Wind% 20BO%202022-0023298_FINAL%20alm.pdf.

the USACE issued a public notice and request for public comment on Revolution Wind's permit application.[45]  Following USACE's August 21, 2023 approval of the Record of Decision, USACE issued the CWA Section 404 and RHA Section 10 permit to Revolution Wind on October 2, 2023.[46]  This permit includes environmental protection measures, annual compliance reporting, coastal surveying, and other special conditions on Revolution Wind's activities.

### 6.    EPA Review

92116. On September 28, 2023, after a notice and public comment process, EPA issued a Clean Air Act ("CAA") Outer Continental Shelf air quality permit to construct and operate the Project pursuant to Section 328 of the Clean Air Act, 42 U.S.C. § 4207, and Title 40, part 55 of the Code of Federal Regulations.[47]  The permit includes emission limits; Nonattainment New Source Review offset requirements; testing, recordkeeping, reporting, and operating requirements; work practice standards; and other conditions on Revolution Wind's activities consistent with the CAA.

93117. Similar environmental reviews for offshore wind projects have been upheld in court, with the First Circuit recently upholding Interior and NOAA approvals of offshore wind projects in three separate cases.  *See Nantucket Residents Against Turbines v. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1 (1st Cir. 2024); *Melone v. Coit*, 100 F.4th 21 (1st Cir. 2024); *Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, 123 F.4th 1 (1st Cir. 2024).

### C.    State Approvals and Concurrences

---

[45] USACE's public notice and request for public comment is available at https://www.nae.usace.army.mil/Portals/74/docs/regulatory/PublicNotices/2022/NAE-2020-00707-20220901-Public-Notice.pdf.

[46] USACE's Record of Decision and Permit for Revolution Wind are available at https://www.nae.usace.army.mil/Missions/Regulatory/Permits-Issued/Orsted-Revolution-Wind-LLC-Oct-2023/.

[47] EPA's permit for Revolution Wind is available at https://www.epa.gov/system/files/documents/2023-09/rw-ocs-air-permit-ocs-r1-05-final-permit.pdf.

94**118**. In addition to all of the federal environmental review described above, Revolution Wind submitted consistency certifications to the Rhode Island Coastal Resources Management Council ("RI CRMC") and the Massachusetts Office of Coastal Zone Management for review for consistency, to the maximum extent practicable, with each State's approved coastal management program pursuant to the Coastal Zone Management Act, 16 U.S.C. § 1451. In May 2023 (following approximately 20 months of review, two publicly-noticed meetings before the RI CRMC, and dozens of meetings with RI CRMC staff, many of which also included the Rhode Island Fisherman's Advisory Board), the RI CRMC issued a federal consistency determination of concurrence for the Project, finding it is consistent and complies with the enforceable policies of Rhode Island's approved coastal management program, subject to certain mutually agreed conditions.[48] For example, Revolution Wind agreed to provide a financial mitigation package including $12 million to compensate Rhode Island commercial and charter fishermen for potential loss of access or reduction of harvest.[49] The Massachusetts Office of Coastal Zone Management also issued a federal consistency determination of concurrence for the Project in May 2023, acknowledging that Revolution Wind would establish a direct compensation program, including $6,425,000 to offset potential economic impacts to Massachusetts commercial and charter/for-hire fishing.[50]

95**119**. The Project has also received all of its necessary state siting approvals for the required

---

[48] State of Rhode Island Coastal Resources Management Council, Re: CRMC Federal Consistency Review of the Revolution Wind Project (May 12, 2023), http://www.crmc.ri.gov/windenergy/revolution/RevWind_FedConDecision_20230512.pdf.

[49] *Id.* at 6.

[50] Commonwealth of Massachusetts Office of Coastal Zone Management, Re: CZM Coastal Zone Management Act Federal Consistency Review of the Revolution Wind Farm (May 10, 2023), https://www.mass.gov/doc/offshore-wind-revolution-wind-farm-fcr-signed-decision-5-10-23/download.

transmission infrastructure under state jurisdiction, along with many other state and local permits and approvals.

### D.    Defendants' Defense of Revolution Wind Approvals

~~96~~**120**.  BOEM's decision to approve the Construction and Operations Plan for the Revolution Wind Project was based upon and supported by an extensive record before the agency, including detailed technical information, public comments, and analyses by a multitude of government agencies.

~~97~~**121**.  Ongoing litigation involves challenges to Revolution Wind's federal approvals.  In connection with that litigation, BOEM has compiled and served its administrative record—spanning over 200,000 pages—regarding BOEM's approval of the Revolution Wind Construction and Operations Plan in cases currently pending before this Court: *Pres. Soc'y of Newport Cnty. v. Burgum*, No. 1:23-cv-03513-RCL (D.D.C.), which has been consolidated with *Southeast Lighthouse Foundation v. Burgum*, No. 1:23-cv-03515-RCL (D.D.C.);[51] and *Green Oceans v. U.S. Dep't of the Interior*, No. 1:24-cv-00141-RCL (D.D.C.) ("*Green Oceans*").[52]  Revolution Wind is an intervenor-defendant in these cases.

~~98~~**122**.  Defendants Interior, the Secretary of the Interior, BOEM, and the BOEM Director have been vigorously defending the Revolution Wind federal approvals in the ongoing federal litigation.  In the case filed over a year and a half ago on January 16, 2024 (*Green Oceans*),[53]

---

[51] BOEM filed its certified administrative record index on July 31, 2024.  *Pres. Soc'y of Newport Cnty. v. Burgum*, No. 1:23-cv-03513-RCL (D.D.C.), Dkt. 43-1 (corrected index).

[52] BOEM filed its certified administrative record index on August 24, 2024, and filed its certified supplemental administrative record index on October 25, 2024.  *Green Oceans v. U.S. Dep't of the Interior*, No. 1:24-cv-00141-RCL (D.D.C.), Dkts. 59-2, 65-1.

[53] Plaintiffs filed a complaint challenging separate federal approvals for both the South Fork Wind Project and the Revolution Wind Project.  *Green Oceans*, Dkt. 1 (D.D.C. Jan. 16, 2024).  Federal Defendants in that case filed a motion to sever Plaintiffs' claims challenging Federal Defendants' South Fork Wind approvals from claims challenging Revolution Wind approvals, which this Court granted on April 10, 2024.  *Id.*, Dkt. 25.

Defendants represented that they "based their approval of the Revolution Project on an extensive environmental review and permitting process that spanned three years, involved the expertise of multiple cooperating federal agencies, and invited and considered robust public comments." Federal Defendants' Opposition to Plaintiffs' Mot. for an Administrative Stay or Preliminary Injunction at 1, *Green Oceans*, Dkt. 38 (D.D.C. filed May 21, 2024).

~~99~~**123**. Defendants further averred that "[t]his review was designed to ensure the soundness of the project and to comply with multiple federal statutes, including the National Environmental Policy Act ("NEPA"), the CWA, the RHA, the ESA, the Marine Mammal Protection Act ("MMPA"), the Migratory Bird Treaty Act, the Coastal Zone Management Act, the National Historic Preservation Act, and the Outer Continental Shelf Lands Act ("OCSLA")." *Id.* at 7.

~~100~~**124**.    In that context, Defendants conceded that "[e]njoining the agency authorizations associated with the Revolution Project would also hinder the public interest, which will be served by the Revolution Project's capacity to provide 704 megawatts of clean energy to the Connecticut and Rhode Island power grids." *Id.* at 2.

~~101~~**125**.    And Defendants also argued that enjoining Project construction "would pose significant harm to the public's interest in the certainty and reliability of Federal Defendants' permitting and approvals process." *Id.* at 43.

~~102~~**126**.    Indeed, Defendants admitted the lawfulness of the procedures and approvals for Revolution Wind, stating that "[w]here, as here, a developer has complied with agency rules and satisfied federal statutory requirements, it should be able to rely on its permits, as it may need to make business and financial decisions in furtherance of completing the authorized activity." *Id.* This makes sense since the Project spent billions in reliance on this regulatory framework.

~~103~~**127**.        Defendants have also expressly confirmed that Revolution Wind's permits and approvals are fully consistent with national security.  In the *Green Oceans* case, Defendants (including Interior and BOEM) expressly denied the allegation that "[t]he Project interferes with national security and military uses of the Outer Continental Shelf."  *Compare* First Amended Complaint at ¶ 133, first sentence, *Green Oceans*, Dkt. 33 (D.D.C. filed May 13, 2024) *with* Answer at ¶ 133, *Green Oceans*, Dkt. 54 (D.D.C. filed July 19, 2024) ("Federal Defendants deny the allegations in the first sentence Paragraph 133.").

~~104~~**128**.        Similarly, Defendants have expressly denied the allegation that "Revolution Wind will interfere with almost all other reasonable uses of the Outer Continental Shelf."  *Compare* First Amended Complaint at ¶ 143, first sentence, *Green Oceans*, Dkt. 33 (D.D.C. filed May 13, 2024) *with* Answer at ¶ 143, *Green Oceans*, Dkt. 54 (D.D.C. filed July 19, 2024) ("Federal Defendants deny the allegations in Paragraph 143.").

~~105~~**129**.        And Defendants have expressly denied the allegation that "BOEM's approval of a Project that guts fishing in the area degrades a vital habitat for fish, adversely impacts recreation and tourism, interferes with navigation and radar systems, interferes with national security and military uses, and destroys pristine visual and scenic resources is proof that BOEM violated Section 1337(p)(4)(I) of OCSLA."  *Compare* First Amended Complaint at ¶ 143, second sentence, *Green Oceans*, Dkt. 33 (D.D.C. filed May 13, 2024) *with* Answer at ¶ 143, *Green Oceans*, Dkt. 54 (D.D.C. filed July 19, 2024) ("Federal Defendants deny the allegations in Paragraph 143.").

~~106~~**130**.        Defendants Interior, the Secretary of the Interior, and BOEM have also been defending BOEM's approval of the Revolution Wind Construction and Operations Plan in the consolidated cases *Pres. Soc'y of Newport Cnty. v. Burgum*, No. 1:23-cv-03513-RCL (D.D.C.),

and *Southeast Lighthouse Foundation v. Burgum*, No. 1:23-cv-03515-RCL (D.D.C.), since those cases were filed in this Court in November 2023.

~~107~~**131**.        In those two cases, Defendants filed a cross-motion for summary judgment, which remains pending before this Court.  In that motion, Defendants explained how "BOEM thoroughly analyzed the Project's potential effects on a wide range of resources" during the multi-year environmental review process, and how "the record shows that BOEM conducted an extensive, thorough NEPA analysis of the Project's potential effects."  Federal Defendants' Cross-Mot. for Summary Judgment at 1, 39, *Pres. Soc'y of Newport Cnty. v. Burgum*, No. 1:23-cv-03513-RCL, Dkt. 47-1 (D.D.C. filed Oct. 11, 2024).   Federal Defendants also demonstrated how "BOEM's extensive analysis of the Project's impacts more than met NEPA's requirements.  42 U.S.C. § 4332(c)(i)."  Reply in Support of Cross-Mot. for Summary Judgment at 16, *Pres. Soc'y of Newport Cnty. v. Burgum*, No. 1:23-cv-03513, Dkt. 57 (D.D.C. filed Dec. 13, 2024).

### E.        Construction of the Project ~~is 80% Complete~~

~~108~~**132**.        Revolution Wind began the onshore construction process in August 2023~~, and the~~**.  The** Project's overall construction (onshore and offshore) ~~is now~~**was** 80% complete **at the time of the First Stop Work Order and is now approximately 87% complete**.

~~109~~**133**.        Onshore construction activities have included installation of the onshore transmission cable and development of a new interconnection station and new substation for the Project.  And the In-Service date for the on-shore substation to deliver electric power to the grid was scheduled for the first half of 2026.

~~110~~**134**.        The offshore construction is supported by multiple port facilities in Connecticut and Rhode Island that prepare components for installation on the Outer Continental Shelf.  The **First and Second** Stop Work ~~Order requires~~**Orders require** idling at those facilities.

~~111~~**135**.        With respect to offshore construction activities, the Project has completed

the great majority of the work, and construction was ongoing at the time of the **First and Second** Stop Work ~~Order~~**Orders**.  Monopile foundation installation for the Project's 65 WTGs and two offshore converter substations began in May 2024 and concluded in August 2025, having observed mandatory periods during which no foundation installation could occur because of species-protective time-of-year restrictions.  **The first WTG was installed in September 2024.**

~~112~~**136**.        When the **First** Stop Work Order was issued, 100% of the Project's monopile foundations ~~are~~**had been** installed and approximately 70% of the Project's WTGs ~~were~~**had been** fully installed atop their foundations.  ~~The first WTG was installed almost a year ago in September 2024.~~  Prior to the issuance of the ~~unlawful~~**First** Stop Work Order, the remainder of the WTGs were scheduled for completed installation by early December **2025**.

~~113.    Cable~~**137.        When the First Stop Work Order was issued, cable** installation ~~is~~ also **had been** substantially complete.  The Project's two export cables ~~have~~**had** been installed, and an inter-link export cable was scheduled to be installed after installation of the second offshore substation.  Installation of the inter-array cables, which are the cables between the turbines that will deliver power from the WTGs to the offshore substation, ~~was also~~**had been** underway and scheduled for installation and electric connection to each WTG to be ~~complete in~~**completed** by the end of 2025.  ~~As of August 2025~~**At the time of the First Stop Work Order**, over 50% of the inter-array cables between turbines ~~have~~**had** been installed.

~~114~~**138**.        Additionally, one of the Project's two offshore substations ~~has~~**had** been installed atop its monopile foundation and cold commissioned, and, until the **First** Stop Work Order was issued, it had been anticipated that the second substation would be installed the week of August 25, 2025, and commissioned later ~~this~~**in** fall~~.  The~~ **2025.  When the First Stop Work Order was issued, the** second substation ~~is now~~**had been** waiting idle atop a transport barge.

**139.    After this Court stayed the First Stop Work Order and enjoined its enforcement, Project construction resumed and continued up until the Second Stop Work Order.**

**140.  When the Second Stop Work Order was issued, construction was approximately 87% complete.  All of the monopile foundations have been installed, but slightly less than 90% of the wind turbines (58 out of 65) have been completed; and cable installation is substantially complete.**

**141.    Work on the Outer Continental Shelf associated with Revolution Wind was halted consistent with and in the manner provided by the First Stop Work Order until the Court stayed and enjoined enforcement of the First Stop Work Order.**

~~115~~**142**.        Work on the Outer Continental Shelf associated with Revolution Wind has **also** been halted consistent with and in the manner provided by the **Second** Stop Work Order.

F.    **The Administration's Statements Against Offshore Wind Leading to the Stop Work ~~Order~~Orders**

1.    **Anti-Wind Statements**

~~116~~**143**.        Although the President has made numerous statements over many years critical of the offshore wind industry, the President noted that, while the Administration generally does not "allow wind mills," there is an exception for "legal situation[s] where somebody committed to it a long time ago."[54]

~~117~~**144**.        The Administration also issued ~~a similar stop-work~~**an** order **similar to the First Stop Work Order** to Empire Wind, a large wind energy project offshore of New York, in April—although it should be noted that offshore construction activities for that project had just

---

[54] *See* ROLL CALL, *Remarks: Donald Trump Leads a Cabinet Meeting at the White House – August 26, 2025*, at 6:48 (Aug. 26, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-cabinet-meeting-white-house-august-26-2025/.

begun at the time.  The Administration later rescinded the order and claimed in a statement to the press that the rescission was a "deal" made with New York Governor Kathy Hochul regarding a new natural gas pipeline in New York.[55]

~~118~~145.        Nevertheless, the President's public statements criticizing offshore wind date back at least to 2012, long before his first campaign for President.[56]

~~119~~146.        The President has apparent hostility towards offshore wind, including based on statements made on the campaign trail.[57]  And even on the day of his inauguration, the President made statements against the offshore wind industry.[58]  These examples are just a few of the adverse comments made about wind energy by the President.

### 2.    The Presidential Memorandum and Other Executive Memoranda

~~120~~147.        On January 20, 2025, the President issued a Memorandum entitled "Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects." Presidential Memorandum, *supra*.

~~121~~148.         The Presidential Memorandum withdraws the entirety of the unleased areas of the Outer Continental Shelf, which include over 1.4 billion acres, from all further wind energy leasing under OCSLA "until [the] [Presidential Memorandum] is revoked," Presidential

---

[55] *See* Mike Soraghan, *White House Claims Hochul 'Caved' on Gas Pipelines to Save Empire Wind*, POLITICO PRO (May 27, 2025), https://subscriber.politicopro.com/article/eenews /2025/05/27/white-house-claims-hochul-caved-on-gas-pipelines-to-save-empire-wind-00369211.

[56] "Donald J. Trump (@realDonaldTrump), X (Apr. 23, 2012, 2:30 PM), https://x.com/realdonaldtrump/status/194493341302394880.

[57] WORKBOAT, *Trump Promises to Block Offshore Wind 'On Day One' If Elected* (May 13, 2024), https://www.workboat.com/wind/trump-promises-to-block-offshore-wind-on-day-one-if-elected.

[58] *See* ROLL CALL, *Speech: Donald Trump Hosts a Post-Inaugural Rally at Capital One Arena - January 20, 2025*, at 14:11 (Jan. 20, 2025),  https://rollcall.com/factbase/trump/transcript/ donald-trump-speech-inauguration-executive-orders-capitol-one-arena-january-20-2025/#:~:text=We%27re%20not%20going,want%20windmills%20either.

Memorandum § 1, despite OCSLA's declaration that the Outer Continental Shelf "should be made available for expeditious and orderly development."  43 U.S.C. § 1332(3).

122149.        The Presidential Memorandum also directs that the heads of all relevant agencies "shall not issue new or renewed approvals, rights of way, permits, leases, or loans for onshore or offshore wind projects pending the completion of a comprehensive assessment and review of Federal wind leasing and permitting practices."  That directive applies regardless of the merits or stage of development of any particular wind energy project.  Presidential Memorandum § 2(a).[59]

123150.        The Presidential Memorandum halts future offshore wind leasing on the Outer Continental Shelf and states that "[n]othing in his withdrawal affects rights under existing leases in the withdrawn areas."  *Id.* § 1.  With respect to existing leases, the Presidential Memorandum directs the Secretary of the Interior to "conduct a comprehensive review of the ecological, economic, and environmental necessity of terminating or amending any existing wind energy leases."  *Id.*

124151.        The Presidential Memorandum treats offshore oil, gas, and mineral production preferentially by specifically carving out offshore "leasing related to any other purposes such as, but not limited to, oil, gas, minerals, and environmental conservation," from the President's withdrawal under OCSLA.

125152.         This preferential treatment is highlighted by other executive actions.  For example, in an Executive Order entitled "Unleashing American Energy," the President declared: "It is the policy of the United States . . . to encourage energy exploration and production on Federal

---

[59] On December 8, 2025, the U.S. District Court for the District of Massachusetts issued a memorandum opinion vacating the federal agency defendants' implementation of the Presidential Memorandum's pause on new wind energy authorizations.  *New York v. Trump*, 2025 WL 3514301, at *1 (D. Mass. Dec. 8, 2025).

lands and waters, *including on the Outer Continental Shelf,* in order to meet the needs of our citizens and solidify the United States as a global energy leader long into the future," but the order only applies to "oil, natural gas, coal, hydropower, biofuels, critical mineral, and nuclear energy resources."  Exec. Order No. 14154 at § 3(a), 90 Fed. Reg. 8353 (Jan. 29, 2025) (emphasis added).

126**153**.        On July 7, 2025, President Trump issued Executive Order 14315 to further disadvantage offshore wind based on his personal bias against it.  Exec. Order No. 14315, 90 Fed. Reg. 30821 (July 10, 2025).  Executive Order 14315 directed the Secretary of the Interior to identify and eliminate sources of supposed "preferential treatment" for wind and solar power and without evidence asserted that wind and solar projects "compromise[] our electric grid", "denigrate[] the beauty of our Nation's natural landscape," and "threaten[] national security."  *Id.* at §§ 1, 4.  **And on July 29, 2025, Secretary Burgum issued a Secretarial Order requiring the Interior Assistant Secretary of Land and Minerals Management within 45 days (e.g., by mid-September 2025) to provide a report with recommendations on the effects of taxpayer-funded subsidies on the wind industry, and impacts that the development of offshore wind projects may have on military readiness, among other things.[60]**

3**G**.        **The Department of the Interior's First Stop Work Order**

127**154**.        Despite these statements and actions by the Administration relative to offshore wind, work to further construction of the Project was allowed to proceed by Interior until the **First** Stop Work Order was issued two weeks ago.  No notices of violation were issued by any Defendant.

128.        Since**155.        Between** January 2025 **and when the First Stop Work Order was issued**, Revolution Wind has continued to participate in regular meetings to update the regulators

---

[60]  **Secretarial Order 3437, "Ending Preferential Treatment for Unreliable, Foreign-Controlled Energy Sources in Department Decision-Making."**

on the Project, including a meeting two days before the **First** Stop Work Order was issued. Regulators did not raise the possibility of a Stop Work Order or concerns regarding national security or conflicts with other offshore uses.

129156.        Revolution Wind accordingly had no reason to believe that it should not continue moving forward with its lawfully permitted project, and encouraged Revolution Wind to continue relying on Defendants' prior approvals and authorizations.   In reliance on these communications, Revolution Wind has moved forward with construction of the Project and, as of the date of the **First** Stop Work Order, had successfully installed on the ocean floor all of the Project's monopile foundations for its 65 WTGs and its two offshore substations, and had also fully installed approximately 70% of the WTGs themselves before the **First** Stop Work Order was issued, among other significant work to install the Project.

130157.        On August 22, 2025, the BOEM Acting Director issued the **First** Stop Work Order.  The **First** Stop Work Order is a letter to Revolution Wind that orders "Revolution Wind LLC to halt all ongoing activities related to the Revolution Wind Project on the outer continental shelf (OCS) to allow time" for BOEM to address purported "concerns that have arisen" related to the Project.  The **First** Stop Work Order vaguely states: "BOEM is seeking to address concerns related to the protection of national security interests of the United States and prevention of interference with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas, as described in" 43 U.S.C. § 1337(p)(4), a subsection of OCSLA, and its implementing regulations at 30 C.F.R. § 585.102(a).  Ex. A at 1.  Other than limited activities to: respond to emergencies; prevent impacts to health, safety and the environment; and comply with conditions of approval, the **First** Stop Work Order prohibits Revolution Wind from "resum[ing] activities

until BOEM informs [Revolution Wind] that BOEM has completed its necessary review," a time period of uncertain and indefinite duration.  *Id.*

131**158**.    The **First** Stop Work Order states that BOEM became aware of the purported "concerns" that BOEM asserts justify the **First** Stop Work Order during the review that Interior is undertaking pursuant to the Presidential Memorandum.  *Id.*  The **First** Stop Work Order does not assert that the Project has violated the law or failed to comply with its permits and approvals.

132**159**.    Moreover, **at the time of the First Stop Work Order,** no notice of non-compliance had been issued by BOEM or BSEE to Revolution Wind.

133**160**.    Although BOEM purports to have issued the **First** Stop Work Order to address national security and prevention of interference with reasonable uses of the Outer Continental Shelf, shortly after its issuance, Interior told the press that the **First** Stop Work Order was "in line with President Donald Trump's energy goals. . . ."  It made no reference in that statement to the Stop Work Order's stated national security and interference "concerns," but rather told the press that "experimental and expensive wind projects that are proven failures," and that "Interior is putting an immediate stop to these costly failures."59**61**  Secretary Burgum then endorsed this framing less than 45 minutes after it was first published.60**62**

134**161**.    In multiple public interviews about the **First** Stop Work Order, Secretary Burgum made only vague references to any purported national security concerns as a justification for halting the Project.  He instead referred to a list of issues including tax credits, purported marine

---

59**61** Audrey Streb, *Trump Admin Kills Massive Offshore Wind Project*, DAILY CALLER (Aug. 22, 2025, 4:00 PM), https://dailycaller.com/2025/08/22/exclusive-trump-admin-kills-massive-offshore-wind-project.

60**62** Secretary Doug Burgum (@SecretaryBurgum), X (Aug. 22, 2025, 4:36 PM), https://x.com/RapidResponse47/status/1958991682034352576.

wildlife impacts, and others, and asserted that the Project's energy would be the most expensive electricity on the market. In an interview, Secretary Burgum said that "the offshore wind industry was really built around incredible, enormous tax subsidies" and that the **First** Stop Work Order was part of the Administration's "whole of government look at these tax subsidies."[163]  When pressed in another interview about the purported national security justification for the **First** Stop Work Order, Secretary Burgum made only loose references to "radar" and "undersea drones," and attempted to justify the **First** Stop Work Order mostly on the basis of other issues, including "people that are concerned about saving the whales" and electricity prices.[164]

~~135~~162.    Lee Zeldin, Administrator of the EPA, similarly acknowledged that the **First** Stop Work Order was not based on national security concerns, stating two days after the **First** Stop Work Order that "[t]he President is not a fan of wind, the economic impacts, the environmental impacts to fisheries," and again making no reference to national security.[165]

~~136~~163.    In the same week that the **First** Stop Work Order was issued, the President continued to indicate that the Administration would take action against wind power regardless of its many benefits or past approvals—and with no reference to national security concerns.[166]

[163] *See* Varney & Co., *Trump Pauses $6.2B Offshore Wind Boondoggle, Touts 'Clean Coal' Project*, at 0:15 – 2:10, FOX BUSINESS (Aug. 27, 2025), https://www.foxbusiness.com/video/6377521139112.

[164] *See* The Source with Kaitlan Collins, *After DC Police Takeover, Trump Digs in on Crime*, at 24:40 – 27:36, CNN PODCASTS (Aug. 27, 2025), https://www.cnn.com/audio/podcasts/the-source-with-kaitlan-collins.

[165] Fox News, *Lee Zeldin Backs Trump's Push for US Energy Dominance: 'Wind Isn't the Answer'* at 0:30 (Aug. 25, 2025), https://www.foxnews.com/video/6377296984112.

[166] *See* Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Aug. 20, 2025, 9:51 AM), https://truthsocial.com/@realDonaldTrump/posts/115061417084982814; *id.* (Aug. 19, 2025, 7:28 AM), https://truthsocial.com/@realDonaldTrump/posts/115055190585472069.

~~137~~**164**.        As evidenced by numerous statements of the President, the Secretary, Interior spokespeople, and Administrator Zeldin, the purported basis for the **First** Stop Work Order ~~is~~**was** pretextual, and the **First** Stop Work Order was issued in bad faith.

~~138.    The Stop Work Order, which amounts to nothing more than a pretextual policy change in position, is also untimely, unreasonable, and contrary to the administrative record.~~

**165.     This Court issued a preliminary injunction against the First Stop Work Order on September 22, 2025.  Dkt. 36.  It found that the First Stop Work Order was "the height of arbitrary and capricious action" because it "represent[ed] a clear change in position on the part of [BOEM], which previously certified that the project did not implicate national security or interference concerns as part of its multiyear, multiagency approval process for the project" and "there are strong reliance interests at stake."  Tr. of Prelim. Inj. Hrg. 41:18-19, 41:1-5, 43:6-7 (Sept. 22, 2025) ("Tr."), Dkt. 39.  The Court also concluded that without injunctive relief, Revolution Wind's "entire enterprise could collapse."  *Id.* at 43:9-10.**

**H.        The Department of the Interior's Second Stop Work Order**

**166.     After the Court granted the preliminary injunction, Revolution Wind restarted construction and maintained its regular cadence of communication with federal agencies.  Between the injunction against the First Stop Work Order on September 22, 2025, and the issuance of the Second Stop Work Order on December 22, 2025, no federal agency or representative ever communicated or suggested to Revolution Wind that there were any national security-related concerns with the Project.**

**167.     Since September 2025, other than during the government shutdown, Revolution Wind has participated in five routine, approximately biweekly meetings with**

BOEM and BSEE to discuss construction updates, plans, reports, mitigation agreements, and other issues related to the Project. The most recent such biweekly meeting was on December 10, 2025. Neither BOEM nor BSEE raised any national security concerns during any of these meetings. The Revolution Wind certification team also had thirteen meetings with BSEE since the preliminary injunction. The last meeting with BSEE was on December 16, 2025—less than a week before the Second Stop Work Order was issued. BSEE never raised any national security concerns at these meetings.

168.    Ørsted's Marine Affairs team continued to have weekly meetings, even during the government shutdown, with the Coast Guard to discuss Project construction progress and activities. Representatives from BOEM, BSEE, and the National Oceanic and Atmospheric Administration frequently attended these meetings. The most recent meeting was on December 15, 2025. No agency in attendance raised any national security concerns during any of these meetings.

169.    No federal military agency provided Revolution Wind with any communication regarding the existence of any national security concerns with the Project supporting the Second Stop Work Order nor did they initiate any mechanisms in the 2024 DOD Agreement. For example, the same Project representatives participate in the U.S. Navy-sponsored Thames River (New London/Groton, CT) Users Group, where unclassified information relative to the U.S. Navy submarine base at Groton are routinely discussed. In none of these forums have national defense issues ever been raised by any of the participants, including the DOW or the U.S. Coast Guard.

170.    Since the First Stop Work Order was enjoined, Revolution Wind has not received any communication from any agency regarding any national security concerns

related to the November 2024 mitigation agreement that Revolution Wind entered into with what was then the DOD and the Air Force to minimize national security risks and mitigate potential impacts on military operations and readiness, including to maintain the effectiveness of military radar systems.

171.    On December 22, 2025, Defendant Matthew Giacona issued the Second Stop Work Order.  The Second Stop Work Order is a letter to Revolution Wind directing Revolution Wind to "suspend all ongoing activities related to the Revolution Wind Project on the Outer Continental Shelf for the next 90 days for reasons of national security."  Ex. B at 1.

172.    Like the First Stop Work Order, the Second Stop Work Order is approximately 1 page and does not acknowledge the Project's 2024 agreement with what was then the DOD.  Id.  It explains that "[b]ased on BOEM's initial review of" "new classified information, including the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects," that it received from the DOW in November 2025, "the particularized harm posed by this project can only be feasibly averted by suspension of on-lease activities."  Id.  The Second Stop Work Order also states that BOEM "will determine whether the national security threats relating to this project can be mitigated" and "will consider all feasible mitigation measures before making a decision as to whether the project must be cancelled."  Id.  It "invite[d] [Revolution Wind] to meet and confer" about these issues.  Id.  It also notes that BOEM could "further extend the 90-day suspension" pending discussions with the DOW.  Id.

173.    As with the First Stop Work Order, this Second Stop Work Order does not assert that the Project has violated the law or failed to comply with its permits and approvals.

**174.     While BOEM purports to have issued the Second Stop Work Order to address national security concerns, Interior's public statements once again provide different and additional information than what Revolution Wind received in the Second Stop Work Order.**

**175.     In a subsequent press release about the Second Stop Work Order—and nearly identical orders issued against four other offshore wind projects—Interior belatedly gave additional reasoning that was not in the Order itself:  "As for the national security risks inherent to large-scale offshore wind projects, unclassified reports from the U.S. Government have long found that the movement of massive turbine blades and the highly reflective towers create radar interference called 'clutter.'  The clutter caused by offshore wind projects obscures legitimate moving targets and generates false targets in the vicinity of the wind projects.  The Department of Energy in a 2024 report stated that a radar's threshold for false alarm detection can be increased to reduce some clutter, but an increased detection threshold could cause the radar to "miss actual targets."[67]  The 2024 Department of Energy report is not new information, this information was reflected in the mitigation agreement and was not cited in the Second Stop Work Order.**

**176.     In another offshore wind project's litigation challenging its nearly identical stop work order, Defendant Giacona stated that he reviewed the supposedly new "classified material" from the DOW on November 26, 2025—nearly a month before issuing the Second Stop Work Order.  Decl. of Matthew Giacona ¶¶ 9-11, *Va. Elec. & Power Co. v. Dep't of the Interior*, No. 2:25-cv-00830 (E.D. Va. Dec. 27, 2025), Dkt. 19-1.  Giacona also stated that, after his initial review, he again reviewed that classified information with "senior Department [of**

---

**[67] Interior, Press Release, The Trump Administration Protects U.S. National Security by Pausing Offshore Wind Leases (Dec. 22, 2025), https://www.doi.gov/pressreleases/trump-administration-protects-us-national-security-pausing-offshore-wind-leases.**

the Interior] leadership in early December 2025." *Id.* ¶ 11.  To the extent an exigent issue was presented in this information that "necessitated" suspension of construction, the Government was not timely to address it.

177.    Secretary Burgum gave other rationales for these stop work orders.  On December 22, 2025, he gave an interview on Fox News in which he criticized offshore wind projects as "unreliable" and "unaffordable."[68]  The next day, in another Fox News interview, he stated that "this is the most expensive form of energy we're producing"—you could "get 1 gigawatt of power for . . . 1/5 of the price" from fossil-fuel sources—that wind energy is "not reliable, it only works when the wind is blowing," and that "people who love the whales are opposed to [offshore wind] because of the whale grounding."[69]  He added that, "if people are worried about an electricity crisis, it was self-made by the same people that support offshore wind," stating that "the grid operator . . . has shut down over 20 gigawatts of baseload in the last 5 years," and that "we have a solution right there . . . , which is natural gas from Pennsylvania, which would generate power five-to-ten times more than all these five wind projects together."[70]  Secretary Burgum also posted on X that "[o]ffshore wind is a GIANT rip off for every American consumer,"[71] that "[i]t's TWICE as expensive to heat a home in New England, the birthplace of the American Revolution, than in Europe during a

---

[68] Fox News, *Doug Burgum explains national security concerns that led to pausing offshore wind projects* at 02:00-02:02 (Dec. 22, 2025), https://www.foxnews.com/video/6386850294112.

[69] YouTube, *Trump admin halts all offshore wind farm construction* at 02:15-02:33, 05:12-05:22 (Dec. 23, 2025), https://www.youtube.com/watch?v=zaGVeJSdy30.

[70] *Id.* at 02:10-48.

[71] Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 23, 2025, 2:04 PM), https://x.com/SecretaryBurgum/status/2003542182930842066.

Russian Invasion!,"[72] and that "[o]ffshore wind isn't just a bad deal, it's a scam and YOU are paying for it!"[73]

**178.** In addition to being inconsistent with Connecticut's Department of Energy & Environmental Protection estimates,[74] the statements of the Secretary and Department of the Interior demonstrate once more that the Second Stop Work Order—like the First Stop Work Order—was apparently issued in bad faith. The Second Stop Work Order appears to be a pretextual policy change in position that is both unreasonable and contrary to the administrative record. In order to fully comply with the Second Stop Work Order, Revolution Wind has suspended Project activity on the Outer Continental Shelf, consistent with and in the manner provided by the Second Stop Work Order, at substantial cost to the Project, once again risking collapse of the Revolution Wind enterprise.

~~G~~I.     **Revolution Wind's Financial Obligations and Commercial Commitments**

~~139~~179.     The **First and Second** Stop Work ~~Order~~**Orders** immediately ~~harms~~**harm** Revolution Wind, including by impairing its significant financial investments in the Project as well as its significant investment of time, money and other resources in the lease auction processes and administrative processes supporting the approvals.

---

[72] Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 23, 2025, 2:04 PM), https://x.com/SecretaryBurgum/status/200354218848484104627.

[73] Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 23, 2025, 2:04 PM), https://x.com/SecretaryBurgum/status/2003542190170210637.

[74] "DEEP estimates that if the Revolution Wind project is canceled, the near-term cost to New England electric ratepayers would be roughly half a billion dollars per year, in the form of higher regional energy market costs, due to the loss of this affordable and reliable offshore wind power." (Sept. 9 2025), https://portal.ct.gov/-/media/deep/energy/procurements/deep-preliminary-estimates-of-energy-cost-impacts-associated-with-revolution-wind-stop-work-order.pdf.

140.    To date180.    When the First Stop Work Order was issued, Revolution Wind hashad already spent or committed approximately $5 billion in developing, permitting, engineering, procuring, fabricating, preparing for, and commencing construction of the Project in reliance on nearly 20 different approvals and authorizations issued by Defendants and various state and local agencies.  That number subsequently exceeded $5 billion by the time the Second Stop Work Order was issued.

181.    Revolution Wind has also entered many contracts with a variety of commercial suppliers to develop the Project.  These include contracts for the manufacture and transport of Project components and for the leasing of specialized vessels to transport and install the components.

141182.    If the Project is cancelled because Revolution Wind is not permitted to resume construction shortly, Revolution Wind anticipates that over $1 billion in breakaway costs will be lost.

142.    In the immediate term, the Stop Work Order is causing losses of millions of dollars per week to the Project.

183.    Before it was enjoined, the First Stop Work Order was causing losses of millions of dollars per week to the Project.   The Second Stop Work Order is now causing losses of millions of dollars per week to the Project.

143184.    Revolution Wind also executed 20-year PPAs with Connecticut and Rhode Island utilities for a combined approximately 704 MW, corresponding to the entire electricity generation capacity of the Project.

144185.    The Second Stop Work Order halting construction could further harm Revolution Wind by resulting in liquidated damages under the PPAs or, ultimately, in PPA

~~termination~~**risking termination of the majority of its PPA capacity**, causing Revolution Wind to substantially lose its investments and expected future profits **and threatening Project cancellation**.

~~145~~**186**.        Revolution Wind has carefully sequenced its construction schedules to ensure efficient use of scarce resources, including the specialized vessels necessary for Project construction.  These specialized vessels are in limited supply and are tightly scheduled, with limited availability to work beyond the contracted reservation dates.  Revolution Wind's contracts for vessels for project construction typically include latest vessel availability date provisions, under which, if Project work is not complete by the specified final vessel availability date, the contracted vessels are able to depart to begin work on other projects.  As a result, unless ~~the unlawful Stop Work Order is vacated and set aside~~**operations are allowed to resume expeditiously**, the vessels may depart for other scheduled commitments without completing work on the Project.

**187.        Additionally, the delay caused by the First Stop Work Order compounds the effects of the Second Stop Work Order.  As a result of the delay from the First Stop Work Order, WTG installation that was anticipated to conclude in December 2025 has been pushed further into the winter months with more challenging weather conditions.  That means the remaining WTGs will take longer to install; further delay from the Second Stop Work Order risks the Project's ability to complete it.**

**188.**        If the work cannot be completed as scheduled, the Project could be delayed by an unknown period of time required to secure an alternative specialized vessel and ~~likely by one year or more and~~**will** be at risk of cancellation.

**189.    If the Second Stop Work Order is not quickly enjoined, there is a risk that the Project will be unable to meet the requirements of the majority of PPA capacity.  The utility would have a unilateral right to terminate this PPA under its terms.**

**190.    Even if there were not these significant vessel availability constraints, delaying the Project by 90 days in and of itself significantly limits the time between Revolution Wind's planned Commercial Operation Date and the Rhode Island PPA deadline.  That limited time is wholly inadequate to mitigate an existential risk to the Project.**

**~~H~~J.    The Stop Work ~~Order's~~Orders' Threat To Energy, Environmental, and Public Health Benefits**

~~146.~~    ~~The~~**191.    To the extent they are not enjoined, the First and Second** Stop Work ~~Order~~**Orders** also ~~poses~~**pose** an immediate threat to significant energy, environmental and public health benefits that the Project would otherwise generate.

~~147~~**192**.    First, the ~~project~~**Project** is contractually committed to deliver 400 MW of electricity to Rhode Island and 304 MW to Connecticut, providing much needed reliable energy as electricity demand continues to grow, including demand related to data centers and artificial intelligence.  Indeed, experts believe that electricity prices will increase a result of the **First and Second** Stop Work ~~Order~~**Orders**.  Available information shows that similar offshore wind generation delivers reliable energy at a capacity on par with that State's baseload power sources.

~~148~~**193**.    Defendants have conceded in ongoing litigation in this Court that "[e]njoining the agency authorizations associated with the Revolution Project would also hinder the public interest, which will be served by the Revolution Project's capacity to provide 704 megawatts of clean energy to the Connecticut and Rhode Island power grids. . . ."  Federal Defendants' Opposition to Plaintiffs' Mot. for an Administrative Stay or Preliminary Injunction at

2, *Green Oceans v. U.S. Dep't of the Interior*, No. 1:24-cv-00141-RCL, Dkt. 38 (D.D.C. filed May 21, 2024).

~~149~~**194**.        As State officials have stated in sworn declarations in other litigation, the power the Project is slated to deliver is critical to consumers in Connecticut and Rhode Island, and to the reliability of New England's integrated regional grid as a whole.  Connecticut "is counting on [its] 304 MW share of Revolution Wind['s power output] to meet 5% of [the] state's electric distribution company load once the project comes online in 2026."  Supplemental Decl. of Katherine S. Dykes, Comm'r of the Connecticut Dep't of Energy and Env't Protection at 5, *State of New York v. Trump*, No. 1:25-cv-11221-WGY, Dkt. 211 (D. Mass. filed Aug. 28, 2025) ("Dykes Declaration").  Revolution Wind's long-term contract prices with utilities "are expected to act as a successful hedge against rising electricity rates," which is projected to save Connecticut ratepayers "hundreds of millions of dollars" on their electric bills in aggregate.  *Id.*  More broadly, Revolution Wind's 704 MW represents "approximately 2.5% of New England's electricity load", and "[l]osing the 704 MW of load would negatively impact [grid] reliability in Rhode Island and throughout New England," raising the risk of blackouts and other reliability problems— particularly in the winter, when New England power demand spikes, natural gas supplies are tight, and offshore wind farms tend to be most productive.  *See* Supplemental Decl. of Christopher Kearns, Acting Energy Comm'r of the Rhode Island Office of Energy Res. at 4, *State of New York v. Trump*, No. 1:25-cv-11221-WGY, Dkt. 212 (D. Mass. filed Aug. 28, 2025) ("Kearns Declaration").

~~150~~**195**.        The New England Independent System Operator ("ISO-NE"), the independent, nonprofit corporation authorized by the federal government to manage New England's grid and ensure its reliability, verified these concerns ~~in~~**.  In** a statement reacting to the

**First** Stop Work Order, ~~stating~~**ISO-NE stated** that: "Delaying the project will increase risks to reliability", and "[u]npredictable risks and threats to resources—regardless of technology—that have made significant capital investments, secured necessary permits, and are close to completion will stifle future investments, increase costs to consumers, and undermine the power grid's reliability and the region's economy now and in the future."~~65~~**75  And in a statement reacting to the Second Stop Work Order, ISO-NE stated:  The Project and another Project that is also subject to an order substantially similar to the Second Stop Work Order are "particularly important to system reliability in the winter when offshore wind output is highest and other forms of fuel supply are constrained."  The ISO-NE also stated that "canceling or delaying these projects will increase costs and risks to reliability in our region.  Beyond increasing risk to reliability, delays of new generating resources also will adversely affect New England's economy and industrial growth, including potential future data centers."[76]**

~~151~~**196**.    The Project is a key component of the States of Rhode Island and Connecticut's laws and policies to meet carbon reduction goals.  Rhode Island has a goal of reaching 100% renewable electricity by 2030~~66~~**77** and its climate goals could require the development of approximately 9 to 11 gigawatts ("GW") of offshore wind power by 2030.~~67~~**78**

---

~~65~~**75** ISO NEWSWIRE, *ISO-NE Statement on Revolution Wind Stop Work Order* (Aug. 25, 2025), https://isonewswire.com/2025/08/25/iso-ne-statement-on-revolution-wind-stop-work-order/.

**76 ISO NEWSWIRE, *ISO New England statement on Department of the Interior offshore wind announcement* (Dec. 22, 2025), https://isonewswire.com/2025/12/22/iso-new-england-statement-on-department-of-the-interior-offshore-wind-announcement/.**

~~66~~**77** *See* 39 R.I. Gen. Laws § 39-26-4(a)(14).

~~67~~**78** *See* Rhode Island Office of Energy Resources, *100 Percent Renewable Electricity by 2030* (last updated June 25, 2024), https://energy.ri.gov/renewable-energy/100-percent-renewable-electricity-2030; Rhode Island Office of Energy Resources & Brattle Group, *The Road to 100% Renewable Electricity by 2030 in Rhode Island* at iv (Dec. 2020), https://energy.ri.gov/sites/g/files/xkgbur741/files/documents/renewable/The-Road-to-100-Percent-Renewable-Electricity---Brattle-04Feb2021.pdf.

According to Rhode Island officials, continued delay to the Project could "significantly harm Rhode Island's efforts to comply with its state statutory requirements to reduce statewide greenhouse gas emissions [to] net zero by 2050." Kearns Declaration at 5. Finally, Connecticut aims to reach 100% zero-carbon electricity supplied to customers by 2040 and its climate goals require the development of 2 GW of offshore wind by 2030.[68][79]

~~152~~197.        Once completed, the Project will provide enough domestic energy to power more than 350,000 homes in Rhode Island and Connecticut.

~~153.~~  ~~The~~198.        **Reacting to the First Stop Work Order, the** Governors of Connecticut and Rhode Island ~~have~~ stated respectively: "This political move by the Trump administration will drive up the cost of electricity bills and contradicts everything the administration has told us. It wastes years of state investment in renewable energy designed to diversify our energy supply and lower costs for families and businesses," said Connecticut Governor Ned Lamont, and "The Trump administration's stop-work order on Revolution Wind undermines efforts to expand our energy supply, lower costs for families and businesses, and strengthen regional reliability. This action puts hundreds of union jobs at risk by halting a project that is 80% complete – just steps away from powering more than 350,000 homes in Rhode Island and Connecticut," said Rhode Island Governor Dan McKee. **Connecticut Department of Energy & Environmental Protection stated that "[b]y 2028, these wholesale market savings [from the Project] are estimated to reach roughly $500 million dollars a year."[80]**

---

[68][79] Conn. Gen. Stat. § 22a-200a(3); Record of Decision at 9.

**[80] Connecticut Department of Energy & Environmental Protection, "DEEP Preliminary Estimates of Energy Cost Impacts Associated with Revolution Wind Stop Work Order," (Sept. 9, 2025), available at https://portal.ct.gov/-/media/deep/energy/procurements/deep-preliminary-estimates-of-energy-cost-impacts-associated-with-revolution-wind-stop-work-order.pdf.**

**199.    Reacting to the Second Stop Work Order, the Governors of New York, Massachusetts, Connecticut, and Rhode Island sent a letter[81] to Secretary Burgum stating: "With this irrational and erratic action, you are not solving a national security crisis; you are creating both a national security and economic disaster.  By obstructing domestic power generation, you are inviting grid failure, surrendering the industries of the future, and threatening the economy and national security."  They noted that "[o]ffshore energy is already providing needed electricity at lower prices to our grid" and that "these Orders heighten reliability concerns across the East Coast and increase the likelihood of rolling blackouts and will place additional financial burdens on ratepayers."**

~~154~~**200**.    Over the lifetime of the Project, Revolution Wind anticipates it will pay hundreds of millions of dollars in rents, operating fees, and federal and state taxes.

~~155~~**201**.    Revolution Wind has employed more than 2,000 people to date across construction, manufacturing, shipbuilding, and operations.  To date, more than 800 local union labor full-time equivalents have worked on the construction of the Project.  The Project is estimated to create hundreds of operations and maintenance jobs.  These would be lost if the Project is cancelled.

~~156~~**202**.    In Rhode Island, the Project has driven substantial port activity, "with over 300 offshore wind-specific vessel calls to the Port of Providence in 2024."  Kearns Declaration at 4.  The Project is one of a small number of major offshore wind projects underpinning a complex and interconnected economic sector, supporting jobs, contracts, supply chains, and investments at

---

[81] **Letter from Governors Kathy Hochul, Maura Healey, Ned Lamont, and Dan McKee to Secretary Burgum (Dec. 24, 2025), https://portal.ct.gov/governor/-/media/office-of-the-governor/news/2025/20251224-letter-to-interior-secretary-on-offshore-wind.pdf?rev=63eae420c6d8468c8f11fe10374c1307&hash=4AEE7A7A5A9156D4886A2FFD17B03640.**

multiple ports and across numerous businesses.  In Connecticut, at least 50 companies participate in different aspects of the offshore wind economy, and Revolution Wind supports more than 100 jobs at New London's State Pier port, along with hundreds of other jobs across the state.  *See* Dykes Declaration at 6.

157203.        On April 22, 2022, Ørsted, the North America's Building Trades Unions, and the United Brotherhood of Carpenters entered into a "National Offshore Wind Agreement," a first-of-its-kind U.S. project labor agreement that creates expansive job opportunities for workers in the building trade unions on offshore construction associated with Ørsted's offshore wind projects, including the Project.[6982]  Construction on the Project is also being performed pursuant to project labor agreements with the Norwich-New London Building Trades Council (offshore wind turbine pre-assembly at the New London State Pier) and the Rhode Island Building and Construction Trades Council (advance foundation component construction, as well as work on the onshore cable route and onshore substation).  Consistent with these agreements, hundreds of the jobs associated with the Project are union jobs.

158204.        Revolution Wind has also made commitments totaling more than $10 million to communities and institutions in Connecticut and Rhode Island.  For example, Revolution Wind contributed $500,000 to establish Rhode Island's first Global Wind Organization training center at the Community College of Rhode Island, and $500,000 to the Rhode Island Department of Labor and Building Futures Rhode Island to enable new entrants to union construction careers through pre-apprenticeship and for offshore wind career training for Rhode islanders involved in

---

[6982] Ørsted, *North America's Building Trades Unions and Ørsted Agree to Build an American Offshore Wind Energy Industry with American Labor* (May 5, 2022, 12:45 PM) https://us.orsted.com/news-archive/2022/05/national-offshore-wind-agreement.

the construction of offshore wind projects.[7083]   To date, this funding has enabled more than 100 Rhode Islanders to obtain credentials required for Revolution Wind's offshore construction.

~~159~~205.        Ørsted and Revolution Wind are also investing significantly in port infrastructure and domestic manufacturing.  In Rhode Island, Revolution Wind's parent companies are investing more than $100 million in an offshore wind construction hub at the Port of Providence, creating local union jobs, partnering with local shipyards, investing $1 million in a local training partnership, and collaborating with local fishermen.[7184]   Revolution Wind's parent companies have also contributed more than $100 million of funding to support the Connecticut Port Authority and the State of Connecticut's re-development of the State Pier Terminal in the Port of New London.

### CLAIM I: VIOLATION OF THE OUTER CONTINENTAL SHELF LANDS ACT AND THE ADMINISTRATIVE PROCEDURE ACT

**The First Stop Work Order Is Arbitrary and Capricious In Violation of 5 U.S.C. § 706**

~~160~~206.        The foregoing paragraphs are incorporated by reference as if set forth in full herein.

~~161~~207.        OCSLA provides that the Outer Continental Shelf is a "vital national resource reserve" that "should be made available for expeditious and orderly development."  43 U.S.C. § 1332(3).

~~162~~208.        To effectuate this "expeditious and orderly development," Congress amended OCSLA in 2005 to expand its reach to include advances in renewable energy, authorizing the Secretary of the Interior to grant leases to "produce or support production, transportation, or

---

[7083] FEIS at F-17.

[7184] Revolution Wind, *Governor McKee, Congressional Delegation, Mayor Smiley Mark New Phase of Offshore Wind Construction Hub at ProvPort* (May 1, 2023, 2:30 PM), https://revolution-wind.com/news/2023/05/new-phase-of-offshore-wind-construction-hub-at-provport.

transmission of energy for sources other than oil and gas," including offshore wind.  43 U.S.C. § 1337(p)(1)(C); Pub. L. No. 109-58, 119 Stat. 594, 746.

163209.        By providing for domestic offshore wind development, Congress sought to "enhance the energy security of the United States," to "reduce dependence on foreign sources of fuel," S. Rept. No. 109-78, at 1 (2005), and to "ensure jobs for our future with secure, affordable, and reliable energy," H.R. Rept. No. 109-90, at 1 (2005).

164210.        Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "arbitrary" and "capricious."  5 U.S.C. § 706(2)(A).

165211.        The **First** Stop Work Order, issued without sufficiently explaining or justifying the basis for its issuance and without notice or an opportunity to be heard, is arbitrary and capricious and impermissible under the APA's requirement of "reasoned decisionmaking," *Michigan v. EPA*, 576 U.S. 743, 750 (2015), which requires an agency to "articulate a satisfactory explanation for its action," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

166212.        Not only did Defendants not provide a satisfactory explanation for issuing the **First** Stop Work Order, they provided *no explanation* for the decision beyond unsubstantiated "concerns."  Ex. A.  That alone falls short of the required "satisfactory explanation," because it is no explanation at all.  *State Farm*, 463 U.S. at 43; *Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019) ("[A]n agency must 'disclose the basis' of its action.") (citation omitted).  "[C]onclusory statements . . . do not substitute for the reasoned explanation that the APA requires."  *Env't Health Trust v. FCC*, 9 F.4th 893, 905 (D.C. Cir. 2021).

167213.        The **First** Stop Work Order also violated the "change-in-position doctrine." The change-in-position doctrine provides that agencies may only change their existing policies if

they "provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *FDA v. Wages and White Lion Investments, LLC*, 145 S. Ct. 898, 917 (2025) (citations and quotations omitted). Defendants have already reviewed and considered all aspects of the Project, including national security and potential for interference with other uses of the Outer Continental Shelf, and documented it in the approvals for the Project. After many years of exhaustive environmental and safety review, Interior concluded "that all practicable means within its authority have been adopted to avoid or minimize environmental and socioeconomic harm associated with" approval of the project. Record of Decision, *supra*, at 24.

~~168~~**214**.        The **First** Stop Work Order suggests a complete reversal of the agency's prior conclusion that the Project complied with federal law by halting the Project to "ensure compliance with . . .applicable law." Ex. A. Defendants "made no attempt to explain [their] about-face," and "that failure of explanation alone renders" the Stop Work Order arbitrary and capricious. *Sinclair Wyo. Refining Co. LLC v. EPA*, 114 F.4th 693, 713 (D.C. Cir. 2024). At this late stage, Defendants' attempted change in position is also not timely.

~~169~~**215**.        Defendants Interior and BOEM have conceded in this Court that Defendants' Revolution Wind "review was designed to ensure the soundness of the project and to comply with multiple federal statutes. . . ." Federal Defendants' Opposition to Plaintiffs' Mot. for an Administrative Stay or Preliminary Injunction at 7, *Green Oceans v. U.S. Dep't of the Interior*, No. 1:24-cv-00141-RCL, Dkt. 38 (D.D.C. filed May 21, 2024). These Defendants have admitted in this Court that "[e]njoining the agency authorizations associated with the Revolution Project would also hinder the public interest, which will be served by the Revolution Project's capacity to provide 704 megawatts of clean energy to the Connecticut and Rhode Island power grids. . . ." *Id.* at 2. These Defendants have expressly denied in this Court that the Project would interfere with

national security or other reasonable uses of the Outer Continental Shelf. *Compare* First Amended Complaint at ¶ 133, first sentence and ¶ 143, first sentence, *Green Oceans*, Dkt. 33 (D.D.C. filed May 13, 2024) *with* Answer at ¶¶ 133, 143, Dkt. 54 (D.D.C. filed July 19, 2024) ("Federal Defendants deny the allegations in the first sentence Paragraph 133. . . . Federal Defendants deny the allegations in Paragraph 143."). These Defendants have also expressly denied in this Court that the Project would not be carried out in a manner providing for the protection of the environment. *Compare* First Amended Complaint at ¶¶ 91, 94 *with* Answer at ¶¶ 91, 94 (flatly denying all allegations in those paragraphs). These Defendants have not withdrawn these statements and denials. Nor have Defendants provided any reasoned explanation for the change, shown awareness of their change in position, or taken reliance interests into account.

~~170~~**216**.        The **First** Stop Work Order also "entirely failed to consider an important aspect of the problem," because it did not consider Revolution Wind's reliance interests. *State Farm*, 463 U.S. at 43. When an agency "changes course," as Interior did here, it must consider whether its prior actions "engendered serious reliance interests" and take those interests into account. *Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). And Defendants were certainly aware of those reliance interests as evidenced by Defendants' concession in this Court that "[w]here, as here, a developer has complied with agency rules and satisfied federal statutory requirements, it should be able to rely on its permits, as it may need to make business and financial decisions in furtherance of completing the authorized activity."

~~171.~~ **217.**        **At the time of the First Stop Work Order** Revolution Wind ~~has~~**had** already spent or committed approximately $5 billion to date to plan, permit, develop, and construct this project. If the Project is cancelled, Revolution Wind will incur over $1 billion in breakaway costs, for a total loss of over $6 billion.

172218.    Defendants did not consider, or even acknowledge, Revolution Wind's substantial and legitimate reliance interests in issuing the **First** Stop Work Order in the form of billions of dollars invested into the project.  This alone is sufficient to render the **First Stop Work** Order arbitrary and capricious.  *See Int'l Org. of Masters, Mates, & Pilots, ILA, AFL-CIO v. NLRB*, 61 F.4th 169, 180 (D.C. Cir. 2023).

173219.    An agency's action is also arbitrary and capricious when it "offer[s] an explanation for its decision that runs counter to the evidence before the agency."  *Evergreen Shipping Agency Am. Corp. v. Fed. Maritime Comm'n*, 106 F.4th 1113, 1117 (D.C. Cir. 2024); *Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 619 (D.C. Cir. 2017).  To the extent that the **First** Stop Work Order provides an explanation at all, it references "concerns that have arisen" about "protection of national security interests and prevention of interference with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas".  Ex. A.  But, as noted below, BOEM both consulted with ~~DOD~~**the DOW** to consider and resolve these issues and concluded, after notice and comment, that the Project was consistent with national security interests and other reasonable uses of the Outer Continental Shelf, issuing the Record of Decision, Construction and Operations Plan approval and Conditions of Approval.  Indeed, "[a]t each stage of the regulatory process involving Lease OCS-A 0486, BOEM . . . consulted with the DOD for the purposes of assessing national security considerations in its decision-making processes."  Record of Decision at B-15.  And ~~DOD~~**the DOW** consulted on the Project and entered into an agreement with the Project to address any potential for national security concerns.  Moreover, Defendants denied in this Court that the Project interferes with national security or other reasonable uses of the Outer Continental Shelf.  The **First** Stop Work Order is contrary to the robust record supporting the Project approvals and Defendants' statements in this Court.  Having

identified no evidence that has changed since these approvals were issued and statements were made in this Court, the **First** Stop Work Order is unlawful.

174**220**.    The **First** Stop Work Order is also arbitrary and capricious because it appears that "political pressure influenced the decision in a manner not dictated by the relevant statutes and regulations." *Connecticut v. U.S. Dep't of the Interior*, 363 F. Supp. 3d 45, 63 (D.D.C. 2019).  The nearly ten-year environmental and safety review process spanning three presidential administrations concluded that Revolution Wind's project should be permitted to go forward under all statutory and regulatory review requirements.  Yet, after the Presidential Memorandum and the statements of various members of the Administration, Interior and BOEM changed their mind and issued the **First** Stop Work Order.  On information and belief, BOEM has been subject to political pressure from the White House and Members of Congress to halt offshore wind.  This pressure campaign and pretextual statements caused BOEM to reverse its decision inconsistent with the statutory and regulatory factors that Congress provided for it to consider, rendering it arbitrary and capricious.

175**221**.    On information and belief, the "the [agency] was determined to" halt the Project and "adopted the [stated] rationale late in the process."  *Dep't of Com.*, 588 U.S. at 782-83.  Such "a significant mismatch between the decision the [agency] made and the rationale [it] provided" is evidence that the agency has acted arbitrarily and capriciously.  *Id.* at 783-85.

176**222**.    The **First** Stop Work Order is also arbitrary and capricious because it treats Revolution Wind inconsistent with other energy development on the Outer Continental Shelf, like offshore oil and gas.  "A fundamental norm of administrative procedure requires an agency to treat like cases alike."  *Westar Energy, Inc. v. Fed. Energy Regulatory Comm'n*, 473 F.3d 1239, 1241 (D.C. Cir. 2007).

~~177~~**223**.        The **First** Stop Work Order arbitrarily delays an already near-decade-long permitting process for the Project.  But on April 23, 2025, Interior announced new procedures "designed to expedite the review and approval" of oil and gas projects, taking a "multi-year process down to just 28 days."  Interior, Press Release, *Department of the Interior Implements Emergency Permitting Procedures to Strengthen Domestic Energy Supply* (Apr. 23, 2025), https://www.doi.gov/pressreleases/department-interior-implements-emergency-permitting-procedures-strengthen-domestic.

~~178~~**224**.        Interior excluded offshore wind energy from the types of projects that can take advantage of these new permitting procedures, and the **First** Stop Work Order attempts to slow even further the development of already permitted projects.

~~179~~**225**.        The **First** Stop Work Order offers no justification for treating Revolution Wind differently from offshore oil and gas, and is thus unlawful.

~~180~~**226**.        The **First** Stop Work Order is arbitrary and capricious and should be vacated and set aside under the APA and OCSLA.

### CLAIM II: VIOLATION OF THE OUTER CONTINENTAL SHELF LANDS ACT AND THE ADMINISTRATIVE PROCEDURE ACT

**The First Stop Work Order Is Contrary to Law In Violation of 5 U.S.C. § 706**

~~181~~**227**.        The foregoing paragraphs are incorporated by reference as if set forth in full herein.

~~182~~**228**.        Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).

~~183~~**229**.    OCSLA provides that the Outer Continental Shelf as a "vital national resource reserve" that "should be made available for expeditious and orderly development."  43 U.S.C. § 1332(3).

~~184~~**230**.    To effectuate this "expeditious and orderly development," Congress amended OCSLA in 2005 to expand its reach to include advances in renewable energy, authorizing the Secretary of the Interior to grant leases to "produce or support production, transportation, or transmission of energy for sources other than oil and gas," including offshore wind.  43 U.S.C. § 1337(p)(1)(C); Pub. L. No. 109-58, 119 Stat. 594, 746.

~~185~~**231**.    By providing for domestic offshore wind development, Congress sought to "enhance the energy security of the United States," to "reduce dependence on foreign sources of fuel," S. Rept. No. 109-78, at 1 (2005), and to "ensure jobs for our future with secure, affordable, and reliable energy," H.R. Rept. No. 109-90, at 1 (2005).

~~186~~**232**.    The **First** Stop Work Order invokes OCSLA and its implementing regulations, particularly 43 U.S.C. § 1337(p)(4) and 30 C.F.R. § 585.102(a) to justify its mandate to "halt all ongoing activities."  Ex. A.

~~187~~**233**.    43 U.S.C. § 1337(p)(4) provides that "[t]he Secretary shall ensure that any activity under this subsection," generally covering the required procedures for granting offshore leases, "is carried out in a manner that provides for"—"safety", "protection of the environment," "public notice and comment" on proposed leases, and "protection of national security interests," among other things.

~~188~~**234**.    30 C.F.R. § 585.102(a) similarly states that BOEM "will ensure that any activities authorized in this part are carried out in a manner that provides for and reaches a rational

balance among the following goals to the extent they conflict or are otherwise in tension, none of which inherently outweighs or supplants any other . . . ."

~~189~~235.      Neither 43 U.S.C. § 1337(p)(4) nor 30 C.F.R. § 585.102(a) grants authority to order a cessation of activities on an already established leasehold for reasons of national security or otherwise.

~~190~~236.      No other provision in OCSLA or its implementing regulations authorizes BOEM to order an immediate stop work order in the circumstances presented here.

~~191~~237.      Defendants' action is contrary to law in violation of the APA.

## CLAIM III: VIOLATION OF THE OUTER CONTINENTAL SHELF LANDS ACT AND THE ADMINISTRATIVE PROCEDURE ACT

### The First Stop Work Order Was Issued Without Observance of Procedure as Required by Law In Violation of 5 U.S.C. § 706

~~192~~238.      The foregoing paragraphs are incorporated by reference as if set forth in full herein.

~~193~~239.      Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action taken "without observance of procedure required by law."  5 U.S.C. § 706(D).

~~194~~240.      BOEM was thus bound to follow the procedures set forth in its own regulations in issuing the First Stop Work Order.  *Int'l Trade Comm'n v. ASAT, Inc.*, 411 F.3d 245, 254 (D.C. Cir. 2005) (agency "is bound by its regulations").

~~195~~241.      30 C.F.R. § 585.105(h) purports to require lessees to "conduct all activities authorized by the lease . . . in a manner consistent with the provisions of [43 U.S.C. § 1337(p)]" of OCSLA.

~~196~~242.      30 C.F.R. § 585.106, in turn, lays out the procedure that BOEM must follow if there is a suspected violation of 30 C.F.R. § 585.105(h).

197243.    Specifically, BOEM must issue "a notice of noncompliance" that tells the lessee "how [it] failed to comply with this part, any order of the Director and/or the provisions of [its] lease, grant or other approval, and will specify what [it] must do to correct the noncompliance and the time limits within which [it] must act." 30 C.F.R. § 585.106(b)-(c).

198244.    BOEM's regulations provide that "failure of a lessee, operator, or grant holder to take the actions specified in a notice of noncompliance . . . within the time limit specified provides the basis for issuance of a cessation order by BSEE, as provided in 30 CFR 285.401 and/or cancellation of the lease or grant by the Secretary as provided in § 585.422." Section 285.401 makes clear that such "[a] cessation order will set forth what measures [the lessee is] required to take, including reports [it is] required to prepare and submit to BSEE, to receive approval to resume activities" on a lease. *Id.* § 285.401(b).

199245.     BOEM failed to follow these procedures. The **First** Stop Work Order loosely cites 43 U.S.C. § 1337(p)(4) and 30 C.F.R. § 585.102(a), but does not invoke 30 C.F.R. § 585.105(h) or follow any of the procedures in 30 C.F.R. § 585.106.

200246.    BOEM thus issued the **First** Stop Work Order without the procedure required by law in violation of the APA.

### CLAIM IV: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT AND FIFTH AMENDMENT

**The First Stop Work Order Violates The Procedural Due Process Guarantees of the Fifth Amendment to the U.S. Constitution**

201247.    The foregoing paragraphs are incorporated by reference as if set forth in full herein.

202248.    Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "not in accordance with law" or "in excess of statutory jurisdiction,

~~authority, or limitations, or short of statutory right~~**contrary to constitutional right, power, privilege, or immunity**.”  5 U.S.C. § 706(2)(~~A), (C~~**B**).

~~203~~**249**.        The **First** Stop Work Order is contrary to law because it deprives Revolution Wind of its property without due process required by law.  U.S. Const., amend. V.

~~204~~**250**.        Leases convey property interests at common law, and a “leasehold interest is a property interest for purposes of the Fifth Amendment.” *Turntable Fishery & Moorage Corp. v. U.S.*, 52 Fed. Cl. 256, 261 (Fed. Cl. 2002).  Lessees pursuing energy development on lands leased by the Department of the Interior have “property rights in the . . . leases.” *E.g.*, *Hoyl v. Babbitt*, 129 F.3d 1377 (10th Cir. 1997).

~~205~~**251**.        The Due Process Clause requires that “an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.” *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) (citations omitted) (emphasis in original).

~~206~~**252**.        Even “temporary or partial impairments to property rights . . . merit due process protection.” *Amoco Prod. Co. v. Fry*, 118 F.3d 812, 819 (D.C. Cir. 1997) (quoting *Connecticut v. Doehr*, 501 U.S. 1, 12 (1991)).

~~207~~**253**.        The **First** Stop Work Order impairs Revolution Wind’s ability to take advantage of its property interest in its leasehold by requiring Revolution Wind to “halt all ongoing activities” on the Project.”  Ex. A.

~~208~~**254**.        Revolution Wind was not afforded any notice or hearing before impairment of its property interest.  Accordingly, Revolution Wind was deprived of property without due process required by law.

**CLAIM V: VIOLATION OF THE OUTER CONTINENTAL SHELF LANDS ACT AND THE ADMINISTRATIVE PROCEDURE ACT**

**The Second Stop Work Order Is Arbitrary and Capricious In Violation of 5 U.S.C. § 706**

**255.  The foregoing paragraphs are incorporated by reference as if set forth in full herein.**

**256.  Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "arbitrary" and "capricious."  5 U.S.C. § 706(2)(A).**

**257.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  The agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).  The Second Stop Work Order fails these requirements on multiple grounds.**

**258.    The Second Stop Work Order is arbitrary and capricious because it lacks a reasonable explanation for the suspension.**

**259.    The Second Stop Work Order is unacceptably conclusory.  In justifying the suspension, the Order says only that the DOW "provided senior leadership with new classified information, including the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects."  Ex. B.  BOEM did not point to a single design or technical specification of Revolution Wind that raised national security concerns.  *See id.*  Indeed, BOEM issued a substantively identical order to four other offshore wind projects, without reference to any specific project characteristics.**

**260.    While national security is undeniably important, "APA review . . . involves more than a court rubberstamping action based on bare declarations from the agency amounting to 'trust us, we had good national security reasons for what we did.'"  *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 257, 270 (D.D.C. 2018).  BOEM was still required complete**

the "critical step" of connecting facts to the conclusion, which BOEM failed to do.

261.    BOEM's sole reference to "classified information" does nothing to change this analysis (with no explanation for why suspension is "necessary"), particularly given indications that BOEM's purported national security rationale could be pretextual.

262.    *First,* Secretary Burgum has made countless statements in subsequent public interviews and announcements maligning offshore wind energy unrelated to national security.  These statements suggest that BOEM's Second Stop Work Order could be based on political pressure, which is a consideration "not made relevant by Congress" in OCSLA, and is inconsistent with the purported "national security" rationale of the Second Stop Work Order.

263.    *Second,* the absence of any indication of concerns from the DOW and military contacts with which the Project regularly communicates further underscores the arbitrary nature of the Order.  Since the First Stop Work Order was enjoined by this Court on September 22, 2024, Revolution Wind has not received any communication from the DOW, Air Force, Coast Guard, Navy, or any other agency regarding national security concerns, despite numerous meetings.

264.    *Third,* the Second Stop Work Order repeats arguments Interior already made with respect to the First Stop Work Order that this Court enjoined.  Secretary Burgum made comments with respect to the First Stop Work Order mentioning radar interference and drones.  *See supra* ¶ 161.  Defendants appear to be applying that same rationale to shut down the Project again, with a sole reference to "classified" information that Revolution Wind representatives with security clearances have not been able to evaluate to determine the alleged basis for the Order.  The Second Stop Work Order also immediately halts work while

the Government "invites" a discussion with the Project on mitigating national security concerns, Ex. B, which of course could have initially occurred over a month ago when these purported concerns were allegedly identified.

265.    Despite the Order's reference to "classified information," the press release by Interior accompanying the Second Stop Work Order discussed "unclassified reports from the U.S. Government," including a 2024 report that the release characterizes as having found radar interference from turbine blades (a report that had been in existence prior to the November 2024 DOD agreement having been executed).  Press Release, *supra* n.66. Secretary Burgum has similarly made repeated unclassified statements on national news about "radar interference" and "drones," just as he did in relation to the First Stop Work Order.  *See, e.g.*, Fox News, *Doug Burgum explains national security concerns that led to pausing offshore wind projects* at 00:10-00:25 (Dec. 22, 2025), https://www.foxnews.com/video/6386850294112.  The Second Stop Work Order (like the First Stop Work Order) does not explain the factual basis for BOEM's concerns and therefore violates the APA.  BOEM's failure to articulate a satisfactory explanation leaves its decision without a justification "that can be scrutinized by courts and the interested public."  *Dep't of Com.*, 588 U.S. at 785.

266.    The inconsistencies in BOEM's Second Stop Work Order also undercut any reasonable explanation that might otherwise satisfy BOEM's obligations under the APA.

267.    *First*, BOEM purports to base the Order on national security information with "the potential to cause serious, immediate, and irreparable harm" from a DOW review completed in November 2025, and that BOEM Director Giacona has since disclosed he reviewed on November 26, 2025.  Ex. B.  However, Director Giacona did not issue the Order

until December 22, 2025, approximately a month later. *Id.* Furthermore, Secretary Burgum's discussion of the DOW review in an interview on December 22, 2025, referred to considerations, such as radar interference, that the Secretary had already used to try to justify the First Stop Work Order in August. At a minimum, this delay is inconsistent with the purported "immediate" and irreparable harm requiring the "necessary" broad cessation of activities under the Order.

268.    *Second*, the Suspension Order states that the harm posed by the Project "can only be feasibly averted by suspension of on-lease activities" but then "invites" Revolution Wind to "meet and confer" about potential mitigation measures. Ex. B. BOEM offers no explanation for why it was necessary to take the drastic step of broadly suspending activities with no notice given existing mitigation measures in place that could have alleviated the need for suspension, or why 90 days or more may be required for resolution. The 2024 DOD agreement addresses adverse impacts on radar, including a curtailment provision by which Revolution Wind agrees to immediately curtail wind turbine operations for a National Security or Defense Purpose, as defined in the agreement. And the Project, consistent with its Construction and Operations Plan Conditions of Approval, has installed all wind turbine generators equipped with rotors with controls enabling the Project to immediately initiate the curtailment of any wind turbine generator upon emergency order from the DOW or the Coast Guard. Revolution Wind's Lease further provides that "[e]very effort will be made . . . to provide as much advance notice as possible of the need to suspend operations" and "[a]dvance notice will normally be given before requiring a suspension." Ex. E at Addendum C, Sec. 3.2.2. None of these mechanisms to protect national security and the Project's reliance interests were initiated and Revolution Wind had absolutely no notice before

BOEM's Second Stop Work Order, despite regular and frequent communications with BOEM and BSEE, and ongoing coordination with the military.

269.    The inconsistency between no advance warning, ignoring existing mitigation, and then shutting down the Project effective immediately (nearly a month after reviewing the purported basis) is unexplained.  Because BOEM's decision is internally inconsistent, it is arbitrary and capricious.

270.    The Second Stop Work Order is also arbitrary and capricious because it violates the "change-in-position doctrine."  *FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 917 (2025).  That doctrine makes clear that agencies may only change their existing policies if they "provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *Id.*  Defendants first failed to justify their change in position in August 2025 with respect to the First Stop Work Order.  After failing to shut down the Project then, including on the basis of "protection of national security interests," Ex. A, BOEM now reiterates its national security concerns and then slightly shifts its position, with a citation to "classified information."  BOEM has still failed to consider that Revolution Wind developed substantial reliance interests based on Defendants' Project approvals, prior cooperation during construction and previous defense of those approvals in this very Court.

271.    In 2023, after many years of exhaustive review, BOEM approved the Project, explaining that its decision was consistent with 43 U.S.C. § 1337(p)(4) of OCSLA, "which requires the Secretary to ensure that approved activity is carried out in a manner that provides for Congress's enumerated goals," including national security.  Record of Decision at 25; *see also* 43 U.S.C. § 1337(p)(4)(F) (enumerating "protection of national security

interests of the United States" as a factor).

272.    BOEM's decision to approve the Project's Construction and Operations Plan was based upon and supported by an extensive record before the Agency.  BOEM has compiled and served its administrative record regarding BOEM's approval of the Revolution Wind Construction and Operations Plan in cases currently pending before this Court:  *Preservation Society of Newport County v. Burgum*, No. 1:23-cv-03513-RCL (D.D.C.), which has been consolidated with *Southeast Lighthouse Foundation v. Burgum*, No. 1:23-cv-03515-RCL (D.D.C.); and *Green Oceans*, No. 1:24-cv-00141-RCL (D.D.C.).

273.    Although BOEM asserts in the Second Stop Work Order that there are purported "national security threats," *see* Ex. B, that is directly contrary to BOEM's filing in the ongoing litigation challenging Revolution Wind's permits and approvals.  Defendants in that case, including BOEM, expressly denied plaintiffs' allegation that "[t]he Project interferes with national security and military uses of the Outer Continental Shelf."  *Compare* First Amended Complaint ¶ 133, *Green Oceans*, Dkt. 33, *with* Answer ¶ 133, Dkt. 54.

274.    BOEM's Second Stop Work Order once again represents a complete reversal of the Agency's long-held prior conclusions and its statements in this Court regarding national security.  But the Second Stop Work Order fails to acknowledge that Defendants' prior approval of the Project and conclusion that there were no national security threats engendered serious reliance interests.

275.    The APA requires an agency reversing a prior policy or agency action "to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33.  BOEM did not even attempt to meet this standard.  Nothing in the Second Stop Work Order

"address[ed] why [BOEM's] policy shift outweighs" Revolution Wind's reliance interests or provided "good reasons for concluding those interests were insufficient to hold off the policy shift." *CSL Plasma Inc. v. CBP*, 628 F. Supp. 3d 243, 261 (D.D.C. 2022).

276.    The reliance interests at stake here are immense.  Revolution Wind has already spent or committed more than $5 billion to date to plan, permit, develop, and construct this Project.  If the Project is cancelled, Revolution Wind anticipates that it would also incur more than $1 billion in breakaway costs, for a total of over $6 billion in Project costs.

277.    BOEM's unreasoned change in position itself is a sufficient basis for deeming the Second Stop Work Order arbitrary and capricious.

278.    The Second Stop Work Order is also arbitrary and capricious because it suspends *all* activities for 90 days or more, without any explanation as to why a suspension was "necessary" or why a narrower suspension would not suffice.  Agencies are required to "address" alternative "way[s] of achieving [their] objections" and give "adequate reasons" for abandoning those alternatives.  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc.*, 463 U.S. at 48.  BOEM failed to do so here.

279.    Although the Second Stop Work Order itself leaves Revolution Wind unclear as to what the purported national security concerns are, Secretary Burgum's interviews, *supra* notes 68-70, and the Interior press release, suggest that the concerns are related to radar interference, Press Release, *supra* note 67.  It is unclear whether these concerns relate to the Project, given the consultation with the DOW on radar interference and the fact that this issue is addressed in the DOD mitigation agreement.  In any event, no basis has been presented as to why concerns relating to radar interference justify an arbitrary total suspension of activities, including critical work related to undersea cables, testing of

equipment, and commissioning.  And, given that the lease states national security suspensions will generally be limited to 72 hours, BOEM offers no explanation why it chose a 90-day suspension, with indefinite renewals of the same length.  Ex. B.

280.    Depriving the Project of the ability to continue to work on elements of the Project unrelated to any purported national security concerns is arbitrary and capricious. Because BOEM "too cavalierly sidestepped its responsibility to address reasonable alternatives, its action was not rational and must, therefore, be set aside."  *Del. Dep't of Nat. Res. & Env't Control v. EPA*, 784 F.3d 1, 18 (D.C. Cir. 2015).

281.  The Second Stop Work Order is arbitrary and capricious and should be vacated and set aside under the APA and OCSLA.

### CLAIM VII: VIOLATION OF THE OUTER CONTINENTAL SHELF LANDS ACT AND THE ADMINISTRATIVE PROCEDURE ACT

### The Second Stop Work Order Was Issued Without Observance of Procedure as Required by Law In Violation of 5 U.S.C. § 706

282.  The foregoing paragraphs are incorporated by reference as if set forth in full herein.

283.  Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action taken "without observance of procedure required by law."  5 U.S.C. § 706(D).

284.  Section 558 of the APA makes it unlawful for an agency to issue a "withdrawal, suspension, revocation, or annulment of a license" if it does not give the licensee "notice" and "opportunity to demonstrate or achieve compliance with all lawful requirements" "before" the agency acts.  *Id.* § 558(c).

285.  Under the APA, a license is defined as "the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission."  *Id.* § 551(8).  An OCSLA lease and Construction and Operations Plan

approval are a "form of permission" to use the Outer Continental Shelf for energy development.

286. Section 558 has limited exceptions for "cases of willfulness" and where "public health, interest, or safety requires otherwise." *Id.* Neither exception had been demonstrated to apply here.

287. BOEM failed to follow these procedures. The Second Stop Work Order suspended all ongoing Revolution Wind activities on the Outer Continental Shelf without any notice or opportunity to demonstrate compliance. As a result, Revolution Wind is unable to exercise its rights under the approved COP, including to conduct "activities pertaining to construction of facilities for commercial operations on [its] commercial lease." 30 C.F.R. § 585.600; *see also id.* §§ 585.620-585.628.

288. Furthermore, references to unspecified "national security implications" and evolution of technology that require further study and dialogue with affected parties are insufficient to deny Revolution Wind notice and an opportunity to demonstrate compliance before BOEM acted. 5 U.S.C. § 558(c). There is nothing in the Second Stop Work Order that shows this is an emergency circumstance that justifies skipping pre-deprivation process.

289. Therefore, BOEM issued the Second Stop Work Order without the procedure required by law in violation of the APA.

## CLAIM VIII: VIOLATION OF THE OUTER CONTINENTAL SHELF LANDS ACT AND THE ADMINISTRATIVE PROCEDURE ACT

### The Second Stop Work Order Was Issued In Excess of Statutory Authority In Violation of 5 U.S.C. § 706

290. The foregoing paragraphs are incorporated by reference as if set forth in full herein.

**291.    Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).**

**292.    BOEM "literally has no power to act unless and until Congress confers power upon it."  *Am. Library Ass'n v. FCC*, 406 F.3d 689, 698 (D.C. Cir. 2005) (internal quotation omitted).  Here, Congress has not conferred the broad authority BOEM claims.**

**293.    The Second Stop Work Order invoked 30 C.F.R. § 585.417(b), which provides that "BOEM may order a suspension . . . when the suspension is necessary for reasons of national security or defense."  "A suspension is an interruption of the period of [a] lease" which extends the expiration date of the relevant period of the lease for the length in time the suspension is in effect.  30 C.F.R. § 585.415(b).**

**294.    Interior cites 43 U.S.C. § 1337 as its authority for 30 C.F.R. § 585.417(b). Section 1337(p) gives the Secretary authority to grant leases on the Outer Continental Shelf promoting "energy from sources other than oil and gas," including wind energy.  43 U.S.C. § 1337(p)(1)(B).  It directs the Secretary of the Interior to "ensure that any activity under this subsection [subsection (p)] is carried out in a manner that provides for . . . protection of national security interests of the United States," *id.* § 1337(p)(4)(F), and to "provide for the duration, issuance, transfer, renewal, suspension, and cancellation of a lease," *id.* § 1337(p)(5).**

**295.    Two other OCSLA provisions provide specific guidance on authority to suspend activities and operations on a lease for reasons implicating national security.**

**296.    *First,* the "national security clause" in 43 U.S.C. § 1341(c) requires BOEM to include a provision in every lease that confers authority on the Secretary to "suspend**

operations" "upon a recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or the President of the United States." Relatedly, Section 1341(d), titled "national defense areas; suspension of operations; extension of leases," permits the "Secretary of Defense, with approval of the President" to designate "areas restricted from exploration and operation that part of the outer Continental Shelf needed for national defense," and to suspend operations on any leases in that area.

297.    *Second*, 43 U.S.C. § 1334(a)(1)(B) authorizes BOEM to order "suspension or temporary prohibition of any operation or activity . . . pursuant to any lease or permit" "if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits . . . , or the marine, coastal, or human environment."

298.    Section 1337 must be read alongside—and is limited by—Sections 1341 and 1334(a)(1)(B). *City & Cnty. of San Francisco v. EPA*, 604 U.S. 334, 350 (2025). Section 1337 is properly interpreted as authorizing suspensions only in the circumstances contemplated by either Section 1341 or Section 1334(a)(1)(B).

299.    BOEM appears to agree because it structured Revolution Wind's lease to follow Sections 1341 and 1334(a)(1)(B).

300.    Revolution Wind's lease permits BOEM to "suspend . . . operations in accordance with the national security and defense provisions of [42 U.S.C. § 1341]."  Ex. E at Section 3(c).  The lease further provides that, in the event of a suspension under Section 1341, "[e]very effort will be made by the appropriate military agency to provide as much advance notice as possible of the need to suspend operations" and that "[a]dvance notice will normally be given before requiring a suspension."  *Id.* at Addendum C, Sec. 3.2.2.  Such

"suspensions . . . for national security reasons" will "not generally exceed seventy-two (72) hours."  *Id.* at Addendum C, Sec. 3.2.3.  Revolution Wind's lease also recognizes that "any cancellation or suspension ordered by the Lessor that is predicated on a threat of serious irreparable, or immediate harm or damage or immediate harm or damage"—i.e., pursuant to § 1334(a)(1)(B)—"requires a finding by the Lessor *of particularized harm* that it determines can only be feasibly averted by suspension of on-lease activities."  *Id.* at Sec. 8 (emphasis added).  No other provisions of Revolution Wind's lease contemplate that BOEM may issue the kind of order here.

301.    Read in context, Section 1337's suspension authority reaches only as broadly as the authorities in Sections 1341 and 1334(a)(1)(B).  Neither provision provides BOEM with authority here.

302.    Section 1341 does not apply because the Secretary of Defense has not recommended suspension during a declaration of war or national emergency nor withdrawn areas of the Outer Continental Shelf for national defense.  *See* Ex. E.  And BOEM made no effort to comply with its promise to provide notice before a national security suspension in the lease.  *See id.* at Addendum C.

303.    Section 1334(a)(1)(B) is also inapplicable.  This provision requires a showing of harm that must also be "serious, irreparable, or immediate."  43 U.S.C. § 1334(a)(1)(B).  The Second Stop Work Order only discussed alleged harm stemming from "offshore wind projects" as a whole, not Revolution Wind's specific project.  *Cf. FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("Particularized" harm is "personal and individual," not "general.").  BOEM's conclusory assertions in the Second Stop Work Order cannot suffice to show there is (1) "serious, irreparable, and immediate harm" that can (2) "only be feasibly

averted by suspension of on-lease activities."  Ex. E.  Moreover, under the lease, BOEM had to (but failed to) make a finding of "*particularized harm* that it determines can only be feasibly averted by suspension of on-lease activities."  *Id.* at Sec. 8.  The Second Stop Work Order does not mention Sections 1341 or  1334.

304.    BOEM's suspension authority in 30 C.F.R. § 585.417(b) must be understood as limited to particular situations contemplated by Congress in other parts of OCSLA. Because BOEM's Second Stop Work Order went further, it improperly exceeded its statutory authority in violation of the APA.

### CLAIM VIII: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT AND FIFTH AMENDMENT

### The Second Stop Work Order Violates The Procedural Due Process Guarantees of the Fifth Amendment to the U.S. Constitution

305.  The foregoing paragraphs are incorporated by reference as if set forth in full herein.

306.  Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "contrary to constitutional right, power, privilege, or immunity"  5 U.S.C. § 706(2)(B).

307.  The Second Stop Work Order is contrary to law because it deprives Revolution Wind of its property without due process required by law.  U.S. Const., amend. V.

308.  The Fifth Amendment guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."  *Id.*

309.  "In assessing constitutional due process claims, [courts] ask two questions:  Did the Government deprive the party of a protected property interest?  If so, what process was due?"  *Amoco Prod. Co. v. Fry*, 118 F.3d 812, 819 (D.C. Cir. 1997); *see Nat'l Council of Resistance of Iran v. Dep't of State* ("*NCRI*"), 251 F.3d 192, 205 (D.C. Cir. 2001).

**310.** **The Second Stop Work Order deprived Revolution Wind of a significant property interest without due process. Revolution Wind has a protected property interest in its lease. The Second Stop Work Order suspends Revolution Wind's rights to develop its lease and to construct the Project on schedule, depriving Revolution Wind of its property interest.**

**311.** **Although the Second Stop Work Order is limited to 90 days, BOEM states that it "may further extend the 90-day suspension period" without limitation. Ex. B. And even "temporary or partial impairments to property rights . . . merit due process protection." *Amoco Prod. Co.*, 118 F.3d at 819 (quoting *Connecticut v. Doehr*, 501 U.S. 1, 12 (1991)).**

**312.** **BOEM failed to provide Revolution Wind the required pre-deprivation process. The due process clause requires the government to provide notice and some form of hearing before deprivation of a property interest. The type of notice and hearing requires a balancing of: (1) the "private interest" affected, (2) "the risk of erroneous deprivation" of that interest and the value of additional procedural safeguards; and (3) "the government's interest," including the burden and cost of additional procedures. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *see NCRI*, 251 F.3d at 205-08. All three factors demonstrate that Revolution Wind was entitled to notice of the Second Stop Work Order and to sufficient information regarding the purported basis for the Order to provide Revolution Wind an opportunity to contest the facts that BOEM considered.**

**313.** ***First*, Revolution Wind's private interest, a significant property right in its lease and billions of dollars of private investments to develop the lease, supports pre-deprivation process. "[T]he entitlement to continue construction without unfair interference—is substantial." *Tri Cnty. Indus., Inc. v. District of Columbia*, 104 F.3d 455, 461**

(D.C. Cir. 1997).  Here, the Second Stop Work Order threatens the viability of the Revolution Wind Project, and, in turn, Revolution Wind's private property interests and investments.

314.    *Second*, there is a high risk of erroneous deprivation without pre-deprivation process.  This is not a situation where "the [agency]'s examination process included numerous safeguards against an arbitrary seizure," including "many opportunities" for the company "to express its views."  *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1100 (D.C. Cir. 1996).  There were no formal or informal safeguards.  BOEM did not raise these issues with Revolution Wind before issuing the Second Stop Work Order, despite many opportunities to do so.  Had BOEM taken these steps, Revolution Wind could have explained its position, addressed any issues, and avoided the Order.  Moreover, an affected entity must have the information it needs "to tailor its submission to the [government's] concerns [and] rebut the factual premises underlying the [agency] action."  *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 320 (D.C. Cir. 2014).  That is true even if "the information at the 'heart' of the [government]'s decision is classified."  *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 613 F.3d 220, 227-29 (D.C. Cir. 2010).  It was possible for BOEM to provide unclassified evidence to Revolution Wind a month ago.  *See* Ex. B.  BOEM also could have provided classified materials to Project representatives with security clearance.  BOEM made no attempt to coordinate with Revolution Wind regarding the classified materials before the Second Stop Work Order.

315.    *Third*, BOEM has not shown that this is an "exigent" or "extraordinary" circumstance that justifies skipping pre-deprivation process with notice and a fair opportunity to defend itself against the government's allegations.  Neither the government's privilege in classified information affecting national security, *NCRI*, 251 F.3d at 207, nor

**BOEM's assertion that it has preliminarily determined that offshore wind projects may implicate national security, Ex. B, demonstrate that BOEM giving Revolution Wind pre-deprivation process would interfere with the government's interest in national security. There is no indication that BOEM needed to keep Revolution Wind in the dark about its concerns until after the Second Stop Work Order was issued. There is no evidence, for example, that it would harm national security interests to alert Revolution Wind in advance to the idea that the government was considering suspending lease activities.**

**316.    The timing of BOEM's decision makes clear that it could have provided pre-deprivation process here. BOEM has had the information from the DOW's review since November 26, 2025. *See* Decl. of Matthew Giacona ¶ 11, *Va. Elec. & Power Co. v. Dep't of the Interior*, No. 2:25-cv-00830 (E.D. Va. Dec. 27, 2025), Dkt. 19-1; Ex. B. Yet BOEM waited until December 22, 2025—the week of a federal holiday—to issue the Second Stop Work Order. This delay cuts against any government interest in suspending the lease before giving Revolution Wind notice and an opportunity to be heard.**

**317.    Revolution Wind was not afforded any notice or hearing before impairment of its protected property interest. Accordingly, Revolution Wind was deprived of property without due process required by law.**

## PRAYER FOR RELIEF

WHEREFORE, Revolution Wind respectfully requests that this Court enter judgment in its favor and grant the following relief:

a.   A declaration pursuant to 28 U.S.C. § 2201 stating that:

i. the **First** Stop Work Order is contrary to law;

ii.    the **First** Stop Work Order violates OCSLA;

iii.   the **First** Stop Work Order was issued without procedure required

by law;

    iv.   the **First** Stop Work Order is arbitrary and capricious; and

    v.    the **First** Stop Work Order **is contrary to constitutional right and** violates the procedural due process guarantees of the Fifth Amendment.

b.  A stay of the **First** Stop Work Order.

c.  An order vacating and setting aside the **First** Stop Work Order.

d.    Temporary, preliminary, and permanent injunctive relief preventing enforcement of the **First** Stop Work Order to interfere with Revolution Wind's ability to conduct lawful activities to construct the Project; and preventing Defendants from unreasonably withholding any required approvals, concurrences, or Project-related agreements.

e.    An order temporarily, preliminarily, and permanently enjoining Defendants, and their officers, agents, employees, assigns, and all persons acting in concert or participating with them, from relying on the **First** Stop Work Order.

**f.**   **A declaration pursuant to 28 U.S.C. § 2201 stating that:**

    **i.** **the Second Stop Work Order is contrary to law;**

    **ii.**   **the Second Stop Work Order violates OCSLA;**

    **iii.**   **the Second Stop Work Order was issued without procedure required by law;**

    **iv.**   **the Second Stop Work Order is arbitrary and capricious; and**

    **v.**   **the Second Stop Work Order is contrary to constitutional right and violates the procedural due process guarantees of the Fifth Amendment.**

**g.**   **A stay of the Second Stop Work Order.**

**h.   An order vacating and setting aside the Second Stop Work Order.**

**i.     Temporary, preliminary, and permanent injunctive relief preventing enforcement of the Second Stop Work Order to interfere with Revolution Wind's ability to conduct lawful activities to construct the Project; and preventing Defendants from unreasonably withholding any required approvals, concurrences, or Project-related agreements.**

**j.     An order temporarily, preliminarily, and permanently enjoining Defendants, and their officers, agents, employees, assigns, and all persons acting in concert or participating with them, from relying on the Second Stop Work Order.**

~~f~~k.    An order awarding Revolution Wind its costs and attorneys' fees and expenses as allowed by law, including under 43 U.S.C § 1349(a)(5).

~~g~~l.    Such other and further relief as the Court deems just and proper.

Dated:  ~~September 4~~**January 1**, ~~2025~~**2026** Respectfully submitted,

By */s/  Janice M. Schneider*
    Janice M. Schneider (D.C. Bar No. 472037)
    Stacey L. VanBelleghem (D.C. Bar No. 988144)
    Roman Martinez (D.C. Bar No. 1001100)
    Devin. M. O'Connor (D.C. Bar No. 1015632)
    Rachael L. Westmoreland~~*~~ (DC Bar No. 90034032)
    LATHAM & WATKINS LLP
    555 11th Street NW, Suite 1000
    Washington, D.C. 20004
    Tel:  (202) 637-2200
    Fax:  (202) 637-2201
    Email: janice.schneider@lw.com
          stacey.vanbelleghem@lw.com
          roman.martinez@lw.com
          devin.o'connor@lw.com
          rachael.westmoreland@lw.com

    *Counsel for Plaintiff*
    *Revolution Wind, LLC*

    ~~*Application for admission to the U.S. District Court for the District of Columbia pending*~~