## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

REVOLUTION WIND, LLC,

      *Plaintiff*,

    v.

DOUGLAS J. BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior;

UNITED STATES DEPARTMENT OF THE INTERIOR;

MATTHEW GIACONA, in his official capacity as Acting Director of the Bureau of Ocean Energy Management;

BUREAU OF OCEAN ENERGY MANAGEMENT;

KENNETH STEVENS, in his official capacity as Principal Deputy Director Exercising the Delegated Authorities of the Director of the Bureau of Safety and Environmental Enforcement; and

BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT,

      *Defendants*,

and

GREEN OCEANS,

      *Defendant-Intervenor*.

Case No.: 1:25-cv-02999-RCL

<u>Expedited Hearing Requested</u>

## <u>PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND STAY PENDING REVIEW</u>

Pursuant to Section 705 of the Administrative Procedure Act, Federal Rule of Civil Procedure 65(a), and Local Civil Rule 65.1(c), Plaintiff Revolution Wind, LLC ("Revolution Wind") hereby moves this Court for a stay pending review and a preliminary injunction of the Department of the Interior ("Interior") Bureau of Ocean Energy Management's ("BOEM") December 22, 2025 Director's Order "suspend[ing] all ongoing activities related to the Revolution Wind Project on the Outer Continental Shelf for the next 90 days for reasons of national security" ("the Second Stop Work Order"). *See* Supp. Compl., Ex. B, Dkt. 47-3.

The Revolution Wind Project is an approximately 704-megawatt ("MW") commercial-scale offshore wind energy facility that will bring approximately 304 MW of domestic energy to Connecticut and approximately 400 MW to Rhode Island pursuant to five power purchase agreements that were awarded to Revolution Wind in competitive solicitations. Over the past several years, Revolution Wind has received over 20 approvals from the relevant federal and state agencies—including from Interior and BOEM. In reliance on those approvals, Revolution Wind began construction on the Project in August 2023 and has spent or committed more than $5 billion to date to plan, permit, develop, design, manufacture, and construct this Project. At the time Revolution Wind received the Second Stop Work Order, the Project was approximately 87% complete. In other litigation pending before this Court, BOEM is currently defending the approvals for the Project, and has compiled and served an administrative record with thousands of pages of information and analyses supporting those approvals.

This is not the first time that Secretary Burgum and this Administration have sought to shut down the Project. On August 22, 2025, BOEM issued the First Stop Work Order attempting to halt the Project, to address purported "concerns related to the protection of national security interests . . . ." That Order was swiftly enjoined by this Court, as the "height of arbitrary and

capricious action." Tr. of Prelim. Inj. Hrg. 41:18-19 (Sept. 22, 2025) ("Tr."), Dkt. 39. While the preliminary injunction was not appealed, both the First and Second Stop Work Orders are part of a pattern of unlawful conduct targeting the offshore wind industry. Just four days before the Second Stop Work Order was issued, the U.S. District Court for the District of Massachusetts entered a judgment declaring unlawful and setting aside the pause in the issuance of all wind energy authorizations that Defendants had adopted pursuant to President Trump's executive memorandum titled "Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects," 90 Fed. Reg. 8363 (Jan. 20, 2025). Judgment, *New York v. Trump*, No. 1:25-cv-11221-PBS (D. Mass. Dec. 18, 2025).

The Second Stop Work Order—like the First Order—is patently unlawful. It violates the Administrative Procedure Act, the Outer Continental Shelf Lands Act, and the U.S. Constitution. Revolution Wind is therefore likely to prevail on the merits of its challenge to the Second Stop Work Order. As a result of Defendants' unlawful action, Revolution Wind now once again faces enterprise-level threats. Defendants' unlawful action is already irreparably harming Revolution Wind, harm that will continue to compound in the absence of a preliminary injunction by **January 12, 2026**. The balance of the equities and the public interest strongly favor a stay of the Second Stop Work Order, so that construction can progress to completion and the Project can send much-needed power to the grid. Over 2,000 workers have been involved in the construction of the Project, which is also estimated to create hundreds of operations and maintenance jobs that would be lost if the Project is cancelled. Hundreds of workers have once again been idled because of the Government's action. And the Stop Work Order increases risks to New England grid reliability, potentially depriving Rhode Island and Connecticut of approximately 704 MW of energy needed

3

to meet current energy needs and accommodate expected growth in energy demand.

The Second Stop Work Order should therefore be stayed by this Court to preserve the *status quo* pending judicial review, *see* 5 U.S.C. § 705, and Defendants should be preliminarily enjoined under Federal Rule of Civil Procedure 65(a) from enforcing the Second Stop Work Order.

Revolution Wind reached out to BOEM promptly after the Second Stop Work Order was issued, asking to meet as soon as possible. On December 30, 2025, Revolution Wind met with BOEM, to seek access to the classified information for Revolution Wind representatives with security clearances, and to resolve this issue. Revolution Wind had notified BOEM in advance that it was bringing individuals with proper clearance, but no efforts were made in advance by BOEM to facilitate a classified briefing, despite repeated inquiries. Moreover, while BOEM promised in the meeting to facilitate a classified briefing, no timeline for resolution was presented by the Government. Additionally, pursuant to Local Civil Rule 7(m), counsel for Revolution Wind contacted counsel for Defendants and Defendant-Intervenor to meet and confer regarding this Motion on December 30, 2025. Counsel for Defendants oppose this motion but stated that, if Revolution Wind files its motion for preliminary injunction by January 1, 2026 (as Revolution Wind has done by lodging its preliminary injunction motion as an attachment to its Motion to Expedite), then Defendants are willing to file a response to Revolution Wind's preliminary injunction motion no later than January 8, 2026. Revolution Wind was not able to obtain a position from counsel for Defendant-Intervenor on this Motion as of the time of this filing, despite sending a follow-up communication the next day. On December 31, 2025, Revolution Wind also served Federal Defendants and other relevant individuals with a notice of intent to sue pursuant to 43 U.S.C. § 1349.

The grounds for this motion are fully set forth in Revolution Wind's accompanying

Statement of Points and Authorities, and Declarations of Paul Murphy, Melanie Gearon, and Edward LeBlanc, and the Exhibits thereto. A proposed order is also attached. For the reasons set forth in Revolution Wind's supporting documents, the Court should enter an Order granting the preliminary injunction and stay of the Stop Work Order. Additionally, Revolution Wind respectfully requests an expedited oral hearing pursuant to Local Civil Rule 65.1(d), given that Revolution Wind is already experiencing irreparable harm, which will only compound in the absence of immediate relief by **January 12, 2026**.

Dated:  January 2, 2026                      Respectfully submitted,

                                             By */s/  Janice M. Schneider*
                                                 Janice M. Schneider (D.C. Bar No. 472037)
                                                 Stacey L. VanBelleghem (D.C. Bar No. 988144)
                                                 Roman Martinez (D.C. Bar No. 1001100)
                                                 Devin. M. O'Connor (D.C. Bar No. 1015632)
                                                 Rachael L. Westmoreland (D.C. Bar No. 90034032)
                                                 LATHAM & WATKINS LLP
                                                 555 11th Street NW, Suite 1000
                                                 Washington, D.C. 20004
                                                 Tel:  (202) 637-2200
                                                 Fax:  (202) 637-2201
                                                 Email: janice.schneider@lw.com
                                                         stacey.vanbelleghem@lw.com
                                                         roman.martinez@lw.com
                                                         devin.o'connor@lw.com
                                                         rachael.westmoreland@lw.com

                                                 *Counsel for Plaintiff Revolution Wind, LLC*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

REVOLUTION WIND, LLC,

       *Plaintiff*,

    v.

DOUGLAS J. BURGUM, in his official capacity as
Secretary of the U.S. Department of the Interior;

UNITED STATES DEPARTMENT OF THE
INTERIOR;

MATTHEW GIACONA, in his official capacity as
Acting Director of the Bureau of Ocean Energy
Management;

BUREAU OF OCEAN ENERGY MANAGEMENT;

KENNETH STEVENS, in his official capacity as
Principal Deputy Director Exercising the Delegated
Authorities of the Director of the Bureau of Safety
and Environmental Enforcement; and

BUREAU OF SAFETY AND ENVIRONMENTAL
ENFORCEMENT,

       *Defendants*.

Case No.: 1:25-cv-02999-RCL

<u>Expedited Hearing Requested</u>

## STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND STAY PENDING REVIEW

# TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................................1

BACKGROUND ......................................................................................................................3

    A.    The Project ...............................................................................................3

    B.    OCSLA ....................................................................................................5

    C.    Multi-Year Review And Approval Process ..............................................6

        1.    BOEM's National Security Review ...........................................6

        2.    DOW, U.S. Coast Guard, And FAA Review And Consultation ................7

        3.    BOEM's COP Approval and Conditions ...................................8

        4.    Defendants' Previous Defense Of The Project's Approvals.....................8

    D.    The Presidential Memorandum And First Stop Work Order..................9

    E.    Federal Agencies' Lack of Stated National-Security-Related Concerns ..............11

    F.    The Second Stop Work Order.................................................................12

JUSTICIABILITY ................................................................................................................14

ARGUMENT ........................................................................................................................16

I.    REVOLUTION WIND IS LIKELY TO SUCCEED ON THE MERITS ........................16

    A.    The Second Stop Work Order Is Arbitrary And Capricious...................17

        1.    The Second Stop Work Order Lacks A Reasonable Explanation.............17

        2.    BOEM Violated The Change-In-Position Doctrine By Ignoring Substantial Reliance Interests ...............................................23

        3.    The Second Stop Work Order Is Arbitrary And Capricious Because It Is Overbroad.................................................26

    B.    The Second Stop Work Order Deprives Revolution Wind Of A Significant Property Interest Without Due Process.................................................27

        1.    BOEM Deprived Revolution Wind Of Its Protected Property Interest.................................................28

2.     BOEM Denied Revolution Wind Required Pre-Deprivation Process ....................................................................................28

C.     The Second Stop Work Order Was Issued Without The Procedures Required By The APA ...............................................................31

D.     The Second Stop Work Order Was Issued Without Statutory Authority .............32

II.     REVOLUTION WIND FACES IRREPARABLE HARM ABSENT IMMEDIATE RELIEF ...............................................................35

A.     Revolution Wind Faces Substantial Irreparable Harm From Construction Delays Due To The Order ...................................................36

B.     The Stop Work Order Poses Existential Threats to Revolution Wind's Business ...............................................................................38

C.     Revolution Wind Faces Substantial Irreparable Reputational Harm ...................40

III.     EQUITABLE FACTORS STRONGLY FAVOR IMMEDIATE RELIEF ......................41

A.     Neither the Public Nor Defendants Will Suffer Harm From Preliminary Injunctive Relief ..........................................................41

B.     The Public Interest Strongly Favors An Injunction ................................................41

CONCLUSION ....................................................................................................................45

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Am. Library Ass'n v. FCC,*
406 F.3d 689 (D.C. Cir. 2005) ...................................................................................32

*\*Amoco Prod. Co. v. Fry,*
118 F.3d 812 (D.C. Cir. 1997) .............................................................................27, 28

*ANR Storage Co. v. FERC,*
904 F.3d 1020 (D.C. Cir. 2018) ................................................................................23

*Atlas Air, Inc. v. Int'l Bhd. of Teamsters,*
280 F. Supp. 3d 59 (D.D.C. 2017), *aff'd,* 928 F.3d 1102 (D.C. Cir. 2019) ...........40

*Bell Helicopter Textron, Inc. v. Airbus Helicopters,*
78 F. Supp. 3d 253 (D.D.C. 2015) .............................................................................40

*Bennett v. Spear,*
520 U.S. 154 (1997) ...................................................................................................15

*Cafeteria & Rest. Workers Union, Loc. 473, AFL-CIO v. McElroy,*
367 U.S. 886 (1961) ...................................................................................................29

*Cent. United Life, Inc. v. Burwell,*
128 F. Supp. 3d 321 (D.D.C. 2015) ...........................................................................41

*City & Cnty. of San Francisco v. EPA,*
604 U.S. 334 (2025) ...................................................................................................33

*Columbia Gas Transmission Corp. v. An Easement to Construct, Operate, &*
*Maintain a 24-inch Gas Transmission Pipeline Across Prop. in Greene Cnty.,*
No. 3:07CV00028, 2007 WL 2220530 (W.D. Va. July 31, 2007) ....................36, 43

*Connecticut v. Doehr,*
501 U.S. 1 (1991) ..................................................................................................28, 29

*Connecticut v. DOI,*
363 F. Supp. 3d 45 (D.D.C. 2019) .............................................................................18

*CSL Plasma Inc. v. CBP,*
628 F. Supp. 3d 243 (D.D.C. 2022) ...........................................................................25

*Darby v. Cisneros,*
509 U.S. 137 (1993) ...................................................................................................15

*Del. Dep't of Nat. Res. & Env't Control v. EPA*,
    784 F.3d 1 (D.C. Cir. 2015) ................................................................27

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ..............................................................19, 21

*\*Dep't of Homeland Sec. v. Regents*,
    591 U.S. 1 (2020) ................................................................25

*Dickson v. Sec'y of Def.*,
    68 F.3d 1396 (D.C. Cir. 1995) ................................................................18

*DSE, Inc. v. United States*,
    169 F.3d 21 (D.C. Cir. 1999) ................................................................45

*E. Tenn. Nat. Gas Co. v. Sage*,
    361 F.3d 808 (4th Cir. 2004) ................................................................36

*Env't Democracy Project v. Green Sage Mgmt., LLC*,
    No. 22-CV-03970, 2022 WL 4596616 (N.D. Cal. Aug. 23, 2022) ................................45

*Env't Health Trust v. FCC*,
    9 F.4th 893 (D.C. Cir. 2021) ................................................................17

*Esparraguera v. Dep't of the Army*,
    101 F.4th 28 (D.C. Cir. 2024) ................................................................30

*Fares v. Smith*,
    901 F.3d 315 (D.C. Cir. 2018) ................................................................21

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ................................................................17

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ................................................................35

*\*FDA v. Wages & White Lion Invs., LLC*,
    145 S. Ct. 898 (2025) ................................................................23

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
    636 F.2d 755 (D.C. Cir. 1980) ................................................................45

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013) ................................................................41

*Healthy Gulf v. DOI*,
    152 F.4th 180 (D.C. Cir. 2025) ................................................................33

*Hoyl v. Babbitt*,
129 F.3d 1377 (10th Cir. 1997) ...................................................................28

*\*In re NTE Conn., LLC*,
26 F.4th 980 (D.C. Cir. 2022) ...............................................................38, 43

*Int'l Org. of Masters, Mates, & Pilots v. NLRB*,
61 F.4th 169 (D.C. Cir. 2023) .....................................................................26

*James Madison Ltd. by Hecht v. Ludwig*,
82 F.3d 1085 (D.C. Cir. 1996) ....................................................................29

*Kirwa v. U.S. Dep't of Def.*,
285 F. Supp. 3d 257 (D.D.C. 2018) .............................................................17

*League of Women Voters of the U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .........................................................................41

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .....................................................................................14

*Mathews v. Eldridge*,
424 U.S. 319 (1976) .....................................................................................28

*\*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983) .................................................................................17, 26

*Nat. Res. Def. Council v. Kempthorne*,
525 F. Supp. 2d 115 (D.D.C. 2007) .......................................................43, 44

*Nat. Res. Def. Council v. Wheeler*,
955 F.3d 68 (D.C. Cir. 2020) .......................................................................15

*\*Nat'l Council of Resistance of Iran v. Dep't of State*,
251 F.3d 192 (D.C. Cir. 2001) .........................................................27, 28, 30

*Nat'l Lifeline Ass'n v. FCC*,
No. 18-1026, 2018 WL 4154794 (D.C. Cir. Aug. 10, 2018) .......................39

*New York v. Trump*,
No. 25-cv-11221, 2025 WL 3514301 (D. Mass. Dec. 8, 2025)................9, 10

*Nken v. Holder*,
556 U.S. 418 (2009) .....................................................................................16

*PayPal, Inc. v. CFPB*,
728 F. Supp. 3d 31 (D.D.C. 2024) ...............................................................21

*Pennsylvania v. DeVos*,
    480 F. Supp. 3d 47 (D.D.C. 2020) ..................................................................16

*People's Mojahedin Org. of Iran v. U.S. Dep't of State*,
    613 F.3d 220 (D.C. Cir. 2010) ......................................................................29

*Propert v. District of Columbia*,
    948 F.2d 1327 (D.C. Cir. 1991) ....................................................................28

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
    758 F.3d 296 (D.C. Cir. 2014) ......................................................................29

*S. Educ. Found. v. U.S. Dep't of Educ.*,
    No. CV- 25-1079, 2025 WL 1453047 (D.D.C. May 21, 2025)...........................39

*Shell Offshore Inc. v. Greenpeace, Inc.*,
    No. 3:12-cv-00042, 2012 U.S. Dist. LEXIS 74387 (D. Alaska May 29, 2012).....28

*Sierra Club v. EPA*,
    292 F.3d 895 (D.C. Cir. 2002) ......................................................................14

*Sierra Club v. EPA*,
    793 F. Supp. 3d 158 (D.D.C. 2025) ................................................................22

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    990 F. Supp. 2d 9 (D.D.C. 2013) ..............................................................41, 42

*Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62 (D.D.C. 2010) ......................40

*Tri Cnty. Indus., Inc. v. District of Columbia*,
    104 F.3d 455 (D.C. Cir. 1997) ......................................................................29

*United States v. Swank*,
    451 U.S. 571 (1981).....................................................................................28

*W. Watersheds Project v. Salazar*,
    692 F.3d 921 (9th Cir. 2012) ........................................................................44

*Wash. Teachers' Union, Loc. No. 6 v. Am. Fed'n of Teachers*,
    751 F. Supp. 2d 38 (D.D.C. 2010) ................................................................40

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008).................................................................................16, 38

*World Shipping Council v. Fed. Maritime Comm'n*,
    152 F.4th 215 (D.C. Cir. 2025)......................................................................17

*Xiaomi Corp. v. Dep't of Def.*,
    No. CV 21-280, 2021 WL 950144 (D.D.C. Mar. 12, 2021).................................18

*XP Vehicles, Inc. v. DOE*,
    118 F. Supp. 3d 38 (D.D.C. 2015) ................................................................................19

*Zevallos v. Obama*,
    793 F.3d 106 (D.C. Cir. 2015) ....................................................................................30

## STATUTES

5 U.S.C.
    § 558 .........................................................................................................................2, 31
    § 558(c) ........................................................................................................................31
    § 704 ............................................................................................................................15
    § 705 ............................................................................................................................16
    § 706(2) ........................................................................................................................16
    § 706(2)(A) ...................................................................................................................32
    § 706(2)(C) ...................................................................................................................32
    § 706(2)(D) ...................................................................................................................31

43 U.S.C.
    § 1334(a)(1) ...................................................................................................................6
    § 1334(a)(1)(B) ......................................................................................................33, 34
    § 1337 .............................................................................................................5, 32, 33
    § 1337(p)(1)(B) .............................................................................................................32
    § 1337(p)(1)(C) ...............................................................................................................5
    § 1337(p)(4) ..............................................................................................5, 8, 10, 23
    § 1337(p)(4)(F) ................................................................................................23, 24, 32
    § 1341 .............................................................................................................6, 33, 34
    § 1341(c) ........................................................................................................5, 33, 34
    § 1349 ...........................................................................................................................15
    § 1349(a)(3) ..................................................................................................................16

## RULES

Fed. R. Civ. P. 65(c) ..........................................................................................................45

## REGULATIONS

30 C.F.R.
    § 585.102(a) ..................................................................................................................10
    § 585.118 ......................................................................................................................15
    § 585.415(b) ..................................................................................................................32
    § 585.417 ........................................................................................................................6
    § 585.417(b) ............................................................................................................32, 35
    § 585.600 ......................................................................................................................31

## CONSTITUTIONAL PROVISIONS

U.S. Const., Amendment V ...........................................................................................2, 27

## OTHER AUTHORITIES

90 Fed. Reg. 8363 (Jan. 29, 2025) ....................................................................................9

90 Fed. Reg. 8433 (Jan. 29, 2025) ..................................................................................27

Pub. L. 83-212................................................................................................................33

Pub. L. No. 109-58, 119 Stat. 594, 746 ..........................................................................5

## INTRODUCTION

This suit challenges the Department of the Interior's second unlawful attempt to suspend the activities of the Revolution Wind Farm and Revolution Wind Export Cable (the "Project"), an offshore wind project that will deliver much needed, reliable power to millions of customers in Rhode Island and Connecticut.  Interior has authorized those activities, through approvals that Interior itself is currently defending in this Court.  Plaintiff Revolution Wind, LLC ("Revolution Wind") secured the relevant approvals in 2023; since then, it has spent or committed more than $5 billion to develop the Project, which is now approximately 87% complete.

As this Court knows, Defendants first attempted to stop the Project with a Director's Order on August 22, 2025 ("First Stop Work Order"), requiring Revolution Wind to "halt all ongoing activities related to the Revolution Wind Project on the outer continental shelf" based on purported "concerns" with national security interests, among other things.  Supp. Compl., Ex. A, Dkt. No. 47-2.  This Court swiftly enjoined the First Stop Work Order, finding it to be "the height of arbitrary and capricious" government action, noting that, without injunctive relief, "the entire enterprise could collapse."  *See* Tr. at 41:18-19, 43:9-10, Dkt. 39.  In an apparent attempt to evade that injunction, on December 22, 2025, again without notice, Defendant Matthew Giacona issued a new "Director's Order" to Revolution Wind ("Second Stop Work Order" or "Order") ordering it to "suspend all ongoing activities related to the Revolution Wind Project on the Outer Continental Shelf for the next 90 days for reasons of national security."  Supp. Compl., Ex. B.

The Second Stop Work Order, like the First, was issued without notice or hearing and offers no reasoning other than a conclusory assertion of "impacts to national security from offshore wind projects."  But national-security considerations were comprehensively addressed through more than nine years of review and approval by the responsible federal regulators, including Defendants.  In 2023, this review culminated in a Record of Decision that the Project is consistent

with law, including with national security requirements.  Indeed, Defendants have defended their determination regarding Revolution Wind's compliance with national security requirements in legal challenges pending before this Court.  And this Court was not persuaded by Defendants' invocation of purported national-security concerns when enjoining the First Stop Work Order.

The Second Stop Work Order violates the Administrative Procedure Act ("APA"), the Outer Continental Shelf Lands Act ("OCSLA"), and the Fifth Amendment.  If allowed to remain in force, the Order is estimated to cost Revolution Wind at least $1.44 million per day.  And compounding costs of delay risk Project cancellation, which would cause Revolution Wind to suffer losses of more than $6 billion.  This Court should ultimately reject the Order.  For now, the Court should stay the Order and preliminarily enjoin its enforcement.  Revolution Wind respectfully asks the Court to grant this relief by **January 12, 2026**, to halt the ongoing irreparable harm caused by the Order.  All of the relevant factors support preliminary injunctive relief.

*First*, Revolution Wind has a strong likelihood of success on the merits.  The Second Stop Work Order is arbitrary and capricious:  It is conclusory; it is internally inconsistent; and it is overbroad.  The Order ignores that Interior has stated plainly that the Project does not interfere with national security.  It also ignores Revolution Wind's substantial actions and billions of dollars of investment made in reliance on Defendants' approvals of the Project.  And BOEM lacks statutory authority to order a suspension of activities under these circumstances.  Finally, BOEM issued the Second Stop Work Order—and thus immediately impaired Revolution Wind's property interests—without notice and a hearing, in violation of the U.S. Constitution and 5 U.S.C. § 558.

*Second*, Revolution Wind will suffer imminent and irreparable harm if the Second Stop Work Order remains in force and Revolution Wind is unable to proceed with construction on the outer continental shelf ("OCS").  The Order was issued mid-construction, this time with the Project

2

approximately 87% complete.  Revolution Wind has carefully sequenced its construction schedule and has contracted specialized vessels necessary for construction.  These specialized vessels are in limited supply globally and are tightly scheduled.  If the Second Stop Work Order is not lifted by **January 12, 2026**, there is a very high risk Revolution Wind will not complete installation of the remaining wind turbine generators ("WTGs") before the latest vessel availability date in the contract for the specialized vessel required to complete that critical work.  Even a short-term delay threatens to block completion of the Project in accordance with the deadlines in its Rhode Island Power Purchase Agreement ("PPA"), which represents the majority of Project capacity.

Revolution Wind has already spent or committed more than $5 billion to date on Project development in reliance on Defendants' approvals.  If the Project is cancelled, Revolution Wind anticipates that it would also incur more than $1 billion in breakaway costs, for a total loss of more than $6 billion.  Additionally, Revolution Wind would forgo billions of dollars in revenues under its PPAs over the life of the Project.

*Third*, the balance of the equities and the public interest favor immediate relief.  The public has a significant interest in the reliable energy the Project will provide to New England, the Project's significant reliability, economic, and job benefits, and the health benefits associated with the Project.  By contrast, neither the public nor the Defendants will suffer harm if this Court preserves the status quo by temporarily restraining enforcement of the Second Stop Work Order.

## BACKGROUND[1]

### A.  The Project

The Project involves the construction and operation of an approximately 704-megawatt

---

[1] This is a general background summary because the Court is already aware of the more detailed Project background from the briefing regarding the First Stop Work Order.  Dkt. 9 at 4-18.

("MW") commercial-scale offshore wind energy facility in federal waters on the OCS offshore Rhode Island. Decl. of Paul Murphy in Supp. of Pl.'s Mot. for a Preliminary Inj. and Stay Pending Review, Dkt. No. 9-6 ("First Murphy Decl.") ¶ 8. BOEM's November 2023 decision to approve the Project's Construction and Operations Plan ("COP"), followed years of environmental, national security, and safety reviews by Federal and State agencies. Dkt. 9 at 5, 12-13.

Once operational, the Project will connect to the transmission system managed by Independent System Operator ("ISO") New England and bring approximately 304 MW of offshore wind capacity to Connecticut and approximately 400 MW to Rhode Island pursuant to five PPAs. First Murphy Decl. ¶¶ 7-8. Each of these PPAs has a deadline by which the Project must achieve its Commercial Operation Date. *Id.* ¶ 26. The key relevant deadline is the Rhode Island PPA, which represents the majority of project capacity and requires that the Project reach the Commercial Operation Date by January 15, 2027.[2] Third Murphy Decl. ¶ 20, attached as Exhibit A. After that, the utility buyer has a unilateral right to terminate the PPA. *Id*. Achieving the Commercial Operation Date under the PPA requires the Project to complete at least 90% of Project capacity (among other requirements). *Id*. ¶ 16, 20 n.9.

The Project has been under construction for more than two years and is now approximately 87% complete. *Id.* ¶¶ 5-6. When the Second Stop Work Order issued, all of the monopile foundations had been installed and pile driving was complete, but slightly less than 90% of the wind turbines were completed; the two offshore substations were fully installed; the two utility export cables from the shore landing to the northern offshore substations were fully installed; the interlink export cable (approximately 8 miles) that connects the two offshore substations was fully

---

[2] Two of the Connecticut PPA's previously had earlier deadlines, but the utilities have extended them. Third Murphy Decl. ¶ 20 n.10.

installed; and the onshore substation was more than 95% complete, with equipment installed and commissioning and testing activities underway.  *Id*. ¶ 5.  The Project's array cables were also laid at all 65 of the wind turbine sites and nearly 65% of the installed array cable ends were terminated at the relevant WTGs.  *Id.*  The Project has already been substantially delayed due to the First Stop Work Order and the schedule has limited remaining flexibility.  *Id.* ¶¶ 6, 19.  The Second Stop Work Order imperils Revolution Wind's ability to complete turbine installation before the required WTG installation vessel is contractually scheduled to leave at the end of February 2026.  *Id.* ¶¶ 16-22.

To date, Revolution Wind has spent or committed approximately $5.4 billion developing, permitting, engineering, procuring, fabricating, preparing for, and constructing the Project in reliance on BOEM's COP Approval.  *Id.* ¶¶ 11, 33.  The Project will generate enough reliable energy to power nearly 350,000 homes and, prior to the Second Stop Work Order, Revolution Wind had been forecasted to start delivering power to the grid as early as this month.  First Murphy Decl. ¶ 44; Third Murphy Decl. ¶8.  The Project will help meet Connecticut's and Rhode Island's energy and emissions reduction goals, and the grid operator has recognized the Project's importance to reliability.  Decl. of Melanie Gearon in Supp. of Pl.'s Mot. for a Preliminary Inj. and Stay Pending Review, Dkt. #9-1 ("First Gearon Decl.") ¶ 43.

### B.  OCSLA

OCSLA governs energy development on the OCS.  In 2005, Congress amended the statute to add Section 1337, which authorizes Interior to grant OCS leases for alternate energy sources, including offshore wind.  43 U.S.C. § 1337(p)(1)(C); Pub. L. No. 109-58, 119 Stat. 594, 746.  The Secretary is required to "ensure that any activity under [§ 1337(p)] is carried out in a manner that provides for" twelve enumerated goals, including "protection of national security interests of the United States[.]"  43 U.S.C. § 1337(p)(4).  OCSLA and its implementing regulations also address

Interior's limited authority to issue lease suspensions.  In particular, 43 U.S.C. § 1341(c) requires that all leases contain a provision "whereby authority is vested in the Secretary, upon a recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or the President of the United States . . . to suspend operations under any lease[.]" OCSLA also allows  the Secretary of the Interior to issue regulations allowing "for the suspension or temporary prohibition of any operation or activity" pursuant to a lease or permit in limited circumstances, including "if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits . . . , or to the marine, coastal, or human environment . . . ." 43 U.S.C. § 1334(a)(1).  BOEM's implementing regulations allow it to order a "suspension" of a lease in only two circumstances:  (1) "[w]hen necessary to comply with judicial decrees prohibiting some or all activities under [the] lease[,]" or (2) "[w]hen the suspension is necessary for reasons of national security or defense."  30 C.F.R. § 585.417.  Under OCSLA's regulations, if BOEM orders a suspension of the lease, BOEM's "written order [must] explain the reasons for its issuance and describe the effect of the suspension order on [the] lease . . . and any associated activities." *Id.* § 585.418(c).  Revolution Wind's Lease also provides that, in the event of a suspension under § 1341, "[e]very effort will be made by the appropriate military agency to provide as much advance notice as possible of the need to suspend operations" and that "[a]dvance notice will normally be given before requiring a suspension[.]" Supp. Compl., Ex. E at Addendum C, Sec. 3.2.2.  Such "[s]uspensions . . . for national security reasons" will "not generally exceed seventy-two (72) hours[.]"  *Id* at Addendum C, Sec. 3.2.3*.

### C.  Multi-Year Review And Approval Process

Revolution Wind's extensive multi-year environmental, national security, and safety review has been briefed before this Court numerous times before.  *See, e.g.*, Dkt. 9 at 8-13.

### 1.  BOEM's National Security Review

Beginning in 2009, BOEM conducted an environmental assessment of potential wind energy areas offshore Massachusetts and Rhode Island, including consultation with the Department of War ("DOW")[3] on potential national security issues.  First Gearon Decl. ¶ 8. Relevant meeting materials from December 10, 2010; May 2, 2011; and March 1, 2012, reflect participation by Department of the Navy, including the Office of the Chief of Naval Operations, N43-Navy Fleet Readiness Division, and the Naval Undersea Warfare Center - Division Newport. *Id.*  BOEM issued a final environmental assessment in May 2013, concluding leasing and site assessment activities in the proposed lease sale area would result in no significant effects.  *Id.*

Revolution Wind submitted its COP to BOEM in March 2020 and in April 2021, BOEM kicked off a more than two-year process preparing an Environmental Impact Statement ("EIS") for the COP.  *Id.* ¶¶ 10-11.  The process involved Revolution Wind, and 12 federal agencies, including as relevant here, the Bureau of Safety and Environmental Enforcement ("BSEE"), DOW, Navy, North American Aerospace Defense Command ("NORAD"), U.S. Air Force, U.S. Coast Guard, and Federal Aviation Administration ("FAA").  *Id.* ¶ 11.

### 2.  DOW, U.S. Coast Guard, And FAA Review And Consultation

The DOW, U.S. Coast Guard, and FAA extensively reviewed the Project.  At each stage of the regulatory process, BOEM consulted with the DOW to assess national security.  *Id.* ¶ 16. The Project itself also repeatedly communicated with agencies regarding national security, navigation safety, and aviation, including the U.S. Coast Guard, U.S. Naval Undersea Warfare Center, U.S. Air Force, NORAD, U.S. Army Corps of Engineers, and FAA.  *Id.* ¶ 17.  After

---

[3] Because the majority of the documents involved in the Project's consultations and approvals predate the renaming of the "Department of Defense" to the "Department of War" this brief uses "Department of War" or "DOW," except where a quoted document or other material refers to the "Department of Defense" or "DOD."

consulting with the DOD Clearinghouse, the DOW division responsible for reviewing energy infrastructure for potential impacts to military missions, in November 2024 Revolution Wind entered into a mitigation agreement with DOW and the Air Force to address national security risks and to mitigate potential adverse effects on military operations and readiness, including to protect military radar systems (the "2024 DOD agreement").  *Id.*  The agreement requires, for example, that Revolution Wind provide funding for upgrading radar system capabilities and to "immediately curtail wind turbine operations" upon request from NORAD for national security or defense purposes.  First Gearon Decl., Ex. 1 at 4-5, 6.  The parties "agree[d] that the terms [set forth] will allow the mutual goals of the Parties to be met, including the protection of the radar, which promotes national security, and protection of the National Airspace System, while supporting military readiness."  First Gearon Decl., Ex. 1 at 2.  The DOD Clearinghouse confirmed that construction of the Project "would not have adverse impacts to DOD missions in the area."  First Gearon Decl., Ex. 2 at 1.  FAA also assessed the Project's potential impacts on radar system and navigation safety within its jurisdiction and concluded that the Project's wind turbines would have no "substantial adverse effect on the safe and efficient utilization of the navigable airspace by aircraft or on the operation of air navigation facilities."  First Gearon Decl. ¶ 18.

### 3.  BOEM's COP Approval and Conditions

BOEM imposed conditions on Revolution Wind's COP approval, developed through BOEM's consultations with the DOW, mandating several measures to address national security considerations.  *Id.* ¶ 14.  The Record of Decision documents BOEM's determination that the COP, with modifications and Conditions of Approval, complies with each of OCSLA's § 1337(p)(4) factors, including with respect to national security.  *Id.*; Record of Decision at Appendix B.

### 4.  Defendants' Previous Defense Of The Project's Approvals

Defendants have defended the Project's federal approvals in ongoing litigation before this

Court. In that capacity, Defendants stated that the Project's national security "review was designed to ensure the soundness of the project and to comply with multiple federal statutes[.]" *Green Oceans v. U.S. Dep't of the Interior*, No. 1:24-cv-00141-RCL ("*Green Oceans*"), Dkt. 38 at 7 (D.D.C. filed May 21, 2024). Defendants, including BOEM, expressly denied that "[t]he Project interferes with national security and military uses of the Outer Continental Shelf." *Compare* First Amended Complaint ¶ 133, *Green Oceans*, Dkt. 33, *with* Answer ¶ 133, *Green Oceans*, Dkt. 54.

### D. The Presidential Memorandum And First Stop Work Order

The Administration has now taken numerous actions targeted at offshore wind energy projects, many of which have been vacated or enjoined. On January 20, 2025, the President issued a Memorandum entitled "Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects" (the "Presidential Memorandum"), which, among other things, paused new wind energy authorizations pending a "comprehensive review of the ecological, economic, and environmental necessity of terminating or amending any existing wind energy leases." 90 Fed. Reg. 8363 (Jan. 29, 2025). Several States challenged the permitting pause in the United States District Court for the District of Massachusetts. *New York v. Trump*, No. 25-cv-11221 (D. Mass.). On December 8, 2025, the court issued a memorandum opinion vacating the federal agency defendants' implementation of the pause on new wind energy authorizations in its entirety. *New York v. Trump*, No. 25-cv-11221, 2025 WL 3514301, at *1 (D. Mass. Dec. 8, 2025). The court found, among other things, that federal agency defendants "concede[d] that the sole factor they considered in deciding to stop issuing permits was the President's direction to do so." *Id.* at *14.[4]

---

[4] Numerous other federal actions designed to harm wind and solar projects were recently challenged in *Renew Northeast et al v. U.S. Department of the Interior*, 1:25-cv-13961 (D. Mass

On July 29, 2025, Secretary Burgum issued Secretarial Order 3437 to implement the Presidential Memorandum.[5]  He instructed the Assistant Secretary for Land and Minerals Management to provide him a report by September 12, 2025, with recommendations for (among other things) addressing the effects of offshore wind projects on military readiness.  *Id*. at 6.

Then on August 22, 2025, BOEM issued the First Stop Work Order.  Compl. Ex. A, Dkt. 1-1 at 1.  The First Stop Work Order directed Revolution Wind "to halt all ongoing activities related to the Revolution Wind Project on the outer continental shelf (OCS) to allow time for [BOEM] to address concerns that have arisen during the review that the Department is undertaking pursuant to the President's Memorandum of January 20, 2025."  *Id.*  BOEM's substantive justification was just three sentences, broadly invoking 43 U.S.C. § 1337(p)(4), 30 C.F.R. § 585.102(a), and all of OCSLA and BOEM's implementing regulations, as well as "concerns" related to "national security."  A news organization reported that an Interior spokesperson stated that the First Stop Work Order was "in line with President Donald Trump's energy goals"; that "experimental and expensive wind projects . . . are proven failures"; and that "Interior is putting an immediate stop to these costly failures."  Compl. ¶ 133 & n.59, Dkt. 1.

Revolution Wind brought this suit challenging the First Stop Work Order on September 4, 2025.  *See* Compl., Dkt. 1.  This Court preliminary enjoined the First Stop Work Order on

---

filed Dec. 23, 2025).  The Government is also seeking to remand the BOEM approved COPs for numerous offshore wind projects.  *Mayor and City Council of Ocean City, Maryland v. U.S. Dep't of the Interior*, 1:24-cv-03111-SAG, Dkt. 81 (D. Md. filed Sept. 12, 2025); *Save Long Beach Island, Inc. v. U.S. Dep't of Commerce*, 1:25-cv-02211-JMC, Dkt. 13 (D.D.C. Sept. 26, 2025); *Ack for Whales, Inc. v. U.S. Dep't of Commerce*, 2:25-cv-1678-JW, Dkt. 18 (D.D.C. filed Dec. 2, 2025).  And most recently it issued virtually identical stop work orders against the five offshore wind projects in active construction: Revolution Wind, Sunrise Wind, Vineyard Wind, Empire Wind and Coastal Virginia Offshore Wind project.  *See* Second LeBlanc Decl. ¶ 5.

[5] Secretarial Order 3437, https://www.doi.gov/document-library/secretary-order/so-3437-ending-preferential-treatment-unreliable-foreign.

September 22, 2025. Dkt. 36. It found that the First Stop Work Order was "the height of arbitrary and capricious action" because it "represent[ed] a clear change in position on the part of [BOEM], which previously certified that the project did not implicate national security or interference concerns as part of its multiyear, multiagency approval process for the project" and "there are strong reliance interests at stake." Tr. at 41:18-19, 41:1-5, 43:6-7. The Court also concluded that without injunctive relief, Revolution Wind's "entire enterprise could collapse." *Id.* at 43:9-10. The Federal Defendants did not appeal the Court's decision.

### E. Federal Agencies' Lack of Stated National-Security-Related Concerns

After the Court granted the preliminary injunction, Revolution Wind restarted construction and maintained its regular cadence of communication with federal agencies. Third Gearon Decl. ¶¶ 4-6, attached as Exhibit B. Between September 22, 2025, and December 22, 2025, when the Second Stop Work Order issued, no federal agency or representative ever communicated or suggested to Revolution Wind that there were any national security-related concerns with the Project. Second LeBlanc Decl. ¶¶ 25, 27-29, 32-33, attached as Exhibit C; Third Gearon Decl. ¶¶ 4-6.

Since the First Stop Work Order was enjoined, other than during the government shutdown, Revolution Wind has continued to participate in five, approximately biweekly meetings with BOEM and BSEE to discuss construction updates, plans, reports, mitigation agreements and other issues related to the Project. Third Gearon Decl. ¶ 4. The most recent biweekly meeting was with BOEM and BSEE on December 10, 2025. *Id.* During these meetings, neither BOEM nor BSEE raised any national security concerns. *Id.*

The Revolution Wind certification team also had thirteen weekly meetings with BSEE since the preliminary injunction. Third Gearon Decl. ¶ 6. The last meeting was held on December 16, 2025. *Id.* BSEE never raised any national security concerns at these meetings. *Id.*

Ørsted's Marine Affairs team has also continued to have thirteen weekly meetings, even during the government shutdown, with the Coast Guard to discuss Project construction progress and activities.  *Id.* ¶ 5; Second LeBlanc Decl. ¶ 29.  Representatives from BOEM and BSEE frequently attended these meetings.  *Id.*  The most recent meeting was on December 15, 2025.  Third Gearon Decl. ¶ 5.  No agency attending raised any national security concerns during any of these meetings.  *Id.*; Second LeBlanc Decl. ¶ 29.  Additionally, the same Project representatives participate in the U.S. Navy-sponsored Thames River Users Group, where unclassified information relative to the U.S. Navy submarine base at Groton are routinely discussed.  In none of these forums has any national defense concern ever been raised by any of the participants, including the DOW or the U.S. Coast Guard.  Second LeBlanc Decl. ¶ 29.

Between the injunction against the First Stop Work Order on September 22, 2025 and issuance of the Second Stop Work Order on December 22, 2025, Revolution Wind never received any communication from any military agency suggesting the existence of any national security concerns with the Project, notably including in the period after BOEM says it received an additional assessment from DOW.  Second LeBlanc Decl. ¶¶ 25, 27-29, 32-33.

### F.  The Second Stop Work Order

On December 22, 2025, with no advance notice to Revolution Wind either within or outside of its regular meetings with BOEM, BSEE, the Coast Guard, and other federal agencies, Defendant Giacona issued the Second Stop Work Order, directing Revolution Wind to "suspend all ongoing activities related to the Revolution Wind Project on the Outer Continental Shelf for the next 90 days for reasons of national security."  Second Stop Work Order at 1, Supp. Compl., Ex. B.  Like the First Stop Work Order, the Second Stop Work Order is approximately 1 page and does not acknowledge the Project's 2024 mitigation agreement with DOW.  *Id.*  It states that "[b]ased on BOEM's initial review of" "new classified information," (which BOEM had received from DOW

in November 2025), "including the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects[,]" "the particularized harm posed by this project can only be feasibly averted by suspension of on-lease activities." *Id.*

The Order also notes that BOEM "will determine whether the national security threats relating to this project can be mitigated" and "will consider all feasible mitigation measures before making a decision as to whether the project must be cancelled." *Id.* It "invite[s] [Revolution Wind] to meet and confer" about these issues. *Id.* It also notes that BOEM could "further extend the 90-day suspension" pending discussions with the DOW. *Id.*

Interior's public statements provide different and additional information that appears to conflict with the Order. In a subsequent press release about the Second Stop Work Order—and about nearly identical orders issued against four other offshore wind projects—Interior gave additional reasoning that was not in the Order itself:

> As for the national security risks inherent to large-scale offshore wind projects, unclassified reports from the U.S. Government have long found that the movement of massive turbine blades and the highly reflective towers create radar interference called "clutter." The clutter caused by offshore wind projects obscures legitimate moving targets and generates false targets in the vicinity of the wind projects.

> The Department of Energy in a 2024 report stated that a radar's threshold for false alarm detection can be increased to reduce some clutter, but an increased detection threshold could cause the radar to "miss actual targets."[6]

In another offshore wind project's litigation challenging its nearly identical stop work order, Defendant Giacona stated that he reviewed the allegedly new "classified material" from the DOW on November 26, 2025—nearly a month before issuing the Second Stop Work Order (which nevertheless claims that the Project has "the potential to cause … immediate … harm"). Decl. of

---

[6] Press Release, (Dec. 22, 2025), https://www.doi.gov/pressreleases/trump-administration-protects-us-national-security-pausing-offshore-wind-leases.

Matthew Giacona ¶¶ 9-11, *Va. Elec. & Power Co. v. Dep't of the Interior*, No. 2:25-cv-00830 (E.D. Va. filed Dec. 27, 2025), Dkt. No. 19-1; Supp. Compl., Ex. B. Giacona also stated that, after his initial review, he again reviewed that classified information with "senior Department [of the Interior] leadership in early December 2025." *Id.* ¶ 11. To the extent an exigent issue was presented in this information, the Government did not promptly address it.

In any event, in Secretary Burgum's press appearances announcing the five orders, he spoke extensively on other rationales for them that are unrelated to national security. On December 22, 2025, he gave an interview on Fox News in which he criticized offshore wind projects as "unreliable" and "unaffordable." Second LeBlanc Decl. ¶ 14. The next day, in another Fox News interview, he stated that offshore wind "is really expensive", that you could "get 1 gigawatt of power for one-fifth of the price" from natural gas, that wind energy is "not reliable, it only works when the wind is blowing," and that "the people who love the whales are opposed to [offshore wind] because of the whale grounding." *Id.* ¶ 16. Secretary Burgum also posted on X that "[o]ffshore wind is a GIANT rip off for every American consumer," that "[i]t's TWICE as expensive to heat a home in New England, the birthplace of the American Revolution, than in Europe during a Russian Invasion!", and that "[o]ffshore wind isn't just a bad deal, it's a scam and YOU are paying for it!" *Id.* ¶ 17.

Revolution Wind has fully complied with the Second Stop Work Order.

## JUSTICIABILITY

Revolution Wind has Article III standing to challenge the Second Stop Work Order. Article III requires a plaintiff to sufficiently plead: (1) injury-in-fact; (2) a "causal connection between the injury and the conduct complained of;" and (3) a likelihood that the alleged injury "will be redressed by a favorable decision." *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The Second Stop Work Order injures Revolution Wind by preventing construction and

completion of the Project, inflicting financial harm, and, depending on the length of delay, potentially jeopardizing the Project and the Revolution Wind enterprise entirely. *See Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002). Revolution Wind's injury is caused by the Second Stop Work Order and is redressable: If this Court provides preliminary injunctive relief against the Second Stop Work Order and vacates the unlawful agency action, Revolution Wind will be able to continue its previously-approved, lawful construction of the Project.

BOEM's Second Stop Work Order is a final agency action subject to judicial review under 5 U.S.C. § 704. The Second Stop Work Order is in effect and "marks the consummation" of BOEM's decision-making to suspend Project activities on the OCS. *See Bennett v. Spear*, 520 U.S. 154, 156 (1997). This is true even if Defendants characterize the Second Stop Work Order as an "interim" decision because the decision to issue the Second Stop Work Order itself "is not itself subject to further consideration" by BOEM. *See Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020). The Second Stop Work Order is also an action by which Revolution Wind's "rights or obligations have been determined" and from which "legal consequences" have already flowed. *See Bennett*, 520 U.S. at 178. The Second Stop Work Order has already resulted in immediate, irreparable harm to Revolution Wind. *See infra* at Section II. The Second Stop Work Order further "suspend[s] all ongoing activities related to the Revolution Wind Project on the Outer Continental Shelf for the next 90 days[.]" *See* Supp. Compl., Ex. B.

Neither OCSLA nor the APA mandate administrative exhaustion as a prerequisite to this action. *See* 43 U.S.C. § 1349; 5 U.S.C. § 704. The relevant BOEM regulations also do not require exhaustion and do not make the decision inoperative pending appeal to the Interior Board of Land Appeals. *See* 30 C.F.R. § 585.118; *Darby v. Cisneros*, 509 U.S. 137, 154 (1993).

Further, this action is subject to immediate review pursuant to OCSLA's citizen-suit

provision, which provides that "[a]n action may be brought . . . immediately after notification of the alleged violation [of OCSLA] in any case in which the alleged violation constitutes an imminent threat to the public health or safety or would immediately affect a legal interest of the plaintiff." 43 U.S.C. § 1349(a)(3). Revolution Wind notified Defendants of their violations before bringing this action. Revolution Wind has a "legal interest" in the subject of the Second Stop Work Order that is immediately and adversely affected.

## ARGUMENT

Revolution Wind is entitled to a stay of the Second Stop Work Order, and a preliminary injunction against enforcement of the Second Stop Work Order to preserve the status quo pending this Court's adjudication of this case on the merits. 5 U.S.C. § 705. Issuance of a stay under the APA is governed by the same four-factor test that generally governs preliminary injunctions: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Pennsylvania v. DeVos*, 480 F. Supp. 3d 47, 58 (D.D.C. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009)); *see also Nken*, 556 U.S. at 426; *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). All the preliminary injunction factors weigh strongly in favor of immediate relief here. This Court should maintain the status quo by staying the Second Stop Work Order and enjoining Defendants from enforcing the Order pending full adjudication on the merits.

## I.    REVOLUTION WIND IS LIKELY TO SUCCEED ON THE MERITS

Revolution Wind is likely to succeed on the merits of its claims that the Second Stop Work Order violates the APA, OCSLA and the U.S. Constitution for many of the same reasons that this Court articulated when it enjoined the First Stop Work Order. The APA requires this Court to "hold unlawful and set aside" BOEM's Second Stop Work Order because it is "arbitrary" and

"capricious," "contrary to constitutional right," and "contrary to law."  5 U.S.C. § 706(2).

## A.  The Second Stop Work Order Is Arbitrary And Capricious

An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  The agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).  The Second Stop Work Order fails these requirements on multiple grounds.

### 1.  The Second Stop Work Order Lacks A Reasonable Explanation

The Second Stop Work Order is arbitrary and capricious because it lacks a reasonable explanation for the suspension.  "To satisfy arbitrary-and-capricious review, an agency must at least reasonably explain its decision[.]"  *World Shipping Council v. Fed. Maritime Comm'n*, 152 F.4th 215, 221 (D.C. Cir. 2025).  "[C]onclusory statements . . . do not substitute for the reasoned explanation that the APA requires."  *Env't Health Trust v. FCC*, 9 F.4th 893, 905 (D.C. Cir. 2021).  And it is "arbitrary and capricious for the agency's decision making to be internally inconsistent."  *World Shipping Council*, 152 F.4th at 221.

The Order is unacceptably conclusory.  In justifying the suspension, the Order says only that DOW "provided senior leadership . . . with new classified information, including the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects."  Supp. Compl., Ex B.  BOEM did not acknowledge the 2024 DOD Agreement or point to a single design or technical specification of Revolution Wind that raised national security concerns.  *See id.*  Indeed, BOEM issued a substantively identical order to four other offshore wind projects, without reference to any specific project characteristics.  *See supra* at Background § F.  While national security is undeniably important, "APA review . . . involves

17

more than a court rubberstamping action based on bare declarations from the agency amounting to 'trust us, we had good national security reasons for what we did.'" *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 257, 270 (D.D.C. 2018). BOEM was still required to complete the "critical step" of connecting facts to its conclusion. *Xiaomi Corp. v. Dep't of Def.*, No. CV 21-280, 2021 WL 950144, at *5 (D.D.C. Mar. 12, 2021) (quoting *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995)). BOEM failed to do so.

BOEM's single reference to "classified information" does nothing to change this analysis (with no explanation for why suspension is "necessary"), particularly given indications that BOEM's purported national security rationale could be pretextual.

*First*, Secretary Burgum has made countless statements in subsequent public interviews and announcements maligning offshore wind energy unrelated to national security. Second LeBlanc Decl. ¶¶ 7-8, 13-17. In announcing the Second Stop Work Order on X, Secretary Burgum called the projects "expensive, unreliable, [and] heavily subsidized," and stated "ONE natural gas pipeline supplies as much energy as these 5 projects COMBINED." *Id.* ¶ 7. Secretary Burgum's posts on X the following day similarly alleged that offshore wind is a "GIANT rip off for every American consumer," and that "[o]ffshore wind isn't just a bad deal, it's a scam and YOU are paying for it!" *Id.* ¶ 17. These biased claims stand in sharp contrast to findings of the Connecticut Department of Energy & Environmental Protection which concluded that "[t]he Revolution Wind project will lower near-term wholesale energy and capacity market costs for Connecticut and all New England ratepayers, by providing fuel diversity and low-marginal cost energy to our region" and that "[b]y 2028, these wholesale market savings are estimated to reach roughly $500 million dollars a year." Third Gearon Decl. ¶ 9.

These claims indicate that BOEM's Second Stop Work Order could have been motivated

by political pressure to oppose the offshore wind industry rather than considerations "made relevant by Congress" in OCSLA, such as the national security rationale upon which the Second Stop Work Order is purportedly based. *See Connecticut v. DOI*, 363 F. Supp. 3d 45, 63 (D.D.C. 2019); *see also XP Vehicles, Inc. v. DOE*, 118 F. Supp. 3d 38, 75-76 (D.D.C. 2015). Defendants' multi-year environmental, national security and safety review process spanning three presidential administrations concluded that the Project should be permitted to proceed under all statutory and regulatory review requirements. Yet, consistent with the Administration's aggressive anti-wind objectives, including its First Stop Work Order that this Court enjoined, BOEM came up with yet another purported rationale to shut down the Project.

*Second*, the absence of any indication of concerns from the DOW and military contacts with which the Project regularly communicates further indicates the conclusory nature of the Order. Since the First Stop Work Order was enjoined by this Court on September 22, 2024, Revolution Wind has not received any communication from the DOW, Air Force, Coast Guard, Navy, or any other agency regarding national security concerns. Second LeBlanc Decl. ¶¶ 25, 27-29, 32-33. The Project met weekly with the Coast Guard, and BSEE and BOEM routinely attended those meetings. *Id.* ¶ 29. And no national security concerns have been raised in the Navy-sponsored Thames River (New London/Groton, CT) Users Group, where unclassified information relative to the Navy submarine base at Groton is routinely discussed. *Id.* Therefore, nothing in Revolution Wind's experience or on the face of the Order itself suggests that the DOW deems the Second Stop Work Order necessary or justified. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (finding agency action arbitrary and capricious when court was presented "explanation for agency action that is incongruent with what the record reveals about the agency's priorities").

*Third*, the Second Stop Work Order repeats arguments Interior already made with respect

to the First Stop Work Order that this court enjoined.  Indeed, Secretary Burgum made comments about radar interference to justify the First Stop Work Order that are substantially identical to what he has now said about the Second Stop Work Order.  Dkt. 30 at 11 n.6; Second LeBlanc Decl. ¶¶ 14-15.  Thus, Defendants repeated what appears to be that same rationale to shut down the Project again, this time alleging that it is grounded in "classified" information and to date preventing representatives of Revolution Wind with appropriate security clearances (and those whose clearances could be reactivated) from evaluating the bases for the Order.  As with the First Stop Work Order, this second Order also halts work while the Government "invites" a discussion with the Project on mitigating national security concerns, Supp. Compl., Ex B, which could have occurred at least a month ago when these purported concerns were allegedly identified.  That BOEM's concerns are now classified as "secret" "does not mean that those concerns rise to such a level that work must cease immediately."  *See* Tr. at 40:13-25 (recognizing that even when "national security" was cited, the agency failed to "actually point to any factual findings" suggesting that "those concerns rise to such a level that work must cease immediately").

Despite the Order's reference to "classified information," the press release by Interior accompanying the Second Stop Work Order discussed "unclassified reports from the U.S. Government," including a 2024 report (that predated the 2024 DOD Agreement) that the release characterizes as having found radar interference from turbine blades.  Second LeBlanc Decl. ¶ 9. Secretary Burgum has similarly made repeated unclassified statements on national news about "radar interference" and "drones," *see* Second LeBlanc Decl. ¶¶ 13, 15-16 , just as he did in relation to the First Stop Work Order.  *See* Dkt. 30 at 11 n.6; see Second LeBlanc Decl. ¶ 15.  Specifically, Secretary Burgum apparently provided at least a partial unclassified summary of DOW's assessment, saying that it "zeroes in" on changed "adversarial threats," and discussing use of

drones in foreign conflicts." Second LeBlanc Decl. ¶ 13. While these statements similarly fail to provide Revolution Wind a reasonable basis to understand the Second Stop Work Order because they are not referenced on the face of the decision document itself, they are a concession by Defendants that additional unclassified information could have been provided in the Second Stop Work Order so that Revolution Wind, as well as the public, can evaluate the nature of BOEM's decision. To date, BOEM has not provided unclassified summaries of the information upon which it relied, or classified information to qualified representatives of Revolution Wind for the purpose of litigation, so that Revolution Wind may adequately defend itself. The Second Stop Work Order (like the First) does not explain the factual basis for BOEM's concerns and therefore violates the APA. *PayPal, Inc. v. CFPB*, 728 F. Supp. 3d 31, 39 (D.D.C. 2024) (failure to explain "*why*" facts supported an agency's "conclusory explanation" rendered it arbitrary and capricious).

BOEM's failure to articulate a satisfactory explanation leaves its decision without a justification "that can be scrutinized by courts and the interested public." *Dep't of Com.*, 588 U.S. at 785. At a minimum, the Court should take action to ensure that both Revolution Wind and the Court can adequately probe the national security assertion. The Court should require Defendants to share with representatives for Revolution Wind that have appropriate security clearances access to the same information (including through reactivating recent government security clearances for Revolution Wind's counsel), while also requiring that the Government provide unclassified summaries of the key decisional documents for those without clearances. *See Fares v. Smith*, 901 F.3d 315, 324 (D.C. Cir. 2018) (discussing unclassified summaries).

The inconsistencies in BOEM's Second Stop Work Order also undercut any reasonable explanation that might otherwise satisfy BOEM's obligations under the APA. *First*, BOEM purports to base the Order on national security information with "the potential to cause serious,

immediate, and irreparable harm" from a DOW review completed in November 2025, and that BOEM Director Giacona has since disclosed he reviewed on November 26, 2025. However, Director Giacona did not issue the Order until December 22, 2025, approximately a month later. Supp. Compl., Ex B. At a minimum, this delay is inconsistent with the purported "immediate" and "irreparable" harm necessitating the broad cessation of activities under the Order. Supp. Compl., Ex. B; *cf. Sierra Club v. EPA*, 793 F. Supp. 3d 158, 165 (D.D.C. 2025) ("[I]ntentional delay is in tension with the high bar they must clear to establish irreparable harm."). And in combination with this Administration's repeated attempts to halt offshore wind development, the delayed timing of the Order until days after judgment setting aside the Presidential Memorandum, *see supra* Background § D, and the unrelated justifications presented at length by the Secretary in the press, the circumstances could indicate pretext.

*Second*, the Suspension Order states that the harm posed by the Project "can only be feasibly averted by suspension of on-lease activities" but then "invites" Revolution Wind to "meet and confer" about potential mitigation measures. Supp. Compl., Ex B. BOEM offers no explanation for why it took the drastic step of suspending activities without notice, despite existing mitigation measures in place that could have alleviated the need for suspension, or why 90 days is required for resolution. The 2024 DOD agreement addresses adverse impacts on radar, including a provision by which Revolution Wind agrees to "immediately curtail wind turbine operations for a National Security or Defense Purpose," as defined in the agreement. Second LeBlanc Decl. ¶ 25. And the Project's COP Conditions of Approval require all wind turbine generator rotors to be equipped with controls enabling the Project to immediately initiate the curtailment of any wind turbine generator upon emergency order from the DOW or the Coast Guard. *Id.* ¶ 23 n. 40. Revolution Wind's Lease further provides that "[e]very effort will be made . . . to provide as much

advance notice as possible of the need to suspend operations" and "[a]dvance notice will normally be given before requiring a suspension." Supp. Compl., Ex E, at Addendum C, Sec. 3.2.2. None of these mechanisms to protect national security were initiated and Revolution Wind had no notice before the Second Stop Work Order, despite frequent communications with BOEM and BSEE, and ongoing coordination with the military. *See* Third Gearon Decl. ¶¶ 4-6; Second LeBlanc Decl. ¶¶ 27-29, 32-33.

The inconsistency between no advance notice, ignoring existing mitigation, and then shutting down the Project effective immediately is unexplained. "Because [BOEM's] decision is internally inconsistent, it is arbitrary and capricious." *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018).

### 2. BOEM Violated The Change-In-Position Doctrine By Ignoring Substantial Reliance Interests

The Second Stop Work Order is also arbitrary and capricious because it violates the "change-in-position doctrine." *FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 917 (2025). That doctrine makes clear that agencies may only change their existing policies if they "provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *Id.* Defendants first failed to justify their change in position in August 2025. Dkt. 9 at 20-26. After failing in their efforts to shut down the Project then, including on the basis of "protection of national security interests," Compl., Ex. A, BOEM doubled down on its shifted position, now cloaked in "classified information." BOEM has still failed to consider that Revolution Wind developed substantial reliance interests based on Defendants' Project approvals and previous defense of those approvals in this very Court.

In 2023, after years of exhaustive review, BOEM approved the Project, concluding its decision was consistent with 43 U.S.C. § 1337(p)(4) of OCSLA, "which requires the Secretary to

ensure that approved activity is carried out in a manner that provides for Congress's enumerated goals," including national security. Record of Decision at 25; *see also* 43 U.S.C. § 1337(p)(4)(F). BOEM's approval detailed its consideration of national security, explaining that "[a]t each stage of the regulatory process . . . BOEM has consulted with the DOD for the purposes of assessing national security considerations in its decision-making processes." Record of Decision at B-15. When determining the lease area, "DOD concluded that site-specific stipulations . . . could mitigate" any impacts and BOEM concluded that national security impacts would "be negligible and avoidable." *Id.* at B-16. And while "reviewing the COP," BOEM requested that the DOD Clearinghouse "coordinate a review" of the COP within DOW, and "BOEM and the DOD Clearinghouse coordinated to address these concerns and to avoid or mitigate them." *Id.* BOEM then included those mitigation measures as conditions of approval. *See id.* at A-30–A-31.

BOEM's decision to approve the Project's COP was based upon and supported by an extensive record before the Agency. BOEM has compiled and served its administrative record regarding BOEM's approval of the Revolution Wind COP in cases currently pending before this Court: *Preservation Society of Newport County v. Burgum*, No. 1:23-cv-03513-RCL (D.D.C.), which has been consolidated with *Southeast Lighthouse Foundation v. Burgum*, No. 1:23-cv-03515-RCL (D.D.C.);[7] and *Green Oceans*, No. 1:24-cv-00141-RCL (D.D.C.).[8]

Although BOEM asserts in the Second Stop Work Order that there are purported "national security threats," *see* Supp. Compl. Ex. B, that is directly contrary to BOEM's filing in the ongoing litigation challenging Revolution Wind's permits and approvals. Defendants in that case,

---

[7] BOEM filed its certified administrative record index on July 31, 2024. *Pres. Soc'y of Newport Cnty. v. Burgum*, No. 1:23-cv-03513-RCL (D.D.C.), Dkt. 43-1 (corrected index).

[8] BOEM filed its certified administrative record index on August 24, 2024, and filed its certified supplemental administrative record index on October 25, 2024. *Green Oceans*, Dkts. 59-2, 65-1.

including BOEM, expressly denied plaintiffs' allegation that "[t]he Project interferes with national security and military uses of the Outer Continental Shelf." *Compare* First Amended Complaint ¶ 133, *Green Oceans*, Dkt. 33, *with* Answer ¶ 133, Dkt. 54.

BOEM's Second Stop Work Order once again represents a complete reversal of the Agency's long-held prior conclusions and its statements in this Court regarding national security. But the Order fails to acknowledge that Defendants' prior approval of the Project and conclusion that there were no national security threats, both upon approval and in July 2024 in defending the approval, "engendered serious reliance interests." *Dep't of Homeland Sec. v. Regents*, 591 U.S. 1, 30 (2020). This Court recognized as much in its oral decision enjoining the First Stop Work Order. *See* Tr. at 43:3-7 ("At every step Revolution Wind has relied on approval from the Interior and BOEM decisions that are currently being defended in related cases before this Court, meaning that there are strong reliance interests at stake."); *id.* at 43:18-25 (acknowledging "reliance interests").

As the Supreme Court has explained, the APA requires an agency reversing a prior policy or agency action "to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33. BOEM did not even attempt to meet this standard. Nothing in the Second Stop Work Order "address[ed] why [BOEM's] policy shift outweighs" Revolution Wind's reliance interests or provided "good reasons for concluding those interests were insufficient to hold off the policy shift." *CSL Plasma Inc. v. CBP*, 628 F. Supp. 3d 243, 261 (D.D.C. 2022). BOEM's passing reference to the Project's "construction status" says nothing about BOEM's consideration of reliance interests with respect to the Second Stop Work Order. Supp. Compl., Ex. B.

The reliance interests at stake here are immense. Revolution Wind has spent or committed approximately $5.4 billion to date to plan, permit, develop, and construct this Project. If the Project

is cancelled, Revolution Wind anticipates that it would also incur more than $1 billion in breakaway costs, for a total of more than $6 billion in Project costs. Third Murphy Decl. ¶¶ 11, 33.

Notably, BOEM has previously conceded Revolution Wind's reliance interests in ongoing litigation in this Court. BOEM (together with other Federal Defendants) stated, "[w]here, as here, a developer has complied with agency rules and satisfied federal statutory requirements, it should be able to rely on its permits, as it may need to make business and financial decisions in furtherance of completing the authorized activity." *Green Oceans*, Dkt. 38 at 43.

BOEM's unreasoned change in position itself is a sufficient basis for deeming the Second Stop Work Order arbitrary and capricious. *See Int'l Org. of Masters, Mates, & Pilots v. NLRB*, 61 F.4th 169, 180 (D.C. Cir. 2023) (vacating decision for "no regard for the parties' reliance interests").[9]

### 3. The Second Stop Work Order Is Arbitrary And Capricious Because It Is Overbroad

The Second Stop Work Order is also arbitrary and capricious because it suspends *all* activities (other than to prevent health, safety, and environmental impacts) for a *minimum* of 90 days, without any explanation as to why a narrower suspension would not suffice. Agencies are required to "address" alternative "way[s] of achieving [their] objections" and give "adequate reasons" for abandoning those alternatives. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc.*, 463 U.S. at 48. BOEM failed to do so here.

---

[5] The States of Rhode Island and Connecticut also have significant reliance interests at stake, as they have relied on Defendants' approvals for the Project in investing hundreds of millions of dollars of State resources and making many significant and interrelated energy-system planning decisions, among other interests. *See, e.g.*, Complaint at ¶¶ 147-151, *Rhode Island v. Dep't of the Interior*, No. 1:25-cv-00349, Dkt. 1 (D.R.I. filed Sept. 4, 2025), transferred to D.D.C. on Dec. 11, 2025, *Rhode Island v. Dep't of the Interior*, 1:25-cv-04328-RCL.

Although the Second Stop Work Order itself leaves Revolution Wind guessing as to what the purported national security concerns are, Secretary Burgum's interviews, *supra* Background § F, and the Interior press release, suggest that the concerns are related to "radar."  Second LeBlanc Decl. ¶¶ 9, 13-16.  It is unclear exactly how these concerns relate to the Project, but, in any event, concerns relating to radar interference do not justify (particularly given that the 2024 DOD Agreement is in place) an arbitrary total suspension of activities, including critical work related to undersea cables, testing of equipment, and commissioning.  Third Murphy Decl. ¶¶ 9, 16.  And, given that the lease suggests national security suspensions will generally be limited to 72 hours, *see infra* Section I.D, BOEM offers no explanation why it chose a 90-day suspension, with indefinite renewals of the same length.  Supp. Compl., Ex. B.

Depriving the Project of the ability to continue to work on elements of the Project unrelated to any purported national security concerns is arbitrary and capricious.  This failure is particularly acute given that the Project was on schedule to achieve first power as early as January 2026, meaning that Revolution Wind was expected to begin generating power, and delivering it to the grid, from a subset of the Project's wind turbine generators.  Third Murphy Decl. ¶ 8.  Depriving the grid of needed power in the face of the President's and Secretary Burgum's own characterizations of an "energy emergency" in the United States is antithetical and overly broad. *See, e.g.*, Executive Order 14156, Declaring a National Energy Emergency, 90 Fed. Reg. 8433 (Jan. 29, 2025).   Because BOEM "too cavalierly sidestepped its responsibility to address reasonable alternatives, its action was not rational and must, therefore, be set aside."  *Del. Dep't of Nat. Res. & Env't Control v. EPA*, 784 F.3d 1, 18 (D.C. Cir. 2015).

### B.  The Second Stop Work Order Deprives Revolution Wind Of A Significant Property Interest Without Due Process

The Second Stop Work Order is unconstitutional because it violates Revolution Wind's

Fifth Amendment due process rights.  The Fifth Amendment guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const., amend. V.  "In assessing constitutional due process claims, [courts] ask two questions:  Did the Government deprive the party of a protected property interest?  If so, what process was due?"  *Amoco Prod. Co. v. Fry*, 118 F.3d 812, 819 (D.C. Cir. 1997); *see Nat'l Council of Resistance of Iran v. Dep't of State* ("*NCRI*"), 251 F.3d 192, 205 (D.C. Cir. 2001).  Revolution Wind has a protected property interest in its lease, and BOEM's lack of notice and opportunity for hearing violated Revolution Wind's due process rights.

### 1.  BOEM Deprived Revolution Wind Of Its Protected Property Interest

Revolution Wind has a protected property interest in its lease.  *See United States v. Swank*, 451 U.S. 571, 579 n.15 (1981); *Hoyl v. Babbitt*, 129 F.3d 1377 (10th Cir. 1997); *Shell Offshore Inc. v. Greenpeace, Inc.*, No. 3:12-cv-00042, 2012 U.S. Dist. LEXIS 74387, at *44 (D. Alaska May 29, 2012) (oil company had a property interest in OCS lease).  The Second Stop Work Order suspends Revolution Wind's rights to develop its lease and to construct the Project on schedule, depriving Revolution Wind of its Property Interest.  *See* Third Murphy Decl. ¶¶ 10, 12-22.

No rationale is provided as to why the Second Stop Work Order is for 90 days, and BOEM states that it "may further extend the 90-day suspension period" without limitation.  Supp. Compl., Ex. B.  Even "temporary or partial impairments to property rights . . . merit due process protection."  *Amoco Prod. Co.*, 118 F.3d at 819 (quoting *Connecticut v. Doehr*, 501 U.S. 1, 12 (1991)) (companies had protected property interest in temporarily-withheld funds).

### 2.  BOEM Denied Revolution Wind Required Pre-Deprivation Process

The due process clause requires the government to provide notice and some form of hearing before deprivation of a property interest.  *Propert v. District of Columbia*, 948 F.2d 1327, 1332 (D.C. Cir. 1991).  The type of notice and hearing requires a balancing of:  (1) the "private interest"

affected, (2) "the risk of erroneous deprivation" of that interest and the value of additional procedural safeguards; and (3) "the government's interest," including the burden and cost of additional procedures. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *see NCRI*, 251 F.3d at 205-08. All three factors demonstrate that Revolution Wind was entitled to notice of the Second Stop Work Order and to sufficient information regarding the purported basis for the Order to provide Revolution Wind an opportunity to contest the facts that BOEM considered.

*First*, Revolution Wind's private interest, a significant property right in its lease and billions of dollars of private investments to develop the lease, supports pre-deprivation process. *Cafeteria & Rest. Workers Union, Loc. 473, AFL-CIO v. McElroy*, 367 U.S. 886, 895 (1961). The Second Stop Work Order threatens the viability of the Revolution Wind Project, and, in turn, Revolution Wind's private property interests and investments. Third Murphy Decl. ¶¶ 3, 12-34. The Supreme Court has found significant interests on far less. *See, e.g.*, *Connecticut v. Doehr*, 501 U.S. 1, 11 (1991) (holding that attachment had significant effect on private property interests). Indeed, courts have found "the entitlement to continue construction without unfair interference— is substantial." *Tri Cnty. Indus., Inc. v. District of Columbia*, 104 F.3d 455, 461 (D.C. Cir. 1997).

*Second*, there is a high risk of erroneous deprivation without pre-deprivation process. This is not a situation where "the [agency]'s examination process included numerous safeguards against an arbitrary seizure," including "many opportunities" for the company "to express its views." *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1100 (D.C. Cir. 1996). There were no safeguards, formal or informal. BOEM did not raise these issues with Revolution Wind before issuing the Second Stop Work Order, despite many opportunities to do so. Third Gearon Decl. ¶¶ 4-6; Second LeBlanc Decl. ¶¶ 29, 33. Had BOEM taken these steps, Revolution Wind could have explained its position, addressed any potential issues, and avoided the Order. Moreover, an

29

affected entity must have the information it needs "to tailor its submission to the [government's] concerns [and] rebut the factual premises underlying the [agency] action." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 320 (D.C. Cir. 2014). That is true even if "the information at the 'heart' of the [government]'s decision is classified." *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 613 F.3d 220, 227-29 (D.C. Cir. 2010). It was possible for BOEM to provide unclassified evidence to Revolution Wind a month ago. *See supra* at Background § F. BOEM also could have provided classified materials to Project representatives with security clearance.

*Third*, the only way BOEM can justify offering *no pre-deprivation process at all* is by showing that there are "exigent circumstances," *Esparraguera v. Dep't of the Army*, 101 F.4th 28, 40 (D.C. Cir. 2024) (citation omitted). BOEM has not shown that this is an "exigent" circumstance that justifies skipping pre-deprivation process. There is of course a strong government interest in national security, but the government has not identified any exigent circumstance sufficient to justify BOEM's failure to give Revolution Wind notice and a fair opportunity to address the BOEM's purported basis for the Second Stop Work Order and in fact the Acting Director had this purported information nearly a month before the Order was issued. Neither the government's privilege in classified information affecting national security, *NCRI*, 251 F.3d at 207, nor BOEM's assertion that it has preliminarily determined that offshore wind projects may implicate national security, Supp. Compl., Ex. B, demonstrate that BOEM giving Revolution Wind pre-deprivation process would interfere with the government's interest in national security. In other words, there is no indication that BOEM needed to withhold from Revolution Wind the nature or even existence of its concerns until after the decision was made. There is no evidence presented, for example, that it would harm national security interests to alert Revolution Wind in advance to the idea that the government was considering suspending lease activities. *Compare Zevallos v. Obama*, 793

F.3d 106, 116 (D.C. Cir. 2015) (government needed to "block[] the assets of international narcotics traffickers" without giving advance notice to avoid "a substantial risk of asset flight").

Moreover,  BOEM has had the information from DOW's review since November 26, 2025. *See* Decl. of Matthew Giacona ¶ 11, *Va. Elec. & Power Co. v. Dep't of the Interior*, No. 2:25-cv-00830 (E.D. Va. Dec. 27, 2025), Dkt. 19-1; Supp. Compl., Ex. B.  Yet BOEM waited until December 22, 2025 to issue the Second Stop Work Order.  This delay cuts against any government interest in issuing the Second Stop Work Order before giving Revolution Wind notice and an opportunity to be heard.

### C.    The Second Stop Work Order Was Issued Without The Procedures Required By The APA

BOEM also violated the APA because it acted without observance of procedure required by law."  5 U.S.C. § 706(2)(D).  APA Section 558 makes it unlawful for an agency to issue a "withdrawal, suspension, revocation, or annulment of a license" if it does not give the licensee "notice" and "opportunity to demonstrate or achieve compliance with all lawful requirements" "before" the agency acts.  *Id.* § 558(c).  The APA defines a license as "the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission."  *Id.* § 551(8).  An OCSLA lease is a "form of permission" to use the OCS for energy development.  Section 558 has limited exceptions for "cases of willfulness" and where "public health, interest, or safety requires otherwise."  *Id.*  Neither applies here.

The Second Stop Work Order suspended all ongoing Revolution Wind activities on the OCS without any notice or opportunity to demonstrate compliance.  Supp. Compl., Ex. B.  As a result, Revolution Wind is unable to exercise its rights under the approved COP, including to conduct "activities pertaining to construction of facilities for commercial operations on [its] commercial lease."  30 C.F.R. § 585.600; *see also id.* §§ 585.620-585.628.  But unspecified

31

"national security implications," like evolution of technology which require further study are insufficient justification to deny Revolution Wind notice and an opportunity to demonstrate compliance before BOEM acted.  5 U.S.C. § 558(c).  For the same reasons that BOEM has no interest in denying pre-deprivation process for constitutional due process purposes, § 558 is not satisfied here.  There is nothing in the Second Stop Work Order that shows that this is an emergency circumstance that justifies the skipping pre-deprivation process required by the APA. *See supra* Background § F.

> ### D.    The Second Stop Work Order Was Issued Without Statutory Authority

The Court "shall . . . hold unlawful and set aside" final agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).  BOEM "literally has no power . . . to act unless and until Congress confers power upon it."  *Am. Library Ass'n v. FCC*, 406 F.3d 689, 698 (D.C. Cir. 2005) (internal quotation omitted).  But Congress has not conferred the broad authority BOEM claims.  Instead, OCSLA only authorizes BOEM to order a national security-based suspension under circumstances that have not been presented here.

In the Second Stop Work Order, BOEM invoked 30 C.F.R. § 585.417(b), which provides that "BOEM may order a suspension . . . when the suspension is necessary for reasons of national security or defense," although BOEM does not explain why suspension is "necessary" for reasons of national security.  "A suspension is an interruption of the period of [a] lease" which extends the expiration date of the relevant period of the lease for the length in time the suspension is in effect. 30 C.F.R. § 585.415(b).  BOEM also does not state that the lease has been extended.  Interior cites 43 U.S.C. § 1337 as its authority for 30 C.F.R. § 585.417(b).  *See id.* § 585.100.  As relevant here, § 1337(p) gives the Secretary authority to grant leases on the OCS promoting "energy from sources other than oil and gas," including wind energy.  43 U.S.C. § 1337(p)(1)(B).  It directs the Secretary

of the Interior to "ensure that any activity under this subsection [subsection (p)] is carried out in a manner that provides for . . . protection of national security interests of the United States," *id.* § 1337(p)(4)(F), and to "provide for the duration, issuances, transfer, renewal, suspension, and cancellation of a lease," *id.* § 1337(p)(5).

Two other OCSLA provisions provide specific guidance on when BOEM may suspend activities and operations on the lease for reasons implicating national security. *First,* the "national security clause" in 43 U.S.C. § 1341(c) requires BOEM to include a provision in every lease that confers authority on the Secretary to "suspend operations" "upon a recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or the President of the United States." Relatedly, § 1341(d), titled "national defense areas; suspension of operations; extension of leases," permits the "Secretary of Defense, with approval of the President," to designate "areas restricted from exploration and operation that part of the outer Continental Shelf needed for national defense," and to suspend operations on any leases in that area. *Second,* 43 U.S.C. § 1334(a)(1)(B) authorizes BOEM to order "suspension or temporary prohibition of any operation or activity . . . pursuant to any lease or permit" "if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits . . . , or the marine, coastal, or human environment." The Second Stop Work Order did not argue these circumstances are present.

Section 1337 must be read alongside—and is limited by—§§ 1341 and 1334(a)(1)(B). *City & Cnty. of San Francisco v. EPA*, 604 U.S. 334, 350 (2025). OCSLA was originally enacted in 1953, Pub. L. 83-212, to provide for offshore oil and gas leasing. *Healthy Gulf v. DOI*, 152 F.4th 180, 187 (D.C. Cir. 2025). When § 1337(p) was enacted to add renewable energy uses of the OCS, Pub. L. 109-58, § 388, 119 Stat. 744-47, Congress gave no indication that it intended to give the

Secretary of the Interior more authority to suspend leases and activities for renewable energy uses than for oil and gas. Thus, Section 1337 is properly interpreted as authorizing suspensions only in the circumstances contemplated by either Section 1341 or Section 1334(a)(1)(B).

The agency appears to agree because it has structured Revolution Wind's lease to follow Sections 1341 and 1334. Revolution Wind's lease permits BOEM to "suspend . . . operations in accordance with the national security and defense provisions of [43 U.S.C. § 1341]." Supp. Compl., Ex. E at Section 3(c). The lease further provides that, in the event of a suspension under § 1341, "[e]very effort will be made by the appropriate military agency to provide as much advance notice as possible of the need to suspend operations" and that "[a]dvance notice will normally be given before requiring a suspension." *Id.* at Addendum C, Sec. 3.2.2. Such "suspensions . . . for national security reasons" will "not generally exceed seventy-two (72) hours." *Id.* at Addendum C, Sec. 3.2.3. Revolution Wind's lease recognizes that "any cancellation or suspension ordered by the Lessor that is predicated on a threat of serious irreparable, or immediate harm or damage"— i.e., pursuant to § 1334(a)(1)(B)—"requires a finding by the Lessor *of particularized harm* that it determines can only be feasibly averted by suspension of on-lease activities." *Id.* at Sec. 8 (emphasis added). No other provisions of the lease contemplate that BOEM may issue the kind of order here.

Thus, read in context, § 1337's suspension authority reaches only as broadly as the authorities in §§ 1341 and 1334(a)(1)(B). Neither provision provides BOEM with authority here. Section 1341 does not apply because the Secretary of Defense has not recommended suspension during a declaration of war or national emergency nor withdrawn areas of the OCS for national defense. *See* Supp. Compl., Ex. B. And BOEM made no effort to comply with its promise to provide notice before a national security suspension in the lease. *See* Compl, Ex. E at Addendum

C.

Section 1334(a)(1)(B) is also inapplicable. Under the lease provision mirroring the language of Section 1334, BOEM had to make a finding of "*particularized harm* that it determines can only be feasibly averted by suspension of on-lease activities." *Id.* at Sec. 8. And the harm must be "serious, irreparable, or immediate." 43 U.S.C. § 1334(a)(1)(B). The Second Stop Work Order only discussed alleged harm stemming from "offshore wind projects" as a whole, not Revolution Wind's specific project. *Cf. FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("Particularized" harm is "personal and individual," not "general."). And BOEM's conclusory assertions in the Second Stop Work Order cannot suffice to show that there is (1) "serious, irreparable, and immediate harm" that can (2) "only be feasibly averted by suspension of on-lease activities." Supp. Compl., Ex. B.

BOEM's suspension authority in 30 C.F.R. § 585.417(b) must be understood as limited to particularly situations contemplated by Congress in other parts of OCSLA. Because BOEM's Second Stop Work Order went further, it improperly exceeded its statutory authority.

## II.    REVOLUTION WIND FACES IRREPARABLE HARM ABSENT IMMEDIATE RELIEF

Revolution Wind is suffering immediate, irreparable harm from the Second Stop Work Order. Revolution Wind conservatively estimates that the Order is currently causing the Project losses of at least $1.44 million per day. Third Murphy Decl. ¶ 26. Indeed, during the First Stop Work Order Revolution Wind conservatively estimated losses of approximately $2.3 million per day, totaling approximately $76 million. However, after the First Stop Work Order was enjoined and construction resumed, Revolution Wind determined that actual losses were $105 million (i.e., approximately $3.2 million per day). *Id.* ¶ 29. The losses associated with the First Stop Work Order were higher than anticipated because of a variety of factors, including higher than

anticipated impact of winter adverse weather delays (e.g., more downtime than expected) and resulting logistical delays. *Id.* ¶ 29. If Revolution Wind does not obtain relief from the Second Stop Work Order by **January 12, 2026**, it will suffer additional certain, imminent, and irreparable harm because the Order increases Project costs and creates construction delays that once again threaten Project cancellation, posing an existential risk to Revolution Wind. *Id.* ¶¶ 3, 37.

A.    **Revolution Wind Faces Substantial Irreparable Harm From Construction Delays Due To The Order**

As discussed in the First Murphy Declaration, Revolution Wind has carefully sequenced its construction schedule to account for seasonal weather variations and a delay at one stage of construction often has knock-on effects. First Murphy Decl. ¶ 19; *see also* Third Murphy Decl. ¶ 13. Revolution Wind has contracted (and reserved for a limited time) specialized vessels necessary for the Project's construction that are believed to be in limited supply globally and this second unplanned delay threatens Revolution Wind's ability to timely complete the Project and to meet the earliest deadline in one of its PPAs that represents the majority of Project capacity. First Murphy Decl. ¶¶ 20-21; Third Murphy Decl. ¶¶ 13-22. Courts, including this one in enjoining the First Stop Work Order, have found irreparable harm from agency action, like the Second Stop Work Order, that threatens timely completion of the project to avoid missing contractual deadlines. *Columbia Gas Transmission Corp. v. An Easement to Construct, Operate, & Maintain a 24-inch Gas Transmission Pipeline Across Prop. in Greene Cnty*., No. 3:07CV00028, 2007 WL 2220530, at *4 (W.D. Va. July 31, 2007); *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 828-29 (4th Cir. 2004) (granting preliminary injunction to avoid missing contractual deadlines).

Specifically, if the Second Stop Work Order is not enjoined by **January 12, 2026**, there is a high risk Revolution Wind may not complete installation of the Project's remaining WTGs before the latest vessel availability date in Revolution Wind's contract for the Scylla, a highly-

specialized WTG installation vessel required to complete this critical work. Third Murphy Decl. ¶¶ 13-22. In particular, the Scylla is one of only three WTG installation vessels qualified and equipped to install offshore wind turbines in U.S. waters (with the other two contracted to other projects); any other wind turbine installation vessel would require special outfitting that would take 9 to 12 months to complete, making it unlikely that an alternate vessel could be used to meet the Rhode Island PPA's deadline. *Id.*¶ 19. Thus, if the Scylla does not install additional WTGs, there is a high risk that the Project may be unable to meet the deadline in Revolution Wind's Rhode Island PPA, which represents the majority of the Project's revenue, and may be unilaterally terminated after that deadline. *Id.*¶¶ 16, 20-22.

Revolution Wind's contract for the Scylla includes a latest vessel availability date of February 22, 2026. *Id.* ¶¶ 16-17, 19. Revolution Wind estimates that it will take approximately 41-58 days to install the Project's remaining seven WTGs, particularly given the additional time required during winter weather conditions. *Id.* ¶ 18; First Murphy Decl. ¶¶ 31-32. A WTG turbine that requires approximately three days to install in the summer could take five to ten days to install in the winter weather. Third Murphy Decl. ¶ 17. After February 22, 2026, the Scylla is no longer contractually available to the Project. *Id.* ¶¶ 16-17, 19. If there is further delay to turbine installation, there is no guarantee that the Project would be able to retain the Scylla (or another highly-specialized vessel capable of completing this work). *Id.* ¶ 19.

Installation of additional WTGs is critical for the Project's Rhode Island PPA, which requires the installation of 90% of its generating capacity (i.e., 59 WTGs) to achieve commercial operation. *Id.* ¶16, 20. The Rhode Island PPA requires a January 15, 2027 commercial operation date, and the PPA's requirement to reach 90% of generating capacity cannot be achieved if the Scylla departs the Project as it stands today. *Id.* ¶ 20. Absent relief from this Court, the Project is

at existential risk.

Additionally, before the Second Stop Work Order, Revolution Wind's forecasted commercial operation date was October 1, 2026, providing approximately 3.5 months (i.e., 106 days) between the commercial operation date and the deadline in the Rhode Island PPA. *Id.* ¶ 23. Aside from the vessel availability challenges (which the Project could not likely overcome), if the Second Stop Work Order remains in place for even 90 days (and even disregarding the extensions explicitly contemplated by the Order), this would likely delay the commercial operation date by at least 90 days from an estimate of October 1, 2026 until January 1, 2027, which would provide insufficient time between the Project's commercial operation date and the deadline in the Rhode Island PPA. *Id.* Unforeseen technical or weather circumstances can extend the time needed to reach the commercial operation date. *Id.* Based on prudent offshore project management experience, 14 days is insufficient to mitigate an existential risk to the Project. *Id.*

The Rhode Island PPA represents the majority of the Project's anticipated revenue. *Id.* ¶¶ 16, 21. Therefore, termination of the Rhode Island PPA would result in a loss of that revenue, which in turn poses an existential threat to Revolution Wind's business, reputational harm, and the loss of billions of dollars, which Revolution Wind is not certain it could recover. *Id.* ¶ 21.

For these reasons, absent an injunction, the Second Stop Work Order will prevent timely completion of the Project and will prevent meeting the Rhode Island PPA deadline, posing an existential risk to the Project, and thus to Revolution Wind. *Id.* ¶ 22. This harm is "likely in the absence of an injunction," *Winter*, 555 U.S. at 22 (emphasis removed), and is irreparable. *In re NTE Conn., LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022) (internal quotations and citation omitted).

**B.    The Second Stop Work Order Poses Existential Threats to Revolution Wind's Business**

The delay caused by BOEM's First Stop Work Order cost the Project approximately $105

million in losses, and the delay caused by BOEM's Second Stop Work Order is currently costing the Project estimated losses of at least $1.44 million per day or more. Third Murphy Decl. ¶¶ 26, 29. Compounding those financial losses is the fact that, if not enjoined, the Second Stop Work Order creates substantial risk of the loss of a majority of PPA capacity, risking cancellation which would create an existential threat to Revolution Wind's business.

Specifically, the Rhode Island PPA represents the majority of the Project's anticipated revenue, which Revolution Wind will lose if that PPA were terminated. *Id.* ¶ 21. If Revolution Wind is able to achieve the Commercial Operation Date under the remaining four PPAs (which only require the Project to be 80% of its planned capacity), the revenue from those PPAs represents a minority of the Project's anticipated revenue, and would not render the Project commercially viable on its own. *Id.* ¶¶ 20, 25. And that revenue would be further reduced, because the PPAs cap the amount of output that the buyers will purchase at the number of turbines that have been installed as of the Commercial Operation Date. *Id.* ¶ 32. So the Project will not be entitled to receive revenue under any of its PPAs for the life of the Project for any WTGs that have not been installed as of that date. *Id.*. The estimated impact of the revenue that Revolution Wind could lose from these WTGs under the existing PPAs is more than a billion over the life of the Project. *Id.* Finally, if the last seven WTGs are not installed, Revolution Wind will also lose approximately $370 million in capital expenditures already spent or committed for those WTGs. *Id.*

More fundamentally, both the potential termination of the Rhode Island PPA and the loss of revenue for the remaining WTGs risks Project cancellation. If the Project is cancelled, Revolution Wind anticipates breakaway costs in excess of $1 billion and the potential loss of its entire multi-billion investment for a total of more than $6 billion in losses (not including future anticipated revenues). Third Murphy Decl. ¶¶ 11, 33. That is exactly the kind of enterprise-level

harm to Revolution Wind courts in this Circuit have recognized as irreparable.

"[F]inancial harm can 'constitute irreparable harm . . . where the loss threatens the very existence of the movant's business.'"  *S. Educ. Found. v. U.S. Dep't of Educ.*, No. CV- 25-1079, 2025 WL 1453047, at *14 (D.D.C. May 21, 2025) (citation omitted) (cleaned up); *see also Nat'l Lifeline Ass'n v. FCC*, No. 18-1026, 2018 WL 4154794, at *1 (D.C. Cir. Aug. 10, 2018) (finding irreparable harm absent injunctive relief where implementation of [an agency's] Order [would] result in substantial, unrecoverable losses in revenue that [might] indeed threaten the future existence of [petitioners'] businesses.").  This Court has already found that "if Revolution Wind cannot meet benchmarked deadlines, the entire enterprise could collapse" and that if the contractual agreements in the PPAs are not met, there is a "right to terminate the planned power agreements with the company", and that these considerations unquestionably create irreparable harm to Revolution Wind.  Tr. at 43:8-15.  While the specific vessels and PPAs that are at risk have changed since September, these same considerations still hold true now.

**C.    Revolution Wind Faces Substantial Irreparable Reputational Harm**

The Second Stop Work Order will harm Revolution Wind's reputation which constitutes irreparable harm; thus, this "[i]njury to reputation can . . . support the issuance of an injunction." *See Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 103 (D.D.C. 2017), *aff'd*, 928 F.3d 1102 (D.C. Cir. 2019).  Cancellation of the Project would in turn mean that Revolution Wind is in default of its PPAs with Connecticut and Rhode Island.  First Murphy Decl. ¶¶ 26-28; *see* Third Murphy Decl. ¶¶ 16, 20, 22.  Where the government's action "jeopardize[s]" the plaintiff's "binding contracts," the plaintiff not only loses economic value but also "good will."  *Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 76 (D.D.C. 2010).  Reputational damage is an irreparable injury. *Wash. Teachers' Union, Loc. No. 6 v. Am. Fed'n of Teachers*, 751 F. Supp. 2d 38, 56 (D.D.C. 2010).

### III.    EQUITABLE FACTORS STRONGLY FAVOR IMMEDIATE RELIEF

The balance of the equities and the public interest favor immediate relief because, as Defendants have acknowledged, the public has an interest in agencies following the law and the Project provides benefits to the public.  Conversely, neither the public nor Defendants will suffer harm if this Court preserves the status quo by enjoining the unlawful Second Stop Work Order.

### A.    Neither the Public Nor Defendants Will Suffer Harm From Preliminary Injunctive Relief

Neither the public nor Defendants will suffer harm if this Court preserves the status quo by granting Revolution Wind relief.  After all, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).  That is particularly true here, where Defendants have not articulated any specific harm from allowing Project construction to proceed and have not provided an evidentiary basis.  *See supra* Section I.A. Moreover, no narrower alternatives were raised, to the extent that Defendants were able to identify any specific threat of harm from construction of Revolution Wind. *See supra* Section II.A.

### B.    The Public Interest Strongly Favors An Injunction

There is, however, "a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'"  *Newby*, 838 F.3d at 12 (citation omitted); *see also Cent. United Life, Inc. v. Burwell*, 128 F. Supp. 3d 321, 330 (D.D.C. 2015). This is especially so where the public also has a specific interest in the certainty and reliability of Defendants' permitting and approvals process. *See, e.g.*, *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 43 (D.D.C. 2013).  Indeed, Defendants admitted the lawfulness of the procedures and approvals for Revolution Wind, stating "[w]here, as here, a developer has complied with agency rules and satisfied federal statutory requirements, it should be able to rely on its

permits, as it may need to make business and financial decisions in furtherance of completing the authorized activity." *Green Oceans*, Dkt. 38 at 43. Allowing Defendants to halt this Project based on a general conclusory statement of "impacts to national security from offshore wind projects" two years after onshore construction began, undermines the public's strong interest in the reliability of federal agency processes and approvals.

Moreover, denying an injunction here would: (1) deprive the public of significant economic benefits from the Project; (2) present a risk to New England grid reliability, potentially depriving Rhode Island and Connecticut of approximately 704 MW of needed electricity when the Project was on schedule to achieve first power as early as January 2026; and (3) harm public health.

Denying an injunction would have significant negative effects on jobs. Over 2,000 workers have been involved in the construction of the Project. First Gearon Decl. ¶ 46. As of September 2025, approximately two million labor hours have been spent on the construction of this Project, including more than 800 local union labor full-time equivalents, not to mention Revolution Wind's contribution to more than 200 additional union labor full-time equivalents supporting the redevelopment of the State Pier in New London, Connecticut. *Id.* It is estimated that the Project will generate 236 full-time equivalent jobs annually during the Project's operations and maintenance work. *Id.*; *see also* Decl. of Comm'r Katherine S. Dykes ¶ 19, *State of New York v. Trump*, No. 25-cv-11221, Dkt. 211 (D. Mass. Aug. 28, 2025) ("Dykes Decl.") (discussing the jobs the Project supports in Connecticut and Rhode Island alone); *see also* Decl. of Acting Comm'r Christopher Kearns ¶ 12, *State of New York v. Trump*, No. 25-cv-11221, Dkt. 212 (D. Mass Aug. 28, 2025) ("Kearns Decl.") (discussing the Project's economic impact on the state of Rhode Island). Since the Second Stop Work Order, approximately 200 workers, from both offshore vessels put on standby and onshore port facilities, have been idled. Third Gearon Decl. ¶ 7. If

the Project is cancelled, many if not all of these jobs will be lost.  First Gearon Decl. ¶ 46; Third

Gearon Decl. ¶ 7.  The public interest favors maintaining those economic opportunities.  *Sierra*

*Club*, 990 F. Supp. 2d at 42 (strong public interest in jobs and economic growth from project).

The public will also benefit from the rents, operating fees, and state taxes Revolution Wind

will pay during construction and operations.  Over the lifetime of the Project, Revolution Wind

anticipates it will pay $178 million in rents and operating fees, as well as generate hundreds of

millions in state tax revenues.  First Murphy Decl. ¶¶ 38-39.  It is in the public's interest to collect

these revenues.  *See Nat. Res. Def. Council v. Kempthorne*, 525 F. Supp. 2d 115, 127 (D.D.C.

2007) (project that would "generate millions of dollars in revenue" is in the public interest);

*Columbia Gas Transmission*, *LLC v. 84.53 Acres of Land, More or Less, In Calhoun, Marshall,*

*Ritchie, Tyler, & Wetzel Ctys., W. Virginia*, 310 F. Supp. 3d 685, 696 (N.D.W. Va. 2018).

Furthermore, delay of the Project will deprive ratepayers in New England of electricity cost

savings.  For example, the Commissioner of Connecticut's Department of Energy and

Environmental Protection has estimated that the Project is expected to result in cost savings to

Connecticut and New England ratepayers "[b]y providing a new source of low-marginal cost

power in New England[,]" further "caus[ing] wholesale energy and capacity market costs in ISO

New England to be lower."  Dykes Decl. ¶ 17.  "Regionally, these wholesale market benefits from

Revolution Wind are expected to be in the hundreds of millions of dollars each year, of which

approximately 25% of the benefits will accrue to Connecticut ratepayers, based on [the] state's

share of total regional load."  *Id.*  It is in the public's interest to receive these significant savings.

*In re NTE Conn.*, 26 F.4th at 992 (granting a stay and finding that there would be harm in "delaying

[a] years-long electricity infrastructure project that could benefit consumers in the region through

more efficient (*i.e.*, less expensive) electricity.").

The New England grid operator responded to the Second Stop Work Order and a similar order for the Vineyard Wind project, noting the projects are "included in [its] near-term and future modeling and analyses to ensure adequate electricity for New England." Third Gearon Decl. ¶ 8. It explained that the projects "are particularly important to system reliability in the winter when offshore wind output is highest and other forms of fuel supply are constrained." *Id*. And it noted that "canceling or delaying [the Projects] will increase costs and risks to reliability in our region." *Id*. It also explained that "delays of new generating resources also will adversely affect New England's economy and industrial growth, including potential future data centers." *Id*.

Rhode Island's Acting Energy Commissioner at Rhode Island's Office of Energy Resources has also testified that losing the Project's "load would negatively impact reliability in Rhode Island and throughout New England." Kearns Decl. ¶ 12. And, the Commissioner of Connecticut's Department of Energy and Environmental Protection has testified that "Connecticut specifically is counting on [its] share of Revolution Wind to meet 5% of [the] state's electric distribution company load once the project comes online." Dykes Decl. ¶ 15. Both Connecticut and Rhode Island officials have explained that offshore wind is particularly important in the winter, when New England's energy grid faces its greatest reliability challenges. *Id*. ¶ 12; Kearns Decl. 13. The public interest favors reducing risk to the region's grid reliability. *Kempthorne*, 525 F. Supp. 2d at 127 ("[D]evelopment of domestic energy resources is of paramount public interest and will be harmed (at least to some extent) if that development is delayed."). Canceling or delaying the Project would harm state energy goals and deprive the public of those benefits. *See, e.g.*, *W. Watersheds Project v. Salazar*, 692 F.3d 921, 923 (9th Cir. 2012).

Indeed, in defending the Project's federal approvals in ongoing litigation in this Court, Defendants have conceded, "[e]njoining the agency authorizations associated with the Revolution

Project would also hinder the public interest, which will be served by the Revolution Project's capacity to provide approximately 704 MW of reliable and needed energy to the Connecticut and Rhode Island power grids[.]" *Green Oceans*, Dkt. 38 at 2. And Defendants argued that enjoining Project construction "would pose significant harm to the public's interest in the certainty and reliability of Defendants' permitting and approvals process." *Id.* at 43.

Finally, the Project will also have significant criteria air-pollutant emission-reduction benefits which will result in significant health benefits. First Gearon Decl. ¶ 44. For example, the Project is expected to result in estimated avoided emissions of between 599 to 749 tons of nitrogen oxides per year and 318 to 398 tons of sulfur oxides per year, as a result of displacing fossil fuel generation. *Id.* The Rhode Island Office of Energy Resources has determined that the Project will result in public health benefits. *Id.* The public has a clear interest in those health benefits. *See Env't Democracy Project v. Green Sage Mgmt., LLC*, No. 22-CV-03970, 2022 WL 4596616, at *4 (N.D. Cal. Aug. 23, 2022) (granting preliminary injunction that "implicate[d] the public's interest in protecting the environment and public health").[10]

## CONCLUSION

For the foregoing reasons, this Court should grant Revolution Wind's motion for a stay of the Second Stop Work Order and a preliminary injunction that bars Defendants from enforcing the Second Stop Work Order.

Dated: January 2, 2026                    Respectfully submitted,

---

[10] Federal Rule of Civil Procedure 65(c) "vest[s] broad discretion in the district court" as to whether to order a plaintiff to provide a security to pay the costs and damages of a party found to have been wrongly enjoined. *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999). A court can "dispense with any security requirement whatsoever where the restraint will do the defendant no material damage." *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980) (internal quotation marks and citation omitted). Defendants will not suffer any material damages from the Court restoring the status quo and allowing Revolution Wind to proceed under its existing federal approvals. The Court should not order a bond.

By /s/  Janice M. Schneider

Janice M. Schneider (D.C. Bar No. 472037)
Stacey L. VanBelleghem (D.C. Bar No. 988144)
Roman Martinez (D.C. Bar No. 1001100)
Devin. M. O'Connor (D.C. Bar No. 1015632)
Rachael L. Westmoreland (D.C. Bar No. 90034032)
LATHAM & WATKINS LLP
555 11th Street NW, Suite 1000
Washington, D.C. 20004
Tel:  (202) 637-2200
Fax:  (202) 637-2201
Email: janice.schneider@lw.com
        stacey.vanbelleghem@lw.com
        roman.martinez@lw.com
        devin.o'connor@lw.com
        rachael.westmoreland@lw.com

*Counsel for Plaintiff Revolution Wind, LLC*