# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| REVOLUTION WIND, LLC,<br><br>       *Plaintiff*,<br><br>  v.<br><br>DOUG BURGUM, in his official capacity as<br>Secretary of the U.S. Department of the Interior;<br><br>UNITED STATES DEPARTMENT OF THE<br>INTERIOR;<br><br>MATTHEW GIACONA, in his official capacity<br>as Acting Director of the Bureau of Ocean Energy<br>Management;<br><br>BUREAU OF OCEAN ENERGY<br>MANAGEMENT;<br><br>KENNETH STEVENS, in his official capacity as<br>Principal Deputy Director Exercising the<br>Delegated Authorities of the Director of the<br>Bureau of Safety and Environmental Enforcement;<br><br>BUREAU OF SAFETY AND<br>ENVIRONMENTAL ENFORCEMENT,<br><br>       *Defendants*,<br>and<br><br>GREEN OCEANS,<br><br>       *Defendant-Intervenor.* | Case No.: 1:25-cv-02999-RCL<br><br><u>Expedited Hearing Requested</u> |

**THIRD DECLARATION OF PAUL MURPHY IN SUPPORT OF PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION AND STAY PENDING REVIEW**

Pursuant to 28 U.S.C. § 1746(1), I, Paul Murphy, declare as follows:

1.     This is my third declaration submitted in this matter.  My role at Orsted North America Inc. ("Ørsted") as the Senior Engineering, Procurement, and Construction ("EPC") Director for the commercial-scale Revolution Wind Farm and Revolution Wind Export Cable (together, the "Project"), my relevant background and experience, an overview of the Project, and my familiarity with the Project's construction status, history, and contracts are described in my first Declaration in Support of Plaintiff's Motion for a Preliminary Injunction and Stay Pending Review of Department of the Interior Bureau of Ocean Energy Management's ("BOEM") August 22, 2025 Order "to halt all ongoing activities related to the Revolution Wind Project on the outer continental shelf (OCS)" (the "First Stop Work Order").  Dkt. 9-6 ¶¶ 1-4, 7-16 (Sept. 5, 2025) ("First Murphy Declaration").  Additional detail regarding Revolution Wind, LLC's ("Revolution Wind") interests and investments in the Project, is provided in my Rebuttal Declaration of Paul Murphy in Support of Plaintiff's Motion for a Preliminary Injunction and Stay Pending Review. Dkt. 31-2 (Sept. 18, 2025) ("Second Murphy Declaration").

2.     As further detailed in the First Murphy Declaration, in my capacity as Ørsted's Senior EPC Director, I am and have been involved in and aware of numerous aspects of the Project, including: full project engineering, procurement and construction scopes, master schedule, capital expenditures ("CAPEX"), and Quality, Health, Safety and Environment considerations.  First Murphy Declaration ¶¶ 2, 4.

3.     I have reviewed the December 22, 2025, order that BOEM's Acting Director issued to Revolution Wind "to suspend all ongoing related activities on the Revolution Wind Project on the Outer Continental Shelf for the next 90 days" except for "any activities that are necessary to respond to emergency situations and/or to prevent impacts to health, safety, and the environment over the next 90 days and during any subsequent extensions" ("Second Stop Work Order").  I am

personally familiar with the Project's construction history and status as well as the ongoing impacts of the Second Stop Work Order and future harm from the Second Stop Work Order if not enjoined or stayed.  Based upon my experience and familiarity with the Project, judicial relief is required by January 12, 2026 to avoid significant Project delays, which could ultimately result in cancellation of the Revolution Wind Project.  In particular, judicial relief is needed as soon as possible (1) to prevent the loss of a highly-specialized vessel that is required to complete necessary construction but has an imminent latest vessel availability date; (2) to in turn allow that vessel to complete its work on schedule for Revolution Wind to meet the commercial operations deadline in Revolution Wind's Rhode Island power purchase agreement ("PPA"), which represents the majority of Project capacity, and thereby avoid termination of the PPA;  (3) to prevent other work delays that separately risk that ability to meet the commercial operations date; and (4) to prevent the increase of costs that could derail the Project.  Each of these factors collectively and separately constitute irreparable harm that threatens the viability of the Project and thus Revolution Wind as an enterprise.

4.     I execute this Declaration in support of Revolution Wind's Motion for a Preliminary Injunction and Stay Pending Review based on my personal knowledge of the matters referred to herein and, if called upon to do so, could and would testify truthfully thereto.  I am over 18 years of age and competent to testify about the matters set forth herein.

A.     **Current Construction Status**

5.     The Project includes onshore and offshore construction activities, and construction of the Project is approximately 87% complete.  To date: all of the Project's 67 monopile foundations[1] are installed on the OCS, including monopiles and secondary steel, and pile-driving

---

[1] There are 65 monopiles for the wind turbine generators and one for each offshore substation, for a total of 67.

is complete; the two offshore substations are fully installed; the utility export cables (two cables, each approximately 39 miles for a total of 78 miles) from the shore landing in Quonset, Rhode Island to the northern offshore substation are fully installed; the interlink export cable (approximately eight miles) that connects the two offshore substations is fully installed; 58 of the Project's 65 wind turbine generators ("WTGs") are fully installed; and the onshore substation is approximately 95% complete, with equipment installed and commissioning and testing activities underway. Furthermore, the Project's array cables have been laid at all 65 of the wind turbine sites, and nearly 65% of the installed array cable ends have been terminated[2] at the relevant WTGs.

6.      Construction of the Project has been underway for more than two years. Before the Second Stop Work Order was issued, the Project had made significant progress, and both onshore and offshore construction activities were ongoing. Onshore activities began in August 2023 and have included work related to the Project's onshore transmission cable and construction of a new interconnection station and substation.[3] Offshore construction began in January 2024 with seabed preparation work. Monopile foundation installation for the Project's 65 WTGs and two offshore substations began in May 2024 and concluded in August 2025. The first WTG was installed well over a year ago, in September 2024. At the time the Second Stop Work Order was issued, the remainder of the WTGs were forecasted to be installed between February 1 and February 18, 2026. This WTG installation and other necessary Project construction has already been extensively

---

[2] Termination occurs when the array cables are connected to the switchgears in each wind turbine generator, which provides a physical link to allow power to flow between the array cable and the respective wind turbine generator.

[3] Revolution Wind, Construction Updates: Week of August 28, 2023, https://orstedcdn.azureedge.net/-/media/www/docs/corp/us/revolution-wind/rev-windweekly-status-report8282023.pdf?rev=e9c40846d2814a8bbd1bac5f09c99788&hash=3C6D1E22575E7049A7E57F17CA9554D2.

delayed due to the First Stop Work Order that this Court enjoined on September 22, 2025. In particular, prior to the First Stop Work Order, WTG installation had been forecasted to be complete by early December 2025. The First Stop Work Order prevented critical work from occurring between August 22 and September 22, 2025, pushing the remainder of WTG installation into the winter months when worsening weather in the North Atlantic where the Project is located makes WTG installation far more challenging and difficult, and therefore more time-consuming. The weather impacts on Project construction are further discussed in my First Murphy Declaration. First Murphy Declaration ¶¶ 21, 31-32, 34.

7.    Prior to the Second Stop Work Order, Revolution Wind had been forecasted to complete offshore physical installation, including (but not limited to) the remaining WTGs, by mid-February 2026 using key installation vessels, described below, that are currently under contract. This is already a multiple month delay from the schedule contemplated before the First Stop Work Order.

8.    Prior to the Second Stop Work Order, Revolution Wind had also been forecasted to achieve first power as early as January 2026, meaning that Revolution Wind had been expected to begin generating power from a subset of the Project's WTGs, and sending power from those WTGs to the grid in coordination with the New England Independent System Operator (even before the entirety of the Project is fully commissioned).

9.    Further work scheduled in the following months would include: final commissioning of the Project's offshore substations; termination of all remaining installed inter-array cable sections; testing of array cables and fiber optics cables embedded in the array cables; establishing supervisory control and data acquisition ("SCADA") networks to enable Revolution Wind to manage, monitor, and control the Project's processes, machines, and infrastructure; hot

commissioning the WTGs, which involves conducting all tests required to establish a live connection so that the WTGs can be certified; and testing the Wind Farm itself.  This work is anticipated to take approximately 9 months for all 65 WTGs.

10.    Consistent with the terms of the Second Stop Work Order, all work on the OCS related to the Project has been halted except for activities that are necessary to prevent impacts to health, safety, and the environment.

11.    Revolution Wind has already spent or committed approximately $5.4 billion to date to plan, permit, develop, design, manufacture, and construct this Project.  If the Project is cancelled, Revolution Wind anticipates that it would also incur more than $1 billion[4] in breakaway costs, for a total of more than $6 billion in costs to the Project.  Additionally, Revolution Wind would forgo billions of dollars of revenue under its Power Purchase Agreements[5] ("PPAs") over the lifetime of the Project.

---

[4] Revolution Wind estimates that breakaway costs will include $734 million in capital expenditures and additional hundreds of millions of dollars in decommissioning costs.

[5] If the Court wishes to view the public redacted versions of the Connecticut PPAs, they are available here:

- 2018 Connecticut Light & Power PPA:
  https://www.dpuc.state.ct.us/DOCKCURR.NSF/5f3a36a996853741852588c600420c24/6159c983671d32f8852583320051344f/$FILE/PUBLIC%20Exhibit%20C-1%20REDACTED-%20DWW%20Rev%20I%20LLC.pdf
- 2018 United Illuminating PPA:
  https://www.dpuc.state.ct.us/DOCKCURR.NSF/5f3a36a996853741852588c600420c24/c4e1af03d35af05785258332005139e7/$FILE/UI%20Exhibit%20C-1%20(redacted).pdf
- 2019 Connecticut Light & Power PPA:
  https://www.dpuc.state.ct.us/DOCKCURR.NSF/5f3a36a996853741852588c600420c24/d7f16ef07874cf67852584bd0053bec2/$FILE/98574910.pdf/PUBLIC%20Exhibit%20C-4%20Amended%20Revolution%20Wind%20Expansion%20(redacted).pdf
- 2019 United Illuminating PPA:
  https://www.dpuc.state.ct.us/DOCKCURR.NSF/5f3a36a996853741852588c600420c24/255f8514de2c65b4852584ba00670578/$FILE/2019-11-22%20UI%20Exhibit%20C-04%20REDACTED%20%2318-05-04.pdf

**B.    Threats to Project Feasibility if the Second Stop Work Order is Not Stayed or Enjoined**

12.    As described below, Revolution Wind is injured by its inability to complete Project construction.  Revolution Wind has no business other than the Project; and if Revolution Wind is prevented from completing Project construction, Revolution Wind will be unable to fulfill its sole and exclusive corporate function of developing, constructing, and operating the Project. Revolution Wind's inability to complete Project construction is directly caused by the Second Stop Work Order, which prevents Revolution Wind from completing construction and finalizing the Project, causing financial and contractual burdens, creating delay in Revolution Wind's development of the Project, and depending on the length of delay, potentially jeopardizing the Project entirely.  The Second Stop Work Order constitutes an existential threat to both the Project and Revolution Wind as a company. Accordingly, absent immediate judicial relief, there are several ways that BOEM's Second Stop Work Order will result in immediate and imminent, irreparable harm that threatens the viability of Revolution Wind's business.

**1.    The Second Stop Work Order Will Result In the Loss of Vessels Needed for Construction and Creates Cost Delays that Threaten Project Cancellation If It Is Not Stayed**

13.    Revolution Wind has carefully sequenced its construction schedules to ensure efficient usage of scarce resources, such as specialized transport and installation vessels, for the Project and to account for seasonal weather variations.  A delay at one stage of construction can have knock-on effects.  For example, the First Stop Work Order has seriously delayed the Project, forcing Revolution Wind to continue necessary construction activities during the winter months

---

The fifth PPA (the 2018 Rhode Island PPA) is available in full, unredacted form on the Rhode Island Public Utilities Commission website, available at: https://ripuc.ri.gov/sites/g/files/xkgbur841/files/eventsactions/docket/4929-NGrid-PPA-NG-1.pdf.

when weather worsens in the North Atlantic where the Project is located, and those activities accordingly take longer.

14.     Construction of large-scale offshore wind projects requires the use of specialized vessels that are in limited supply and in high demand, with limited or no availability to work beyond the contracted reservation dates.  Given this extreme scarcity, these vessels are normally scheduled years in advance.  Here, there are several primary vessels that are needed to transport and install the Project's remaining offshore components: the Cadeler Wind Scylla (the "Scylla")[6], a specialized vessel designed to install offshore wind turbines; the Crowley 455-8[7], a barge to carry WTG components from New London, Connecticut, to the Project site; two tug boats to transport that barge; and the Harvey SUB-SEA[8], a support vessel used to support initial commissioning of WTGs.

15.     Critically, Revolution Wind's contracts for Project construction vessels include latest vessel availability date provisions.  Under these provisions, if Project work is not complete by the specified latest vessel availability date, the contracted vessels are scheduled to depart.  As a result, if there are additional schedule delays, the vessels are scheduled to depart the site (for other contractually-scheduled commitments) without completing work.  If Revolution Wind cannot use the vessels because of the Second Stop Work Order, Revolution Wind will nonetheless be required to pay for the vessels' time spent idling due to the Second Stop Work Order.  In addition, Revolution Wind would need to try and secure additional vessel capacity to complete the unfinished works, which would come with significant cost and schedule uncertainty (because, as

---

[6] https://www.cadeler.com/vessels/wind-scylla.
[7] The following webpage shows the "feeding" transportation solution used by the Crowley 455-8 for South Fork Wind, which is also being used for the Revolution Wind Project: https://www.crowley.com/lp/feedering-solution/.
[8] https://harveygulf.com/wp-content/uploads/2024/12/Harvey-Sub-Sea-Rev-0.pdf.

described above, specialized vessels are in limited supply and often are contracted years in advance) and it is unknown whether or when the required vessels could be obtained. And, even if replacement vessels could be obtained, their timing is uncertain and additional costs would be involved.

16.     This second unplanned delay threatens Revolution Wind's ability to timely complete the Project to meet the deadline in one of its PPAs. In particular, if the Second Stop Work Order is not enjoined by January 12, 2026, there is a significant risk that Revolution Wind will not be able to install the Project's seven remaining WTGs before the latest vessel availability date (February 22, 2026) in Revolution Wind's contract for the Scylla, a highly-specialized WTG installation vessel that is necessary to complete this critical work. If the Scylla cannot continue WTG installation, there is in turn a significant risk that the Project will not be able to meet the commercial operation deadline in its Rhode Island PPA, which corresponds to approximately 400 MW (and thereby the majority of the Project's capacity and its anticipated revenue), and which may be unilaterally terminated by the utility under the agreement's terms. (The Project must have completed 90% of its proposed capacity by the commercial operations deadline in the Rhode Island PPA, as well as complete performance testing and be capable of regular commercial operations among other requirements).

17.     Revolution Wind is already suffering irreparable harm from the issuance of the Second Stop Work Order because it is already possible that Revolution Wind will be unable to complete this work before the Scylla's latest vessel availability date on February 22, 2026. As discussed in my First Murphy Declaration, completing construction tasks during worsening winter weather conditions requires additional time and involves greater risks. First Murphy Decl. ¶¶ 31-32. Thus, a WTG that typically requires approximately three days to install in the summer could

take five to ten days to install in the winter due to worsening weather. *Id.* ¶ 31.

18.    Because of the First Stop Work Order, the Project's WTG installation has been pushed into the winter months, and seven WTGs remain to be installed. The 90-day period cited in the Second Stop Work Order pushed WTG installation beyond the February 22nd latest vessel availability date. In addition, based on experience, Revolution Wind estimates that it will take 41 to 58 days to install the remaining seven WTGs, particularly given the additional time required during more challenging winter weather conditions as well as other technical challenges. Specifically, Revolution Wind estimates that this installation will require: (a) approximately 20 to 28 days (i.e., five to seven days per turbine) to install four of the remaining turbines and (b) approximately 21 to 30 days (i.e., seven to 10 days per turbine) to install three of the remaining turbines, which present additional technical difficulties for installation. The lower end of my estimate assumes favorable weather conditions. The bottom line is that every day of delay matters to our ability to timely complete the work.

19.    Even under the best of circumstances, as a result of the delay stemming from the First Stop Work Order, WTG installation work that was forecast to conclude by early December 2025 had been pushed to between February 1 and February 18, 2026, leaving the Project only approximately 4 to 21 days of "float time" for any delays before the Scylla is no longer contractually available to the Project. The issuance of the Second Stop Work Order and the work stoppage required to comply with this Order has now already eliminated the "float time" included in the Project's forecasted schedule. If there is a further construction delay, there is no guarantee that Revolution Wind would be able to retain the Scylla (or another highly-specialized vessel capable of completing this work). In addition to the Scylla, there are currently only two other vessels in operation that are qualified and equipped to install offshore wind turbines in U.S. waters

(and those are contracted to other projects). Any other wind turbine installation vessels require special outfitting (e.g., mooring and sea-fastening) in order to install turbines in the United States. This special outfitting would take 9 to 12 months (including engineering, fabrication, construction, commissioning, and transit to the Revolution Wind site for all of which Revolution Wind would have to pay). It is therefore highly unlikely that an alternate wind turbine installation vessel could be used to meet the January 15, 2027 deadline.

20.      Installation of the remaining WTGs is critical for the Project's Rhode Island PPA, which requires installation of 90% of the Project's generating capacity (equivalent to at least 59 of 65 WTGs) in order for the Project to achieve its commercial operation date.[9] This will not be achieved if the Second Stop Work Order remains in place and the Scylla departs the Project without installing at least one additional WTG. Furthermore, even if the Stop Work Order was lifted after the Scylla's latest vessel availability date of February 22, 2026, there is a high risk that Revolution Wind would not be able to secure a vessel to complete the installation by January 15, 2027, which is the commercial operation date deadline in the Rhode Island PPA, and after which the utility will have a unilateral termination right.[10]

21.      The Rhode Island PPA represents the majority of the Project's anticipated revenue. Thus, termination of the Rhode Island PPA would result in an existential threat to Revolution

---

[9] As reflected in this 90% requirement, Revolution Wind can achieve its commercial operation date under all five PPAs by installing fewer than 65 WTGs. But, as further explained in paragraph 32, below, if Revolution Wind elects to do so, it will be permanently limited to that reduced capacity under the PPAs (i.e., the remaining seven WTGs will never be able to be added under the PPAs), resulting in a substantial loss of previously-anticipated revenue, as well as a substantial reduction in the amount of power delivered to the States of Rhode Island and Connecticut under the PPAs (the Connecticut PPAs allow the Project to achieve the commercial operation date at 80% of Project capacity, but have the same permanent reduction mechanism and would come at great cost to the Project).

[10] Previously, two of the Connecticut PPAs had earlier deadlines, but the utilities have extended these agreements.

Wind's business, reputational harm, and the loss of billions of dollars that Revolution Wind is unlikely to recover.

22.     Accordingly, if the Second Stop Work Order is not enjoined by January 12, 2026, there is a risk that the Project cannot be completed before the deadline in the Project's Rhode Island PPA.  Revolution Wind has no mechanism for extending that deadline, and the PPA counterparty has a unilateral right to terminate, significantly threatening the financial viability of the entire Project and posing an existential risk to the Project, and thus to Revolution Wind.

**2.     The Project's Construction Schedule is Constrained By the PPAs, Which Could Be Terminated if the Project is Delayed**

23.     There are additional reasons that it is likely that the Rhode Island PPA could be terminated if the Second Stop Work Order is not enjoined.  Before the Second Stop Work Order was issued, Revolution Wind's forecasted commercial operation date had been October 1, 2026, providing a flexibility of approximately 3.5 months (106 days) of "float" between the Project's commercial operation date and the January 15, 2027 deadline in the Rhode Island PPA.  Aside from the vessel availability challenges (which the Project could not likely overcome), if the Second Stop Work Order remains in place even for its initial term of 90 days (and disregarding the possibility of extensions that are explicitly contemplated by the Second Stop Work Order itself), this alone would likely delay the Project's commercial operation date by 90 days from October 1, 2026 until January 1, 2027, leaving only 14 days, which is insufficient time between the Project's commercial operation date and the Rhode Island PPA's deadline.  Many unforeseen technical issues or weather-related delays can increase the amount of time required for installation beyond what had been anticipated or otherwise increase the amount of time the Project needs to reach its commercial operation date and require more time than anticipated to install.  Thus, based on my prudent offshore project management experience, 14 days is not sufficient "float" to manage any

unexpected occurrences given the work that remains to be done and to mitigate the existential risk to the Project.

24.     If the delays caused by the Second Stop Work Order were to result in Revolution Wind missing the Rhode Island PPA's deadline and that PPA were to be terminated, it would create enterprise-level threats for Revolution Wind, the loss of billions of dollars in foregone revenue, forfeiture of tens of millions of required credit support for the Rhode Island PPA, and reputational harm.

25.     Furthermore, while the Connecticut PPAs would theoretically not require any additional WTGs to be installed in order for Revolution Wind to achieve commercial operations, reliance on these PPAs alone would account for the minority of the Project's overall capacity.  It would be financially unviable for Revolution Wind to only receive PPA revenue associated with a fraction of the Project's output creating a subscale project from a cost perspective (as explained in paragraph 32, below).

### 3.     The Second Stop Work Order Increases Costs that Could Derail the Project

26.     Revolution Wind has entered into contracts for the manufacture, transport, and installation of Project components during specific times of the year and has taken other steps in reliance on its approvals.  Revolution Wind is conservatively[11] estimated to be losing at least $1.44 million per day, or greater than $10.1 million per week, on installation and manufacturing contracts, including costs in day rates for nearly 11 idle vessels, standby costs and storage and

---

[11] This estimate contains zero contingency for unforeseen and unknown costs (such as additional demobilization, maintenance and remobilization costs for vessels that have been unexpectedly stood down).  If the Project becomes liable for additional vessels' day rates, the Project's daily burn rate could increase substantially.  As noted below, this methodology proved too conservative when estimating costs from the First Stop Work Order.

other costs including internal resource costs and equipment without any certainty that construction work will be permitted to resume.

27.    As a result of the Second Stop Work Order, Revolution Wind will also have to overcome significant logistical constraints (and incur additional costs) and pay to store Project components that may not be installed during the duration of the Second Stop Work Order, including WTG components such as tower sections, blades, and nacelles which are currently stored at the New London State Pier in Connecticut.  In particular, Revolution Wind will be required to spend more than $60,000 per day to continue to store the Project's WTGs at this facility.

28.    Attached as Exhibit 1, is a true and correct copy of the summary materials outlining costs associated with an idle workforce and vessels as a result of the Second Stop Work Order that I reviewed before executing this Declaration.

29.    These costs are expected to increase substantially the longer the Second Stop Work Order remains in place, significantly increasing if replacement vessels are required—assuming Revolution Wind is able to secure these replacement vessels—due to high costs associated with these replacement vessels.  For example, during the First Stop Work Order Revolution Wind conservatively estimated losses of approximately $76 million (i.e., approximately $2.3 million per day).  First Murphy Declaration ¶¶ 18, 21, 25; Second Murphy Declaration ¶ 6.  After the First Stop Work Order was enjoined and construction resumed, Revolution Wind determined that actual losses were $105 million (i.e., approximately $3.2 million per day).  Attached as Exhibit 2, is a true and correct copy of the summary materials outlining costs associated with the final capital expenditure impact assessment for the First Stop Work Order as well as information reconciling the difference between Revolution Wind's initial estimates and the final costs.  I reviewed Exhibit 2 before executing this Declaration.  As depicted in Exhibit 2, the losses associated with the First

14

Stop Work Order were higher than anticipated because of a variety of factors, including higher than anticipated impact of winter adverse weather delays (e.g., more downtime than expected) and resulting logistical delays.

30.     The Second Stop Work Order has also led to delays and idling with respect to onshore activities that support offshore construction on the OCS.  Construction of the offshore components of the Project requires a significant amount of support from onshore facilities and workers.  The Project's WTG marshalling facilities (where Project components are received, prepared for installation, and loaded onto barge and tug vessels to be transported for installation) are located at New London State Pier in Connecticut, a facility in which the Connecticut Port Authority, the State of Connecticut, and Revolution Wind's parent companies have invested hundreds of millions of dollars in order to create the only active offshore wind marshalling terminal in the northeast United States with unobstructed access to the ocean.[12]  Here, predominantly union workers were preparing WTGs for offshore installation.  As discussed above, *supra* ¶ 27, work at the New London State Pier is currently idle due to the Second Stop Work Order, with no loadout possible.

31.     Any additional delay will only increase costs, while the Project would be unable to generate revenue to offset those additional costs including the revenue it expected to receive after achieving first power.  In particular, a 90-day delay could cost Revolution Wind tens of millions of dollars in delayed revenues during this period, making it more difficult for Revolution Wind to offset the additional costs associated with yet another Stop Work Order.

---

[12] Connecticut Port Authority, State Pier Infrastructure Improvements Project, available at https://statepiernewlondon.com/.

32.     Furthermore, if the Second Stop Work Order is not enjoined or the delay caused by the Order prevents Revolution Wind from installing its remaining 7 WTGs, but the Project is otherwise allowed to operate and supply power to the grid, Revolution Wind could lose over a billion dollars in revenue over the lifetime of the Project as well as millions of dollars in capital expenditures already spent or committed for these WTGs.  In particular, under the Project's PPAs, the Project's operating capacity will be limited to the number of WTGs that have been installed— any WTGs that have not been installed at the Project's commercial operation date will not be included in any of the Project's existing PPAs for the life of the Project due to contractual constraints and the Project will not receive revenue for these WTGs.  If the Second Stop Work Order is not enjoined or if Revolution Wind is unable to complete WTG installation because of this Order, Revolution Wind estimates that the Company could lose over a billion dollars in revenue over the lifetime of the Project.  Furthermore, if these seven WTGs are not installed, Revolution Wind may also lose approximately $370 million in capital expenditures already spent or committed for those WTGs.

33.     Overall, if the Project is cancelled, Revolution Wind anticipates that the Company will incur more than $1 billion in breakaway costs and Revolution Wind has already spent or committed approximately $5.4 billion to date to plan, permit, develop, design, manufacture, and construct this Project.  Thus, if the Project is cancelled, Revolution Wind anticipates that the Company would lose more than $6 billion in costs to the Project.  Additionally, Revolution Wind would forgo billions of dollars of revenue under its PPAs over the lifetime of the Project.

34.     Before BOEM issued the Second Stop Work Order, Revolution Wind was in the midst of various ongoing and planned financing transactions (as it is necessary for most such projects to raise external capital).  The Second Stop Work Order has introduced a material

roadblock and significant uncertainty in those financing processes in a way that is extremely consequential to Revolution Wind's ability to attract and retain financing counterparties. If the Second Stop Work Order remains in effect, the Project will likely bear adverse financial implications arising from resulting delay or inability to consummate planned transactions.

### C.    Important Project Benefits

35.    Over the lifetime of the Project, Revolution Wind anticipates it will pay $178 million in rents and operating fees to the federal government. The vast majority of this sum will be foregone by the federal government if the Project cannot move forward due to the Second Stop Work Order.

36.    The Project is currently estimated to generate hundreds of millions of dollars in state tax revenue over its lifetime, and that public value would likewise be lost if the Project is cancelled.

### D.    Relief From BOEM's Second Stop Work Order Is Needed By January 12, 2026

37.    For these foregoing reasons, judicial relief is required by January 12, 2026 to avoid significant Project delays, potential Project cancellation, and significant additional costs that threaten the Project's viability and thus Revolution Wind's very existence. Providing preliminary injunctive relief against the Second Stop Work Order and vacating the unlawful agency action will redress the injuries described above because Revolution Wind will be able to complete its previously-approved, lawful construction and operation of the Project and be able to generate revenues to offset the significant losses that the Project has already experienced as a result of yet another Stop Work Order.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746(1) under the laws of the United States of America that the foregoing is true and correct.

Executed on January 1, 2026, at Rome, Italy.

_____
Paul Murphy

# EXHIBIT 1

## FILED UNDER SEAL

# EXHIBIT 2

# FILED UNDER SEAL