# EXHIBIT D

555 Eleventh Street, N.W., Suite 1000
Washington, D.C.  20004-1304
Tel: +1.202.637.2200  Fax: +1.202.637.2201
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tel Aviv |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

# LATHAM&WATKINS LLP

December 31, 2025

**VIA FEDEX AND ELECTRONIC MAIL**

Douglas J. Burgum
Secretary of the Interior
U.S. Department of the Interior
1849 C Street, NW
Washington, DC 20240

Matthew Giacona
Acting Director
Bureau of Ocean Energy Management
1849 C Street, NW
Washington, DC 20240

Kenneth Stevens
Principal Deputy Director
Bureau of Safety and Environmental
Enforcement
1849 C Street, NW
Washington, DC 20240

Pamela Bondi, Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Office of Governor Ned Lamont
State Capitol
210 Capitol Avenue
Hartford, CT 06106

Office of Governor Dan McKee
82 Smith Street
Providence, RI 02903

Re:    Outer Continental Shelf Lands Act ("OCSLA") Notice of Intent to Sue for
Violations of OCSLA Relating to Revolution Wind, LLC

Dear Secretary Burgum, Attorney General Bondi, Acting Director Giacona, Principal Deputy
Director Stevens, Governor Lamont, and Governor McKee:

On behalf of Revolution Wind, LLC ("Revolution Wind"), this letter hereby provides a
second notice of Revolution Wind's intent to sue the United States Department of the Interior
("Interior"); Doug Burgum, in the official capacity as Secretary of the Interior; Matthew
Giacona, in the official capacity as the Acting Director of the Bureau of Ocean Energy
Management ("BOEM"); BOEM; Kenneth Stevens, in the official capacity as the Principal
Deputy Director Exercising the Delegated Authorities of the Director of the Bureau of Safety and
Environmental Enforcement ("BSEE"); and BSEE (collectively, the "Federal Actors"),
challenging the Second Stop Work Order issued by BOEM to Revolution Wind on December 22,
2025 for violations of the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331-
1356c; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706; and the United States
Constitution.  This letter constitutes a notice of violation and intent to either file suit or a
supplemental complaint ("Notice Letter") pursuant to Section 23(a) of OCSLA, 43 U.S.C. §
1349(a), to the extent necessary and in order to protect Revolution Wind's significant interests,

LATHAM&WATKINS LLP

unless the Second Stop Work Order is immediately withdrawn.[1]  Section 1349(a)(3) allows an action to be brought in court immediately after notification of the alleged violation in any case in which the alleged violation "would immediately affect a legal interest of the plaintiff."  As explained in Section III below, to the extent this Notice is required prior to filing suit, that exception applies here, as Federal Actors' conduct is in effect and the Second Stop Work Order has immediately and adversely affected Revolution Wind's legal interests.

## I.    FACTUAL BACKGROUND

### A.    The Project and Its Extensive Review and Approval Process

The Revolution Wind Farm and Revolution Wind Export Cable (collectively, the "Project") constitute an approximately 704-megawatt ("MW") commercial-scale wind energy facility under construction in federal waters on the U.S. Outer Continental Shelf ("OCS"), 15 miles off the coast of Rhode Island and 15 miles east of Long Island, New York.  The Project is planned to include 65 wind turbine generators ("WTGs") and to deliver enough electricity to provide energy security to over 350,000 homes in Rhode Island and Connecticut using domestic resources.

Construction of the Project is slightly less than 90% complete.  Among other things, at the time the Second Stop Work Order was issued, all of the Project's monopile foundations for the WTGs had been installed on the ocean floor, but less than 90% of the WTGs themselves had been fully installed.

Over the course of many years, the Project has undergone an exhaustive federal and state review process to study and approve its potential environmental, public safety, and national security impacts.  This review process has led to the issuance of more than 20 federal and state permits and approvals for the Project.

To date, Revolution Wind has incurred substantial financial obligations developing, permitting, engineering, procuring, fabricating, preparing for, and commencing construction of the Project.  Revolution Wind has spent or committed more than $5 billion to date for the development and construction of the Project, and will further incur more than $1 billion in breakaway costs if the Project is cancelled.

### B.    The Second Stop Work Order

On December 22, 2025, Acting Director Giacona of BOEM issued a "Director's Order" (the "Second Stop Work Order") to Revolution Wind, ordering it to "suspend all ongoing

---

[1] Some courts have held that OCSLA's citizen-suit provision is inapplicable to lessees, such as Revolution Wind.  *See, e.g.*, *Murphy Exploration & Production Co. v. U.S. Dep't of the Interior*, 167 F. Supp. 2d 1 (D.D.C. 2000), rev'd on other grounds, *Murphy Exploration & Prod. Co. v. U.S. Dep't of the Interior*, 252 F.3d 473 (D.C. Cir. 2001).  Either way, Revolution Wind is entitled to relief under the APA and the Due Process Clause of the Fifth Amendment.

LATHAM&WATKINS LLP

activities related to the Revolution Wind Project on the Outer Continental Shelf for the next 90 days for reasons of national security" pursuant to 30 C.F.R. § 585.417(b).  The Second Stop Work Order cited no violations of law by Revolution Wind or violations of the terms of Revolution Wind's lease.

This is the second time BOEM has issued a Director's Order targeting the Project.  On August 22, 2025, BOEM issued a "Director's Order" (the "First Stop Work Order") to Revolution Wind, directing it to "halt all ongoing activities related to the Revolution Wind Project on the outer continental shelf (OCS) to allow time for [BOEM] to address concerns that have arisen during the review that the Department is undertaking pursuant to the President's Memorandum of January 20, 2025.  90 Fed. Reg. 8363 (January 29, 2025)."

Revolution Wind served a notice of intent to sue in relation to the First Stop Work Order on September 3, 2025.  It subsequently filed suit in the U.S. District Court for the District of Columbia, and the Honorable Royce C. Lamberth preliminarily enjoined the First Stop Work Order on September 22, 2025.  Dkt. 36.  That case remains pending.

## II.    BOEM AND OTHER FEDERAL ACTORS HAVE VIOLATED OCSLA, THE APA, AND THE U.S. CONSTIUTION

The Second Stop Work Order violates OCSLA, the APA, and the U.S. Constitution because it is arbitrary and capricious and contrary to law, as well as being issued without observance of procedure as required by law.

### A.    The Second Stop Work Order Is Arbitrary and Capricious

Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "arbitrary" and "capricious."  5 U.S.C. § 706(2)(A).  Interior's Second Stop Work Order, issued without sufficiently explaining or justifying the basis for its issuance and without notice or an opportunity to be heard is arbitrary and capricious and impermissible under the APA, which requires an agency to "articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Not only did Interior not provide a sufficient explanation for issuing the Second Stop Work Order, Interior provided *no explanation* for its decision beyond a conclusory assertion of "impacts to national security from offshore wind projects."  That alone falls short of the required "satisfactory explanation," because, even when national security is at issue, an agency must provide factual information supporting the reasoning for its decision.  The Second Stop Work Order also contains unexplained internal inconsistencies in its reasoning, such as why there is a purportedly immediate and irreparable harm to national security but the Acting Director was aware of the relevant national security information for a month before notifying the Project of any issue and taking action.

The Second Stop Work Order also violates the "change-in-position doctrine."  The change-in-position doctrine provides that agencies may only change their existing policies if they "provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *FDA v. Wages and White Lion Investments,*

December 31, 2025
Page 4

LATHAM&WATKINS LLP

*LLC*, 604 U.S. 542, 568 (2025).  Federal Actors have already spent years reviewing and considering all aspects of the Project, including national security, and documented it in the approvals for the Project.

Indeed, Federal Actors have previously defended the soundness of the review process and approvals for the Project in ongoing litigation, including findings related to national security. *See Green Oceans v. U.S. Dep't of the Interior*, No. 1:24-cv-00141-RCL (D.D.C. filed Jan. 16, 2024).  BOEM first failed to justify its change in position in the First Stop Order and has, with the Second Stop Work Order, doubled down on its shifted position from its prior conclusion that the Project did not raise national security concerns.  Federal Actors have violated the change-in-position doctrine by making this about-face without taking Revolution Wind's substantial reliance interests into account.  "When an agency changes course," as Interior did here, it must consider whether its prior actions "engendered serious reliance interests" and take those interests into account.  *Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020).

Revolution Wind has spent or committed more than $5 billion to date to plan, permit, develop, and construct this project.  If the Project is cancelled, Revolution Wind will incur an additional more than $1 billion in breakaway costs, for a total of over $6 billion.  In reliance on Federal Actors' approvals, Revolution Wind entered into contracts for union labor, the manufacture and transport of project components and for the leasing of vessels necessary to construct the Project.  The Second Stop Work Order halting construction of Revolution Wind risks termination of at least one of the Project's Power Purchase Agreements ("PPA"), causing Revolution Wind to substantially lose its investments and expected future profits.  Interior did not consider, or even acknowledge, the harm to Revolution Wind or Revolution Wind's substantial and legitimate reliance interests in issuing its Second Stop Work Order.  This alone is sufficient to render the Order arbitrary and capricious.

An agency's action is also arbitrary and capricious when it fails to "address" alternative "way[s] of achieving [its] objectives" and give "adequate reasons" for abandoning those alternatives.  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc.*, 463 U.S. at 48.  Here, the Second Stop Work Order fails to explain why a narrower suspension would not suffice.  Depriving the Project of the ability to continue to work on elements of the Project unrelated to any purported national security concerns is arbitrary and capricious.  This failure is particularly acute given that the Project was on schedule to achieve first power as soon as January 2026, meaning that Revolution Wind was expected to shortly begin generating power (and delivering it to the grid) from a subset of the Project's wind turbine generators.  Depriving the grid of that power in the face of the President's and Secretary Burgum's own characterizations of an "energy emergency" is antithetical to an energy emergency and overly broad, especially given that the Project would soon provide power..

### B.     The Second Stop Work Order Violates the Fifth Amendment

Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).  BOEM's Second Stop Work Order is

LATHAM&WATKINS LLP

contrary to law because it deprives Revolution Wind of its property without due process of law, as required by the Fifth Amendment.  U.S. Const., amend. V.

Leases convey property interests at common law, and "[a] leasehold interest is a property interest for purposes of the Fifth Amendment."  *Turntable Fishery & Moorage Corp. v. U.S.*, 52 Fed. Cl. 256, 261 (Fed. Cl. 2002).  Lessees pursuing energy development on lands leased by the Department of the Interior have "property rights in the . . . leases."  *E.g.*, *Hoyl v. Babbitt*, 129 F.3d 1377, 1386 (10th Cir. 1997).

The Due Process Clause requires "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest."  *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) (citations omitted) (emphasis in original).  Even "temporary or partial impairments to property rights . . . merit due process protection."  *Amoco Prod. Co. v. Fry*, 118 F.3d 812, 819 (D.C. Cir. 1997) (quoting *Connecticut v. Doehr*, 501 U.S. 1, 12 (1991)).

The Second Stop Work Order impairs Revolution Wind's ability to take advantage of its property interest in its leasehold by requiring Revolution Wind to "suspend all ongoing activities related to the [Project]."  Revolution Wind was not afforded any notice or hearing before impairment of its property interest nor provided sufficient information regarding the purported basis for the Order, so that Revolution Wind could address the facts that BOEM considered. Indeed, despite numerous meetings between BOEM and Revolution Wind over the past year including a number more recently in November and December, there was no mention of this concern.  Accordingly, Revolution Wind was deprived of property without due process required by law.

### C.     The Second Stop Work Order Was Issued Without the Procedures Required by the APA

Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action taken "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).  APA Section 558 makes it unlawful for an agency to issue a "withdrawal, suspension, revocation, or annulment of a license" if it does not give the licensee "notice" and "opportunity to demonstrate or achieve compliance with all lawful requirements" "before" the agency acts.  *Id.* § 558(c).  The APA defines a license as "the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission."  *Id.* § 551(8).  An OCSLA lease and Construction and Operations Plan approval is a "form of permission" to use the OCS for energy development.  Section 558 has limited exceptions for "cases of willfulness" and where "public health, interest, or safety requires otherwise."  *Id.*  None of those exceptions has been demonstrated to apply here, and BOEM failed to comply with the procedures of 5 U.S.C § 558.

### D.     The Second Stop Work Order Is Contrary to Law

Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).  BOEM "literally has no power to act unless and until Congress confers power upon it."  *Am. Library Ass'n v. FCC*, 406 F.3d 689, 698 (D.C.

LATHAM&WATKINS LLP

Cir. 2005) (internal quotation omitted).  But Congress has not conferred the broad authority BOEM claims.

In the Second Stop Work Order, BOEM invoked 30 C.F.R. § 585.417(b), which provides that "BOEM may order a suspension . . . when the suspension is necessary for reasons of national security or defense."  Interior cites 43 U.S.C. § 1337 as its authority for 30 C.F.R. § 585.417(b).  *See id.* § 585.100.  Section 1337(p) gives the Secretary authority to grant leases on the OCS promoting "energy from sources other than oil and gas," including wind energy.  43 U.S.C. § 1337(p)(1)(C).  It directs the Secretary of the Interior to "ensure that any activity under this subsection [subsection (p)] is carried out in a manner that provides for . . . protection of national security interests of the United States," *id.* § 1337(p)(4)(F), and to "provide for the duration, issuance, transfer, renewal, suspension, and cancellation of a lease," *id.* § 1337(p)(5).

Two other OCSLA provisions are relevant to national security suspensions.  *First,* the "national security clause" in 43 U.S.C. § 1341(c) requires BOEM to include a provision in every lease that confers authority on the Secretary to "suspend operations" "upon a recommendation of the Secretary of Defense [War], during a state of war or national emergency declared by the Congress or the President of the United States."  And § 1341(d), titled "national defense areas; suspension of operations; extension of leases," permits the "Secretary of Defense [War], with the approval of the President," to designate "areas restricted from exploration and operation that part of the outer Continental Shelf needed for national defense," and to suspend operations on any leases in that area.  *Second*, 43 U.S.C. § 1334(a)(1)(B) authorizes BOEM to order "suspension or temporary prohibition of any operation or activity . . . pursuant to any lease or permit" "if there is a threat of serious, irreparable, or immediate harm or damage to life…, to property, to any mineral deposits . . . , or to the marine, coastal, or human environment."

Section 1337 must be read alongside—and is limited by—§§ 1341 and 1334.  *City & Cnty. of San Francisco v. EPA*, 604 U.S. 334, 350 (2025).  OCSLA was originally enacted in 1953, Pub. L. 83-212, to provide for offshore oil and gas leasing.  *Healthy Gulf v. DOI*, 152 F.4th 180, 187 (D.C. Cir. 2025).  When § 1337(p) was enacted to add renewable energy uses of the OCS, Pub. L. 109-58, § 388, 119 Stat. 744-47, Congress gave no indication that it intended to give the Secretary of the Interior more authority to suspend leases and activities for renewable energy uses than for oil and gas.  Thus, Section 1337 is properly interpreted as authorizing suspensions only in the circumstances contemplated by either Section 1341 or Section 1334.

Section 1341 does not apply because the Secretary of War has not recommended suspension during a declaration of war or national emergency nor withdrawn areas of the OCS for national defense.  Section 1334(a)(1)(B) is also inapplicable.  BOEM had to make a finding of "*particularized harm* that it determines can only be feasibly averted by suspension of on-lease activities."  Amendment and Restatement of Renewable Energy Lease OCS-A 0486, at Sec. 8. And the harm must be "serious, irreparable, or immediate."  43 U.S.C. § 1334(a)(1)(B). BOEM's conclusory assertions in the Second Stop Work Order cannot suffice to show that there is (1) "serious, irreparable, or immediate harm" that can (2) "only be feasibly averted by suspension of on-lease activities."

LATHAM&WATKINS LLP

BOEM's suspension authority in 30 C.F.R. § 585.417(b) must be understood as limited to particular situations contemplated by Congress in other parts of OCSLA. Because BOEM's Second Stop Work Order went further, it improperly exceeded its statutory authority.

### III.    THE SECOND STOP WORK ORDER IMMEDIATELY AFFECTS A LEGAL INTEREST OF REVOLUTION WIND

OCSLA's citizen-suit provision provides that "[a]n action may be brought . . . immediately after notification of the alleged violation in any case in which the alleged violation constitutes an imminent threat to the public health or safety or would immediately affect a legal interest of the plaintiff." 43 U.S.C. § 1349(a)(3). The Second Stop Work Order is in effect and immediately and adversely affects the legal interests of Revolution Wind. Revolution Wind intends to bring suit or to file a supplemental complaint in its existing lawsuit challenging the First Stop Work Order imminently to protect its interests, unless the Second Stop Work Order is rescinded.

The Second Stop Work Order immediately impacts Revolution Wind's ability to conduct activities on its leasehold. As a result of the Second Stop Work Order, Revolution Wind is currently facing a sudden, unplanned work stoppage that is expected to generate cascading delays, substantially increase costs, and ultimately threaten Project viability. Revolution Wind has carefully sequenced its construction schedule and has contracted (and reserved for a limited time) specialized vessels necessary for the Project's construction. The Second Stop Work Order prevents Revolution Wind from meeting this schedule, delaying the overall Project timeline, increasing costs, causing workers not to be able to do their jobs, and undermining grid reliability, which can inhibit economic growth and public safety.

Delays are costly, regardless of whether the Project is ultimately cancelled. Delay of this nature could ultimately lead to the Project's cancellation, including in relation to one of Revolution Wind's PPA's, which includes a buyer termination right if timelines are sufficiently delayed. If the Project is cancelled, Revolution Wind anticipates that it may lose its entire greater than $6 billion of investment including approximately $1 billion in breakaway costs. Additionally, Revolution Wind would forgo substantial revenues under the PPAs.

The longer the Second Stop Work Order remains in place, the more likely it is that the Second Stop Work Order will lead to the Project's termination. Overall, the delay caused by BOEM's Second Stop Work Order is already costing Revolution Wind millions of dollars per week. Defendants' Second Stop Work Order interferes with Revolution Wind's ability to carry out construction activities in the short term, and all operations in the longer term.

### IV.    CONCLUSION

This Notice Letter sufficiently states Revolution Wind's grounds for filing suit or a supplemental complaint challenging the Second Stop Work Order, to the extent notice is required under 43 U.S.C. § 1349. In addition to the violations set forth above, this Notice Letter covers the violations of OCSLA, the APA, and the U.S. Constitution by the Federal Actors that is evidenced by information that becomes available to Revolution Wind after the date hereof.

**December 31, 2025**
**Page 8**

**LATHAM&WATKINS** LLP

       In addition to injunctive relief under OCSLA and the APA, Revolution Wind may seek all such other relief as is permitted by law.  Section 23(a)(5) of OCSLA, 43 U.S.C. § 1349(a)(5), also permits prevailing parties to recover costs and fees of litigation.

       Revolution Wind has retained me to represent it in this matter.  Please direct all communications to:

Janice M. Schneider                janice.schneider@lw.com
Stacey L. VanBelleghem      stacey.vanbelleghem@lw.com
Latham & Watkins LLP
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
(202) 637-2306

       Sincerely,

Janice M. Schneider
LATHAM & WATKINS LLP

December 31, 2025
Page 9

LATHAM&WATKINS LLP

Pursuant to 28 U.S.C. § 1746(2) and 43 U.S.C. § 1349, I declare under penalty of perjury that the factual information in the foregoing is true and correct.

Executed on December 31, 2025.

Winchester, MA

Ryan Chaytors, Authorized Person
Revolution Wind, LLC

LATHAM&WATKINS LLP

### Service List

| | |
|---|---|
| Doug Burgum<br>Secretary of the Interior<br>1849 C Street, NW<br>Washington, DC 20240 | United States Department of the Interior<br>1849 C Street, NW<br>Washington, DC 20240 |
| Matthew Giacona<br>Acting Director<br>Bureau of Ocean Energy Management<br>1849 C Street NW<br>Washington, DC 20240 | Bureau of Ocean Energy Management<br>1849 C Street NW<br>Washington, DC 20240 |
| Kenneth Stevens<br>Principal Deputy Director<br>Bureau of Safety and Environmental<br>Enforcement<br>1849 C Street, NW<br>Washington, DC 20240 | Bureau of Safety and Environmental<br>Enforcement<br>1849 C Street, NW<br>Washington, DC 20240 |
| Pamela Bondi<br>U.S. Department of Justice<br>950 Pennsylvania Avenue NW<br>Washington DC 20530 | Office of Governor Ned Lamont<br>State Capitol<br>210 Capitol Avenue<br>Hartford, CT 06106 |
| Office of Governor Dan McKee<br>82 Smith Street<br>Providence, RI 02903 | William Tong<br>Attorney General, State of Connecticut<br>165 Capitol Avenue<br>Hartford, CT 06106 |
| Peter Neronha<br>Attorney General, State of Rhode Island<br>150 South Main Street<br>Providence, RI 02903 | |