**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| REVOLUTION WIND, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:25-cv-02999-RCL |
| v. | ) | |
| | ) | Hon. Royce C. Lamberth |
| DOUGLAS J. BURGUM, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| GREEN OCEANS, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

**DEFENDANT-INTERVENOR'S OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Roger J. Marzulla, Bar No. 394907
Nancie G. Marzulla, Bar No. 400985
Mollie A. Jackowski, Bar No. 1780535
Marzulla Law, LLC
1150 Connecticut Ave., NW
Suite 1050
Washington, DC 20036
Tel: (202) 822-6760
roger@marzulla.com
nancie@marzulla.com
mollie@marzulla.com

January 8, 2026                    Attorneys for Green Oceans

**Table of Contents**

Table of Authorities...................................................................................................... ii

Table of Exhibits .......................................................................................................... iii

Table of Abbreviations ................................................................................................ iii

Factual and Procedural Background ............................................................................. 2

   1.   Radar Interference Is a Known, Present National Security Risk ........................ 3

   2.   Turbine Heights Threaten the United States' Current Missile Defense System ................ 5

   3.   Other Countries Are Evaluating National Security Risks Posed by Offshore Wind
Turbines ...................................................................................................................... 6

Legal Standard ............................................................................................................. 6

   1.   The Company Is Unlikely to Succeed on the Merits ........................................... 7

      A.   The Order Is Tailored and Within BOEM's Discretion to Protect National Security
During Activities on the Outer Continental Shelf ...................................................... 7

      B.   The Company's Argument Ignores the Changeable Nature of National Security Risks 9

      C.   The Order Is Appropriately Tailored and Is Not Overly Broad ................................11

      D.   The Company's Procedural and Due Process Claims Fail........................................11

      E.   The Order Falls Within BOEM's Statutory and Regulatory Authority.................... 13

   2.   The Company Has Not Shown Irreparable Harm ............................................. 14

   3.   The Balance of Equities and Public Interest Weigh Against Injunctive Relief............... 17

**Table of Authorities**

**Cases**

*3883 Connecticut LLC v. D.C.*, 191 F. Supp. 2d 90 (D.D.C. 2002).............................................. 12

*Bazzi v. Gacki*, 468 F. Supp.3d 70 (D.D.C. 2020)............................................................................. 9

Brock v. Roadway Express, Inc., 481 U.S. 252 (1987) ................................................................... 12

*Carabillo v. ULLICO Inc. Pension Plan & Tr.*, 355 F. Supp. 2d 49 (D.D.C. 2004). .................... 17

*Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716 (D.C. Cir. 2022) ....................................... 9

*Citizens Against Casino Gambling in Erie Cnty. v. Chaudhuri*, 802 F.3d 267 (2d Cir. 2015)...... 13

*Cuomo v. U.S. Nuclear Regul. Comm'n*, 722 F.2d 972 (D.C. Cir. 1985).......................................... 7

*Dep't of Navy v. Egan*, 484 U.S. 518 (1988) .................................................................................... 9

*Fed. Express Corp. v. United States Dep't of Com.*, 39 F.4th 756 (D.C. Cir. 2022) ..................... 10

Gardner v. City of Balt. Mayor & City Council, 969 F.2d 63 (4th Cir. 1992)............................... 12

*Glob. Relief Found., Inc. v. O'Neill*, 207 F. Supp. 2d 779 (N.D. Ill. 2002) ..................................... 8

*Gomez v. Trump*, 485 F. Supp. 3d 145 (D.D.C. 2020) ................................................................... 16

*Haig v. Agee*, 453 U.S. 280 (1981) .................................................................................................. 8

*Hikvision USA, Inc. v. Fed. Commc'ns Comm'n*, 97 F.4th 938 (D.C. Cir. 2024). .................... 9, 10

*Mazurek v. Armstrong*, 520 U.S. 968(1997)..................................................................................... 7

*McGehee v. Casey*, 718 F.2d 1137 (D.C. Cir. 1983). ....................................................................... 8

*Merriweather v. Lappin*, 680 F. Supp. 2d 142 (D.D.C. 2010). ........................................................ 7

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)...................................................................................................................... 7

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915
    F.3d 197 (4th Cir. 2019).......................................................................................................... 16

*Pac. Networks Corp. v. Fed. Commc'ns Comm'n*, 77 F.4th 1160 (D.C. Cir. 2023) ....................... 9

*Pratt Land & Dev., LLC v. City of Chattanooga*, 581 F. Supp. 3d 962 (E.D. Tenn. 2022)........... 12

*Scotts Valley Band of Pomo Indians v. Burgum*, No. 1:25-CV-00958 (TNM), 2025 WL 1639901
    (D.D.C. June 10, 2025). .......................................................................................................... 16

*Seafreeze Shoreside, Inc. v. United States Dep't of the Interior*, 123 F.4th 1, 25 (1st Cir. 2024) . 13

*Seafreeze Shoreside, Inc. v. United States Dep't of the Interior*, No. 1:22-CV-11091-IT, 2023 WL
    6691015 (D. Mass. Oct. 12, 2023)......................................................................................... 13

*Sec'y of Lab. v. Knight Hawk Coal, LLC*, 991 F.3d 1297 (D.C. Cir. 2021).................................... 7

*Seko Customs Brokerage, Inc. v. United States*, 719 F. Supp. 3d 1279
    (Ct. Int'l Trade 2024). ......................................................................................................... 14, 15

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011)......................................................................... 7

*Sims v. Ellis*, 972 F. Supp. 2d 1196 (D. Idaho 2013) ................................................................... 13

*Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81 (D.D.C. 2021)................................... 9

The *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972). ........................................... 12

*Washington Legal Clinic for the Homeless v. Barry*, 107 F.3d 32 (D.C. Cir. 1997) ..................... 12

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .............................................................. 7

Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7 (2008) ........................................ 6

**Statutes**

43 U.S.C. § 1331(a)(1) ................................................................................................................... 10

43 U.S.C. § 1334(a)(1) ................................................................................................................... 12

43 U.S.C. § 1334(a)(2) ................................................................................................................... 12

43 U.S.C. § 1337(p)(4)(F) .............................................................................................................. 13

**Regulations**

30 C.F.R. § 556.1102 ...................................................................................................................... 12

30 C.F.R. § 585.417(b) .............................................................................................................. 10, 13

**Table of Exhibits**

| Exhibit No. | Description |
|---|---|
| Ex. 1 | December 22, 2025 Suspension Order |
| Ex. 2 | Memorandum Opinion Denying Motion for Preliminary Injunction, *Mayor and City Council of Ocean City, Maryland v. United States Department of Interior*, Case No. SAG-24-03111 (Dec. 15, 2025) |
| Ex. 3 | Letter re Department of Defense's Review of Revolution Wind's Impacts on Radar Operations |
| Ex. 4 | Lease for OCS-A 0486 |

**Table of Abbreviations**

| Abbreviation | Definition |
|---|---|
| BOEM | Bureau of Ocean Energy Management |
| DoD | Department of Defense |
| OCSLA | Outer Continental Shelf Lands Act |
| PAVE PAWS | PAVE Phased Array Warning System |

Revolution Wind, LLC ("the Company") seeks the extraordinary remedy of a preliminary injunction to bar the Department of the Interior and the Bureau of Ocean Energy Management ("BOEM") from implementing a time-limited suspension of lease activities for reasons of national security. The Company has not carried its heavy burden of overcoming the paramount public interest in our nation's security, and has also failed to prove the other three factors required to justify the issuance of a preliminary injunction.

The lease suspension rests on BOEM's determination—following receipt and initial review of newly classified information and in light of rapidly evolving adversary technologies—that particularized national security risks associated with the Revolution Wind Project (the "Project") necessitate a temporary suspension until feasible mitigation is determined. On December 22, 2025, BOEM issued a Director's Order requiring the Company to suspend all ongoing activities related to the Revolution Wind Project on the Outer Continental Shelf for 90 days "for reasons of national security," based on BOEM's initial review of new classified information received in November 2025 addressing the rapid evolution of adversary technologies and resulting direct impacts to national security from offshore wind projects.[1] BOEM's Order states that the agency will determine whether national security threats relating to the Project can be mitigated and will consider all feasible mitigation measures.[2]

The Company's motion for a preliminary injunction asks this Court to reject the Government's judgment that the Project jeopardizes our nation's security—to ensure its own multi-billion-dollar (and publicly subsidized) profits. But the evidence the Company itself presents shows that the Government intends only a short, temporary pause to allow interagency

---

[1] Exhibit 1, Temporary Suspension Order (Dec. 22, 2025).
[2] *Id.*

evaluation of new national-security information—coupled with an open invitation for the Company to meet and confer on how these newly identified security threats can be mitigated. BOEM's Order is limited in time to 90 days, allows health, safety, and environmental protections to continue, and expressly contemplates collaborative efforts to address the national security threat. In a recent decision by a Maryland district court judge, the court denied US Wind's— another offshore wind developer—motion for a preliminary injunction, rejecting US Wind's similar argument about its business losses as support for its motion. The Court held that US Wind's financial losses did not constitute "legally cognizable hardship."[3] The equities and public interest do not favor compelling the Government to disregard current national-security concerns while mitigation options are actively being evaluated.

Because the Company fails to establish a likelihood of success, irreparable injury, a favorable balance of equities, and the public interest in national security supports an injunction, the Court should deny the motion.

**Factual and Procedural Background**

The Company's motion seeks to preliminarily enjoin a BOEM Director's Order issued on December 22, 2025, following BOEM's initial review of newly classified information received in November 2025, which cited national security risks and ordered a 90-day suspension of on-lease activities. The Order invites the Company to meet and confer on mitigation and indicates BOEM will evaluate whether national-security risks can be mitigated or whether cancellation is necessary.

---

[3] Ex. 2 at 10, Memorandum Opinion Denying Motion for Preliminary Injunction, *Mayor and City Council of Ocean City, Maryland v. United States Department of Interior*, Case No. SAG-24-03111 (D. Md. Dec. 15, 2025).

1.     **Radar Interference Is a Known, Present National Security Risk**

Although Green Oceans does not have the benefit of the classified materials supporting BOEM's suspension order, we do have the benefit of substantial Government documentation of the security risks offshore turbines pose. Shortly before BOEM approved the Revolution Wind Project, the Department of Energy reported to Congress that "[a]s wind turbines continue to expand in both size and number, they can interfere with radar systems," and that this interference "represents a significant challenge" because "over 40 percent of land-based and over 25 percent of offshore wind resource technical potential is in the field of view of critical radar systems."[4] The radar systems affected by offshore wind "support air traffic control and flight safety, severe weather forecasting and warnings, coastal sea-surface and maritime surveillance, oceanographic measurements, and homeland and national defense missions."[5]

The Department of Defense has made specific findings that the Revolution Wind Project, when operational, will interfere with national defense installations. The Department has now determined that "[t]he results of our review identified impacts to the mission of the North American Aerospace Defense Command's (NORAD) radar operations[,]" and that "[t]he Revolution Offshore Wind Project will adversely impact the Falmouth, Massachusetts Airport Surveillance Radar model 8 (ASR-8) used for NORAD's air defense mission."[6] Independent technical analysis confirms the national security role of these systems, explaining that long-range radar sites are "used for air defense by the DoD at the North American Aerospace Defense

---

[4] U.S. Dep't of Energy, *Update on the Efforts of the Wind Turbine Radar Interference Mitigation Working Group: Report to Congress* at 2 (Dec. 14, 2023), https://www.energy.gov/sites/default/files/2024-02/EXEC-2022-004484%20-%20Report%20to%20Congress%20as%20of%20December%2014%202023%20%282%29.pdf (Department of Energy Report).
[5] *Id.*
[6] Ex. 3, Letter re Department of Defense's Review of Revolution Wind's Impacts to Radar (Oct. 15, 2021).

Command and for homeland security by the Customs and Border Protection Air and Marine Operations Center[,]" and that "[t]he DoD uses the Cape Cod [Air Force Station] [Early Warning Radar] for ballistic missile defense and space surveillance."[7]

The Project's "wind turbines . . . will be within line-of-sight of and will interfere with the Falmouth ASR-8[,]" and turbines "will be within line-of-sight of and will interfere with the Providence ASR-9[.]"[8] In short, when operational, these "wind turbines in the study area within line-of-sight of the Cape Cod [Air Force Station] [Early Warning Radar] could have a significant impact on this early warning radar."[9]

The effects of this radar interference from wind turbines cannot be fully resolved through mitigation: "To date, no mitigation technology has been able to fully restore the technical performance of impacted radars[,]"[10] and "existing technologies can only reduce, but not eliminate, the interference caused by wind turbines[.]"[11] While some progress has been made to improve radar operating capacity in areas with wind turbines, "with the anticipated development of additional wind farms, these software upgrades may not be enough to mitigate the impacts."[12] When operational, the Project's "radar effects will include unwanted radar returns (clutter) resulting in a partial loss of primary target detection and a number of false primary targets[,]" as well as "a partial loss of weather detection and false weather indications[.]"[13]

---

[7] Westslope Consulting, *Revolution Wind Project Radar and Navigational Aid Screening Study* at 2, 5 (Sept. 3, 2021), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/App_S2%20RevWind%20Radar%20and%20Navigational%20Aid%20Screening%20Study.pdf (Westslope Radar Report).

[8] *Id.* at 7, 8.

[9] *Id.* at 12.

[10] Department of Energy Report *supra* note 2 at 3.

[11] Department of Energy Report *supra* note 2 at 4.

[12] Department of Energy Report *supra* note 2 at iii.

[13] Westslope Radar Report *supra* note 5 at 7.

2.      **Turbine Heights Threaten the United States' Current Missile Defense System**

In 2007, the Missile Defense Agency concluded that utility-scale wind turbines could significantly affect the Cape Cod Precision Acquisition Vehicle Entry Phased Array Warning System (PAVE PAWS) radar. The Agency emphasized that effective mitigation requires an offset or keep-out zone within the radar's effective line of sight, accounting for direct, refracted, and diffracted signal paths.[14] The Agency further warned that objects within the radar beam can block, reflect, or diffract energy in ways "not easily characterized," and that further study is required within these zones to account for turbine height and position within the radar's field of view.[15] The turbine configurations analyzed by the Agency were far smaller than those approved for Revolution Wind. The Agency evaluated turbines approximately 150 to 250 feet tall (225-380 ft with blades), whereas Revolution Wind's turbines reach blade-tip heights hundreds of feet greater (873 ft), dramatically expanding line-of-sight exposure and interference zones.[16]

Considering the height of Revolution Wind's turbines, as well as those from the other nearby projects, as well as the number of turbines, the threat to the Cape Cod PAVE PAWS is serious. The Cape Cod PAVE PAWS operates as an Upgraded Early Warning Radar under the U.S. Space Force and plays an integrated role in the Nation's missile defense architecture. That the Government sees a need to evaluate whether these turbines interfere with that system, given its critical role in the United States' national defense, is a reasonable request.

---

[14] Missile Defense Agency, *Wind Turbine Analysis for Cape Cod Air Force Station Early Warning Radar and Beale Air Force Base Upgraded Early Warning Radar* at 7–8 (2007), https://users.ece.utexas.edu/~ling/US7%20mda_ewr_windturbine_report.pdf.
[15] *Id.* at 7.
[16] *See id.* at 3.

3.      **Other Countries Are Evaluating National Security Risks Posed by Offshore Wind Turbines**

Other nations have canceled offshore wind projects, citing similar national security concerns. Last November Sweden's government blocked the construction of 13 offshore wind farms over concerns that they would shorten the country's early-warning window for a Russian missile attack.[17] "The reaction time in the event of a missile attack could go from 2 minutes to 60 seconds with wind farms in the way," Swedish Defense Minister Pål Jonson wrote in a series of posts on X, formerly known as Twitter.[18] And "the wind farms could also lead to reduced intelligence-gathering capabilities and disrupt sensors used to detect submarines[,]" Jonson said in his announcement.[19] Altogether, the construction would have "unacceptable consequences for Swedish security."[20]

Defendant-Intervenor, Green Oceans, also adopts the Government's Opposition to Plaintiff's Motion for Preliminary Injunction, and adds these additional points.

**Legal Standard**

Preliminary injunctions are "extraordinary remed[ies] never awarded as of right."[21] For a plaintiff to be awarded the extraordinary remedy of a preliminary injunction, that plaintiff must make a "clear showing" that it is entitled to such relief.[22] The Supreme Court has held that "it frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one

---

[17] *See* Pål Jonson (@PlJonson), *Swedish government today decided to reject the applications of 13 offshore wind farms in the Baltic Sea* (Nov. 4, 2024, 6:08 AM), X (formerly Twitter), https://x.com/PlJonson/status/1853393931876106541.

[18] *Id.*

[19] Pål Jonson (@PlJonson), *The wind farms could also lead to reduced intelligence-gathering capabilities & disrupt sensors used to detect submarines* (Nov. 4, 2024, 6:08 AM), X (formerly Twitter), https://x.com/PlJonson/status/1853393939706912934.

[20] *Id.*

[21] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

[22] *Id.* at 22.

that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."[23]

A party seeking a preliminary injunction must demonstrate it meets the following four factors: (1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest.[24] These factors are considered on a sliding scale, meaning that a strong showing on one factor may compensate for a weaker showing on another.[25] However, the movant must at least demonstrate some likelihood of success on the merits and irreparable harm.[26]

**Argument**

**1.    The Company Is Unlikely to Succeed on the Merits**

> **A.    The Order Is Tailored and Within BOEM's Discretion to Protect National Security During Activities on the Outer Continental Shelf**

Administrative action is reviewed deferentially; agencies need only articulate a rational connection between the facts found and the choice made.[27] Here, BOEM acted upon "new classified information"[28] from the lead national-defense department indicating rapidly evolving adversary capabilities with direct national-security impacts from offshore wind installations, and took a limited, temporary step to pause activities while considering feasible mitigation. The

---

[23] *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal citations and quotations omitted) (emphasis in original).

[24] *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985).

[25] *See Merriweather v. Lappin*, 680 F. Supp. 2d 142, 143 (D.D.C. 2010).

[26] *Winter*, 555 U.S. at 20; *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).

[27] *Sec'y of Lab. v. Knight Hawk Coal, LLC,* 991 F.3d 1297, 1307 (D.C. Cir. 2021) (quoting *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) ("It is well-settled that, under arbitrary and capricious review, 'the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'").

[28] *See* Ex. 1 at 1.

Order expressly grounds its action in reasons of national security based on an interagency submission, states the pause is necessary to avert particularized harm, and limits the suspension to 90 days while BOEM considers mitigation measures. That explanation is facially rational in the national-security context and need not disclose classified details to be adequate.

The Company's contention that the Order is conclusory ignores the deference owed to national-security judgments and the limits on what the agency can disclose in a public order grounded in secret, classified information. The fundamental rule, however, is that "[a]s a general principle, . . . this Court should avoid impairment of decisions made by the Congress or the President in matters involving foreign affairs or national security."[29] Because the Government has agreed to make the classified, secret report available to the Court ex parte, the Court is in a far better position than any of the parties to determine whether the Company has overcome the general rule against impairing Government judgments whose justification is the protection of national security. As the D.C Circuit has held in cases like this, "courts do not second-guess expert agency judgments on potential risks to national security. Rather, we defer to the informed judgment of agency officials whose obligation it is to assess risks to national security."[30]

What we do know is that the body of the BOEM order on its face and without disclosing classified information, reflects that the order is based on information provided by the Department of War and offers to confer with the Company on how the identified national-security risks can be ameliorated. The Administrative Procedure Act does not compel the Government to publish classified specifics or litigate national security in public filings to avoid being labeled conclusory, particularly where the agency has promptly convened a process to consider

---

[29] *Glob. Relief Found., Inc. v. O'Neill*, 207 F. Supp. 2d 779, 788 (N.D. Ill. 2002) (citing *Haig v. Agee*, 453 U.S. 280, 292 (1981)).
[30] *Olivares v. Transportation Sec. Admin.*, 819 F.3d 454, 462 (D.C. Cir. 2016).

mitigation with the project proponent.[31]

### B.    The Company's Argument Ignores the Changeable Nature of National Security Risks

The Company argues that the Government has made an unexplained policy reversal. But agencies may and often must respond to new information and evolving risks, particularly when national security is at stake.[32]

In *Hikvision USA, Inc. v. Federal Communications Commission*,[33] a case involving Chinese-owned manufacturers whose video surveillance equipment was previously placed on the covered list and then was found to pose a threat to national security, the D.C. Circuit held that, when it comes to national security risks, agencies have significant deference over decision-making: "'[C]ourts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs.' . . . As we have previously written, '[w]e cannot second-guess the FCC's judgment that allowing China to access this information poses a threat to national security.'"[34] The Court continued, stating that such "deference is redoubled" when Congress has expressly identified specific national security risks, "requiring 'the full force' of judicial deference on issues that 'fall in the core of Executive and Legislative Branch expertise

---

[31] *See Bazzi v. Gacki*, 468 F. Supp.3d 70, 79 (D.D.C. 2020) (recognizing agencies can satisfy their obligations through procedural safeguards and engagement processes rather than through detailed public explanations of classified matters); *see also Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 94 (D.D.C. 2021) ("Deference for agency decision-making is heightened in the context of executive blocking decisions, which lie at the intersection of national security, foreign policy, and administrative law.") (internal quotation marks and citations omitted).

[32] *See Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 723 (D.C. Cir. 2022) ("[W]e defer to Executive Branch judgments on how best to protect national security. . . .[W]e would be 'hard-pressed' to set aside the Secretary's understanding of how a federal statute interacts with national security.") (internal citations omitted).

[33] *Hikvision USA, Inc. v. Fed. Commc'ns Comm'n*, 97 F.4th 938 (D.C. Cir. 2024).

[34] *Id.* at 948 (quoting *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988); *Pac. Networks Corp. v. Fed. Commc'ns Comm'n*, 77 F.4th 1160, 1164 (D.C. Cir. 2023)).

in the areas of national security and foreign affairs.'"[35]

Under the lease, the Company agrees that the Government reserves authority to suspend operations that may impair national security: "The Lessor reserves the right to suspend the Lessee's operations in accordance with the national security and defense provisions of section 12 of the Act and applicable regulations,"[36] and "[t]he Lessee hereby recognizes and agrees that the United States reserves and has the right to temporarily suspend operations and/or require evacuation on this lease in the interest of national security[.]"[37] And Section 12 of the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1334(a)(1) allows for the Secretary to suspend leases "if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits (in areas leased or not leased), or to the marine, coastal, or human environment[.]"[38] OCSLA's implementing regulations also allow BOEM to order a suspension "[w]hen the suspension is necessary for reasons of national security or defense."[39]

Although the Company touts its reliance on Government decisions made on then-known facts, BOEM's Order is not based on old facts but on BOEM's initial review of new classified information received in November 2025 relating to the rapid evolution of adversary technologies. The Company's demand that the Government ignore presumably rapidly evolving technologies (which could include advances in artificial intelligence, drones, manned aircraft, missiles—or as-yet-unknown threats to national security) amply justify—indeed demand—a

---

[35] *Id.* (quoting *Fed. Express Corp. v. United States Dep't of Com.*, 39 F.4th 756, 770 (D.C. Cir. 2022)).

[36] Ex. 4 at Section 3(c), OCS-A 0486 Commercial Lease of Submerged Lands for Renewable Energy Development.

[37] *Id.* at Addendum C-5.

[38] 43 U.S.C. § 1334(a)(1).

[39] 30 C.F.R. § 585.417(b).

temporary pause to assess that new information about new adversarial threats. BOEM's offer to meet and discuss how the Project can mitigate these new threats reasonably accounts for any reliance interests by selecting a short duration and inviting engagement rather than immediate cancellation. The Company's reliance narrative cannot freeze BOEM's ability to act on updated defense assessments concerning current threats, and the Company's desire for profits does not outweigh the pre-eminent duty of the Government to protect the nation against its enemies.

### C.    The Order Is Appropriately Tailored and Is Not Overly Broad

The Company argues that BOEM should have selected narrower measures to protect the nation, but fails to identify what those measures might be. Here, BOEM determined that the particularized harm "can only be feasibly averted by suspension of on-lease activities" during a short window for assessment. The Company offers no reason (other than anticipated profits) why this time-limited assessment window is unreasonable.

BOEM's Order limits the suspension to 90 days, allows necessary health, safety, and environmental activities, and sets a framework for considering "all feasible mitigation measures."[40] On its face, the agency considered scope and duration and chose a calibrated pause while mitigation is explored. The Company's criticism of BOEM's action falls far short of sustaining its burden to show that it was arbitrary or capricious.

### D.    The Company's Procedural and Due Process Claims Fail

The APA's licensing provision and constitutional due-process requirements do not mandate pre-disclosure of classified rationales or pre-deprivation hearings where the Government acts to address potential national-security harm on a temporary basis. The Order identifies national-security grounds based on classified information from the Department of War

---

[40] *See* Ex. 1.

and adopts a temporary, 90-day suspension while the agency assesses mitigation and engages with the Company to address these national security concerns. The Company points to no statutory command that BOEM must disclose classified assessments or provide a pre-suspension hearing before issuing a short, time-limited suspension to avert potential national-security harm.

To establish a protected property interest under the Due Process Clause, a party must demonstrate a legitimate claim of entitlement or a justifiable expectation in the approval of a building or development plan.[41] Federal permits and approvals for activities on the Outer Continental Shelf are at most a conditional and revocable benefit or approval subject to ongoing federal oversight.[42] There is no vested property right to construct on the Outer Continental Shelf because the Government, through BOEM, retains discretion to decide whether to approve permits, and ultimately whether to revise those permits, revoke those permits, or remand those permits.[43] OCSLA provides procedures for agency review and public participation, but it does not confer a vested right in permits or approvals once issued. Indeed, OCSLA expressly authorizes BOEM to suspend or cancel operations in specified circumstances.[44]

---

[41] *See Pratt Land & Dev., LLC v. City of Chattanooga*, 581 F. Supp. 3d 962, 993 (E.D. Tenn. 2022).

[42] *See Gardner v. City of Baltimore Mayor & City Council*, 969 F.2d 63, 68 (4th Cir. 1992) (a cognizable property interest in a permit or approval exists "only when the discretion of the issuing agency is so narrowly circumscribed that approval of a proper application is virtually assured." (internal quotations and citations omitted)); *see generally 3883 Connecticut LLC v. D.C.*, 191 F. Supp. 2d 90, 93–94 (D.D.C. 2002).

[43] *See generally Washington Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 36 (D.C. Cir. 1997) (citing *Brock v. Roadway Exp., Inc.*, 481 U.S. 252, 260 (1987)); *The Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).

[44] *See* 43 U.S.C. § 1334(a)(1) (authorizing lease suspension or prohibition of operation if there is a threat of serious, irreparable, or immediate harm to damage to life, property, mineral deposits, or the marine, coastal or human environment); 43 U.S.C. § 1334(a)(2) (authorizes lease cancellation if continued activity would likely cause serious harm or damage to life, property, national security, or the environment, and if the advantage of cancellation outweigh those of continuing the lease); 30 C.F.R. § 556.1102 (authorizes lease cancellation if the lessee fails to comply with OCSLA).

### E.    The Order Falls Within BOEM's Statutory and Regulatory Authority

The Outer Continental Shelf Lands Act and its implementing regulations require BOEM to regulate offshore wind projects to (among others) protect the national defense: "The Secretary shall ensure that any activity under this subsection is carried out in a manner that provides for— (f) protection of national security interests of the United States[.]"[45] The First Circuit, affirming the district court, has held that the Secretary's duty under this section is mandatory: "the OCSLA criteria are 'mandatory,'" and "BOEM must ensure that 'each criterion is met[.]'"[46] The Interior Department has also issued a formal Solicitor's opinion that "the OCSLA criteria are mandatory"[47]—the Solicitor's Opinion is binding on the Department.[48] And the order itself cites 30 C.F.R. § 585.417(b), BOEM's regulatory authority to order a suspension "[w]hen the suspension is necessary for reasons of national security or defense."[49] There is no case law on this regulation.

The Company's attempt to confine BOEM's authority to only wartime or formally declared emergency suspensions ignores BOEM's statutory duty to ensure that offshore wind activities are carried out in a manner that protects national security, and BOEM's regulatory

---

[45] 43 U.S.C. § 1337(p)(4)(F).

[46] *Seafreeze Shoreside, Inc. v. United States Dep't of the Interior*, 123 F.4th 1, 25 (1st Cir. 2024) (quoting *Seafreeze Shoreside, Inc. v. United States Dep't of the Interior*, No. 1:22-CV-11091-IT, 2023 WL 6691015, at *22 (D. Mass. Oct. 12, 2023)).

[47] *See* Off. of the Solicitor, U.S. Dep't of the Interior, M-37086 Memorandum Opinion on the Withdrawal of Solicitor's Opinion M-37067 and Reinstatement of M-Opinion 37059 at 3 (May 1, 2025), https://www.doi.gov/sites/default/files/documents/2025-05/m-37086.pdf.

[48] *See Citizens Against Casino Gambling in Erie Cnty. v. Chaudhuri*, 802 F.3d 267, 277 n.8 (2d Cir. 2015) ("The Solicitor of the [Department of Interior] has authority over the [Department's] legal work. . . . '[T]he Solicitor's M-Opinions are binding on the [Department] as a whole. After an M-Opinion is completed, the [Department] will take action consistent with the legal interpretation explained by the Solicitor.'" (quoting *Sims v. Ellis*, 972 F. Supp. 2d 1196, 1202 n.5 (D. Idaho 2013))).

[49] 30 C.F.R. § 585.417(b).

authority to issue temporary lease suspensions for national-security reasons. The agency's selection of a limited 90-day pause to evaluate new classified information and mitigation options fits comfortably within that framework—and BOEM is not free to ignore its mandatory statutory duty to protect national security, as the Company here demands.

## 2. The Company Has Not Shown Irreparable Harm

The Company's asserted harms from the temporary suspension are largely monetary, scheduling, and self-imposed risks arising from its construction sequencing and vessel contracts. But such monetary harms are not irreparable.

For example, in a recent decision by a Maryland district court judge, the court denied US Wind's motion for a preliminary injunction, rejecting US Wind's similar argument about its business losses as support for its motion. The held that US Wind's financial losses did not constitute "legally cognizable hardship."[50]

Courts regularly reject similar claims of "irreparable" economic and reputational harm as the routine costs of operating in a regulated market. In *Seko Customs Brokerage, Inc. v. United States*,[51] a licensed customs broker argued that Customs and Border Protection's suspension order would destroy its business, wipe out its reputational good will, and render substantial investments worthless—investments the company claimed were made in reliance on the Government's past approvals.[52] The court denied preliminary relief, however, holding that such harms—though serious—were insufficient to warrant extraordinary relief: "Seko's economic

---

[50] *See* Ex. 2 at 10.
[51] *Seko Customs Brokerage, Inc. v. United States*, 719 F. Supp. 3d 1279 (Ct. Int'l Trade 2024).
[52] *Id.* at 1289.

loss stemming from regulatory action is a cost that many businesses face, and it is a consequence for which Seko had notice."[53]

The Company pursued contracting, procurement, and construction-adjacent activities before any federal approvals were issued[54] and, later, while multiple legal challenges were pending and federal program leadership was publicly reassessing policies. Throughout the time the Company was investing in this Project, the Trump administration vocally opposed offshore wind projects. In his first administration, President Trump voiced opposition to offshore wind projects.[55] A key plank in his 2024 campaign for President was to oppose construction of offshore wind projects.[56] Yet even this highly visible opposition to offshore wind at the highest levels of the federal government did not deter the Company from accelerating and making new commitments amid pending federal approvals and unmistakable signs of federal reevaluation. The Company cannot now claim that the suspension order caused these self-inflicted injuries; they were business risks the Company voluntarily undertook—and the law does not insure against such business risks.[57]

---

[53] *Id.* at 1288.

[54] Durakovic, *Siemens Gamesa Receives Firm Order for Two US Offshore Wind Farms*, Offshore Wind.biz (Oct. 1, 2021), https://www.offshorewind.biz/2021/10/01/siemens-gamesa-receives-firm-order-for-two-us-offshore-wind-farms/ ("Siemens Gamesa has received the firm order from Orsted and Eversource to supply wind turbines for two wind farms offshore the USA. . . . Siemens Gamesa will supply, deliver and install a total of 77 . . . wind turbines for the Revolution Wind project off Rhode Island and the South Fork wind farm off Long Island.")

[55] *See Philip Bump, Trump Claims That Wind Farms Cause Cancer Very Trumpian Reasons*, Washington Post (April 3, 2019), https://www.washingtonpost.com/politics/2019/04/03/trump-claims-that-wind-farms-cause-cancer-very-trumpian-reasons/; Presidential Remarks, *Remarks by President Trump on American Energy and Manufacturing* (Aug. 13, 2019), https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-american-energy-manufacturing-monaco-pa/.

[56] Maxine Joselow and Josh Dawsey, *Trump Rails Against Wind Energy in Fundraising Pitch to Oil Executives*, Washington Post (Apr. 17, 2024), https://www.washingtonpost.com/climate-environment/2024/04/17/trump-wind-power-oil-executives/.

[57] *See* Ex. 2 at 9–10.

Such voluntary commitments undertaken during periods of obvious financial risk do not create irreparable harm warranting an injunction. In *Scotts Valley Band of Pomo Indians v. Burgum*,[58] the court rejected similar claims where the tribe alleged economic loss from contracts made in reliance on an agency approval later suspended. The court found that agreements executed before approval "did not rely on" it and thus were "not harmed" by the suspension, and that generalized spending assertions were too speculative to show imminent harm.[59]

The Company estimates daily losses, describes vessel availability constraints for the Scylla through February 22, 2026, and identifies risks to meeting the Rhode Island PPA's January 15, 2027 commercial operation milestone. But these assertions show contingency-laden, future-facing business risks, not certain, immediate, and non-compensable injury traceable to a 90-day pause carefully designed to address national security. These speculative injuries are insufficient to support a request for preliminary injunction because "[t]o establish irreparable harm, the movant must make a clear showing that it will suffer harm that is neither remote nor speculative, but actual and imminent."[60] This is particularly true for the Company's asserted economic injuries because "absent extraordinary circumstances, economic loss is not grounds for preliminary injunctive relief, even though it may result in financial hardship."[61]

---

[58] *Scotts Valley Band of Pomo Indians v. Burgum*, No. 1:25-CV-00958 (TNM), 2025 WL 1639901 (D.D.C. June 10, 2025).

[59] *Id.* at 4.

[60] *See Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (internal citations and quotation omitted); *see also Gomez v. Trump*, 485 F. Supp. 3d 145, 200 (D.D.C. 2020) ("A party seeking preliminary injunctive relief bears the burden of showing that she imminently will be irreparably harmed by the challenged action or inaction. The injury must be both certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.") (internal citations and quotations omitted).

[61] *Carabillo v. ULLICO Inc. Pension Plan & Tr.*, 355 F. Supp. 2d 49, 56 (D.D.C. 2004).

Reputational harm and generalized "existential risk" premised on business choices and third-party contract remedies are likewise speculative on this record. They do not justify compelling the Government to disregard present national-security concerns during a short assessment period.

**3.      The Balance of Equities and Public Interest Weigh Against Injunctive Relief**

When the Government invokes national security to justify a short, temporary pause to evaluate new classified information and develop mitigation measures, the equities and public interest strongly counsel against an injunction. BOEM issued a 90-day suspension "for reasons of national security,"[62] tied to new agency information and evolving adversary technologies, and invited the Company to confer on feasible mitigation. The public has a paramount interest in ensuring that federal agencies can address current national-security risks associated with critical infrastructure sited on the Outer Continental Shelf while mitigation is considered. The Company's asserted economic interests do not outweigh that public interest, particularly when the agency has chosen a short duration and collaborative process rather than outright lease cancellation.

The Company also claims public-interest harms related to energy supply and jobs, but a temporary, 90-day pause to evaluate mitigation does not outweigh the Government's national-security responsibilities, especially where the Company remains free to engage with BOEM to tailor mitigation and resume activities promptly upon resolution. The Order expressly states that BOEM will consider "all feasible mitigation measures" and a decision whether risks can be mitigated or whether cancellation is required.[63] The public interest is not served by judicially overriding an ongoing national-security assessment.

---

[62] *See* Ex. 1.

[63] *Id.*

**Conclusion**

The Court should deny the Company's motion for a preliminary injunction.

Respectfully submitted,

s/ Roger J. Marzulla
Roger J. Marzulla, Bar No. 394907
Nancie G. Marzulla, Bar No. 400985
Mollie A. Jackowski, Bar No. 1780535
Marzulla Law, LLC
1150 Connecticut Ave., NW
Suite 1050
Washington, DC 20036
Tel: (202) 822-6760
roger@marzulla.com
nancie@marzulla.com
mollie@marzulla.com

January 8, 2026                    Attorneys for Green Oceans