IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REVOLUTION WIND, LLC,

    *Plaintiff,*

v.

DOUGLAS BURGUM, in his official capacity as Secretary of the Interior, et al.,

    *Federal Defendants*,

  and

GREEN OCEANS,

    *Intervenor-Defendant.*

Case No. 1:25-cv-02999

Hon. Royce C. Lamberth

**FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND STAY PENDING REVIEW**

# INTRODUCTION

On December 22, the Department of the Interior's Bureau of Ocean Energy Management ("BOEM") suspended Revolution Wind's offshore wind lease given new national security information provided by the Department of War ("DoW"). The information DoW provided "includ[ed] the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects." Letter from Matthew Giacona to Rob Keiser (Dec. 22, 2025) ("Suspension Order"), Ex. C to Decl. of Jacob Tyner (Jan. 8, 2026). BOEM concluded that those national security considerations are implicated by Revolution Wind's offshore wind project. Tyner Decl. ¶¶ 7, 10.

Revolution Wind now seeks to preliminarily enjoin the entirety of the Suspension Order, but it has not shown it is entitled to that broad preliminary relief. For one, BOEM had statutory authority to issue the Suspension Order. And Revolution Wind too quickly dismisses the national security interests that the Court must consider when balancing the harms. BOEM concluded those national security risks "arise from the operation of" the Revolution Wind Project, and it sought to prevent those risks from occurring. *Id.* ¶¶ 4, 10. DoW is submitting classified information to the Court related to those risks. Given these national security risks, the Court should maintain the Suspension Order with respect to at least project operations.

# BACKGROUND

## I. Wind Energy Development on the Outer Continental Shelf

This case involves a wind energy project on the Outer Continental Shelf ("OCS"). The OCS consists of the submerged lands beneath the ocean, generally from 3 to 200 miles seaward of the coastline. *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 472 (D.C. Cir. 2009); 43 U.S.C. § 1331(a). Under the Outer Continental Shelf Lands Act ("OCSLA"), the United States holds these lands as a "vital national resource reserve" that "should be made

available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition *and other national needs*[.]" *Id.* § 1332(3) (emphasis added).

Interior approvals related to wind energy development on the OCS are governed by OCSLA and Interior's implementing regulations. *See* 43 U.S.C. § 1337(p)(1)(C) (authorizing the Secretary of the Interior to "grant a lease, easement, or right-of-way" for activities that "produce or support production, transportation, storage, or transmission of energy from sources other than oil and gas"); *id.* § 1337(p)(8) (authorizing the Secretary to "issue any necessary regulations to carry out this subsection"); *see also id.* § 1334(a) ("The Secretary shall administer the provisions of this subchapter relating to the leasing of the outer Continental Shelf, and shall prescribe such rules and regulations as may be necessary to carry out such provisions.").

In granting Interior that authority, Congress directed that "[t]he Secretary shall ensure that any activity under this subsection is carried out in a manner" that satisfies multiple criteria. *Id.* § 1337(p)(4). Among them are: "protection of national security interests of the United States." *Id.* § 1337(p)(4)(F). Interior regulations delegate to BOEM the responsibility to implement Section 1337(p)(4). *See* 30 C.F.R. § 585.102(a).

Under BOEM's renewable energy regulations and lease terms, a lease issued under OCSLA does not itself authorize development. 30 C.F.R. § 585.200(a). A lessee must first assess the site, obtain BOEM's approval of a site assessment plan, and obtain BOEM's approval of a Construction and Operations Plan ("COP"). 30 C.F.R. §§ 585.600, 585.605–585.613, 585.620–585.628.

II. **Factual Background**

The Revolution Wind Farm and Revolution Wind Export Cable Project ("Revolution Project" or "Project") is an offshore wind energy project that has been under construction in federal

2

waters off the coast of Rhode Island. Suppl. Compl. for Declaratory & Injunctive Relief ¶ 35, Dkt. No. 52 ("Suppl. Compl."). Revolution Wind submitted an initial COP for the Project to BOEM in 2020 and subsequently submitted several updated versions of the COP. Bureau of Ocean Energy Mgmt., Record of Decision: Revolution Wind Farm & Revolution Wind Export Cable Project Construction & Operations Plan 3 (Aug. 21, 2023) ("ROD") (filed at Dkt. No. 17-3). BOEM reviewed the COP in compliance with several statutes, including OCSLA. *Id.* at 1. BOEM issued a Record of Decision to approve the COP with modifications in August 2023, and sent Revolution Wind a letter of approval in November 2023. *See generally id.*; Suppl. Compl. ¶ 97. The COP, as approved, contemplates construction of up to 65 wind turbine generators, inter-array cables, two offshore substations, and other offshore and onshore components. ROD 22, A-2.

In January 2025, the President issued a Presidential Memorandum entitled, "Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects[.]" 90 Fed. Reg. 8363 (Jan. 20, 2025). Section 1 of that memorandum instructs the Secretary of the Interior to "conduct a comprehensive review of the ecological, economic, and environmental necessity of terminating or amending any existing wind energy leases[.]" *Id.*

"In November 2025, the DoW completed an additional assessment regarding the national security implications of offshore wind projects, and provided senior leadership at the Department of the Interior with new classified information, including the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects." Suspension Order.

Given the Project's location and "[b]ased on BOEM's initial review of the classified information," BOEM issued an order, "pursuant to 30 C.F.R. § 585.417(b), to suspend all ongoing

3

activities related to the [Project] on the Outer Continental Shelf for the next 90 days for reasons of national security." Suspension Order.

BOEM based its decision in part on the classified information it received from DoW, assessing that information in the context of existing national security-based mitigation measures for the Project. Tyner Decl. ¶¶ 4-7, 10. BOEM determined that, at current, the Project's activities did not adequately provide for protection of national security interests. *Id.* ¶ 7. And BOEM recognized the national security risks that the Project could pose once it became operational and acted in order to assess whether additional mitigation can be imposed to address those concerns. *Id.* ¶ 10. BOEM "[a]t this time[] is not aware whether the national security risks can be mitigated[.]" *Id.* BOEM also believes "any potential mitigation measures may be more effectively incorporated into the Revolution Wind Project before construction is completed." *Id.*

Concurrent with this filing, Federal Defendants are submitting the classified Declaration of Dale R. Marks for *ex parte*, *in camera* review.[1] An unclassified version of Mr. Marks's declaration is attached to this brief.

---

[1] Revolution Wind states that "[t]he Court should require Defendants to share with representatives for Revolution Wind that have appropriate security clearances access" the classified information BOEM relied on, "including through reactivating recent government security clearances for Revolution Wind's counsel[], while also requiring that the Government provide unclassified summaries of the key decisional documents for those without clearances." Pl.'s Br. 21. This request was not presented as a motion or properly briefed, and the Court should disregard it. In any case, prosecuting a civil action challenging agency action does not create the requisite "need to know" classified information under Exec. Order No. 13,526, § 6.1(dd), 75 Fed. Reg. at 729 (defining need to know as "a determination within the executive branch . . . that a prospective recipient requires access to specific classified information *in order to perform or assist in a lawful and authorized governmental function*." (emphasis added)). Courts regularly accept *ex parte* and *in camera* classified information that is part of the administrative record and upon which the agency intends to rely to defend the challenged agency action. *See, e.g.*, *China Telecom (Ams.) Corp. v. FCC*, No. 21-1233, Order (D.C. Cir. July 14, 2022); *Kidd v. TSA*, 723 Fed. App'x 5, 5 (D.C. Cir. 2018); *Jifry v. FAA*, 370 F.3d 1174, 1181-82 (D.C. Cir. 2004).

## STANDARD OF REVIEW

Revolution Wind seeks a preliminary injunction under Federal Rule of Civil Procedure 65(a). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The movant must make a "clear showing" that it satisfies four factors: (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Id.* at 22; *see also id.* at 20. The balance of equities and public interest merge when preliminary relief is sought against the government, because "the government's interest is the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009). Courts "should pay particular regard for the public consequences in employing the extraordinary remedy of an injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

Revolution Wind also requests preliminary relief under Section 705 of the Administrative Procedure Act ("APA"), which authorizes "the reviewing court" to "postpone the effective date of an agency action or to preserve status or rights pending" judicial review "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. The same factors governing preliminary injunctions also govern relief under Section 705. *See Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985). The relief available under Section 705, however, is not the same, since the relief allowed under Section 705 can only "postpone the effective date of an agency action" or "preserve status or rights" through a stay. 5 U.S.C. § 705. [2]

---

[2] The States of Rhode Island and Connecticut also have a case before the Court challenging BOEM's August 22 stop work order. *See Rhode Island v. U.S. Dep't of the Interior*, No. 25-cv-4328-RCL (D.D.C.). That case was transferred from the District of Rhode Island and recently consolidated with Revolution Wind's case. *See* Order, *Rhode Island v. U.S. Dep't of the Interior*,

**ARGUMENT**

Revolution Wind alleges that the Suspension Order is contrary to the APA, was issued without adequate due process, and that BOEM lacked authority for the Suspension Order. *See* Pl.'s Mot. for Prelim. Injunction & Stay Pending Review 16-35, Dkt. No. 50 ("Pl.'s Br."). Revolution Wind bases its alleged irreparable harms on construction delays that could allegedly result in delaying operation of the Project beyond contractual deadlines, and argues that preliminarily enjoining the Order would be in the public interest. *See* Pl.'s Br. 35–41. Addressing the merits first, BOEM had authority under OCSLA to issue the Suspension Order. And even if Revolution Wind has at least some chance of success on certain aspects of its remaining claims, the movant seeking preliminary relief holds the burden to demonstrate *all four* factors. Further, the Supreme Court has made clear that, as here, national security interests can outweigh irreparable harm. Preliminary injunctive relief, if appropriate, must be narrowly tailored to remedy the specific harm shown.

**I.     BOEM Had Authority to Issue the Suspension Order.**

BOEM was within its authority to issue the Suspension Order. BOEM regulations explicitly set forth the authority to issue the Order: "BOEM may order a suspension . . . [w]hen the suspension is necessary for reasons of national security or defense." 30 C.F.R. § 585.417(b).

---

Dkt. No. 50. In moving to expedite consideration of their motion to consolidated, the States attached their own motion for preliminary injunctive relief as to the December 22 Suspension Order. *See* Lodged Mot. for Prelim. Inj., *Rhode Island v. U.S. Dep't of the Interior*, Dkt. No. 46-1. Though the Court granted the States' motion to expedite, the States' preliminary injunction motion has yet to be docketed. In any event, the States do not have a basis on which to seek preliminary relief as to the December 22 Suspension Order because the States' complaint does not challenge that Order. *See* Compl., *Rhode Island v. U.S. Dep't of the Interior*, Dkt. No. 1. The States do not have a claim on which they could likely succeed for purposes of the preliminary injunction standard.

Revolution Wind argues that Government can suspend a lease for national security reasons "only in the circumstances contemplated by either [OCSLA] Section 1341 or Section 1334(a)(1)(B)[,]" which Revolution Wind argues are not present. Pl.'s Br. 34. Section 1341(c) provides that leases "shall contain or be construed to contain a provision whereby authority is vested in the Secretary [of the Interior,] upon a recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or the President . . . to suspend operations under any lease[.]" 43 U.S.C. § 1341(c); *see also id.* § 1331(b) ("[t]he term 'Secretary' means the Secretary of the Interior" except with regard to functions performed by the Secretary of Energy or FERC). Section 1341(d) concerns the Secretary of Defense's designation as "restricted from exploration and operation that part of the [OCS] needed for national defense[.]" And Section 1334(a)(1) directs the Secretary of the Interior to promulgate regulations that "shall include, but not be limited to, provisions . . . for the suspension or temporary prohibition of any operation or activity . . . if there is a threat of serious, irreparable, or immediate harm or damage to life . . . , to property, to any mineral deposits (in areas leased or not leased), or to the marine, coastal, or human environment[.]"

However, Sections 1334 and 1341 are not the sole sources of statutory authority related to national security issues. *See* 43 U.S.C. § 1337(p)(4)(F), (5). Section 1337(p)(4) provides that "[t]he Secretary shall ensure that any activity under this subsection is carried out in a manner that provides for . . . protection of national security interests of the United States[.]" The Suspension Order issued to Revolution Wind was a valid exercise of this statutory authority.

While Revolution Wind's complaint alleges § 1337(p)(4) does not give Interior "authority to order a cessation of activities on an already established leasehold," it does not press that argument in its motion, and for good reason. Suppl. Compl. ¶ 67, 235; *see also* Pl.'s Br. 34 (arguing §

7

1337 "is properly interpreted as authorizing suspensions" only in certain circumstances).  Paragraph (p)(4) is stated in the present tense: "The Secretary shall ensure that any activity under this subsection is carried out in a manner that provides for" the enumerated criteria.  The statute also does not limit itself to the initial decision to grant a lease.  Rather, it applies broadly to "*any* activity under [the] subsection" and explicitly contemplates "[t]he Secretary [] provid[ing] for the duration, issuance, transfer, renewal, *suspension*, and cancellation of a lease, easement, or right-of-way under this subsection." 43 U.S.C. § 1337(p)(4), (p)(5) (emphasis added).  In accordance with the statute, BOEM regulations require that a lessee "[c]onduct all activities authorized by the lease or grant in a manner consistent with the provisions of [43 U.S.C. § 1337(p)]." 30 C.F.R. § 585.105(h).  This construction of OCSLA is also supported by general administrative law principles, as "it is generally accepted that in the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decisions." *Macktal v. Chao*, 286 F.3d 822, 825–26 (5th Cir. 2002) (citations omitted*); see also Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (agencies generally have authority to reconsider unless "Congress has spoken").

Nor is the § 1337 authority constrained to the circumstances contemplated by Sections 1334 and 1341, as Revolution Wind argues.  Section 1334(a) is focused on the Secretary's promulgation of regulations and does not limit the Secretary's authority for continuing oversight under § 1337(p)(4).  And in any case, § 1334(a) is explicitly permissive—regulations promulgated under that subsection "shall include, *but not be limited to*" those accounting for the circumstances in § 1334(a)(1) that Revolution Wind argues are the limits of BOEM's authority. 43 U.S.C. § 1334(a) (emphasis added).

Interior's authority to suspend a lease for national security reasons is also not limited to the specific situations contemplated by § 1341(c), i.e., where the Secretary of Defense makes a

8

recommendation during a state of war or national emergency. *See* 43 U.S.C. § 1341(c). Section 1337(p)(4) grants the Secretary of the Interior broad authority to ensure "protection of national security interests of the United States[.]" *Id.* § 1337(p)(4)(F). It does not limit the United States' interest in national security to times of war or national emergency, and does not require that Interior be prompted by "a recommendation of the Secretary of Defense." *Compare* 43 U.S.C. § 1341(c) *with id.* § 1337(p)(4)(F). Indeed, OCSLA allows the Secretary of the Interior to *cancel* leases for national security reasons outside of those circumstances. *See* 43 U.S.C. § 1334(a)(2)(A)(i). It would be incongruous with this statutory scheme to assume Congress meant to withhold the lesser authority to suspend leases for national security reasons.

The same goes for § 1341(d), which "reserves and retains the right to designate by and through the Secretary of Defense, with the approval of the President, as areas restricted from exploration and operation that part of the [OCS] needed for national defense[.]" The rights § 1341(d) retains "through the Secretary of Defense" are separate from the obligations § 1337(p) places on the Secretary of the Interior. And national security interests go beyond "need[ing]" "part of the [OCS] . . . for national defense[.]" 43 U.S.C. § 1341(d). Further, by arguing that § 1334(a)(1) provides (and defines) authority for suspending a lease for national security purposes, Revolution Wind seems to acknowledge that lease suspensions are not limited to the specific circumstances in §§ 1341(c) or (d). Pl.'s Br. 33-34.

Finally, Revolution Wind's arguments about the terms of its lease are irrelevant to the question of statutory authority. Any claim that BOEM has violated the lease is a breach of contract claim over which the Court lacks jurisdiction. The only applicable waiver of sovereign immunity Revolution Wind has identified is the APA. But the APA's waiver does not apply where "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5

9

U.S.C. § 702; *see also id.* § 704 (APA only available to challenge "final agency action for which there is no other adequate remedy in a court."). The Tucker Act waives sovereign immunity for suits against the United States alleging a breach of contract, placing jurisdiction exclusively in the Court of Federal Claims for any claim more than $10,000. 28 U.S.C. § 1491(a)(1); *see also id.* § 1346(a)(2). The D.C. Circuit has "interpreted the Tucker Act . . . to impliedly forbid contract claims against the Government from being brought in district court under the waiver in the APA[.]" *Crowley Gov. Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (cleaned up) (internal quotations omitted).

BOEM had the authority to issue the Suspension Order. And even if Revolution Wind has some chance of success on certain aspects of its remaining claims, the movant seeking preliminary relief holds the burden to demonstrate *all four* factors. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, *and* that an injunction is in the public interest." *Winter*, 555 U.S. at 20 (emphasis added). Though never squarely holding so, the "D.C. Circuit has [] repeatedly suggested that [a] 'sliding scale' approach does not remain good law after *Winter*[.]" *Crowe v. Fed. Bureau of Prisons*, No. 24-cv-3582 (APM), 2025 WL 1635392, at *6 (D.D.C. June 9, 2025); *see also Clevinger v. Advocacy Holdings, Inc.*, 134 F.4th 1230, 1235–36 (D.C. Cir. 2025) ("[W]e have (somehow) gone seventeen years without needing to say if *Winter* really meant what it can be read to have said."); *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., Concurring) ("[T]he old sliding-scale approach to preliminary injunctions . . . is 'no longer controlling, or even viable.'" (quoting *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009)); *Henderson ex rel. NLRB v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018) ("*Winter* made

clear that *each* of these four factors must be satisfied to obtain preliminary injunctive relief." (emphasis in original)).

## II. National Security Concerns Can Outweigh a Plaintiff's Irreparable Harm When Balancing the Harms.

In weighing the balance of equities and public interest, "[t]he national security interest here must be paramount." *Nat. Res. Def. Council, Inc. v. Pena*, 972 F. Supp. 9, 20 (D.D.C. 1997). BOEM's Suspension Order was based in part on classified national security information from DoW. Tyner Decl. ¶¶ 4-7, 9-10; Decl. of Dale R. Marks ¶ 7 (Jan. 8, 2026). Federal Defendants are concurrently providing an unredacted, classified version of the Marks Declaration to the Court for *ex parte*, *in camera* review.

In assessing the balance of the harms here, the Court must "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." *Winter*, 555 U.S. at 24 (quoting *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986)). "[C]ourts do not second-guess expert agency judgments on potential risks to national security." *Olivares v. Transp. Sec. Admin.*, 819 F.3d 454, 462 (D.C. Cir. 2016). Indeed, in *Winter*, the Supreme Court concluded that the Navy's (and therefore the public's) interest in military readiness "plainly outweighed" the harms to marine mammals that could impact the plaintiffs' ability to study and observe them. *Winter*, 555 U.S. at 33. Other courts have similarly highlighted the import of national security concerns in considering injunctive relief. *See Stagg, P.C. v. U.S. Dep't of State*, 673 F. App'x 93, 95-96 (2d. Cir. 2016) (noting "matters of national security . . . present the most compelling national interest"); *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 100 (D.D.C. 2021) (agency actions that "are particularly important to national security . . . are subject to significant deference").

Based on the classified information from DoW, BOEM issued the Suspension Order to address the national security risk that would arise if the Project becomes operational and because further mitigation measures would be necessary before the Project reaches that stage. Tyner Decl. ¶¶ 4-7, 9-12. Revolution Wind does not have the benefit of the classified information in asserting that "[n]either the public nor [Federal] Defendants will suffer harm" if the Court grants its requested preliminary injunction. Pl.'s Br. 41. The Court will have the opportunity to review that classified information for purposes of balancing the harms here.

With respect to the other side of that balance, we recognize that the Court concluded in adjudicating Revolution Wind's prior preliminary injunction motion that the company's harms stemming from construction delays were irreparable. But Revolution Wind has not made a showing of any irreparable harm related to Project *operations* during the ninety-day suspension period or, even if that period was extended, during the pendency of this suit. Indeed, the company states that even before the Suspension Order, the Project's forecasted commercial operation date was not until October 1, 2026. *See* Pl.'s Br. 38 (citing Third Murphy Decl. ¶ 23). Revolution Wind posits that it may lose revenue should its Power Purchase Agreement ("PPA") in Rhode Island be terminated. Pl.'s Br. 38 (citing Third Murphy Decl. ¶ 16, 21). But the *possibility* of irreparable harm is insufficient. *See Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."). And Revolution Wind acknowledges that the PPA it bases its irreparable harm

argument on does not require commercial operations until January 2027.[3]  Pl.'s Br. 37 (citing Third Murphy Decl. ¶ 20).

Regardless of when operations could start, "mitigation measure will need to be in place before the Revolution Wind Project becomes operational."  Tyner Decl. ¶ 10.  Those of undersigned counsel who have reviewed the classified information submit that it provides a reasonable basis on which to find that, when it comes to operation of the Project, the public interest in national security outweighs Revolution Wind's alleged economic harms.  In balancing the national security risks identified by DoW against the costs alleged by Revolution Wind, the Court should "defer to the informed judgment of agency officials whose obligation it is to assess risks to national security."  *Olivares*, 819 F.3d at 462; *see also Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 100 (D.D.C. 2021) (denying preliminary injunction despite plaintiffs' "substantial harm" because "[i]n light of the national security interests involved, the equities and public interest d[id] not favor preliminary injunctive relief.").

### III. Any Preliminary Injunction Must be Narrowly Tailored to Prevent Demonstrated Irreparable Harm.

Given that the balance of harms that could occur during the pendency of the suit weighs in favor of the national security interests related to Project operations, Revolution Wind's request to enjoin the Suspension Order in full is overly broad.  "[A]ny injunction that the court issues must be carefully circumscribed and 'tailored to remedy the harm shown.'"  *Dorsey v. Dist. of Columbia*, 711 F. Supp. 2d 133, 135 (D.D.C. 2010) (quoting *Nat'l Treasury Emps. Union v. Yeutter*, 918 F.2d 968, 977 (D.C. Cir. 1990)).  Further, the harm must be suffered "while the case is pending."  *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at * 1 (D.C. Cir. May 16, 2025)

---

[3] Revolution Wind does not appear to argue that it would be irreparably harmed if it was unable to meet the December 31, 2026 commercial operation deadline in its two 2018 Connecticut PPAs.  *See* First Murphy Decl. ¶ 26, Dkt. No. 9-6.

13

(citing *Winter*, 555 U.S. at 20, 32). Applying those principles here means that any preliminary injunction should be tailored to maintain the suspension of operational activities.

As noted above, Revolution Wind alleges it will suffer irreparable harm because of *construction* delays that "threaten[] Revolution Wind's ability to timely complete the Project and to meet" a January 15, 2027 commercial operation "deadline in one of its PPAs that represents the majority of Project capacity." Pl.'s Br. 36; *see also id.* at 37. "Specifically," Revolution Wind alleges it faces the risk of project cancellation if it is unable to "complete installation of the Project's remaining [wind turbine generators,]" which relies on a specialized vessel only guaranteed to be available through February 22, 2026. *Id.* at 36-37. One of Revolution Wind's declarants references "other work delays that separately risk that ability to meet the commercial operations date[,]" but Revolution Wind does not explain what those other delays or risks are. Third Murphy Decl. ¶ 3.

But Revolution Wind fails to make any showing of irreparable harm concerning Project operations—which, again, implicate national security concerns—before this suit can be litigated on the merits. Thus, any injunction—assuming the Court finds one appropriate—should retain the suspension of Project operations until mitigation measure acceptable to DoW and BOEM are adopted. Indeed, the Suspension Order, as currently stated, is slated to expire well before the January 15, 2027 PPA commercial operations deadline. Even if the initial suspension period is extended, Revolution Wind's case, as an APA case, is likely to be litigated on the merits well in advance of January 2027.

## CONCLUSION

Revolution Wind has not shown it is entitled to the broad preliminary injunction it seeks. BOEM had authority under OCSLA to issue the Suspension Order. Any likelihood of success on the merits may be outweighed by the balance of equities and public interest in national security,

14

which the Court may assess through *ex parte*, *in camera* review of the classified information BOEM relied on. Even if the Court concludes preliminary relief is appropriate, the Court should allow Federal Defendants to maintain suspension of Project operations as stated in the Suspension Order.

January 8, 2026

                                 ADAM R.F. GUSTAFSON
                                 Principal Deputy Assistant Attorney General

                                 *s/ Peter M. Torstensen, Jr.*
                                 PETER M. TORSTENSEN, JR.
                                 Deputy Assistant Attorney General

                                 *Kristofor R. Swanson\**
                                 KRISTOFOR R. SWANSON*
                                 (Colo. Bar. No. 39378)
                                 AMANDA K. RUDAT*
                                 JOHN K. ADAMS
                                 Natural Resources Section
                                 Environment & Natural Resources Division
                                 U.S. Department of Justice
                                 P.O. Box 7611
                                 Washington, D.C. 20044-7611
                                 Telephone: (202) 598-9646 (Torstensen)
                                 Telephone: (202) 598-1937 (Swanson)
                                 Telephone: (202) 532-3201 (Rudat)
                                 peter.torstensen@usdoj.gov
                                 kristofor.swanson@usdoj.gov
                                 amanda.rudat@usdoj.gov

                                 *Attorneys for Federal Defendants*

*Counsel contributed to the drafting of this brief, but lacks the security clearance necessary to review the classified materials.