# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

REVOLUTION WIND, LLC,

       *Plaintiff*,

    v.

DOUGLAS J. BURGUM, in his official capacity
as Secretary of the U.S. Department of the
Interior;

UNITED STATES DEPARTMENT OF THE
INTERIOR;

MATTHEW GIACONA, in his official capacity
as Acting Director of the Bureau of Ocean
Energy Management;

BUREAU OF OCEAN ENERGY
MANAGEMENT;

KENNETH STEVENS, in his official capacity as
Principal Deputy Director Exercising the
Delegated Authorities of the Director of the
Bureau of Safety and Environmental
Enforcement; and

BUREAU OF SAFETY AND
ENVIRONMENTAL ENFORCEMENT,

       *Defendants*,

and

GREEN OCEANS,

       *Defendant-Intervenor*.

Case No.: 1:25-cv-02999-RCL

<u>Hearing: January 12, 2026</u>
<u>2:00 PM, Courtroom 15</u>

**<u>PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
AND STAY PENDING REVIEW</u>**

## INTRODUCTION

Defendants do not dispute—and thereby concede—that the Second Stop Work Order is arbitrary and capricious, overbroad, and violates due process and Section 558 of the Administrative Procedure Act ("APA"). Their failure to defend against those claims is telling, as is Defendant-Intervenor's inability to muster more than a conclusory argument on any of those claims.

Defendants effectively concede that Revolution Wind will suffer irreparable harm from the Second Stop Work Order's halt of construction. That construction delay will lead to potential termination of the majority of Revolution Wind's power purchase agreements from delayed operations. The attendant risk of Project cancellation is exactly the kind of enterprise-level harm to the Project that is irreparable.

Defendants' claim of a public interest in national security does not overcome Revolution Wind's conceded success on the merits and irreparable harm. Indeed, Defendants can only claim a public interest if the national security justification is not arbitrary and not pretextual. But the rationalizations provided in Defendants' declarations do not detail a compelling public interest that is served by the Second Stop Work Order. Instead, they provide further evidence that this Second Stop Work Order is arbitrary and capricious.

Furthermore, Defendants ask this Court to maintain the Second Stop Work Order and deny preliminary relief based on classified information that they refuse to share with Revolution Wind or even with any cleared U.S. experts retained for that express purpose. That refusal is incompatible with due process, which guarantees Revolution Wind notice of the basis for adverse action and a meaningful opportunity to rebut it. Revolution Wind is entitled to at least the unclassified evidence or adequate unclassified summaries of or access to the classified evidence Bureau of Ocean Energy Management ("BOEM") relied on when it issued the Second Stop Work

Order.  The government has changed explanations for withholding this information, explicitly citing the litigation-driven nature of its position.

The Court should stay the Second Stop Work Order and preliminarily enjoin its enforcement.

## ARGUMENT

### I.    THE GOVERNMENT CONCEDES THAT REVOLUTION WIND IS LIKELY TO SUCCEED ON THE MERITS OF AT LEAST SOME OF ITS CLAIMS

1. Defendants offer no response to Revolution Wind's detailed arguments that the Second Stop Work Order is arbitrary and capricious, unconstitutional, and contrary to the APA, 5 U.S.C. § 558.  Mot. at 17-31.  Both the D.C. Circuit and this Court have been clear that courts should treat "unaddressed arguments as conceded" when "a party file[s] an opposition that addresses only *some* of the arguments raised in the underlying motion."  *Texas v. United States*, 798 F.3d 1108, 1114 (D.C. Cir. 2015); *Hayes v. Sebelius*, 762 F. Supp. 2d 90, 100 (D.D.C. 2011) (Lamberth, J.) (same) (citing LCvR 7(b)).

Defendants have thereby conceded that the Second Stop Work Order (1) lacks any reasonable basis, (2) violates the change-in-position doctrine, (3) is overbroad, and (4) violates Revolution Wind's due process and APA rights.  This concession confirms that Revolution Wind is likely to succeed on the merits on a number of its claims.[1]

---

[1] Green Oceans similarly concedes most of Revolution Wind's merits arguments.  Where Green Oceans addresses the merits at all, it merely gestures at the argument, such as by stating that Revolution Wind's "Procedural And Due Process Claims Fail" (in a section header) and that "the APA's licensing provision . . . do[es] not mandate pre-disclosure of classified rationales or pre-deprivation hearings where the Government acts to address potential national-security harm on a temporary basis."  Green Oceans Opp. at 11.  But such conclusory statements are insufficient to preserve an argument.  *Hall v. District of Columbia*, 867 F.3d 138, 152 n.1 (D.C. Cir. 2017) ("Without any arguments advancing the disputed claims[]"—particularly where statements are made "in a section header"—"such blanket, conclusory assertions are insufficient to preserve them."); *In re Carvalho*, 598 B.R. 356, 361 (D.D.C. 2019) ("[A] litigant does not properly raise

2.   The only response Defendants offer on the merits is to defend their statutory authority to issue the Second Stop Work Order, Fed. Defs.' Opp. at 6-10, but they do not even contest that the Order was arbitrary and capricious, and violated constitutional due process and APA Section 558.  Furthermore, Defendants are wrong about their statutory authority.

Defendants do not dispute—and thus concede—that they have no authority to issue the Second Stop Work Order under the legal standards for suspension set forth in 43 U.S.C. §§ 1334(a)(1)(B) and 1341.  According to Defendants, those statutory provisions are irrelevant here because 43 U.S.C. § 1337(p)(4) allegedly grants unlimited authority to the Secretary to ensure that "any activity under this subsection is carried out in a manner that provides for . . . protection of national security interests of the United States," even if that means suspending activities on a lease without any prior notice or opportunity to address the Government's allegation.  Fed. Defs.' Opp. at 7-9.[2]  But Defendants cannot rely on Section 1337(p)(4) here, for at least two reasons.

*First*, Defendants' regulations refute their position that Section 1337(p)(4) provides unbounded oversight authority.  As Defendants note (at 8), 30 C.F.R. § 585.105(h) requires lessees to "conduct all activities authorized by the lease or grant in a manner consistent with the provisions of [43 U.S.C. § 1337(p)(4)]."  But BOEM already determined that the Project complied with Section 1337(p)(4) in the Record of Decision approving the Project.  Record of Decision at B-2.[3]

---

an issue by addressing it in a cursory fashion, with only bare-bones arguments.") (quotation omitted).

[2] Unlike the First Stop Work Order, the Second Stop Work Order does not even cite that statutory provision.  Defendants' reliance on it now is nothing more than a *post hoc* rationalization.  Instead, the Second Stop Work Order borrows language from 43 U.S.C. § 1334(a)(1) in referring to "serious, immediate, and irreparable" harm.  However, BOEM did not make the finding of "particularized harm" necessary to satisfy Section 1334(a)(1), Mot. at 25 and Defendants do not argue otherwise.

[3]    The    Record    of    Decision    is    available    at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution-Wind-Record-of-Decision-OCS-A-0486_3.pdf.

Here, 30 C.F.R. § 585.105(h) addresses noncompliance with the conditions of the COP approval, not purported noncompliance based on supposedly new and previously unknown security threats. And even so, BOEM's own regulations prescribe the remedy for noncompliance, in the very next section at 30 C.F.R. § 585.106, though application in this context is nonsensical, especially as where OCSLA in Section 1341 provides a clear mechanism for suspension for new national security threats. BOEM's regulations refute the notion that Section 1337(p)(4) provides some sort of inherent authority to immediately suspend activities any time the Secretary unilaterally determines he wishes to do so, particularly for a Project like Revolution Wind that is *not* out of compliance with the statute or 30 C.F.R. § 585.105.[4]

*Second*, Defendants misinterpret Section 1337(p)(4). That section governs "leases, easements or rights-of-way for energy and related purposes." It provides, among other things, general authority to issue those instruments for specific purposes, it governs whether leases can be issued on a noncompetitive basis, it requires imposition of security requirements, pertains to coordination with state and local governments, and, as relevant here, it imposes certain "requirements" to ensure that in executing the subsection the Secretary "provides for" certain interests, including national security. 43 U.S.C. § 1337(p). Here, Interior satisfied that requirement as discussed in detail in Plaintiffs' opening brief. But other statutory provisions— namely, 43 U.S.C. § 1341(c) and (d)—more specifically provide the Secretary's authority with

---

[4] Although BOEM relies on a different regulation in the Second Stop Work Order, 30 C.F.R. § 585.417(b), Defendants do not suggest that this suspension authority overlaps with the § 1337(p)(4) factors, instead relying on 30 C.F.R. § 585.105 as the implementing regulation. Fed. Opp. at 8 ("In accordance with the statute, BOEM regulations require that a lessee "[c]onduct all activities authorized by the lease or grant in a manner consistent with the provisions of [43 U.S.C. § 1337(p)]. 30 C.F.R. § 585.105(h)."). And it is axiomatic that a regulation cannot give an agency authority that Congress has not. *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 301 (2022) ("An agency, after all, literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute.") (quotation omitted).

respect to suspending lease operations on national security grounds.  Mot. at 33-35.  Defendants'

reading of Section 1337(p)(4) would render the specific and narrow authority for national security

suspensions in Sections 1341(c) and (d) as well as the suspension authority in Section

1334(a)(1)(B) superfluous if the Secretary could just override the statutorily required prerequisites

for suspension by alleging, without notice or an opportunity for defense or mitigation, a violation

of Section 1337(p)(4).  *See Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 213 (2018) ("[O]ne

of the most basic interpretive canons" is "that [a] statute should be construed so that effect is given

to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."

(second alteration in original) (citation omitted)).  This Court must give meaning to every provision

of the Outer Continental Shelf Lands Act ("OCSLA").  *See Life Techs. Corp. v. Promega Corp.*,

580 U.S. 140, 141 (2017) ("Whenever possible, however, we should favor an interpretation that

gives meaning to each statutory provision.").

    And Defendants' suggestion (at 9) that it would be incongruous for OCSLA to permit

cancellation under Section 1334(a)(2) in circumstances other than those contemplated elsewhere

in OCSLA, but not suspension, makes no sense.  Section 1334(a)(2)(B) only permits cancellation

if a suspension has been operative for at least five years, and suspension on national security

grounds, in turn, is authorized when the conditions set forth in Sections 1341(c) and (d) are

satisfied or any applicable condition in Section 1334(a)(1)(A) is satisfied.    43 U.S.C. §

1334(a)(2)(B).[5]    This delay on cancelation authority reinforces that Congress purposely

constrained the Secretary's suspension authority.

---

[5] Contrary to Defendants' characterization of Revolution Wind's argument, the lease makes clear
BOEM is contradicting its own interpretation of the statute, as demonstrated in Revolution Wind's
motion.  Mot. at 34.

The Defendants' invocation of Section 1337(p)(5) (at 8) is not valid.  OCSLA was originally enacted in 1953, Pub. L. 83-212, to provide for offshore oil and gas leasing.  *Healthy Gulf v. DOI*, 152 F.4th 180, 187 (D.C. Cir. 2025).  When Section 1337(p) was enacted to add renewable energy uses of the Outer Continental Shelf, Pub. L. 109-58, § 388, 119 Stat. 744-47, Congress gave no indication that it intended to give the Secretary of the Interior more authority to suspend leases and activities for renewable energy uses than for oil and gas, let alone unfettered authority.  Thus, Section 1337(p)(5) is properly interpreted as a direction to the Secretary to provide for certain mechanisms—which are reflected in the Revolution Wind lease and BOEM's regulations—and to aid in renewable-lease management by providing for "the duration, issuance, transfer, renewal, suspension, and cancellation of a lease, easement, or right-of-way under [Section 1337(p)]" consistent with the statutory limitations pre-existing in OCSLA, including Sections 1334 and 1341.  Section 1337(p)(5) does not grant yet another and duplicative statutory basis to suspend leases.

## II.    REVOLUTION WIND FACES IRREPARABLE HARM ABSENT IMMEDIATE RELIEF

The Defendants effectively concede that the construction delays caused by the Second Stop Work Order would result in irreparable harm to Revolution Wind for the same reasons that this Court preliminarily enjoined the First Stop Work Order.  Fed. Defs.' Opp. at 12.  Their only response is that "Revolution Wind has not made a showing of any irreparable harm related to Project *operations*" during either (i) the initial 90-day suspension period or (ii) during the pendency of this suit if the suspension period is extended.  *Id.* (emphasis in original).  The Defendants ignore the fact that completing construction of the Project—which Revolution Wind is currently prohibited from doing—is a necessary precondition to commencing operations.  Third Decl. of Paul Murphy in Supp. of Pl.'s Mot. for a Preliminary Inj. and Stay Pending Review, Dkt.

50-1 ("Third Murphy Decl.") ¶¶ 13-22.  Revolution Wind faces irreparable harm because the Second Stop Work would result in the loss of a highly-specialized vessel that is necessary to complete Project construction.  Mot. at 36-37.  This Court has already found that if construction delays prevent the Project from becoming operational by the deadlines in Power Purchase Agreements ("PPAs") with third party contractual rights to terminate, this would threaten the viability of the Project itself.  Mot. at 36-40; *see also* Tr. of Prelim. Inj. Hrg. 43:8-15 (Sept. 22, 2025) ("Tr."), Dkt. 39; *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008).

Defendants ignore the enterprise-level harms to the Project posed by the Second Stop Work Order.  *See* Mot. at 38-40.  Defendants suggest that Revolution Wind faces only "the *possibility* of irreparable harm" because "the PPA it bases its irreparable harm argument on does not require commercial operations until January 2027".  Fed. Defs.' Opp. at 12-13 (emphasis in original).  But Defendants misrepresent Revolution Wind's position.  Prior to the Second Stop Work Order, Revolution Wind's forecasted commercial operation date was October 1, 2026[6] to meet the contractual deadline in January 2027.  Third Murphy Decl. ¶ 23.  The 90-day Second Stop Work Order makes it impossible to meet either date.  *Id.*  Therefore, the Second Stop Work Order causes immediate and irreparable harm to the Project's operations.

Moreover, Defendants do not grapple with Revolution Wind's explanation as to *why* failure to commence operations by the contractual Commercial Operations Date in the Rhode Island PPA poses an existential threat to its business.  The Rhode Island PPA, "which represents the majority of project capacity . . . requires that the Project reach the Commercial Operation Date by January 15, 2027."  Dkt. 50 at 4.  As Revolution Wind explained, the Rhode Island PPA accounts for most

---

[6] This date already reflects a delay to the Project's schedule due to BOEM's First Stop Work Order which this Court enjoined.

of the Project's expected revenue, which Revolution Wind would lose if it is terminated.  Mot. at 29; Third Murphy Decl. ¶ 21.  If that happens, the remaining four PPAs, which represent a minority of the Project's anticipated revenues, would not be sufficient to make the Project commercially viable, particularly if the Project's remaining wind turbine generators cannot be installed before those PPAs' Commercial Operation Date.  Mot. at 29; Third Murphy Decl. ¶¶ 20, 25, 32.  Both the potential termination of the Rhode Island PPA and the loss of revenue for the remaining wind turbine generators risks Project cancellation, which could result in breakaway costs exceeding $1 billion and the potential loss of $6 billion in prior investments in the Project.  Third Murphy Decl. ¶¶ 11, 33.  That is exactly the kind of enterprise-level harm that courts in this Circuit—including this Court with respect to the First Stop Work Order—have recognized as irreparable.  *See* Mot. at 40; Tr. at 43:7-23.

Defendants also make no attempt to grapple with the fact that the Second Stop Work Order will harm Revolution Wind's reputation, which constitutes irreparable harm.  *See* Mot. at 40. Because the Second Stop Work Order "jeopardize[s]" Revolution Wind's "binding contracts" with Rhode Island and Connecticut through the PPAs, Revolution Wind stands to lose not only economic value but also "good will."  *See Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 76 (D.D.C. 2010).  Reputational damage is a separate irreparable injury, which Defendants fail to acknowledge.  *See Wash. Teachers' Union*, *Loc. No. 6 v. Am. Fed'n of Teachers*, 751 F. Supp. 2d 38, 56 (D.D.C. 2010).

Finally, Defendants' are wrong (at 13-14) that Revolution Wind has not made a showing of irreparable harm concerning Project operations.[7]  First, Defendants appear to be under the

---

[7] To the extent that, as part of their retrenchment, Defendants argue that lack of irreparable harm from a delay to operations means that any injunctive relief should be limited, that argument is unsupported.

misimpression that, prior to the Second Stop Work Order, the Project had only been anticipated to "'become[] operational'" (in Defendants' words), in October of this year (which had been the anticipated timeline for achieving the Commercial Operations milestone under its PPAs).[8]  On the contrary, Revolution Wind made clear that before BOEM issued the Second Stop Work Order, the Project was on schedule to begin operations as early as January 2026 by achieving "first power"— *i.e.*, when a subset of the Project's wind turbine generators begin generating power that is sent to the onshore electric grid.  Mot. at 27, 42; Third Murphy Decl. ¶¶ 8, 31.  This matches BOEM's definition of "commercial operations": "the generation of electricity or other energy product for commercial use, sale, transmission, or distribution from a commercial lease." 30 C.F.R. § 585.113.  To the extent the Second Stop Work Order is not fully enjoined, a suspension on operations prevents the Project from receiving crucial revenue—necessary to offset costs—from operating the Project after achieving first power within the initial 90-day suspension period and beyond then if BOEM extends the suspension.  *See* Third Murphy Decl. ¶ 31As an initial matter, there is no guarantee that this lost revenue would be recoverable.  *See* Mot. at 40 (citing *Nat'l Lifeline Ass'n v. FCC*, No. 18-1026, 2018 WL 4154794, at *1 (D.C. Cir. Aug. 10, 2018) (finding irreparable harm where implementation of [an agency's] Order [would] result in substantial, unrecoverable losses in revenue that [might] indeed threaten the future existence of [petitioners'] businesses.")).  Second, given the indefinite nature of the Second Stop Work Order's duration, and BOEM's course of conduct, there is no reason to believe that the Second Stop Work Order will be resolved in short order.  Indeed, both the Second Stop Work Order and the Tyner Declaration (at ¶ 12) explicitly contemplated cancelation, which can only occur after five years of suspension.  *See*

---

[8] Achievement of this milestone requires satisfying multiple requirements.  *See* Third Murphy Decl. ¶ 16.  Revolution Wind cannot achieve it simply by building a wind farm that is at least 90% the size of what was proposed but is not operational.

*supra* at 5.  Of course, a suspension of operations past the Rhode Island PPA's Commercial Operations Date deadline would allow the utility buyer a unilateral right to terminate the PPA, presenting an existential threat to the Project.  Mot. at 37-38.

Green Oceans repeats arguments it made in opposition to Revolution Wind's motion to enjoin the First Stop Work Order, including that "monetary harms are not irreparable," and that Revolution Wind assumed the risk by constructing the Project.  Green Oceans Opp. at 14-16.  But they fail to grapple with Revolution Wind's actual presentation of irreparable harm, which goes beyond monetary harm, and which this Court credited in enjoining the First Stop Work Order.  *See* Tr. 43:7-18.  The same reasoning applies to the Second Stop Work Order.  Green Oceans' reliance (at 16) on *Scotts Valley Band of Pomo Indians v. Burgum*, No. 1:25-CV-00958 (TNM), 2025 WL 1639901 (D.D.C. June 10, 2025) is also misplaced.  There, the court found that a plaintiff tribe could not rely on contracts entered into before Interior's decision to make tribal land eligible for gaming to demonstrate irreparable harm when Interior suspended that decision two months later. Revolution Wind's irreparable harm claims are not based on financial losses from contracts entered into before BOEM issued the now-suspended lease in 2013.  *See* Decl. of Melanie Gearon in Supp. of Pl.'s Mot. for a Preliminary Inj. and Stay Pending Review, Dkt. 9-1 ¶ 8.  Instead, Revolution Wind's harms are based on the threat of Project cancellation and attendant existential risk to Revolution Wind.  *See* Mot. at 35-40.  Revolution Wind has done more than allege "conclusory monetary losses," *see Scotts Valley*, 2025 WL 1639901 at *4, as Federal Defendants effectively concede, *see* Fed. Defs.' Opp. at 12.

## III.    EQUITABLE FACTORS STRONGLY FAVOR IMMEDIATE RELIEF

Defendants' core argument is that the public interest factor dominates the balance of harms, relying on their national security assertions and classified information.  Fed. Defs.' Opp. at 11-13. But those assertions hold water for balance-of-harms purposes only if they adequately support

BOEM's decision on the merits. Revolution Wind's "credible and unrebutted evidence of harm, and the absence of any such evidence on the other side, tilts both the balance of equities and the public interest in [its] favor." *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 766 F. Supp. 3d 74, 84 (D.D.C.), *enforced*, 768 F. Supp. 3d 1 (D.D.C. 2025). As part of their response, Defendants submitted declarations from two government officials—Jacob Tyner (Department of the Interior) and Dale Marks (Department of War). Dkts. 60-1 ("Tyner Decl."), 60-2 ("Marks Decl."). But the post hoc rationalizations provided in those declarations do not demonstrate a compelling public interest that is served by the Second Stop Work Order and instead provide further evidence that this Second Stop Work Order is arbitrary and capricious, especially when the concerns were first raised on November 13, 2025, more than six weeks before BOEM issued the Second Stop Work Order.

*First*, while the Second Stop Work Order "suspend[s] *all ongoing activities* related to the Revolution Wind Project on the Outer Continental Shelf for the next 90 days for reasons of national security," Supp. Compl., Ex. B, the Tyner Declaration does not even attempt to justify the Second Stop Work Order's suspension of construction activities on national security grounds. Instead, it refers to a purported threat from "*operations*," not construction. Tyner Decl. ¶¶ 4, 10 (emphasis added). And notably—as best as Revolution Wind can tell—the Marks Declaration provides no statement on behalf of the Department of War that a present suspension of *any* activities is necessary for the protection of national security.[9] As explained in Revolution Wind's motion, the

---

[9] Defendants' are not entitled to deference on national security here. *See Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 601, 603 (4th Cir.) (en banc), *as amended* (May 31, 2017, June 15, 2017), *vacated as moot and remanded*, 583 U.S. 912 (2017) (declining to defer to the administration's national security rationale for the second travel ban). Indeed, Defendants' own cases (at 11) reflect this point. In *Olivares v. TSA*, 819 F.3d 454 (D.C. Cir. 2016), the Court would not defer to just any agency official on any national security issue; "[r]ather," it would "defer to the informed judgment of agency officials whose obligation it is to assess risks to national

Second Stop Work Order essentially (and impermissibly) just says, "trust us, we had good national security reasons for what we did." *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 257, 270 (D.D.C. 2018). But BOEM failed to complete the "critical step" of connecting facts to its ultimate conclusion that the Second Stop Work Order was justified. *Xiaomi Corp. v. Dep't of Def.*, No. CV 21-280, 2021 WL 950144, at *5 (D.D.C. Mar. 12, 2021) (quoting *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995)).[10]

*Second*, the only justification provided by the Tyner Declaration for suspending "all activities" to avoid what he asserts is a threat from operations does not stand up to scrutiny. The Tyner Declaration suggests that BOEM believed it necessary to halt the Project because of a "concern[] that allowing the Revolution Wind Project to become operational without addressing the national security risks may cause the Developers to ignore those risks and claim that it is too late to address the issues." Tyner Decl. ¶ 12. In the first place, this means that BOEM is not

---

security." *Id.*; *see also Goldman v. Weinberger*, 475 U.S. 503, 507 (1986) (deferring to the "professional judgment of military authorities concerning the relative importance of a particular military interest"). BOEM should get no deference here.

[10] Further calling into question any rational basis for the Second Stop Work Order, Defendants applied the same logic to other projects at varying stages of construction. All five projects that BOEM halted in virtually identical orders are at very different stages of construction. *Compare* Third Murphy Decl. ¶ 5 ("[T]he Project is approximately 87% complete."), *with, e.g.*, Compl. ¶ 5, *Sunrise Wind LLC v. Burgum*, No. 1:26-cv-00028 (D.D.C. Jan. 6, 2026), Dkt. 1 ("Overall, the Project is nearly 45% complete . . . ."); Compl. ¶ 6, *Empire Leaseholder LLC, et al. v. Burgum, et al.*, No. 1:26-cv-00004 (D.D.C. Jan. 2, 2026), Dkt. 3 (noting the Project is "approximately 60% [] complete," with no wind turbines up); Compl. ¶¶ 44, 45, 47, *Va. Elec. & Power Co. v. Dep't of the Interior*, No. 2:25-cv-00830   (E.D. Va. Dec. 23, 2025), Dkt. 1 (confirming "[o]nshore construction has advanced considerably" and that "[f]abrication of wind turbine towers . . . is in process"); Bureau of Ocean Energy Mgmt., Director's Order to Vineyard Wind 1 LLC at 1 (Dec. 22, 2025), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/BOEM%20Vineyard%20Suspension%20Letter.pdf?VersionId=fjS0RXlwQMRGj._l1 DSaZOPTpcvkP6HM ("[G]iven that this project is partially generating power, you may continue any activities from those wind turbines that are necessary for the current level of power generation."). If "operation[s]"-related concerns were truly the problem, then it makes no sense to subject all five projects to sweeping 90-day suspensions given the projects' vastly different stages of development.

pointing to an immediate threat to national security from allowing offshore wind projects to commence operations, but rather to BOEM's own perception of its leverage over developers (not to mention BOEM's misplaced suspicion of their commitment to national security, a bias consistent with the government's open hostility to the industry). Furthermore, to the extent that BOEM claims that such a threat has been identified, the circumstances of its action call that justification into question. Revolution Wind engages in near-weekly contact with agencies, including Defendants, and no one raised any of these alleged concerns or the potential need to enhance certain capabilities prior to the Second Stop Work Order. Second Decl. of Edward LeBlanc in Supp. of Pl.'s Mot. for a Preliminary Inj. and Stay Pending Review, Dkt. 50-3 ("Second LeBlanc Decl.") ¶ 29; Third Decl. of Melanie Gearon in Supp. of Pl.'s Mot. for a Preliminary Inj. and Stay Pending Review, Dkt. 50-2 ¶¶ 2-6; Mot. at 11-12. No other conclusion can be drawn other than the Federal Government's statements regarding an urgent national security issue are incongruous with their actions. Rebuttal Declaration of Edward LeBlanc in Support of Plaintiff's Motion for A Preliminary Injunction and Stay Pending Review ("Third LeBlanc Decl.") ¶ 4, attached as Exhibit B. ("In my decades of experience it is highly unusual for the federal government to perceive a threat involving critical energy infrastructure or national security concerns and fail to engage with the company about those concerns.").[11]

Tyner's suggestion that the purported national security concerns may not be capable of mitigation—a matter on which he admits BOEM lacks knowledge—also lacks evidence, and also

---

[11] Indeed, on January 9, 2026, the former Director of the DOD Clearinghouse filed sworn testimony in litigation challenging a similar order with respect to the Coastal Virgina Offshore Wind Project that, in his opinion, the Government did not follow appropriate process "that is designed to identify challenges and collaborate on solutions."). Decl. of Howard Belote in Supp. of Mot. for a Preliminary Inj. and Stay Pending Review ¶ 33, *Va. Elec. & Power Co. v. Dep't of the Interior*, No. 2:25-cv-00830 (E.D. Va. Dec. 27, 2025), Dkt. 39-4.

calls into question BOEM's course of conduct.  Tyner Decl. ¶10.  Ørsted (one of Revolution Wind's parent companies) has extensive experience worldwide working with military and national security governmental agencies to identify measures to meet the specific needs of those agencies. Third LeBlanc Decl. ¶ 1.  There are a multitude of readily available solutions that can be employed to mitigate interference with military defense and national security capabilities.  *Id.* ¶ 2.  Ørsted has experience installing and deploying measures at operational offshore wind facilities and those under construction.  *Id.* ¶ 3.  Had a genuine concern arisen about the feasibility of mitigating a newly-identified risk, it would have made sense for BOEM to confer with Revolution Wind, not withhold the information for nearly six weeks.  For this reason, as well, the Defendants have failed to demonstrate that national security mitigation concerns warrant the sweeping Second Stop Work Order.

*Third*, the timeline of events provided in the Marks and Tyner Declarations confirms that there is no "immediate" or "irreparable" harm to national security justifying the Second Stop Work Order.  *See* Mot. at 21-22 (discussing unexplained delay in issuance of Second Stop Work Order). The Marks Declaration states that, on November 13, 2025, DOW provided classified information to BOEM "regarding risks attendant to the interference with radar caused by wind turbine rotation in the offshore wind farm."  Marks Decl. ¶ 7.  Interior's Deputy Assistant Secretary, Land and Minerals Management, then did not review this information until November 26, 2025.  Tyner Decl. ¶ 6.  And then BOEM's Acting Director appears to have waited at least another week to review the information with senior Departmental leadership.  Decl. of Matthew Giacona ¶ 11, *Va. Elec. & Power Co. v. Dep't of the Interior*, No. 2:25-cv-00830 (E.D. Va. Dec. 27, 2025), Dkt. 19-1.  In total, BOEM waited nearly six weeks from receiving the information from DOW before issuing the Second Stop Work Order to Revolution Wind on December 22, 2025.

In all that time, BOEM never raised this issue to Revolution Wind at their routine meetings, including the one on December 10, 2025. Mot. at 11. This timeline and BOEM's failure to engage immediately with Revolution Wind is inconsistent with the Second Stop Work Order's conclusion that the Project has "the potential to cause serious, immediate, and irreparable harm to our great nation" such that an immediate "90-day suspension" was required. Am. Compl., Ex. B at 1. And the timing is even more incongruous given the many indications that BOEM's purported national security rationale is pretextual and politically motivated, as previously detailed in Revolution Wind's motion. *See* Mot. at 13-14, 18-19.

Indeed, just one day after Defendants filed their opposition to that motion, at a public summit with oil executives, it was reiterated to Secretary Burgum that the Administration's "goal is to not let any windmill be built," for reasons entirely unrelated to the alleged national security concerns that were claimed as the reason for the Second Stop Work Order. [12] The Government "will not approve windmills" unless "forced to do something" because of Biden-era approvals. *Id.*

The Marks Declaration also suggests that the well-established DOD Clearinghouse process is inadequate because it "focuses on project disruption to military operations and readiness . . . rather than evaluating potential threats to . . . the homeland." Marks Decl. ¶ 8. While difficult to divine the declaration's meaning, it is not accurate to say that consultation between BOEM and the DOD Clearinghouse over the Project excluded potential threats. As the agreement between Revolution Wind, DOW, and U.S. Airforce ("2024 DOD Agreement") explains, as "originally filed," the Project would conflict with North American Aerospace Defense Command's (NORAD) operation of the Falmouth, Massachusetts Airport Surveillance Radar 8 (ASR-8)." Dkt. 48-4,

---

[12] The Administration's event is available at
https://www.youtube.com/watch?v=iaE8lw8_x30&t=3590s.

Second LeBlanc Decl., Ex. 2 at 66.  As a result, the purpose of the 2024 DOD Agreement was "de-conflicting these activities" and the DOW concluded "that the terms [of the agreement] will allow the mutual goals of the Parties to be met, ***including the protection of the radar, which promotes national security***, and protection of the National Airspace System, while supporting military readiness." *Id.* (emphasis added).  Indeed, one of the stated missions of NORAD is to provide "Aerospace warning to North America," defined as "processing, assessing, and disseminating intelligence and information related to man-made in the aerospace domain and the ***detection, validation, and warning of attack against North America whether by aircraft, missiles or space vehicles*** . . . ."[13]  Given that detecting and warning of attacks on the U.S. is one of the primary "operations" of NORAD, it is difficult for the Defendants to claim that the DOD Clearinghouse did not consider "potential threats to critical infrastructure or the homeland" when reviewing the Project.

*Fourth*, there is good reason to doubt the magnitude of any national security threat asserted by Defendants.  Unfortunately, Revolution Wind cannot offer a full assessment of the risk, because Defendants have refused to let it see the classified information on which they purport to rely.  Nonetheless, it is important that Defendants have not to suspended lease operations under Section 1334(a)(1)(B), which is available when the government concludes "there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits (in areas leased or not leased), or to the marine, coastal, or human environment."  Defendants' failure to even attempt invoking Section 1334(a)(1)(B) amounts to a

---

[13] Agreement Between the Government of the United States and the Government of Canada on the North American Aerospace Defense Command (April 2006), available at https://www.norad.mil/Portals/29/Documents/History/NORAD%20Agreements/2006%20NORAD%20Agreement.pdf?ver=52SH6UU_1njFmjaq4fQUTg%3d%3d.

concession that Revolution Wind's activities pose no threat to human or marine life, property, mineral deposits, or the environment. So even if national security is implicated here in some way, the magnitude of any actual threat appears to be overstated.

"[W]hen calculating the harm the government will suffer . . . , the court is entitled to examine whether harm to the government is a necessary result or a contrived one." *Bonds v. Heyman*, 950 F. Supp. 1202, 1216 (D.D.C. 1997). Yet, here, Defendants have not even defended themselves against Revolution Wind's claims that the national security rationale for the Second Stop Work Order is unlawful. Fed. Defs.' Opp. at 6-11. After conceding those claims, it would violate every notion of equity for Defendants to be permitted to claim a national security issue based on the same evidence it could have theoretically supported itself with on the merits, under the claim of balancing the equities. Defendants have essentially implied that their national security argument will not win on the merits. There is thus no basis to favor that same national security argument when it comes to the purported public interest. This is particularly so in light of the extensive evidence that Revolution Wind will support public interest jobs, provide economic benefits, and promote energy reliability and security in New England. Mot. at 41-45. The balance of equities tips decidedly in Revolution Wind's favor.

## IV.    DENYING RELIEF TO REVOLUTION WIND ON THE BASIS OF THE CLASSIFIED EVIDENCE WOULD VIOLATE DUE PROCESS

Due process requires that Revolution Wind have a fair opportunity "to tailor its submission to the [government's] concerns [and] rebut the factual premises underlying the [agency] action," regardless of whether classified information is key to the government's decision. *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 320 (D.C. Cir. 2014); *see also People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 613 F.3d 220, 227-29 (D.C. Cir. 2010); Mot. at 29-30. Yet Defendants urge this Court to deny Revolution Wind's request for relief based on classified

evidence that it has refused to share with Revolution Wind. Rebuttal Declaration of Bryan Stockton In Support of Plaintiff's Motion for a Preliminary Injunction and Stay Pending Review ("Stockton Decl.") ¶ 18, attached as Exhibit C; Rebuttal Declaration of Janice Schneider In Support of Plaintiff's Motion for a Preliminary Injunction and Stay Pending Review ("Schneider Decl.") ¶ 2, attached as Exhibit D.

It is true that in some, limited circumstances, classified information may be submitted to courts for *ex parte*, *in camera* review. But the Constitution still requires minimum of due process. Mot. at 27-31. Here, Revolution Wind has no information by which to meaningfully defend itself.

Making things worse, Defendants appear to be withholding the classified information from Revolution Wind based only on the litigation. That is the most reasonable inference to draw from their continually shifting position on whether and when Revolution Wind can be made aware of the national security concerns purportedly underlying the suspension.

In preparation for a meeting between Revolution Wind with BOEM and the Interior Department on December 30, 2025, Revolution Wind informed Interior that it was bringing experts with national security clearances so that information could be presented to those individuals in the Department's Sensitive Compartmented Information Facility ("SCIF"). Stockton Decl. ¶¶ 14-18. Interior did not facilitate access to the information. *Id*. ¶ 18. However, at the meeting between Revolution Wind and BOEM, Christopher Danley, Senior Advisor to the Solicitor of the Interior Department, agreed to arrange access to and request a briefing for Revolution Wind's experts with national security clearances on the classified information by the Department of War that is the basis for the Second Stop Work Order. *Id*. ¶ 19. Revolution Wind provided contact information for its technical representatives to begin that process at the meeting. *Id.* The Company followed up as to the status on January 2, 2026. *Id.* ¶ 20. Five days later, on January 7, 2026, after

Revolution Wind filed the instant motion, one of Revolution Wind's technical experts, Vice Admiral Paul Thomas (ret.), who has a U.S. top secret security clearance, emailed Mr. Danley to follow up. *Id.* ¶ 21. In response, the government changed course, informing Revolution Wind that the government would not share classified information while litigation is pending: "DOW [the Department of Defense] has informed me that they are awaiting resolution of the litigation before they would consider sharing the classified information with Orsted's representatives." *Id.* ¶ 20. In other words, Defendants were willing to share the classified information until they realized that doing so would enable Revolution Wind to defend itself in litigation—and they have indicated they "may" share that information after the litigation concludes, and are now raising concerns about a foreign parent company. This opportunistic change of position suggests that the Defendants' restrictions on access to the information are motivated by litigation tactics, *not* a genuine concern for national security.

Notably, the Tyner Declaration now provides an entirely new rationale for declining to share the information: "Given the foreign control over the Revolution Wind Project, BOEM is coordinating with DoW on whether access to the classified material with a secret designation by Developers is possible and/or whether certain information can be declassified or an unclassified summary could be created." Tyner Decl. ¶ 11. But the upstream partial foreign ownership of Revolution Wind (which is itself a U.S. corporation) is irrelevant.[14] Revolution Wind presented experts who are U.S. citizens and that currently hold top secret clearances with the United States government. *See* Stockton Decl. ¶¶ 18-20; Third LeBlanc Decl. ¶ 7. These experts will not share classified information with the developer, consistent with the terms of their clearances. Defendants' position is also not credible—no responsible company wants to facilitate an attack by

---

[14] Moreover, Revolution Wind's joint venture partner is an American company.

an adversary on its facilities costing billions of dollars or on the community it serves.  *See* Tyner Decl. ¶ 12 ("BOEM is concerned that allowing the Revolution Wind Project to become operational without addressing the national security risks may cause the Developers to ignore those risks and claim that it is too late to address the issues since the Revolution Wind Project would then be supplying power to customers.").

And relatedly, the Department of Justice gave *yet another*, different rationale on January 2, 2026, in an email to undersigned counsel.  Schneider Decl. ¶ 2.  There, the Department of Justice stated that it does not intend to share the classified information with Plaintiff or its counsel as part of the litigation because, "even where an individual has the necessary security clearance, the agency that originates the information at issue must make a separate 'need-to-know' determination that actually grants access to the classified information at issue."  Ex. 1 to Schneider Decl.  According to the Department of Justice, "allowing access to classified information in order to prosecute a civil action challenging agency action does not serve a governmental function," and thus there is no "need to know" the national security information.  *Id.*; *cf. Horn v. Huddle*, 647 F. Supp. 2d 55, 63 (D.D.C. 2009) ("While the [D.C.] Circuit has thus far not squarely ruled on the question of whether the Court can order a party's attorney to have access to information that the government deems is classified, it has continuously suggested, or at least reserved, that it may be appropriate in the right circumstance."), *vacated on other grounds*, 699 F. Supp. 2d 236 (D.D.C. 2010).  This response ignores the obvious due process problem created by the government's failure to provide the classified information.  After all, that information is the only purported basis for issuing the Second Stop Work Order and denying the injunction sought here, and the Defendants' refusal to share the information makes it impossible for Revolution Wind to fully defend itself in

this litigation.  Surely upholding due process rights serves a legitimate government function.[15]

At a minimum, Defendants must provide the unclassified evidence or unclassified summaries of evidence.[16]  "[D]ue process requires, at the least, that an affected party be informed of the official action, be given access to the *unclassified evidence* on which the official actor relied and be afforded an opportunity to rebut that evidence."  *Ralls*, 758 F.3d at 319 (emphasis added).  "Excluding parties from directly accessing the evidence against them is strongly disfavored, so reliance on undisclosed classified evidence is permissible '[o]nly [in] the most extraordinary circumstances.'"  *Fares v. Smith*, 901 F.3d 315, 324 (D.C. Cir. 2018).  Revolution Wind requested at its December 30, 2025, meeting with Interior and BOEM that the agencies provide an unclassified summary and unclassified redacted versions of the classified material.  Stockton Decl. ¶ 18.  No unclassified material has been provided in response to this request, and the bare-bones references to "radar," Tyner Decl. ¶ 4, Marks Decl. ¶ 6, are insufficient to summarize the evidence

---

[15] Green Oceans argues (at 12) that there cannot be any violation of Revolution Wind's due process rights here because Revolution Wind lacks a protected property interest.  Green Oceans does not contest that Revolution Wind has an interest in its *lease*, as courts have held in the context of mining and other resources leases on the Outer Continental Shelf.  Mot. at 28.  Rather, it claims only that "OCSLA . . . does not confer a vested right in permits or approvals once issued."  But the cases they cite are inapposite.  Their primary cases (at 12 nn.42, 43) explain the requirements for finding an entitlement to yet-unapproved benefits.  *See Wash. Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 36 (D.C. Cir. 1997); *Gardner v. City of Baltimore Mayor & City Council*, 969 F.2d 63, 64, 68 (4th Cir. 1992).  These cases do not consider, as here, whether a previously granted lease or approval could give rise a protected interest.  Indeed, Green Oceans' own authorities (at 12 n.42) show that these completed approvals *do* give rise to a protected interest:  as this Court discussed in *3883 Connecticut LLC v. District of Columbia*, 191 F. Supp. 2d 90 (D.D.C. 2002), a completed and issued "building permit is a property right," but that there is no interest in the preceding "steps toward issuance of [such] a building permit."  *Id.* at 93 (citing *Tri Cnty. Indus., Inc. v. District of Columbia*, 104 F.3d 455, 462 (D.C. Cir. 1997), *aff'd on other grounds*, 336 F.3d 1068 (D.C. Cir. 2003)).

[16] Revolution Wind notes that on January 10, 2026, the Defendants filed with this Court a Notice of Providing Classified Information for Ex Parte and In Camera Review that included not only the Marks declaration, but also "appended classified materials" in support of their opposition to Revolution Wind's motion for preliminary injunction.  Dkt. 61.

upon which BOEM relied.  *Id.*

## CONCLUSION

For the foregoing reasons, this Court should grant Revolution Wind's motion for a stay of the Second Stop Work Order and a preliminary injunction that bars Defendants from enforcing the Second Stop Work Order.  This Court should further order Defendants to (1) request that the Department of War process pending requests for representatives for Plaintiff who have appropriate security clearances to review the classified information that Defendants refer to in the Second Stop Work Order; and (2) request that the Department of War provide unclassified summaries of the key decisional documents to the Plaintiff.  An amended proposed order is attached.

Dated:  January 11, 2026                    Respectfully submitted,

By */s/  Janice M. Schneider*
    Janice M. Schneider (D.C. Bar No. 472037)
    Stacey L. VanBelleghem (D.C. Bar No. 988144)
    Roman Martinez (D.C. Bar No. 1001100)
    Devin. M. O'Connor (D.C. Bar No. 1015632)
    Rachael L. Westmoreland (D.C. Bar No. 90034032)
    LATHAM & WATKINS LLP
    555 11th Street NW, Suite 1000
    Washington, D.C. 20004
    Tel:  (202) 637-2200
    Fax:  (202) 637-2201
    Email: janice.schneider@lw.com
        stacey.vanbelleghem@lw.com
        roman.martinez@lw.com
        devin.o'connor@lw.com
        rachael.westmoreland@lw.com

    *Counsel for Plaintiff Revolution Wind, LLC*