UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF RHODE ISLAND, et al.,          )
                                        )
                                        )
          Plaintiffs,                   )
                                        )        CASE NO. 1:25-cv-04328-RCL
     vs.                                )
                                        )
UNITED STATES DEPARTMENT OF             )
THE INTERIOR, et al.,                   )
                                        )
          Defendants.                   )
_____        )
                                        )
REVOLUTION WIND, LLC,                   )
                                        )
          Plaintiff,                    )
                                        )
     vs.                                )        CASE NO. 1:25-cv-02999-RCL
                                        )
DOUGLAS J. BURGUM, et al.,              )
                                        )
          Defendants,                   )
_____        )

TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
**BEFORE THE HONORABLE ROYCE C. LAMBERTH, DISTRICT JUDGE**
Monday - January 12, 2026
2:07 p.m. - 3:59 p.m.
Washington, DC

**FOR PLAINTIFF REVOLUTION WIND:**
Latham & Watkins, LLP
BY:  JANICE SCHNEIDER, RACHAEL WESTMORELAND, STACEY
     VANBELLEGHEM, ROMAN MARTINEZ and DEVIN O'CONNOR
555 11th Street, NW, Suite 1000
Washington, DC 20004

_____

**SONJA L. REEVES**
**Registered Diplomate Reporter**
**Certified Realtime Reporter**
**Federal Official Court Reporter**
333 Constitution Avenue, NW
Washington, DC 20001
Transcript Produced from the Stenographic Record

**FOR PLAINTIFF STATE OF RHODE ISLAND:**
Rhode Island Department of the Attorney General
BY:  SARAH RICE
150 South Main Street
Providence, Rhode Island 02903

**FOR PLAINTIFF STATE OF CONNECTICUT:**
Office of the Connecticut Attorney General
BY:  BENJAMIN CHENEY
165 Capitol Avenue
Hartford, Connecticut 06106

**FOR DEFENDANTS:**
U.S. Department of Justice
Natural Resources Section
BY:  PETER TORSTENSEN and AMANDA RUDAT
950 Pennsylvania Avenue, NW
Washington, DC 20530

**FOR INTERVENOR-DEFENDANT GREEN OCEANS:**
Marzulla Law, LLC
BY: ROGER MARZULLA
1150 Connecticut Avenue, NW, Suite 1050
Washington, DC 20036

(Call to Order of the Court at 2:07 p.m.)

DEPUTY CLERK:  Your Honor, we are on the record in Civil Matter 25-2999, *Revolution Wind, LLC versus Douglas Burgum, et al.*

Beginning with plaintiffs' counsel, please approach the podium and identify yourselves for the record.

MS. SCHNEIDER:  Good afternoon, Your Honor.  Janice Schneider for plaintiff Revolution Wind.

THE COURT:  Okay.

MR. TORSTENSEN:  Good afternoon, Your Honor.  Peter Torstensen for the federal defendants.

THE COURT:  All right.

MR. MARZULLA:  And good afternoon, Your Honor.  Roger Marzulla for intervenor Green Oceans and intervenor-defendants.

MS. RICE:  Good afternoon, Your Honor.  Sarah Rice for the State of Rhode Island and Connecticut.  Thank you.

MR. CHENEY:  Good afternoon, Your Honor.  Ben Cheney, Assistant Attorney General for the State of Connecticut.

THE COURT:  Okay.  Let's start with the plaintiffs.  Let me say one thing at the outset.

Because the case involves classified national security information, I want to remind the parties to be mindful not to reveal any such information as everyone in the courtroom obviously is not cleared to receive it.

MS. SCHNEIDER:  Thank you, Your Honor.

May it please the Court, my name is Janice Schneider with Latham & Watkins representing plaintiff Revolution Wind.

Your Honor, we have coordinated our argument time with the States of Connecticut and Rhode Island, who are here today. With the Court's permission, they will follow my presentation.

THE COURT:  All right.

MS. SCHNEIDER:  Once again, Your Honor, with no notice or opportunity to be heard, the government has issued a second stop work order suspending work on the Revolution Wind project at a crucial stage of construction without considering our reliance interests, again, in violation of the Administrative Procedure Act, Revolution Wind's due process rights and the Outer Continental Shelf Lands Act.

This time, Your Honor, the project is now 87 percent built and was just weeks away from beginning to deliver power to the electric grid needed this winter as part of testing the system.  This shutdown is costing us at least $1.44 million per day.  The last stop work order cost us approximately $100 million, far more than we had initially projected.

The government does not contest our Administrative Procedure Act or due process arguments, and thus concedes them, and likelihood of success on the merits.

If the second stop work order is not enjoined, the project will miss its contractual power purchase agreement

commercial operations date, which could be unilaterally terminated and the entire project would fail.  This is enterprise-threatening irreparable harm for Revolution Wind.

In order to meet the January 15, 2027 deadline in the Rhode Island power purchase agreement, at least two things need to happen.

First, we need to construct the project and we need to do that within the short time that we have remaining for a critical wind turbine installation vessel called the Scylla, and that's spelled S-c-y-l-l-a, before it has a contractual right to depart the project on February 22, 2026.  This is the exact same issue, Your Honor, that we talked about in our first --

THE COURT:  I take it the biggest part of the problem is this specialty vessel that you can only use.  Tell me more about the details of that.

MS. SCHNEIDER:  So the details of that particular vessel is that it's required to actually install the remaining seven turbines that are needed for the project.  The latest vessel availability date for that vessel is February 22nd, as I have said.  It's going to take --

THE COURT:  To come to your side?

MS. SCHNEIDER:  They are available now, and, on February 22nd, they have a contractual right to depart the site.

THE COURT:  To depart February 22nd?

MS. SCHNEIDER:  To leave, so we need to get the work done between now and February 22nd.  That's 41 days.  The estimate to complete the work is 41 days, which is why we asked Your Honor for relief today.

THE COURT:  Okay.

MS. SCHNEIDER:  So second --

THE COURT:  Then if they depart, then you have got to find another vessel, and there are only three, I take it?

MS. SCHNEIDER:  That's correct, Your Honor, and two of them are already contracted and this one has a right to leave.  So it's very, very problematic.

THE COURT:  So that's the critical part from your point of view?

MS. SCHNEIDER:  That's the critical part from a construction standpoint.

But there is also a critically important operations point that we need to talk about here today.  We also need to be operating well in advance of the January 15, 2027 commercial operations date deadline.  The schedule includes months and months of operation and testing that is essential to achieve the contractual requirements on time.

Now, the government ignores or purposefully tries to obfuscate critical distinctions between the contractual definition for commercial operations date versus commercial

operations more generally, which are defined in BOEM's regulations and the project's large generator interconnection agreement with the grid operator, the New England Independent System Operator.

So we need to be able to do three things to meet that PPA. We need to construct. We need to test. And we need to make sure the whole system --

THE COURT: The test is making sure you have got things in place that you're testing?

MS. SCHNEIDER: Exactly. We have things in place, and each of the turbines needs to be tested to make sure that it's working in proper order and that the entire system together is operable as a system. So --

THE COURT: Before January?

MS. SCHNEIDER: Before January 15th of 2027. All of that work, which includes operations, is going to take months and months and months and months, and that's why we need to be able to not only construct, because we're going to lose the vessel, but also conduct operations and put power on the grid to test this operability. And so the project needs to be operational. We were scheduled to start that testing this month.

THE COURT: Right.

MS. SCHNEIDER: Your Honor enjoined their first stop work order finding it the height of arbitrary and capricious

behavior, and that Revolution Wind would suffer irreparable existential harm from the terms of the first order halting all of the ongoing activities on the outer continental shelf.  You should make that same irreparable harm finding here.

Now, notwithstanding the DoD mitigation agreement that we executed with the Department of War after a four-year DoD clearinghouse review with all branches of the military, including NORAD, which concluded to DoD's satisfaction, the government is now stating -- BOEM actually is now stating that it's relying on new national security issues and classified information to support the second order, which was supplied to Your Honor ex parte and for in-camera review.

We take national security issues very, very seriously, but we do think that this Court should be very skeptical of the government's true motives here.  We're flying a little blind admittedly because we have not had access to the classified material or been provided the unclassified summaries that we requested.

BOEM and the Justice Department, in our view, have purposely hamstrung us as a litigation tactic.  But there are five reasons we are very concerned about BOEM's order, then we think it's pretextual, and you should at least be skeptical of this.

First, the context of the first stop work order, BOEM asserted national security concerns --

THE COURT:  Let me go back one step.  Up until this point, you have had people with classified authority that are working with the government on getting to this point.  In other words, they have -- your personnel, besides your lawyers, your personnel operating this system have worked with the government and made sure that the government and they agreed on how the system worked and used classified information and had access to classified information making all of that work to the government's satisfaction.  Am I correct?

MS. SCHNEIDER:  Just to be clear, Your Honor, I am not sure that any classified information was shared with us during the DoD clearinghouse process.  But we have --

THE COURT:  But under the 2024 agreement, they were given clearances.  I don't know to what extent they were given access then.  They had clearances, right?

MS. SCHNEIDER:  I was not involved in that process.  What I can tell you is that the government asked us for information.  We provided all of the information that they requested.  And then they reviewed that information based on the height, the location, all of the attributes of the project, and then the government concluded an agreement with us that satisfied them that national security issues were fairly addressed.

So we concluded that, and now they are coming back and now they are saying there may be something new, and that's

what's in what they provided to you.

THE COURT:  You're not sure that classified information was shared with your people then?

MS. SCHNEIDER:  I cannot confirm that, Your Honor. But what I can tell you is since the stop work order was issued, we have provided representatives, experts, U.S. citizens with top secret security clearances, and we have asked the government please show them the information.  And for people who don't -- and they have not done that to date.

For people who don't have security clearances, we have asked please share unclassified summaries of that information so that we can try to assess it to see if there is truly an issue.  And we are dubious, Your Honor, candidly.  But if there is truly an issue, we want to have that conversation.

I mean, I think what's really important for Your Honor to understand is the project is equipped with significant surveillance and other measures.  Based on what we can tell from the media and other sources that have been supplied, like the declarations that have been supplied, we have experience in these issues.

The company has access to significant experience, to people who have been involved in extensive coordination with other military and governmental agencies around the world, including NATO, Central Europe, the Baltics, the United Kingdom and Asia.  We understand these issues.  But they are

purposefully, for reasons that we cannot understand, keeping the information from us.  So we think it's very, very problematic.

If they really want to -- if there is really an issue and if they really want to solve it, why not have a conversation about it?  And candidly they should have had this conversation before they even issued the stop work order to begin with, and we think that is a violation of our due process rights.

So, Your Honor, some of the other concerns that we have go to the administration -- this goes to their motivation, the administration's statements.  Administration leadership, including but not limited to the Secretary of the Interior, have been clear in the media that they are trying to shut down offshore wind for reasons that are entirely unrelated to national security:  the birds, the whales, the cost, it's a rip-off, reliability, it's a scam, oil and gas is better.  The list goes on and on.

And there have been real clear public statements, even just a few days ago, in a meeting with oil and gas executives, which we cited in our reply papers, and there is a USA Today article from January 9th that I would urge the Court to look at, and I would urge the Court to look at our reply brief and look at the video clip that we provided there.  It is clear, Your Honor, that the administration's goal is to not let any

windmill be built.  And that's a quote.

So third, the DoD, the Department of War role.  Based on what little we can tell, and when we look at the Department of War declaration, we actually don't see "DOW."  Maybe it's in there, I don't know.  But we don't see in the unredacted portion the Department of War asserting that there is a national security threat that requires the suspension.

Revolution Wind has been in regular communication with numerous agencies for the project, and none have raised national security issues to us.  And I will say, Your Honor, separately, notwithstanding our mitigation agreement, no military agency has raised any concerns directly with us.

Fourth reason to be skeptical, timing and BOEM's stonewalling.  BOEM and the Department of War had the Department of War information for six weeks, but waited to issue the order right before Christmas.  Since then, we have been trying to engage with the agency to discuss their concerns.  It's now been three weeks.

And our experts, who are U.S. citizens with top secret security clearance, including a vice admiral, have not been given access, and they continue to basically just string us out.

Finally, Your Honor, we think the order is overbroad.  At the very least, you know, there is no reason -- if they are really concerned about radar, which is what they have told us

and what we can glean from the media, then why do we have to stop all undersea work, just by way of example, why do we need to stop testing, why do we need to stop the commissioning process.

So, Your Honor, we think this is all --

THE COURT:  The people who could best figure out how to solve it would be your people, wouldn't they?

MS. SCHNEIDER:  You would think, Your Honor.

THE COURT:  You've spent billions of dollars now.

MS. SCHNEIDER:  You would you think, Your Honor --

THE COURT:  Wouldn't you have the most incentive to solve it?

MS. SCHNEIDER:  We have extremely high incentive to solve it, Your Honor.  And, in fact, we are working in other parts of the world to solve these very issues.

So for purposes of today's hearing, I want to just focus on three particular arguments.

First, that the government has conceded likelihood of success on the merits;

Second, that the government has deprived and continues to deprive, by not letting us have access to this information, Revolution Wind's due process;

And then finally, the balance of harms and the public interest.

So moving to the preliminary injunction test itself,

Your Honor, the government concedes that Revolution Wind is likely to succeed on the merits of most of its claims.  They make no rebuttal at all to our Administrative Procedure Act or due process arguments.

They thereby concede that the second stop work order is arbitrary and capricious because it's overbroad.  See our motion at pages 26 and 27.  It lacks any reasonable basis or explanation.  See our motion at page 17 to 23.  It violates the change in position doctrine and ignores our substantial reliance issues, which is in our motion at pages 23 to 26.  And that it was issued without the procedures required by law under APA Section 558(c).  So that's in our motion at pages 31 to 32.

They also do not grapple at all with our due process argument.  These concessions confirm that we are likely to succeed on the success of the merits in a number of our claims.

And both the DC Circuit and this Court have been clear that unaddressed arguments should be treated as conceded when a party files its opposition.

And the cases -- we cite the cases in our brief, but, you know, *Texas versus United States*, as well as Your Honor's opinion in *Hays v. Sebelius*.

The intervenor's arguments on these claims are also cursory and conclusory, and they're not sufficient to preserve the argument.  Indeed, the vast majority of Green Oceans' arguments simply rehash their arguments from the first

go-around on the first stop work order and are largely reliant on deference to the government's national security allegations.

But the government has not even sought to defend their national security judgments against our arguments that they are arbitrary and capricious.  And that's all we need to show, Your Honor, to check the box.

And so we just need to show we have likelihood of success on the merits of one claim, and we believe that we have done so with both our APA arguments and our due process arguments.

And I would direct the Court to the *Mid-Atlantic Equity Consortium* case at 793 F. Supp. 3d 166 as well as *Express One International versus Postal Service* at 814 F. Supp. 87.

We have talked a bit about irreparable harm in my introduction.  And I want to just see if the Court has any questions related to either the need for the Scylla or our operations.  I do think the operational point is very important to make sure that everyone understands, because it's clear that the government either doesn't understand it or is trying to make things a little confusing for the record.

But the bottom line, as I mentioned, is that in order for us to achieve the commercial operations date under the PPA, we have to do the three things:  Construction, performance testing, and test the whole system so that it's capable of

regular operation. And all of that takes time.

And the PPA requirements in the commercial operation -- for the commercial operations date cannot be met if Revolution Wind is precluded from commercial operations, i.e., testing and commissioning.

And so, therefore, defendants are wrong to argue that a restriction on project operations will not irreparably harm the project. They seem to have conceded construction, and then they make this operations argument, but we think that's not correct.

Then on due process, as we have noted, we believe that the government violated Revolution Wind's due process argument by issuing the order initially without notice or opportunity to respond, and that it continues to violate our due process rights by denying us access to the information that is necessary to resolve this issue.

We can't work other than under the environment, health and safety exception. The stop work order deprives Revolution Wind of its property interests in the lease and being able to actually construct the turbines and complete the project.

Obviously, Your Honor, our view is if they had taken these steps beforehand, we believe that we would have been able to work with them and address any potential issues and avoid the order, but -- and that would have been normal -- that would have been the normal course. That would have been how a normal

regulatory process would have worked, but BOEM has done nothing of the sort here.

And I will say also on a timing perspective, they have really not shown that this is an exigent circumstance that justifies skipping pre-deprivation process, particularly since they've sat on the information now for six weeks and issued this extreme sweeping order.

We did meet, Your Honor, with the agency on December 30th.  Their order invited us to come in.  We did come in.  We brought our three experts with top secret clearances. We told them ahead of time we were bringing them to facilitate a transfer of information.  The Department of the Interior has a SCIF, and so we thought let's just have a conversation.  They did not facilitate access to the information, and so none was provided, and none has been provided to date.

Initially, we were told, yes, we'll set something up. Then we were told, no, we're not going to do it because of the litigation.  Today in the courtroom, I was told that's no longer a reason, but there is no timeline to provide you with the information.

The Tyner declaration takes a completely different approach to why we can't see the information, and that's foreign control over the project.  But the upstream partial foreign ownership of the project, which is itself a U.S. corporation, is irrelevant.

We presented experts.  As I said, they are U.S. citizens, they have top secret clearances, long, distinguished histories serving the United States, and so we don't understand why the classified information couldn't be shared with them, and we certainly don't understand why the unclassified summaries can't be shared with the rest of us.

The Tyner declaration is very telling.  It actually states that the stop work order is needed because they are concerned that Revolution Wind, and this is a quote, "Will ignore those risks and claim it's too late to address the issue since the Revolution Wind project would then be supplying power to customers."

This admission that this is simply an attempt to gain leverage is remarkable, in my view, and ignores a key fact that no responsible company, Your Honor, wants to facilitate an attack on its own facilities, costing billions of dollars, or on the communities that it serves.

The other reason we haven't been given access to the information is the Justice Department has stated there is no need to know.  That just strikes us as an obvious due process problem, particularly where the information is the basis for the second stop work order, and we have really no way to defend ourselves.

The other thing I'll note about the Tyner declaration, Your Honor, it says in paragraphs 10 and 12 that BOEM is not

aware of whether the national security risks can be mitigated and BOEM is not aware of measures that would mitigate the national security risk. This makes things all the more dubious and curious from our perspective given our experience.

The government actions here, Your Honor, including its delays, are designed to keep us in the dark for as long as possible. Your Honor should be very skeptical of the government's motivation here.

Just briefly, Your Honor, on public interest and balance of harms, the government argues its national security point actually in the third prong of the test in the balance of harms rather than in the first prong of the test.

But their claim of an interest, the public interest in national security, cannot overcome the fact that they have conceded likelihood of success on the merits. And defendants, in our view, can only claim a public interest if the national security justification is not arbitrary, not a violation of due process and not pretextual or the result of political pressure.

They have failed to do that here, Your Honor. The public has an interest in the agency following the law and the project provides significant public benefits as outlined in our brief.

Your Honor, we ask that you grant our motion for preliminary injunction.

THE COURT: All right.

MS. SCHNEIDER:  Thank you.

MS. RICE:  Good afternoon, Your Honor.  The States of Rhode Island and Connecticut agree with the merits that have been aptly briefed and argued by Revolution Wind and we would join them in those arguments.  But we are grateful for this opportunity to explain a little bit about the irreparable harm that will be befalling our government or citizens and how that factors into the public interest test here.

There are a number of different ways in which the state plaintiffs are harmed.  First is harm to the grid.  And I think that this a really important point that dovetails with the operations arguments that Revolution Wind was just here making.

As described in the declaration of Director Dykes, the first power for Revolution Wind was anticipated to happen in the coming weeks, in the month of January.  That is not a symbolic deadline.  That is when electricity actually begins to flow from the project into the ISO New England grid.  That means all of those benefits that ISO New England, the State of Rhode Island and the State of Connecticut have been counting on would begin to flow.

They are not going to be at their maximum at that point.  It would ramp up until that last contractual commercial operations deadline to the full for Rhode Island 400 megawatts but the full power of the plant over time.

THE COURT:  The notion is for those users, that will now be their power from then on, not just for some temporary time.

MS. RICE:  Correct.

THE COURT:  They are now going to have power through this source.

MS. RICE:  They will have power through this source sort of beginning in that deadline at those quantities.  Before that, we're still getting some power and some benefits from those quantities.  For Rhode Island, the 400 megawatts is actually 20 percent of Rhode Island's power consumption.

THE COURT:  That's a pretty good amount.

MS. RICE:  It's a pretty good amount.  Rhode Island is not very big.  We also don't consume that much electricity.  I think we are last in the nation in terms of electricity consumption.  So it's about 5 percent for Connecticut.  They have some other baseload power generation.  They have a nuclear plant.  But that is still not an insignificant amount of power for either Rhode Island or Connecticut, especially in these winter months, a fraction of that can be very helpful, especially as we are in colder degree days.  We often have to turn to natural gas generation, which can be volatile and expensive in the ISO New England market.

And there have been times when there have been significant shortages, and this is covered, especially I think

in the Dykes declaration periods of significant shortages in the past during those low degree days.

So that reliability -- winter reliability, the capacity planning and ISO New England, which has been a long-running problem for ISO New England, this is not generation that will displace other generation. This is generation that is needed to make this market a functioning market and to have enough electricity for everybody in New England at achievable prices for people to heat their homes.

That ISO New England has recently stated, and both Director Kearns and Director Dykes discuss this statement, Kearns at paragraph 31, Dykes at paragraphs 17 through 19, that these projects, Revolution Wind and also the project in Massachusetts, have been part of their long-term planning and that delay of these projects onto the grid has significant impacts on the capacity markets.

The second is harm to the environment. Director Dykes, at paragraph 20, discusses a study that shows significant avoided greenhouse gas emissions when wind capacity is available in ISO New England in the winter because of switching to that cheaper and more reliable power. This has downstream health effects which, in fact, Revolution Wind discussed in their briefing at page 45 of their preliminary injunction brief.

The third effect is in pricing. And Director Dykes

has stated that it will cost hundreds of millions of dollars to New England rate payers if this energy does not eventually come online to ISO New England.  And she broke that down further, and it's going to be about $31 million per 90-day interval.  I think she estimated that -- but that 90 days could be repeated under the second stop work order.  So that's for each 90 days that is delayed.  We're talking about millions of dollars in increased electricity costs in the region.

THE COURT:  That's just in Connecticut.

MS. RICE:  I think she may have talked about it in terms of Connecticut and New England.

THE COURT:  And Rhode Island.  Okay.

MS. RICE:  Those are just the effects on the electricity market, which are incredibly substantial.  They are -- in real terms, it is about people being able to turn on their heat in the winter.  These are essential issues for Rhode Islanders and the people of Connecticut.

But in addition to these issues with the electricity, there are also significant job effects.  In Rhode Island alone, there are 1,000 union construction jobs that Revolution Wind has been supporting.  Many of those are idle at this time. It's the winter.  And Rhode Island, we're a very seasonal economy.  It's not the easiest to find different or additional work in the winter.

There is an amicus brief that was lodged in the first

PI, that NABTU brief that describes these jobs in a little bit more detail. They are good-paying jobs. The average wage is $55 an hour, and the people that hold these jobs have had to take additional training over and above what they might have taken for their profession in order to work on wind farms.

This is a workforce that is specialized, that has the ability to provide for their family and is now sitting idle for however many days or weeks or months a delay stays in place. That's a significant harm to Rhode Island and Connecticut's economy. I think for Connecticut, it's hundreds of jobs, but that can still be significant to a state's economy. Neither Connecticut nor Rhode Island are very large states. In Rhode Island, we only have a million people. So 1,000 jobs is quite a lot.

It also has eventual impact on the 3,300 jobs that Rhode Island has projected from the wind industry in the coming years. And those impacts may be permanent as we see that these jobs are not -- could be interrupted or that people can't count on them to put food on their tables.

The third category is to Rhode Island and Connecticut's sovereign interests, and these are our reliance interests which Revolution Wind also talks about at page 45. It has taken years of intense coordination between the state and Connecticut legislative branches, the executive branch, ISO New England, which is an intergovernmental organization,

private companies, all kinds of community groups and participants that have had to spend countless hours oftentimes after work to negotiate complex fisheries agreements and other aspects of this project.  All of this, to the extent that the project is interrupted or delayed, may need to be renegotiated because different times, different weather conditions, for example, for phases of construction or operation could change some of these things.

They also very much injure the sovereign interests of Rhode Island and Connecticut in terms of our enacted public policies.  Both Rhode Island and Connecticut, as detailed in the supporting declarations, have statutes that required procurement of wind power or other kinds of renewable energies, of which this project fulfills some of those goals.

And they also have greenhouse gas reduction mandates. Those mandates have timelines on them, and as both Director Dykes and Director Kearns testified, there are no readily available projects to substitute for Revolution Wind, so it could be that missing a deadline or being without this project for too long puts Rhode Island and Connecticut in a place they can't recover from in terms of meeting those time goals, even though they are in the future.

I think that this is a moment too to talk a little bit about why these harms to the state and the state's people should have -- weigh heavily in your consideration of this

preliminary injunction.

And this connects back to some of what my colleague for Revolution Wind was saying. But it is that the underlying national security justification for these actions has also not been shared with the appropriate state officials. For example, Senator Jack Reed, Rhode Island Senator, is the ranking member of the Arms Services Committee and he's on the Select Committee For Intelligence.

On January 2nd, he had a press conference where he stated that he requested information about why this project had been halted and has not been given that information.

This aligns with an amicus that was recently filed in an Eastern District of Virginia case, the *Virginia Electric Power versus the Interior* case there. It's 25-00830.

It's an amicus of Senators Warner, Kaine and Representative Scott, where they also describe their efforts to receive a briefing or some explanation of this set of second stop work orders, and they were not given that opportunity.

THE COURT: They didn't get it either?

MS. RICE: Yes. It was not just some issue with Senator Reed.

So, again, this is in -- raises questions when we do see in the media just two days ago the President telling oil executives that wind farms will never be approved, that it is -- in fact, talking to Secretary Burgum directly to say that

if he can stop them, he will.

So we would ask this Court to please enter the preliminary injunctive relief requested by Revolution Wind and the preliminary injunctive relief requested by the State of Rhode Island and the State of Connecticut.  Thank you.

THE COURT:  Thank you very much.

MR. TORSTENSEN:  Good afternoon, Your Honor.  Peter Torstensen for the federal defendants.  Before addressing Your Honor's questions, I want to make three quick points.

First, BOEM received classified information from the Department of War in November 2025, detailing new national security risks from offshore wind projects, concerns that are amplified when these projects are owned or controlled by foreign entities.

Based on this new information, which has been provided to the Court for ex parte in-camera review, BOEM reasonably suspended ongoing activities for 90 days to ensure that there was an opportunity to attempt to find mitigation measures before these projects began operating.

Second, under *Winter*, plaintiff bears the burden of satisfying all four preliminary injunction factors.  The balance of the equities and the public interest are the most salient factors here --

THE COURT:  Let me start with one easy question first.  In the papers that I saw, the statute actually requires that

when there is a suspension for national security reasons, it will generally not exceed 72 hours, and it's only if there is a finding of particularized harm that it can exceed that 72 hours.

I take it that somehow that's not really addressed here, but how do you get around the statutory requirement that a suspension be for only a 72-hour period and here you have done it for 90 days.  I don't understand that, is the first point.

MR. TORSTENSEN:  Yes.  So I think that's a provision that's construed as part of the lease, if I'm not mistaken, under 1334 -- sorry, 1341(c).

THE COURT:  I'm citing from -- in the statute itself, 1341 or 1334 under the national security provisions in 1341, I think.

MR. TORSTENSEN:  I believe 1341(c) construes each lease should contain a provision relating to national security, but that's subject, if I recall correctly, to a determination by the Department of War or recommendation by the Department of War in a state of war or, I believe, in -- where is the language?  Or a national emergency.

So I think the answer to that is I don't believe that is the basis -- the statutory basis for the order here.  I believe the statutory basis is under 13 --

THE COURT:  I'll let you make your argument and we'll

come back to that then.  Go ahead.

Right now you have got it open-ended.  You have done it for 90 and said we may do it forever.

MR. TORSTENSEN:  Sorry, I didn't hear that.

THE COURT:  Right now you have got it open-ended.  You said you have done it for 90, but we may do it for more.

MR. TORSTENSEN:  Right.  Yes.  It certainly doesn't comply with the 72-hour timeframe from that specific provision, but I don't believe that's the statutory basis for --

THE COURT:  There is $6 million just thrown away right now.

MR. TORSTENSEN:  I wouldn't say -- I mean, I think we understand that there are substantial, like, costs or investment costs that have been, I guess, devoted to the project, but there are also substantial national security interests on the other side.

Turning to the second point, under *Winter*, plaintiff bears the burden of satisfying all four factors, and those factors include the balancing of the harms.

So third, and this goes without saying, but national security concerns are of paramount importance, and federal courts do not second-guess the informed judgment of officials whose duty it is to assess national security risks.

As the Supreme Court held in *Winter*, even when the government loses on irreparable harm or on a likelihood of

success, national security risks can outweigh other irreparable harms.  That is true here, and the Court should deny plaintiffs' requested injunction.

Turning specifically to the balance of the harms and the public interest, we submit that when implicated, protecting against the new national security risks identified in the classified materials outweighs any alleged irreparable harm that will arise before this case can be litigated on the merits.

As for the alleged operational harms, plaintiffs fail to show that these harms are irreparable.  These alleged harms, as we heard this morning or heard this afternoon, include lost revenue from not meeting the commercial operations deadlines in the power purchase agreements.

But even if these harms are irreparable and even if they would materialize before this case can be litigated on the merits, plaintiffs still fail to show that these harms outweigh the national security interests identified in the classified materials.

As for their alleged construction-related harms, plaintiffs fail to show that these harms -- sorry.  As for the construction-related harms, these are the only harms that their allegations show may be irreparable, but these harms must be balanced against the national security concerns that we have discussed, specifically, BOEM's conclusion that the national

security risks from operations made it necessary to stop ongoing activities now to see if mitigation measures were possible and, if so, to make sure that there was an opportunity to incorporate them into the remaining construction.

But if the Court finds that the harms tied to plaintiffs' construction-related activities outweigh the national security risks identified in the classified materials, it should narrowly tailor any injunction to allow only those specific activities to continue during the litigation and it should leave the suspension order in place as to everything else.

THE COURT:  I guess I don't understand that.  You don't know whether it can be mitigated at all, but you want to stop everything in place now while you decide whether it can be mitigated.  What is the harm in continuing what they are doing?

MR. TORSTENSEN:  I think the idea is primarily that if they get all the way down the line to completing construction and everything becomes operational and there was mitigation measures that could have addressed the concern and then been incorporated into construction, then you lose that opportunity if you don't stop and actually try to engage in the discussion to determine appropriate mitigation measures now.

And BOEM has reflected willingness to continue those conversations with the project operators to determine if there are mitigation measures available.  They don't know if there

are any now, but I don't think that they are crossing their fingers and hoping that there won't be an available mitigation measure.

THE COURT:  I don't understand that reason.  You want to stop everything in place, cost them a million and a half a day while you figure out what you are going to do?

MR. TORSTENSEN:  I think they want to figure out if there is something they can do.  They want to make sure that if they get all the way to the end of construction and it turns out that nothing can be done to mitigate the national security interest that's been identified in the classified materials, then they don't want to have them continue to devote more resources to that in the interim period.  So the idea is try to stop and have that discussion now.

THE COURT:  Go ahead.

MR. TORSTENSEN:  If Your Honor doesn't have any further questions, I don't have more to add.

THE COURT:  All right.  I'll hear from Green Oceans.

MR. MARZULLA:  Good afternoon, Your Honor.  Roger Marzulla appearing on behalf of Green Oceans.

It seems to me that the elephant in the room is the Court's review of the classified materials that have been supplied to you and have not been supplied to the rest of us, at least other than perhaps the Department of Justice.

If, as Revolution Wind would have it, this is all

pretextual, this is all made up, there is no national security issue, and the Court doesn't have anything in the documents that were provided to you that would serve as an administrative record to demonstrate that there is a legitimate national security interest issue here, then, by all means, we would expect the Court to summarily grant this motion for preliminary injunction.

If, on the other hand, there is, in fact, a serious concern about the radar interference with the Falmouth radar surveillance facility, with the Providence radar facility, with the NORAD-operated defense radar facility, then indeed this is a much more close question than counsel would have you think by suggesting, oh, this is just -- this is what she calls the second stop work order.  It's just like the other one, Your Honor, which had different authority, different facts, different everything, and no national defense issues involved.

The company tells you, Your Honor, we have 41 days with the boat out there and 41 days of construction.  It's January 12th.  You have to make a decision today.  They got this notice back on December 22nd, and it took them two weeks to even file this motion.

It is a somewhat manufactured -- if we're going to be casting aspersions upon the motives here of the various parties, we might at least suggest that had the issue been as critical to the project as suggested by Revolution Wind, that

41 days, this is the very last day for you to save this project, then we might have thought that they would have raised the issue a little bit earlier.

The legal authorities here are two.  First of all, there has been no discussion of the Outer Continental Shelf Lands Act, which requires -- says the Secretary of Interior shall ensure for all activities on the outer continental shelf, and one of those things is protection of the national defense.

So unless this is not a protection of the national defense, the secretary has not only the authority but the obligation to ensure that this activity is consistent with the protection of the national defense.

Second, you also have not heard discussion of paragraph 3(c) of the lease itself.  Mind you, this is a letter suspending the lease.  What does paragraph 3(c) say?  It says that the United States reserves the right to suspend the lease for the protection of the national security.  It's a contractual arrangement that Revolution Wind made with the United States.  It is an exercise of a contractual right that the United States reserved.

And you know what, even if this were a breach of the lease, the United States would be liable in a suit for breach of contract to be filed in the Court of Federal Claims, which has jurisdiction over breach of contract cases for money damages.

What is the irreparable injury here?  It's money damages.  In the end, we hear Revolution Wind talking about all of the other factors, about supplying power and so forth, but in the end, their damage is this million dollars a day, their damage is whatever they suffered before, but it is monetary damage.

Is it irreparable if they have conceded that right to the United States in their lease, which they have attached to their amended complaint as Exhibit E?  Is it an irreparable damage if they can recover those monetary losses in a contract suit against the United States?

And by the way, will a suit lie to compel the United States to live up to some contractual requirement?  Does specific performance even lie against the United States?  I think the cases say that it does not.

So in terms of the irreparable injury claims that have been put forward, the monetary irreparable injury claims, they become far less significant in the context of the contractual arrangement that Revolution Wind has entered into and the fact that this December 22nd letter is a lease suspension.

We certainly join the United States in saying -- and I think the cases say this -- that national defense is paramount, and this project, if it goes into operation -- and what I thought I heard, Your Honor, was it's going into operation if you grant this preliminary injunction, in a couple of weeks,

they are going to start revving this up, and that is the source of -- assuming this is the radar interference we're talking about, that is the source of the radar interference, it is these 300-foot long blades spinning at 200 miles an hour that create a wall of radar responses that can both block the possibility of incoming or other objects behind that wall of radar interference and can send messages to the radar operators that are incorrect; that, in fact, show objects that aren't there, hide objects that are there.

And that's the reason -- yes, this foreign company, Orsted, does have significant experience.  They have had their projects canceled in Sweden, in Finland, in Estonia precisely for reasons of radar interference.

And you will note that those are nations that are located either adjacent to or relatively nearby Russia and that have concerns about their national defense, historical as well as present.

So far from this being a situation in which we can airily dismiss the fact that, no doubt, the President and the administration have significant concerns and have expressed even dislike of offshore wind, granted, does that mean that they have no reason under the classified documents that have been provided to the Court that there is nothing in national defense that does need protecting here?

We suggest that ultimately, Your Honor, you have got

that answer, we don't.  But unless it is the case that the government's claims of threats to national security are pretextual, as Revolution Wind would have it, that national defense concern, the protection of our country, resolves the issues of what is the public interest, what is the weighing of the equities in the case, and I suspect would address the likelihood of success as well.

If the Court has no questions, thank you, Your Honor.

THE COURT:  Thank you, Mr. Marzulla.

MR. TORSTENSEN:  If I may have one quick thing.

If Your Honor is inclined to grant the injunction, just wanted to ask that Your Honor would deny the portion of the amended order that was submitted relating to the production of classified materials.  We don't think that that is properly before the Court.

THE COURT:  I agree.  I couldn't do that.  I agree with that.

MR. TORSTENSEN:  We just wanted to put that on the record.  Thank you, Your Honor.

MS. SCHNEIDER:  Thank you, Your Honor.  Just go point by point on a few items for Your Honor's consideration and the record.

With respect to the concern articulated that the suspension order is necessary because we have to try to do something during this construction process and we can't wait

until the project is in operation, I would point Your Honor to the LeBlanc rebuttal declaration submitted with our reply at paragraphs 5 and 6 of that declaration where Mr. LeBlanc states that there are a multitude -- these are quotes:  "A multitude of readily available tried and tested solutions that can be employed to mitigate interference with military defense and national security capabilities.  Orsted has firsthand experience of a range of both land-based and offshore measures."

And then in paragraph 6 he says, "Orsted regularly works with military national security governmental agencies to identify and deploy mitigation or enhancement measures during the offshore facilities design stage.  Orsted also has experience installing and deploying measures at operational offshore wind facilities and those under construction.  Orsted, in partnership with defense contractors Terma and Saab installed and successfully tested supplementary infill radar on Orsted's Hornsea One offshore wind facility, which was already in operation and was the largest offshore wind facility in the world at the time."

So while BOEM says it just doesn't know, there are solutions, to the extent that the information provided to Your Honor has identified a new issue that we're currently unaware of.  That's point number one.

And then turning to the issues raised by intervenor's

counsel, this is not just about money, Your Honor.  This is an existential threat to the very existence of the project.  There is an abundant amount of case law that holds that that is an irreparable harm.

With respect to the canceled wind farms in Sweden and other places, those were all in the planning stage, Your Honor. They were not involving projects that were already 87 percent complete and about to deliver power to the states of Rhode Island and Connecticut.

And then with respect to the timing of our filing, candidly, Your Honor, we wanted to meet with the Department and the government before filing our case.  We had that meeting on December 10th -- excuse me, on December 30th, and then after it was clear that they were not going to be providing the information to us in any reasonable timeframe, we filed immediately thereafter on the 2nd of this year.

And then finally, with respect to the lease provisions that intervenor's counsel pointed you to, when you actually look at that provision, it reserves the right for national security per Section 12 of OCSLA, which is Section 1341(c) and (d), which the government has not invoked here.  1337(p)(4) is not some broad authority that they can use.  They need to use the authorities that Congress provided to them in OCSLA itself, in Section 1341(c) and (d), and perhaps at best 1334.

Thank you, Your Honor.

THE COURT:  All right.

MR. TORSTENSEN:  Your Honor, if I may, one quick response.

I just want to say to the extent that any of the comments were relying on rebuttal declaration, we just wanted to note for the record that those were submitted yesterday, and so we haven't had a chance to respond to those specifically.

THE COURT:  I'll take a short recess.

(Recessed from 3:13 p.m. to 3:49 p.m.)

THE COURT:  The Bureau of Ocean and Energy Management, BOEM, issued a stop -- a new stop work order to Revolution Wind, LLC on December 22, 2025 to, quote, "suspend all ongoing activities related to the Revolution Wind project on the outer continental shelf for the next 90 days for reasons of national security."

During this time, BOEM claimed that it would coordinate with Revolution Wind to determine whether the national security threats posed by the project could be mitigated and reserved the right to extend the suspension at the end of the 90-day period.

In arguing that the project posed a national security threat, BOEM relied on the new classified information provided to the Bureau by the Department of War in November 2025.

BOEM made it publicly known this report included information relating to the rapid evolution of relevant

adversary technologies and the resulting direct impacts to national security from offshore wind projects.

The classified information in question was shared with the Court for ex parte in-camera review, but was not provided in either a classified or redacted format to the plaintiffs or their lawyers.

I have reviewed the classified information and have heard oral arguments from all parties and am now considering motions for preliminary injunction and stay pending review from both Revolution Wind and the State plaintiffs.

Issuance of a stay under the APA is governed by the same four-factor test that governs preliminary injunctions. One, whether the party seeking the stay is likely to succeed on the merits. Two, the likelihood that the moving party will be irreparably harmed absent a stay. Three, the prospect that others will be harmed if the Court grants the stay. And four, the public interest in granting the stay, citing *Hill Dermaceuticals, Incorporated versus FDA*, 524 F. Supp. 2d 5 at 8, DDC 2007. Here, all four factors weigh in favor of granting the motions.

Plaintiffs I find are likely to succeed on the merits. As the basis for the stop work order, the Bureau cited national security concerns based on classified information uncovered as a part of new assessment completed by the Department of War in November of 2025.

These were the same concerns cited in a number of near identical stop work orders issued on the same day to multiple wind projects up and down the East Coast.

The Bureau did not explain anywhere in the December 20 stop work order which features, specifications or activities related to the Revolution Wind project implicated new national security concerns, nor did the Bureau explain how these national security concerns differed from the same ones that the developers of Revolution Wind specifically committed to mitigating in their 2024 agreement with the Department of Defense or the ones which the project was extensively screened out for as part of its multi-year, multi-agency approval process under the Outer Continental Shelf Lands Act.

The Bureau's failure to account for its previous assurances the project does not improperly interfere with national security clearly amounts to a change in position by the government.

As the Supreme Court has stated, an agency action is arbitrary and capricious where it is not reasonable or reasonably explained. *FCC v. Prometheus Radio Project*, 592 U.S. 414 at 423, 2021. Pointing to ongoing national security concerns based on purportedly new classified information does not constitute a sufficient explanation for the Bureau's decision to entirely stop work on the Revolution Wind project.

Although the Department of the Interior did

subsequently issue a press release with additional justification for all of the stop work orders, that action did not solve the issue.

Under *DHS versus Regents of the University of California*, I am limited to considering the specific grounds the Bureau invoked at the time it acted.  591 U.S. 1 at 20, 2022 is the year.  That's because it is foundational -- quote: "It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action."

At the time that the Bureau issued the stop work order, it merely cited national security concerns without further explanation, and without applying the newly discovered concerns to the Revolution Wind project specifically.  The Bureau also admits that it's not sure that its new concerns can be mitigated at all and does not explain why construction cannot continue while it investigates that question further.

Revolution Wind has agreed at every stage of the approval process to work with the government to mitigate national security concerns.  I can see no reason why the project will not continue to do so even when construction is complete.

Because the Bureau failed to provide sufficient reasoning for its change in position, because the Bureau failed to explain why it could not take action short of a complete

stop to construction, the December 22nd stop work order likely amounts to arbitrary and capricious action under the Administrative Procedure Act.

When I stayed the Bureau's first stop work order back in September of 2025, I said that the Bureau's failure to provide any reasoning for its decision was the height of arbitrary and capricious action.  This time the government did provide a reason for its decision, but its failure to explain or apply that reasoning suggests that the stated national security reason may have been pretextual.

My concern is heightened by Interior Secretary Burgum's press appearances on December 22nd and 23rd in which he criticized offshore wind projects for a variety of reasons unrelated to national security.

And while the Bureau may order a suspension of operations for legitimate reasons of national security under the Outer Continental Shelf Lands Act and Revolution Wind's own lease, those suspensions are limited to emergency situations and demonstrated findings of particularized harm that cannot be averted short of a total stop to project activity.

Given that the Bureau became aware of the new classified information in November of 2025 and did not act until December 22, 2025, I'm not persuaded that any such emergency exists in this case, nor have I been provided any evidence of a new finding of particularized harm such that the

government could order an immediate suspension.

Moreover, I am persuaded that plaintiffs will be irreparably harmed absent a stay.  As it stands, the Revolution Wind project is 87 percent complete and many hundreds of workers have stopped work.  At every step, Revolution Wind has relied on approval from Interior and BOEM decisions that are currently being defended in related cases before this Court, meaning that there are strong reliance interests at stake.

Revolution Wind represents that the delays resulting from the stop work order are costing the project $1.44 million a day, but, more importantly, if Revolution Wind cannot meet certain benchmark deadlines, the entire enterprise could collapse, costing Orsted $5 billion of development funds and another $1 billion in breakaway costs.

Of note, a specialized ship necessary to complete the project will be no longer available after February of this year, which means if the stop work order is not stayed, it will be impossible for Revolution Wind to deliver energy under its power purchase agreements by its deadline of early 2027.  If Revolution Wind cannot meet its contractual deadlines, then the States of Rhode Island and Connecticut will have the right to terminate their agreements with the company.

In light of plaintiffs' significant reliance interests and the government's unreasonable and seemingly unjustified change in position, the balance of equities clearly cut in

favor of Revolution Wind continuing work while the government considers ways to mitigate any new national security concerns that the project may implicate.

For these reasons, both Revolution Wind and the State plaintiffs' motions are granted.  The stays and injunction will run only to the December 22nd stop work order.  I'll issue plaintiffs' proposed orders and say "for the reasons stated on the record in open court."

With that, the Court will be in recess.

(Proceedings concluded at 3:59 p.m.)

CERTIFICATE

I, Sonja L. Reeves, Federal Official Court Reporter in and for the United States District Court of the District of Columbia, do hereby certify that the foregoing transcript is a true and accurate transcript from the original stenographic record in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 12th day of January, 2026.


                              /s/ Sonja L. Reeves
                              SONJA L. REEVES, RDR-CRR
                              FEDERAL OFFICIAL COURT REPORTER